FILED
2021 Feb-19  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| CAROL GUY, as representative of the ESTATE OF STEVEN MULLINS, <br><br> Plaintiff, <br><br> v. <br><br> JEFFERSON DUNN; GRANTT CULLIVER; CHARLES DANIELS; JEFFERY WILLIAMS; EDWARD ELLINGTON; CHRISTY VINCENT; KARLA JONES; GWENDOLYN GIVENS; ANTHONY BROOKS; GARY MALONE; KEVIN WHITE; CARLA GRAHAM; ANGELIA GORDY; WILLIAM RAGSDALE; ANTOINE PRICE; NEKETRIS ESTELLE; TANYA ARY; CYNTHIA CAVER; LATONYA SCOTT; and OFFICER WILSON, <br><br> Defendants. | Case No.: _____ <br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Carol Guy, as representative of the Estate of Steven Mullins, by her attorneys with the law firms of Loevy & Loevy and the Dagney Johnson Law Group, files this Complaint against Defendants Jefferson Dunn, Grantt Culliver, Charles Daniels, Jeffery Williams, Edward Ellington, Karla Jones, Gwendolyn Givens, Anthony Brooks, Gary Malone, Kevin White, Carla Graham, Christy Vincent, Angelia Gordy, William Ragsdale, Antoine Price, Neketris Estelle, Tanya Ary, Cynthia Caver, Lieutenant Scott, and Officer Wilson, and states as follows:

## INTRODUCTION

1.      Plaintiff Carol Guy brings this action to redress the tragic and preventable death of her son, Steven Mullins, who was but one victim of an epidemic of violence and complete

breakdown of security at the dangerous St. Clair Correctional Facility ("St. Clair"). Defendants responded with deliberate indifference to both the dangerous conditions at St. Clair and specific, known risks of harm to Mr. Mullins, resulting in his death while in their custody.

2.     In the years leading up to Mr. Mullins's death in 2019, Defendants were aware of the horrific epidemic of violence and proliferation of dangerous contraband weapons at St. Clair.

3.     Defendants turned a blind eye to the breakdown of security at St. Clair. They failed to discipline acts of violence and possession of contraband weapons when they occurred, failed to protect prisoners who reported threats or fears of violence, failed to safely house prisoners by segregating prisoners with a history of violence in custody, and failed to confiscate and control the prolific spread of contraband weapons.

4.     Defendants also knowingly failed to rein in the "hot bay" P/Q blocks at St. Clair, even after having been warned by the Equal Justice Initiative ("EJI") about the danger that those blocks posed to the prisoners at the facility. Defendants knew that those blocks contained a disproportionate number of prisoners with histories of violence who had been responsible for a recent explosion of fatal and near-fatal violent assaults, and they knew these cell blocks were effectively unsupervised and unmonitored. Despite this, Defendants failed to address this known breakdown in security. Thus, prisoners housed in the P/Q blocks were left to move about the prison and perpetrate violence against other prisoners without interference from staff.

5.     Defendants responded with deliberate indifference not only to the widespread security breakdown at St. Clair, but also to a substantial risk of serious harm to Mr. Mullins from prisoner Clarence Jackson, who had a known history of violence, including sexual violence, while in custody and yet was left unsupervised by Defendants and free to assault others.

6.      Soon after Mr. Mullins and Mr. Jackson were placed in general population together, Mr. Jackson physically attacked Mr. Mullins at knifepoint and sexually assaulted him.

7.      When Mr. Mullins reported the attack to Defendants, they failed to confiscate the knife in Mr. Jackson's possession, protect Mr. Mullins from retaliation, or meaningfully separate Mr. Jackson from Mr. Mullins.

8.      Tragically and predictably, soon after Mr. Mullins's report, Mr. Jackson retaliated against, stabbed, and killed Mr. Mullins, resulting in his utterly preventable and tragic death.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Mr. Mullins's rights secured by the U.S. Constitution.

10.      This Court has jurisdiction of the federal claims in this case pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of the state law claim pursuant to 28 U.S.C. § 1367.

11.      Venue is proper under 28 U.S.C. § 1391(b), as the majority of the Defendants reside in this judicial district and the events and omissions giving rise to the claims in this case occurred within this judicial district.

## PARTIES

### Plaintiff

12.      Carol Guy is the mother of Steven Mullins and the court-appointed representative of his Estate.

13.      Mr. Mullins was a prisoner at St. Clair at the time of his death. He was 45 years old when he was brutally and fatally stabbed by another prisoner.

**Defendants**

14.     Plaintiff sues each of the Defendants listed below in his or her individual capacity.

15.     Each of the Defendants listed below acted under color of law and within the scope of his or her employment when engaging in the misconduct described herein.

16.     Each of the Defendants listed below is above the age of majority.

*Defendant Administrative Supervisors*

17.     Defendant Jefferson Dunn is the Commissioner of the Alabama Department of Corrections ("ADOC"). The Commissioner is the highest-ranking official in the ADOC and is responsible for the direction, supervision, and control of the Department of Corrections. Defendant Dunn took over this role in January 2015.

18.     Defendant Grantt Culliver is a former Associate Commissioner for Operations and Institutional Security for the ADOC. Defendant Culliver first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015. He was placed on administrative leave in September 2018 and permitted to retire in December 2018. As Associate Commissioner for Operations and Institutional Security, Defendant Culliver was responsible for ensuring the effective and safe daily operations of prison facilities, including directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

19.     Defendant Charles Daniels is a former Associate Commissioner for Operations and Institutional Security for the ADOC. Defendant Daniels took over the role after Culliver's retirement. As Associate Commissioner for Operations and Institutional Security, Defendant Daniels was responsible for ensuring the effective and safe daily operations of prison facilities,

including directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

20.     Defendant Jeffery Williams is the current Deputy Commissioner of Governmental Relations for the ADOC. During the period between when Culliver went on administrative leave and Daniels took over as Associate Commissioner for Operations and Institutional Security, Williams took over some or all of the responsibilities of Associate Commissioner for Operations and Institutional Security.

21.     Defendant Edward Ellington is the Institutional Coordinator for the Northern Region of the ADOC, a role which he assumed in June 2017. In that role, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, which included St. Clair. His duties included supervising the wardens of St. Clair, ensuring safe conditions at St. Clair, and leading the external security audit team.

22.     Defendant Christy Vincent was the PREA Director for the ADOC up to and during the events described in Plaintiff's Complaint. In that role, Defendant Vincent's responsibilities included directing and managing the ADOC's implementation of PREA requirements and ensuring that all ADOC facilities, including St. Clair, were implementing and complying with PREA requirements. Defendant Vincent was responsible for ensuring that ADOC adequately protected against sexual assault and that incidents of sexual assault were appropriately addressed.

23.     Collectively, Defendants Dunn, Culliver, Daniels, Williams, Ellington, and Vincent are referred to as the "Defendant Administrative Supervisors."

24.     Each of the Defendant Administrative Supervisors acted in a supervisory capacity over other St. Clair employees, at all times relevant to this Complaint. Further, the constitutional

violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the Defendant Administrative Supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by their actions or by their deliberate indifference and failure to act.

*Defendant Facility Supervisors*

25.    Defendant Karla Jones was the Warden at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Warden of St. Clair, Defendant Jones was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at St. Clair, and the supervision of all subordinate employees. Defendant Jones's responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of PREA, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

26.    Defendant Gwendolyn Givens was an Assistant Warden at St. Clair leading up to and during the events described in Plaintiff's Complaint.  As Assistant Warden, Defendant Givens was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees.

27.    Defendant Anthony Brooks was an Assistant Warden at St. Clair Correctional Facility leading up to and during the events described in Plaintiff's Complaint. As Assistant

Warden, Defendant Books was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees.

28.    Defendant Gary Malone was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Malone was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

29.    Defendant Kevin White was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant White was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

30.    Defendant Carla Graham was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Graham was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

31.    Defendant Neketris Estelle was the Head of Classification at St. Clair at the time of the events at issue in Plaintiff's Complaint and first began working in classification at St. Clair in 2009. As the Head of Classification, Defendant Estelle's responsibilities included conducting initial screenings; conducting semi-annual progress reviews for prisoners, attended by the warden or his designee, to review their disciplinary histories and other developments; serving on the Institutional Segregation Review Board along with the Warden and Segregation Captain; serving on the Sexual Incident Review Team; reclassifying prisoners for segregation if their disciplinary history warranted a segregation placement; reclassifying prisoners for general population if they no longer required a segregation placement; notifying security staff of housing assignment

requests; making recommendations that prisoners be transferred to protective custody; and ensuring safe housing assignments for prisoners.

32.    Defendant Angelia Gordy was the Institutional PREA Compliance Manager at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Institutional PREA Compliance Manager, Defendant Gordy was responsible for the implementation of PREA and compliance with its requirements at St. Clair, and for making sure that incidents of sexual assault were appropriately addressed.

33.    Defendant Lieutenant William Ragsdale was the Backup Institutional PREA Compliance Manager at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Backup Institutional PREA Compliance Manager, Defendant Ragsdale was responsible for the implementation of PREA and compliance with its requirements at St. Clair, and for making sure that incidents of sexual assault were appropriately addressed.

34.    Collectively, Defendants Jones, Givens, Brooks, White, Malone, Graham, Gordy, Ragsdale, and Estelle are referred to as the "Defendant Facility Supervisors."

35.    Each of the Defendant Facility Supervisors acted in a supervisory capacity over other St. Clair employees at all times relevant to this Complaint. Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the Defendant Facility Supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by their actions or by their deliberate indifference and failure to act.

36.    Collectively, the Defendant Administrative Supervisors and the Defendant Facility Supervisors are referred to as the "Defendant Supervisors."

*Additional Defendants*

37.    Defendant Antoine Price was a lieutenant at St. Clair leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff.

38.    Defendant Latonya Scott was a lieutenant at St. Clair leading up to and during the events described in Plaintiff's Complaint. She was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff.

39.    Defendant Tanya Ary was a classification officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Her responsibilities included identifying vulnerable prisoners, prisoners with a history of violence, and enemies within the prisoner population and ensuring that all prisoners were assigned to housing units in which they were safe from violence.

40.    Defendant Wilson was an officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at St. Clair and for monitoring and supervising the prisoners.

41.    Defendant Cynthia Caver was the sole cube officer on duty in the L block during the murder of Mr. Mullins by Clarence Jackson. Defendant Caver was responsible for the safety and security of prisoners like Mr. Mullins in L block.

## DEFENDANTS' FAILURE TO PROTECT MR. MULLINS
## FROM A KNOWN AND SUBSTANTIAL RISK OF SERIOUS HARM

### Defendants' Failure to Discipline, Monitor, and Separate
### Mr. Jackson from Vulnerable Prisoners

42.    Clarence Jackson had a known history of perpetrating violence, including sexual violence, at St. Clair at the time of his attack on Mr. Mullins.

43.    Mr. Jackson sexually assaulted a previous cellmate, C.M., repeatedly.

44.    Mr. Jackson also physically assaulted C.M.

45.    C.M. reported the sexual abuse and physical assault to Defendant White.

46.    C.M. asked Defendant White to transfer him.

47.    Defendant White refused to transfer C.M. and forced C.M. to return to his cell despite C.M.'s protests.

48.    C.M. began staying in another cell—where he was not authorized to say—because he was scared to return to his cell with Mr. Jackson.

49.    Defendants failed to adequately discipline Mr. Jackson for assaulting C.M., thereby emboldening Mr. Jackson and encouraging him to continue committing acts of violence against other prisoners at St. Clair.

50.    Despite knowing of Mr. Jackson's history of violence, Defendants did not take adequate steps to separate Mr. Jackson from vulnerable prisoners or otherwise protect other prisoners from violence perpetrated by Mr. Jackson, exposing prisoners like Mr. Mullins to a substantial risk of serious harm.

51.    Instead, Mr. Jackson remained in general population in the P/Q blocks, where he was not adequately monitored and free to commit further acts of violence without interference.

**The Fatal Stabbing of Mr. Mullins**

52.     While incarcerated in the custody of the Alabama Department of Corrections, Mr. Mullins was repeatedly identified as a prisoner facing heightened risks to his safety and security.

53.     In March 2018, Mr. Mullins was transferred to St. Clair.

54.     In or around July 2018, Mr. Mullins was placed in segregation at St. Clair because he was afraid for his life.

55.     Mr. Mullins remained in segregation for more than six months.

56.     Mr. Mullins was released from segregation in February 2019 by Defendant Scott, despite the fact that his safety was at serious risk in general population housing.

57.     Defendants were aware of the risk that Mr. Mullins faced in population.

58.     Mr. Mullins was assigned to Q block, one of the most violent housing units at St. Clair, despite the fact that he was known to face heightened security risks.

59.     In Q block, Mr. Mullins shared a cell with Mr. Jackson, despite the fact that Defendants knew Mr. Mullins was an especially vulnerable prisoner and Mr. Jackson had a known history of violence against other prisoners.

60.     Once in Q block, Mr. Mullins was sexually assaulted by Mr. Jackson.

61.     Mr. Mullins communicated to his cellmate that this misconduct was unwelcome and told his roommate to stop the sexual abuse, but due to the complete lack of prisoner discipline at St. Clair, Mr. Jackson faced no pressure to do so.

62.     On or about February 25, the situation escalated. Mr. Jackson physically attacked Mr. Mullins, hitting him in the head and eye, causing injuries.

63.     Mr. Jackson also threatened Mr. Mullins with a knife and refused to let him get up from his bed, even to go to the bathroom.

64.    Mr. Mullins ran from the cell and immediately reported to Defendant Ragsdale the physical assault and sexual abuse, as well as the threats he had suffered at knifepoint from Mr. Jackson.

65.    Mr. Mullins next reported to Defendant Givens the physical assault and sexual abuse, as well as the threats he had suffered at knifepoint from Mr. Jackson.

66.    Nonetheless, Defendant Givens and Ragsdale took no action to confiscate Mr. Jackson's knife, discipline him for the conduct, or segregate him from vulnerable prisoners in general population such as Mr. Mullins.

67.    Mr. Mullins requested that Defendants Givens and Ragsdale place him in safe housing because he was afraid of Mr. Jackson, but they refused to do so.

68.    Instead, Defendant Givens ordered staff to take Mr. Mullins back to Q block.

69.    Mr. Mullins tried to refuse to return to Q block, but Defendant Wilson and other officers forced him to return.

70.    Mr. Mullins next reported the physical assault, sexual abuse, and threats at knifepoint to Defendants Price and Brooks.

71.    Defendants Price and Books took no action to confiscate Mr. Jackson's knife, discipline him for the conduct, or segregate him from other prisoners.

72.    Mr. Mullins reported the threats and abuse using the PREA hotline but was not placed in protective custody or segregation and instead was kept in general population, this time in the L block, where he remained accessible to his abuser, who was not moved.

73.    Defendants left Mr. Jackson in general population where he had access to Mr. Mullins, even though Mr. Jackson was known to be armed with a knife and even though

Defendants could have instead confiscated his weapon and placed him in segregation to keep him from assaulting Mr. Mullins and others.

74.     By leaving both Mr. Mullins and Mr. Jackson in general population, the Defendants failed to separate the two individuals, despite the known risk that Mr. Jackson presented to Mr. Mullins.

75.     On or about February 26, 2019, as Mr. Mullins was preparing to leave L block to go to chow, he was attacked by Mr. Jackson and two other prisoners.

76.     Mr. Jackson stabbed Mr. Mullins multiple times.

77.     Defendant Caver was the only officer present in the cell block and she was assigned to the L block cubicle.

78.     Defendant Caver witnessed the attack, but did not leave the cubicle or otherwise intervene.

79.     No other officers intervened to stop Mr. Jackson's attack on Mr. Mullins.

80.     Mr. Jackson was not authorized to be in L block at the time of the attack. He and his accomplices had come from the P/Q blocks to attack Mr. Mullins.

81.     Neither Defendant Caver nor any other officers took action to secure L block or otherwise prevent unauthorized prisoners like Mr. Jackson and his two accomplices from entering the L block.

82.     Neither Defendant Caver nor any other officers stopped Mr. Jackson and his accomplices from leaving the P/Q blocks and entering the L block.

83.     Mr. Jackson carried out the attack in retaliation for Mr. Mullins reporting the sexual assault.

84.     After the attack, Mr. Jackson and the two other prisoners involved ran back to the P/Q blocks.

85.     No officers, including Defendant Caver, stopped Mr. Jackson or the other assailants from returning to the P/Q blocks.

86.     Neither Defendant Caver nor any other officers acted to facilitate the provision of emergency care to Mr. Mullins for approximately twenty to thirty minutes following the attack.

87.     As a result, Mr. Mullins was deprived of timely and critically important emergency care, and he suffered extreme pain, agony, and fear.

88.     As set forth in more detail below, Defendants were aware of an enduring and widespread crisis of violence at St. Clair. The deadly attack that Mr. Mullins suffered was a direct and foreseeable result of Defendants' inaction in the face of this violence, including a longstanding failure to discipline and segregate perpetrators of violence; to respond to fears and threats of violence; to confiscate and control the possession of contraband weapons; to monitor and control the movement of prisoners in the P/Q blocks and prevent them from harming other prisoners at the facility; to identify and address instances of sexual assault and prevent retaliation against prisoners who reported sexual abuse; and to otherwise stem the tide of violence at St. Clair.

**The Security Crisis at St. Clair**

89.     Well before the fatal stabbing of Mr. Mullins at St. Clair on or about February 26, 2019, the Defendants were all on notice of a complete breakdown of security at St. Clair that put prisoners such as Mr. Mullins at risk. In particular, Defendants were aware of the endemic nature of prison assaults and stabbings, particularly perpetrated by unsupervised prisoners in the "hot bay" P/Q blocks.  In addition to receiving repeated and unequivocal notice of the substantial risk of serious harm facing prisoners such as Mr. Mullins at St. Clair, Defendants were made aware of

specific steps that they could take to reduce the violence. Nonetheless, Defendants failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as Mr. Mullins at St. Clair.

90.     In 2018, the year prior to Mr. Mullins's death, St. Clair had the highest per capita prisoner-on-prisoner homicide rate of all of the men's prisons in Alabama, which, in turn, had the highest prisoner-on-prisoner homicide rate in the nation for a state prison system.

91.     Defendants had long been on notice of the risks posed by high levels of violence at the facility.

92.     The violence at St. Clair increased sharply beginning in 2010.

93.     In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

94.     The number of reported assaults has grown at an astonishing rate: to 59 in fiscal year 2011; 78 in fiscal year 2012; 101 in fiscal year 2013; 127 in fiscal year 2014; 157 in fiscal year 2015; 249 in fiscal year 2016; 132 in fiscal year 2017; and 163 in fiscal year 2018.

95.     The rate of reported assaults at St. Clair in the years leading up to Mr. Mullins's death far exceeded typical levels of violence at comparable facilities across the nation, even without taking into account that the reported assaults grossly underestimated the violence at St. Clair because so many assaults went undocumented.

96.     Listed below in paragraphs 98 to 142 are but some examples of the staggering number of brutal assaults at St. Clair in the two years preceding Mr. Mullins's brutal murder:

97.     In February 2017, a prisoner was stabbed 9 times by three men who came into his cell and attacked him.

98.     In March 2017, a prisoner was sexually assaulted and later found by officers having been beaten and tied to a chair.

99.    That same month, at least four other prisoners were stabbed.

100.    In April 2017, two men were hospitalized with stab wounds after a knife fight.

101.    That same month, another stabbing occurred that left a prisoner in a coma.

102.    In May 2017, a large violent incident occurred in which 15 prisoners were stabbed.

103.    That same month, a prisoner suffered a broken jaw when he was assaulted by another prisoner who used a lock placed in a sock as a weapon.

104.    In July 2017, a prisoner at St. Clair was found dead by staff with his hands tied to a bedpost, with clear strangulation marks on his neck.

105.    That same month:

a.    Another prisoner was killed, a second was stabbed in the neck, and a third was stabbed in his sleep;

b.    A prisoner told officers that he was unsafe in Q block and was being extorted, prompting staff to order him to return to Q block, where he was held hostage, sexually assaulted, and stabbed;

c.    A violent incident in Q-block resulted in the stabbing of 4 prisoners;

d.    A knife fight occurred in P-block and officers witnessed the fight but did nothing to intervene; and,

e.    The same prisoner stabbed at least 5 people, in 3 separate incidents.

106.    In August 2017, a prisoner was stabbed in his own cell after confronting another prisoner about stealing his property.

107.    That same month:

a.    A prisoner was stabbed near the cubicle in block P-2 by a prisoner who was intoxicated on crystal methamphetamine;

b. A prisoner was stabbed 13 times in block P-1 shortly after being released from segregation; and,

c. Another prisoner was stabbed in block P-1.

108. In September 2017, a prisoner was found under his bed in block Q-2 with multiple stab wounds.

109. That same month:

a. A prisoner at St. Clair was sexually assaulted;

b. A prisoner was stabbed by a known enemy, in a fight that lasted for over 20 minutes before anyone intervened;

c. Four prisoners were involved in a fight with box cutters and knives; and,

d. A knife fight in G-Yard involved at least 6 prisoners.

110. In October 2017, a prisoner was sexually assaulted in the P/Q barbershop after he had passed out, and another prisoner was sexually assaulted in the Q block at knifepoint.

111. That same month:

a. A prisoner took another prisoner hostage in his cell and assaulted him over a period of two days;

b. A prisoner was sexually assaulted in the H dorm;

c. Officers observed a prisoner walk onto the yard wearing only a blanket and socks, after he had been severely beaten and burned on his face;

d. A prisoner was stabbed in his sleep in segregation when the cube officer left the cubicle with the door open;

e. Three additional prisoners were stabbed in two separate incidents; and,

     f.   Another prisoner slit a prisoner's throat in the O block after improperly gaining access to the housing unit.

112.    In November 2017, a prisoner was held hostage and sexually assaulted over three days by four prisoners in Q block. The prisoner had recently been released from segregation.

113.    That same month:

     a.   Another prisoner was sexually assaulted at knifepoint;

     b.   A prisoner stabbed another prisoner who was being escorted by two correctional officers, and then was allowed to escape without recovery of the knife;

     c.   A prisoner stabbed another prisoner who was trying to sexually assault him; and,

     d.   Two prisoners fought with large machete-type knives in the chow hall and then out onto the G-yard, while three officers watched but did not intervene.

114.    In December 2017, two prisoners were sexually assaulted, one at knifepoint.

115.    That same month:

     a.   A prisoner was stabbed 16 times in front of the P/Q blocks.

     b.   A prisoner was stabbed in his back, knees, and legs while helping another prisoner move his belongings into Q block.

     c.   A prisoner was stabbed 12 times in the arm, side, and back in H-dorm, in view of an officer who was nearby but did not intervene;

     d.   Another prisoner was robbed and assaulted in the N/O blocks;

     e.   Another prisoner was stabbed four times; and,

     f.   A transgender prisoner was assaulted by a prisoner wielding a metal pole.

116.    In January 2018, a prisoner was sexually assaulted at knifepoint in O block. The assailant had previously been reported as the assailant in a number of sexual assaults at St. Clair.

117.    That same month, a prisoner was stabbed repeatedly in his cell in O block by prisoners carrying out a robbery.

118.    Starting in January 2018 and lasting through June 2018, a prisoner was repeatedly sexually assaulted by a group of individuals who said he owed them a debt. The sexual assaults occurred on a near daily basis, and officers were aware of the situation but did nothing to intervene.

119.    In February 2018, a prisoner was stabbed repeatedly in Q block.

120.    That same month:

    a.    Another prisoner was killed in a knife fight at St. Clair by a prisoner with an extensive history of being disciplined for possession of knives;

    b.    A prisoner was stabbed in the back of the head near the P/Q blocks right after being released from segregation;

    c.    Another prisoner was stabbed in the P/Q blocks;

    d.    A prisoner at St. Clair was repeatedly physically and sexually assaulted over the course of several days by his cell mate, who was also extorting him;

    e.    A handcuffed prisoner was stabbed in segregation when another prisoner escaped from his own handcuffs; and,

    f.    Another prisoner was stabbed in the G dorm.

121.    In March 2018, a prisoner was stabbed in the P/Q blocks while the prison was on lockdown, and the knife was still embedded in his body when he emerged from the blocks.

122.    That same month:

    a.    A prisoner was sexually assaulted multiple times during his first month at St. Clair;

    b.    A prisoner was stabbed in the chest at the doorway to Q block;

    c.    A prisoner was stabbed in the leg during an attempted robbery in the gym; and.

d.  At least five other stabbing incidents occurred.

123.    In April 2018, a prisoner was kidnapped and sexually assaulted in Q block.

124.    That same month:

a.  A knife fight in P block resulted in a prisoner being stabbed 13 times, including in the chest and head;

b.  A prisoner was threatened with sexual assault by two men armed with knives, and was able to escape from them only by cutting his wrists with a razor blade so that he could report what happened to a mental health officer; and,

c.  A prisoner was stabbed in front of the gym by a prisoner who had recently been released from segregation.

125.    In May 2018, a prisoner was held hostage by four other prisoners who sexually assaulted him. During the two days, officers did not enter the cell and simply asked how many men were inside when they conducted counts. The victim did not press charges after an investigator told him reporting would put his life in danger and promised that he would be transferred if he did not report.

126.    That same month:

a.  A prisoner was stabbed in his sleep in his cell in Q block;

b.  A prisoner was sexually assaulted at knifepoint by another prisoner;

c.  A prisoner was stabbed and beaten outside the doorway to the L/M blocks;

d.  Another prisoner was stabbed 7 times in the G yard;

e.  Another prisoner was stabbed in front of officers on his way to a GED class; and,

f.  Another prisoner was held in a cell and beaten with a wooden paddle.

127.    Also in May 2018, a prisoner was stabbed by a group of prisoners outside the entry to Q block. The apparent motive for the attack was that the assailants had seen a document suggesting that the prisoner had provided staff with information related to a prior stabbing.

128.    In June 2018, a prisoner was sexually assaulted in P block. When he reported the sexual assault to Defendant Jones, she told him that she did not care.

129.    In July 2018, three prisoners physically assaulted and attempted to sexually assault another prisoner who returned to P block following a prior sexual assault. The group of prisoners locked him in a cell and beat him with a belt buckle.

130.    That same month:

   a.   A prisoner was stabbed by his cellmate and several other prisoners because he refused to move out of his cell in P block;

   b.   A prisoner was stabbed in his sleep in his cell in Q block;

   c.   Another prisoner was stabbed in Q block;

   d.   Yet another prisoner was stabbed in his cell in Q block after confronting other prisoners about taking his belongings;

   e.   A prisoner taped knives to both his hands and repeatedly stabbed yet another prisoner in Q block;

   f.   Another prisoner was stabbed in the P/Q hallway;

   g.   Another prisoner was stabbed on the porch of the P/Q blocks;

   h.   A robbery resulted in the stabbing of another prisoner, who passed out from blood loss; and,

     i.    A prisoner slit the throat of another prisoner with a razor in the common area of A block in an attack that was witnessed by a correctional officer who did not intervene.

131.    In August 2018, a prisoner was sexually assaulted within a week of his arrival at St. Clair.

132.    That same month:

    a.    A prisoner was stabbed over 20 times by a group of prisoners in the P/Q hallway in August 2018, in front of a cubicle officer who observed the incident but did not intervene;

    b.    A prisoner was stabbed over 10 times in the Q block in relation to a debt;

    c.    A prisoner was given a drink laced with a substance that caused him to lose consciousness; stabbed by several prisoners in the P-2 dayroom while he was unconscious; and left there for about 30 minutes while other prisoners tried to get help from officers who refused to intervene;

    d.    A prisoner was stabbed through the tray hole in his cell in B block by a prisoner who was working as a segregation runner; and,

    e.    At least six other separate incidents occurred in which prisoners were stabbed.

133.    In September 2018, a prisoner was stabbed to death at St. Clair. The prisoner had previously been stabbed at St. Clair in July 2017.

134.    That same month:

    a.    A prisoner was stabbed in his bed in H dorm by an intoxicated prisoner, who was then attacked and stabbed by another group of prisoners; and,

    b.   A prisoner was stabbed in the stomach and the leg, and forced to attempt to sew up the lacerations himself, which eventually became infected.

135.    In October 2018, a prisoner was stabbed by several men in a cell in Q block.

136.    That same month:

    a.   A prisoner was sexually assaulted in P block at knifepoint; and,

    b.   A prisoner was stabbed in the throat while in segregation.

137.    In November 2018, a prisoner was stabbed in the P/Q blocks by an intoxicated prisoner who was acting erratically before the assault.

138.    That same month, another prisoner was stabbed in the H dorm.

139.    In December 2018, a prisoner was stabbed and killed by another prisoner in an altercation that took place in part in the P/Q blocks.

140.    That same month, a robbery resulted in a prisoner being stabbed in Q block.

141.    Also in December 2018, a group of prisoners assaulted and threatened to stab a prisoner who had just been released from restricted housing. Because the prisoner would not identify his attackers, he was written up by staff for creating a safety and security hazard.

142.    In January 2019, a prisoner was stabbed in the neck in Q block by three prisoners that were trying to steal his phone.

143.    The level of violence by prisoners at St. Clair—particularly, perpetrated by prisoners in the "hot bay" P/Q blocks—far exceeded levels of violence in comparable prisons across the nation.

**Defendants' Failure to Act Despite**
**Notice of the Substantial Risk of Serious Harm to Mr. Mullins**

144.    Defendants had knowledge of the substantial risk of serious harm facing prisoners such as Mr. Mullins at St. Clair, including from unsupervised and armed prisoners in the "hot bay"

P/Q blocks, based on incident reports for the above-identified assaults, as well as reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, and/or prisoner lawsuits.

145.    ADOC's publicly available reports in the timeframe leading up to the murder of Mr. Mullins at St. Clair also reflected that injuries, deaths, and fighting were a systemic problem at St. Clair.

146.    Nonetheless, the Defendant Supervisors failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as Mr. Mullins at St. Clair.

147.    In 2014, a security audit of St. Clair was conducted. Defendant Culliver later admitted that, to his knowledge, no corrective action plan of any kind was developed in response to the audit.

148.    In October 2014, following an alarming number of violent attacks and murders at St. Clair, the Equal Justice Initiative filed a class action lawsuit on behalf of St. Clair prisoners seeking injunctive relief to reduce the violence at St. Clair. *See* Exh. A, *Cheatham* Complaint.

149.    The *Cheatham* Complaint also described the policies and practices fueling the outbreak of violence at St. Clair, including inadequate supervision and monitoring of the facility, failure to address the widespread proliferation of contraband weapons at the facility, creation of a dangerous culture of violence and abuse, and failure to respond appropriately to violence, including sexual assault.

150.    Each of the Defendant Supervisors were put on notice of the *Cheatham* litigation and deficiencies identified therein long before the fatal stabbing of Mr. Mullins.  For example,

Defendant Malone were each named as Defendants in the *Cheatham* Complaint at the time it was filed and served with the *Cheatham* Complaint. Defendant Dunn received notice of the allegations in the *Cheatham* Complaint and became a defendant in the action when he took over as ADOC Commissioner in January 2015.

151.    In the aftermath of the *Cheatham* lawsuit, the Defendant Supervisors again failed to take reasonable, necessary, and appropriate steps to remedy the dangerous conditions at St. Clair.

152.    The violence at St. Clair continued to escalate.

153.    In October 2016, the United States Department of Justice ("DOJ") opened an investigation into whether the conditions in Alabama's prisons for men violated the Eighth Amendment of the U.S. Constitution.  The DOJ investigation included inquiries into whether ADOC adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners and provides prisoners with safe living conditions.

154.    The Defendant Supervisors received notice of the DOJ investigation.

155.    Nonetheless, the Defendant Supervisors failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair.

156.    The *Cheatham* case settled in November 2017, with the ADOC agreeing to implement an internal classification system to protect prisoners and staff by identifying risks and needs, rather than randomly assigning people to beds; create an incident management system that would allow the prison to prevent, track, and respond to violent incidents; replace faulty locks and install surveillance cameras; and create a transitional unit for prisoners released from segregation, among other things. *See* Equal Justice Initiative, *Alabama Department of Corrections Agrees to*

*Reforms at St. Clair Prison in Response to EJI Lawsuit* (Nov. 8, 2017), available at https://eji.org/news/alabama-settles-eji-lawsuit-on-st-clair-prison/.

157.    The Defendant Supervisors were on notice of the settlement agreement in *Cheatham* and their obligation and responsibility to comply with the agreement, as well as the importance of the corrective measures contained therein to ensuring the safety of prisoners at St. Clair like Mr. Mullins.

158.    However, the Defendant Supervisors failed to take meaningful corrective actions to comply with the settlement agreement and reduce the substantial risk of serious harm facing prisoners at St. Clair.

159.    In June 2018, EJI notified Defendant Administrative Supervisors, including Defendant Dunn, that ADOC had failed to implement the necessary reforms and comply with the settlement agreement.

160.    At the time of Mr. Mullins's fatal stabbing at St. Clair, the unconstitutional policies and practices identified in the *Cheatham* litigation continued at St. Clair despite the *Cheatham* litigation and settlement.

161.    In a letter dated September 6, 2018, five-and-a-half months before the February 2019 murder of Mr. Mullins at St. Clair, EJI notified Defendant Dunn of a "concerning increase in serious incidents of violence" at St. Clair.

162.    EJI warned in its letter specifically about the dangers of St. Clair's "'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack programming opportunities and any regular security staff presence"; that "hot bay" dorms like Q block "ha[ve] been a source of violence, substance abuse, extortion, assaults, and uncontrolled movement contributing to an increased risk of harm at

the prison"; and that "the last two homicides [of Travis Wilson and Terry Pettiway] are a manifestation of the safety problems this kind of management technique creates."

163.    EJI also warned Defendant Dunn in its letter that "weapons contraband continues to saturate the prison and continues to contribute to serious incidents of violence at St. Clair," and that "contraband searches continue to be sporadic and ineffectual."

164.    EJI further noted in its letter: "Nationally recognized experts who have reviewed operations at St. Clair have recommended specific, detailed steps that are necessary to the detection and elimination of contraband at the facility," including "to completely lock-down the facility 'for several days' and 'conduct a thorough unannounced shake down of all areas including living areas and administrative or program areas before releasing inmates,'" as the "first step in creating a 'sterile' environment," to be followed by a "'regular, routine and effective practice of searching the prison.'"

165.    However, Defendant Supervisors including Defendant Dunn failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair following receipt of EJI's letter.

166.    The violence at St. Clair continued unabated.

167.    Prisoners filed individual complaints alleging assaults, including sexual assaults, at knifepoint at St. Clair. These complaints detailed the dangerous conditions at St. Clair; the prevalence of stabbings, sexual abuse, and violence; and the failures of staff to address these problems, including inadequate supervision, monitoring, and contraband searches at the prison. Some examples include: Complaint, Dkt. 1, *McGregor v. Thomas, et al.*, Case 4:17-cv-00593 (N.D. Ala. Apr. 12, 2017); Amended Complaint, Dkt. 11, *Miller v. Dunn, et al.*, Case 4:17-cv-00180 (N.D. Ala. Mar. 28, 2017); and Complaint, Dkt. 1, *Townsel v. Thomas, et al.*, Case 4:17-

cv-00516 (N.D. Ala. Mar. 31, 2017). Defendants including Defendants Dunn, Culliver, Malone, Estelle, Gordy, and Ary were named as Defendants in these lawsuits, served with the lawsuits, and provided with notice of the allegations therein, in which they were accused of having failed to protect prisoners from assaults at knifepoint at St. Clair in 2014 and 2015. Defendants Dunn, Malone, Ary, Gordy, and Estelle were deposed in the lawsuits, and confronted with evidence of systematic failures at St. Clair to protect prisoners from prisoner-on-prisoner beatings and stabbings. Defendant Dunn's deposition occurred in November 2018, just three months before Mr. Mullin's fatal stabbing.

168.    Nonetheless, the Defendant Supervisors did not take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as Mr. Mullins at St. Clair.

169.    Following its investigation beginning in 2016, the DOJ issued extensive Notice Letters to the ADOC in April 2019 and July 2020 outlining the ADOC's failures relating to the protection of prisoners.

170.    The April 2019 Notice Letter, for example, notified the Defendant Supervisors that ADOC was violating the Eighth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse and failing to provide safe conditions to prisoners.

171.    The April 2019 Notice Letter went on to conclude that the constitutional "violations are severe, systematic, and exacerbated by serious deficiencies" including those in "ineffective housing and classification protocols"; "inadequate incident reporting"; "inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons"; "ineffective prison management and training"; and "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." And further, the DOJ apprised Defendants of the frequency with

which prisoners are "found in unauthorized areas" and that "an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."

172.    The violence at St. Clair has continued unabated, and the DOJ filed a lawsuit on December 9, 2020.

173.    Despite having notice of the substantial risk of serious harm facing prisoners at St. Clair in the time leading up to Mr. Mullins's murder at St. Clair, the Defendants failed to take reasonable steps to address and reduce the risk of violence to prisoners such as Mr. Mullins at St. Clair.

**Defendants' Failure to Address Threats or Incidents of Violence
and Separate Vulnerable Prisoners from Those Likely to Commit Violence**

174.    In the period leading up to Mr. Mullins's murder at St. Clair, Defendant Supervisors had an unreasonable and longstanding policy and practice of failing to protect prisoners from known threats to their safety, including by failing to discipline prisoners for acts of violence and possession of contraband, failing to identify and separate prisoners with a known history of violence or contraband possession from potential victims, and failing to adequately respond to reports from prisoners that they feared for their safety.

175.    Defendants Supervisors maintained these policies and practices even though they knew that the failure to adequately respond to reports of safety concerns from prisoners and to identify, discipline and safely segregate predatory prisoners had contributed to violent incidents in the past, including those identified above.

176.    In the time period leading up to Mr. Mullins's murder at St. Clair, ADOC staff, including Defendants, failed to properly investigate and discipline acts of violence and possession of contraband weapons by prisoners at St. Clair, emboldening violent prisoners such as Mr. Jackson and encouraging a culture of violence.

29

177.    Defendants Supervisors, including Defendant Givens, failed to create an established grievance system, limiting prisoners' ability to report threats of violence.

178.    ADOC staff, including Defendants, routinely discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

179.    ADOC staff, including Defendants, routinely retaliated against prisoners who reported violence and threats of violence by subjecting such prisoners to discipline in conjunction with the prisoners' reports of violence and threats of violence.

180.    In many cases, prisoners were subjected to discipline for refusing to name the individuals who they feared might harm them.

181.    This retaliation had the effect of deterring prisoners from reporting violence and threats of violence.

182.    Defendant Supervisors were aware of these failures to properly investigate and respond to reports of violence and threats of violence.

183.    Defendants Supervisors were aware that the failure to create an established grievance system and the response of ADOC staff to reports of violence or threats of violence encouraged a culture of violence and impunity at St. Clair and put prisoners like Mr. Mullins at risk of serious harm.

184.    Despite this, Defendant Supervisors failed to take adequate steps to ensure that acts of violence and threats of violence were reported and properly disciplined.

185.    In addition, Defendant Supervisors and Defendant Ary, through their acts and omissions, failed to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should have been kept separate.

186.    For example, Mr. Jackson has a history of committing acts of violence against other prisoners at St. Clair, but was housed within the general population, where he shared a cell with Mr. Mullins, a prisoner who Defendants knew was especially vulnerable.

187.    And when Mr. Mullins reported to Defendants that he was sexually and physically assaulted and threatened at knifepoint by Mr. Jackson, his requested transfer to segregation (or, more appropriately, protective custody), was refused.

188.    Defendants similarly failed to place Mr. Mullins's attacker, Mr. Jackson, in segregation, to discipline Mr. Jackson, or otherwise to ensure that Mr. Mullins was safely housed so as to prevent violent incidents like the stabbing that resulted in his death.

189.    These Defendants acted with deliberate indifference and their misconduct placed prisoners such as Mr. Mullins at substantial risk of serious harm and caused his injuries.

### Defendants' Failure to Address the Widespread Proliferation of Contraband Weapons at St. Clair

190.    The Defendant Supervisors, including Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent, Jones, Givens, Brooks, Malone, White, Graham, Gordy, and Ragsdale, through their acts and omissions, permitted contraband weapons to proliferate at St. Clair and failed to effectively control the introduction, manufacture, and use of contraband weapons by prisoners at St. Clair, exhibiting deliberate indifference to the substantial risk of serious harm that such weapons created to prisoners such as Mr. Mullins.

191.    As set forth above, both the widespread availability of weapons at St. Clair and the resulting stabbings and other violent incidents at St. Clair were brought to the attention of the Defendants through, for example, incident reports, the *Cheatham* lawsuit, EJI's letter from September 6, 2018, and individual prisoner lawsuits.

192.    The widespread proliferation of contraband weapons within St. Clair contributed to the high rate of violence and death and created a substantial risk of serious harm to prisoners such as Mr. Mullins.

193.    By the time of Mr. Mullins's brutal death, it was a matter of common knowledge among St. Clair staff that the prisoner population at St. Clair was heavily armed.

194.    Prisoners believed they needed to arm themselves at St. Clair for protection because of the endemic violence at the facility.

195.    Stab wounds were seen on a weekly, if not daily, basis.

196.    Large machete-type knives have been reported at St. Clair.

197.    At least one knife found at St. Clair was over 2 feet long.

198.    In the words of St. Clair Correctional Officer Jonathan Truitt, a single 24-person cell block at St. Clair could contain "30 to 40" contraband knives; contraband was "out of control"; and prisoners were being "being assaulted in every way imaginable." Cam Ward, *Alabama Correctional Officer Numbers Down 20%*, Montgomery Advertiser (Jan. 8, 2017), available at http://www.camward.com/alabama_correctional_officer_numbers_down_20.

199.    Staff at St. Clair frequently responded with deliberate indifference when prisoners were observed with contraband weapons and failed to discipline prisoners found with contraband weapons.

200.    The failure to discipline prisoners in possession of contraband weapons created a dangerous culture whereby prisoners knew they could possess such weapons with impunity and felt emboldened to use such weapons without fear of incurring any disciplinary action.

201.    As set forth above, knives, box cutters, and other contraband weapons were commonly used in assaults at St. Clair.

202.    Despite this, the Defendant Supervisors permitted contraband weapons to proliferate at St. Clair and took no meaningful action to curtail the widespread availability of contraband weapons at St. Clair, exhibiting deliberate indifference to prisoners such as Mr. Mullins who were likely to be victimized by such weapons.

203.    In the months leading up to the fatal stabbing of Mr. Mullins, contraband searches continued to be ineffective and sporadic.

204.    Defendant Culliver has admitted that the contraband search protocols at St. Clair were inadequate.

205.    As of February 2019, the Defendant Supervisors had made no meaningful changes to increase and improve contraband searches at St. Clair.

206.    As of February 2019, the Defendant Supervisors had made no effort to provide meaningful discipline for prisoners found with contraband weapons at St. Clair.

207.    When Mr. Mullins reported that Mr. Jackson had threatened him at knifepoint, Defendants took not steps to confiscate the contraband weapon or discipline Mr. Jackson, consistent with their policy of inaction in the face of widespread possession and use of contraband weapons at St. Clair.

208.    These Defendants acted with deliberate indifference and their misconduct placed prisoners such as Mr. Mullins at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Provide Adequate Supervision and Monitoring**

209.    The Defendant Supervisors, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within St. Clair to prevent violence.

210.    Most of the time a single cube officer was the only officer monitoring an entire housing block.

211.    The cube officers generally did not leave their cubicles.

212.    Oftentimes, the cube officers had not even undergone basic correctional officer training.

213.    The officers in the cubes were, at times, absent, asleep, on the telephone, or otherwise not paying attention to the prisoners they were charged with monitoring.

214.    Random patrols of the blocks by additional officers occurred extremely infrequently.

215.    The housing blocks also lacked adequate surveillance cameras to monitor the housing units.

216.    Blind spots on the housing blocks, in concert with inadequate staff presence, officer inattentiveness, and the lack of surveillance equipment, created a further substantial risk of serious harm to prisoners such as Mr. Mullins and had contributed to numerous violent incidents in the years leading up to the sexual and physical assault of Mr. Mullins.

217.    Due to lax supervision, security staff at St. Clair sometimes watched violent or troubling incidents unfold without intervening.

218.    Due to lax supervision, security staff at St. Clair often failed to observe violent incidents and only discovered the victim after the violence and/or injuries had occurred.

219.    Due to lax supervision, security staff at St. Clair failed to control the movement of prisoners between housing units, increasing the risk and frequency of violent incidents.

220.    Further, due to lax supervision, security staff at St. Clair often failed to timely respond to prisoners who had been seriously injured in violent incidents, causing critical delays in the treatment of serious injuries.

221.    For example, in September 2018, Terry Pettiway was stabbed in or near the P/Q blocks. Because ADOC staff failed to timely respond and facilitate the provision of emergency medical aid, other prisoners had to carry Mr. Pettiway to the infirmary on a garbage cart.

222.    Similarly, on or about December 29, 2018, Terrence Andrews was stabbed by his cellmate in the P block. Only a single cubicle officer was present in P block, and other prisoners again attempted to carry Mr. Andrews to the infirmary on a garbage cart because ADOC staff failed to timely respond and facilitate the provision of emergency medical care.

223.    When Mr. Mullins was stabbed in L block, only Defendant Caver was present. Defendant Caver and other ADOC employees and agents failed to timely respond and facilitate the timely provision of emergency medical care to Mr. Mullins, despite his clear need.

224.    The Defendant Supervisors were aware that the inadequate supervision and monitoring of prisoners at St. Clair created a substantial risk of serious harm that facilitated and encouraged sexual abuse and assaults such as that suffered by Mr. Mullins.

225.    The Defendant Supervisors were similarly aware that a lack of supervision and monitoring in the housing blocks created a substantial risk in the event of an emergency, caused significant delays in the provision of emergency medical care to prisoners, and otherwise prevented prisoners from accessing necessary medical care in the event of an emergency or other urgent need.

226.    Despite this, the Defendant Supervisors including Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent, Jones, Givens, Brooks, Malone, White, Graham Gordy, and Ragsdale, failed to improve supervision, monitoring, and control of movement at St. Clair.

227.    These Defendants acted with deliberate indifference and their misconduct placed prisoners such as Mr. Mullins at substantial risk of serious harm and caused his assault and death.

**Defendants' Creation of a Serious Threat of Violence Through the Use of
Unsupervised "Hot Bay" Housing Blocks**

228.    The Defendants Supervisors had a policy and practice of housing prisoners with
histories of violence and disciplinary issues at St. Clair in the P/Q blocks without adequate
supervision and monitoring.

229.    At the time that Mr. Mullins was sexually assaulted by his cellmate in the Q block
at St. Clair in February 2019, the P/Q blocks at St. Clair had long been a source of staggering levels
of prisoner-on-prisoner violence.

230.    Despite this, the supervision in this area was virtually non-existent.

231.    Defendant Supervisors were aware of this problem.

232.    The P/Q blocks were generally left unsecured, so that prisoners could roam freely
and without supervision or interference in and out of the blocks and throughout the prison.

233.    For example, Mr. Mullins's attackers moved freely in and out of P/Q blocks in
order to carry out the attack against him in L block.

234.    The Defendant Supervisors were aware of the high levels of violence perpetrated
by prisoners in the P/Q blocks and high proportion of prisoners housed there with disciplinary
problems and histories of violence while in ADOC custody.

235.    In the months leading up to Mr. Mullins's murder, at least three men—Terry
Pettiway, Rogarius Bray, and Terrence Andrews—were killed by individuals living or present in
the P/Q blocks at St. Clair.

236.    The Defendant Supervisors were similarly aware that prisoners were permitted to
move freely between the housing blocks, including to and from the P/Q blocks, and that prisoners
were frequently found in areas where they were not authorized to be.

237.   The Defendant Supervisors were also aware of the substantial risk of violence this unrestricted and unsupervised movement posed to prisoners at St. Clair.

238.   In addition, the Defendant Supervisors knew that a lack of programming opportunities in the P/Q blocks left prisoners there idle and that idleness, along with inadequate supervision and monitoring, increased the likelihood of violence committed by prisoners housed in those blocks.

239.   The Defendant Supervisors acted with deliberate indifference and their misconduct placed prisoners such as Mr. Mullins at substantial risk of serious harm and caused his assault and death.

### Defendants' Failure to Adequately Prevent, Detect, and Respond to Prior Instances of Sexual Abuse at St. Clair

240.   The Defendant Supervisors also failed, through their acts and omissions, to protect prisoners at St. Clair such as Mr. Mullins from sexual violence.

241.   The Defendant Supervisors, through their acts and omissions, allowed for high levels of prisoner-on-prisoner sexual abuse to occur at St. Clair without taking reasonable measures to keep prisoners such as Mr. Mullins safe from such abuse.

242.   At the time of both Mr. Mullins's sexual assault and fatal attack, the Defendants, including Defendants Vincent, Gordy, Jones, Givens, Brooks, Ragsdale, Estelle, and Ary, were aware of the high rate of incidents of sexual violence at St. Clair, including the sexual assaults at St. Clair identified above, which all took place between February 2017 and January 2019.

243.   The Defendant Supervisors were also aware that numerous sexual assaults at St. Clair had gone unreported.

244.   The Defendant Supervisors and Defendant Ary likewise knew when Mr. Mullins was sexually assaulted and fatally attacked that St. Clair's policies and procedures, including

inadequate supervision and monitoring in dangerous housing units, the proliferation of weapons contraband, the failure to protect vulnerable prisoners from enemies and predatory prisoners, the failure to discipline instances of prisoner misconduct, and the creation and encouragement of a culture of violence and abuse, all created a substantial risk of serious harm from sexual violence to vulnerable prisoners.

245.   EJI's *Cheatham* lawsuit and individual lawsuits further put the Defendant Supervisors on notice of the prevalence of prisoner-on-prisoner sexual violence at St. Clair, as well as the inadequacies of the policies and practices at St. Clair related to the detection, prevention, and response to incidents of sexual violence.

246.   The Defendant Supervisors were also well aware of their obligations to address sexual abuse at St. Clair to reduce the substantial risk of serious harm to prisoners such as Mr. Mullins.

247.   In 2003, Congress passed the Prison Rape Elimination Act of 2003, cautioning that authorities who do not take the basic steps to prevent sexual violence in prisons demonstrate deliberate indifference to prisoners' constitutional rights. 42 U.S.C. § 15601(13).

248.   PREA, in turn, established a body known as the National Prison Rape Elimination Commission ("NPREC") to investigate sexual violence in prisons. NPREC's 2009 report found that: "Sexual abuse is not an inevitable feature of incarceration. Leadership matters because corrections administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse." National Prison Rape Elimination Commission Report, June 2009, at 5 (available at https://www.ncjrs.gov/pdffiles1/226680.pdf). The NPREC report, too, issued findings on the importance of proper classification, supervision, staffing, and responses to complaints of sexual assault. *Id.* at 5-8.

249.    PREA also resulted in the 2011 promulgation of the National PREA Standards, which imposed requirements on correctional facilities in such areas as supervision and monitoring, screening for risk of victimization and abusiveness, proper official responses following an inmate report of sexual assault, and disciplinary sanctions for perpetrators. *See* 28 C.F.R. § 115.11 - 115.18 (standards for adult prisons and jails).

250.    As the Defendant Supervisors were aware, PREA, the PREA National Standards, and ADOC's 2014 PREA policy required Defendants to fulfill their obligation to protect prisoners in ADOC custody from sexual assault.

251.    Nonetheless, the Defendant Supervisors were deliberately indifferent to the substantial risk of serious harm that sexual violence posed to prisoners such as Mr. Mullins.

252.    The Defendant Supervisors continued and maintained general policies and practices that heightened the risk of sexual assault, including inadequate supervision, deficient security, inadequate search procedures to eliminate weapons contraband, failure to safely house prisoners who express fear, and encouragement of violence.

253.    The Defendant Supervisors also fostered a longstanding and unreasonable policy and practice pursuant to which St. Clair staff failed to identify and segregate known or likely perpetrators of sexual violence to ensure the safety of other prisoners at St. Clair.

254.    The Defendant Supervisors failed to adequately and effectively segregate predatory prisoners even though they knew that the failure to do so had contributed to violence in the past.

255.    For example, Defendants knew that Mr. Jackson had a history of sexually assaulting prisoners, including C.M., but failed to safely house him away from vulnerable prisoners like Mr. Mullins.

256.    The Defendant Supervisors likewise did not protect victims from retaliation, including by providing sight and sound separation between the victims and their assailants and by protecting victims from gang associates of their assailants.

257.    For those prisoners courageous enough to report sexual assault at St. Clair, retaliation frequently followed from their assailants or associates of their assailants, and the Defendant Supervisors took no meaningful steps to prevent or address this retaliation.

258.    For example, Clarence Jackson carried out his brutal attack on Mr. Mullins in retaliation for Mr. Mullins reporting the sexual assault and previous physical attack by Mr. Jackson.

259.    Furthermore, the Defendant Supervisors engaged in a longstanding practice of placing prisoners who report sexual abuse in isolation cells in segregation, which discouraged prisoner reports of sexual abuse, and, in turn, increased the risk of sexual assault and undermined the ability of staff to detect and prevent sexual abuse.

260.    Furthermore, when prisoners reported sexual assaults, the Defendant Supervisors such as Defendant Jones failed to ensure that thorough investigations were completed of those sexual assault complaints, victims were notified of the results of investigations, and perpetrators were disciplined.

261.    The failure of the Defendant Supervisors to properly prevent or respond to incidents of sexual abuse emboldened perpetrators and heightened the risk of sexual violence to prisoners such as Mr. Mullins.

262.    Despite the prevalence of sexual assault at St. Clair prior to the sexual assault and fatal attack of Mr. Mullins, and their knowledge of the same, the Defendant Supervisors failed to

implement any corrective action to reduce the substantial risk of serious harm to prisoners such as Mr. Mullins, exhibiting deliberate indifference to their safety.

263.    These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as Mr. Mullins at substantial risk of serious harm and caused his injuries.

### Defendants' Creation of a Culture of Abuse at St. Clair

264.    Defendants including Defendants Culliver, Daniels, Williams, Ellington, Vincent, Jones, Givens, Brooks, Malone, White, Graham, Gordy, Ragsdale, Price, and Scott also fueled a culture of abuse at St. Clair by tolerating and condoning excessive uses of force by staff members, and in the case of Defendant Malone, engaging in excessive force and abusive tactics himself.

265.    These Defendants' acts and omissions created a culture of abuse at St. Clair in which staff perpetrated excessive force against prisoners with impunity.

266.    The failure to discipline officers for excessive force and other misconduct signaled to the correctional officers at St. Clair that they could abuse, or fail to protect, prisoners without fear of any adverse consequences.

267.    Defendants' conduct created a dangerous culture of violence and abuse at St. Clair, which, in turn, heightened the risk of prisoner-on-prisoner assaults.

268.    The Defendant Supervisors were on notice of the culture of abuse through internal sources including use-of-force reports, incident reports, duty officer reports, and medical reports.

269.    For example:

a.    In March 2017, Officer Howard and other officers assaulted a prisoner with severe mental health issues after he told them he thought his skin was falling off. The officers sprayed the prisoner with mace, beat him with handcuffs, and left him in his cell for three days rather than taking him to the infirmary. He was subsequently

rushed to the hospital because his esophagus closed up. Defendant Malone was present during the assault.

b. In June 2017, a prisoner was sprayed with a large volume of mace in his cell at the direction of Defendant Malone after officers discovered a broken window in his cell. He was left alone in the cell with mace for approximately one hour despite having asthma.

c. In August 2017, guards assaulted an 84-year-old prisoner who was confined to a wheelchair. He had to be taken to an outside hospital due to the severity of his injuries.

d. In November 2017, an officer slapped a prisoner without provocation in front of a large group of officers and incarcerated men before a meeting of the segregation board. The officer had previously been encouraged by other officers to "slap [prisoners] upside the head" whenever they "talk crazy."

e. In November 2017, a handcuffed prisoner was beaten by officers in the segregation yard.

f. In December 2017, Officers McMillian and McLemore assaulted a handcuffed prisoner in D block. The prisoner had requested to be taken to a suicide cell, and the officers punched him in the face, head, and body for multiple minutes.

g. In January 2018, Sergeant Weaver and other officers assaulted a prisoner after he reported fearing for his life and requesting to be placed in segregation. Sgt. Weaver and the officers dragged the prisoner by his feet from the shift office, struck him in the head, and sprayed him with mace. Officer Walker witnessed the event and did nothing to intervene.

h.  In March 2018, Sgt. McLemore and others handcuffed a prisoner in the infirmary, sprayed him with a large volume of Sabre Red chemical agent so that he could not see clearly, and then proceeded to punch and kick his entire body for over 10 minutes, using particular violence against his head, face, and testicles. The prisoner has experienced ongoing injuries, including difficulty with his vision.

i.  Also in March 2018, a prisoner was assaulted by Officer Chapman at a meeting of the segregation board. The prisoner reportedly made a statement about an officer during his segregation board hearing, and Officer Chapman interjected that he was lying and slammed him forcefully into the doorframe while other officers watched. The prisoner's nose was broken in the incident, and he was then disciplined for failure to obey a direct order for leaving the place prisoners are forced to stand during their segregation board hearings.

j.  In May 2018, a prisoner was assaulted by officers after he cut his wrists in segregation, where he had been placed after suffering a sexual assault several days earlier. He was struck in the face while handcuffed by Sgt. Dent and then had his head slammed into a brick wall by Officer Jones.

k.  Also in May 2018, Sgt. Dent assaulted a prisoner in B block, breaking his jaw.

l.  In August 2018, Sgt. Dent, Officer Kendrick, and Officer McMillian assaulted a prisoner in B block after he asked to be moved from the top tier to the lower tier.

m.  In September 2018, a prisoner made a comment that an officer interpreted as disrespectful, so the officer tried to have his cell assignment changed so he would be next to a prisoner who had previously stabbed him. When the prisoner refused

to go, Defendant Malone sprayed him with Sabre Red chemical agent and wrote a false report that the prisoner had threatened to kill an officer and charged at him.

n.  In October 2018, Sgt. Dent, Officer Burns, and Officer Kendrick attacked a prisoner who had been beating on his cell door trying to get help after smoking a cigarette that had been laced with methamphetamine without his knowledge. The officer sprayed him with mace, picked him up by the handcuffs and ankle cuffs, scraped him on the concrete, and beat on him while he was on the ground. He was taken to an outside hospital for treatment.

o.  In December 2018, Sgt. Dent sprayed a prisoner in the face with mace and then forced the prisoner to go outside with his hands and feet shackled, while it was sleeting and the prisoner was wearing only boxer shorts.

p.  In early January 2019, Sgt. McLemore sprayed a prisoner in B block, left him for more than 30 minutes without decontaminating him, then told him to cuff up forcing him to remove the splint he wore for carpal tunnel syndrome. As the prisoner walked out of the cell in cuffs, Sgt. McLemore jumped him from behind, busting his head open and injuring his arm. Defendant Malone had Sgt. McLemore take photos of the prisoner after the assault. The prisoner was then written up for disorderly conduct and disobeying a direct order.

270.  The Defendant Supervisors were also on notice of the culture of abuse at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, prisoner lawsuits, and media coverage.

271.    In addition, the Defendant Supervisors were on notice of this culture of abuse through EJI's *Cheatham* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse at St. Clair and the resulting risks to prisoners.

272.    Because this culture of abuse was tolerated, if not condoned, and staff could cause harm to prisoners seemingly with impunity, staff often failed to prevent harm to prisoners like Mr. Mullins.

273.    Nonetheless, the Defendant Supervisors took no meaningful action to disrupt the culture of abuse and impunity at St. Clair. The Defendant Supervisors acted with deliberate indifference and their misconduct placed prisoners like Mr. Mullins at substantial risk of serious harm and caused his injuries.

## DAMAGES

274.    As a result of the Defendants' wrongful actions, Mr. Mullins was sexually assaulted, physically attacked, threatened, and brutally murdered. In the days before his death, he suffered stress, fear, and desperation. In the moments before his death, he suffered immense physical and emotional pain and terror.

## CLAIMS

### Count I - 42 U.S.C § 1983
### Eighth Amendment Failure to Protect

275.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

276.    Pursuant to the Eighth Amendment of the United States Constitution, Mr. Mullins was entitled to be free from a substantial risk of serious harm while in the custody of the State.

277.    Defendants, acting individually and in conspiracy with other Defendants, failed to protect Mr. Mullins.

278.    Defendants knew of and consciously disregarded the substantial risk that Mr. Mullins would be seriously harmed while in custody, failing to protect him from harm.

279.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Mullins, and was objectively unreasonable.

280.    Defendants' misconduct directly and proximately caused Mr. Mullins to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

**Count II - 42 U.S.C § 1983**
**Eighth and Fourteenth Amendments State-Created Danger**

281.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

282.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Mr. Mullins was entitled to be free from a known and substantial risk of serious harm while in the custody of the State, including from a State-created danger.

283.    Defendants limited Mr. Mullins's ability to care for himself in prison.

284.    Defendants affirmatively placed Mr. Mullins in a position of danger he would not have otherwise faced.

285.    In violation of Mr. Mullins's Eighth and Fourteenth Amendment rights, Defendants knew of and consciously disregarded the substantial risk that Mr. Mullins would be seriously harmed while in custody, including from a State-created danger.

286.    Defendants, acting individually and in conspiracy with other Defendants, then failed to take reasonable steps to address the known and substantial risk of serious harm to Mr. Mullins, including from a State-created danger.

287.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Mullins, and was objectively unreasonable.

288.    Defendants' misconduct directly and proximately caused Mr. Mullins to be subjected to a substantial risk of serious harm, and caused him to suffer horrific physical and emotional injuries and death.

### Count III - 42 U.S.C § 1983
### Eighth and Fourteenth Amendments Denial of Adequate Medical Care

289.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

290.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Mr. Mullins was entitled to adequate medical care while in the custody of the state.

291.    Mr. Mullins had a serious medical need as a result of his assault by Clarence Jackson that posed a substantial risk of serious harm, including death, to Mr. Mullins.

292.    This medical need and the substantial risk posed by a failure to provide timely medical care were obvious.

293.    Defendants, acting individually and in conspiracy with other Defendants, failed to provide Mr. Mullins with access to timely and necessary medical care in response to his serious medical need.

294.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Mullins, and was objectively unreasonable.

295.    Defendants' misconduct directly and proximately caused Mr. Mullins to be subjected to a substantial risk of serious harm, and caused him to suffer horrific physical and emotional injuries and death.

### Count IV - 42 U.S.C § 1983
### First, Eighth, and Fourteenth Amendments Unlawful Retaliation

296.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

297.    As set forth in more detail above, Defendants, individually and in conspiracy, violated Plaintiff's First, Eighth, and Fourteenth Amendments rights by subjecting Mr. Mullins to retaliation for exercising his constitutional right to report a personal grievance to prison authorities.

298.    Defendants subjected Mr. Mullins to exposure to his enemies to retaliate against him for reporting his sexual assault.

299.    Defendants' retaliatory misconduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

300.    A causal connection existed between Defendants' retaliatory actions and the Plaintiff's protected speech and acts.

301.    As a direct and proximate result of Defendants' retaliatory actions, Mr. Mullins suffered damages, including extreme emotional pain and suffering.

### Count V - 42 U.S.C § 1983
### Civil Conspiracy

302.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

303.    As described more fully in the preceding paragraphs, the Defendants and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

304.    The Defendants and other co-conspirators not yet known to Plaintiff reached an agreement among themselves to deprive Mr. Mullins of his right to be free from unreasonable harm and to receive adequate medical care, to retaliate against him for exercising his constitutional rights, and to fail to intervene to prevent harm from occurring to Mr. Mullins, in violation of his constitutional rights, in the manner described above.

305.     In furtherance of this conspiracy, and as set forth in the Complaint above, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

306.     As a direct and proximate result of the illicit agreement referenced above, Mr. Mullins's rights were violated and he suffered physical and emotional injuries and death.

### Count VI - 42 U.S.C § 1983
### Failure to Intervene

307.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

308.     One or more Defendants knew that Mr. Mullins's rights were being violated, and had the realistic opportunity to intervene to prevent or stop the constitutional misconduct alleged above, but failed to do so.

309.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Mullins's constitutional rights.

310.     As a result of the Defendants' failure to intervene, Mr. Mullins's constitutional rights were violated and he suffered physical and emotional injuries and death.

### Count VII – State Law
### Wrongful Act or Omission Resulting in Death
### Ala. Code § 6-5-410

311.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

312.     Defendants had a duty of care to Mr. Mullins.

313.     Defendants breached that duty of care.

314.     In doing so, Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

315.     Defendants' breach of their duty of care to Mr. Mullins directly and proximately caused Mr. Mullins to suffer damages, including physical and emotional pain and suffering and death.

316.    Mr. Mullins would have been able to bring a claim for Defendants' misconduct had that misconduct not resulted in his death.

WHEREFORE, Plaintiff Carol Guy, as representative of the Estate of Steven Mullins, respectfully requests that this Court enter a judgment in Plaintiff's favor and against all Defendants, awarding compensatory damages, punitive damages, and attorneys' fees and costs against each Defendant, jointly and severally, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**CAROL GUY as representative of the ESTATE OF STEVEN MULLINS**

BY: /s/ Megan Pierce
*One of Plaintiff's Attorneys*

BY: /s/ Anil Mujumdar
*Local Counsel*

*Ruth Z. Brown (pro hac vice application forthcoming)
Megan Pierce (pro hac vice application forthcoming)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
E: ruth@loevy.com, megan@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-L65M)
Dagney Johnson Law Group
2170 Highland Avenue, Suite 250

Birmingham, AL 35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com