FILED

2023 Sep-29  PM 09:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **CAROL GUY, as representative of the estate of STEVEN MULLINS,** ] ] ] | |
| **Plaintiff,** ] ] | |
| **v.** ] ] | **Case No.: 4:21-cv-00264-ACA** |
| **JEFFERSON DUNN, et al.,** ] ] | |
| **Defendants.** ] | |

## <u>MEMORANDUM OPINION</u>

Clarence Jackson and Steven Mullins were cellmates at St. Clair Correctional Facility. While cellmates, Mr. Jackson sexually assaulted Mr. Mullins on at least one occasion and both physically attacked and threatened him with a knife on another. Mr. Mullins did not report the incident of sexual assault but immediately reported the attack and threat with a knife to two different assistant wardens, the backup complaint manager under the Prison Rape Elimination Act ("PREA"), 34 U.S.C. § 30301 *et seq.*, and a lieutenant, all of whom failed to confiscate Mr. Jackson's knife and refused Mr. Mullins's request for safe housing.

Mr. Mullins contacted the PREA hotline later that same day and was transferred to another cell block. But the block and cellmate change provided him

1

only a short respite. The next day, Mr. Jackson and two other prisoners entered Mr. Mullins's new cell block, located him, and Mr. Jackson stabbed him to death.

Carol Guy is Mr. Mullins's mother and the representative of his estate. In that capacity, she filed suit against multiple parties, all of whom serve or served either as Alabama Department of Corrections ("ADOC") officials or St. Clair Correctional Facility supervisors and officers at the time of Mr. Mullins's death. Currently before the court are Defendants' motions to dismiss Ms. Guy's claims. (Docs. 42, 45).

After reviewing the briefing on the motions to dismiss, the court held a hearing relating to Counts One and Two. (Doc. 58). The court thereafter ordered additional briefing by all parties on Defendants' motions to dismiss Counts Three, Four, Five, Six, and Eight. (Doc. 60). Based on the parties' extensive briefing and oral arguments, the court **WILL GRANT IN PART** and **DENY IN PART** the motions to dismiss.

## I.   BACKGROUND

### 1.  The Parties

Ms. Guy alleges that Defendants were deliberately indifferent to Mr. Mullins's Eighth Amendment rights by failing to protect him while in custody, failing to intervene while Mr. Jackson stabbed Mr. Mullins, and denying him adequate medical care. Ms. Guy also alleges that Defendants breached the duty of care they owed to Mr. Mullins under state law, which directly and proximately

2

caused his death. Each defendant maintains that he or she is immune from damages arising from any violations of Mr. Mullins's Eighth Amendment rights and/or breach of the duty of care owed to Mr. Mullins.

The amended complaint makes its claims against the following Defendants: (1) former ADOC Commissioner Jefferson Dunn; (2) former ADOC Associate Commissioner for Operations and Institutional Security Grant Culliver; (3) former ADOC Associate Commissioner for Operations and Institutional Security Charles Daniels; (4) ADOC Deputy Commissioner of Governmental Relations Jeffery Williams; (5) ADOC Institutional Coordinator for the Northern Region Edward Ellington; (6) former ADOC PREA Director Christy Vincent; (7) former St. Clair Warden Karla Jones; (8) former St. Clair Assistant Warden Gwendolyn Givens; (9) former St. Clair Assistant Warden Anthony Brooks; (10) former St. Clair Captain Gary Malone; (11) former St. Clair Captain Kevin White; (12) former St. Clair Captain Carla Graham; (13) former St. Clair Head of Classification Neketris Estelle; (14) former St. Clair Institutional PREA Compliance Manager Angelia Gordy; (15) former St. Clair Backup Institutional PREA Compliance Manager Lieutenant William Ragsdale; (16) former St. Clair lieutenant Antoine Price; (17) former St. Clair Lieutenant Latonya Scott; (18) former St. Clair classification officer Tanya Ary; (19) former St. Clair Officer Wilson; and (20) St. Clair cube officer Cynthia Caver. Each defendant is sued in his or her individual capacity.

For ease of reference, the court collectively refers to Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent, and Jones as "Administrative Supervisors" and Defendants Jones, Givens, Brooks, Malone, White, Graham, Estelle, Gordy, Ragsdale, Price, and Scott as "Facility Supervisors." When referring to Defendants of both groups collectively, the court will identify them as "Defendant Supervisors." The court refers to Officers Caver, Ary, and Wilson individually.

### 2.  Procedural History

Ms. Guy filed her original, shotgun complaint on February 19, 2021. (Doc. 1). On the court's order, Ms. Guy later timely filed an amended (and now operative) complaint. (Doc. 40). Defendants move to dismiss the amended complaint on the grounds that it remained a shotgun pleading and that they were entitled to qualified immunity. (Docs. 42, 45). The Administrative Defendants also move to dismiss by asserting a state-agent immunity defense. After full briefing, the court conducted a hearing on the motions and for reasons stated on the record allowed the parties to supplement their briefs. (*See* doc. 58).

### 3.  The Claims

Ms. Guy's sixty-seven page amended complaint makes federal claims and is brought pursuant to 42 U.S.C. § 1983. The amended complaint also alleges that Defendants are liable for Mr. Mullins's death under Alabama's Wrongful Death Statute, Alabama Code § 6-5-410.

The federal claims are:

(1)  Defendant Supervisors failed to protect Mr. Mullins from a known risk of inmate-on-inmate violence ("Count One");

(2)  Assistant Warden Givens, Assistant Warden Brooks, Ms. Gordy, Lt. Ragsdale, Lt. Price, Lt. Scott, Captain White, Ms. Ary, Officer Wilson, and Officer Caver failed to protect Mr. Mullins from a specific risk of inmate-on-inmate violence ("Count Two");

(3)  Defendant Supervisors are liable for state-created danger ("Count Three");

(4)  Commissioner Dunn, Associate Commissioner Culliver, Associate Commissioner Daniels, Deputy Commissioner Williams, Mr. Ellington, Warden Jones, Assistant Warden Givens, Assistant Warden Brooks, Captain White, Captain Malone, Captain Graham, Lt. Ragsdale, Lt. Price, and Lt. Scott denied Mr. Mullins adequate medical care ("Count Four");

(5)  Officer Caver denied Mr. Mullins adequate medical care ("Count Five");

(6)  Assistant Warden Givens, Lt. Ragsdale, Lt. Price, Assistant Warden Brooks, and Officer Wilson unlawfully retaliated against Mr. Mullins ("Count Six")

(7)  Commissioner Dunn, Associate Commissioner Culliver, Associate Commissioner Daniels, Deputy Commissioner Williams, Mr. Ellington, Warden Jones, Assistant Warden Givens, Assistant Warden Brooks, Captain White, Captain Malone, Captain Graham, Ms. Gordy, Head of Classification Estelle, Lt. Ragsdale, Lt. Price, Lt. Scott, Ms. Ary, Officer Wilson, and Officer Caver engaged in civil conspiracy ("Count Seven"); and

(8)  Warden Jones, Assistant Warden Givens, Assistant Warden Brooks, Ms. Gordy, Lt. Price, Lt. Ragsdale, Officer Wilson, and Officer Caver failed to intervene ("Count Eight").

Under state law, Ms. Guy brings two separate wrongful death claims; one against Defendant Supervisors ("Count Nine"); and the other against Assistant Warden Givens, Assistant Warden Brooks, Lt. Ragsdale, Lt. Price, Lt. Scott,

Ms. Gordy, Captain White, Ms. Ary, Officer Wilson, and Officer Caver ("Count Ten"). (Doc. 40 at 50–65).

For the reasons explained below, the court **WILL GRANT IN PART** and **DENY IN PART** the motions to dismiss.

### 4.  The Facts

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1043 (11th Cir. 2019).

#### a.  Mr. Mullins's Death

While in the custody of ADOC, Mr. Mullins was "repeatedly identified as a prisoner facing heightened risks to his safety and security" and an "especially vulnerable prisoner." (Doc. 40 at 11 ¶ 48; *id.* at 12 ¶ 55). In March 2018, ADOC transferred Mr. Mullins to St. Clair. (*Id.* at 11 ¶ 49). Four months later, Facility Supervisors placed Mr. Mullins in segregated housing because of his fear of grave danger from the other prisoners. (*Id*. at 11 ¶ 50; *see also* 11 ¶ 48). Mr. Mullins remained in segregated housing for seven months until February 2019, when Lt. Scott released Mr. Mullins to the prison's general population over Mr. Mullins's objection. (*Id*. at 11 ¶ 52).

After his release, an unidentified official assigned Mr. Mullins to the Q Block, a part of the "Hot Bay," a unit in the prison where prisoners with behavioral problems were housed. (Doc. 40 at 28 ¶ 158). It is one of the most violent blocks at St. Clair prison. (*Id*. at 12 ¶ 54). Despite knowing Mr. Mullins was an especially vulnerable prisoner, the Facility Supervisors and Officer Ary placed Mr. Mullins in a cell with Clarence Jackson, a dangerous inmate. (*Id*. at 10 ¶ 38, 12 ¶ 55). Soon after Mr. Mullins's arrival, Mr. Jackson sexually assaulted him. (*Id.* at 12 ¶¶ 56–57). Mr. Mullins asked Mr. Jackson to stop but Mr. Jackson knew he would not face discipline by prison officials and so he did not stop. (*Id*. at 11 ¶ 51).

On February 25, 2019, Mr. Jackson physically attacked Mr. Mullins, causing injuries to his head and eye. (Doc. 40 at 12 ¶ 58). After the physical attack Mr. Jackson threatened Mr. Mullins with a knife and refused to let him leave his bed in their shared cell. (*Id*. at 12 ¶ 59). Mr. Mullins managed to escape and immediately reported the incident to various prison officials. (*Id.* at 12–13 ¶¶ 60–68).

Mr. Mullins first reported the incident to Lt. Ragsdale, the St. Clair official responsible for, among other things, making sure incidents of sexual assault were appropriately addressed. (*Id*. at 8 ¶ 31, 12 ¶ 60). Next, he reported the assault, sexual abuse, and threats to Assistant Warden Givens, who was responsible for safety of the prisoners. (Doc. 40 at 12 ¶ 61). Neither Lt. Ragsdale nor Assistant Warden Givens took action to confiscate Mr. Jackson's knife, segregate him from

Mr. Mullins, or discipline him for his misconduct. (*Id.* at 13 ¶ 62). Despite knowing that prisoners like Mr. Jackson frequently retaliated against victims who reported their sexual assaults and notwithstanding Mr. Mullins's request to be moved to safe housing, Assistant Warden Givens ordered staff to take Mr. Mullins back to the Q block. (*Id.* at 13 ¶ 63, 44 ¶ 253). When Mr. Mullins tried to refuse to return to Q block, Officer Wilson "and others" forced him to return. (*Id.* at 13 ¶ 65).

Mr. Mullins next reported Mr. Jackson's actions to Lt. Price and Assistant Warden Brooks. (Doc. 40 at 13 ¶ 66). Each of these defendants was responsible for Mr. Mullins's safety and security (*id.* at 6 ¶ 25, 8–9 ¶ 32), but neither Price nor Brooks took action to confiscate Mr. Jackson's knife, segregate him from Mr. Mullins, or discipline him for his misconduct (*id.* at 13 ¶ 67). At this point, Mr. Mullins turned to the PREA hotline to report Mr. Jackson's violent conduct. (*Id.* at 13 ¶ 68). In response to his PREA complaint, officials transferred Mr. Mullins from the Q block to the L block. (Doc. 40 at 13 ¶ 68).

The transfer to the L block provided only some level of protection for Mr. Mullins because security staff at St. Clair failed to secure prisoners housed in the Hot Bay to prevent them from harming prisoners elsewhere in the facility. (*Id.* at 14 ¶ 78, 15 ¶ 84, 39 ¶ 228). Consequently, Hot Bay prisoners freely roamed the prison without supervision. (*Id.* at 39 ¶ 228). And because Mr. Mullins remained in the general population, he remained accessible to Mr. Jackson. (*Id.* at 13 ¶ 68).

The day after Mr. Mullins transferred to the L block, Mr. Jackson and two other prisoners went there looking for him. (*See* doc. 40 at 14 ¶ 76). Mr. Jackson located Mr. Mullins and stabbed him in retaliation for reporting Jackson to prison officials. (*Id.* at 14 ¶ 79). Officer Caver witnessed the attack but did not stop Mr. Jackson from either coming or going into the L block or attacking Mr. Mullins. (*Id.* at 14 ¶¶ 74, 77–78, 15 ¶¶ 81–82). Officer Caver also failed to provide or attempt to provide Mr. Mullins with emergency care for twenty to thirty minutes after the attack. (*Id.* at 15 ¶ 82).

Mr. Mullins died because of the injuries he sustained from Mr. Jackson's attack. (Doc. 40 at 3 ¶ 8).

### b. *The Conditions at St. Clair*

In 2018, the year before Mr. Mullins's murder, St. Clair had the highest per capita homicide rate among all Alabama men's prisons and Alabama had the highest homicide rate of all the men's prisons in the nation. (*Id.* at 16 ¶ 86). Over a three-year period ending in 2018, the average number of inmate-on-inmate assaults at St. Clair—a recurring and significant problem since 2010—was 181 assaults per year. (*Id.* at 16 ¶¶ 88–90).

The most common acts of violence at St. Clair were stabbings. From February 2017 to February 2019, almost one hundred inmate-on-inmate stabbings took place there. (*Id.* at 16–24 ¶¶ 93–139). Prisoners were stabbed in their own cells (doc. 40 at

16 ¶ 93, 18 ¶ 104, 20 ¶¶ 113, 22 ¶ 117, 22 ¶ 126(d)), in their sleep (*id.* at 17 ¶ 101(a), 18 ¶ 107(d), 21 ¶ 122(a), 22 ¶ 126(b)), in segregation (*id.* at 18 ¶ 107(d), 20 ¶ 116(e), 24 ¶ 132(b)), after being released from segregation (*id.* at 18 ¶ 103(b), 20 ¶ 116(b)), while the prison was on lockdown (doc. 40 at 20 ¶ 117), during large violent incidents (*id.* at 17 ¶¶ 98, 101(c)), in the gym (*id.* at 21 ¶¶ 118(c), 120(c)), in the yard (*id.* at 21 ¶ 122(d)), on the way to a GED class (doc. 40 at 21 ¶ 122(e)), and after being given a substance that caused unconsciousness (*id.* at 23 ¶ 128(c)).

The violence was particularly prevalent in the Hot Bay where prisoners with disciplinary issues were housed. (*Id.* at 39 ¶ 224). Of the inmate-on-inmate incidents described in the complaint, seventy-seven appear to have taken place in the Hot Bay; forty-two of those involved knives. But some assaults occurred outside the Hot Bay. The complaint identifies three assaults in the G block (*id.* at 18 ¶ 105(d), 20 ¶ 116(f), 21 ¶ 122(d)); three in the H block (doc. 40 at 18 ¶ 107(b), 23 ¶ 130(a), 24 ¶ 134); four in the O block (*id.* at 19 ¶¶ 107(f), 111(d), 20 ¶¶ 112–13); three in segregation (*id.* at 18 ¶ 107(d), 20 ¶ 116(e), 24 ¶ 132(b)); and single incidents in the A block (*id.* at 23 ¶ 126(i)), B block (doc. 40 at 23 ¶ 128(d)), and outside the door to the L/M blocks (*id.* at 21 ¶ 122(c))). The complaint does not identify the location of the other incidents.

Despite these conditions, Defendant Supervisors did not (1) discipline prisoners for acts of violence and possession of contraband (*id.* at 11 ¶ 45, 13 ¶ 62,

17 ¶ 101(d), 18 ¶ 103(a), 19 ¶¶ 109(b), 109(d), 20 ¶ 114, 22 ¶ 124, 31 ¶ 172, 35 ¶¶ 197–98, 36 ¶ 203); (2) identify and separate prisoners with a known history of violence or contraband possession from potential victims (*id.* at 11 ¶ 46, 13 ¶ 63, 18 ¶ 107(c), 19 ¶ 108, 20 ¶ 112, 27 ¶¶ 152, 154–56, 39 ¶ 228); (3) adequately respond to reports from prisoners who feared for their safety (doc. 40 at 11 ¶ 43, 17 ¶ 101(b)); and (4) train and discipline subordinates whose known misconduct contributed to these policies and practices (*id.* at 38 ¶ 222, 46–49 ¶¶ 265(a)–(p); *see also id.* at 31 ¶ 170).

Inmates at St. Clair were mostly supervised by only one cube officer monitoring an entire housing block. (*Id.* at 36 ¶ 206). The cube officers generally did not leave their cubicles and blind spots in the block existed. (Doc. 40 at 36 ¶ 207, 37 ¶ 212). At times, the cube officers were absent, asleep, on the telephone, or otherwise not paying attention to inmates they were supposed to monitor. (*Id.* at 37 ¶ 209). Often, the cube officers had not received basic correctional officer training. (*Id.* at 36 ¶¶ 207–08). Additional officers performed random patrols of the housing units infrequently, and the housing blocks lacked adequate surveillance cameras to monitor the housing units. (*Id.* at 37 ¶¶ 210–12).

Contraband searches at St. Clair were ineffective and sporadic and inmates were "heavily armed" around the time of Mr. Mullins's death. (Doc. 40 at 34 ¶¶ 189–90, 35 ¶ 199). In addition to knives and box cutters, inmates reported seeing

11

machete-type knives and one knife measuring over two feet in length. (*Id*. at ¶¶ 192–93, 35 ¶ 197). In 2017, the Montgomery Advertiser quoted a St. Clair correctional officer as characterizing the issue with contraband as "out of control" and stating that a single twenty-four-person cell block could contain thirty to forty contraband knives. (Doc. 40 at 34 ¶ 194). When searches did occur, inmates found with contraband often went undisciplined. (*Id*. at 35 ¶ 195).

### 5.   Defendants' Knowledge of Alleged Conditions and Risk of Harm

Ms. Guy contends that all the Defendants knew that the conditions at St. Clair created a risk of harm to prisoners such as Mr. Mullins. (Doc. 40 at 25–26 ¶ 140). Personal experience and observation, incident reports for the assaults described in the amended complaint, reports from ADOC's Investigation & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, and prisoner progress reports, put Defendants on notice of the risk of harm. (*Id*.).

St. Clair was also subject to lawsuits and a DOJ investigation. (*Id*. at 25–26 ¶¶ 144–50). Ms. Guy's amended complaint also alleges that Defendants were on notice of the conditions at St. Clair through three separate complaints filed with this court by prisoners at St. Clair during 2017. (*Id*. at 29 ¶ 163). Those complaints alleged assaults at knifepoint and detailed the dangerous conditions at St. Clair, the prevalence of stabbings and violence, and failures such as inadequate supervision

and contraband searches. (Doc. 40 at 29 ¶ 163). Commissioner Dunn, Captain Malone, PREA Compliance Manager Gordy, Head of Classification Estelle, and Classification Officer Ary were deposed in those cases. (*Id*.).

In addition to individual lawsuits, a class action lawsuit was filed on behalf of St. Clair prisoners in October 2014 (the "*Duke* lawsuit"). (*Id.* at 24–25 ¶ 140). Defendants Dunn, Culliver, and Malone were defendants in that case. (*Id.* at 26 ¶ 146). The class action alleged that the high rate of inmate-on-inmate violence, including homicides and assaults, were caused by placing vulnerable prisoners with violent ones, widespread possession of contraband by inmates, and a failure to monitor the prisoners, among other things. (*See* doc. 40-1). As a result of the lawsuit ADOC agreed to (1) implement an internal classification system to protect prisoners and staff by identifying risks and needs, instead of randomly assigning inmates; (2) create an incident management system to prevent, track, and respond to violent incidents; (3) replace faulty locks and install surveillance cameras; and (4) create a transitional unit for prisoners released from segregation. (Doc. 40 at 27 ¶ 152). All Defendants were on notice of this agreement, their obligation to comply with the agreement, and the importance of the corrective measures contained therein to ensure the safety of prisoners like Mr. Mullins at St. Clair. (*Id*. at 27 ¶ 153). But when Mr. Mullins died sixteen months later, no meaningful action to comply with the terms of the settlement had taken place. (*Id.* at 27 ¶¶ 154, 156).

While ADOC was litigating the *Duke* case, the United States Department of Justice notified ADOC in 2016 that it was investigating Alabama prisons, including St. Clair. (*Id.* at 26 ¶¶ 149–50). Among other issues, the Department of Justice investigation included whether ADOC adequately protected prisoners from physical and sexual assaults as required by the Eighth Amendment to the U.S. Constitution. (Doc. 40 at 26 ¶¶ 149–50).

Despite knowing that the conditions at St. Clair raised questions about their constitutionality, the risk of harm Mr. Jackson posed for Mr. Mullins, and notice of the 116 inmate-on-inmate assaults involving cutting agents in the twenty-three months before Mr. Mullins death (*see id.* at 16–24 ¶¶ 93–139), Defendants took no action to address the problem (*id.* at 15–16 ¶ 85).

## II.   DISCUSSION

Defendants move to dismiss Ms. Guy's amended complaint, contending that: (1) it is a shotgun pleading; (2) various defenses to official capacity claims bar this action, and the action is an impermissible attempt to avoid Eleventh Amendment immunity and sovereign immunity; and (3) Ms. Guy's claims fail to state a claim or are barred by qualified or state-agent immunity. (Docs. 42, 43, 45, 46).

### 1.   Shotgun Pleading

The Defendants argue that the court should dismiss Ms. Guy's amended complaint because it does not comply with the court's order to file an amended

complaint to correct shotgun pleading deficiencies. (Doc. 43 at 5–10; doc. 46 at 7–10). The court will not dismiss the amended complaint on this ground because the amended complaint gives the Defendants "adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

First, the Defendants urge the court to dismiss the amended complaint because Ms. Guy did not comply with the court's order to file an amended complaint containing a separate count for each claim against one defendant and a factual basis for that claim only. (Doc. 43 at 5–10; doc. 46 at 7–10; *see also* doc. 36). Ms. Guy admits that her amended complaint does not set out a separate count containing one claim made against one defendant, but it does identify by name the specific Defendants against whom each count is asserted and references the paragraphs supporting each allegation. (Doc. 48-1 at 39–44; *see also* doc. 40).

A multi-defendant complaint does not fall within the parameters of a "shotgun" so long as each count specifies "which of the defendants are responsible for which acts or omissions." *Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021). Plaintiff did that here. The amended complaint identifies the factual basis for each claim and specifically identifies the defendants against whom those claims are based. (*See* doc. 40). It is true that there is not a separate count alleging a single cause of action against one defendant. (*See id.*). But the claims specifically reference facts

that support the specific allegations against each defendant and where the complaint identifies general allegations against several different defendants, the paragraphs supporting those general allegations are identified.

The simple fact is that the complaint is made difficult simply because of the sheer number of defendants involved; in all, there are over 100 separate claims. And because the parties and the court must examine each claim against each defendant, it takes extraordinary time and effort. But the hallmark of a shotgun complaint is confusion and obfuscation that results from either intentional or reckless pleading, not the time and effort required to examine the claims. Therefore, dismissal is not appropriate on this ground.

Defendants also argue that Ms. Guy's amended complaint fails to place each individual defendant on notice of the specific claims against him or her. (Doc. 43 at 9; doc. 46 at 9). But each count of Ms. Guy's amended complaint contains specific averments with reference to the precise factual paragraph(s) that support those statements. (*See, e.g.*, doc. 40 at 53 ¶ 288, 55 ¶ 301, 56 ¶¶ 306, 308, 62 ¶ 347). Therefore, Defendants are on notice of the factual allegations that form the basis of the claims against them. Accordingly, dismissal is not appropriate on this ground either. *See Weiland*, 792 F.3d at 1325 ("A dismissal under Rules 8(a)(2) and 10(b) is appropriate where it is *virtually impossible* to know which allegations of fact are

intended to support which claim(s) for relief.") (quotations omitted; emphasis in original).

Lastly, Defendants Givens, Brooks, Malone, White, Graham, Gordy, Ragsdale, Price, Estelle, Art, Caver, Scott, and Wilson argue that the court should dismiss the amended complaint with prejudice because each count effectively incorporates by reference the allegations of all preceding counts. (Doc. 43 at 8–10). In support of their argument, defendants point out that, "[i]nstead of simply incorporating all paragraphs preceding a particular count . . . [Ms. Guy] incorporates entire sections of the Complaint . . . except for the paragraphs relating to jurisdiction and venue." (*Id*. at 8). But the fact that several hundred factual allegations might support each claim does not by itself make the amended complaint a shotgun pleading. *See Barmapov*, 986 F.3d at 1325. Nor is a complaint a shotgun pleading merely because it "incorporate[s] almost every factual allegation in the complaint," so long as it does not "adopt[] the allegations in the preceding counts." *Id*. Ms. Guy's amended complaint no longer adopts all preceding allegations into each count, and as explained above, the amended complaint identifies which factual allegations apply to which individual counts.

Accordingly, the court **WILL DENY** the Defendants' motion to dismiss the amended complaint on shotgun pleading grounds.

> 2. Defenses to Official Capacity Claims, Eleventh Amendment, and Sovereign Immunity

The Administrative Supervisors and Warden Jones assert defenses related to official capacity claims (doc. 46 at 17–18), but Ms. Guy does not make claims against them in their official capacity. These defendants also identify the Eleventh Amendment and sovereign immunity in general as grounds for dismissing the claims brought against them in their individual capacities. (Doc. 46 at 17–18). Without more, simply identifying grounds for dismissal is insufficient. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–83 (11th Cir. 2014). Accordingly, the court **WILL DENY** Defendants' motion to dismiss the amended complaint on these grounds.

      3.  <u>Merits</u>

"To survive a [Rule 12(b)(6)] motion to dismiss, the plaintiff must plead 'a claim to relief that is plausible on its face.'" *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants move to dismiss the entirety of Ms. Guy's amended complaint for failure to state a claim. (Docs. 42, 43, 45, 46). Ms. Guy concedes that Counts Three and Seven are due to be dismissed. (Doc. 48-1 at 39 n.10; doc. 63 at 3 n.10). She also voluntarily withdraws her denial of adequate medical care claim in Count Four

against Defendants Ragsdale, Price, and Scott; her failure to intervene claim in Count Eight against Defendants Givens, Jones, Gordy, Brooks, Price, Ragsdale, and Wilson; and her retaliation claim in Count Six against Defendant Wilson. (Doc. 63 at 3 n.1). Therefore, the court **DISMISSES** those claims **WITH PREJUDICE** without substantively addressing them further. Ms. Guy opposes summary judgment as to all other counts.

The remaining claims allege that Defendants each violated Mr. Mullins's Eighth Amendment rights by: failing to protect him (Counts One and Two); denying him adequate medical care (Counts Four and Five); retaliating against him for reporting sexual abuse, which he alleges also violated his First Amendment rights (Count Six[1]), and failing to intervene to prevent his death (Count Eight). Defendants argue that they are entitled to qualified immunity on each of these claims.

Ms. Guy brings these claims under 42 U.S.C. § 1983, which "does not create any substantive federal rights in and of itself; it is merely a vehicle to bring such suits." *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1265 (11th Cir. 2010). The statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person

---

[1] In their supplemental briefing, the parties mistakenly refer to Ms. Guy's retaliation claim as Count Seven. (Doc. 63 at 23; doc. 64 at 8).

> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken in
> such officer's judicial capacity, injunctive relief shall not
> be granted unless a declaratory decree was violated or
> declaratory relief was unavailable.

42 U.S.C. § 1983.

By its plain meaning, the statute *requires* the imposition of liability on any person who, acting under the authority of a state, local, or territorial government of the United States, deprives another of their constitutionally or federally created rights. But courts interpreting the statute, as one does a good work of fiction, have interpreted it to include an alternate reality: qualified immunity. "Qualified immunity shields a government official from liability unless he violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019) (quotations omitted). When, as here, Defendants argue that they are qualifiedly immune from liability (*see* doc. 43 at 10–27; doc. 46 at 21–25; *see also* docs. 64, 66), the court looks "to the pleadings to see if the plaintiff has successfully alleged a violation of a clearly established right." *O'Rourke v. Hayes*, 387 F.3d 1201, 1206 (11th Cir. 2004).

The analysis looks like this. A defendant asserting qualified immunity must show that "he was acting within the scope of his discretionary authority." *Alocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). Defendants here assert that they were, and Ms. Guy does not challenge that assertion. (*See generally* docs. 48-1, 50-1, 63). Once a defendant establishes he was acting in the scope of his discretionary authority, Ms. Guy must establish (1) the defendant violated a constitutional right and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

So how do you prove the law is clearly established? In analyzing the issue, the dispositive question for the court is whether the law at the time of the challenged conduct gave the government official fair warning that his conduct was unconstitutional. *Wade v. United States*, 13 F.4th 1217, 1225 (11th Cir. 2021), *cert. denied sub nom. Wade v. Lewis*, 142 S. Ct. 1419 (2022) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). Fair warning is defined as "beyond debate." *Wesby*, 583 U.S. at 62–64 (citing *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). Therefore, the law must be settled—not suggested—either dictated by controlling authority or a robust consensus of cases of persuasive authority. *Wesby*, 583 U.S. at 65 n.7. *Every* reasonable officer must interpret it to apply to the rule Ms. Guy seeks to apply. *Id.* at 63 (emphasis added).

21

To satisfy this standard, the contours of the rule must be identified to a "high degree of specificity." *Id.* (citing *Mullinex v. Luna*, 577 U.S. 7, 12 (2015)). It is only then that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wesby*, 583 U.S. at 63 (citing *Saucier v. Katz*, 533 U.S. 194, 2020 (2001) (quotation marks omitted)). After all, the Supreme Court's doctrine protects "all but the plainly incompetent." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Having established the standard for qualified immunity, the court pauses to address one last issue: plaintiff's burden at this stage of the proceeding includes the burden of production: district courts are not required to "sift through the facts presented and decide for itself which were material to the particular cause of action asserted." *Beckwith v. Bellsouth Telecomms. Inc.*, 146 F. App'x 368, 372 (11th Cir. 2005) (quoting *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.9 (11th Cir. 2002) (citations omitted)).

### a.  Count One – Failure to Protect

The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (quotation marks omitted). This duty includes "protect[ing] prisoners from violence at the hands of other prisoners." *Id*. at 833. A prison official violates a prisoner's Eighth Amendment right to protection from prisoner violence when that official is deliberately indifferent to a substantial risk of serious harm. *Id*. at 828.

Therefore, to state a failure-to-protect claim, a plaintiff must allege sufficient facts to plausibly show: (1) the inmate was incarcerated under conditions that posed a substantial risk of serious harm, (2) deliberate indifference to that risk by each of the defendants against whom a plaintiff makes that claim, and (3) causation. *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021).

Whether the conditions at St. Clair created a substantial risk of serious harm is analyzed using an objective standard. To state a claim, Ms. Guy must allege sufficient facts to reasonably infer that "conditions [at St. Clair] were extreme and posed an unreasonable risk of serious injury to [Mr. Mullins's] future health or safety." *Id.* Occasional, isolated attacks are insufficient; "but confinement in a prison where violence and terror reign is actionable." *Purcell ex rel. Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005) (cleaned up). So Ms. Guy's complaint must contain sufficient facts to plausibly allege that serious inmate-on-inmate violence was the norm or something close to it. *Marbury v. Warden*, 936 F.3d 1227, 1234 & n.16 (11th Cir. 2019) (citing *Purcell*, 400 F.3d at 1322 (quotations omitted)).

Ms. Guy's complaint establishes a substantial risk of serious harm. She alleges that St. Clair had the highest per capita prisoner-on-prisoner homicide rate of all the men's prisons in Alabama; St. Clair, in turn, had the highest prisoner-on-prisoner homicide rate in the nation for a state prison system the year before Mr. Mullins died. (Doc. 40 at 16 ¶ 86). She also notes there were 132 reported assaults in 2017

and 163 reported assaults in 2018. [2] (*Id*. at 16 ¶ 90). Included in those numbers are 96 inmate-on-inmate stabbings that took place during that same period. (*Id*. at 16 ¶ 90, 16–24 ¶¶ 93–137). Finally, Ms. Guy claims that this level of violence by prisoners "far exceeded levels of violence in comparable prisons across the nation." (*Id.* at 16 ¶ 91).

But as our Circuit precedent establishes, context is king. *Purcell*, 400 F.3d at 1321; *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1581–84 (11th Cir. 1995); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1029 (11th Cir. 2001); *see also Harrison v. Culliver*, 746 F.3d 1288, 1299–1300 (11th Cir. 2014). To sustain her burden on a claim alleging a general but substantial risk of serious harm, Ms. Guy can establish a substantial risk of serious harm by alleging incidents of violence that may fall short of establishing the "norm" by using characteristics of the prison such as population, the number of incidents occurring over an identified period, the area of the prison where the violence occurred, and staffing and/or security issues. The Facility Defendants point out that Ms. Guy's complaint does not include information about the size, layout, or population of St. Clair. (Doc. 43 at 16). She does, however, include other allegations that, when combined with the incidents of violence, readily establish the existence of a substantial risk of serious harm.

---

[2] The complaint does not specify whether the assaults reported are limited to inmate-on-inmate assaults.

St. Clair has a historic problem of adequately supervising and monitoring its prison population. (Doc. 40 at 36–37 ¶¶ 205–12; doc. 40-1 at 13–14 ¶ 27). The inability to see the entire cellblock can prevent the discovery of violent incidents until only after they happened. (Doc. 40 at 17 ¶ 100, 18 ¶¶ 104, 37 ¶ 214). The failure to have personnel outside of the cellblock's cube sometimes results in the cube officer witnessing violent incidents without intervening. (*Id.* at 13 ¶ 213). Critically, without adequate supervision, St. Clair officers failed to control the movement of the prisoners between housing units. (*Id.* at 37 ¶ 215). This includes the prisoners housed in the Hot Bay, who had a history of violence. (*Id.* at 2 ¶ 4).

Finally, Ms. Guy alleges that these conditions create a substantial risk of serious harm to prisoners "such as Mr. Mullins." (Doc. 40 at 15–16 ¶ 85, 24–25 ¶ 140, 25 ¶ 142, 30 ¶ 169, 51 ¶ 275). At the core of this claim is Ms. Guy's assertion that Mr. Mullins was a "vulnerable prisoner." (*See, e.g.*, *id.* at 11 ¶ 46, 12 ¶ 55, 13 ¶ 62). The only allegation in the complaint to support Ms. Guy's conclusion that Mr. Mullins was "vulnerable" is that ADOC classified Mr. Mullins as a "prisoner facing heightened risks to his safety and security." (*Id.* at 11 ¶ 48; *see also id.* at 12 ¶ 54). Standing alone, a heightened risk to safety is not a substantial risk of serious harm. Therefore, the court rejects Ms. Guy's attempts to couch Mr. Mullins's heightened risk of safety as demonstrating, on its own, that Mr. Mullins faced a substantial risk of serious harm (*see* doc. 40 at 50–51 ¶ 273) or constitutionally requiring segregation

from the general population (*see id.* at 13 ¶ 62, 32–33 ¶ 181, 33 ¶ 183, 51 ¶ 275).

But when considered alongside incidents of inmate-on-inmate stabbings, the

widespread proliferation of contraband and the failure to adequately supervise and

monitor prisoners, the complaint plausibly claims that prisoners like Mr. Mullins

who face a heightened risk of safety face a substantial risk of serious harm at

St. Clair.

For the second element of failure to protect, Ms. Guy's claim is analyzed both

objectively and subjectively. Ms. Guy must plausibly allege for each defendant that

he or she was "aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he [or she] must also [have] draw[n] the

inference" to satisfy the subjective component.   *Farmer*, 511 U.S. at 837. Where

"inmate attacks are longstanding, pervasive, well-documented, or expressly noted

by officials in the past" the court can infer knowledge of the risk. *Id.* at 842–43. In

other words, if the risk is obvious, then knowledge of those facts can be inferred.

*Hale*, 50 F.3d at 1583. Taking the facts in the light most favorable to Ms. Guy, the

risk is obvious. Ms. Guy alleges that the prisoner-on-prisoner homicide rates at St.

Clair in 2011, 2012, 2013, 2014 and 2018 were higher than the anywhere else in the

country. (Doc. 40 at 16 ¶ 86; doc. 40-1 at 6–7 ¶ 13). In addition, the complaint

alleges that the number of reported assaults from 2011 to 2019 exceeded typical rates

of violence at comparable facilities throughout the United States. (Doc. 40 at 16 ¶¶ 90–91).

Finally, Ms. Guy points to the 2014 class action filed on behalf of St. Clair prisoners. The claims of inmate-on-inmate violence in that lawsuit are similar to the claims asserted here and Ms. Guy alleges that every defendant here knew about that lawsuit. (*Id.* at 25–26 ¶¶ 144–46). She also alleges that each defendant knew that ADOC settled that lawsuit by agreeing to implement specific measures aimed at reducing inmate violence. Given that the settlement terms were publicly available, the court finds that each defendants' knowledge of the terms is plausible.

Having determined that Ms. Guy's complaint creates the inference that defendants knew prisoners with a heightened security risk faced a substantial risk of serious harm at St. Clair, the court must determine if Ms. Guy plausibly alleges that each Defendant had the authority and means to address the constitutional infirmity but responded unreasonably. *LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir. 1993). Whether the officials' response was reasonable does not depend on whether the harm was averted. *Farmer*, 511 U.S. at 844. Instead, an official responds in an objectively unreasonable manner if "he knew of ways to reduce the harm" but knowingly or recklessly declined to act. *Hale*, 50 F.3d at 1583.

Count One alleges that the Supervisor and Facility Defendants' failure to take steps to reduce the widespread violence at St. Clair was deliberately indifferent to

the substantial risk of serious harm that prisoners like Mr. Mullins faced. (Doc. 40 at 50–52 ¶¶ 271–81). According to Ms. Guy, these defendants failed to:

- take steps to ensure that threats or incidents of violence were adequately addressed and that vulnerable prisoners were separated from prisoners likely to commit violence (*id.* at 51 ¶ 276);

- perpetuated policies and customs of ignoring complaints of violence or retaliating against complainants and housed vulnerable prisoners alongside vulnerable prisoners (*id.*);

- failed to address the widespread proliferation of contraband weapons (*id.* at 51 ¶ 277);

- failed to take steps to ensure that prisoners at St. Clair were adequately supervised and monitored and perpetuated a custom and policy of allowing prisoners to leave housing units unsupervised (doc. 40 at 52 ¶ 278);

- failed to take action to prevent, detect, and respond to instances of sexual abuse and perpetuated policies and customs of allowing sexual abuse to occur with impunity, (*id.* at 52 ¶ 279); and

- failed to train and discipline subordinates who perpetuated all these policies and customs (*id.*).

Having applied the analysis to each defendant, the court determines that there are three categories of defendants within Count One.

28

Defendants Dunn, Ellington, Vincent, and Jones fall within the first category of defendants: individuals who Ms. Guy plausibly claims were deliberately indifferent to the substantial risk of serious harm. And Ms. Guy's complaint plausibly claims that their deliberate indifference caused Mr. Mullins's death. Therefore, the court must decide if Ms. Guy has shown that the defendants' conduct was deliberately indifferent when he engaged in it. If it was, Ms. Guy's claim against that defendant proceeds.

The second category of defendants consists of defendants who knew there was a substantial risk of serious harm but did not have the authority and/or means to make reasonable efforts to reduce the harm. Those defendants are Givens, Brooks, Malone, White, Graham, Gordy, Ragsdale, Estelle, Price, and Scott. Because Ms. Guy did not allege facts to plausibly claim that these defendants had the means and authority to reduce the substantial risk of serious harm but knowingly or willfully declined to act, Ms. Guy's claim that they violated Mr. Mullins's Eighth Amendment rights fails for the reasons set out below.

The final category of defendants consists of Mr. Culliver, Mr. Daniel, and Mr. Williams. Ms. Guy does not state a claim against these defendants because the complaint does not plausibly claim their conduct caused Mr. Mullins's injuries. For this group of defendants, the court will analyze whether Ms. Guy plausibly alleges

a constitutional violation that was clearly established at the time of Mr. Mullins's injuries.

### i. Category One.

Defendant Dunn became the Commissioner of ADOC in 2015 and remained in that position during all relevant periods. (Doc. 40 at 4 ¶ 17). As Commissioner he was the highest-ranking official in the ADOC and was responsible for the direction, supervision, and control of ADOC. (*Id.*). Defendant Ellington is the Institutional Coordinator for the Northern Region of ADOC, which includes St. Clair. (*Id.*). Mr. Ellington has served in this position since June 2017 and is responsible for planning, monitoring, and reviewing day-to-day operations and insuring safe conditions for the correctional institutions in his region. (*Id.*). In addition, Mr. Ellington leads the external security audit team. (Doc. 40 at 4 ¶ 17). As Institutional Coordinator, Mr. Ellington supervised Karla Jones who served as warden during the relevant period. (*Id.*; *see also* 5–6 ¶ 23). Defendant Jones was responsible for the day-to-day operations of the prison, safety, and security of all prisoners at St. Clair and the supervision of all subordinate employees. (*Id.* at 5–6 ¶ 23). Defendant Vincent was the PREA Director for ADOC and was responsible for ensuring that ADOC adequately protected against sexual assault and that incidents of sexual assault were appropriately addressed. (*Id.* at 5 ¶ 22).

Ms. Guy plausibly alleges that these defendants knew about the substantial risk of serious harm to prisoners with heightened safety risks. Ms. Guy alleges that each of these defendants received incident reports, ADOC Investigations and Intelligence reports, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, copies of prisoner lawsuits and attorney letters. (*Id.* at 25 ¶ 140, 143–44, 28 ¶¶ 158–59). Commissioner Dunn was also provided evidence of prisoner-on-prisoner violence during a deposition just three months before Mr. Mullins was killed. (*Id.* at 29 ¶ 163). Under these facts, Ms. Guy has plausibly alleged that Commissioner Dunn knew there was a substantial risk of serious harm. *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1029 (11th Cir. 2001) (allegations that jail officials were provided state agency inspection reports outlining the conditions that existed at the facility, complaints from prisoners and requests for assistance, correspondence from prisoners' attorneys "detailing staffing problems and warning of a 'serious threat to the safety of inmates,'" and a previous lawsuit filed on behalf of inmates were sufficient at the pleading stage to show that a sheriff was subjectively aware of a serious risk of harm); *see also LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993) ("[I]ncident reports, internal staff reports, and reports by external investigators" supported a bench trial finding that the prison superintendent "knew that an unreasonable risk of violence

31

existed" at the prison and "knew of alternative means that would have brought that risk to within constitutional norms").

At this stage of the proceedings, Ms. Guy's complaint also plausibly alleges these defendants were deliberately indifferent because they not only knew about the substantial risk of serious harm but also had the means and authority to reduce the risk but knowingly or recklessly failed to act. *Cox v. Nobles*, 15 F.4th 1350, 1360 (11th Cir. 2021) (citing *Farmer*, 511 U.S. at 844). Ms. Guy's complaint sets out measures that ADOC agreed to implement to reduce the substantial risk of serious harm fifteen months before Mr. Mullins's death but had not implemented. (Doc. 40 at 27 ¶ 152). It also alleges that "nationally recognized experts" reviewed operations at St. Clair and recommended specific, detailed steps to detect and eliminate contraband there. (*Id.* at 28 ¶¶ 160–61). Finally, Ms. Guy's complaint plausibly alleges that the job responsibilities for each of the defendants in Category One reasonably infers that these defendants had the means and authority to implement these changes but knowingly declined to act. (*Id.* at 28 ¶ 161, 27 ¶ 154; *see also* doc. 69 at 79).

But to establish a constitutional violation, Ms. Guy must also allege facts to support a reasonable inference that these defendants caused Mr. Mullins's injuries. Ms. Guy's complaint alleges that the conduct of these defendants "directly and proximately caused Mr. Mullins to be subjected to a substantial risk of serious harm

32

and to suffer physical and emotional injuries and death." (Doc. 40 at 52 ¶ 281). The allegations she incorporates to support this claim are sufficient to establish causation at this stage of the proceedings. Any number of the measures defendants failed to implement, despite having the authority to do so, facilitated Mr. Jackson's attack on Mr. Mullins. Therefore, Ms. Guy has plausibly claimed these defendants violated Mr. Mullins' constitutional rights.

Ms. Guy has also established that the defendants' constitutional violation was clearly established at the time they engaged in the conduct. Ms. Guy has not identified "a case on all fours with materially identical facts," but prior decisions still may put officials on "fair warning that their acts are unconstitutional" if "the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Hunter v. Leeds*, 941 F.3d 1265, 1281 (11th Cir. 2019). Two prior decisions from the Eleventh Circuit have done so.

First, in the Eleventh Circuit's 1995 decision in *Hale*, 50 F.3d 1579, a plaintiff asserted § 1983 failure to protect claims against the county and the sheriff after he was attacked by two cellmates. *Id.* at 1581. The plaintiff produced evidence demonstrating that when the jail was overcrowded, as it was on the day he was beaten, inmates were placed in a 13-by-20 foot cell with as many as twelve other inmates and that "fights occurred between inmates on a regular basis and occasionally resulted in injuries requiring medical attention and hospitalization." *Id.*

33

The evidence also showed that the jail had no policy for classifying and segregating inmates based on offense level and did not train the jail officer stationed near the plaintiff's cell. *Id.* at 1583–84. The plaintiff claimed that the sheriff was deliberately indifferent because the sheriff knew about the regular inmate-on-inmate violence but did not take steps to address it, including "classifying and segregating the inmates based on their likelihood for violence; assigning inmates to cells and bunks rather than letting them choose for themselves; adequately training jailers; and adequately supervising and monitoring the inmates." *Hale*, 50 F.3d at 1583. The Eleventh Circuit found that this evidence created questions of fact about whether the sheriff failed to take reasonable measures to reduce the violence, despite evidence from the sheriff that he had worked toward construction of a new jail which he contended was the only way to address the problem. *Id.* at 1584.

Second, in the Eleventh Circuit's 2001 decision in *Marsh*, 268 F.3d 1014, a plaintiff alleged that a sheriff was deliberately indifferent to the serious risk posed by inmate-on-inmate violence after he was beaten by four inmates. *Id.* at 1025. The plaintiff alleged: (1) "[i]nmates were able to obtain makeshift weapons by cannibalizing parts of the decaying building;" (2) "[l]ack of adequate monitoring of the inmates allowed inmate activities to go mostly unchecked;" (3) "[l]ocks to the doors of the inmates' cells did not work, resulting in the inability of the guards to lock down the prisoners; (4) "[b]ecause prisoners were never locked down, jailers

34

were afraid to conduct visual inspections of inmate cells on the second floor" where most of the inmates were housed; (5) "[n]o visual or audio surveillance system was in place on the second floor, nor, did prisoners have means to contact guards other than by screaming or banging on the walls"; (6) "[j]ailers never conducted prisoner headcounts"; (7) "[o]ften, only one jailer was on duty" at a time; (8) inmates "were not screened for mental impairments or for whether they had conflicts with other inmates;" (9) the jail had no inmate classification system; and (10) inmates were not disciplined or segregated "for assaulting other inmates, destroying jail property, or threatening jailers." *Id.* at 1024–25.

Although not all of the conditions in *Marsh* can be found here, the amended complaint creates the reasonable inference that a majority of the conditions found in *Marsh* are substantially similar to the conditions at St. Clair. In addition to these similarities, the plaintiff in *Marsh* alleged that a jail inspector told the sheriff that the jail was not "reasonably secure" and a letter from prisoner-rights advocates informed the sheriff that the jail's conditions posed a serious threat to inmate safety and left inmates vulnerable to attacks by other inmates. *Marsh*, 268 F.3d at 1025. Still, according to the plaintiff, the sheriff "did nothing to alleviate the conditions at the Jail." *Id.* at 1030. Here, not only did the EJI warn these defendants when they sued on behalf of a class of prisoners, defendants agreed to a settlement requiring implementation of safety protocols aimed to reduce the risk of harm at St. Clair. But

ADOC did not implement those protocols in the fifteen months between the settlement and Mr. Mullins's death.

In *Marsh*, the Eleventh Circuit found that, at the motion to dismiss stage, the sheriff was not entitled to qualified immunity from the plaintiff's claim that the sheriff was deliberately indifferent to a threat of harm. *Id.* at 1034. In reaching its conclusion, the Eleventh Circuit explained that at the time of the conduct alleged (July 1996), "it was clearly established in this Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions—like the conditions alleged in [*Marsh*]—that pose a risk of serious physical harm to inmates." *Id.*

Applied to facts alleged in Ms. Guy's complaint, the clearly established principles from *Hale* and *Marsh* govern. Although the facts here are not identical to those in *Hale* and *Marsh*, they are similar in that Ms. Guy alleges that various prison conditions at St. Clair—namely inadequate staffing, safety features, officer training, housing classification systems, contraband searches, and discipline of prisoners—contributed to regular inmate-on-inmate violence to which Commissioner Dunn, Institutional Coordinator Ellington, Warden Jones, and Director Vincent turned a blind eye.

Therefore, the court finds that "the state of the law" as of February 2019 when Mr. Mullins died, gave Commissioner Dunn, Dunn, Ellington, Director Vincent, and

Warden Jones "fair warning that their alleged conduct was unconstitutional." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1102 (11th Cir. 2014) (quotations omitted).

Accordingly, the court **WILL DENY** Defendants Commissioner Dunn, Institutional Coordinator Ellington, Warden Jones, and Director Vincent's motions to dismiss Count One.

### ii. Category Two.

The second category of defendants in Ms. Guy's complaint are officers of various rank at St. Clair. Defendants Malone, White, and Graham are captains; all three of them had the authority to adjust a prisoner's housing assignment. (Doc. 40 at 6–7 ¶¶ 26–28). Defendant Estelle was the Head of Classification, whose responsibilities included among other things, reclassifying prisoners for general population if they no longer required segregation, making recommendations for prisoners to be transferred to protective custody, and ensuring safe housing assignments for prisoners. (*Id.* at 7–8 ¶ 29). Defendants Price, Scott, and Ragsdale were lieutenants at St. Clair. (*Id.* at 8–9 ¶¶ 31–33). Ms. Guy generally alleges that each of these lieutenants were responsible for the safety and security of St. Clair's prisoners. (*Id.*). In addition, Defendant Ragsdale held the title of Backup Institutional PREA Compliance Manager and was responsible for the implementation of PREA, compliance with its requirements at St. Clair, and for making sure that incidents of

sexual assault were appropriately addressed. (*Id.* at 9 ¶ 31). The last defendant in this category is Officer Gordy, the Institutional PREA Compliance Manager at St. Clair. (Doc. 40 at 8 ¶ 30). Officer Gordy shared the same responsibilities as Officer Ragsdale. (*Id.*).

The defendants in the second category are all charged with knowing that the prison conditions at St. Clair created a substantial risk of serious harm to prisoners with heightened security risks. But Ms. Guy's complaint does not plead sufficient facts to plausibly allege that these defendants had the means or authority to implement changes that would reduce the risk of that harm. Therefore, Ms. Guy cannot establish that these defendants violated Mr. Mullins's constitutional rights. Accordingly, the court **GRANTS** the category two defendants' motion to dismiss.

### iii. Category Three.

The final category of defendants consists of Grant Culliver, Jeffrey Williams, and Charles Daniels. These defendants cannot be held liable for Mr. Mullins's injuries because the complaint does not reasonably infer causation.

Ms. Guy alleges that Mr. Culliver was the Associate Commissioner for Operations and Institutional Security from mid-2015 to September 2018. (Doc. 40 at 4 ¶ 18). In that capacity, Mr. Culliver was responsible for the daily operations of prison facilities, including "ensuring the effective and safe daily operations" at St. Clair. (*Id.*). After Mr. Culliver left that position, Mr. Williams took over some of the

responsibilities of Associate Commissioner for Operations and Institutional Security from September 2018 to December 2018. (*Id.* at 5 ¶ 20). There is no allegation that Mr. Williams was employed by ADOC prior to September 2018. (*Id.*) There is also no allegation that Mr. Williams's successor, Mr. Daniels, held a position within ADOC before he became the Associate Commissioner for Operations and Institutional Security for ADOC in December 2018. (Doc. 40 at 4 ¶ 19). Under these facts, Ms. Guy cannot establish that the actions of any of these defendants violated Mr. Mullins's constitutional rights.

Taking the complaint in the light most favorable to Ms. Guy, the court will assume that her complaint plausibly alleges that Mr. Williams knew of the substantial risk of serious harm to prisoners with heightened risks at St. Clair despite the limitations of time and scope in his position as Associate Commissioner for Operations and Institutional Security. But without alleging Mr. Williams's responsibilities during the relevant period, Ms. Guy cannot plausibly allege that Mr. Williams had the authority or means to reasonably respond to a substantial risk of serious harm. At oral argument, Ms. Guy acknowledged this "fair point" but did not concede the claim failed. (Doc. 69 at 89). Instead, Ms. Guy generally alleged without support and contrary to the allegations in the complaint that Mr. Williams would have had the same responsibilities as Mr. Culliver. (*Id.* at 89–90). Ms. Guy's attempt to salvage her claim against Mr. Williams fails.

Similarly, Ms. Guy's claim against Mr. Culliver fails for the same reason. At oral argument, the court specifically asked how Mr. Culliver could be deliberately indifferent if he did not have the authority or responsibility of the Associate Commissioner for Operations and Institutional Security in the five plus months leading up to Mr. Mullins's death.  (Doc. 69 at 90). At oral argument, Ms. Guy did not identify allegations in the complaint that established either Mr. Culliver's deliberate indifference to Mr. Mullins or causation. Instead, Ms. Guy generally advanced a theory of how Mr. Culliver's failure to act "allowed the dangerous conditions to take hold" at St. Clair. (Doc. 69 at 90–92). Ms. Guy suggested that the theory alone was sufficient and that Mr. Culliver can defend the claim on that basis at a later point. (*Id.* at 91).

This argument misses the point. Mr. Culliver raises the defense of qualified immunity, which places the burden on Ms. Guy to identify—at this stage of the proceedings—the plausible allegations in her complaint that raise a reasonable inference that Mr. Culliver caused Mr. Mullins's injury and that the conduct complained of clearly established a constitutional violation at the time of Mr. Mullins's injury. Ms. Guy's argument did not satisfy that burden. Therefore, Ms. Guy's claim against Mr. Culliver fails. Accordingly, the court **GRANTS** the category three defendants' motions to dismiss.

40

### b. *Count Two – Failure to Protect*

The title of Count Two identifies the claim as a violation of the Eighth Amendment for failure to protect. (Doc. 40 at 52). It identifies the defendants to this claim as Assistant Warden Givens, Ms. Gordy, Lt. Ragsdale, Ms. Estelle, Lt. Price, Captain White, Assistant Warden Brooks, Lt. Scott, Ms. Ary, Officer Wilson, and Officer Caver. (*Id.*). To make a claim these defendants violated Mr. Mullins's rights under the Eighth Amendment by failing to protect him, Ms. Guy's complaint must first allege that Mr. Mullins faced a substantial risk of serious harm. *See Cox*, 15 F.4th at 1357. Ms. Guy must then make specific allegations that lead to the reasonable inference each defendant was deliberately indifferent to that substantial risk. *Id.* Assuming Ms. Guy satisfies the first two pleading burdens, she must adequately allege each defendant's deliberate indifference caused Mr. Mullins's injuries. *Id.*

Even if Ms. Guy's allegations plausibly show a constitutional violation, the analysis does not end because all named defendants assert the defense of qualified immunity. (*See generally* docs. 43, 46). Ms. Guy does not dispute that these defendants were acting within their discretionary authority. So in order for her claims to proceed, Ms. Guy must demonstrate that the violation was clearly established at the time. *Wesby*, 138 S. Ct. at 589.

Count Two does not incorporate the allegations regarding what Ms. Guy characterizes as the "security crisis at St. Clair" or the general allegations regarding the defendants' alleged failures to reasonably respond to that crisis. (Doc. 40 at 15–24 ¶¶ 85–139, 46 ¶ 264). Instead, Ms. Guy's claim that Mr. Mullins faced a substantial risk of serious harm relies entirely on each defendant's personal knowledge and conduct. Therefore, the court will address each defendant in turn. Before engaging in that analysis, the court reiterates its determination that the complaint's description of Mr. Mullins as "vulnerable," or even particularly or especially vulnerable, does not, standing alone, adequately allege anything beyond having heightened security and safety risks. For that reason, the court cannot infer a substantial risk of serious harm simply from Mr. Mullins being housing in the general population.

### 1. Defendants Givens, Ragsdale, Gordy, Price, Brooks, Ary, Wilson

To support her claim of a constitutional violation, Ms. Guy alleges that these defendants knew of and consciously disregarded the substantial risk that Mr. Jackson would seriously harm Mr. Mullins, and failed to protect Mr. Mullins from harm. (Doc. 40 at 53 ¶ 284). Ms. Guy alleges that all defendants other than Ms. Gordy knew that Mr. Jackson had a history of violence. (*Id.* at ¶ 286). Ms. Guy also alleges that these defendants knew that Mr. Jackson sexually abused, physically attacked, and threatened Mr. Mullins at knifepoint as his cellmate but refused to take steps to

protect Mr. Mullins by ensuring Mr. Mullins and Mr. Jackson were separated and confiscating Mr. Jackson's weapon. (*Id.* at ¶ 290; *see also* 12–13 ¶¶ 61–64, 13 ¶ 68–70). Ms. Guy further alleges that these defendants injured Mr. Mullins. (*Id.* at 54 ¶ 293).

Ms. Guy's claims fail to the extent she claims damages for the injuries Mr. Mullins sustained while he was Mr. Jackson's cellmate. No allegations incorporated into Ms. Guy's claim support the inference that any of these defendants knew Mr. Jackson had a history of violence before he injured Mr. Mullins in their shared cell. Save one conclusory allegation that the court may not consider (doc. 40 at 10 ¶ 38), the only allegation that Mr. Jackson was violent relates to his previous physical and sexual abuse of C.M. (*id.* at 10–11 ¶¶ 39–40). But the complaint alleges that C.M. reported those incidents only to Defendant White; it does not allege, nor can the court reasonably infer, that Defendant White reported the incident to Ms. Givens. (*Id.* at 10 ¶ 41).

Ms. Guy's claim against these defendants based on Mr. Mullins's death also fails because the incorporated facts do not adequately allege that they were deliberately indifferent to Mr. Mullins's risk. Ms. Guy alleges that these defendants could have placed Mr. Jackson in segregation to keep him from assaulting Mr. Mullins. (*Id.* at 13 ¶¶ 62–64, 69). But without an allegation suggesting that the defendants knew Mr. Jackson would attempt to retaliate against Mr. Mullins or

otherwise cross paths in an unsupervised setting, the court cannot infer that Defendants' decision to move Mr. Mullins to another cellblock rather than segregate Mr. Jackson was unreasonable. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). Even if the allegations were sufficient to state a claim, any violation is not clearly established. *See Cox v. Nobles*, 15 F.4th 1350, 1360–61 (11th Cir. 2021) (citing *Mosley v. Zachery*, 966 F.3d 1265 (11th Cir. 2020)) (holding that the plaintiff failed to adequately allege an objectively unreasonable response when she failed to allege that the officer who moved her to another cell knew that she would encounter her attacker again in an unsupervised setting).

Ms. Guy also claims that these defendants could have confiscated Mr. Jackson's knife. There are no allegations that support this claim. The complaint does not allege that any of these defendants were physically present when the attack occurred; rather, it implies that Mr. Jackson and Mr. Mullins were alone in their cell. (*See* doc. 40 at 12 ¶¶ 58–60). Nor does the complaint allege that Mr. Jackson was found in possession of a knife. Without any facts to suggest that these defendants had the means to find and confiscate the knife within the first twenty-four hours of the attack, the complaint does not adequately allege that they actually could have confiscated the knife.

Based on the foregoing, Ms. Guy failed to establish that these defendants violated Mr. Mullins's constitutional rights. Therefore the claims against these defendants fail.[3] Accordingly, the court **WILL GRANT** their motion to dismiss Count Two.

### 2. *Captain White*

Sometime before Mr. Jackson attacked Mr. Mullins, Mr. Jackson had a different cellmate, C.M., whom Mr. Jackson repeatedly sexually and physically assaulted. (*Id.* at 10 ¶¶ 39–41). Captain White had direct knowledge of this abuse because C.M. reported it directly to him. (*Id.* at 10 ¶ 41). Ms. Guy's complaint alleges that Captain White failed to protect Mr. Mullins because he failed to ensure that Mr. Jackson was disciplined after he abused C.M. and did not segregate Mr. Jackson from the general population. (Doc. 40 at 53 ¶ 288 (citing 10–11 ¶¶ 38–47)). Ms. Guy does not allege that Captain White assigned Mr. Mullins to Mr. Jackson's cell. In fact, Ms. Guy specifically contends that it was Defendant Ary's responsibility to ensure that Mr. Jackson and Mr. Mullins were not cellmates. (*See* doc. 40 at 53 ¶ 289). Instead, Ms. Guy's claim against Captain White rests entirely on her argument that he should have removed Mr. Jackson from the general

---

[3] Ms. Guy's claims against Defendants Price and Brooks allege that both defendants failed to discipline Mr. Jackson for assaulting Mr. Mullins. This additional allegation does not alter the court's analysis. Even assuming the failure to discipline a prisoner within twenty-four hours of an assault violates the Eight Amendment, Ms. Guy has not shown that the violation was clearly established at the time Price and Brooks failed to discipline Mr. Jackson.

population based solely on Captain White's knowledge of Mr. Jackson's attack on C.M. (*Id.* at 53 ¶ 288).

The claim against Captain White is due to be dismissed. Even if these allegations established a constitutional violation, Ms. Guy has not identified any case that clearly establishes the failure to permanently remove a prisoner from the general population for sexually and physically assaulting a cellmate constitutes a violation of another prisoner's Eighth Amendment rights. Accordingly, the court **WILL GRANT** Captain White's motion to dismiss Count Two.

### 3. Lieutenant Scott

Ms. Guy alleges that Lt. Scott violated Mr. Mullins's Eighth Amendment rights because she released Mr. Mullins from segregation into the general population. (Doc. 40 at 11 ¶ 52, 53 ¶¶ 286–87). Ms. Guy supports her claim against Lt. Scott by alleging that Lt. Scott knew that Mr. Jackson had a history of violence and that Mr. Mullins was classified as being at a heightened risk of safety. This claim must be dismissed for two reasons: (1) there is no allegation that Lt. Scott knew Mr. Jackson had a history of violence; (2) there is no allegation that Lt. Scott knew or should have known that Mr. Jackson and Mr. Mullins were cellmates. In the absence of such allegations, the court cannot infer that Lt. Scott knew that Mr. Mullins was at a substantial risk of serious harm. Accordingly, Ms. Guy cannot establish that

Lt. Scott violated Mr. Mullins's constitutional rights and the court **WILL GRANT** his motion to dismiss Count Two.

    4.    *Defendant Caver*

Ms. Guy alleges that Officer Caver violated Mr. Mullins's Eighth Amendment rights because she was present when Mr. Jackson and his co-assailants entered the L block and stabbed Mr. Mullins but took no action to protect Mr. Mullins from the violence. (Doc. 40 at 14–15 ¶¶ 71–81, 54 ¶ 291). She also alleges that Officer Caver took no action to secure the L block at the time of the attack or otherwise prevent unauthorized prisoners like Mr. Jackson from entering. (*Id.* at 14 ¶ 77). According to the allegations in the complaint, Officer Caver was the sole officer in the L block and witnessed the attack. (Doc. 40 at 14 ¶¶ 73–74). According to the complaint, Officer Caver did nothing to intervene to protect Mr. Mullins. (*Id.* at 14 ¶ 74).

This claim survives. Not only is Officer Caver's failure to provide any assistance to Mr. Mullins under these circumstances a violation of his Eighth Amendment rights, but the violation has also been clearly established for some time. *Cottone v. Jenne*, 326 F.3d 1352, 1359–60 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

Because the amended complaint plausibly alleges that Officer Caver violated Mr. Mullins's clearly established Eighth Amendment rights by failing to protect him as Mr. Jackson stabbed him, Officer Caver is not entitled to qualified immunity at

this stage in the proceedings. Accordingly, the court **WILL DENY** her motion to dismiss Count Two.

### c. Count Three – State-Created Danger

Count Three of Ms. Guy's amended complaint alleges that Defendant Supervisors are liable for state-created danger. (Doc. 40 at 54–56 ¶¶ 294–305). Ms. Guy withdrew that claim. (Doc. 63 at 10 n.1). Accordingly, the court **WILL GRANT** Defendants' motion to dismiss Count Three.

### d. Count Four – Adequate Medical Care; Supervisory Liability Claims

Count Four of Ms. Guy's amended complaint alleges the denial of adequate medical care. Ms. Guy asserts that Mr. Mullins had a serious medical need because Mr. Jackson repeatedly stabbed him and that need constituted a substantial risk of harm that obviously required timely medical care. (*Id.* at 56–57 ¶¶ 308–09). Ms. Guy claims that Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, White, Malone, and Graham[4] knew that the lack of supervision and monitoring at St. Clair, especially in the P/Q blocks, prevented the timely provision of medical care for serious medical needs, including stabbings. (*Id.* at 57 ¶ 311). Despite this knowledge, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, White, Malone, and Graham failed to take steps to ensure

---

[4] Ms. Guy voluntarily withdrew her claims against Lieutenants Ragsdale, Price, and Scott in Count Four. (Doc. 63 at 3 n.1).

that prisoners like Mr. Mullins had access to timely emergency medical care. (*Id.* at 57 ¶ 312). Finally, Ms. Guy alleges that these defendants' failure caused Mr. Mullins's death. (Doc. 40 at 57 ¶ 313). To support these conclusory allegations, Ms. Guy's complaint incorporates by reference paragraphs 205–219 and 221–223 of the complaint. (*Id.* at 57 ¶ ¶ 311–312).

Defendants Dunn, Culliver, Daniels, Williams, Ellington, and Jones argue that Count Four fails to state a claim.[5] (Doc. 66 at 2–6). First, these Defendants argue that the allegations in the amended complaint do not demonstrate that ADOC officials instituted a custom or policy that resulted in deliberate indifference. (Doc. 66 at 3). But that is not the only way to establish a causal connection. *Cottone*, 326 F.3d at 1360. Ms. Guy can create a reasonable inference of a causal connection (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," (2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights," or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (cleaned up). A plaintiff's burden to hold

---

[5] Defendants Givens, Brooks, White, Malone and Graham argue only that Ms. Guy fails to allege the violation of clearly established law. (*See* doc. 64 at 5–7). However, the court's analysis as to whether Ms. Guy states a claim applies equally to all defendants named in Count Four.

a supervisor "liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Id.* (alteration omitted).

To establish a constitutional violation, Ms. Guy must allege facts creating a reasonable inference that Mr. Mullins had an objectively serious medical need, that the official acted with deliberate indifference to that need, and that Mr. Mullins's injury was caused by the official's wrongful conduct. *Wade v. United States*, 13 F.4th 1217, 1125 (11th Cir. 2021) (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)). A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326 (cleaned up). Ms. Guy's complaint sufficiently alleges that Mr. Mullins had a serious medical need.

Ms. Guy's claim does not adequately allege any of these defendants were deliberately indifferent to that need. To establish deliberate indifference for each defendant, Ms. Guy has to plead facts that support a reasonable inference that each defendant (1) was deliberately indifferent to Mr. Mullins's serious health care needs by failing to adequately train and supervise subordinates; (2) that a reasonable person in the supervisor's position would know that his or her failure to train and supervise reflected deliberate indifference; and (3) that his or her conduct was causally related to the constitutional infringement by his subordinates. *Greason v. Kemp*, 891 F.2d

50

829, 836–37 (11th Cir. 1990). As relevant to this claim, Ms. Guy alleges that Officer Caver was the sole officer on the L block and did not leave her cube despite witnessing Mr. Jackson stab Mr. Mullins. (Doc. 40 at 14 ¶¶ 73–74, 38 ¶ 219). Taking the allegations in the light most favorable to Ms. Guy, she further alleges that these defendants were aware that having a single cube officer monitor and supervise the cellblock delayed medical care, particularly in the Hot Bay. (*Id.* at 57 ¶ 310).

Here is the problem: Mr. Mullins was not stabbed in the Hot Bay. Outside of the Hot Bay, Ms. Guy alleges only one incident in which a prisoner was denied timely access to emergency care outside the Hot Bay. (Doc. 63 at 22).[6] One incident does not support Ms. Guy's conclusory that lax supervision "often" resulted in a failure to timely respond to prisoners who had been seriously injured. (Doc. 40 at 37 ¶ 216). And the allegation of one incident does not allow the reasonable inference that these defendants knew that lax supervision presented a substantial risk of serious harm for prisoners outside of the Hot Bay.[7]

---

[6] After initial briefing and oral argument, the court provided Ms. Guy another opportunity to show cause why this claim should not be dismissed. (Doc. 60). In response, Ms. Guy presented several theories of liability—most of which were not alleged in the complaint—and cited to several allegations—many of which were not incorporated in the claim. (*See generally* doc. 63). The court rejects this attempt to rewrite her claim entirely.

[7] Moreover, Ms. Guy has not alleged that Defendants Malone, White, and Graham had the authority to post additional staff to or install surveillance cameras in cellblocks for the purpose of increasing supervision and monitoring. (Doc. 40 at 6–7 ¶¶ 26–28). These defendants are due to be dismissed on that basis alone.

Even if Ms. Guy alleged sufficient, plausible facts to support the inference of a constitutional violation, these defendants are due to be dismissed because she has not established any controlling precedent that clearly establishes the violation. Ms. Guy cites to five cases, which she maintains satisfy her burden. (Doc. 63 at 19–20 (citing *Anderson v. City of Atlanta*, 778 F.2d 678 (11th Cir. 1985); *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990); *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700 (11th Cir. 1985); *Thomas v. Town of Davie*, 847 F.2d 771 (11th Cir. 1988); *Ex parte Hale*, 6 So. 3d 452 (Ala. 2008)). But those cases are materially distinguishable.

For example, in *Anderson*, there was evidence that the detention center was consistently understaffed and had no medical staff present at all from midnight until 7:00 A.M. 778 F.2d at 682–83. In *Greason*, the prison's clinical director and its warden knew of a severe lack of medical staff as well as specific facts about the deficient psychiatric care provided to several inmates; in addition, the Georgia Department of Corrections' director of mental health also knew of the facility's understaffing, lack of mental health treatment plans and recreation time, and lack of policies or procedures designed to help staff recognize suicidal tendences in inmates. 891 F.2d at 837–40. With that knowledge, the Eleventh Circuit held, none of them were entitled to qualified immunity. *Id.*

In *Ancata*, despite the inmate's obvious physical deterioration and medical staff's finding that the inmate needed an orthopedic or psychiatric evaluation, the

prison refused to have the inmate examined by a specialist absent a court order, which it conditioned on the inmate agreeing to bear the costs of the evaluation; the Eleventh Circuit held that the sheriff might be liable for creating such a custom or policy or for his personal involvement in refusing medical care to the inmate. 769 F.2d at 702, 706. In *Thomas*, the Eleventh Circuit reversed a district court's dismissal of a complaint with prejudice because the plaintiff might have been able to plead more specific facts showing why his need for medical attention was obvious and why the defendants should have known he needed medical attention. 847 F.2d at 773. And in *Ex parte Hale*—a case decided by the Alabama Supreme Court using Alabama pleading standards—the inmate alleged that the sheriff was aware of a widespread and "troubling pattern" with respect to the health care provided to inmates at the jail over which he presided, including a failure to staff the jail with medical personal and a failure to train non-medical personal in how to respond to inmates' requests for medical attention. 6 So. 3d at 460–62.

The allegations in this case do not rise to the level of the allegations or evidence in the cases on which Ms. Guy relies. There is no allegation that St. Clair lacked a medical staff (as in *Anderson* and *Ex parte Hale*) or had a severely understaffed medical department (as in *Greason*) or affirmatively refused to provide medical care that the medical staff had actually recommended (as in *Ancata*). And *Thomas* stands only for the requirement that the district court should have allowed

the plaintiff to replead before dismissing the case with prejudice. None of those cases establishes that, if these defendants violated Mr. Mullins's constitutional rights, the violation was clear at the time.

Because the amended complaint fails to plausibly allege that Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, White, Malone, and Graham violated Mr. Mullins's clearly established Eighth Amendment right to adequate medical care, these Defendants are entitled to qualified immunity at this stage. Accordingly, the court **WILL GRANT** their motion to dismiss Count Four.

### e. Count Five – Adequate Medical Care; Direct Liability Claims

In Count Five of her amended complaint, Ms. Guy claims that Officer Caver violated Mr. Mullins's Eighth Amendment rights by failing to provide adequate medical care. (Doc. 40 at 57–58 ¶¶ 314–20). Ms. Guy correctly points out that it was clearly established at the time of Mr. Mullins's stabbing that delaying or failing to provide access to care violated the Eighth Amendment. (Doc. 63 at 13–18). For her claim, Ms. Guy alleges that Officer Caver was the only officer in the cellblock at the time of Mr. Mullins's stabbing, witnessed Mr. Jackson stab Mr. Mullins multiple times but did not act "to facilitate the provision of emergency care" for approximately twenty to thirty minutes. (Doc. 40 at 14–15 ¶¶ 72–74, 82).

Officer Caver maintains that the claim against her must be dismissed because Ms. Guy did not identify a case that bears factual relevance to the issue at hand. (Doc. 64 at 4–5). The court is not persuaded. The complaint alleges that Officer Caver did *nothing* for twenty to thirty minutes following the attack. The constitutional insufficiency of that conduct has been established for almost fifty years. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Because the amended complaint plausibly alleges that Officer Caver violated Mr. Mullins's clearly established Eighth Amendment rights by failing to provide him with emergency medical attention after he was stabbed, Officer Caver is not entitled to qualified immunity at this stage in the proceedings. Accordingly, the court **WILL DENY** her motion to dismiss Count Five.

### f. Count Six – Unlawful Retaliation

In Count Six of her amended complaint, Ms. Guy asserts a claim for unlawful retaliation against Defendants Givens, Ragsdale, Price, Brooks, and Wilson. (Doc. 40 at 58 ¶¶ 321–29). To state a claim of retaliation, Ms. Guy must allege that: (1) Mr. Mullins's speech was constitutionally protected, (2) the defendant's retaliatory conduct adversely affected that speech, and (3) a causal connection existed "between the retaliatory actions and the adverse effect on speech." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).

The amended complaint alleges that Defendants Givens, Ragsdale, Price, Brooks, and Wilson violated Mr. Mullins's constitutional rights "by subjecting [him] to retaliation for exercising his constitutional right to report a personal grievance to prison authorities." (Doc. 40 at 58 ¶ 322). According to the amended complaint, these Defendants "knew that prisoners who reported sexual abuse were often violently attacked by other prisoners." (*Id*. at 59 ¶ 324). Ms. Guy alleges that leaving Mr. Mullins in the general population despite knowing that prisoners who reported sexual abuse were often violently attacked by other prisoners was these defendants' retaliation against him for reporting Mr. Jackson's misconduct. (*Id*. at 59 ¶ 325). These allegations state a plausible claim for retaliation.

Moreover, the fact that retaliation violates Mr. Mullins's constitutional rights is clearly established. *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989). The defendants maintain that Ms. Guy's reliance on a "broad statement of principle" is insufficient to sustain her burden of proving the conduct about which she complains violated Mr. Mullins's constitutional rights. (Doc. 64 at 9 (citing *Reichle v. Howards*, 566 U.S. 658, 666 (2012))). But Ms. Guy does not propose a general right to be free from retaliation for one's speech. Ms. Guy relies on the principle that Mr. Mullins has a constitutional right not to be subjected to a prison official's deliberate indifference of a substantial risk of serious harm in retaliation for his complaints about Mr. Jackson's abuse. To the extent these defendants do not

56

believe this type of retaliation is a sufficiently definite right, they can appeal this court's decision and get those contours of the right in writing.

Because Ms. Guy satisfies her burden of demonstrating that Defendants Givens, Ragsdale, Price, Brooks, and Wilson violated Mr. Mullins's clearly established constitutional rights, the Defendants are not entitled to qualified immunity. Therefore, the court **WILL DENY** their motion to dismiss Count Six.

### g.  *Count Seven – Civil Conspiracy*

In Count Seven, Ms. Guy alleges that Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent Jones, Givens, Brooks, White, Malone, Graham, Gordy, Estelle, Ragsdale, Price, Scott, Ary, Wilson, and Caver engaged in civil conspiracy to deprive Mr. Mullins of his First and Eighth Amendment rights. (Doc. 40 at 59–61 ¶¶ 330–40.). Ms. Guy concedes that Count Seven is due to be dismissed (Doc. 48-1 at 47 n.10; *see* doc. 60 at 2 n.1). Accordingly, the court **WILL GRANT** Defendants' motion to dismiss Count Seven.

### h.  *Counts Eight– Failure to Intervene*

In her amended complaint, Ms. Guy alleges that Officer Caver violated Mr. Mullins's constitutional rights because "she was present when Mr. Jackson and his co-assailants stabbed Mr. Mullins but failed to take any steps to intervene." (Doc. 40 at 62 ¶ 344). Ms. Guy's claim in Count Eight fails because Ms. Guy does not demonstrate the violation of a *clearly established* constitutional right.

It is well-settled that an officer has a duty to intervene when he observes another officer committing an affirmative act that violates a constitutional right—typically by using excessive force—and is in a position to act to stop the constitutional violation. *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) ("[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance."); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983."); *see also Keating v. City of Miami*, 598 F.3d 753, 767 (11th Cir. 2010) (holding that defendants were not entitled to qualified immunity on First Amendment claims because the defendants "violated clearly established law when, in their supervisory capacities, they directed their subordinate officers to use less-than-lethal weapons to disperse a crowd at a large public demonstration and consequently failed to stop such conduct"). That conduct is materially different from the conduct alleged here.

In Count Eight, Ms. Guy essentially duplicates her allegations against Officer Caver from Count One and alleges that Officer Caver is liable for failing to intervene in another *inmate's* conduct. (*See* doc. 40 at 14–15 ¶¶ 71–82, 62 ¶ 344). Ms. Guy cites to a litany of cases—both binding and non-binding—for the proposition that

Officer Caver should be held liable for her failure to act when she witnessed Mr. Jackson attack Mr. Mullins. (Doc. 63 at 20–23). She argues that this "robust consensus of cases . . . put Defendant Caver on notice that the Constitution required her to take some action when a prisoner was being stabbed in her presence, rather than doing nothing." (*Id*. at 21) (quotations omitted). But most of the cases Ms. Guy cites involve claims for deliberate indifference. *See, e.g.*, *Davidson v. Cannon*, 474 U.S. 344 (1986); *Williams v. Mueller*, 13 F.3d 1214 (8th Cir. 1994). Ms. Guy's failure to identify any binding caselaw that recognizes the existence of a failure to intervene claim outside the context of an official failing to intervene when she observes another official violating an individual's constitutional rights precludes her ability to defend against Officer Caver's assertion of qualified immunity.

Because Ms. Guy has failed to demonstrate that Officer Caver violated clearly established constitutional rights, Officer Caver is entitled to qualified immunity on Ms. Guy's failure to intervene claim. Accordingly, the court **WILL GRANT** Officer Caver's motion to dismiss Count Eight.

### i. *Counts Nine and Ten – State Law Wrongful Death*

In Counts Nine and Ten of her amended complaint, Ms. Guy asserts state law wrongful death claims against all Defendants. (Doc. 40 at 62–65 ¶¶ 347–68).[8]

---

[8] Ms. Guy asserts Count Nine as a supervisory liability claim and Count Ten as a direct participation claim. (*See* doc. 40 at 62–66 ¶¶ 347–68). The court can locate no basis in Alabama

Alabama Code § 6-5-410 provides that a personal representative may initiate an action to recover damages "for the wrongful act, omission, or negligence of any person . . . whereby the death of h[er] testator or intestate was caused," so long as "the testator or intestate could have brought a claim for the wrongful act, omission, or negligence had it not caused death." Ala. Code § 6-5-410.

All Defendants argue that Ms. Guy's wrongful death claim is barred by state-agent immunity. (Doc. 43 at 29–31; doc. 46 at 26–28). Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So .2d 112, 117 (Ala. 2002). The Alabama Supreme Court has established a burden-shifting framework for application of the state-agent immunity test. *Ex parte Estate of Reynolds*, 946 So. 2d 450, 454–55 (Ala. 2006). First, the state agent must demonstrate that the "plaintiff's claims arise from a function that would entitle the State agent to immunity." *N.C. v. Caldwell*, 77 So. 3d 561, 567 (Ala. 2011) (quoting *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)). Ms. Guy does not challenge that the Defendants have made this preliminary showing. (*See* doc. 48-1; doc. 50-1). Therefore, the burden shifts to Ms. Guy to show either: (1) that "the Constitution or laws of the United States . . . require[s] otherwise, or (2) that the Defendants acted

---

law for distinguishing wrongful death claims based on supervisory liability or direct participation. Therefore, the court will address Counts Nine and Ten together.

willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So. 2d at 405.

The Defendants all contend that Ms. Guy's wrongful death claim does not plausibly claim that they acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. (Doc. 43 at 31–32 (citing *Ex Parte Gilland*, 274 So. 3d 976, 985 n.3 (Ala. 2018); doc. 46 at 34 –35 (same)). But as the Alabama Supreme Court held in *Ex Parte Butts,* "it is the rare case involving the defense of [State-agent] immunity that would be properly disposed of by a dismissal" for failure to state a claim. 775 So. 2d 173, 177 (Ala. 2000) (cleaned up); *see also Gilland*, 274 So. 3d at 985–86. And Ms. Guy's claim is not that rare case.

Defendants argue that Ms. Guy failed to sustain her burden of overcoming state-agency immunity by merely reciting the applicable elements and standard for state-agent immunity. But Ms. Guy's claim specifically incorporates allegations that, taken as true, could collectively support a plausible claim that Defendants' conduct was willful, malicious, in bad faith, or beyond their authority. Until the court can conduct a review the undisputed evidence supporting these allegations, it cannot say that Defendants are entitled to state-immunity as a matter of law. Therefore, the court **WILL DENY** the Defendants' motions to dismiss Counts Nine and Ten.

### III.   CONCLUSION

For the reasons explained above, the court **WILL GRANT IN PART** and **DENY IN PART** the Defendants' motions to dismiss Ms. Guy's amended complaint.

The court **WILL DENY** Defendants Dunn, Ellington, Jones, and Vincent's motions to dismiss Count One. The **WILL GRANT** the remaining defendants' motions to dismiss Count One.

The court **WILL GRANT** the motions to dismiss Count Two against Defendants Givens, Ragsdale, Gordy, Price, Brooks, Ary, Wilson, White, and Scott and **WILL DENY** the motions to dismiss Count Two against Defendant Caver.

The court **WILL GRANT** the motions to dismiss Count Three, which Ms. Guy concedes is due to be dismissed.

The court **WILL GRANT** the motion to dismiss Count Four against Defendants Ragsdale, Price, and Scott, as Ms. Guy concedes those Defendants should be dismissed. The court **WILL GRANT** the motion to dismiss Count Four against the remaining Defendants.

The court **WILL DENY** the motion to dismiss Count Five.

The court **WILL DENY** the motion to dismiss Count Six.

The court **WILL GRANT** the motion to dismiss Count Seven, which Ms. Guy concedes is due to be dismissed.

The court **WILL GRANT** the motion to dismiss Count Eight.

The court **WILL DENY** the motions to dismiss Count Nine and Ten.

The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 29, 2023.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE