FILED
2025 Jan-28  PM 05:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **LORI GUY WILLS, as administrator of the ESTATE OF STEVEN MULLINS,** | ) ) ) | |
| | ) | **Case No. 4:21-CV-00264-ACA** |
| **Plaintiff,** | ) | |
| | ) | **[OPPOSED]** |
| **v.** | ) | |
| | ) | |
| **JEFFERSON DUNN, _et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN
## <u>SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

NARRATIVE STATEMENT OF UNDISPUTED FACTS ..................................... 2

   I.   Procedural History ............................................................. 2

   II.  The ADOC Officials .......................................................... 2

   III. Factual Background ........................................................... 4

       A.   ADOC's Facilities and Custody Levels ............................ 4

       B.   Mullins's Institutional History ...................................... 5

       C.   Jackson's Institutional History ...................................... 7

       D.   The February 2019 Incident .......................................... 8

       E.   The Investigation ...................................................... 10

   IV. St. Clair .......................................................................... 11

       A.   St. Clair Standard Operating Procedures ..................... 11

       B.   The ADOC Officials' Efforts Regarding Correctional Staffing ........... 14

       C.   The ADOC Officials' Efforts Regarding Inmate Violence and Contraband at St. Clair ............... 16

       D.   Security Features of St. Clair ....................................... 17

       E.   The ADOC Officials' Efforts to Control Inmate Movement ............... 19

       F.   St. Clair's Classification Procedures ............................. 20

       G.   Inmate Sexual Violence ............................................... 20

   V.   Training ........................................................................... 22

EXPERT TESTIMONY ........................................................................ 23

LEGAL STANDARDS .......................................................................... 27

   I.   Summary Judgment ........................................................ 27

   II.  Deliberate Indifference .................................................... 28

       A.   Wade v. McDade ........................................................ 28

       B.   Supervisory Liability .................................................. 32

   III. Qualified Immunity ......................................................... 32

   IV. Wrongful Death ............................................................... 33

ARGUMENT ....................................................................................................34

   I.  Dunn's Actions Entitle Him to Summary Judgment. ....................34

      A.  Plaintiff's Failure-to-Protect Claim. .................................34

      B.  Plaintiff's Wrongful-Death Claim. ...................................42

   II.  Ellington's Actions Entitle Him to Summary Judgment. .............44

      A.  Plaintiff's Failure-to-Protect Claim. .................................44

      B.  Plaintiff's Wrongful-Death Claim. ...................................45

   III.  Vincent's Actions Entitle Her to Summary Judgment. ................46

      A.  Plaintiff's Failure-to-Protect Claim. .................................46

      B.  Plaintiff's Wrongful-Death Claim. ...................................48

   IV.  Jones's Actions Entitle Her to Summary Judgment. ...................48

      A.  Plaintiff's Failure-to-Protect Claim. .................................48

      B.  Plaintiff's Wrongful-Death Claim. ...................................49

   V.  Plaintiff's Failure to Plead Causation Entitles Culliver to Summary Judgment on Plaintiff's Wrongful-Death Claim. ..........................................50

CONCLUSION ................................................................................................50

CERTIFICATE OF SERVICE ..............................................................................52

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ..........................................................................................27

Boykins v. Dunn,
    696 F. Supp. 3d 1061 (N.D. Ala. 2023) ...............................................................49

Brown v. Dunn,
    C.A. No. 2:21-cv440-MHT, 2024 WL 5168637 (M.D. Ala. Dec. 19, 2024) ......42

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ..........................................................................................28

Cottone v. Jenne,
    326 F.3d 1352 (11th Cir. 2003)..........................................................................32

Ex parte Ala. Dept. of Corrs.,
    201 So.3d 1170 (Ala. 2016)............................................................ 43, 45, 48, 49

Ex parte Cranman,
    792 So. 2d 392 (Ala. 2000) ................................................................................33

Farmer v. Brennan,
    511 U.S. 825, 114 S.Ct. 1970 (1994) ......................................................... passim

George v. Wexford Health Sources, Inc.,
    Case No. 2:22-cv-434-ECM, 2024 WL 1120110 (M.D. Ala. Mar. 10, 2024).....36

Gilmore v. Dept. of Corr.,
    111 F.4th 1118 (11th Cir. 2024 ..........................................................................39

Hale v. Tallapoosa County,
    50 F.3d 1579 (11th Cir. 1995)....................................................................... 40, 41

Lee v. Ferraro,
    284 F.3d 1188 (11th Cir. 2002)..................................................................... 32, 33

Marsh v. Butler County, Alabama,
    268 F.3d 1014 (11th Cir. 2001)..................................................................... 40, 41

Rasho v. Jeffreys,
    22 F.4th 703 (7th Cir. 2022)......................................................................... 38, 39

Stalley v. Cumbie,
    -- F.4th --, 2024 WL 5244627 (11th Cir. Dec. 30, 2024) ............................. 31, 40

Swain v. Junior,
  961 F.3d 1276 (11th Cir. 2020) ....................................................... 31, 38

Wade v. McDade,
  106 F.4th 1251 (11th Cir. 2024) .................................................... passim

Wade v. McDade,
  83 F.4th 1332 (11th Cir. 2023) ................................................................29

Williams v. Bennett,
  689 F.2d 1370 (11th Cir. 1982) ..............................................................36

Willingham v. Loughnan,
  261 F.3d 1178 (11th Cir. 2001) ..............................................................32

**Statutes**

18 U.S.C.§ 3636(a)(1)(A) ...........................................................................35

18 U.S.C.§ 3636(c)(2) .................................................................................35

42 U.S.C. § 1983 ...........................................................................................2

Ala. Code § 6-5-410 ............................................................................. passim

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................27

Fed. R. Civ. P. 56(e) ....................................................................................28

Rule 56(c) .....................................................................................................28

Jefferson Dunn ("Dunn"), Edward Ellington ("Ellington"), Christy Vincent ("Vincent"), Karla Jones ("Jones"), and Grantt Culliver ("Culliver," and, together with Dunn, Ellington, Vincent, and Jones, the "ADOC Officials") submit this memorandum in support of their Motion for Summary Judgment (Doc. 158).

## INTRODUCTION

Plaintiff seeks to hold the ADOC Officials personally liable for the criminal actions of one inmate (Clarence Jackson ("Jackson")) that resulted in the death of another inmate (Steven Mullins ("Mullins")). After the Court ruled on the ADOC Officials' Motion to Dismiss (Doc. 84), the Parties engaged in extensive discovery, and the Eleventh Circuit issued its landmark opinion in Wade v. McDade, 106 F.4th 1251 (11th Cir. 2024) (en banc). Wade changed the landscape for deliberate-indifference claims in this Circuit, clearly demarcating the level of deliberation required for a state official to violate an individual's Eighth Amendment rights. At the same time, discovery confirmed the absence of evidence supporting Plaintiff's claims. Discovery disproved Plaintiff's allegation that the ADOC Officials "did nothing" to protect inmates at St. Clair from violence, establishing the extensive actions each ADOC Official took, within his or her authority, to address inmate violence at St. Clair.

As set forth separately below with respect to each individual ADOC Official, the Court should grant summary judgment for at least the following three reasons:

(1)    Plaintiff cannot establish that Dunn, Ellington, Vincent, or Jones violated the Constitution;

(2)    Plaintiff cannot establish that Dunn, Ellington, Vincent, or Jones violated clearly established law; and

(3)    Plaintiff cannot establish a state-law wrongful-death claim against any ADOC Official.

The ADOC Officials therefore respectfully request that the Court grant summary judgment in their favor on Plaintiff's remaining claims against them.

## Narrative Statement of Undisputed Facts

### I.    Procedural History

1.    Plaintiff, as the representative of Mullins's estate,[1] filed this action seeking to hold the ADOC Officials and other current and former ADOC employees personally liable for Mullins's death at St. Clair on February 26, 2019. (Docs. 1, 40).

2.    The following claims remain against the ADOC Officials: Count One, failure to protect Mullins from a known risk of inmate-on-inmate violence pursuant to 42 U.S.C. § 1983 ("section 1983"); and Count Nine, wrongful death pursuant to Alabama state law.  (Doc. 83 at 3).

### II.    The ADOC Officials

3.    Dunn served as ADOC's Commissioner from April 1, 2015, until December 31, 2021.  (Doc. 160-11 (Ex. C) at 6 (14:8-10), 14 (48:16-17)).

---

[1] Mullins's mother, Carol Guy, originally filed this action as the representative of Mullins's estate; however, the Court substituted Mullins's sister, Lori Guy Willis, as the estate representative on March 5, 2024.  (Doc. 104).

4.      Dunn represented the highest-ranking official in ADOC and exercised general oversight over ADOC's statewide operations.  (Doc. 89, ¶ 17).

5.      Culliver served as ADOC's Associate Commissioner of Operations until his retirement on November 20, 2018; in that position, he exercised general oversight over certain aspects of the operations of ADOC facilities.  (Doc. 89, ¶ 18).

6.      Ellington began working for ADOC in 1989 as a correctional officer and received several promotions; at the time of the Incident at issue in this action, he served as Institutional Coordinator for ADOC's Northern Region.  (Doc. 160-5 (Ex. B) at 8 (21:14-20), 9 (28:5-29:5)).

7.      As Institutional Coordinator, Ellington provided general oversight over certain security operations of ADOC male facilities within the northern region of Alabama, including St. Clair.  (Id. at 11 (35:24-36:8)).

8.      Vincent assumed the role of ADOC statewide Prison Rape Elimination Act ("PREA") Director in 2015, a role she occupied at the time of the Incident at issue in this action.  (Doc. 160-1 (Ex. A) at 5 (9:18-10:2)).

9.      As ADOC's PREA Director, Vincent exercised state-wide oversight regarding compliance with PREA.  (Doc. 89, ¶ 22).

10.      Jones served as the Warden III at St. Clair at the time of the Incident; in that position, she exercised general oversight over certain day-to-day operations at St. Clair.  (Doc. 160-12 (Ex. D) at 6 (14:21-15:13); Doc. 89, ¶ 23).

### III.   FACTUAL BACKGROUND

#### A.   ADOC'S FACILITIES AND CUSTODY LEVELS.

11.    ADOC designates its facilities as Security Level I, Security Level II, Security Level IV, or Security Level V, with Security Level V constituting the most secure and restrictive environment in the ADOC system and housing the most violent and highest classified offenders in ADOC custody.  (ADOC Male Inmate Handbook, https://doc.alabama.gov/docs/PublicMaleInmateHandbook.pdf, at 7-8).

12.    St. Clair maintains the designation of a Security Level V, close custody facility.  (https://doc.alabama.gov/facility.aspx?loc=21).

13.    ADOC also assigns each inmate a custody level.  (Doc. 160-17 (Ex. D-N) at 6-8).

14.    "Close" custody level represents ADOC's most restrictive custody level and includes inmates with prior escape attempts, inmates exhibiting violent behavior, and inmates who demonstrate an inability to follow institutional regulations; ADOC houses "Close" custody inmates in restrictive housing units at Security Level V facilities, including St. Clair.  (Id. at 29-30).

15.    ADOC's "Medium" custody level applies to inmates considered suitable for institutional programming and able to adapt to dormitory living or double occupancy cells; ADOC houses "Medium" custody inmates at Security Level IV and V facilities, including St. Clair.  (Id. at 31-32).

**B.    MULLINS'S INSTITUTIONAL HISTORY.**

16.    Mullins received a sentence of life without the possibility of parole for Capital Murder and Kidnapping and entered ADOC custody on April 6, 1999.  (Doc. 160-31 (Ex. I) at 12; Doc. 160-55 (Ex. P-15) at 5).

17.    ADOC initially classified Mullins as Security Level V, medium custody.  (Doc. 160-55 (Ex. P-15) at 2; Doc. 160-9 (Ex. B-10) at 38).

18.    On March 13, 2000, Mullins assaulted another St. Clair inmate because the other inmate made a sexual advance on him.  (Doc. 160-26 (Ex. F-7) at 2-3).

19.    On January 6, 2003, Mullins assaulted another inmate at Donaldson for stealing sandwiches from the kitchen.  (Doc. 160-32 (Ex. I) at 15).

20.    On January 20, 2004, Mullins stabbed an inmate multiple times because the inmate owed Mullins a debt.  (Id.).

21.    In December 2007, Holman correctional staff located a notepad with a swastika on the cover, an Aryan Brotherhood tattoo design, a picture of Adolf Hitler, and other similar material during a search of Mullins's property.  (Doc. 160-22 (Ex. F-3) at 2).

22.    ADOC transferred Mullins to St. Clair on March 23, 2018, and St. Clair staff assigned him to cell Q24 in general population.  (Doc. 160-32 (Ex. I) at 17).

23.    Classification staff completed PREA risk assessments of Mullins on January 31, 2018, and March 23, 2018, and determined Mullins required no designation as either a potential victim or predator.  (Id. at 33).

24.    On July 17, 2018, Mullins reported to correctional staff that he owed another inmate a debt and feared for his life; however, Mullins failed to identify the individual who allegedly threatened his life.  (Doc. 160-44 (Ex. P-5) at 3-4).

25.    The same day, Mullins tested positive for amphetamines, and correctional staff placed Mullins in the restrictive housing unit ("RHU").  (Doc. 160-23 (Ex. F-4) at 2; Doc. 160-45 (Ex. P-7) at 2-3; Doc. 160-18 (Ex. D-P) at 3).

26.    Mullins wrote classification on September 10, 2018, asking to return to general population, and reporting he believed he could live in population problem free.  (Doc. 160-47 (Ex. P-8) at 3-5; Doc. 160-32 (Ex. I) at 17).

27.    Classification refused Mullins's request and kept him in RHU until February 12, 2019, when Mullins requested again to return to general population, and signed a statement which read, in part, "I, do hereby state that I can live in the St. Clair population without any problems, and I have no known enemies at this institution…I hereby relieve any and all DOC officials of any liability and damages…"  (Doc. 160-48 (Ex. P-9) at 2).

28.     St. Clair staff released Mullins from RHU and assigned him to cell Q-32 in general population; however, Mullins chose to move to cell Q-27 without informing St. Clair staff.  (Doc. 160-32 (Ex. I) at 18).

29.     At the time of the Incident, ADOC classified Mullins as Security Level V and custody level medium.  (Doc. 160-9 (Ex. B-10) at 16).

### C.    JACKSON'S INSTITUTIONAL HISTORY

30.     Jackson entered ADOC custody on November 27, 2006, after receiving a twenty-eight-year sentence for murder and a twenty-year sentence for rape.  (Doc. 160-32 (Ex. I) at 9).

31.     Jackson committed several disciplinary infractions at various ADOC facilities.  (Id. at 11-12 (21 disciplinaries between April 2010 and November 2015)).

32.     On April 11, 2018, ADOC reclassified Jackson to Close custody after he assaulted another inmate, resulting in Jackson's placement in RHU for six (6) months.  (Id. at 10-11).

33.     ADOC transferred Jackson to St Clair on May 11, 2018.  (Id. at 10).

34.     On May 15, 2018, St. Clair classification staff conducted a PREA assessment of Jackson and identified him as a potential predator.  (Id. at 12).

35.     At the time of the Incident, ADOC classified Jackson as Security Level V, medium custody level.  (Doc. 160-36 (Ex. M) at 44; Doc. 160-30 (Ex. G) at 9).

### D.    THE FEBRUARY 2019 INCIDENT

36.    On the morning of February 25, 2019, Mullins reported to Correctional

Officer Dylan Tucker ("CO Tucker") that an unknown inmate assaulted him, and

Mullins requested placement in a cell by himself.  (Doc. 160-55 (Ex. P-15) at 27).

37.    Lieutenant William Ragsdale ("Lt. Ragsdale") moved Mullins to cell

P-36, and CO Tucker escorted him to the infirmary for a medical assessment.  (Id.).

38.    A nurse completed a medical assessment of Mullins and noted an

abrasion to Mullins's head which "did not appear to be a fresh wound."  (Id.).

39.    Lt. Ragsdale questioned Mullins, and Mullins stated that he could not

identify his assailant "because it was too dark in the cell."  (Id.).

40.    At approximately 4:00 p.m. on February 25, 2019, Lieutenant Angelia

Gordy ("Lt. Gordy") received notification that Mullins made a PREA Hotline call

and stated that his cellmate Jackson attempted to make Mullins perform oral sex at

knifepoint, but Mullins ran out of the cell.  (Doc. 160-18 (Ex. D-P) at 4).

41.    Lt. Gordy escorted Mullins to the infirmary for a body chart.  (Id.).

42.    Following Mullins's body chart, staff reassigned Mullins to cell L-28,

and staff completed mental health referrals for Mullins and Jackson.  (Id.).

43.    The incident report noted that Cpt. Kevin White ("Cpt. White") would

complete a full investigation into Mullins's PREA allegation.  (Id.).

8

44. On February 26, 2019, Correctional Cubicle Operator Brandie Smith opened the L-2 side housing unit door to conduct chow and saw Mullins fall down bleeding outside the cubicle door; she immediately called for assistance over her hand-held radio. (Id. at 2).

45. Captain White and Lieutenant Antoine Price ("Lt. Price") responded to L dorm, and while Cpt. White transported Mullins to the infirmary, Mullins identified "CJ" as his assailant; however, Cpt. White did not know "CJ's" identity. (Doc. 160-29 (Ex. F-10) at 2; Doc. 160-18 (Ex. D-P) at 7).

46. Correctional staff placed Jackson and two other suspects in RHU pending investigation; however, staff were unable to locate a weapon. (Doc. 160-29 (Ex. F-10) at 2).

47. St. Clair medical staff treated Mullins and notified local paramedics, who responded to St. Clair. (Id.). Paramedics administered life-saving measures until arranging for a life flight helicopter to transport Mullins to University of Alabama Hospital at Birmingham ("UAB"), where Mullins received surgery. (Id.).

48. Between the night of the Incident and February 28, 2019, Mullins suffered a brain hemorrhage, and UAB physicians declared him brain dead; Mullins died on March 1, 2019. (Doc. 160-18 (Ex. D-P) at 2-3).

E.    THE INVESTIGATION

49.    Investigations & Intelligence investigator Brian Casey ("Agent Casey") responded to St. Clair the evening of the Incident.  (Id. at 2).

50.    Agent Casey and Agent Bradley Arledge ("Agent Arledge") interviewed Lt. Price, who stated that Mullins told him an inmate named "CJ" stabbed Mullins in L dorm, and Lt. Price identified Jackson and another inmate (Christopher Jones ("Jones")) as suspects.  (Id. at 5).

51.    Lt. Price explained to Agents Casey and Arledge that staff knew Mullins as a drug user, and he believed Mullins owed Jackson a debt.  (Id.).

52.    Lt. Price further stated that he understood that Jackson attempted to collect the debt in the form of a sexual favor; however, when Mullins refused and reported Jackson to prison staff, Jackson stabbed Mullins in retaliation.  (Id.).

53.    Lt. Gordy told Agents Casey and Arledge that a urine sample confirmed that Mullins used amphetamines the morning of the Incident.  (Id.).

54.    Inmate Vandrick Thomas ("Thomas") told Agents Casey and Arledge that he stood behind Mullins while exiting L dorm for chow when an inmate stabbed Mullins, after which Thomas ran back into the dorm; Thomas viewed a photographic lineup and identified Jackson as the inmate who stabbed Mullins.  (Id.).

55.    Agents Casey and Arledge also interviewed inmate Jones, who indicated that at the time of the Incident he was sleeping in his cell.  (Id. at 5-6).

10

56.    Jackson denied any involvement or knowledge of the Incident; thereafter, Agent Casey confiscated a pair of Jackson's boots containing possible blood, which later tested positive for Mullins's DNA.  (Id. at 6).

57.    Agent Casey interviewed Cpt. White, who indicated that Mullins told him "CJ" stabbed him.  When Cpt. White asked Mullins which "CJ," Mullins responded, "[t]he one y'all had to move me away from the other day."  (Id. at 7).

58.    Agent Casey forwarded his investigation to the St. Clair District Attorney's office and recommended presentation to the grand jury for murder, and, on October 2, 2020, a St. Clair County Grand Jury returned an indictment against Jackson for Capital Murder.  (Id.; Doc. 160-38 (Ex. O)).

## IV.    ST. CLAIR

### A.    ST. CLAIR STANDARD OPERATING PROCEDURES

59.    In 2018 and 2019, ADOC maintained a comprehensive set of Administrative Regulations ("AR") which established the policies and procedures that applied to all ADOC facilities.  (Doc. 160-56 (Ex. P-16) at 1-7).

60.    In addition to ADOC's ARs, St. Clair maintained facility-specific Standard Operating Procedures ("SOP").  (See e.g., Docs. 160-58—160-65 (Exs. P-18—P-25)).

61.    St. Clair SOP 031, titled "Staffing," defines "Critical Manning" as "[t]he minimum number of security personnel needed to man all posts without altering the routine operations of the institution." (Doc. 160-59 (Ex. P-19) at 2).

62.    Pursuant to SOP 031, "Essential Posts" are those posts "that will be manned twenty-four hours a day, seven days a week." (Id. at 3).

63.    SOP 032 establishes the "posts that should be shut down" in times of minimal staff availability, and the order in which shift supervisors should close them. (Doc. 160-60 (Ex. P-20) at 6).

64.    SOP 083, which establishes the responsibilities for St. Clair's Inmate Control Systems Officer, requires staff to house inmates identified as potential PREA victims on the one side of the population housing units and inmates identified as potential PREA predators on the two side. (Doc. 160-61 (Ex. P-21) at 8-9).

65.    Additionally, SOP 083 assigns the ICS Officer responsibility for issuing colored wristbands according to inmates' housing assignments. (Id. at 7).

66.    St. Clair's Internal Classification Board ("ICB"), which consists of a Captain or above, a classification specialist, and psychological associate or mental health professional, meets weekly and on an as needed basis to review housing assignments and determines the "needs and requirements of an inmate," including custody level, programming, and housing unit placement for inmates housed at St. Clair. (Doc. 160-31 (Ex. H) at 17).

67.    St. Clair SOP 137, titled "Inmate Movement Control," guides correctional officers in controlling inmate movement to provide for "orderly movement as well as provide increased security." (Doc. 160-28 (Ex. F-9) at 2).

68.    Under SOP 137, inmates may not visit unassigned living areas, job sites, or program areas unless they obtain approval from the shift commander or a higher-ranking security staff member. (Id. at 4).

69.    Under SOP 110, titled "Search and Shakedowns," cell block rovers must conduct cell searches each shift in their assigned housing unit and perform pat searches randomly or as the situation dictates to prevent the introduction of contraband into the facility, detect the manufacture of prohibited items, discourage theft, and discover health or safety hazards. (Doc. 160-62 (Ex. P-22) at 4).

70.    Under SOP 229, all employees must receive training, including the "prevention, detection, response and reporting of allegations of inmate sexual abuse, sexual harassment, and custodial sexual abuse." (Doc. 160-64 (Ex. P-24) at 8).

71.    All inmates receive PREA orientation upon intake and must provide written confirmation that they understand the PREA policies. (Id.).

72.    In addition to unannounced rounds conducted by shift supervisors, the Warden, IPCM, or Shift Commander must conduct at least one unannounced round on each shift, with a minimum of three checks per week. (Id. at 10).

73.     SOP 229 provides several methods for inmates to report PREA concerns, including filing a grievance, calling the PREA hotline, using the PREA drop box, telling the Institutional PREA Compliance Manager ("IPCM"), contacting I&I, or reporting to a staff member, contractor, or volunteer. (Id. at 18-20).

74.     Pursuant to SOP 229, all PREA allegations must be investigated thoroughly and as quickly as possible, and I&I must be notified of substantiated PREA allegations for investigation. (Id. at 16-18).

75.     Under SOP 230, first responders must "[p]hysically separate alleged victim(s), abuser(s) and witnesses;" ensure the preservation of evidence; report the incident to the shift supervisor or shift commander; escort the victim to the health care unit; place the alleged aggressor in restrictive housing pending investigation; follow the instructions of the IPCM and LESD investigator; and secure the crime scene. (Doc. 160-65 (Ex. P-25) at 4-5).

### B.    THE ADOC OFFICIALS' EFFORTS REGARDING CORRECTIONAL STAFFING

76.     ADOC and St. Clair faced staffing challenges, much like most corrections agencies throughout the nation. (Doc. 160-33 (Ex. J) at 38-39; Doc. 160-30 (Ex. G) at 35).

77.     Prior to the COVID-19 pandemic, ADOC, under Dunn's leadership, reversed the decline in hiring of new correctional staff and achieved an increase in

correctional officers in 2019, which continued until the outbreak of COVID-19 in early 2020.  (Doc. 160-11 (Ex. C) at 49 (186:6-17)).

78.    In 2016, Dunn introduced a new classification of security staff – Correctional Cubicle Operators ("CCOs"), who work in enclosed booths and do not come into direct contact with inmates; the introduction of CCOs increased the availability of fully-trained correctional officers for other tasks.  (Id. at 43 (161:17-20); Doc. 160-72 (Ex. P-32) at 14).

79.    In fiscal year 2019, the Alabama Legislature approved a thirty-million-dollar supplement to ADOC's budget, and ADOC dedicated a portion of these funds to correctional officer pay raises.  (Doc. 160-72 (Ex. P-32) at 14).

80.    In 2017, ADOC retained Warren Averett to advise it on its staffing challenges; among other things, Warren Averett recommended an increase in base pay for Correctional Officer Trainees.  (Id. at 72).

81.    In July 2018, after receiving legislative approval, ADOC implemented a four-step ten percent (10%) increase for correctional officers working in close security prisons, such as St. Clair, and a two-step five percent (5%) increase for correctional officers working in medium security prisons.  (Id. at 14).

82.    When Dunn began his tenure as Commissioner, ADOC received an annual budget of approximately $320 million; however, in 2021, when Dunn left his

role as ADOC Commissioner, ADOC's budget increased to approximately $620 million dollars.  (Doc. 160-30 (Ex. G) at 21).

83.    ADOC retained Savage Corrections Consulting, LLC ("Savage") to conduct a staffing analysis regarding the number of posts required at each facility for optimal staffing levels, which ADOC and Savage completed in May 2018.  (Doc. 160-68 (Ex. P-28)).

84.    In addition to retaining Warren Averett and Savage, ADOC retained the services of Stephen Condrey at Troy University, who conducted an analysis of the compensation offered to correctional staff.  (Doc. 160-72 (Ex. P-32) at 14).

85.    ADOC supplemented St. Clair's staff regularly in 2018 and 2019 with Correctional Emergency Response Team ("CERT") members, officers from Hamilton Aged and Infirm, retired officers, and volunteers from other facilities in order to address staffing levels at St. Clair.  (Doc. 160-5 (Ex. B) at 36 (136:7-13)).

86.    Between February 10, 2019, and March 1, 2019, CERT team members and volunteer officers manned posts at St. Clair on at least February 10, 11, 26, 27, and March 1.  (Doc. 160-52 (Ex. P-13) at 3, 5, 32; Doc. 160-53 (Ex. P-13) at 49, 54-56, 62-63, 66, 69, 71, 75, 80, 87).

C.    **THE ADOC OFFICIALS' EFFORTS REGARDING INMATE VIOLENCE AND CONTRABAND AT ST. CLAIR**

87.    ADOC maintained a zero-tolerance policy for contraband at all ADOC facilities, including St. Clair.  (Doc. 160-11 (Ex. C) at 17 (59:23-60:6)).

88.    Correctional facilities throughout the country face challenges with individuals attempting to introduce contraband.  (Doc. 160-30 (Ex. G) at 49).

89.    ADOC conducted facility searches by I&I or the Law Enforcement Services Division ("LESD") and K-9 units, K-9 searches of vehicles, searches of individuals going in the front gate, and monitoring of perimeter fences.  (Doc. 160-12 (Ex. D) at 49 (187:14-188:13)).

90.    In 2017, ADOC deployed five CERT teams consisting of 80-85 correctional officers and K-9 officers to conduct searches at ADOC's male facilities, including St. Clair, on a rotating basis.  (Doc. 160-5 (Ex. B) at 35-36 (132:7-25), 133:9-134:1)).

91.    ADOC assigned CERT team members and staff from Hamilton Aged and Infirm to assist St. Clair staff with searches and shakedowns in 2018 and 2019. (Id. at 35-36 (129:21-130:24, 136:4-137:7, 138:3-8)).

92.    Jones testified that during her tenure as Warden III at St. Clair, staff conducted daily searches, conducted larger shakedowns throughout the facility three to four times per week, and conducted facility-wide searches approximately twice per month.  (Doc. 160-12 (Ex. D) at 49 (185:5-19, 186:7)).

D.    SECURITY FEATURES OF ST. CLAIR

93.    During Dunn's first visit to St. Clair, he recognized structural deficiencies of the institution and their resulting security challenges, including line-

of-sight issues from housing cubicles into the dayrooms, low ceilings that allowed inmates access to tamper with or damage surveillance equipment, and generally aging infrastructure not originally designed for modern correctional practices. (Doc. 160-11 (Ex. C) at 9-10 (25:17-27:5, 28:4-29:18)).

94.     Dunn developed a plan to modernize ADOC's infrastructure, including St. Clair, early in his tenure, and drafted the Alabama Prison Transformation Initiative ("APTI") in late 2015. (Id. at 10 (30:10-17)).

95.     Dunn developed the APTI to consolidate fourteen high and medium custody level prisons into four large scale, state-of-the-art regional correctional facilities. (Doc. 160-41 (Ex. P-2) at 15).

96.     Dunn and Ellington explained how the low ceilings at St. Clair presented particular challenges in terms of ADOC maintaining working cameras inside the facility, as the ceiling height provided inmates easy access to tamper with or damage the cameras in their housing units. (Doc. 160-11 (Ex. C) at 10 (29:2-30:3); Doc. 160-5 (Ex. B) at 21 (73:22-74:10)).

97.     ADOC expended vast resources repairing locks, replacing locks with tamper resistant mechanisms, and replacing cell doors at St. Clair. (Doc. 160-11 (Ex. C) at 19 (66:2-7); Doc. 160-41 (Ex. P-2) at 6).

### E.    THE ADOC OFFICIALS' EFFORTS TO CONTROL INMATE MOVEMENT

98.    St. Clair maintains SOP 137 "to ensure orderly movement as well as provide increased security." (Doc. 160-63 (Ex. P-23) at 2).

99.    Ellington testified that ADOC completed several fencing projects at St. Clair to assist with inmate movement control, including installation of interior fences in the population yard designed to provide separation of the population housing units. (Doc. 160-5 (Ex. B) at 46 (173:22-175:22)).

100.    St. Clair implemented a color-coded wristband system to assist security staff in identifying inmate housing assignments and improve inmate movement control; however, St. Clair faced difficulties as inmates frequently removed or damaged their wristbands. (Id. at 44 (166:3-167:25)).

101.    During a September 2018 audit of wristband compliance at St. Clair, only 19 of the 888 inmates housed at St. Clair lacked wristbands; moreover, the auditors noted that correctional staff secured and controlled all doors, and in total only 2.3% of the inmate population failed to comply with the wristband policy, and those inmates received disciplinary action. (Doc. 160-31 (Ex. H) at 23).

102.    Correctional officers received corrective action for failing to secure doors and locks and received reminders from facility leadership to keep housing unit doors secure to control inmate movement. (Doc. 160-14 (Ex. D-K) at 6-25; Doc. 160-31 (Ex. H) at 24).

103. Moreover, as noted above, ADOC expended vast resources installing interior fencing in the population yard to control and restrict inmate movement between population housing units.  (Doc. 160-61 (Ex. P-23) at 8).

F.  **ST. CLAIR'S CLASSIFICATION PROCEDURES**

104. ADOC utilizes the Ohio Risk Assessment System ("ORAS") in its facilities, including St. Clair.  The ORAS considers an inmate's security risk, disciplinary history, mental health and medical needs, programming, educational, and vocational needs to place inmates into the least restrictive setting available while taking into account the safety and security of the facility, staff, other inmates, and the general public.  (Doc. 160-17 (Ex. D-N) at 6-7).

105. All inmates received initial classification assessments upon intake to ADOC, and, twice a year or as needed, classification performed reviews of each inmate's classification designation for any necessary changes.  (Id. at 12-14, 17-18).

106. ADOC and St. Clair's classification system complies with nationally accepted standards.  (Doc. 160-31 (Ex. H) at 16).

107. ADOC employs classification specialists at each facility, including St. Clair.  (Doc. 160-17 (Ex. D-N) at 10-11, 17).

G.  **INMATE SEXUAL VIOLENCE**

108. Under AR 454, related to PREA, ADOC provides employees with extensive training regarding PREA, including "the prevention, detection, response,

20

and reporting of inmate sexual abuse, sexual harassment, and custodial sexual misconduct." (Doc. 160-57 (Ex. P-17) at 12).

109.   ADOC employs a state-level PREA Director, who possesses "the authority to coordinate and develop procedures to identify, monitor, and track sexual abuse[,] rape[,] and sexual harassment in the ADOC; maintain statistics; and, conduct practice audits to ensure compliance with Department policy and [PREA.]" (Doc. 160-57 (Ex. P-17) at 3).

110.   Each ADOC facility also employs an institutional PREA Compliance Manager ("IPCM"), who remains on call twenty-four hours a day, seven days a week. (Id. at 11-12).

111.   During the inmate screening process, a classification professional utilizes the ADOC PREA Risk Factors Checklist (the "PREA Checklist"), interviews inmates, and reviews relevant information to help determine whether to designate inmates as "predators" or "victims" for housing decisions. (Id. at 32-33).

112.   ADOC maintains a 24-hour PREA hotline, which Vincent checks not only during her work hours, but also "at home, on holidays, on weekends," and Vincent receives an immediate email notification of each hotline message. (Doc. 160-1 (Ex. A) at 17 (60:2-11)).

113.   AR 454 provides specific procedures for "first responder staff" to follow "[u]pon learning of a PREA related incident," including separating victims,

aggressors, and witnesses; preserving the crime scene and evidence, and notifying the Shift Commander of the incident and drafting an incident report on ADOC Form 302-A. (Doc. 160-57 (Ex. P-17) at 18-19).

114. During St. Clair's 2018 PREA audit, the auditor observed that ADOC's "PREA Director and IPCM showed an amazing level of commitment and effort to come into compliance" in those areas in which the auditor initially found St. Clair out of compliance. (Doc. 160-75 (Ex. P-33) at 6).

115. The 2018 PREA auditor further observed that, during a return visit to St. Clair on July 22, 2018, "St. Clair leadership . . . had obviously made great strides toward addressing each and every issue (under their control) noted in the on-site tour," and "ADOC has shown numerous efforts to hire and retain more staff for all facilities, Statewide." (Id.).

## V.    TRAINING

116. The ADOC Correctional Training Academy (the "Academy") consists of ten weeks of instruction for Correctional Officer Trainees, who must meet all requirements set forth by APOSTC and ADOC to obtain certification. (Doc. 160-70 (Ex. P-30) at 3, ¶ 9).

117. Correctional officer trainees receive 400 training hours at the Academy on topics including, but not limited to, searches of bodies, cells, and areas, classification procedures, illicit drugs, evidence collection, disciplinary procedures,

security, custody and control, count procedures, use of force, de-escalation tactics, contraband, security threat groups known colloquially as gangs, strategic self-defense and grappling tactics, mental health, and PREA.  (Id. at 4, ¶ 12).

118.   APOSTC mandates continuing education for correctional officers each year, and ADOC requires 40 hours of annual training, which it documents in employee training files.  (Id. at 5, ¶ 16).

## EXPERT TESTIMONY

The ADOC Officials submitted expert reports from two experts: Kevin Myers ("Myers") and Mark Inch ("Inch").  In addition, other current and former ADOC employees named as defendants in this action submitted an expert report from Brian Zawilinski ("Zawilinski").

Myers possesses almost fifty years of experience in corrections, from a line staff member to warden and management positions.  (Doc. 160-32 (Ex. I) at 1). Myers provided opinions the following opinions regarding the allegations against the ADOC Officials:

- "The ADOC Officials maintained appropriate classification procedures, properly classified Jackson, and Mullins, and took appropriate action to separate Mullins from his alleged abuser." (Id. at 31).

- "The ADOC Officials took reasonable and appropriate steps to protect inmates from the risk of inmate-on-inmate violence at St. Clair."  (Id. at 36).

23

- "The ADOC Officials took reasonable steps to locate, and remove contraband, including contraband weapons, from St. Clair." (Id. at 40).

- "The ADOC Officials maintained appropriate policies and procedures providing guidance to correctional staff in responding to instance of sexual abuse at St. Clair. St. Clair staff responded appropriately and within policy to Mullins allegations of sexual harassment." (Id. at 49).

- "[T]he ADOC Officials acted deliberately and intentionally to improve the conditions at St. Clair for the inmate population and the brave staff who served at the facility every day. . . . Dunn and the ADOC Officials did not turn a blind eye to ADOC's challenges, staffing demands, antiquated facilities, contraband weapons and drugs. Instead, Dunn and the ADOC Officials expended significant effort and resources to achieve long lasting improvements and change within ADOC." (Id. at 54).

- "I found no evidence that indicates the ADOC Officials were negligent, much less intentionally or unintentionally ignored the risk of harm to inmates within ADOC custody. To the contrary, I find that ADOC officials were consistently engaging the executive and legislative branches of government to address the needs of the department, were engaging resources of subject matter experts to find more effective methods to address challenges, and providing leadership training to enhance necessary skills to direct staff in a manner consistent with the policies promulgated by ADOC Officials." (Id. at 55).

- "[I]t is my firm opinion that the ADOC Officials and St. Clair staff were not responsible for Mullins' death." (Id.).

Inch's "forty-year public service career" includes leadership positions "in the military and civilian sectors at both the Federal and State levels." (Doc. 160-30 (Ex. G) at 3). From 2017 to 2018, Inch served as the Director of the Federal Bureau of

24

Prisons, and, from 2019 to 2021, Inch served as the Secretary of the Florida Department of Corrections.  (Id. at 4).  Inch provided opinions regarding the claims "against the executive leadership of" ADOC, including Dunn, Ellington, and Jones. (Id. at 3).  Inch also reviewed the report of Plaintiffs' purported expert, Dan Pacholke ("Pacholke").  Inch concluded that "Pacholke failed to identify any concrete policy, procedure, or practice that Dunn, Culliver, Daniels, or Ellington failed to adhere to that caused the assaults of Andrews and Mullins, or anything those officials could have done in their individual capacities to prevent either assault."  (Doc. 160-30 (Ex.G) at 34).

Inch offered the following opinions:

- "Dunn identified challenges facing the ADOC and responded reasonably, by developing a comprehensive strategic plan and taking concerted actions to implement his plan to realize long-term positive change for ADOC."  (Id. at 37).

- "The ADOC Officials responded reasonably to the risk of violence at St. Clair by repairing or replacing damaged and aging infrastructure, establishing controlled movement measures, and taking various steps to address staffing challenges."  (Id. at 41).

- "St. Clair staff responded quickly and appropriately to the discovery of the inmate-on-inmate assaults at issue in these cases."  (Id. at 43).

- "ADOC operates under a robust set of policies and procedures guiding the practice of every individual from Commissioner to correctional officer within the ADOC."  (Id.).

- Staffing levels, inmate population levels, inmate supervision, unauthorized movement, classification and housing policies, and contraband search protocols did not cause Andrews's assault. (Id. at 46-49).

Unlike Myers and Inch, Zawilinksi primarily focused on lower-level ADOC personnel, but he offered the following opinions relevant to the ADOC Officials:

- St. Clair faced "a severe staffing shortage," and "ADOC went to great lengths to recruit, retain, and supplement staff on a consistent basis." (Doc. 160-33 (Ex. J) at 38-39).

- While multiple outside entities and alleged experts criticized St. Clair's lack of staff, "adding staff was also an ongoing redundant recommendation that ADOC was already attempting to resolve in several ways." (Id. at 41-42).

- St. Clair supplemented staff with CERT team members and staff from neighboring facilities, and supervisory staff assisted officers with tasks such as "mass movement, meal service, pill call and counts." (Id. at 42-43).

- "There is no evidence to suggest that supervisory staff condoned or approved of [St. Clair] staff not doing their job, turning a blind eye to breakdowns in security or any form of negligence toward inmates at" St. Clair." (Id. at 43).

- St. Clair staff complied with ADOC and St. Clair policies with respect to Mullins. (Id. at 44).

Plaintiff submitted a report from her advocate Pacholke. Pacholke's report focused on "the conditions at St. Clair," and it failed to identify any conduct by any ADOC Official that placed Andrews at a substantial risk of serious harm. (Doc. 160-36 (Ex. M) at 5 ("In my opinion, the conditions at St. Clair posed a substantial

risk of serious harm to prisoners such as Mr. Mullins. . . .").  Pacholke "visited St. Clair for the first time in April 2022" – more than three years after Mullins's death. (Id.).  Accordingly, Pacholke's alleged observations regarding "conditions" at St. Clair fail to represent the conditions at the time of Mullins's death.

Pacholke criticized "understaffing" at St. Clair, but he failed to acknowledge the extensive efforts the ADOC Officials took to increase staffing (see supra at ¶¶ 76-86), and he failed to suggest that any ADOC Official failed to take any action within his or her authority to improve St. Clair's staffing levels.  (Doc. 160-36 (Ex. M) at 45-46).  Pacholke's criticisms of contraband at St. Clair relied on the number of contraband items St. Clair staff recovered in searches – thus indicating that St. Clair staff in fact attempt to control contraband within the facility.  (Id. at 46-48). Pacholke's criticisms of inmate movement focused largely on allegedly insufficient staffing.  (Id. at 48-52).  Ultimately, Pacholke failed to identify any measures the ADOC Officials failed to take within their authority to reduce inmate violence at St. Clair.

## LEGAL STANDARDS

### I.  SUMMARY JUDGMENT.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  To defeat a motion for summary judgment, a plaintiff must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).  Because Plaintiff cannot produce any, much less substantial, evidence supporting her claims, the ADOC Officials are entitled to summary judgment.

## II.    DELIBERATE INDIFFERENCE.

### A.    WADE V. MCDADE.

On July 10, 2024, the Eleventh Circuit issued its unanimous opinion in Wade. 106 F.4th 1251.  The Court granted rehearing *en banc* in Wade "to resolve a question that, while simply stated, has bedeviled panels of this Court for the better part of the last three decades: 'What is the standard for establishing liability on an Eighth Amendment deliberate-indifference claim?'"  Id. at 1253.  The Court provided the following answer to that question:

> 1.    *First*, of course, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'"  [Farmer v. Brennan, 511 U.S. 825,] 834, 114 S.Ct. 1970 [1994] (citation omitted).

> 2.    *Second*, the plaintiff must demonstrate that the defendant acted
> with "subjective recklessness as used in the criminal law," *id.*
> at 839, 114 S.Ct. 1970, and to do so **he must show that the
> defendant was actually, subjectively aware that his own
> conduct caused a substantial risk of serious harm to the
> plaintiff**—with the caveat, again, that even if the defendant
> "actually knew of a substantial risk to inmate health or safety,"
> he "cannot be found liable under the Cruel and Unusual
> Punishments Clause" if he "responded reasonably to the risk."
> *Id.* at 844-45, 114 S.Ct. 1970.

Id. at 1262 (emphasis added).

The Wade Court observed that Eleventh Circuit "precedent has been marred by internal inconsistency regarding the" legal standard for deliberate-indifference claims.  106 F.4th at 1255.  Previous precedents required an inmate-plaintiff to "prove that the [defendant] official was subjectively aware that the inmate was at risk of serious harm" and "that the official disregarded that risk."  Id.  Additionally, the precedents required the plaintiff to "demonstrate that the official acted with more than some requisite level of negligence," but, "[w]ith respect to this third sub-requirement, our precedent reflects a persistent split between cases holding that the inmate must prove that the official's conduct reflected 'more than *mere* negligence' and those holding that the inmate must demonstrate that the official acted with more than *gross* negligence.'"  Id. (citing Wade v. McDade, 83 F.4th 1332 (11th Cir. 2023)).  The Court observed that these "negligence-based formulations" "stray[ed] from" the Supreme Court's pronouncement "that the Eighth Amendment requires

proof of 'subjective recklessness as used in the criminal law.'" Id. at 1255, 1256 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 839 (1994)). The Court therefore "repudiate[d] [its] dueling 'more than' formulations." Id. at 1255.

In place of the negligence-based standards, the Wade Court returned to Farmer's standard of "'subjective recklessness as used in the criminal law.'" Id. (quoting Farmer, 511 U.S. at 839). To meet Farmer's criminal recklessness standard, the Court held that a "plaintiff must show that *the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm*." Id. (emphasis added). The Court distinguished a risk of harm caused by the official's conduct from "some preexisting risk that the inmate plaintiff faced, without regard to its origin or cause." Id. at 1260. The Court noted that, in Farmer itself, "the inmate's allegations—and thus the Court's decision concerning those allegations—were trained not just on the risks of violence and assault that *exist* in a prison's general population, but rather on the risks that the prison officials *created* by placing the inmate in a particular prison's general population." Id. at 1258. Moreover, the Court noted the Farmer Court's observation that "'[t]he Eighth Amendment does not outlaw cruel and unusual *conditions*; it outlaws cruel and unusual *punishments*.'" Id. at 1257 (quoting Farmer, 511 U.S. at 837) (emphasis added). Therefore, "'[a] subjective approach,' the [Farmer] Court stressed, 'isolates

those who inflict punishment,' and thus 'ensure[s] that only inflictions of punishment carry liability.'"  Id. (quoting Farmer, 511 U.S. at 839, 841).

The Wade Court retained Farmer's "caveat" that "a defendant who 'respond[s] reasonably' to a risk, even a known risk, 'cannot be found liable' under the Eighth Amendment." Id. at 1255 (quoting Farmer, 511 U.S. at 837, 844).  Thus, it remains true after Wade that "[e]ven a 'prison official[] who actually knew of a substantial risk to inmate health or safety may be found free of liability if [he] responded reasonably to the risk, even if the harm was not averted.'"  Id. at 1257 (quoting Farmer, 511 U.S. at 844); see also Swain v. Junior, 961 F.3d 1276, 1286 (11th Cir. 2020)).  Wade represents a substantial development in Eleventh Circuit jurisprudence, and many previous Eleventh Circuit precedents will not survive scrutiny under its revised deliberate-indifference standard.  See id. at 1265 (Jordan, J. concurring) ("[C]ourts and attorneys [should] look carefully at prior Eleventh Circuit cases to see if they are consistent with the subjective component of deliberate indifference set out in Farmer. . . .  If they are not, then they probably have been abrogated to at least some degree by today's decision."); 1269 (Newsom, J., concurring) (describing majority opinion as "the Court wisely repudiat[ing] its long-confused deliberate-indifference caselaw"); Stalley v. Cumbie, -- F.4th --, 2024 WL 5244627, at *15 (11th Cir. Dec. 30, 2024) (Ed Carnes, J., concurring) ("[A]ll of the

pre-*Wade* decisions . . . are obsolete, extinct, gone, insofar as establishing that deliberate indifference does exist in a post-*Wade* conduct case.").

## B. SUPERVISORY LIABILITY.

Under Eleventh Circuit precedent, "supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). Plaintiff makes no allegation that Dunn, Ellington, Vincent, or Jones personally participated in the events that led to Mullins's death, or even that they were present at St. Clair when the events occurred. Accordingly, Plaintiff must establish a causal connection between these ADOC Officials' actions and a violation of Mullins's constitutional rights. She cannot do so.

## III. QUALIFIED IMMUNITY.

"Qualified immunity offers complete protection for government officials sued in their individual capacities so long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal quotation marks and citations omitted). Qualified immunity protects "'all but the plainly incompetent or one who is knowingly violating the federal law.'" Id. at 1194 (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)). Qualified

immunity protects Dunn, Ellington, Jones, and Vincent from Plaintiff's section 1983 failure-to-protect claim. Plaintiff concedes that Dunn, Ellington, Jones, and Vincent acted within the scope of their discretionary authority. (Doc. 84, 21). Accordingly, to defeat qualified immunity, Plaintiff must demonstrate both that these ADOC Officials violated a constitutional right of Mullins and that the right was clearly established at the time of the violation. Lee, 284 F.3d at 1194.

## IV.    WRONGFUL DEATH.

Under Alabama's wrongful-death statute, a personal representative may pursue a claim "for the wrongful act, omission, or negligence of any person . . . whereby the death of the testator or intestate was caused, provided the testator or intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death." Ala. Code § 6-5-410. However, under Alabama law, state-agent immunity protects state employees against individual-capacity liability arising from the official "formulating plans, policies, or designs" and/or "exercising his or her judgment in the administration of a department or agency of government," unless the official acted "willfully, maliciously, fraudulently in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Ex parte Cranman, 792 So. 2d 392, 405 (Ala. 2000).

## ARGUMENT

### I.  DUNN'S ACTIONS ENTITLE HIM TO SUMMARY JUDGMENT.

#### A.    PLAINTIFF'S FAILURE-TO-PROTECT CLAIM.

As noted above, the Court decided the ADOC Officials' Motion to Dismiss without the benefit of the Eleventh Circuit's decision in Wade. The Court therefore relied on pre-Wade caselaw to conclude that "[w]hether the conditions at St. Clair created a substantial risk of serious harm is analyzed using an objective standard." (Doc. 84 at 23). However, Wade made clear that, instead of "some preexisting risk that the inmate plaintiff faced, without regard to its origin or cause," courts should "focus[] on the official's subjective awareness of the risk created by his own conduct." 106 F.4th at 1260, 1261. Accordingly, Plaintiff must establish more than merely "that [Dunn] knew prisoners with a heightened security risk faced a substantial risk of serious harm at St. Clair." (Doc. 84 at 27). She must establish that Dunn knew *his own conduct* placed Mullins at a substantial risk of serious harm. Wade, 106 F.4th at 1260. Plaintiff failed to identify any conduct by Dunn that placed Mullins at a substantial risk of serious harm, much less demonstrate that Dunn knew his own conduct placed Mullins at a substantial risk of serious harm.

Plaintiff's Complaint relies heavily on a putative class action filed by the Equal Justice Initiative (the "Duke Action"). (Doc. 40, ¶¶ 144-147; 152-161).[2]

---

[2] The Duke Plaintiffs reinstated the Duke Action, and their motion for class certification remains pending. Duke v. Hamm, Civil Action No. 4:14-cv-01952-RDP (N.D. Ala.) (Doc. 417).

According to Plaintiff, Dunn "failed to take meaningful corrective actions to comply with the settlement agreement" in <u>Duke</u>. (<u>Id.</u>, ¶ 154). As a preliminary matter, Plaintiff failed to establish that the actions included in the <u>Duke</u> settlement agreement represented constitutional requirements, rather than aspirational goals. The <u>Duke</u> settlement agreement constituted a private settlement agreement under 18 U.S.C. § 3636(c)(2), which permits parties to enter into private agreements that "do[] not comply with the limitations of relief set forth in subsection (a)." (Doc. 160-76 (Ex. D-A) at 2). Accordingly, the private settlement agreement lacked any finding or stipulation that the relief was necessary to correct any violation of federal law. 18 U.S.C. § 3636(a)(1)(A) (providing that courts "shall not grant or approve any prospective relief [in actions regarding prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right"). Indeed, the <u>Duke</u> settlement agreement explicitly stated that it did not constitute "an admission by any Defendant that any policy, practice, or procedure addressed in this Agreement violated or failed to comply with any applicable Constitutional provision, law, rule, or regulation." (Doc. 160-76 (Ex. D-A) at 3). Thus, Plaintiff possesses no evidence that non-compliance with the <u>Duke</u> settlement agreement violated the Constitution.

Moreover, the Duke Plaintiffs instituted an official-capacity action, not an individual-capacity action like this one. Even assuming the truth of Plaintiff's allegations here that ADOC failed to meet some of the Duke settlement agreement's provisions, those allegations do not lead to individual-capacity liability for Dunn. The Eleventh Circuit addressed a similar situation over forty years ago. Williams v. Bennett, 689 F.2d 1370 (11th Cir. 1982). Williams involved individual-capacity damages claims arising from an inmate-on-inmate assault. Id. at 1384. In a previous class action, "the district court entered injunctive relief . . . direct[ing] that only minimum custody inmates be assigned to dormitories and that at least one guard be stationed inside and one guard outside the dormitories." Id. at 1375. Despite the injunction, the plaintiff's "dormitory housed medium security prisoners, and no prison guards were stationed either inside or outside the dormitory." Id. at 1374. The plaintiff sought to hold various prison officials individually liable for failing to protect him from violence by failing to implement the injunction. Id. at 1380.

The Eleventh Circuit held that the plaintiff could not simply rest on "wrongdoing by the prison system, in its corporate form," but instead "must prove that one or more of the individual defendants acted with such callous indifference to [plaintiff's] safety as to amount to constitutional wrongdoing." Id. Therefore, "to prove actionable conduct or callous indifference, [plaintiff] must demonstrate that a particular defendant had the capability (authority and means) to provide adequate

36

security and did not do so." Id. at 1388-89; George v. Wexford Health Sources, Inc., Case No. 2:22-cv-434-ECM, 2024 WL 1120110 (M.D. Ala. Mar. 10, 2024) (rejecting a plaintiff's "attempts to cobble together factual findings from [a previous official-capacity class action] and Eleventh Circuit case law on deliberate indifference to overcome qualified immunity," because it "asks this Court to leapfrog the requisite analysis of culpability for individual defendants for alleged violations of the Eighth Amendment"). Plaintiff cannot establish that Dunn possessed the "authority and means" to eliminate any risk of harm to Mullins but failed to do so.

Indeed, the record confirms the affirmative steps taken by Dunn within his authority to reduce the risk of inmate violence at St. Clair. For example, Dunn's administration instituted an extensive "lock project, the fencing project, the QIT, Operation Restore Order, the pay increase to increase staff, the classification of a new cubicle officer classification, the use of retirees, the augmentation of our CERT teams from other facilities, augmentation from other correctional officers from facilities." (Doc. 160-11 (Ex. C) at 43 (161:17-23)). Dunn also faced limitations at St. Clair. For example, "the physical design of the prison presented security problems," including visibility challenges and low ceilings that permitted inmates to damage security cameras. (Id. at 9 (26:21-27:5), 10 (29:7-16)). Dunn and his administration sought new facilities as a "long-term" solution "while using the

resources that we had to manage the short-term issues." (Id. at 10 (29:19-30:17), 43 (161:7-11)). Dunn testified that, "with the resources that we had, I believed that we were working to stem the issues and address them as best as we could as we were working towards more long-term solutions." (Id. at 49 (186:23-187:1)). Thus, discovery demonstrated the falsity of Plaintiff's allegation that Dunn failed to take actions to reduce the risk of inmate violence at St. Clair.

Ultimately, Plaintiff complains that Dunn's and ADOC's actions failed to eradicate inmate violence at St. Clair. However, even before Wade, "'officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*.'" Swain v. Junior, 961 F.3d 1276, 1287 (11th Cir. 2020) (quoting Farmer, 511 U.S. at 844). The Court emphasized that "the fundamental question in any deliberate-indifference case is whether the defendants exhibited 'a sufficiently culpable state of mind.'" Id. (quoting Farmer, 511 U.S. at 834). "In evaluating that question, we must focus not on isolated failures—or impossibilities . . . but rather on the defendants' entire course of conduct." Id. at 1287-88; see also Rasho v. Jeffreys, 22 F.4th 703, 710 (7th Cir. 2022) (reversing deliberate-indifference finding where officials "made reasonable efforts to cure the deficiencies," which "demonstrate[d] a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment claim"). Moreover, while "[i]t is always

possible to do more or move faster . . . , the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm." Rasho, 22 F.4th at 711. Thus, the mere fact that the measures Dunn took failed to eliminate all violence at St. Clair, or even that those measures failed to prevent Mullins's death, does not automatically mean Dunn acted with deliberate indifference.

Even if Plaintiff could establish a constitutional violation, she cannot establish that Dunn violated clearly established law. This Court recognized that "the dispositive question for the court is whether the law at the time of the challenged conduct gave the government official fair warning that his conduct was unconstitutional." (Doc. 84 at 21). Thus, "the law must be settled—not suggested—either dictated by controlling authority or a robust consensus of cases of persuasive authority." (Id. (citing Dist. of Columbia v. Wesby, 583 U.S. 48, 65 n. 7 (2018)).[3] No authority makes it "'clear to a reasonable officer [in Dunn's position] that his conduct was unlawful in the situation he confronted.'" (Id. at 22 (quoting Wesby, 583 U.S. at 63)).

---

[3] The en banc Eleventh Circuit is currently considering whether a "robust consensus" of out-of-circuit authority may clearly establish the law for purposes of qualified immunity. Gilmore v. Dept. of Corr., 111 F.4th 1118, 1135, reh'g en banc granted and vacated by 119 F.4th 839 (11th Cir. 2024). The outcome of that rehearing remains irrelevant to this action because no authority, binding or otherwise, supports individual liability in the circumstances present here.

At the motion to dismiss stage, the Court concluded that <u>Marsh v. Butler County, Alabama</u>, 268 F.3d 1014 (11th Cir. 2001) (en banc), <u>abrogated on other grounds by</u> <u>Bell Atlantic Corporation v. Twombly</u>, 550 U.S. 544 (2007), and <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579 (11th Cir. 1995), provided clearly established law. (Doc. 84 at 33-37). First, <u>Wade</u> abrogated <u>Marsh</u> and <u>Hale</u>, because they improperly relied on a "risk" posed to inmates by "conditions," rather than a risk created by the prison officials' conduct. <u>Marsh</u>, 268 F.3d at 1028 (referring to risk posed by "conditions"); <u>Hale</u>, 50 F.3d at 1583 (holding that plaintiff needed to demonstrate "only that [the defendant official] had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence"). According to Judge Ed Carnes, "all of the pre-*Wade* decisions . . . are obsolete, extinct, gone, insofar as establishing that deliberate indifference does exist in a post-*Wade* conduct case." <u>Stalley</u>, 2024 WL 5244627, at *15 (Ed Carnes, J., concurring). Judge Carnes reasoned:

> [P]re-*Wade* negligence measurement cases cannot serve as binding precedent to establish deliberate indifference in the post-*Wade* era. They can't because when a deliberate indifference claim was up for decision before *Wade* existed, that panel did not apply or purport to apply the criminal recklessness deliberate indifference standard adopted in *Wade*. That earlier panel had no occasion to determine whether the facts of the case amounted to criminal recklessness because that was not the deliberate indifference standard that applied then.

<u>Id.</u> at *16 (Ed Carnes, J., concurring).

40

Even if <u>Wade</u> did not abrogate <u>Marsh</u> and <u>Hale</u>, both cases remain distinguishable from the facts here. <u>Marsh</u> involved a motion to dismiss (under the pre-<u>Twombly</u> standard). 268 F.3d at 1021. The plaintiffs alleged that "jailers were afraid to conduct visual inspections of inmate cells;" "[n]o visual or audio surveillance system was in place;" "[j]ailers never conducted prisoner headcounts;" the jail employed "[n]o system of classification;" "[n]ever were prisoners disciplined or segregated for assaulting other inmates, destroying jail property, or threatening jailers;" and the sheriff "did absolutely nothing to alleviate the conditions." <u>Id.</u> at 1024-25, 1029. The Court concluded "that it is an unreasonable response for an official to do nothing when confronted with prison conditions—like the conditions alleged in this case—that pose a risk of serious physical harm to inmates." <u>Id.</u> at 1034. Here, unlike in <u>Marsh</u>, where the sheriff allegedly did "nothing," ADOC and St. Clair staff maintain surveillance cameras, employ a classification system, discipline inmates for violent acts, and conduct regular inmate headcounts. Further, as set forth above, the record reflects numerous actions Dunn, and his administration took to reduce inmate violence at St. Clair. (See <u>supra</u>, ¶¶ 87-118). Accordingly, even if <u>Marsh</u> remains good law, its holding that an officer responds unreasonably when he "do[es] nothing" could not put Dunn on notice that his multiple actions to reduce inmate violence at St. Clair amounted to a constitutionally insufficient response.

The <u>Hale</u> plaintiff offered evidence similar to that in <u>Marsh</u>: "that the jail had no policy for classifying and segregating the inmates," "had no written training policy and that [the jailer] had received no professional training at all." 50 F.3d at 1583-84. The sheriff argued "that he was not deliberately indifferent primarily because he worked toward construction of a new jail which, he contends, was the only was to reduce the risk of violence." <u>Id.</u> The <u>Hale</u> Court held that "[a] jury could find that despite any efforts he made toward construction of the new jail, [the sheriff] was deliberately indifferent by disregarding 'alternative means' or interim measures for reducing the risk of violence," such as providing training or instituting a classification procedure. <u>Id.</u> Again, the undisputed evidence establishes that St. Clair employed classification procedures and provided training to security staff. Accordingly, even if <u>Hale</u> survived <u>Wade</u>, it could not put Dunn on notice that his actions with respect to inmate violence at St. Clair violated the Constitution.

## B.  PLAINTIFF'S WRONGFUL-DEATH CLAIM.

As a preliminary matter, Plaintiff's wrongful-death claim duplicates her section 1983 claim, and the Court should therefore dismiss it. <u>See</u> <u>Brown v. Dunn</u>, C.A. No. 2:21-cv440-MHT, 2024 WL 5168637, at *10 (M.D. Ala. Dec. 19, 2024) (dismissing wrongful-death claim "as redundant" because "plaintiff's § 1983 claim is based on a violation of the wrongful-death statute"). In any event, Plaintiff cannot establish a wrongful-death claim against Dunn because, as set forth at length above,

42

she possesses no evidence suggesting Dunn performed a "wrongful act, omission, or negligence . . . whereby the death of [Mullins] was caused." Ala. Code § 6-5-410. Instead, Plaintiff seeks to hold Dunn personally liable because of allegedly generally violent conditions at St. Clair. Under this theory, ADOC's commissioner would bear personal liability for any inmate death due to violence in any ADOC facility deemed "too violent," despite the efforts of the commissioner and his or her administration to mitigate the violence. Plaintiff possesses no authority supporting such broad liability, and such a rule would deter qualified individuals from serving as commissioner of ADOC.

Even if Plaintiff possessed evidence supporting her claim that Dunn caused Mullins's death, she cannot overcome state-agent immunity. Plaintiff does not dispute that her claims "'arise from a function that would entitle the State agent to immunity.'" (Doc. 84 at 60 (quoting Cranman, 792 So. 2d at 405)). Accordingly, Plaintiff must demonstrate that Dunn "acted willfully, maliciously, fraudulently, in bad faith, beyond his . . . authority, or under a mistaken interpretation of the law." (Doc. 84 at 61). As set forth above with respect to Plaintiff's section 1983 claim, Plaintiff failed to do so. See Ex parte Ala. Dept. of Corrs., 201 So.3d 1170, 1181 (Ala. 2016) (holding state-agent immunity applied to claim against on-site prison officials where plaintiff alleged they "fail[ed] to conduct a more thorough investigation" of an incident between two inmates where one inmate later stabbed

43

the other to death). Instead, the evidence establishes that Dunn took reasonable actions within his authority to address inmate violence at St. Clair. Accordingly, state-agent immunity protects him from Plaintiff's wrongful-death claim.

## II. ELLINGTON'S ACTIONS ENTITLE HIM TO SUMMARY JUDGMENT.

### A. PLAINTIFF'S FAILURE-TO-PROTECT CLAIM.

Plaintiff cannot meet the Wade standard with respect to Ellington. Specifically, Plaintiff cannot identify any conduct by Ellington that placed Mullins at a substantial risk of serious harm, and she certainly cannot establish that Ellington knew his own conduct placed Mullins at a substantial risk of serious harm. Wade, 106 F.4th at 1255. To the contrary, the record establishes that Ellington worked within his authority to address inmate violence at St. Clair. For example, Ellington, the other institutional coordinator, and the wardens from Level IV and V facilities held monthly "violence indicator meeting[s]" in which each warden "would actually report out on some of the incidents that transpired at his or her facility." (Doc 160-5 (Ex. B) at 17 (60:25-61:13), 18 (64:23)). Those meetings presented "an opportunity for the wardens and [Ellington] and the other region institutional coordinator to actually sit down and have discussions to mitigate crime, violence, drugs, contraband." (Id. at 18 (61:14-25)). Ellington also testified about efforts to replace cameras and fix cell door locks when inmates damaged them. (Id. at 21 (73:5-74:1), 23 (81:10-12, 84:20-25)). St. Clair utilized staff members from other

facilities and CERT members to augment staffing, and Ellington worked with Daniels and others to transfer 100 particularly violent inmates from St. Clair to other facilities.    (Id. at 27 (98:19-99:10), 37 (137:8-138:24)).    Thus, the record demonstrates Ellington's reasonable response to inmate violence at St. Clair, and Plaintiff cannot establish that he violated Mullins's constitutional rights.

Plaintiff certainly cannot establish that Ellington violated clearly established law.  As set forth above with respect to Dunn, the facts here remain distinguishable from those in Marsh and Hale.  The record shows that, rather than doing "nothing," Ellington took reasonable actions within his authority to reduce inmate violence at St. Clair.  (Supra, ¶¶ 87-118; supra, p. 44).  No caselaw exists putting Ellington on notice that any instance of inmate violence at a facility over which he bore supervisory responsibility would expose him to individual liability.  Accordingly, qualified immunity protects Ellington from Plaintiff's failure-to-protect claim.

### B.    PLAINTIFF'S WRONGFUL-DEATH CLAIM.

Plaintiff cannot establish a wrongful-death claim against Ellington because, as set forth above, she possesses no evidence suggesting Ellington "caused" Mullins's death.  Ala. Code § 6-5-410.  This evidentiary failure disposes of Plaintiff's claim.  Even if Plaintiff possessed evidence supporting her claim, she cannot overcome state-agent immunity.  See Ex parte Ala. Dept. of Corrs., 201 So.3d at 1181 (Ala. 2016).  As set forth above with respect to Plaintiff's section 1983 claim,

the evidence establishes that Ellington took reasonable actions within his authority to address inmate violence at St. Clair.  Accordingly, state-agent immunity protects him from Plaintiff's wrongful-death claim.

## III.   VINCENT'S ACTIONS ENTITLE HER TO SUMMARY JUDGMENT.

### A.    PLAINTIFF'S FAILURE-TO-PROTECT CLAIM.

Plaintiff cannot satisfy the <u>Wade</u> standard with respect to Vincent.  Plaintiff cannot identify any conduct by Vincent that placed Mullins at a substantial risk of serious harm.  <u>Wade</u>, 106 F.4th at 1255.  The record establishes that Vincent created and revised policies and procedures; trained ADOC employees on PREA's requirements; and ensured that inmates are "assessed for risk of abusiveness or victimization."  (Doc. 160-1 (Ex. A) at 6 (13:17-14:7)).  Vincent performs annual internal PREA audits at each ADOC facility, including St. Clair.  (<u>Id.</u> at 8 (21:12-22:12)).  Where Vincent requests corrections as part of her internal audit, she follows up and monitors the corrections.  (<u>Id.</u> at 8-9 (24:14-26:24)).  Vincent "facilitate[s] continual training throughout the year to ensure that [the facility IPCMs] are all knowledgeable on – of the policies and procedures and what we require for PREA."  (<u>Id.</u> at 12 (39:13-16)).  Vincent receives "quarterly data reports from each IPCM," and if she notices a trend of increasing PREA incidents, she considers "what can we do to facilitate – to put something in place to maybe lessen that trend."  (<u>Id.</u> at 13 (41:5-19)).  On issues that are "outside of the control of the IPCM," such as cameras,

Vincent speaks with "the warden and maybe the regional director." (Id. (41:24-42:7)). Accordingly, far from supporting Plaintiff's allegation that Vincent "does nothing" to address PREA concerns, the record establishes that she takes multiple steps within her authority to address PREA concerns in ADOC facilities, including St. Clair. With respect to Mullins specifically, St. Clair staff followed PREA policy in moving him from P/Q dorm to L dorm to separate him from the alleged assailant. (Id. at 45 (169:10-14, 170:10-18)). Any issues regarding the assailant's movement from P/Q to L dorm fell "outside of what the PREA director can control." (Id. (172:12-15)). Accordingly, Plaintiff cannot establish that Vincent violated the Constitution.

Even if Plaintiff could establish a constitutional violation, she cannot establish a violation of clearly established law. As set forth above with respect to Dunn, the facts here remain distinguishable from those in Marsh and Hale. The record shows that, rather than doing "nothing" as alleged in those cases, Vincent took reasonable actions within her authority to ensure PREA compliance at St. Clair. (Supra, ¶¶ 87-118; supra, p. 46). No caselaw exists putting Vincent on notice that any instance of inmate sexual violence at any ADOC facility would expose her to individual liability. Accordingly, the Court should grant summary judgment to Vincent on the basis of qualified immunity.

### B.    PLAINTIFF'S WRONGFUL-DEATH CLAIM.

Plaintiff's failure to provide evidence that Vincent caused Mullins's death disposes of her wrongful-death claim.  Ala. Code § 6-5-410.  Moreover, Vincent's reasonable actions to address PREA incidents at St. Clair entitle her to state-agent immunity.  See Ex parte Ala. Dept. of Corrs., 201 So.3d at 1181 (Ala. 2016).  Accordingly, the Court should grant summary judgment to Vincent on Plaintiff's wrongful-death claim.

## IV.    JONES'S ACTIONS ENTITLE HER TO SUMMARY JUDGMENT.

### A.    PLAINTIFF'S FAILURE-TO-PROTECT CLAIM.

As with the other ADOC Officials, Plaintiff cannot identify any conduct by Jones that placed Mullins at a substantial risk of serious harm.  Wade, 106 F.4th at 1255.  The record demonstrates that Jones acted within her authority to prevent inmate violence at St. Clair.  For example, in response to a 2018 PREA audit, Jones issued a memorandum reminding St. Clair staff to "enforce the wristband policy" and "ensure that security doors are secured always" and requiring that "only Lieutenants and above are to conduct PREA unannounced round[s]."  (Doc. 160-14 (Ex. D-K) at 2).  She instituted additional bed roster checks after discovering that inmates "were out of place."  (Doc. 160-12 (Ex. D) at 45 (169:14-170:4)).  Thus, the record demonstrates that Jones took reasonable actions within her authority to reduce inmate violence at St. Clair, and Plaintiff cannot demonstrate that she violated Mullins's constitutional rights.

Plaintiff certainly cannot establish that Jones violated clearly established law. As set forth above with respect to Dunn, the facts here remain distinguishable from those in <u>Marsh</u> and <u>Hale</u>. The record shows that, rather than doing "nothing," Jones took reasonable actions within her authority to address inmate violence at St. Clair. (<u>Supra</u>, ¶¶ 87-118; <u>supra</u>, p. 48). No caselaw exists putting Jones on notice that any instance of inmate violence at St. Clair would expose her to individual liability. Indeed, this Court recently held that a warden of St. Clair was entitled to qualified immunity in a similar case. <u>Boykins v. Dunn</u>, 696 F. Supp. 3d 1061, 1085 (N.D. Ala. 2023) (although plaintiff alleged that former St. Clair warden "was aware of the conditions at St. Clair," plaintiff "failed to demonstrate how it shows that he violated clearly established law"). Accordingly, the Court should grant summary judgment to Jones on the basis of qualified immunity.

## B.    PLAINTIFF'S WRONGFUL-DEATH CLAIM.

Plaintiff's failure to provide evidence that Jones caused Mullins's death disposes of her wrongful-death claim. Ala. Code § 6-5-410. Moreover, Jones's reasonable actions to address violence at St. Clair entitle her to state-agent immunity. <u>See Ex parte Ala. Dept. of Corrs.</u>, 201 So.3d at 1181 (Ala. 2016). Accordingly, the Court should grant summary judgment to Jones on Plaintiff's wrongful-death claim.

## V.    PLAINTIFF'S FAILURE TO PLEAD CAUSATION ENTITLES CULLIVER TO SUMMARY JUDGMENT ON PLAINTIFF'S WRONGFUL-DEATH CLAIM.

The Court dismissed Plaintiff's failure-to-protect claim against Culliver because "the complaint does not reasonably infer causation." (Doc. 84 at 38). The Court held that Plaintiff failed to allege that Culliver held "the authority or responsibility of the Associate Commissioner for Operations and Institutional Security in the five plus months leading up to Mr. Mullins's death." (Doc. 84 at 40). Plaintiff's failure to demonstrate, or even plausibly allege, that Culliver caused any injury to Mullins defeats her wrongful-death claim against him. Ala. Code § 6-5-410.

### CONCLUSION

For the reasons set forth herein and in the ADOC Officials' Motion and Evidentiary Submission, the ADOC Officials respectfully request that the Court grant them summary judgment on Plaintiff's remaining claims against them.

Respectfully submitted this 28th day of January, 2025.

/s/ William J. Cranford, III

One of the Attorneys for the ADOC Officials

William R. Lunsford
William J. Cranford, III
Daniel J. Chism
**BUTLER SNOW LLP**
200 West Side Square
Suite 100

Huntsville, Alabama 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
will.cranford@butlersnow.com
dan.chism@butlersnow.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all parties in this matter, including without limitation the following, by the Court's CM/ECF system or by U.S. Mail on this 28th day of January, 2025:

Ruth Zemel Brown
Megan Colleen Pierce
Quinn Rallins
**LOEVY & LOEVY**
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
ruth@loevy.com
megan@loevy.com
rallins@loevy.com

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, AL 35205
Telephone: (205) 590-6986
Facsimile: (205) 809-7899
anil@dagneylaw.com

*Attorneys for Plaintiff*

James N. Walter, Jr.
C. Richard Hill, Jr.
William Jackson Britton
Caitlin E. Cobb
William A. Sheehan
**CAPELL & HOWARD P.C.**
150 South Perry Street (36104)
P.O. Box 2069
Montgomery, AL 36102-2069
Telephone: (334)241-8043
Facsimile: (334)-241-8243
jimmy.walter@chlaw.com
rick.hill@chlaw.com
jackson.britton@chlaw.com
caitlin.cobb@chlaw.com
allen.sheehan@chlaw.com

*Attorneys for Gwendolyn Givens,*
*Anthony Brooks, Gary Malone,*
*Kevin White, Carla Graham, Angelia*
*Gordy, William Ragsdale, Antoine*
*Price, Neketris Estelle, Tanya Ary,*
*Cynthia Caver, LaTonya Scott and*
*Officer Wilson*

*/s/ William J. Cranford, III*

*Of Counsel*