FILED
2025 Jan-31  PM 01:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**In The Matter Of:**

**Lakeisha Ezell v. Jefferson Dunn, et al.**

_____

Angelia Gordy - Redacted

*August 7, 2024*

_____

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

```
 1        CONFIDENTIAL NAMES REDACTED IN
 2        DEPOSITION OF ANGELIA GORDY
 3
 4 PAGE 32, LINES 8-9
 5 Clarence Jackson
 6
 7 PAGE 32, LINE 13
 8 Clarence Jackson sexually assaulted Steven Mullins
 9
10 PAGE 32, LINE 18
11 Clarence Jackson stabbed and killed Steven Mullins
12
13 PAGE 33, LINES 1-2
14 Cedrick Davis
15
16 PAGE 33, LINE 6
17 Cedrick Davis
18
19 PAGE 38, LINES 9-10
20 Clarence Jackson
21
22 PAGE 38, LINE 13
23 Inmate Jackson
24
25                                        Page 1
```

```
 1 Inmate Sexual Abuse and Harassment; is that correct?
 2 A.        Yes.
 3 Q.        Are you familiar with this document?
 4 A.        Yes.  It looks familiar, yes.
 5 Q.        Would you have reviewed this SOP as part
 6 of your responsibilities as IPCM?
 7 A.        Yes, I would have.
 8 Q.        I want to go down to Section 3 titled
 9 Definitions and Acronyms.
10 A.        Okay.
11 Q.        And I want to look at the definition for
12 sexual assault, letter I.  Do you see where I'm
13 pointing to right here?
14
15 PAGE 55, LINES 1-6
16 A.        Yes.
17 Q.        "Any willful attempt or threat with the
18 intent to commit a sexual offense upon an inmate or
19 employee."
20           Did I read that correctly?
21 A.        Yes, that's what it states.
22
23 PAGE 63, LINES 21-25
24 Q.        PREA sets out specific definitions for
25 sexual assault, sexual harassment, and sexual abuse,
                                                  Page 3
```

```
 1 PAGE 38, LINE 15
 2 Mullins
 3
 4 PAGE 40, LINE 25
 5 Clarence Jackson
 6
 7 PAGE 52, LINE 25
 8 Clarence Jackson
 9
10 PAGE 75, LINE 20
11 Clarence Jackson
12
13 PAGE 141, LINES 13-14
14 Clarence Jackson
15
16
17        HIGHLY CONFIDENTIAL PORTIONS TO THE
18        DEPOSITION OF ANGELIA GORDY
19
20 PAGE 54, LINES 8-25
21 Q.        And this is a copy of standard
22 operational procedure number 229 dated May 23, 2018;
23 is that correct?
24 A.        Yes.  That's what the date says.
25 Q.        And this procedure, SOP, is called
                                                  Page 2
```

```
 1 correct?
 2 A.        Are you reading that somewhere?
 3 Q.        On this page in front of us, we have
 4
 5 PAGE 64, LINES 1-17
 6 definitions for sexual harassment, sexual assault,
 7 and sexual abuse.
 8 A.        So which one are you reading now?
 9 Q.        Just looking at this definition section
10 that is here, definition one, sexual abuse.
11 Definition two, sexual abuse.
12 A.        So we're going to go back to one?
13 Q.        I will represent to you that this SOP
14 sets out definitions for sexual abuse, sexual
15 assault, and sexual harassment.  Is it your
16 testimony here today that you are unable to tell me
17 whether or not Mr. Mullins' allegations should be
18 defined as sexual harassment, sexual assault, or
19 sexual abuse?
20 A.        What I'm telling you is that the
21 incident that was written back then was done to the
22 best of our ability.
23
24 PAGE 68, LINES 23-25
25 Q.        Do you know what this document is?
                                                  Page 4
```

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

```
1 A.              It says an investigative report.
2 Q.              So this is an investigative report that
3
4 PAGE 69, LINES 1-18
5 would be done by the I&I or the LESD division; is
6 that correct?
7 A.              Yeah.  It says that on there, yes.
8 Q.              Okay.  And you've seen documents or
9 received documents like this before; is that
10 correct?
11 A.             Yeah, I've seen an investigative report.
12 Q.             I will take you to page -- I'll
13 represent to you that this is the investigative
14 report relating to the stabbing death of Steven
15 Mullins.  Okay?
16 A.             Okay.
17 Q.             And I will take you to Page 17, which is
18 an attachment to the report.  It's a transcript of
19 the PREA hotline call that was made by Steven
20 Mullins on February 25, 2019.  Can you see that
21 okay?
22 A.             Yes.  I see it now.
23
24 PAGE 69, LINE 23
25 A.             Is it where it says S.M.?  Start reading
```

```
1
2 PAGE 70, LINES 1-3
3 recording that the inmate would hear when they would
4 call the PREA hotline, I believe.  So you can start
5 at S.M.
6
7 PAGE 70, LINES 9-17
8 transcript of this call, correct?
9 A.             Yeah.  I just read the paragraph, yes,
10 ma'am.
11 Q.            Okay.  And reading over this transcript
12 of the call made by Steven Mullins, does that
13 refresh your recollection in any way about who
14 Mr. Steven Mullins is, the PREA allegation that he
15 made, or your involvement in the response to that
16 PREA allegation?
17
18 PAGE 70, LINES 19-25
19 A.             No, it does not.
20 Q.             After reading this transcript, did you
21 recall receiving this call from Mr. Mullins?
22 A.             When you say "receiving this call" --
23 Q.             Let me reask that question.  I'll strike
24 that.
25                When you read over this transcript, did
```

```
1
2 PAGE 71, LINES 1-25
3 you recall receiving a transcript or an audible copy
4 of this PREA hotline call that was made by
5 Mr. Mullins?
6 A.             I don't recall that I ever -- I can't
7 recall that I listened to this phone call from him.
8 Q.             And do you recall receiving a written
9 transcript of this phone call?
10 A.            No, ma'am.
11 Q.            I want to just direct your attention to
12 the sixth line from the bottom.  I'll highlight it.
13 Can you see it okay?
14 A.            Come down just a little bit.  A little
15 bit more.  Okay.
16 Q.            It says, "My mattress and all of my
17 other stuff.  That's why I'm calling from the gym.
18 Because that's where I feel the safest.  And that's
19 the only place I can go that's out of the way.  I
20 need some help.  I've asked to be placed in seg for
21 my own safety, PC if possible.  But I cannot live in
22 St. Clair population.  I need some help badly.  And
23 I don't know what to do.
24                Your message has been saved.  Please
25 hang up now."
```

```
1                Did I read that correctly?
2 A.             Yes.
3
4 PAGE 72, LINES 1-3
5 Q.             Based on your knowledge and experience
6 as IPCM at St. Clair, what should have been done in
7 regard to this message?
8
9 PAGE 72, LINES 5-25
10 A.            What should have been done?  It looks
11 like Warden Givens was involved in it, according to
12 the recording.  So it was recorded.  The message was
13 sent to the facility.  I don't know who would get it
14 first.  I can't remember how the steps went back
15 then.
16                But you want me to tell you what should
17 have been done?  Is that the main question?
18 Q.            Yes.
19 A.            So the report was done.  I'm going to
20 stick with the report.  It was done.  As far as me
21 remembering all of this and this jarring my memory,
22 no.  That was two years ago, four years ago, five
23 years ago.  No.  The report was done.  And I'm not
24 the only one that get the report.  I can't recall
25 who all gets it.  But I know it's a list.  So
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (5 - 8)

Lakeisha Ezell v. Jefferson Dunn, et al.

Angelia Gordy - Redacted
8/7/2024

1 **something was done.**
2          **What dorm does it say he was in at this**
3 **time?  Does it say?**
4          **So something was done with him calling**
5 **the PREA hotline.  So could I second-guess and say**
6
7 PAGE 73, LINES 1-14
8 something else should have been done differently?
9 Yeah, I could.  But I'm not.  Because I feel like it
10 was handled to the best of our ability at that time.
11          Not only did -- I didn't even hear this
12 because I don't listen to the PREA hotline when they
13 come through.  I can't even recall who does or how
14 often they listen.  I can't recall none of that.
15          But I do know it was sent to the
16 facility because, according to the report, I did get
17 it.  And something was -- something was done.
18 Q.      After Mr. Mullins said that, quote, I
19 cannot live in St. Clair population, I need some
20 help badly, was it appropriate to leave him in
21 general population after he expressed those fears?
22
23 PAGE 73, LINES 16-25
24 Once again, something was done.  To second-guess and
25 say why it was done like it was done back then, I

Page 9

1 just can't do that.  Something was done.  I can't --
2 I just don't feel comfortable doing that.  I'm not
3 going to do it.  I'm not going to go against my gut.
4 I'm not going to do that.  Something was done.
5 Q.      Okay.
6 A.      **You want me to say it could have been**
7 **done better, this, that.  That's second-guessing.**
8
9 PAGE 74, LINES 1-25
10 Something was done.  And all these other people who
11 read the report and saw what was done and who heard
12 this and didn't suggest anything else, yeah, they
13 probably could have just -- I don't know.  But
14 something was done.  Something was done.
15 Q.      Is it a fair characterization of your
16 testimony that you can't say today whether or not
17 Mr. Mullins should have been placed in segregation
18 or protective housing following this allegation?
19 A.      **What's fair to say is that I said**
20 **something was done.  I said something was done.  I**
21 **can't remember what the incident report said, that**
22 **he was moved here, moved there.  The incident report**
23 **did not say he was moved into restrictive housing.**
24 **I do believe it did say that.  It did not say that.**
25 **I'm sorry.  It did not say that.**

Page 10

1          **Because I don't want everything just**
2 **held against me for trying to do the best that I**
3 **can.  I don't think it said he was moved to**
4 **restrictive housing like he was asking to be.  The**
5 **reason why?  I don't know.  I can't answer that.**
6 **But something was done.**
7 Q.      So is it your testimony that it's
8 sufficient that something was done in response to
9 this allegation?
10
11 PAGE 75, LINES 1-25
12 A.      **My testimony is that something was done.**
13 **It was reported, it went down to the facility, and**
14 **something was done, yes.**
15 Q.      I am going to go up to the report itself
16 by Agent Casey.  I want to direct your attention to
17 Page 4 of his report, ADOC008966, the fourth
18 paragraph down.  I'll highlight it for you.  Can you
19 see that?
20 A.      **Okay.**
21 Q.      "At approximately 1126 hours, S.A. Casey
22 and Agent Arledge interviewed Lieutenant Angelia
23 Gordy about Inmate Mullins' PREA complaint.  After
24 handing S.A. Casey a written statement, Lieutenant
25 Gordy told the investigator that as she looked into

Page 11

1 Inmate Mullins' sexual assault allegation, she
2 learned from Inmate Mullins that his harasser was
3 CJ.
4          In an effort to identify CJ better,
5 Lieutenant Gordy showed Inmate Mullins a picture of
6 Inmate NAME REDACTED, who Inmate Mullins
7 immediately identified as his assailant.
8          Lieutenant Gordy also told the
9 investigators that after receiving Inmate Mullins'
10 complaint from both the PREA hotline and in person
11 on February 25, 2019, she requested a urinalysis of
12
13 PAGE 76, LINES 1-16
14 Inmate Mullins.
15          That urinalysis collected at 0222 hours
16 on the morning of Inmate Mullins' death indicated
17 that the inmate recently used an illicit substance,
18 specifically amphetamine, supporting the supposition
19 of Lieutenant Price that Inmate Mullins was a drug
20 user.
21          Lieutenant Gordy then offered those
22 results to S.A. Casey prior to the investigator and
23 gave the interview."
24          Did I read that correctly?
25 A.      **Yes, ma'am.**

Page 12

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (9 - 12)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

1 Q.          Again, does this refresh your
2 recollection in any way about who Steven Mullins is,
3 his PREA allegation, or your involvement in the
4 response to that allegation?
5
6 PAGE 76, LINES 18-25
7 A.          No.
8 Q.          The first paragraph that we looked at
9 says that you handed a written statement to S.A.
10 Casey.
11          Do you recall providing S.A. Casey with
12 a written statement?
13 A.          No, I do not recall.
14 Q.          And was it your typical practice to
15
16 PAGE 77, LINES 1-25
17 provide a written statement any time you were
18 interviewed by I&I in relation to a PREA
19 investigation?
20 A.          Say it one more time.
21 Q.          Was it your practice to write a written
22 statement any time you were interviewed by I&I in
23 relation to a PREA allegation that you had received?
24 A.          You're asking me was it my -- for me to
25 write a statement?  Or for the inmate?

Page 13

1 A.          I can't recall it just being a practice.
2 Someone had to have asked me to have done that.
3 Now, who that was, I don't know.  I'm not going to
4 say that was a practice.  It could have been because
5 it could have been one of the duties.  But I'm not
6 going to say it was a practice.
7 Q.          Did you have any concern that subjecting
8 someone who made a PREA allegation to a urinalysis
9 in the early morning hours right after they had made
10 their allegation would make it less likely that
11 others would report PREA allegations to you?
12
13 PAGE 78, LINES 22-25
14 I cared about my job.  As far as just putting my
15 personal thoughts into it, I didn't do that.  If I
16 was asked to do something, I did it, if it wasn't
17 life threatening.
18
19 PAGE 79, LINES 1-4
20 Q.          Were you concerned that an inmate might
21 view a urinalysis that was conducted immediately
22 after making a PREA allegation as retaliation for
23 making a PREA allegation?
24
25 PAGE 79, LINES 7-16

Page 15

1 Q.          For you to write a statement.
2 A.          No, I didn't write a statement and give
3 to the investigator.  I can't recall ever doing
4 that.
5 Q.          So what does this statement refer to?
6 A.          That's going to be -- I'm thinking it's
7 referring to the inmate's statement.
8 Q.          So you would have gotten a written
9 statement from Mr. Mullins and provided that to S.A.
10 Casey; is that correct?
11 A.          If the inmate felt like writing a
12 statement, yes.  Because we had a lot of them
13 embarrassed because they couldn't write well, even
14 though I told them, "Tell me the words you want to
15 spell, and I will spell it to you."
16 Q.          And then the next paragraph indicates
17
18 PAGE 78, LINES 1-18
19 that you requested a urinalysis that was collected
20 at 2:22 in the morning; is that correct?
21 A.          I can't recall doing that.  But it says
22 I did, so that's what I did.
23 Q.          Was it your practice to request a
24 urinalysis from everybody who made a PREA
25 allegation?

Page 14

1 A.          Once again, that's personal, putting my
2 personal thought into it.  That was the time or
3 place for me to do all that.  And I'm not going to
4 do it now.  If I was asked to do it, I would have
5 done it.
6          I called myself being a very
7 approachable person as the IPCM where the inmates
8 could talk to me and everything.  I would say, "I'm
9 instructed to get a urinalysis from you."  They
10 could have said yes or no.
11
12 PAGE 80, LINES 5-24
13 Q.          I'm going to scroll down to one of the
14 attachments to this report.  This is starting on
15 page ADOC008995.  I'm sorry.  ADOC008994, just the
16 first page.
17          And the title is "Statement of
18 Lieutenant Angelia Gordy, Special Agent Bryan
19 Casey."  Did I read that correctly?
20 A.          I got lost a little bit.  What line are
21 you on?  I'm sorry.
22 Q.          I'm just reading the title of the page
23 here.
24 A.          Oh, okay.  That's what it states at the
25 top.

Page 16

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4 (13 - 16)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

| | |
|---|---|
| 1 Q.         Do you recall giving a statement to | 1         "B.C.:  I know he was assigned to Q27." |
| 2 Special Agent Bryan Casey in relation to the | 2         "A.G.:  Right." |
| 3 incident relating to Steven Mullins? | 3         "B.C.:  Okay.  So I know what you mean" |
| 4 **A.         No, I do not recall.** | 4 -- strike that. |
| 5 Q.         Was it typical for you to give a | 5         "B.C.:  Okay.  So I know that you -- I |
| 6 statement to I&I in relation to PREA allegations | 6 mean, I'm -- your statement here is -- is everything |
| 7 that were made at St. Clair? | 7 I know.  So after that, you took him to get a body |
| 8 | 8 chart?" |
| 9 PAGE 81, LINES 1-25 | 9         "A.G.:  Yes, sir." |
| 10 **A.         I cannot recall if that's typical or** | 10 |
| 11 **part of the duties of the IPCM at that time.  But if** | 11 PAGE 83, LINES 14-25 |
| 12 **I&I asked me to do something, I'm going to** | 12 Q.         "B.C.:  You told the warden about it?" |
| 13 **cooperate.** | 13         "A.G.:  Yes, sir." |
| 14 Q.         And this is a transcript of a | 14         "B.C.:  And the warden, because he had |
| 15 conversation between you and Bryan Casey relating to | 15 been moved that morning from -- he was assigned to |
| 16 Mr. Mullins, correct? | 16 Q32.  He relocated himself to Q27." |
| 17 **A.         Yeah.  That's what it states at the top.** | 17         "A.G.:  Uh-huh." |
| 18 Q.         I'm going to turn to the third page of | 18         "B.C.:  And then he was assigned to like |
| 19 your statement, which is ADOC008996.  I'll just | 19 P28 or something and then some -- something in P |
| 20 start at the top of this page. | 20 dorm.  And then" -- |
| 21 **A.         Okay.** | 21         "Uh-huh." |
| 22 Q.         I'm going to go up a little bit further | 22 Did I read that correctly? |
| 23 for context.  I'll go up to ADOC008995. | 23 **A.         Yes.** |
| 24         It says, "B.C.:  And he pretty much told | 24 |
| 25 you the same thing that he said in the PREA call, | 25 |
| Page 17 | Page 19 |
| 1 right?  Huh?" | 1 PAGE 84, LINES 2-11 |
| 2         "A.G.:  Yes, sir." | 2 Q.         And you said here -- I want to look up |
| 3         "You didn't notice any deviation in | 3 to the part that I'm highlighting.  It's six lines |
| 4 that, right?" | 4 from the bottom. |
| 5         "A.G.:  No." | 5         Agent Casey says, "You told the warden |
| 6         "B.C.:  Okay." | 6 about it?" |
| 7         "A.G.:  I don't know." | 7         And you said, "Yes, sir." |
| 8         "B.C.:  And then as part of our initial | 8 Did I read that correctly? |
| 9 investigation in that sexual harassment complaint of | 9 **A.         Yes.  That's what it says.** |
| 10 | 10 Q.         Do you recall telling Warden Jones about |
| 11 PAGE 82, LINES 1-23 | 11 Mr. Mullins' allegation? |
| 12 this, you showed him a photo of, how'd you come | 12 |
| 13 across Clarence Jackson? | 13 PAGE 84, LINE 13 |
| 14         "A.G."  Because he said it was his cell | 14 **A.         No, I don't recall it.** |
| 15 mate." | 15 |
| 16         "B.C.:  Okay." | 16 PAGE 86, LINES 11-25 |
| 17         "A.G.:  "So I went and" -- | 17 Q.         (By Ms. Pierce) Ms. Gordy, does it say |
| 18         "B.C.:  Pulled it up in IMS?" | 18 here you told the warden about the allegations made |
| 19         "A.G.:  Uh-huh.  And" -- | 19 by Mr. Mullins? |
| 20         "B.C.:  Okay.  Okay." | 20 **A.         Yeah, it does state that -- "You told** |
| 21         "A.G.:  And that's who the cell mate | 21 **the warden about it?"** |
| 22 came up." | 22 **And I said, "Yes, sir."** |
| 23         "B.C.:  Yeah.  Because when I pulled it | 23 Q.         Do you know which warden you're |
| 24 up in IMS2 and looked at his movement history" -- | 24 referring to here? |
| 25         "A.G.:  Right." | 25 **A.         I cannot recall.** |
| Page 18 | Page 20 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (17 - 20)

Lakeisha Ezell v. Jefferson Dunn, et al.

1 Q.        Do you dispute that you told the warden
2 about Mr. Mullins' allegations?
3 A.        If I was to dispute that, I would say
4 that the investigator was -- all this that he wrote
5 is a lie.  So I'm not going to dispute that.
6 Q.        I'm going to continue on to the next
7
8 PAGE 87, LINES 1-25
9 page of the transcript.
10        "B.C.:  That was after he had talked to
11 Lieutenant Ragsdale.  I think it was that morning."
12        "A.G.:  Yeah.  Okay."
13        "And they reassigned him to somewhere in
14 P dorm.  And then he came -- and then he come and
15 saw you.  And Warden Jones said, 'Let's go ahead and
16 move him to L dorm?"
17        "A.G.:  Yes, sir."
18        Did I read that correctly?
19 A.        Yes.
20 Q.        Does it say here that Warden Jones said,
21 "Let's go ahead and move him to L dorm"?
22 A.        Yes.  That's what the statement says
23 that B.C. said.
24 Q.        And you agreed with that, correct?
25 A.        I said, "Yes, sir."

Page 21

1 Q.        And then you said -- excuse me.
2        B.C. said, "Um" --
3        And you said, "Well, pretty much let's
4 move him somewhere in population.  And I found a bed
5 in L."
6        Did I read that correctly?
7 A.        Yes.
8 Q.        So is it -- do you recall Warden Jones
9
10 PAGE 88, LINES 1-7
11 telling you to move Mr. Mullins to somewhere in
12 population?
13 A.        I can't recall that.
14 Q.        Would it have been your decision to keep
15 Mr. Jones in population?  Strike that.
16        Would it have been your decision to keep
17 Mr. Mullins in population?
18
19 PAGE 88, LINES 10-11
20 A.        Like I stated, that's not my call.
21 Q.        Whose call would it have been?
22
23 PAGE 88, LINES 13-17
24 A.        It's the warden's, captain.  It's their
25 call.  But if you ask me to do something, I'm going

Page 22

1 to look it up and do it for you.  But finalizing it
2 is not -- that's not me.  I don't do that.  That
3 wasn't -- I didn't do bed moves.
4
5 PAGE 88, LINES 21-24
6        So if you and Warden Jones were having a
7 discussion about where to move Mr. Mullins, it would
8 have been Warden Jones' decision about the
9 appropriate placement for Mr. Mullins, correct?
10
11 PAGE 89, LINES 1-4
12 A.        Yes.  It would have been her, not me.
13 Q.        And as you sit here today, do you have
14 any reason to dispute that Warden Jones told you to
15 move Mr. Mullins to somewhere in population?
16
17 PAGE 89, LINES 6-15
18 A.        Warden Jones was Warden Jones.  She ran
19 the facility.  And if any disagreement was going to
20 be done, it wouldn't have been between me and her.
21 It would have been Ms. Vincent, not me.  I know that
22 wasn't my responsibility on that.
23 Q.        You would have been -- strike that.
24        In answering I&I's questions,
25 specifically Agent Casey's questIons here, you would

Page 23

1 have been as honest and complete as possible,
2 correct?
3
4 PAGE 89, LINES 19-21
5 Q.        When you were speaking with Agent Casey
6 here, you would have made every effort to be as
7 honest and complete as possible, correct?
8
9 PAGE 89, LINES 24-25
10 A.        Yes, I would have done my best to be --
11 to give good answers, yes, during whatever year this
12
13 PAGE 90, LINES 1-11
14 was.
15 Q.        When you say -- you said here, "Well,
16 pretty much let's move him somewhere in population.
17 And I found a bed in L."
18        Do you know why you found a bed in L
19 versus any other housing unit at St. Clair?
20 A.        Let's go back to where it says, "Warden
21 Jones said let's go ahead and move him to L dorm."
22 Q.        So is it a fair characterization of your
23 testimony that Warden Jones would have instructed
24 you to move him to L dorm?
25

Page 24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6 (21 - 24)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

---

1 PAGE 90, LINES 13-17
2 A.          According to what B.C. was saying to me,
3 "You and Warden Jones said let's go ahead and move
4 him to L dorm."
5 Q.          And whose decision would it have been to
6 move Mr. Mullins to L dorm?
7
8 PAGE 90, LINES 20-21
9 A.          It would have been Warden Jones, not
10 mine.  I do not do bed movements.
11
12 PAGE 90, LINES 24-25
13 Q.          After the line we just read, Agent Casey
14 said, "Okay.  And so, I mean, that's the nuts and
15
16 PAGE 91, LINES 1-25
17 bolts of it.  Is there anything that you think is
18 relevant about any of that that we've talked about,
19 about building up to his homicide that I might have
20 overlooked or that you can?"
21          "A.G.:  Naw.  I -- because I would have
22 already told the warden if I thought it was
23 something extra going on."
24          Did I read that correctly?
25 A.          Yes.
                                            Page 25

---

1 Q.          What did you mean by that statement, "I
2 would have already told the warden if I thought it
3 was something extra going on"?
4 A.          Knowing who I am.  Now, if it was
5 anything very important, I would have shared it,
6 that information.  I wouldn't have kept it to
7 myself.  That's what I mean.
8 Q.          And who would you have shared it with?
9 A.          I could have shared it with any of the
10 wardens or captains that were there that needed to
11 know it.
12 Q.          So if you thought there was something
13 important with regard to the allegations made by
14 Mr. Mullins and his safety, you would have shared
15 that with the captains or the wardens; is that
16 correct?
17
18 PAGE 92, LINES 1-3
19 A.          Yes.  And maybe even Ms. Vincent.
20 Q.          And why did you say, "Ugh, ugh"
21 repeatedly?
22
23 PAGE 92, LINES 6-13
24 A.          I do not know why I said, "Ugh, ugh"
25 back four yeas, five years ago.  I do not know.
                                            Page 26

---

1 Maybe because I was nervous.  I don't know.
2 Q.          Has viewing this statement refreshed
3 your recollection at all about Mr. Mullins or your
4 involvement in the response to the PREA allegations
5 made by him?
6 A.          No.
7
8 PAGE 93, LINES 4-20
9 Q.          And this is an email from
10 SharpmM654@stclair to you; is that correct?
11 A.          Yeah, that's what it states.
12 Q.          Do you know who SharpmM654@stclair is?
13 A.          No, ma'am.
14 Q.          And I'm going to turn to the attachment
15 here.  This says Mental Health Referral Form.
16          Did I read that correctly?
17 A.          Yes, ma'am.
18 Q.          And here it says, "Person making
19 referral."  Is that your name there, Angelia Gordy?
20 A.          Angelia Gordy.
21 Q.          Angelia.  Excuse me.
22          Angelia Gordy, is that your name there?
23 A.          Yes.
24 Q.          Did you complete this form?
25 A.          Yes.
                                            Page 27

---

1
2 PAGE 94, LINES 1-14
3 Q.          This, again, is an email from
4 SharpmM654@stclair.doc.al to you on March 1, 2019,
5 correct?
6 A.          Yes, that's what it states.
7 Q.          And then the attachment here is a Mental
8 Health Referral Form for Clarence Jackson dated
9 2-26-2019; is that correct?
10 A.          Yes.
11 Q.          And, again, the person making the
12 referral is A. Gordy; is that correct?
13 A.          Yes.
14 Q.          So did you make this referral form?
15 A.          Yes.  That's my handwriting.  It looks
16 like it anyway.
17
18 PAGE 95, LINES 4-25
19 Q.          This is two emails from SharpmM654 to
20 you on February 26th containing the first and second
21 pages of a statement from Steven Mullins.  Can you
22 see this first page of the statement on ADOC018954?
23 A.          Yes, I see it.
24 Q.          Is this a statement that you would have
25 gotten from Mr. Mullins?
                                            Page 28

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (25 - 28)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **Angelia Gordy - Redacted**
                                                                              **8/7/2024**

1 A.        I can't recall if that was the one that
2 he gave me or is that the one he wrote for mental
3 health.
4 Q.        Would he have written separate
5 statements to you and to mental health?
6 A.        It's possible he had written more than
7 one if you want to write a statement to explain
8 yourself, to put it on the record.
9 Q.        Okay.  Do you recognize this statement
10 at all?
11 A.        No, ma'am.
12 Q.        Does this statement at all refresh your
13 recollection about Steven Mullins or your
14 involvement in the response to the PREA allegations
15 that he made?
16
17 PAGE 96, LINE 1
18 A.        No, ma'am.
19
20 PAGE 97, LINES 18-25
21 Q.        The title of this document is Prison
22 Rape Elimination Act (PREA) Audit Report, Adult
23 Prisons and Jails.  And interim is marked; is that
24 correct?
25 A.        Yes, that's what it states.
                                                                    Page 29

1 Q.        Are you familiar with these PREA audit
2 reports?
3 A.        That looks familiar.
4
5 PAGE 98, LINES 1-24
6 Q.        Do you recall ever seeing this
7 particular PREA audit report?
8 A.        Seeing this particular PREA audit
9 report?
10 Q.        Yes.
11 A.        I'm sure I had to see it when I was
12 doing PREA, when I was IPCM.  I'm sure I had to see
13 this.
14 Q.        So you would have received this report
15 as part of your responsibilities as PREA compliance
16 manager, correct?
17 A.        I don't know how this would have related
18 to the audit.  But I'm sure I would have received
19 this either before, after, in the middle.  Sometime
20 I would have received it because it doesn't -- the
21 final is not checked, though.
22 Q.        Do you recall anyone by the name of
23 Melinda Allen?
24 A.        No, I can't recall, just recall.  I see
25 her name right here on this report.  So I'm sure she
                                                                    Page 30

1 was the auditor.
2 Q.        And do you recall why this PREA audit
3 was done?  It looks like the date of the facility
4 visit was April 3rd through 6th 2018.
5
6 PAGE 99, LINES 1-25
7 A.        Why it was done?  No.
8 Q.        I am going to go to the fourth page
9 which is entitled Audit Findings, Audit Narrative.
10 Did I read that correctly?
11 A.        Yes.
12 Q.        The second paragraph, "An in-brief
13 meeting was held April 3, 2018, with Deputy Warden
14 Anthony Brooks, Institutional PREA Compliance
15 Manager Lieutenant Angelia Gordy, Institutional
16 Assistant PREA Compliance Manager Lieutenant
17 Ragsdale, and Captain Carla Graham."
18 Did I read that correctly?
19 A.        Yes.
20 Q.        Do you recall participating in this
21 meeting prior to Ms. Allen's tour of St. Clair?
22 A.        I don't recall this meeting.  But it
23 says I was there.
24 Q.        As PREA compliance manager, would you
25 have accompanied Ms. Allen on the tour?
                                                                    Page 31

1 A.        I'm sure I would have accompanied her on
2 the tour because I'm the PREA compliance manager.
3 Or unless my backup did it.
4 Q.        I'm going to scroll to Page 5, the
5 second full paragraph on that page.  I'm going to
6 read that.
7
8 PAGE 100, LINES 1-25
9        "During the facility tour, I observed
10 several deficiencies in security that were of grave
11 concern, to include unsecured gates, unsecured cell
12 doors, unsecured storage doors, cameras/electronic
13 monitoring devices that were damaged or not
14 viewable, broken windows, makeshift curtains used to
15 block officers' views into cells, cell doors jammed
16 with paper to prevent the proper securing of the
17 doors, inmates that were openly violating facility
18 rules, to include being in the wrong housing units,
19 smoking, and not wearing an arm band which
20 designates the inmates housing assignment."
21        Did I read that correctly?
22 A.        Yes.
23 Q.        Do you recall being made aware of those
24 observations by Ms. Allen?
25 A.        I do not recall being made aware of that
                                                                    Page 32

Lakeisha Ezell v. Jefferson Dunn, et al.

1 **at this time. But this report, I'm sure I would**
2 **have got a copy of it.**
3 Q.          I'm going to skip down two paragraphs.
4 "At the closure of the on-site audit, a debrief
5 meeting was held with Warden Estes, Deputy Warden
6 Brooks, Lieutenant Gordy, and Lieutenant Ragsdale.
7 The auditor thanked the staff for all their
8 hospitality.
9
10 LINE 101, LINES 1-12
11          It should be noted that Lieutenant Gordy
12 and Lieutenant Ragsdale were very accommodating and
13 tried to provide everything requested by the
14 auditor. But it was apparent that the IPCM does not
15 have the authorization to request certain
16 documentation from areas to which she does not have
17 direct linkage."
18          Did I read that correctly?
19 **A.      Yes.**
20 Q.          Do you know what type of documentation
21 Ms. Allen was referring to that you did not have
22 access to?
23
24 PAGE 101, LINES 14-25
25 **A.      No, ma'am.**
                                                    Page 33

1 Q.          While you were IPCM, did you feel like
2 there was documentation related to your
3 responsibilities that you did not access to?
4 **A.          Once again, we're talking about several,**
5 **several years ago. So I can't recall that thought**
6 **on that.**
7 Q.          Do you recall this debrief meeting that
8 Ms. Allen identifies in this report?
9 **A.          I do not recall this meeting. But I was**
10 **there. It says I was there.**
11 Q.          Do you recall anything that was
12
13 PAGE 102, LINES 1-3
14 Discussed or any deficiencies that were discussed at
15 that meeting?
16 **A.          No, I do not recall.**
17
18 PAGE 102, LINES 6-10
19          Do you recall any subsequent meetings
20 with any of the wardens or Mr. Ellington regarding
21 any deficiencies identified by Ms. Allen in her PREA
22 report or any corrective action that could be taken
23 to address them?
24
25 PAGE 102, LINES 13-25
                                                    Page 34

1 Q.          I'm going to move to Page 12. This is
2 Page 12, the fourth paragraph down. Ms. Allen
3 wrote, "Unannounced rounds are documented on the
4 admin logbooks. The facility has an electronic
5 monitoring system that is monitored by cubicle
6 correctional officers.
7          However, when checked, most of the
8 cameras were inoperable or not visible because
9 inmates had manipulated the systems or scratched the
10 lenses, rendering them not visible.
11          There were numerous blind spots
12 identified to which inmates have access. The
13 facility currently has a plan in place to address
14
15 PAGE 103, LINES 1-11
16 these blind spots and to add additional cameras.
17 They are aware of where many of the problems are
18 located."
19          Did I read that correctly?
20 **A.      Yes.**
21 Q.          Were you aware in 2018 of a problem with
22 inoperable cameras at St. Clair?
23 **A.      I can't recall at this time.**
24 Q.          Were you aware in 2018 of problems of
25 blind spots in the housing units and other parts of
                                                    Page 35

1 the prison to which inmates had access?
2
3 PAGE 103, LINES 13-16
4 **A.      I cannot recall.**
5 Q.          Do you -- strike that.
6          What was the facility's plan to address
7 the blind spots and to add additional cameras?
8
9 PAGE 103, LINES 18-25
10 **A.          I can't recall or remember what was the**
11 **detailed plans that we had to make according to what**
12 **the auditor was stating. But I'm quite sure what we had**
13 **to have a plan together for the auditor. Because**
14 **all my auditors were strict.**
15 Q.          But fair to say, as you sit here today,
16 you don't recall anything specific or general about
17 the plans you had in place, correct?
18
19 PAGE 102, LINES 2-5
20 **A.          From four to five years ago, no.**
21 Q.          As you sit here today, do you dispute
22 the findings that I just read to you in this
23 paragraph?
24
25
                                                    Page 36

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9 (33 - 36)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

1 PAGE 104, LINES 7-10
2 A.          Let's me see how to answer that.  Do I
3 dispute the findings of the auditor?
4 Q.          Yes.  Do you have any reason, as you sit
5 here today, to dispute her findings?
6
7 PAGE 104, LINES 12-17
8 A.          That wouldn't be my job to dispute the
9 findings.
10 Q.          I'm just asking as you sit here today,
11 is there any reason that you can tell me that you
12 dispute her findings that I just read to you in this
13 paragraph?
14
15 PAGE 104, LINES 19-25
16 A.          That would not be my job to dispute her
17 findings.  My job would be to assist her and make a
18 plan to work it out, to correct whatever she found.
19 As far as me disputing her, that wouldn't be my job
20 to dispute her.
21 Q.          The next paragraph, "The facility uses a
22 screening system to identify vulnerable inmates
23
24 PAGE 105, LINES 1-10
25 during the initial screening process before

1 placement in a housing unit.  However, with the
2 pervasive open gates, unit doors, and cell doors,
3 inmates move throughout the facility when and where
4 they desire.
5          I interviewed numerous inmates that
6 claimed they did not sleep in the housing unit they
7 were assigned by staff.  Inmates acknowledged that
8 they returned to their assigned unit for mandated
9 counts when names or identities are verified."
10
11 PAGE 105, LINES 15-25
12 Q.          "It was particularly disturbing to learn
13 that many inmates identified as being at risk for
14 victimization are often moved to the adjacent
15 housing unit where potential predators are housed.
16 The facility typically houses the vulnerable inmates
17 on one side of the unit and the predators on the
18 other.  Many inmates stated that they simply placed
19 their bed rolls in the floors of the day room area
20 or other common areas to sleep."
21          Did I read that correctly?
22 A.          Yes.
23
24 PAGE 106, LINES 1-7
25 Q.          Do you recall being informed about these

1 findings from Ms. Allen?
2 A.          I don't recall it.  But I'm sure she
3 brought them up to me and Ms. Vincent and whoever
4 had to be there.  I'm sure she did.
5 Q.          And as you sit here today, do you have
6 any reason to dispute these findings from her?
7
8 PAGE 106, LINES 9-18
9 A.          Once again, it's not my job to dispute
10 them.  It's just not my job to go back and forth and
11 argue with her about what she found, no.  That's not
12 my responsibility.  That's not my job.
13          And I'm sure she communicated with
14 Ms. Vincent very well about what she found at
15 St. Clair.
16 Q.          As IPCM at St. Clair, were you aware of
17 a pattern of inmates sleeping in areas other than
18 their assigned cell?
19
20 PAGE 106, LINES 21-24
21 A.          I can't recall that.
22 Q.          Based on what Ms. Allen reported here,
23 did you have concerns that inmates were being
24 meaningfully separated from their PREA abusers?
25

1 PAGE 107, LINES 1-6
2 A.          My concern would have been to help
3 correct what she saw.  That would have been my
4 concern, to correct what she saw and what she
5 stated.
6 Q.          What steps did you take to correct the
7 deficiencies that she noted here?
8
9 PAGE 107, LINES 8-20
10 A.          In 2024 -- and this happened four or
11 five years ago -- I cannot tell you what steps I
12 took.  But I know we took -- we took something.  The
13 department of corrections took some steps.  Because
14 this is bigger and higher than me.
15 Q.          When you say, "It's bigger and higher
16 than me," what do you mean by that?
17 A.          I mean I'm not the one to just make all
18 the decisions.  That's what I mean.  I'm not the one
19 to make all the decisions by myself.
20 Q.          So who would have been responsible for
21 making sure that the deficiencies here were
22 corrected?
23
24 PAGE 107, LINES 22-25
25 A.          All of us that's working in the

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (37 - 40)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                                   **Angelia Gordy - Redacted**
**8/7/2024**

1 department of corrections would be, from the
2 officers on. We are all responsible to do better.
3 Q.          Officers were not receiving this PREA
4
5 PAGE 108, LINE 1
6 audit report, correct?
7
8 PAGE 108, LINES 3-6
9 A.          No, the officers wouldn't have seen
10 this.
11 Q.          So who would have received this PREA
12 audit report?
13
14 PAGE 108, LINES 8-25
15 A.          Ms. Vincent would have seen it, of
16 course. And then she would have shared the
17 information with me. And I don't know if this --
18 once it's finalized, it's on the website.
19 Q.          Once it's finalized -- I'm sorry. I
20 didn't hear the last part.
21 A.          I said once it's finalized, it's on the
22 website. So anybody could have pulled it up and
23 looked at it once it's finalized.
24 Q.          Would Warden Jones have been notified of
25 these PREA findings?
                                                    Page 41

1 A.          I'm sure -- well, I can't recall. I
2 can't say. But I'm sure Ms. Vincent would have
3 shared that with her. If there was an audit done
4 when she was here as warden, let's say that.
5 Q.          Let me reask my question.
6            Would the warden III have been notified
7 of these PREA audit findings?
8
9 PAGE 109, LINES 1-14
10 A.          Once again, Ms. Vincent would have got
11 this report, and she would have spoken with the
12 warden of the facility and other people. I'm sure
13 she didn't just speak to the warden of the facility.
14 It takes more than just the warden of the facility
15 to run the department of corrections. So who all
16 would have saw this, I don't know.
17            But once it's finalized, it's on the
18 website and everybody could have read it years ago.
19 You could read this. If it has changed, I don't
20 know. Because I ain't been to the website since I
21 stopped doing PREA. But then I was on it. I knew
22 my job. I loved my raises, too, and I loved what I
23 did.
24
25
                                                    Page 42

1 PAGE 109, LINES 20-25
2 Q.          At the bottom of Page 12, there's a line
3 that says, "Corrective Action Plan." Do you see
4 that?
5 A.          Yes, I do.
6 Q.          Would you have been involved in creating
7 this corrective action plan with the auditor?
8
9 PAGE 110, LINES 1-25
10 A.          I can't recall. I don't know. I can't
11 recall.
12 Q.          Do you know who else would have been
13 involved in creating the corrective action plan with
14 the auditor?
15 A.          I can't recall. I'm going to say
16 Ms. Vincent because she was over PREA. But I can't
17 recall.
18 Q.          The first line of this corrective action
19 plan says, "It is recommended that leadership amend
20 their staffing plan to provide additional staff
21 coverage in troublesome areas. Staff should take
22 extra precautions to ensure staff closely monitor
23 these areas."
24            Did I read that correctly?
25 A.          Yes.
                                                    Page 43

1 Q.          Did you take any steps to implement this
2 corrective action?
3 A.          I can't recall.
4 Q.          Were you involved in any discussions
5 about this corrective action?
6 A.          I can't recall.
7 Q.          The next line is, "It is not possible to
8 adequately provide the minimum coverage required
9 based on the number of staff presented. This
10
11 PAGE 111, LINES 1-18
12 Staffing shortage coupled with inadequacies with the
13 video monitoring system, lack of control of doors
14 and movement present very dangerous conditions for
15 both staff and inmates.
16            The facility should control egress of
17 doors and gates so inmates cannot move from one unit
18 to the next, resulting in the mixing of
19 classifications."
20            Did I read that correctly?
21 A.          Yes.
22 Q.          Were you involved in any discussions
23 about this corrective action?
24 A.          I can't recall.
25 Q.          Did you take any steps to implement this
                                                    Page 44

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

1  corrective action?

2  **A.          I cannot recall.**

3  Q.          Did anyone else take any steps to

4  implement this corrective action?

5

6  PAGE 111, LINES 20-25

7  **A.          I cannot recall.**

8  Q.          Then the last paragraph here,

9  "Unannounced rounds are to be conducted by

10  intermediate or higher staff.  In this case, a

11  lieutenant or higher should always be conducting the

12  unannounced PREA rounds.

13

14  PAGE 112, LINES 1-23

15              The facility SOP Number 229 mandates

16  that shift commanders and segregation commanders

17  personally conduct a minimum of three unannounced

18  rounds each week in an effort to deter staff sexual

19  abuse and harassment."

20              Did I read that correctly?

21  **A.          Yes.**

22  Q.          Were you involved in any discussions

23  about making sure that unannounced rounds were

24  conducted in compliance with PREA?

25  **A.          I can't recall.**

                                                    Page 45

1              Did you take any steps to make sure that

2  unannounced rounds were conducted in compliance with

3  PREA?

4  **A.          I cannot recall.**

5  Q.          Do you recall anyone else taking any

6  steps to make sure that unannounced rounds were

7  conducted in compliance with PREA?

8  **A.          If this was a problem that the auditor**

9  **said needed to be addressed, I'm sure we did what**

10  **the auditor asked us to do.**

11  Q.          And as you sit here today, you don't

12  recall any corrective action being taken, correct?

13

14  PAGE 113, LINE 1

15  **A.          I cannot recall.**

16

17  PAGE 113, LINES 3-25

18  Q.          So I'm going to reshare what was Exhibit

19  7.  Again, this is the PREA audit report from

20  Melinda Allen.  I'm going to direct you to Page 38,

21  the fourth full paragraph.  I'll move it up so you

22  can see it.

23              "Staff interviews confirmed that the

24  screening instrument is being used and that staff

25  are considering the responses to the instruments

                                                    Page 46

1  when considering placement of the inmates in

2  housing.  Interviews with inmates reveal that

3  inmates often move throughout the facility and sleep

4  wherever they desire, circumventing the screening

5  process altogether.

6              One inmate that was interviewed had been

7  designated as a potential victim during the

8  screening process.  He told me he felt more

9  comfortable sleeping on the other side of the unit

10  where predators are often placed.  The inmate was

11  not aware that potential predators are often housing

12  on that side of the unit.

13              Interviews with staff verify that

14  inmates are moving on their own to other housing

15  areas."

16

17  PAGE 114, LINES 1-25

18              Did I read that correctly?

19  **A.          Yes.**

20  Q.          Do you recall being notified of this

21  finding by Ms. Allen?

22  **A.          I cannot recall.**

23  Q.          Did you take any corrective action in

24  response to this finding?

25  **A.          If this was in the report and the**

                                                    Page 47

1  **auditor wanted us to handle it, I'm sure I did.  I'm**

2  **sure we did.  Because I couldn't do it by myself.**

3  **So I'm sure we did.**

4  Q.          And as you sit here today, do you recall

5  any of the corrective action that was taken?

6  **A.          I cannot recall.**

7  Q.          I'm going to move to Page 43.  This

8  first paragraph here, "Agency regulation 454, Page

9  9, Section H 6 states that the warden is responsible

10  for ensuring that inmates at high risk for sexual

11  victimization are not placed in involuntary

12  segregation such as administrative segregation or

13  protective custody unless an assessment of all

14  available means have been made and there are no

15  other available alternatives.

16              Interviews with inmates indicate that

17  they are placed in segregation for extended periods

18

19  PAGE 115, LINES 1-15

20  Of time.  Inmate interviews indicated that they had

21  been in segregation four, six, and seven months and

22  continuing.  Inmates placed in segregation that are

23  at risk of sexual victimization have not had access

24  to programming, education, work, or other

25  privileges."

                                                    Page 48

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (45 - 48)

Lakeisha Ezell v. Jefferson Dunn, et al.

Angelia Gordy - Redacted
8/7/2024

1          Did I read that correctly?
2 A.          Yes.
3 Q.          Do you recall when you were informed of
4 this finding that was made by Ms. Allen?
5 A.          I cannot recall.
6 Q.          Were you aware that inmates who were
7 determined to be at high risk for sexual
8 victimization were held for four, six, or seven
9 months in segregation for their own protection?
10
11 PAGE 115, LINES 18-20
12 A.          I can't recall.
13 Q.          Did you take any steps to address the
14 deficiency identified here by Ms. Allen?
15
16 PAGE 115, LINES 22-25
17 A.          If the auditor advised Ms. Vincent and
18 others that this needed to be addressed, I'm sure we
19 addressed it.  As far as me just recalling it, no.
20 Q.          Would you have documented anywhere if
21
22 PAGE 116, LINES 1-3
23 You, Ms. Jones, or Ms. Allen had taken corrective
24 action in response to these deficiencies that we've
25 discussed?

Page 49

1 PAGE 117, LINES 1-6
2 not my job.
3 Q.          What steps did you take to address the
4 issue that she identified here?
5 A.          I do not recall.
6 Q.          Do you recall anyone else taking any
7 steps to correct the issue that she identified here?
8
9 PAGE 117, LINE 8
10 A.          I do not recall.
11
12 PAGE 117 LINES 17-25
13 Q.          This is another interim PREA audit
14 report dated June 4, 2018; is that correct?
15 A.          Yes, that's what it states.
16 Q.          And the auditor in this case was Dave
17 Cotten; is that correct?
18 A.          Yes.
19 Q.          And it says the date of his facility
20 visit was May 1st through 3rd of 2018; is that
21 correct?
22
23 PAGE 118, LINES 1-25
24 A.          Yes.  I see that on the report.
25 Q.          Do you recall receiving this interim

Page 51

1 PAGE 115, LINES 5-25
2 A.          I don't know if I failed this audit or
3 not, totally just failed it.  But I'm sure there
4 were steps that we had to send back and forth to the
5 auditor.  So I cannot recall.
6 Q.          I'm going to take you to Page 62, the
7 last paragraph on this page.  "Interviews revealed
8 that investigators evaluate the credibility of the
9 alleged victim, witness, or suspect.  It was
10 concerning that the investigator claimed that in
11 many cases, they cannot prove it was not consensual
12 or to pay a debt.  He stated if there was a debt
13 involved the case, it tends to be overlooked."
14          Did I read that correctly?
15 A.          Yes.
16 Q.          Do you recall when you were informed
17 about this finding from Ms. Allen?
18 A.          I do not recall.
19 Q.          Do you dispute this finding by
20 Ms. Allen?
21 A.          Once again, I do not dispute anything
22 that she put in her report.  That's not my -- that's
23
24
25

Page 50

1 report from Dave Cotten?
2 A.          I am familiar with this type of audit
3 report after an audit is completed.  Interim, no.
4 It's not finalized yet, but it's an interim.
5 Q.          And do you recall this specific audit
6 that was done by Dave Cotten?
7 A.          I cannot recall.
8 Q.          I'm going to scroll down to Page 4.  I'm
9 going to look at the third paragraph here.
10 "Auditors arrived at the facility on 5-1-18 at
11 approximately 8:00 a.m. and met with Warden Brooks,
12 IPCM Gordy, and Lieutenant Ragsdale, backup to the
13 IPCM."
14          Did I read that correctly?
15 A.          Yes.
16 Q.          "A tour of the facility was then
17 conducted with Lieutenant Gordy, Lieutenant
18 Ragsdale, and Auditor Cotten."
19          Did I read that correctly?
20 A.          Yes.
21 Q.          Does this refresh your recollection at
22 all about this PREA audit or meeting with Mr. Cotten
23 to conduct the tour?
24
25

Page 52

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13 (49 - 52)

Lakeisha Ezell v. Jefferson Dunn, et al.

Angelia Gordy - Redacted
8/7/2024

1 PAGE 119, LINES 1-23
2 A.              No.
3 Q.              I'm going to go down to the end of the
4 paragraph.  Mr. Cotten wrote -- below in these
5 bullet points he's identified some observations and
6 findings from his tour.  I'm going to go over those
7 with you now.
8               The first bullet point is, "Numerous
9 inmates were seen violating rules, sometimes
10 challenged by staff and sometimes not.  When
11 challenged, several of the inmates appeared to not
12 be concerned with the challenge and continued what
13 they were doing, in violation of rules."
14              Did I read that correctly?
15 A.            Yes.
16 Q.            Do you recall being informed about this
17 finding from Mr. Cotten?
18 A.            I do not recall.
19 Q.            Do you dispute this finding from
20 Mr. Cotten?
21 A.            Not my job to dispute his findings.
22 Q.            What steps did you take to address the
23 issue identified in this bullet point?
24 A.            I can't recall.
25
                                          Page 53

1 PAGE 120, LINES 1-4
2 A.            I said I cannot recall.
3 Q.            Do you recall anyone else taking any
4 steps to address the issue identified in this bullet
5 point?
6
7 PAGE 120, LINES 6-25
8 A.            I cannot recall.
9 Q.            The next bullet point says, "From
10 previous knowledge of the facility's policy of
11 separating identified victim prone inmates from
12 identified abusiveness prone inmates by placing
13 victim prone on one side of housing unit and
14 abusiveness prone inmates on the other side and the
15 doors to each side being controlled by staff, it was
16 obvious practice was not in place.
17              The policy requires inmates to wear
18 colored wrist bands to indicate which side of the
19 unit they are allowed to access.  The majority of
20 inmates observed were not wearing wrist bands.  And
21 staff granting access to the different sides of the
22 unit did not check wrist bands.
23              The access doors to the honor unit are
24 left unsecure on both sides, reportedly due to
25 collapsing that control room's post as a result of
                                          Page 54

1 staffing shortages, allowing inmates from both sides
2 to walk freely between the two sides.
3
4 PAGE 121, LINES 1-6
5               The reasoning provided to the auditor
6 was that because it was an honor unit, the inmates
7 were less likely to violate sexual abuse rules
8 because they did not wish to lose the honor status."
9               Did I read that correctly?
10 A.            Yes.
11
12 PAGE 121, LINES 15-19
13              Do you recall being notified of this
14 finding?
15 A.            I cannot recall.
16 Q.            Do you dispute the finding here by
17 Mr. Cotten?
18
19 PAGE 121, LINES 21-24
20 A.            Not my job to dispute his findings.
21 Q.            What corrective action did you take in
22 response to the issues identified in this bullet
23 point?
24
25
                                          Page 55

1 PAGE 122, LINES 1-4
2 A.            I cannot recall.
3 Q.            Do you recall anyone else taking any
4 corrective action in response to the issue
5 identified here?
6
7 PAGE 122, LINES 6-25
8 A.            I cannot recall.
9 Q.            I'm going to go down to Page 66 of
10 Mr. Cotten's report.  In the second paragraph he
11 says, "Observations.  The facility uses the
12 placement of potential victims on one side of a
13 living unit and the possible abusers on the other
14 side for both the separation of victims from abusers
15 and for the protection against retaliation per file
16 documentation.
17              The facility uses wrist bands to
18 identify which unit and which side of the unit an
19 inmate is assigned to.  This would be a good system
20 if the facility would actually keep the inmates
21 separated, which they do not.
22              Inmates were able to move freely from
23 dorm to dorm or from side to side of a dorm,
24 disregarding the colored wrist bands.  Many inmates
25 did not have wrist bands at all, and much of the
                                          Page 56

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

| | |
|---|---|
| 1 time staff allowed the inmates access through a | 1 different. |
| 2 restricted access door without verifying that the | 2         If you knew as IPCM that inmates were |
| 3 | 3 allowed to move freely throughout the facility, |
| 4 PAGE 123, LINES 1-11 | 4 would that raise concerns with you about your |
| 5 inmate should be entering.  This subverts the | 5 ability to protect inmates who reported sexual |
| 6 facility's policy on the separation of victims and | 6 |
| 7 abusers and protection from retaliation. | 7 PAGE 125, LINE 1 |
| 8         In the honor dorm, doors to both sides | 8 assault from retaliation? |
| 9 are left open any time staff are not in the Q | 9 |
| 10 reportedly due to short staffing, thereby granting | 10 PAGE 125, LINES 5-10 |
| 11 all facility inmates access to the entire dorm. | 11         If you learned as IPCM that inmates were |
| 12 This was reportedly because it was an honor dorm and | 12 allowed to move freely through the general |
| 13 the inmates feared losing that status and would not | 13 population dorms at St. Clair, would that raise |
| 14 violate that protocol." | 14 concerns for you about your ability to protect |
| 15         Did I read that correctly? | 15 inmates who reported sexual assault from |
| 16 | 16 retaliation? |
| 17 PAGE 123, LINES 13-18 | 17 |
| 18 A.        **Yes, you did.** | 18 PAGE 125, LINES 13-19 |
| 19 Q.        When were you made aware that inmates -- | 19 A.        **So you're saying my ability to protect** |
| 20 strike that. | 20 **them?  Was that part of the question?** |
| 21         When were you made aware of the problem | 21 Q.        Yes.  And I mean the facility's ability |
| 22 of staff not controlling inmate movement at | 22 to protect -- |
| 23 St. Clair? | 23 A.        **Okay.** |
| 24 | 24 Q.        -- individuals who reported sexual |
| 25                              Page 57 | 25 abuse.                              Page 59 |

| | |
|---|---|
| 1 PAGE 123, LINES 21-24 | 1 |
| 2 A.        **I cannot recall.** | 2 PAGE 125, LINES 21-25 |
| 3 Q.        Did this finding raise concerns for you | 3 A.        **I was not aware at the time of this** |
| 4 that inmates were not being properly protected from | 4 **violation until I read the report or until** |
| 5 sexual abuse and retaliation at St. Clair? | 5 **Ms. Vincent told me, one or the other.  I don't want** |
| 6 | 6 **it to be said that you said this, and it wasn't  No.** |
| 7 PAGE 124, LINES 3-8 | 7 **Once it was reported, we put something together to** |
| 8 Q.        Sure.  Based on your training and | 8 |
| 9 experience as IPCM, did the fact that inmates were | 9 PAGE 126, LINE 1 |
| 10 allowed to move freely throughout the facility raise | 10 try to do a better job. |
| 11 concerns to you that inmates were not being | 11 |
| 12 protected from sexual abuse or retaliation after | 12 PAGE 126, LINES 10-25 |
| 13 reporting sexual abuse at St. Clair? | 13 Q.        And this is an SOP signed by Karla Jones |
| 14 | 14 dated 8-29-18.  This is Standard Operating |
| 15 PAGE 124, LINES 11-25 | 15 Procedure, SOP, Number 230, Inmate Sexual Abuse |
| 16 A.        **So that question that you asked me is** | 16 Coordinated Response. |
| 17 **coming from the auditor's observation, right?** | 17         Did I read that correctly? |
| 18 Q.        Yes. | 18 A.        **Yes.** |
| 19 A.        **I'm not here to disagree with what he's** | 19 Q.        Are you familiar with this SOP? |
| 20 **saying or she.  Is this a she or he?  I don't know.** | 20 A.        **I'm sure four or five years ago I was** |
| 21 **I'm not here to disagree with what he's saying.  If** | 21 **very familiar with this.  So I see it in front of** |
| 22 **he's saying this was going on, I'm sure Ms. Vincent** | 22 **me.  I'm sure I had something to do with following** |
| 23 **read the report and we was going to handle it, do** | 23 **what's inside of it.** |
| 24 **our best.** | 24 Q.        With what?  I'm sorry. |
| 25 Q.        And my question is a little bit | 25 A.        **Huh?** |
| |                              Page 58 | |                              Page 60 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15 (57 - 60)

Lakeisha Ezell v. Jefferson Dunn, et al.

Angelia Gordy - Redacted
8/7/2024

1 Q.          It would have had something to do with
2 what?  I missed the last part.
3 A.          With PREA.  It says sexual abuse.
4
5 PAGE 127, LINES 1-25
6 Q.          And would you have relied on this policy
7 in SOP 229 that we discussed earlier in carrying out
8 your responsibilities as IPCM?
9 A.          Would I have relied on this one like I
10 did the other one you showed me earlier?
11 Q.          Let me reask the question.
12          Would you have relied on SOP Number 230
13 that we're looking at now to carry out your
14 responsibilities as PREA compliance manager?
15 A.          Yeah.  If it related to PREA, yes.
16 Q.          So Section 4 -- excuse me.  Section 5 of
17 this SOP is titled Procedures.  And I want to look
18 at a particular procedure here on Page 5.
19          "Upon witnessing or receiving a report
20 of sexual abuse, sexual assault, or a rape, the
21 first responder shall physically separate alleged
22 victims, abusers, and witnesses."
23          Did I read that correctly?
24 A.          Yes.
25 Q.          So physical separation of alleged
                                           Page 61

1 victims and abusers and witnesses is the first step
2 that should be taken in response to an allegation of
3 sexual abuse, sexual assault, or rape; is that
4 correct?
5 A.          That's what it states.
6
7 PAGE 128, LINES 1-3
8 Q.          And who is responsible for making sure
9 that this section of the SOP was complied with by
10 first responders?
11
12 PAGE 128, LINES 5-13
13 A.          Who is responsible for making sure it
14 was done?
15 Q.          Yes.
16 A.          Reading that, I would say whoever is on
17 duty on that shift.
18 Q.          And who would be responsible for making
19 sure that whoever was on duty during that shift was
20 carrying out their responsibilities as first
21 responder?
22
23 PAGE 128, LINES 16-25
24 A.          That would be -- let's see.  You've got
25 a sergeant, you've got lieutenants, you've got a
                                           Page 62

1 captain, and you've got a warden who would have the
2 reports.  And if there were any witnesses so they
3 could be questioned, yes.  But definitely the victim
4 and the abuser.  Because you're going to talk to --
5 if you've got the abuser, you're going to talk to
6 the victim and the abuser.
7 Q.          Would the warden III have been
8 responsible for reviewing incident reports and
9
10 PAGE 129, LINES 1-2
11 Ultimately making sure that the requirements of PREA
12 were complied with?
13
14 PAGE 129, LINES 4-10
15 A.          Once again, the report is sent out to so
16 many people.  All the captains, all the wardens, all
17 the lieutenants are looking at it, even my
18 supervisor, which is Ms. Vincent.
19 Q.          And is it your testimony that all those
20 individuals were responsible for making sure that
21 the requirements of PREA were being complied with?
22
23 PAGE 129, LINES 12-25
24 A.          What I -- maybe I said that wrong.  It
25 was -- everybody received that report.  Now, some of
                                           Page 63

1 them could have been off on vacation or whatever and
2 didn't receive that report.  But we all -- they all
3 would have seen it.
4          And I'm sure they would have made sure
5 that they do their job to the best of their ability
6 to make sure that the witnesses and abusers were
7 separated, to get a statement from them.
8 Q.          Still in the requirements section here,
9 Section K, "Within 30 days of the conclusion of the
10 I&I investigation, the warden director shall convene
11 a sexual abuse incident review team to review all
12 substantiated and unsubstantiated PREA allegations.
13
14 PAGE 130, LINES 1-25
15          This team shall be composed of the
16 warden designee, medical or mental health
17 representative, investigator, supervisor present at
18 the time of allegation, and IPCM.
19          The IPCM shall take detailed meeting
20 minutes to include the agenda, participants, date,
21 names, and number of the investigation, type of
22 investigation and findings, and all meeting content
23 utilizing ADOC Form 454E, Sexual Abuse Incident
24 Review.
25          The team shall consider whether the
                                           Page 64

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (61 - 64)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

1 allegation or investigation indicates a need to
2 change policy or practice to better prevent, detect,
3 or respond to sexual abuse, consider whether the
4 incident or allegation was motivated by race,
5 ethnicity, gender identify, LGBTI identification,
6 status or perceived status, or gang affiliation or
7 motivated or otherwise caused by other group
8 dynamics, examine the area in the facility where the
9 incident allegedly occurred to assess whether
10 physical barriers in the area may enable abuse,
11 assess the adequacy of staffing levels in that area
12 during different shifts, assess whether monitoring
13 technology would be employed or augmented to
14 supplement supervision by staff, and prepare a
15
16 PAGE 131, LINES 1-6
17 Report of its findings, including but not
18 necessarily limited to determination made pursuant
19 to the preceding paragraphs and any recommendations
20 for improvement.  Such reports shall be submitted to
21 the warden and PREA director in a timely manner."
22          Did I read that correctly?
23
24 PAGE 131, LINES 8-25
25 **Q.        Yes.**

Page 65

1 **Q.        Do you recall as IPCM participating in**
2 **any of these sexual abuse incident review**
3 **committees?**
4 **A.        Are you referring to me?**
5 **Q.        Yes.**
6 **A.        Can you scroll to the top a little bit?**
7 **Bring it down, I guess.  Yeah, bring it down.**
8 **          So it states that a meeting will be held**
9 **within 30 days after the conclusion of an I&I**
10 **investigation.  So it states that, and that was part**
11 **of my duties.  So I did that.**
12 Q.        As you sit here today, do you recall any
13 actual -- strike that.
14          As you sit here today, do you recall any
15 specific sexual abuse incident review committee that
16 you participated in?
17 **A.        No, I do not recall any.**
18
19 PAGE 132, LINES 1-25
20 Q.        I'm going to go back to what I believe
21 was marked as Exhibit 2.  Just let me check.  Yes,
22 Exhibit 2.  This is SOP 229.  Again, we discussed
23 this SOP earlier in the deposition.
24          You're familiar with SOP 229, correct?
25 **A.        Yeah, I saw it earlier.  Yes.**

Page 66

1 Q.        I'm going to scroll down to Page 5,
2 which is a section titled Responsibilities.
3 Subsection A is the warden is responsible for.
4          And I want to go to Subsection B which
5 says, "The institutional PREA compliance manager is
6 responsible for."  And Number 1 is, "Monitoring
7 inmates identified as being sexual aggressors,
8 potential sexual aggressors, victims of sexual
9 abuse, and potential victims of sexual abuse."
10          Did I read that correctly?
11 **A.        Yes.**
12 Q.        What steps did you take as IPCM to make
13 sure that you were monitoring inmates identified in
14 this section of the SOP?
15 **A.        I cannot recall.**
16          I want to look at Number 3,
17 "Recommending placement and/or transfer of inmates
18 involved in all PREA related incidents with the
19 approval of the warden designee and taking an
20
21 PAGE 133, LINES 1-16
22 immediate action when an inmate is subject to a
23 substantial risk of imminent abuse."
24          Did I read that correctly?
25 **A.        Yes.**

Page 67

1 Q.        Do you agree that as IPCM, you were
2 responsible for recommending placements or transfers
3 of inmates who were involved in PREA incidents?
4 **A.        I read and understand that, yes.**
5 Q.        Did you take any steps to recommend
6 placements for individuals who you learned were
7 involved in PREA incidents while you were IPCM?
8 **A.        I can't recall that, that I did or I did**
9 **not.**
10 Q.        And when it says here "with the approval
11 of the warden or designee," do you know which warden
12 this refers to?
13
14 PAGE 133, LINES 18-25
15 **A.        I can't recall what warden would it**
16 **apply to.**
17 Q.        And do you agree that, according to this
18 SOP, you were responsible for taking immediate
19 action when it came to your attention that an inmate
20 was subject to a substantial risk of imminent abuse?
21 **A.        Repeat that again.**
22 Q.        So do you agree that, according to this
23
24 PAGE 134, LINES 1-11
25 SOP, you were responsible for taking immediate

Page 68

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (65 - 68)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

1 action when an inmate -- when you learned that an
2 inmate is subject to a substantial risk of imminent
3 abuse?
4 **A.        Yes.  I was there to help the inmates be**
5 **safe from sexual abuse if I knew of it.  Yes.**
6 Q.        So if, while you were IPCM, you learned
7 that an inmate was at substantial risk of sexual
8 abuse if they remained in population, would it be
9 your responsibility to make sure that they were
10 moved out of general population?
11
12 PAGE 134, LINES 14-19
13 **A.        That would -- I don't do bed movements.**
14 **I would do a report.  And the warden, captains,**
15 **lieutenants, and Ms. Vincent would all get it.  And**
16 **it's their decision on what happened.  That just**
17 **don't apply to me.  It applies to all.  We are all**
18 **first responders.**
19
20 PAGE 136, LINES 2-25
21          This document is titled Secure Facility
22 Vulnerability Assessment, correct?
23 **A.        Yes.**
24 Q.        Do you recognize this document?
25 **A.        I see the IPCM on there.  So I see**

1 **Ms. Vincent's name on there and I see St. Clair.  So**
2 **do I just totally recall it?  No.  But I had to do**
3 **something with this.  She came in and did something,**
4 **a review or something.**
5 Q.        Do you know what -- strike that.
6          Do you recall conducting any type of
7 assessment referred to as a secure facility
8 vulnerability assessment?
9 **A.        I do not recall that.**
10 Q.        Do you know what was involved in
11 conducting a secure facility vulnerability
12 assessment?
13 **A.        I cannot recall.  I see the form in**
14 **front of me.  Is that what you're talking about, the**
15 **form that's in front of me?**
16 Q.        I'm asking if you ever were involved in
17 conducting a secure facility vulnerability
18 assessment.
19 **A.        I can't recall how it was done, how**
20
21 PAGE 137, LINES 1-12
22 Ms. Vincent completed it or done it.  I can't
23 recall.
24 Q.        Do you recall being involved in this
25 type of secure facility vulnerability assessment?

1 **A.        I cannot recall.**
2 Q.        Do you recall completing this form?
3 **A.        Well, it says completed by Ms. Vincent,**
4 **the director.**
5 Q.        If Ms. Vincent testified during her
6 deposition that you, as the IPCM, would have
7 completed this secure facility vulnerability
8 assessment, do you have any reason to dispute that?
9
10 PAGE 137, LINES 14-24
11 **A.        I don't know because I can't recall.**
12 Q.        As you sit here today, are you at all
13 familiar with the term "secure facility
14 vulnerability assessment"?
15 **A.        I can't recall.**
16 Q.        Do you know what this form was used for?
17 **A.        I can't recall.**
18 Q.        Do you recall anything about this form
19 or the term "secure facility vulnerability
20 assessment"?
21 **A.        No.**
22
23 PAGE 138, LINES 13-25
24 Q.        These are monthly security supervisor
25 meetings from February 20, 2019.

1          Did I read that correctly?
2 **A.        Yes.**
3 Q.        I want to go down to a section
4 attributed to you.  It's on Page 3.  I want to look
5 down at the bottom paragraph.
6          "All inmates must have on a wrist band.
7 Any inmate observed without a wrist band should
8 receive disciplinary action.  All inmates observed
9 in an unauthorized area should receive disciplinary
10 action."
11          Did I read that correctly?
12
13 PAGE 139, LINES 1-22
14 **A.        Yes.**
15 Q.        Do you know why you stated this at the
16 staff meeting?
17 **A.        Because why I stated everything in**
18 **there.  No particular reason.  It was just a**
19 **reminder of first responders' duties or correctional**
20 **officers' duties of what needs to be done to keep a**
21 **safe environment.  So it was no particular reason.**
22 **Like no particular reason why I made a statement**
23 **about unannounced rounds or you cannot force an**
24 **inmate to write a statement, mental health forms**
25 **need to be completed.**

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18 (69 - 72)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Angelia Gordy - Redacted**
**8/7/2024**

1 Q.          You understood the importance for inmate

2 safety of enforcing the inmate wrist band policy,

3 correct?

4 **A.          I understood all the guidelines.  At**

5 **that time, I understood everything.  And I did my**

6 **best at my job.**

7 Q.          Was it your understanding that it was

8 important to enforce the inmate wrist band policy in

9 order to ensure that inmates at St. Clair were kept

10 safe?

11

12 PAGE 139, LINES 24-25

13 **A.          Yes.  Yes, it was good to enforce that,**

14 **with everything else.  I'm not going to leave out**

15

16 PAGE 140, LINE 1

17 everything else.  All of it works together.

18

19 PAGE 140, LINES 10-25

20 Q.          Again, these are monthly security

21 supervisor meeting notes, this time from January 16,

22 2019.  Again, I'm going to go down to a section

23 attributed to you.

24          In here, the only statement you make is,

25 "We must make certain that inmates have their wrist

Page 73

1 bands on."

2          Did I read that correctly?

3 **A.          Yes.**

4 Q.          Why did you remind staff about their

5 responsibilities to make sure inmates were wearing

6 their wrist bands?

7 **A.          I can't recall why I just said that one**

8 **thing.  I could have been not feeling well or**

9 **anything on that day.  Or just, you know, a bad**

10 **headache or anything, just didn't feel like**

11

12 PAGE 141, LINE 1

13 speaking.

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19 (73 - 74)