**FILED**

**HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY**

**INVESTIGATIVE REPORT**

2025 Jan-31 PM 01:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

**ALABAMA DEPARTMENT OF CORRECTIONS**
Commissioner Jefferson S Dunn

**INVESTIGATIONS & INTELLIGENCE DIVISION**
Director Arnaldo Mercado

**Confidential-For Official Use Only**

| | |
|---|---|
| Offense | Capital Murder |
| Incident No. | SCCF-19-00285 |
| | Case No. 19-0325 |
| Location/Facility | St. Clair Correctional Facility |
| County | St. Clair |
| Date of Offense: | 02/26/2019 |

| Victim(s): | Subject(s): |
|---|---|
| 1. Stephen Mullins (AIS: W 175255) | 1. Clarence Jackson (AIS: B 249273) |
| 2. | 2. |

## COMPLAINT:

On February 26, 2019, Inmate Clarence Jackson, with intent to cause the death of Inmate Stephen Mullins, caused the death of Inmate Mullins, violating Ala. Code 1975 13A-6-2.

## DETAILS:

According to staff reports, on Tuesday, February 26, 2019, at approximately 1745 hours, Inmate Stephen Mullins (AIS: W 175255) was the victim of an assault. Officer (Ofc) Brandy Smith, a correctional officer working overtime at the St. Clair Correctional Facility's (SCCF) "L" dormitory, reported that as she opened the door to the dorm's "L2" side, she heard a loud bang. Ofc Smith turned and saw Inmate Mullins fall to the floor and noticed the inmate bleeding severely. She then notified SCCF staff, which responded and escorted Inmate Mullins to the prison's infirmary. Before losing consciousness, Inmate Mullins reportedly identified to Captain (Cpt) Kevin White that Inmate Clarence Jackson (AIS: B 249273) was his assailant. Prison staff notified local paramedics who responded to the prison before arranging for a life flight helicopter to transport the wounded inmate to the University of Alabama Hospital at Birmingham (UAB). Then, through a chain of command, prison staff notified Senior Agent Casey (SA) of the incident.

SA Casey arrived at UAB at approximately 2000 hours that night. After speaking to hospital staff, SA Casey learned that Inmate Mullins was in the hospital's operating room but received a grim prognosis. At approximately 2230 hours, after receiving a report that Inmate Mullins was still in surgery, SA Casey returned to SCCF to document the crime scene.

Upon arriving at the crime scene, just prior to 2330 hours, SA Casey received notification from on duty prison staff that Inmate Mullins survived surgery and had been relocated to a recovery room in the hospital. SA Casey then documented, through photographs, the crime scene. Then, with the expectation of Inmate Mullins' recovery, the SA Casey left the prison with the anticipation of speaking with the inmate upon his return to SCCF. SA Casey also noted that prison staff did not locate or recover the weapon used in the assault.

On Friday, March 1, 2019, at approximately 1550 hours, SA Casey received notification from SA C. Hedrick that Inmate Mullins succumbed to his injuries. SA Casey responded to UAB to photograph Inmate Mullins' corpse and continue the investigation into the inmate's homicide. Through that preliminary homicide investigation, the investigator learned that at some time before Thursday, February 28, 2019, Inmate Mullins had suffered a brain hemorrhage, which resulted in Dr. Margaret Yates declaring the inmate, "brain dead" at 1240 hours.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

As a result of this determination, and the certification of the physicians in the organization tasked with acquiring viable human organs of deceased individuals for transplant, that Inmate Mullins died. UAB staff then contacted an unidentified female warden at SCCF to update the prison on the inmate's condition. According to hospital staff, that warden informed the hospital that the decision to remove life support from Inmate Mullins was at the inmate family's discretion.

SA Casey also discovered that on Wednesday, February 27, 2019, Warden II Gwendolyn Givens of SCCF authorized Ms. Sue Guy, Inmate Mullins' mother, visitation to the dying inmate. At some time after Ms. Guy's visitation, she inquired from hospital staff the procedures and contact information relative to donating the inmate's organs to persons in need. Understanding from prison staff and implications apparently given by Warden II Givens that such a donation was at the discretion of the victim's family, Ms. Guy had contacted personnel at the Legacy of Hope; however, because of the nature of the inmate's death, and his immediate ties and control by the Alabama Department of Corrections, neither Ms. Guy nor the Legacy of Hope procured the inmate's organs, due to the criminal investigation surrounding the inmate's death and the need for a subsequent autopsy of the inmate's body. SA Casey also discovered that Warden Givens later authorized ███████, ████████████████, visitation on February 28, 2019.

Finally, at approximately 2005 hours, on Friday, March 1, 2019, UAB staff induced a cardiac arrest on Inmate Mullins. At approximately 2020 hours, that same day, UAB staff prepared Inmate Mullins' body for collection by Dennis Russell, the St. Clair County Coroner. Coroner Russell then arranged for the inmate's transfer to the Alabama Department of Forensic Sciences (ADFS) in Huntsville, Alabama for an autopsy related to Inmate Mullins' homicide.

As SA Casey continued his investigation into Inmate Mullins' homicide, he discovered that on Saturday, July 7, 2018, at approximately 1730 hours, Inmate Mullins approached SCCF staff and told officers that he was unable to live in the prison's general population (see Inc. No. SCCF-18-00891). Inmate Mullins cited a previous assault by unknown inmates and an alleged debt as his reasons for the request of removal from the general population. As a result, SCCF placed Inmate Mullins in the prison's segregation/special security unit, an area referred to as "protective custody," pending disciplinary hearings and actions for "Inability to Adjust to Population/Programs."

That same day, Inmate Mullins provided a urine sample for a prison drug screen (see Inc. No. SCCF-18-01093). The returned results of that test showed that Inmate Mullins had, at some time recently, ingested amphetamine. With no evidence of any prescribed medicinal relationship to the positive test results, Inmate Mullins received a subsequent disciplinary action for "Intoxicants – Use." Inmate Mullins remained in SCCF's segregation unit until February 12, 2019.

Ultimately, on Tuesday, February 12, 2019, after an Institutional Classification Board (ICB) review of Inmate Mullins time in segregation and considering his own request to leave that protective custody, the prison's ICB released Inmate Mullins from the prison's protective custody. Prior to his return to the prison's population, the inmate signed a voluntary statement which, in part, read, "I, [Steven Mullins], do hereby state that I can live in the St. Clair population without any problems and I have no known enemies at this institution…I hereby relieve any and all DOC officials of any liability and damages…" Upon his release, prison staff assigned Inmate Mullins to SCCF's "Q" dorm, cell 32 (Q-32).

Then, on Monday, February 25, 2019, at approximately 0601 hours, Inmate Mullins reported to Officer (Ofc) Dylan Tucker that he was the victim of an assault by an unknown assailant (see Inc. No. SCCF-19-00259). Inmate Mullins then requested that he receive placement in a cell by himself, so Lieutenant (Lt) William Ragsdale moved Inmate Mullins to a cell in the prison's "P" dormitory (cell P-36). Ofc Tucker then escorted Inmate Mullins to SCCF's infirmary for a medical assessment.

During that medical assessment, medical staff noted bruising to Inmate Mullins's head. Inmate Mullins told the attending nurse that his assailant was his cellmate, but Inmate Mullins provided no name. Because of the fluid

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

nature of the assault, particularly since Inmate Mullins frequently moved between prison cells without authorization, SA Casey was unable to identify Inmate Mullins' assailant during this incident with the information readily available through prison records.

Later that day, at 1052 hours, Inmate Mullins, using the prison's PREA Hotline, reported a sexual assault, apparently perpetrated by the same cell mate identified by the prison's infirmary. According to that report, upon his release from SCCF's segregation unit and his assignment to Q-32, Inmate Mullins found both beds occupied. He then took it upon himself to relocate to Q-27. Inmate Mullins then told that his cell partner in Q-27, a man he identified as "CJ," rubbed him on his feet and his head while he slept. Inmate Mullins told "CJ" to stop but the cellmate evidently persisted.

Inmate Mullins continued and said that on the morning of that recording, the same morning on which he reported his assault to SCCF staff, "CJ" woke up Inmate Mullins by punching him the head, a narrative consistent with that told by the inmate to prison staff and documented by the inmate's visit to the prison's infirmary. After punching Inmate Mullins, "CJ" then pulled a knife on him and demanded that Inmate Mullins perform oral sex on "CJ." Inmate Mullins refused and pushed "CJ" aside, allowing Inmate Mullins to escape.

Inmate Mullins then said that he reported the incident to prison staff, a statement consistent with the incident documented by Inc. No. SCCF-19-00259. However, at the order of Warden Gwendolyn Givens, Inmate Mullins returned to his cell and his assailant for the prison's performance of an institutional count. After that count, Inmate Mullins said that he no longer felt safe in his dorm or at the prison and relocated himself to the prison's gym for his own safety. Before ending that call, Inmate Mullins begged for help and expressed his fear for his own safety.

That same date, at approximately 1600 hours, Lt Angelia Gordy received notification of Inmate Mullins' PREA Hotline call. In her report (see Inc. No. SCCF-19-00262), she identified Inmate Mullins' assailant, "CJ," as Inmate Clarence Jackson (AIS: B 249273). After reviewing the incident, Lt Gordy escorted Inmate Mullins to SCCF's infirmary for a brief medical assessment and noted that Captain Kevin White would investigate Inmate Mullins' claim of sexual harassment against "CJ." Inmate Mullins then received another transfer from P-36 to L-28.

During Lt Gordy's preliminary investigation, Inmate Mullins penned a statement supporting his report of sexual harassment. Inmate Mullins' written statement closely mimicked that of his recorded report on the prison's PREA Hotline and that reported previously to Ofc Tucker. In his statement to Lt Gordy, Inmate Mullins added that "CJ" would regularly expose himself to Inmate Mullins. He also wrote that he tried to talk to "CJ" about his persistent sexual harassment and assault, but "CJ" only became infuriated before pulling a knife on Inmate Mullins and demanding that he perform fellatio on "CJ" prior to Inmate Mullins fleeing the cell.

Two days later, Inmate Mullins was the victim of the assault (see Inc. No. SCCF-19-270), as previously documented in this report, which ultimately led to his death (see Inc. No. SCCF-19-00285), also documented earlier in this case narrative. After an autopsy, Staton Correctional Facility (SCF) received Inmate Mullins' remains. A burial was performed at SCF on Wednesday, March 13, 2019, at approximately 0930 hours. Chaplain Mark Michael performed the service.

As SA Casey continued his investigation, he noticed that on the night of Inmate Mullins' assault, prison staff also detained Inmate Christopher Jones (AIS: B 151939), another inmate known as "CJ" and, Inmate Vantrick Thomas (AIS: B 148503) as suspects in that assault. Through the Alabama Department of Corrections database, SA Casey determined that Inmates Jones and Thomas both resided in SCCF's "L" dormitory. Similarly, Inmate Jackson resided in SCCF's Q-27 cell at the time Inmate Mullins reported his instances of sexual abuse, substantiating Inmate Jackson's identity as "CJ."

On Friday, March 15, 2019, at approximately 0957 hours, SA Casey, accompanied by Agent (Agt) B. Arledge, traveled to SCCF and spoke with Warden Gwendolyn Givens about her mention throughout this investigation.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

In her voluntary statement given during an interview, Warden Givens noted that she gave the notification of Inmate Mullins' death but that she did authorize those visitors, mentioned previously, to the hospital and later authorized the processing of his remains. Warden Givens also told the investigators that she, unaware of Inmate Mullins' allegations against "CJ," did order Inmate Mullins to return to his cell for the institutional roster count but the inmate then returned after that count. With no additional information to further her involvement in Inmate Mullins' homicide, SA Casey concluded the interview.

At approximately 1003 hours, that same day, SA Casey and Agt Arledge spoke with Lt Price, a witness to Inmate Mullins' dying declaration that Inmate Jackson stabbed him. According to Lt Price, as Inmate Mullins received medical attention at the prison, he told Lt Price that an inmate named "CJ" stabbed Inmate Mullins in the prison's "L" dorm. Lt Price eventually told the investigators that he understood Inmate Mullins' declaration to infer that another inmate, identified as "CJ" and not assigned to "L" dorm, stabbed Inmate Mullins in "L" dorm. Lt Price assumed that inmate was Inmate Jackson because of his violent reputation. However, Lt Price, discovering another inmate in "L" dorm named "CJ," and detained Inmate Jones as a precaution.

Lt Price told the investigators that Inmate Mullins was a known drug user. Lt Price then said that the homicide, as he understood it, was revenge for a drug a debt Inmate Mullins owed to Inmate Jackson. Inmate Jackson first tried to collect his debt from Inmate Mullins in the form of a sexual favor but, when Inmate Mullins refused Inmate Jackson's sexual advance and reported the incident to prison staff, Inmate Jackson stabbed Inmate Mullins. After obtaining Lt Price's statement, SA Casey ended the interview.

At approximately 1126 hours, SA Casey and Agt Arledge interviewed Lt Angelia Gordy about Inmate Mullins' PREA complaint. After handing SA Casey a written statement, Lt Gordy told the investigator that as she looked into Inmate Mullins' sexual assault allegation, she learned from Inmate Mullins that his harasser was "CJ." In an effort to identify "CJ" better, Lt Gordy showed Inmate Mullins a picture of Inmate Clarence Jackson, whom Inmate Mullins immediately identified as his assailant.

Lt Gordy also told the investigators that after receiving Inmate Mullins' complaint from both the PREA hotline and in person on February 25, 2019, she requested a urinalysis of Inmate Mullins. That urinalysis, collected at 0222 hours on the morning of Inmate Mullins' death indicated that the inmate recently used an illicit substance, specifically amphetamine, supporting the supposition of Lt Price that Inmate Mullins was a drug user. Lt Gordy then offered those results to SA Casey prior to the investigator ending the interview.

Next, the investigators visited SCCF's segregation unit to continue interviews with persons of interest in this case. At approximately 1202 hours, the investigators spoke with Inmate Thomas about Inmate Mullins' homicide. Unsure of his involvement in the offense, SA Casey read Inmate Thomas his rights per Miranda, which the inmate waived. After doing so, Inmate Thomas told SA Casey that he stood behind Inmate Mullins as the two men left "L" dorm for breakfast immediately prior to Inmate Mullins' homicide.

Inmate Thomas said that as the dorm's door opened, another inmate, wearing a knit cap and unknown to Inmate Thomas viciously stabbed Inmate Mullins. Inmate Thomas noted that during the incident's violence, blood from Inmate Mullins splashed on Inmate Thomas' uniform, which SA Casey collected after the interview as evidence. Once the assault began, Inmate Thomas said that he turned and ran back into his dorm. Inmate Thomas then told the investigators that although he did not know the black inmate that stabbed Inmate Mullins he could identify the murderer by a photograph. Therefore, as SA Casey continued the interview with Inmate Thomas, Agt Arledge printed suspect pictures for hopeful identification.

Shortly thereafter, Agt Arledge returned with pictures of other black male inmates, including Inmate Jackson. Then, Inmate Thomas identified Inmate Jackson as Inmate Mullin's murderer. Inmate Thomas signed the photograph he selected as Inmate Jackson for identification purposes.

At approximately 1222 hours, SA Casey spoke with Inmate Jones about the homicide. After waiving his rights per Miranda, Inmate Jones told the investigators that he was neither involved nor did he see the assault from

HIGHLY CONFIDENTIAL–ATTORNEY'S EYES ONLY

which Inmate Jackson maintained that an unidentified assailant attacked him while asleep in his bed before his cellmate, Inmate John Underwood (AIS: B 167873) woke him up to tell him that the dorm was on lock-down. SA Casey later verified Inmate Jones' alibi through Inmate Underwood. With no information to forward this investigation, SA Casey ended the interview with Inmate Jones.

At approximately 1254 hours, after waiving his rights per Miranda, Inmate Jackson spoke with the investigators about his involvement in the homicide of Inmate Mullins. Inmate Jackson told the investigators that at the time of the assault of Inmate Mullins in "L" dorm, he was in the hallway of "P" and "Q" dorm getting a haircut. Then, SCCF staff entered "Q" dorm and detained Inmate Jackson because Inmate Mullins identified someone as "CJ" as his assailant.

As Inmate Jackson continued, he told investigators that he resided in cell "Q-27," the same cell where Inmate Mullins lived and where the first assault reported by Inmate Mullins occurred. Inmate Jackson's admission of his location of residence substantiated the previous claims by Inmate Mullins and the assumption that Inmate Jackson was, in fact, the "CJ" identified by Lt Gordy, Lt Price, Inmate Thomas, and Inmate Mullins. Inmate Jackson then admitted that he was Inmate Mullins' cellmate but maintained that he was in Willie Jenkins' cell during the assault on Inmate Mullins. SA Casey later discovered that there was no inmate at SCCF named Willie Jenkins at the time of Inmate Mullins' assault. Instead, SA Casey found only an inmate named Courtney Jenkins (AIS: B 259248) to reside at SCCF, leaving the investigator to question the validity of Inmate Jackson's alibi.

As the interview continued, Inmate Jackson denied being in "L" dorm at the time of Inmate Mullins' murder and any knowledge of Inmate Mullins' PREA complaint against him. Inmate Jackson also denied any sexual relationship with Inmate Mullins. Then Inmate Jackson said he spoke with SCCF about the assault on Inmate Mullins that morning but that nobody implicated him in that assault. After SA Casey reviewed those occasions in which Inmate Mullins specifically identified Inmate Jackson as his assailant, Inmate Jackson continued to deny his involvement in the previous assaults. Eventually, after refusing to confess his involvement in Inmate Mullins' murder, SA Casey and Agt Arledge concluded the interview.

After speaking with Inmate Jackson, SA Casey and Agt Arledge searched Inmate Jackson's segregation cell for any evidence linking him to Inmate Mullins' homicide. During that search, the investigators found and secured two knit hats belonging to Inmate Jackson and possibly similar to the one worn by him during the murder of Inmate Mullins. The investigators also secured several documents of interest for review of evidentiary value.

Once the search of Inmate Mullins' cell finished, the investigators searched the inventory of Inmate Mullins' property in the prison's segregation property room. In that search, SA Casey discovered a pair of brown boots that appeared to have traces of blood spatter on them. The investigator collected those boots for a forensic biology analysis by the Alabama Department of Forensic Sciences (ADFS) on Tuesday, March 19, 2019.

On Friday, February 07, 2020, SA Casey received the results of the forensic biology analysis from Inmate Jackson's boots. According to those results, Inmate Jackson's right boot exhibited a positive result when tested for the presumptive presence of blood. Additional tests showed that Inmate Jackson's boot held DNA from at least two individuals, the major contributor being the murdered victim, Steven Mullins.

On Friday, February 21, 2020, at approximately 0940 hours, after traveling to the Limestone Correctional Facility, SA Casey interviewed Inmate Jackson a second time. After waiving his rights per Miranda, Inmate Jackson, once again, denied murdering Inmate Mullins. As the inmate refuted the investigator's accusations, SA Casey referred to the results of the ADFS forensic biology report that discovered Inmate Mullins' blood and DNA on Inmate Jackson's boots. Inmate Jackson suspected that Inmate Mullins' blood and DNA contaminated Inmate Jackson's boots at an unknown time on an unknown date while Inmate Mullins used intravenous drugs. However, Inmate Jackson could not substantiate such a claim.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

As the interrogation continued, SA Casey pointed that federal judges would need to know as Inmate Mullins' murderer. Inmate Jackson maintained his innocence. SA Casey continued to point out more probable cause supporting Inmate Jackson's involvement in Inmate Mullins' murder by reciting Inmate Mullins' dying statement identifying Inmate Jackson as his murderer. With Inmate Jackson continuing to maintain his innocence despite of the amount of probable cause pointing to him as the victim's murderer, SA Casey concluded the interview and returned Inmate Jackson to the prison's population.

Finally, on Monday, April 20, 2020, SA Casey spoke with Cpt Kevin White, the correctional staff member to which Inmate Mullins identified his killer as Inmate Clarence Jackson. At approximately 1150 hours, Cpt White told SA Casey that as he responded to the call of Inmate Mullins' assault, he asked the inmate, "Who did this?"

Inmate Mullins responded, "CJ."

Cpt White followed up, "Which CJ?"

Then Inmate Mullins, confirming Inmate Jackson as his murderer, told Cpt White, "You know which CJ, Captain. The one y'all had to move me away from the other day." Cpt. White clarified that Inmate Mullins had recently been separated from Inmate Jackson.

After receiving Cpt White's statement, SA Casey concluded the interview.

## DISPOSITION:

The investigator recommends that this criminal case's disposition show it as "substantiated," that its status reflect it as "closed" and its contents forwarded to the St. Clair County District Attorney's Office for further review and Grand Jury consideration.

| Case Type: | | Case Disposition: | | Except. Cleared: | | Status: | |
|---|---|---|---|---|---|---|---|
| Criminal | x | Referred to GJ | x | Sup./Offender Death | ____ | Open | ____ |
| Administrative | ____ | Cleared by Arrest | ____ | Prosecution  Denied | ____ | Closed | x |
| | | Unfounded | ____ | Vic. Refused to Cooperate | ____ | Pending | ____ |
| | | Referred to Admin | ____ | | | Inactive | ____ |
| | | Admin Cleared | ____ | | | | |
| | | Except. Cleared | ____ | | | | |

| Copies of Report to: | | PREA: | | Date of Report Completion: 04/20/20 | |
|---|---|---|---|---|---|
| Commissioner | ____ | Not Applicable | X | Agent: | Senior Agent B. Casey |
| DA | x | Substantiated | ____ | Report Typed by: | Senior Agent B. Casey |
| DC/AC | ____ | Unsubstantiated | ____ | Supervisor Approval: | T. J. Loggins 4/20/20 |
| Other | ____ | Unfounded | ____ | Final Prosecution Review: | A.Bickhaus, A.D. 04/30/2020 |
| | | | | | **Director/Assistant Director** |

**THIS REPORT IS PROPERTY OF THE ALABAMA DEPARTMENT OF CORRECTIONS AND MAY BE RELEASED TO AUTHORIZED PERSONS <u>ONLY</u> AS DIRECTED BY THE COMMISSIONER OF CORRECTIONS/DESIGNEE OR THE I & I DIVISION DIRECTOR/DESIGNEE OR AS REQUIRED BY LAW**



Inv. Signature

**Revised 4/30/2019**

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

**INVESTIGATIVE REPORT**

| | | |
|---|---|---|
| **ALABAMA DEPARTMENT OF CORRECTIONS**<br>Commissioner Jefferson S Dunn |  | **INVESTIGATIONS & INTELLIGENCE DIVISION**<br>Director Arnaldo Mercado |

**Confidential-For Official Use Only**

| | |
|---|---|
| Offense | Capital Murder |
| Incident No. | SCCF-19-00285    Case No.    19-0325 |
| Location/Facility | St. Clair Correctional Facility    County    St. Clair    Date of Offense: 02/26/2019 |

| Victim(s): | Subject(s): |
|---|---|
| 1. Stephen Mullins (AIS: W 175255) | 1. Clarence Jackson (AIS: B 249273) |
| 2. | 2. |

## COMPLAINT:

On February 26, 2019, Inmate Clarence Jackson, with intent to cause the death of Inmate Stephen Mullins, caused the death of Inmate Mullins, violating Ala. Code 1975 13A-6-2.

## DETAILS:

According to staff reports, on Tuesday, February 26, 2019, at approximately 1745 hours, Inmate Stephen Mullins (AIS: W 175255) was the victim of an assault. Officer (Ofc) Brandy Smith, a correctional officer working overtime at the St. Clair Correctional Facility's (SCCF) "L" dormitory, reported that as she opened the door to the dorm's "L2" side, she heard a loud bang. Ofc Smith turned and saw Inmate Mullins fall to the floor and noticed the inmate bleeding severely. She then notified SCCF staff, which responded and escorted Inmate Mullins to the prison's infirmary. Before losing consciousness, Inmate Mullins reportedly identified to Captain (Cpt) Kevin White that Inmate Clarence Jackson (AIS: B 249273) was his assailant. Prison staff notified local paramedics who responded to the prison before arranging for a life flight helicopter to transport the wounded inmate to the University of Alabama Hospital at Birmingham (UAB). Then, through a chain of command, prison staff notified Senior Agent Casey (SA) of the incident.

SA Casey arrived at UAB at approximately 2000 hours that night. After speaking to hospital staff, SA Casey learned that Inmate Mullins was in the hospital's operating room but received a grim prognosis. At approximately 2230 hours, after receiving a report that Inmate Mullins was still in surgery, SA Casey returned to SCCF to document the crime scene.

Upon arriving at the crime scene, just prior to 2330 hours, SA Casey received notification from on duty prison staff that Inmate Mullins survived surgery and had been relocated to a recovery room in the hospital. SA Casey then documented, through photographs, the crime scene. Then, with the expectation of Inmate Mullins' recovery, the SA Casey left the prison with the anticipation of speaking with the inmate upon his return to SCCF. SA Casey also noted that prison staff did not locate or recover the weapon used in the assault.

On Friday, March 1, 2019, at approximately 1550 hours, SA Casey received notification from SA C. Hedrick that Inmate Mullins succumbed to his injuries. SA Casey responded to UAB to photograph Inmate Mullins' corpse and continue the investigation into the inmate's homicide. Through that preliminary homicide investigation, the investigator learned that at some time before Thursday, February 28, 2019, Inmate Mullins had suffered a brain hemorrhage, which resulted in Dr. Margaret Yates declaring the inmate, "brain dead" at 1240 hours.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

As a result of this determination by the UAB organ procurement organization tasked with acquiring viable human organs of deceased individuals for transplant, that Inmate Mullins died. UAB staff then contacted an unidentified female warden at SCCF to update the prison on the inmate's condition. According to hospital staff, that warden informed the hospital that the decision to remove life support from Inmate Mullins was at the inmate family's discretion.

SA Casey also discovered that on Wednesday, February 27, 2019, Warden II Gwendolyn Givens of SCCF authorized ███████████████████, visitation to the dying inmate. At some time after Ms. Guy's visitation, she inquired from hospital staff the procedures and contact information relative to donating the inmate's organs to persons in need. Understanding from prison staff and implications apparently given by Warden II Givens that such a donation was at the discretion of the victim's family, Ms. Guy had contacted personnel at the Legacy of Hope; however, because of the nature of the inmate's death, and his immediate ties and control by the Alabama Department of Corrections, neither ██████ nor the Legacy of Hope procured the inmate's organs, due to the criminal investigation surrounding the inmate's death and the need for a subsequent autopsy of the inmate's body. SA Casey also discovered that Warden Givens later authorized ██████, ████████████████████, visitation on February 28, 2019.

Finally, at approximately 2005 hours, on Friday, March 1, 2019, UAB staff induced a cardiac arrest on Inmate Mullins. At approximately 2020 hours, that same day, UAB staff prepared Inmate Mullins' body for collection by Dennis Russell, the St. Clair County Coroner. Coroner Russell then arranged for the inmate's transfer to the Alabama Department of Forensic Sciences (ADFS) in Huntsville, Alabama for an autopsy related to Inmate Mullins' homicide.

As SA Casey continued his investigation into Inmate Mullins' homicide, he discovered that on Saturday, July 7, 2018, at approximately 1730 hours, Inmate Mullins approached SCCF staff and told officers that he was unable to live in the prison's general population (see Inc. No. SCCF-18-00891). Inmate Mullins cited a previous assault by unknown inmates and an alleged debt as his reasons for the request of removal from the general population. As a result, SCCF placed Inmate Mullins in the prison's segregation/special security unit, an area referred to as "protective custody," pending disciplinary hearings and actions for "Inability to Adjust to Population/Programs."

That same day, Inmate Mullins provided a urine sample for a prison drug screen (see Inc. No. SCCF-18-01093). The returned results of that test showed that Inmate Mullins had, at some time recently, ingested amphetamine. With no evidence of any prescribed medicinal relationship to the positive test results, Inmate Mullins received a subsequent disciplinary action for "Intoxicants – Use." Inmate Mullins remained in SCCF's segregation unit until February 12, 2019.

Ultimately, on Tuesday, February 12, 2019, after an Institutional Classification Board (ICB) review of Inmate Mullins time in segregation and considering his own request to leave that protective custody, the prison's ICB released Inmate Mullins from the prison's protective custody. Prior to his return to the prison's population, the inmate signed a voluntary statement which, in part, read, "I, [Steven Mullins], do hereby state that I can live in the St. Clair population without any problems and I have no known enemies at this institution…I hereby relieve any and all DOC officials of any liability and damages…" Upon his release, prison staff assigned Inmate Mullins to SCCF's "Q" dorm, cell 32 (Q-32).

Then, on Monday, February 25, 2019, at approximately 0601 hours, Inmate Mullins reported to Officer (Ofc) Dylan Tucker that he was the victim of an assault by an unknown assailant (see Inc. No. SCCF-19-00259). Inmate Mullins then requested that he receive placement in a cell by himself, so Lieutenant (Lt) William Ragsdale moved Inmate Mullins to a cell in the prison's "P" dormitory (cell P-36). Ofc Tucker then escorted Inmate Mullins to SCCF's infirmary for a medical assessment.

During that medical assessment, medical staff noted bruising to Inmate Mullins's head. Inmate Mullins told the attending nurse that his assailant was his cellmate, but Inmate Mullins provided no name. Because of the fluid

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

nature of the assault, perpetrated by an inmate who had evidently moved from one of the prison's cells without authorization, SA Casey was unable to identify Inmate Mullins' assailant during this incident with the information readily available through prison records.

Later that day, at 1052 hours, Inmate Mullins, using the prison's PREA Hotline, reported a sexual assault, apparently perpetrated by the same cell mate identified by the prison's infirmary. According to that report, upon his release from SCCF's segregation unit and his assignment to Q-32, Inmate Mullins found both beds occupied. He then took it upon himself to relocate to Q-27. Inmate Mullins then told that his cell partner in Q-27, a man he identified as "CJ," rubbed him on his feet and his head while he slept. Inmate Mullins told "CJ" to stop but the cellmate evidently persisted.

Inmate Mullins continued and said that on the morning of that recording, the same morning on which he reported his assault to SCCF staff, "CJ" woke up Inmate Mullins by punching him the head, a narrative consistent with that told by the inmate to prison staff and documented by the inmate's visit to the prison's infirmary. After punching Inmate Mullins, "CJ" then pulled a knife on him and demanded that Inmate Mullins perform oral sex on "CJ." Inmate Mullins refused and pushed "CJ" aside, allowing Inmate Mullins to escape.

Inmate Mullins then said that he reported the incident to prison staff, a statement consistent with the incident documented by Inc. No. SCCF-19-00259. However, at the order of Warden Gwendolyn Givens, Inmate Mullins returned to his cell and his assailant for the prison's performance of an institutional count. After that count, Inmate Mullins said that he no longer felt safe in his dorm or at the prison and relocated himself to the prison's gym for his own safety. Before ending that call, Inmate Mullins begged for help and expressed his fear for his own safety.

That same date, at approximately 1600 hours, Lt Angelia Gordy received notification of Inmate Mullins' PREA Hotline call. In her report (see Inc. No. SCCF-19-00262), she identified Inmate Mullins' assailant, "CJ," as Inmate Clarence Jackson (AIS: B 249273). After reviewing the incident, Lt Gordy escorted Inmate Mullins to SCCF's infirmary for a brief medical assessment and noted that Captain Kevin White would investigate Inmate Mullins' claim of sexual harassment against "CJ." Inmate Mullins then received another transfer from P-36 to L-28.

During Lt Gordy's preliminary investigation, Inmate Mullins penned a statement supporting his report of sexual harassment. Inmate Mullins' written statement closely mimicked that of his recorded report on the prison's PREA Hotline and that reported previously to Ofc Tucker. In his statement to Lt Gordy, Inmate Mullins added that "CJ" would regularly expose himself to Inmate Mullins. He also wrote that he tried to talk to "CJ" about his persistent sexual harassment and assault, but "CJ" only became infuriated before pulling a knife on Inmate Mullins and demanding that he perform fellatio on "CJ" prior to Inmate Mullins fleeing the cell.

Two days later, Inmate Mullins was the victim of the assault (see Inc. No. SCCF-19-270), as previously documented in this report, which ultimately led to his death (see Inc. No. SCCF-19-00285), also documented earlier in this case narrative. After an autopsy, Staton Correctional Facility (SCF) received Inmate Mullins' remains. A burial was performed at SCF on Wednesday, March 13, 2019, at approximately 0930 hours. Chaplain Mark Michael performed the service.

As SA Casey continued his investigation, he noticed that on the night of Inmate Mullins' assault, prison staff also detained Inmate Christopher Jones (AIS: B 151939), another inmate known as "CJ" and, Inmate Vantrick Thomas (AIS: B 148503) as suspects in that assault. Through the Alabama Department of Corrections database, SA Casey determined that Inmates Jones and Thomas both resided in SCCF's "L" dormitory. Similarly, Inmate Jackson resided in SCCF's Q-27 cell at the time Inmate Mullins reported his instances of sexual abuse, substantiating Inmate Jackson's identity as "CJ."

On Friday, March 15, 2019, at approximately 0957 hours, SA Casey, accompanied by Agent (Agt) B. Arledge, traveled to SCCF and spoke with Warden Gwendolyn Givens about her mention throughout this investigation.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

In her voluntary interview, Warden Givens told the investigators that she did not make the notification of Inmate Mullins' death but that she did authorize those visitors, mentioned previously, to the hospital and later authorized the processing of his remains. Warden Givens also told the investigators that she, unaware of Inmate Mullins' allegations against "CJ," did order Inmate Mullins to return to his cell for the institutional roster count but the inmate then returned after that count. With no additional information to further her involvement in Inmate Mullins' homicide, SA Casey concluded the interview.

At approximately 1003 hours, that same day, SA Casey and Agt Arledge spoke with Lt Price, a witness to Inmate Mullins' dying declaration that Inmate Jackson stabbed him. According to Lt Price, as Inmate Mullins received medical attention at the prison, he told Lt Price that an inmate named "CJ" stabbed Inmate Mullins in the prison's "L" dorm. Lt Price eventually told the investigators that he understood Inmate Mullins' declaration to infer that another inmate, identified as "CJ" and not assigned to "L" dorm, stabbed Inmate Mullins in "L" dorm. Lt Price assumed that inmate was Inmate Jackson because of his violent reputation. However, Lt Price, discovering another inmate in "L" dorm named "CJ," and detained Inmate Jones as a precaution.

Lt Price told the investigators that Inmate Mullins was a known drug user. Lt Price then said that the homicide, as he understood it, was revenge for a drug a debt Inmate Mullins owed to Inmate Jackson. Inmate Jackson first tried to collect his debt from Inmate Mullins in the form of a sexual favor but, when Inmate Mullins refused Inmate Jackson's sexual advance and reported the incident to prison staff, Inmate Jackson stabbed Inmate Mullins. After obtaining Lt Price's statement, SA Casey ended the interview.

At approximately 1126 hours, SA Casey and Agt Arledge interviewed Lt Angelia Gordy about Inmate Mullins' PREA complaint. After handing SA Casey a written statement, Lt Gordy told the investigator that as she looked into Inmate Mullins' sexual assault allegation, she learned from Inmate Mullins that his harasser was "CJ." In an effort to identify "CJ" better, Lt Gordy showed Inmate Mullins a picture of Inmate Clarence Jackson, whom Inmate Mullins immediately identified as his assailant.

Lt Gordy also told the investigators that after receiving Inmate Mullins' complaint from both the PREA hotline and in person on February 25, 2019, she requested a urinalysis of Inmate Mullins. That urinalysis, collected at 0222 hours on the morning of Inmate Mullins' death indicated that the inmate recently used an illicit substance, specifically amphetamine, supporting the supposition of Lt Price that Inmate Mullins was a drug user. Lt Gordy then offered those results to SA Casey prior to the investigator ending the interview.

Next, the investigators visited SCCF's segregation unit to continue interviews with persons of interest in this case. At approximately 1202 hours, the investigators spoke with Inmate Thomas about Inmate Mullins' homicide. Unsure of his involvement in the offense, SA Casey read Inmate Thomas his rights per Miranda, which the inmate waived. After doing so, Inmate Thomas told SA Casey that he stood behind Inmate Mullins as the two men left "L" dorm for breakfast immediately prior to Inmate Mullins' homicide.

Inmate Thomas said that as the dorm's door opened, another inmate, wearing a knit cap and unknown to Inmate Thomas viciously stabbed Inmate Mullins. Inmate Thomas noted that during the incident's violence, blood from Inmate Mullins splashed on Inmate Thomas' uniform, which SA Casey collected after the interview as evidence. Once the assault began, Inmate Thomas said that he turned and ran back into his dorm. Inmate Thomas then told the investigators that although he did not know the black inmate that stabbed Inmate Mullins he could identify the murderer by a photograph. Therefore, as SA Casey continued the interview with Inmate Thomas, Agt Arledge printed suspect pictures for hopeful identification.

Shortly thereafter, Agt Arledge returned with pictures of other black male inmates, including Inmate Jackson. Then, Inmate Thomas identified Inmate Jackson as Inmate Mullin's murderer. Inmate Thomas signed the photograph he selected as Inmate Jackson for identification purposes.

At approximately 1222 hours, SA Casey spoke with Inmate Jones about the homicide. After waiving his rights per Miranda, Inmate Jones told the investigators that he was neither involved nor did he see the assault from

AD0C008972

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

which Inmate Jones also stated that the morning of Inmate Mullins' death, he was asleep in his bed before his cellmate, Inmate John Underwood (AIS: B 167873) woke him up to tell him that the dorm was on lock-down. SA Casey later verified Inmate Jones' alibi through Inmate Underwood. With no information to forward this investigation, SA Casey ended the interview with Inmate Jones.

At approximately 1254 hours, after waiving his rights per Miranda, Inmate Jackson spoke with the investigators about his involvement in the homicide of Inmate Mullins. Inmate Jackson told the investigators that at the time of the assault of Inmate Mullins in "L" dorm, he was in the hallway of "P" and "Q" dorm getting a haircut. Then, SCCF staff entered "Q" dorm and detained Inmate Jackson because Inmate Mullins identified someone as "CJ" as his assailant.

As Inmate Jackson continued, he told investigators that he resided in cell "Q-27," the same cell where Inmate Mullins lived and where the first assault reported by Inmate Mullins occurred. Inmate Jackson's admission of his location of residence substantiated the previous claims by Inmate Mullins and the assumption that Inmate Jackson was, in fact, the "CJ" identified by Lt Gordy, Lt Price, Inmate Thomas, and Inmate Mullins. Inmate Jackson then admitted that he was Inmate Mullins' cellmate but maintained that he was in Willie Jenkins' cell during the assault on Inmate Mullins. SA Casey later discovered that there was no inmate at SCCF named Willie Jenkins at the time of Inmate Mullins' assault. Instead, SA Casey found only an inmate named Courtney Jenkins (AIS: B 259248) to reside at SCCF, leaving the investigator to question the validity of Inmate Jackson's alibi.

As the interview continued, Inmate Jackson denied being in "L" dorm at the time of Inmate Mullins' murder and any knowledge of Inmate Mullins' PREA complaint against him. Inmate Jackson also denied any sexual relationship with Inmate Mullins. Then Inmate Jackson said he spoke with SCCF about the assault on Inmate Mullins that morning but that nobody implicated him in that assault. After SA Casey reviewed those occasions in which Inmate Mullins specifically identified Inmate Jackson as his assailant, Inmate Jackson continued to deny his involvement in the previous assaults. Eventually, after refusing to confess his involvement in Inmate Mullins' murder, SA Casey and Agt Arledge concluded the interview.

After speaking with Inmate Jackson, SA Casey and Agt Arledge searched Inmate Jackson's segregation cell for any evidence linking him to Inmate Mullins' homicide. During that search, the investigators found and secured two knit hats belonging to Inmate Jackson and possibly similar to the one worn by him during the murder of Inmate Mullins. The investigators also secured several documents of interest for review of evidentiary value.

Once the search of Inmate Mullins' cell finished, the investigators searched the inventory of Inmate Mullins' property in the prison's segregation property room. In that search, SA Casey discovered a pair of brown boots that appeared to have traces of blood spatter on them. The investigator collected those boots for a forensic biology analysis by the Alabama Department of Forensic Sciences (ADFS) on Tuesday, March 19, 2019.

On Friday, February 07, 2020, SA Casey received the results of the forensic biology analysis from Inmate Jackson's boots. According to those results, Inmate Jackson's right boot exhibited a positive result when tested for the presumptive presence of blood. Additional tests showed that Inmate Jackson's boot held DNA from at least two individuals, the major contributor being the murdered victim, Steven Mullins.

On Friday, February 21, 2020, at approximately 0940 hours, after traveling to the Limestone Correctional Facility, SA Casey interviewed Inmate Jackson a second time. After waiving his rights per Miranda, Inmate Jackson, once again, denied murdering Inmate Mullins. As the inmate refuted the investigator's accusations, SA Casey referred to the results of the ADFS forensic biology report that discovered Inmate Mullins' blood and DNA on Inmate Jackson's boots. Inmate Jackson suspected that Inmate Mullins' blood and DNA contaminated Inmate Jackson's boots at an unknown time on an unknown date while Inmate Mullins used intravenous drugs. However, Inmate Jackson could not substantiate such a claim.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

As the interviewed continued, SA Casey told Inmate Jackson that several people identified eye witnesses Inmate Mullins' murderer. Inmate Jackson maintained his innocence. SA Casey continued to point out more probable cause supporting Inmate Jackson's involvement in Inmate Mullins' murder by reciting Inmate Mullins' dying statement identifying Inmate Jackson as his murderer. With Inmate Jackson continuing to maintain his innocence despite of the amount of probable cause pointing to him as the victim's murderer, SA Casey concluded the interview and returned Inmate Jackson to the prison's population.

Finally, on Monday, April 20, 2020, SA Casey spoke with Cpt Kevin White, the correctional staff member to which Inmate Mullins identified his killer as Inmate Clarence Jackson. At approximately 1150 hours, Cpt White told SA Casey that as he responded to the call of Inmate Mullins' assault, he asked the inmate, "Who did this?"

Inmate Mullins responded, "CJ."

Cpt White followed up, "Which CJ?"

Then Inmate Mullins, confirming Inmate Jackson as his murderer, told Cpt White, "You know which CJ, Captain. The one y'all had to move me away from the other day." Cpt. White clarified that Inmate Mullins had recently been separated from Inmate Jackson.

After receiving Cpt White's statement, SA Casey concluded the interview.

## DISPOSITION:

The investigator recommends that this criminal case's disposition show it as "substantiated," that its status reflect it as "closed" and its contents forwarded to the St. Clair County District Attorney's Office for further review and Grand Jury consideration.

| Case Type: | | Case Disposition: | | Except. Cleared: | | Status: | |
|---|---|---|---|---|---|---|---|
| Criminal | x | Referred to GJ | x | Sup./Offender Death | ____ | Open | ____ |
| Administrative | ____ | Cleared by Arrest | ____ | Prosecution Denied | ____ | Closed | x |
| | | Unfounded | ____ | Vic. Refused to Cooperate | ____ | Pending | ____ |
| | | Referred to Admin | ____ | | | Inactive | ____ |
| | | Admin Cleared | ____ | | | | |
| | | Except. Cleared | ____ | | | | |

| Copies of Report to: | | PREA: | | Date of Report Completion: 04/20/20 | |
|---|---|---|---|---|---|
| Commissioner | ____ | Not Applicable | X | Agent: | Senior Agent B. Casey |
| DA | x | Substantiated | ____ | Report Typed by: | Senior Agent B. Casey |
| DC/AC | ____ | Unsubstantiated | ____ | Supervisor Approval: | T. J. Loggins 4/20/20 |
| Other | ____ | Unfounded | ____ | Final Prosecution Review: | A.Bickhaus, A.D. 04/30/2020 |
| | | | | | **Director/Assistant Director** |

THIS REPORT IS PROPERTY OF THE ALABAMA DEPARTMENT OF CORRECTIONS AND MAY BE RELEASED TO AUTHORIZED PERSONS <u>ONLY</u> AS DIRECTED BY THE COMMISSIONER OF CORRECTIONS/DESIGNEE OR THE I & I DIVISION DIRECTOR/DESIGNEE OR AS REQUIRED BY LAW



Inv. Signature

**Revised 4/30/2019**

AD0C008974

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# ALABAMA DEPARTMENT OF CORRECTIONS
## KNOWN OFFENDER REPORT

**FILE NUMBER: 19-0325**
NAME: **JACKSON, CLARENCE JR**
AIS#: **00249273S**

RACE: **B**  SEX: **M**

POB: **USA**

HEIGHT: **5' 6"**  WEIGHT: **165 lbs.**

NATIONALITY: American

HAIR: BLK  EYES: BRO

PHYSICAL ODDITIES:

LKA: **ST.CLAIR CORRECTIONAL FAC.**
LK PHONE NO: (    )-     -
FAMILY:
VEHICLE:
ASSOCIATES:

Date of Picture: **11/14/2018**

CONVICTED FELON:   YES  ☒   NO  ☐   INCARCERATED:   YES  ☒   NO  ☐

SUMMARY OF ARRESTS:

| | DATE | LOCATION | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 1) | **10/04/2006** | **MONTGOMERY** | **MURDER** | **28Y 0M 0D** |
| 2) | | | | |
| 3) | | | | |
| 4) | | | | |

CRIMINAL SPECIALITY:
M.O & MISC. INFO:
OUTSTANDING WARRANTS:

SUBMITTED BY: **B. CASEY**
DISSIMINATION:

AD0C008975

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

# State of Alabama Department of Corrections
# Investigations and Intelligence Division
## Rights Form

LOCATION: _St. Clair Correctional Facility_

DATE: _3/15/19_    TIME: _1254_

RACE: _B_    SEX: _M_

CHARGE(s): _____

### MIRANDA WARNING

Before asking you any questions, I must explain to you that you have the right to remain silent; that anything you say can be used against you in court; that you have the right to the advice and presence of a lawyer even if you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint you one before questioning. If you want to answer questions you can do so, but you can stop answering at any time.

### WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone.

NAME: _Clarence Jackson_

SIGNATURE: _Clarence Jackson_

INVESTIGATOR: _[signature]_

WITNESS: _[signature]_

Case Number: _19-0326_

AD0C008976

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

# State of Alabama Department of Corrections
# Investigations and Intelligence Division
### Rights Form

LOCATION: _St. Clair Correctional Facility_

DATE: _3/15/19_    TIME: _1222_

NAME: _Christopher Jones_

RACE: _B_    SEX: _M_

CHARGE(s): _____

### MIRANDA WARNING

Before asking you any questions, I must explain to you that you have the right to remain silent; that anything you say can be used against you in court; that you have the right to the advice and presence of a lawyer even if you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint you one before questioning. If you want to answer questions you can do so, but you can stop answering at any time.

### WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone.

NAME: _Christopher Jones_

SIGNATURE: _Chris Jones_

INVESTIGATOR: _____

WITNESS: _____

Case Number: _19-0325_

AD0C008977

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

# State of Alabama Department of Corrections
## Investigations and Intelligence Division
### Rights Form

LOCATION: _St. Clair Correctional Facility_

DATE: _3/15/19_     TIME: _1202_

NAME: _Vantrick Thomas_ ████████

RACE: _B_     SEX: _M_  ████████

CHARGE(s): _____

### MIRANDA WARNING

Before asking you any questions, I must explain to you that you have the right to remain silent; that anything you say can be used against you in court; that you have the right to the advice and presence of a lawyer even if you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint you one before questioning. If you want to answer questions you can do so, but you can stop answering at any time.

### WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone.

NAME: _Vantrick Thomas_

SIGNATURE: _[signature]_ ████

INVESTIGATOR: _[signature]_

WITNESS: _[signature]_

Case Number: _19-0325_

AD0C008978

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

**PHONE CALL INMATE STEVEN MULLINS**
**AGENT BRIAN CASEY**

Call #188328294.  Date 2019-02-25.  Time 105208.  Dialed # from Station 57119.  Press 1 for English.  The time is 10:52 a.m.  To report sexual abuse or sexual harassment to an agency outside of Alabama DOC leaving detailed information so that the report can be investigated, press #66 after this message.  Please record your message after the tone.  The time limit is two (2) minutes.  When you are finished recording please press the # key.

S.M.        My name is Steve Mullins.  I'm at St. Clair Correctional Facility.  Um I was released from the seg two (2) weeks ago tomorrow, I was told to go sleep in uh Cube thirty-two (32).  They were to be (INAUDIBLE) that cell so I found an empty bed in Cube twenty-seven (27).  Okay um I've had issues with my cell partner uh rubbing on my feet while I was asleep, rubbing me on my hip while I was asleep, I asked him to stop.  Okay and then this morning uh I was waking up by him punching me in the side of my head and he hit me in the eye twice.  He pulled a knife on me and um actually wanted me to perform uh oral sex on him and what I did was I shoved him outa my way and I left out of that cell.  Someone went and got my property for me and then I got dressed in the hallway and went to the shift office.  Um the shift office uh eventually talked to Warden Givens and I was supposed to go back to the block so they could do a recount this morning and um I'm the only white individual in that block came to 2-side.  Um my life is in danger, I feel very unsafe and I have nowhere to sleep.  My property is in the breezeway by the shift office now.  My mattress and all of my other stuff, that's why I'm calling from the gym because that's where I feel the safest and that's the only place I can go that's outa the way.  I need some help.  I've asked to be placed in seg for my own safety, PC if possible but I cannot live in St. Clair population.  Um I need some help badly.  Um and I don't know what to do.  Your message has been saved.  Please hang up now.

/jew

AD0C008979

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

**STATEMENT OF INMATE CLARENCE JACKSON**
**AGENT BRIAN CASEY**

B.C.        So you remember me?

C.J.        Yea.

B.C.        So you know sometimes when you get these cases you grasp at straws.  So
            sometimes you just gotta find extra information, you gotta come back and talk
            to people sometimes right?  So then you know what case I'm talking about----

C.J.        Ahuh.

B.C.        ----that one (1) at St. Clair?

C.J.        Right.

B.C.        So but before we start talking and all that stuff do you remember the Miranda
            I read you?

C.J.        I um I need----

B.C.        Okay you wanna go over it again I got another form here.  Just to be on the
            safe side.  Okay?  Alright just read it along with me.  It says before I ask you
            any questions, I must explain to you that you have the right to remain silent.
            That anything you say can be used against you in court. That you have the
            right to the advice and presence of a lawyer even if you cannot afford to hire
            one.  If you cannot afford to hire an attorney and wanna have one present
            during interrogation, the court will appoint you one before questioning.  If you
            wanna answer questions you can do so, but you can stop at any time.  You
            understand that right?

C.J.        Understood.

AD0C008980

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Alright so the Waiver of Rights, I have been advised of my rights.  I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone.  You understand that?

C.J.        Understood.

B.C.        You good with it?

C.J.        I'm good.

B.C.        Alright go ahead and throw your John Hancock where it says signature again.

C.J.        Okay so uh what's, what's going on now?

B.C.        I just wanna get your story from you again and ask you some more questions.  Alright and just, cause I gotta put this on that recording.  Your uh today's date is 2-21-20.  It's Case #19-0325.  It is 0935 hours and what's your AIS Clarence?

C.J.        249273.

B.C.        Okay, alright.  So tell me again what happened that day with you.

C.J.        Okay.  Uh I was in my dorm getting a haircut and shave um they had locked the camp down.  I don't know they come in the dorm hollering for, for C.J.

B.C.        And what was your relationship prior to that with Steven Mullins?

C.J.        No relation.

B.C.        Y'all were cellmates though right?

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.      At the time----

B.C.      I don't mean like----

C.J.      Well I understand----

B.C.      ----intimate relationship, I guess y'all were cellmates?

C.J.      Yea.

B.C.      So I mean you knew him kina thing?

C.J.      Understood.

B.C.      Okay.  Um and then when uh when we came and talked to you, you said that when he ended up getting killed that he was on the other, that you was on the other side getting a haircut.  That's what you just told me right?

C.J.      Right.  He, he wasn't living in, in my cell when he got killed.

B.C.      Right.  Right I know that.  He had gotten moved.

C.J.      Right, right lived in another dorm.

B.C.      Okay.  So you didn't kill him?

C.J.      No I didn't.

B.C.      So the thing, the problem I have with that alright is I got the shoes you were wearing when he was killed.

C.J.      Okay.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    They have his blood on em.  So how'd he get his blood on your shoes if you wouldn't there stabbing him?

C.J.    He was my cellmate um I don't know man.

B.C.    He just walked around actively bleeding all the time in your cell?

C.J.    No but I'm saying he got high I don't you know what I'm saying I don't if blood coulda got on there, he got high, shave, I don't understand, I don't know.

B.C.    Cause the clothes you were wearing when we come and talked to you was brand damn new and everybody else had on their dirty clothes.  So you had changed clothes before you went into seg and you even had on the prison shoes that I know you wouldn't wearing at the time and I mean these are let's see----

C.J.    My clothes wasn't new, they wouldn't new.

B.C.    They was clean.  Everbody else's was dirty.  I mean it had looked you had, okay so interpretations the thing, let's see here.  I submitted for evidence.  The boots you were wearing at the time of the homicide that I got out of your property and uh let's see the right boot positive result for presumptive presence of blood.  When they tested it genetic traits detecting a swab and a reddish brown stain on the right boot are a mixture of two (2) individuals, at least one (1) of which is male.  Major component and genetic traits detected was a DNA profile of Steven Mullins.  Besides with a high degree of confidence, Steven Mullins, or his identical twin is the major source of blood components of the genetic traits detected in the swabbing of the reddish-brown stain in the right boot.  So your DNA is in your boots.

C.J.    Ahuh.

B.C.    His DNA cause it's his blood.  I just want you to explain it to me.  Because you told me you weren't there but that says you're where.

C.J.    As I said he was my cellmate, he got high.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Ahuh.

C.J.        So and my boots are in the cell you know it coulda got on there from that.

B.C.        From getting high?

C.J.        Using, using a rig.  Using a needle.

B.C.        But you're not typically gonna have blood spatter on boots from a needle and for that to happen there's gotta be a big enough gash in his vein that it's spirting blood and it's gonna be all over the place and that don't typically happen from a needle.  So----

C.J.        But it does, it does happen though.  Things----

B.C.        I, twenty-two (22) years I been dealing with this I ain't never seen that.

C.J.        You never heard of uh of a vein collapsing or busting?

B.C.        Ahuh.

C.J.        Okay.

B.C.        But not to shoot across the room and if that happened and got on your boots it seems to me you'd remember it.

C.J.        You know well maybe they were in my cell and I had my slides on was out of the cell.  You know we don't stay in the cell together twenty-four (24) hours.

B.C.        Well here's the thing C.J.

C.J.        Alright.

AD0C008984

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        You in here for twenty-eight (28) years on a murder.  I've got enough
            probable cause evidence with written statements, with Steven Mullins dying
            testimony and with blood on your shoes that says you was there when this
            happened.  And you say you wouldn't all day.  But it kina really looking like
            it was and I kina think any reasonable person is gonna think that you were
            there when it happened.  That being the case, hold on, I just, I need a better
            excuse if, if you wouldn't there then it mighta just happened because he was
            shooting up one (1) day and maybe got some blood on your boots when y'all
            were sharing the cell together.  Capital Offense Homicide's.  The following
            capital offenses and we're making a PREA complaint.  Another
            (INAUDIBLE) defendant during social abuse in the 1st, 2nd degree in an
            attempt thereof.  Well I don't know they might push that one (1).  Murder by
            defendant who has been convicted of any other murder in the twenty (20)
            years preceding the crime.  A Capital Murder is gas chamber shit.

C.J.        Right.

B.C.        And that's what we're talking about.  And so if it wasn't it it was Manslaughter
            because he was high, he was high, self-defense or something like that that's a
            different story but right now it's kina looking like Capital Murder.  And that's
            what I'm gonna end up presenting to the District Attorney unless there's
            something different.  Unless you can convince me otherwise.  Cause I, look I
            got witness statements, I got his blood on your shoes, I got people putting you
            there, I got DNA evidence, I got everything in the world saying you the one
            (1) that killed him.  And so I need something better than you just killed him
            because you was pissed off at him cause he filed PREA on you.

C.J.        I knew nothing about PREA.

B.C.        So why'd you kill him?

C.J.        I didn't kill him.

B.C.        Who killed him?  You was there for a minute then you'd heard a name.

C.J.        They said C.J.?

B.C.        He said C.J.

AD0C008985

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        Alright.

B.C.        He said his cellmate C.J. which is you.

C.J.        He----

B.C.        Why the hell he gonna finger you if you ain't the one (1) that killed his ass?

C.J.        I don't understand that but so he got jumped on in the cell.

B.C.        Ugh, ugh.

C.J.        Right.

B.C.        He got jumped on coming out damn door of the dorm.

C.J.        Okay, no, he had an incident where he got jumped on and he reported it to Lieutenant----

B.C.        McGordy?  You talking about the PREA complaint?

C.J.        Naw, naw not Gordy uh lieutenant uh who wrote the disciplinary.  I have two (2) disciplinaries.  They wrote me two (2) disciplinaries.  Found me guilty on both of em.

B.C.        Ahuh.

C.J.        I think its Ragsdale, Lieutenant Ragsdale.  He reported the incident where guys jumped on him.  He said that happened in the cell.  They asked me about it, called me up to ask me about it and I wasn't present you know I was at breakfast.  I had no knowledge of it.  They had three (3) guys locked up for this case.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        They did.  You're one (1) of the three (3).

C.J.        One (1) of em, one (1) of the other guy's name was C.J.

B.C.        Yea it was.  It was uh it was a Christopher or something another I think.

C.J.        Jones.

B.C.        Yea, yea Christopher Jones.  Another inmate name Vandrick Thomas.

C.J.        Vandrick Thomas, he was supposed to be right there.  He had a lotta blood on his jacket.

B.C.        He did.  And it was C.J.'s blood from where it was coming off of the knife he was getting stabbed with.  I mean not C.J.'s blood, Steven Mullin's blood.

C.J.        Who did he ID?  Who he say did it?

B.C.        You.  Everybody said you did it.  People in the cube said you did it.

C.J.        They're saying C.J. but damn that's not, I done got caught up in that, that's not me.  I wouldn't the guy that stabbed him.

B.C.        So when we show, everybody we show we do a lineup.  Picture a whole bunch of people that look like you, a whole bunch of people your age.  So pick which one (1) of these people ended up stabbing him and they said it was you.  I mean everybo-, everybody we talked to and it wouldn't just them two (2) and the cube officer, I mean it was other people in there that seen all this stuff.  So that's why I was just trying to get a, you know I'm trying to see if you'll give me a better excuse.

C.J.        Look like those two (2) guys, it look like that they live over there together, their story will coincide.

AD0C008987

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.     Yea I get that, I don't know how they would've had time to go ahead and make up the story together though because I mean as soon as they found out about it they come running in there, staff comes running in there, takes em to seg, starts hunting you down, I mean they were separated from the word go. Alright but like I said, so I'm just trying to give you an opportunity to convince me on how I need to proceed with this.

C.J.     Like I said I'm not positive that his blood got on my boots.

B.C.     Well I am.

C.J.     From the, from using a, a needle.  I wasn't finished talking.

B.C.     I'm sorry, I'm sorry I didn't, I didn't mean to.  I'm sorry go ahead.

C.J.     Right from using a needle.

B.C.     Ahuh.

C.J.     You know what I'm saying?  He was my cellmate so it's possible that his blood coulda got on my boots from being in the cell with him you know maybe from shooting, I don't know, shaving, maybe he cut hisself, I don't, you know I don't know.

B.C.     It just, you know I mean he's, he was calling the PREA hotline and telling the lieutenants all this stuff that you were in the process of sexually assaulting him and things like that so I mean it, it, it come down that you have a motive. Let's see woke me up touching my foot.  You exposed yourself in there.  He'd act as if he didn't see it.  He'd leave the cell you know it just kina looked like you got pissed off that he was reporting all this PREA activity----

C.J.     Right.

B.C.     ----and you get him over for it.

AD0C008988

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        Right.  And that's a lot of em.  I tell you I saw them uh sexually, come in and sexually enter and like I said I never knew anything about a PREA.

B.C.        Let's see while enroute to the Healthcare Unit Inmate Mullins identified Clarence Jackson as the inmate that assaulted him.  I mean so a man's dying statement, the last words he said was that you killed him.  I mean that's, that's pretty, that's pretty damning man.

C.J.        Yea but see he said C.J.

B.C.         Well they got in their report, they say Clarence Jackson.

C.J.        Well they switched it up.

B.C.        He said C.J. in his letters about the assault.

C.J.        About the murder too, he said it because that's how they got Christopher Jones.

B.C.        Um.  I'm just reading you what it has in here.

C.J.        Right.

B.C.        Let me see if I've talked to them yet.

C.J.        Yea the first (1st), the first (1st) disciplinary that they wrote they said I was assisting.  Then the second (2nd) disciplinary that they wrote----

B.C.        Well you're always a suspect until you get convicted.

C.J.        Right and then the second (2nd) disciplinary they wrote me with a different arresting officer said that he had told the captain that it was Clarence Jackson.  Which is, because if that was the case they wouldn't have had three (3) guys

AD0C008989

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

or me and Christopher Jones.  They wouldn't have never had two (2) C.J.'s.  They would have got me from the start.

B.C.     So why he's all pissed off at you that, over that.  Why, why is he gonna make all those PREA complaints on you then?

C.J.     He got jumped on in his cell I don't, you know I don't know if he thought I had something to do with it or you know some of the people I hang with jumped on him but I wasn't in the cell I was at breakfast.  I didn't know anything about it.  I think it was Lt. Ragsdale that called me up there and asked me about it.  Did I know anything about it?  And so I told him I had no knowledge of it.  Signed the paper, put my statement down.

B.C.     I'm just trying to figure out why he'd lie on you though.  Twice I mean about all this stuff and then when he's dying.  Was he dealing out there?

C.J.     Yes sir.  And lieutenant asked me that too did, did he owe me some money.  No he didn't owe me no money.

B.C.     Didn't they give you all little hats or something to wear man, you got that towel?

C.J.     It was cold out there man.  Naw they don't give toboggans.

B.C.     Cold as hell man.

C.J.     Naw they don't give toboggans out man.

B.C.     Alright.

C.J.     Y'all got both of my toboggans on my permanent, on my um cell.

B.C.     What that night?

AD0C008990

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.    Nah when you came up there and questioned me.

B.C.    They didn't take those?

C.J.    No.

B.C.    They didn't give you new ones?

C.J.    Ugh, ugh.  Nope they didn't give me new ones so I had to go the winter without a toboggan.

B.C.    The good thing is it's almost over.

C.J.    Okay yea.  Yea I done weathered the storm.

B.C.    Well like I said you know I just ended up getting this new stuff and just wanted to come get your side of the story on it you know make sure we right and tell you what the hell I'm thinking.

C.J.    Right.

B.C.    And give you a chance to explain it.  I mean that's only fair.

C.J.    Understood.

B.C.    You know so anything else you can think of then?  And you ain't heard no names then since you been there?

C.J.    Since I, since I----

B.C.    When you was there after all this stuff happened.  You told me you didn't do it, I mean any, anybody else say any names on who would have done it?

AD0C008991

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        No sir.

B.C.        Okay.

C.J.        C.J. that's all the name I heard, the nickname C.J.

B.C.        I just you know, I know that, I just ask that because I know that when you're sitting inside the gate sometimes people ain't got nothing better to do than gossip.

C.J.        Right.

B.C.        You know so I just asking that.  Well if you're good with it, I mean hell I'm good with it, like I said I just, the new stuff I got I just wanted to come your side of it right?  I mean what I'm gonna end up doing with it is I will type up what we talked about today, I'll include that in my report and I'm gonna turn it over to the District Attorney and they'll end up presenting it to Grand Jury I'm sure----

C.J.        Alright.

B.C.        ----and uh you know so eighteen (18) people will end up making that decision. So it'll be on them and then uh if an indictment comes from it or something like that you'll end up hearing about it but I mean I gotta type up what I've got.

C.J.        Understood.

B.C.        You know you feel me?  And like I said I'll put in your side of it too.

C.J.        Right.

B.C.        Cause that's what happened with my other one (1).  You know I wrote up in here where we talked.  I mean I put in here how you told me you didn't do it.

AD0C008992

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        Right.

B.C.        So I'll put that in there again.  But, so I just wanted to come holler at you
            cause it'd be shitty of me not to.

C.J.        Right.

B.C.        I don't wanna hit you with that surprise.  Alright man well your good?

C.J.        I'm good.

B.C.        Alright well then we'll go ahead and end it at 9:55.

BC/jew

AD0C008993

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

### STATEMENT OF LIEUTENANT ANGELIA GORDY
### SPECIAL AGENT BRIAN CASEY

B.C.    Today is 3-15-19. It's 1126 hours. I'm Agent Casey from St. Clair I&I. I'm at St. Clair Correctional Facility on Case #19-0325. With me is Agent Arledge and Lieutenant Angelia Gordy. Just for the record tell me your uh social or your employee #; whichever you know.

A.G.    Oh. I'm Lt. Angelia Gordy. ████████████████████████

B.C.    Okay so you know we've already talked a little bit. So you're here. We're talking about Stephen Mullins before he was murdered he ended up making a PREA complaint. Um you ended up getting forwarded that complaint. I'm looking at your statement but I mean I'm going----

A.G.    Yes sir.

B.C.    ----I'm going by----

A.G.    Yes sir.

B.C.    ----I'm going by things that I've already figured out too.

A.G.    Yes sir.

B.C.    So this all adds up.

A.G.    Yes sir.

B.C.    So you listened to his, his recording, that's how you got notified of it.

A.G.    Yes.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    And then when you got notified of that you went and pulled Mullins and had a conversation with Mullins?

A.G.    Yes.

B.C.    And he pretty much told you the same thing that he said in the PREA call right huh?

A.G.    Yes sir.

B.C.    You didn't notice any deviation in that right?

A.G.    No.

B.C.    Okay.

A.G.    I don't know.

B.C.    And then um as part of your initial investigation in that sexual harassment complaint of his you uh showed him a photo of, how'd you come across Clarence Jackson?

A.G.    Cause he said it was his cellmate.

B.C.    Okay.

A.G.    So I went and uh----

B.C.    Pulled it up in IMS?

A.G.    Ahuh and----

AD0C008995

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Okay.  Okay.

A.G.        ----and that's who the cellmate came up in.

B.C.        Yea cause when I pulled it up in IMS too and looked at his movement history----

A.G.        Right.

B.C.        ---- I know he was assigned to Q27.

A.G.        Right.

B.C.        Um okay so I know that you, I mean I'm, your statement here is, is everything I know so after that you took him to get a body chart.

A.G.        Yes sir.

B.C.        You told the warden about it.

A.G.        Yes sir.

B.C.        And the warden, cause he had been moved that morning from, he was assigned to Q32, he relocated himself to Q27----

A.G.        Ahuh.

B.C.        ----then he was assigned to like P28 or something and then some, something in P-dorm.  And then----

A.G.        Ahuh.

AD0C008996

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.      ----that was after he had talked to uh Lieutenant Ragsdale I think it was that morning.

A.G.      Yea okay.

B.C.      And they reassigned him to somewhere in P-dorm and then he come and saw you and Warden Jones said let's go ahead and move him to L-dorm?

A.G.      Yes sir.

B.C.      Um----

A.G.      Well pretty much let's move him somewhere in population and I found a bed in L.

B.C.      Okay and so uh I mean that's the nuts and bolts of it.  Is there anything that you think is relevant about any of that that we've talked about, about his, building up to his homicide that I might have overlooked or that you can?

A.G.      Naw I, ugh, ugh.  Cause I woulda already told the warden if I thought it was something extra going on.  Ugh, ugh.

B.C.      And then Captain White is the one (1) who was supposed to do the final investigation on this right?

A.G.      Yea whose on, gonna, whose going to do it, right.

B.C.      Yea has he done anything on that that you know?

A.G.      I really don't know.  He, I mean he coulda done it last night.

B.C.      Yea.

A.G.      Cause he don't get off till, what is his new hours?

AD0C008997

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    Oh that's why the hell he ain't here.

A.G.    Right.  I don't know his new hours.  I don't know what time.  He get here at 8:00.

B.C.    I know he ain't here yet, when I asked earlier so.

A.G.    Yea so I , 12:00, he get off at 8:00 or 9:00----

B.C.    Okay.

A.G.    ----tonight.  So he coulda done it last night.

B.C.    Okay.

A.G.    Yea.

B.C.    Alright.

A.G.    Yes sir.

B.C.    Alright well I'm try and get up with him.  But I know this is quick.  I know you wrote the statement and hell it ain't nothing for me to question in that cause that backs up everything I know and everything we've talked about.

A.G.    Okay.

B.C.    So nothing else you can think of that I need to know right?

A.G.    And if I do I'll, I'll let you know.

AD0C008998

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    Yea you know where I live.  Seems like it some days.  Alright.  Well then I'll
        go ahead and end  this at 11:29.


BC/BA/jew

AD0C008999

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

**STATEMENT OF LIEUTENANT ANTOINE PRICE**
**SPECIAL AGENT BRIAN CASEY**
**SPECIAL AGENT BRADLEY ARLEDGE**

B.C.     Today is 3-15-19.  It's 1003 hours.  I'm Agent Casey St. Clair I&I.  I am at St. Clair Correctional Facility on Case #19-0325.  With me is Agent Brad Arledge and Lieutenant Antoine Price.  Um so just for record tell me ███████

A.P.     ████████████

B.C.     Okay.  So uh Tuesday 2-26th Steven Mullins was stabbed?

A.P.     Ahuh.

B.C.     You were shift commander?

A.P.     Correct.

B.C.     At that time right?

A.P.     Yea.

B.C.     Cause I know it was about shift change.

A.P.     Ahuh.

B.C.     Um now according to the 302 and all that stuff it says that when he was taken to the infirmary that he identified his assailant to you and Captain White?

A.P.     Correct.

B.C.     Right?  Who did he say his assailant was?

AD0C009000

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

A.P.        C.J.

B.C.        Okay did he say who C.J. was?

A.P.        He identified him as someone who was on L2 side, that's where he came from but, but they, he wouldn't sleeping there.  He slept on, he was assigned to another bed but he was sleeping at L2 side.

B.C.        So he said C.J. from L2?

A.P.        Ahuh.  Yea, yea, correct.  That's where he was sleeping at.  But we knew who Clarence Jackson was so that's the reason why we went and got him.

B.C.        Okay.  How'd y'all know who Clarence Jackson was?

A.P.        Because he's know, he's known for certain violent activities uh you know dealing with certain people.

B.C.        Okay.  Did the two (2) of them have a relationship or anything before?

A.P.        I know there was a incident report where he was, that was done the day prior to that where they had an altercation or something like that dealing with some kina homosexual type a stuff so.

B.C.        Yea.

A.P.        Yea.

B.C.        Yea.

A.P.        That's the, that's the extent that I know of.

B.C.        Because----

AD0C009001

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

A.P.      Allegedly what they're saying the whole thing was, was that he owed him for some drugs that he had got and that he wanted to----

B.C.      Mullins owed Jackson?

A.P.      Right.  Jackson right.  And then when he wanted to collect with you know the sexual favors or whatever, he couldn't pay it and he wanted him to do some sexual favors supposedly and then when he said no, then that's when he supposedly went and told PREA or um----

B.C.      Yea he, he did a PREA.

A.P.      ----fi- Yea and then from there I guess that's where the ang-, the other stuff happened from that.

B.C.      Cause see huh what I'm trying to rectify then is Clarence Jackson was in Q27?

A.P.      Ahuh.

B.C.      And Christopher Jones was in L-dorm which is the finally dorm where Mullins ended up?

A.P.      Ahuh.

B.C.      So when Mullins comes to you and says C.J. stabbed me from L-dorm, how clear was he talking?

A.P.      He was talking pretty clear.  He was, he knew but he was sounding, he was getting weak cause he was losing so much blood but he specifically told me and Captain White it was C.J. and was specif-, specifically enough to tell us what dorm he was in.  Or sleep in there where he came from.

B.C.      Well so, so that's what it was.  It wasn't so much, it was C.J.----

AD0C009002

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

A.P.    Ahuh.

B.C.    ----in L-dorm that stabbed me.  It was C.J. who stabbed me in L-dorm.

A.P.    Right.

B.C.    Okay.

A.P.    Yea.

B.C.    Okay cause see that's the thing.  I don't wanna hem up Christopher Jones because he's a C.J. in L-dorm.

A.P.    Oh no, no.

B.C.    Yea.

A.P.    I know what you're saying, no.  Well we had init-, initially we had got Christopher Jones because we wasn't sure which C.J. he was talking about until he. When we ask around and they, they told us specifically he was in the dorm, that Clarence Jackson was in the dorm at the time and the other one (1) was asleep.

B.C.    Who told you that?

A.P.    Just all the inmates when we were, when we were asking around trying to----

B.C.    You don't remember who though?

A.P.    Naw I don't remember.  It was, it was a but they all came and went to the breezeway and said what the hell he just woke up blah, blah, blah.  It was a bunch of em so really I couldn't identify who it was but----

AD0C009003

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.     Yea.

A.P.     ----you know ten guys----

B.C.     A whole bunch of guys wearing white uniforms?

A.P.     Yea.  Yea exactly so it was just a whole bunch of different people but we knew we had got the right person.  We came and he didn't put up any kina resistance or anything and----

B.C.     Did he say anything?

A.P.     Naw he just, he was compliant, he went ahead and just came along and didn't buck or nothing so.

B.C.     He never said yea I killed him, y'all got me?

A.P.     Naw he didn't say anything like that.

B.C.     Just----

A.P.     Nothing incriminating like that but he just didn't deny it either.

B.C.     Yea.

A.P.     So I mean you know?

B.C.     Yea kina like a resign to himself that----

A.P.     Exactly.

B.C.     ----yea they got me, screw it, I got caught.

AD0C009004

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

A.P.      Yea pretty much or you know uh if I don't say nothing then they'll have to do, they're gonna have to do the work and prove it or something to that degree.

B.C.      Were they feeding at that time or something?

A.P.      Yes.

B.C.      Okay.

A.P.      She had just opened up um the CERT team member, Brandi Smith, just opened up the door for L2 side to go to chow, that's when he got hit.

B.C.      Okay.

A.P.      Yea.

B.C.      So Clarence Jackson okay Clarence Jackson was already in the dorm?

A.P.      I don't----

B.C.      Or she opened the dorm and he came walking in there and popped him?

A.P.      She said that all she heard was a loud noise when he, as soon as they opened the door and she looked down and saw that he was bleeding.  She didn't see who it was.  She didn't----

B.C.      Well I'm just trying to figure out hell if door opened.  If Clarence Jackson was In there or----

A.P.      I'm imagining cause I mean he would, why would he have, why would he have waited till she overrode the door if he was already inside coulda got him right then before she rolled the door.

AD0C009005

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    Right.

A.P.    Yea.

B.C.    That's what makes sense to me.

A.P.    Yea so----

B.C.    You know so he was just there waiting----

A.P.    ----he probably was just starting, yea waiting for the door to roll and as soon as it rolled boom.  So he had to be in the hallway with you know----

B.C.    I'm just yea cause I'm trying to think of some of the questions I'm gonna ask her.

A.P.    Ahuh.

B.C.    So if he's in the hallway waiting she should have seen him----

A.P.    Ahuh.

B.C.    ----walking back and forth to pop them doors.  I would hope anyway.

A.P.    Uh yea.

B.C.    But she ain't assigned here so that ole know your inmates ain't gonna apply when you work at Limestone working overtime at St. Clair so.

A.P.    Yea and then on top a that you know I think she, well her statement was so brief but you know----

AD0C009006

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        It was like two (2) sentences.

A.P.        Yea and I'm like that's it, that's all you got?  She's like well end of statement dog.

B.C.        We'll see how much more she got when I gotta drive my happy rear end to (INAUDIBLE).

A.P.        I hope she got more for you than she's got on that statement cause uh that was real thin and I'm like wow.  Dude got stabbed right there and if you're a CERT team member and that's all you got but um----

B.C.        Well let me, let me ask you this.

A.P.        Ahuh.

B.C.        Just outa curiosity.

A.P.        Ahuh.

B.C.        Okay so remember I called you and you thought he was already at the hospital. How long did they work on him before he flew out?

A.P.        They were still, when you had called they were still in the parking lot.

B.C.        Yea that's----

A.P.        And then just----

B.C.        ----and I told you, I said that ain't a good sign.

A.P.        Yea, yea, I remember that and then about maybe fifteen (15) minutes after you hung up then they took off and I'm like, I well I said yea I mean----

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.     Well I told you, I said I'm gonna head your way, I'll call before I make that turn.

A.P.     Ye-, yea I remember that, yea.  But you know I mean I thought, I'm surprised he lasted as long as he did but----

B.C.     Yea.

A.P.     ----I don't know, I don't know.  But they said he----

B.C.     Yea you wouldn't working when they called back up here to say he died huh?

A.P.     No, no I was on hold for another shift.

B.C.     Alright.  Yea.

A.P.     We had um we had already gone for the day and that's the reason why they did the (INAUDIBLE) at the shift.

B.C.     Yea.  Yea Mason did that, yea.

A.P.     Yea.

B.C.     I know he called me every ten (10) minutes that night.  He said I need to know this.  All you gotta do is put in that he died from his injuries man.

A.P.     Ahuh.

B.C.     He was pronounced dead at whatever the heck time.  That's all I need Mason. I know, I mean I was there when it happened.  I don't need a----

A.P.     Oh yea.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        ----I watched em pull the plug.  I don't need the uh----

A.P.        Yea I figured he was nervous.

B.C.        ----a narrative.

A.P.        He was nervous because it's uh it was a serious, it's homicide so.

B.C.        Yea.

A.P.        I knew he didn't wanna mess that up so man.  I understand where I used to----

B.C.        I told him, I said it ain't nothing you're gonna put in that report that I don't already know.

A.P.        Yea.  Yea, I mean I know he just, he just, probably just was panicking a little bit cause, homicide.  You think homicide, you better make sure you cross your t's and dot your i's so.

B.C.        That's right.

A.P.        Yea.

B.C.        Alright.  Well you can't think of nothing else I didn't ask that I need to know huh?  Ain't heard nothing else?

A.P.        Naw that was all I pretty much heard of was of some hom-, homosexual stuff and he didn't want, he didn't wanna do it and.

B.C.        Well that's a common thing.  You get in debt and then you gotta pay with that sexual favor or get stabbed.

A.P.        Yea.  So I don't, that's, that's all that I know.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Okay.

A.P.        I mean I ain't got any information other than that but that's pretty much it though.

B.C.        Well that's good with me.

A.P.        Alright.

B.C.        Well then we'll end this at 10:11.

BC/BA/jew

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

### STATEMENT OF INMATE CHRISTOPHER JONES
### SPECIAL AGENT BRIAN CASEY
### SPECIAL AGENT BRADLEY ARLEDGE

B.C.       Alright today is 3-15-19. It is 1222 hours. I'm Agent Casey St. Clair I&I. I am at St. Clair Correctional Facility on Case #19-0325. With me is Agent Arledge and uh Inmate Christopher Jones. What you go by? You go by Chris or what?

C.J.       Chris yes.

B.C.       Okay. I call you Chris that's cool?

C.J.       Yea.

B.C.       Okay. Alright um what is your uh AIS Chris?

C.J.       15----

B.C.       Ahuh.

C.J.       ████████████

B.C.       ███████████████

C.J.       ████████

B.C.       ████████ Alright and I explained to you know I'm doing this murder investigation on Mullins and just to go ahead and cover everybody while we're going through this process of eliminating these suspects I'm gonna go ahead and read you this Miranda. You got questions about this by all means go ahead and ask me. You can read right?

C.J.       Yes sir.

AD0C009011

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Alright.  Well read along with me here.  It says before asking you any questions, I must explain to you that you have the right to remain silent and anything you say can be used against you in court. That you have the right to the advice and presence of a lawyer even if you cannot afford to hire one.  If you cannot afford to hire a lawyer and you wanna have one (1) dur-, one (1) present during interrogation, the court will appoint you one before questioning. If you wanna answer questions you can do so, but you can stop at any time. Any questions?

C.J.        No sir.

B.C.        Alright below that there's a Waiver.  It says I have been advised of my rights. I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me.  No pressure or coercion has been used against me by anyone.  You understand that?

C.J.        Yes sir.

B.C.        You're good?

C.J.        Yes sir.

B.C.        Wanna give me a statement?

C.J.        Yes sir.

B.C.        Alright I'll hold this and I know y'all got them skills man.  I'll let you throw your John Hancock right there where it says signature.  You can stand up if you want, shit we ain't- I see you got a magazine, what you reading?

C.J.        Uh Daily Bread.

B.C.        Ah okay.  What's that that Jehovah Witness Thing?

AD0C009012

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.       No that's a----

B.C.       Mormon?

C.J.       ----Christian.

B.C.       Chris- is it?

B.A.       Daily Bread.

B.C.       That's right watch tower is Mormon idn't it?  Yea.  Um so hell I'll just let you start man and I'll ask questions as we go so.  Just tell me whatever you think you gotta tell me about this Mullins homicide.

C.J.       Um on that particular day I had went to sleep about two o'clock.

B.C.       You did?

C.J.       Yes sir.

B.C.       Okay.

C.J.       Um my roommate came in about 5:00, 5:30.

B.C.       Who's your roommate?

C.J.       His name is John Underwood.  He's in L2-34 cell.

B.C.       Okay.  Alright go ahead.

AD0C009013

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.      He said C.J. something's going on out here.  Well only thing I heard was the door was closing and I had already been asleep for two (2) hours so it really didn't have nothing to do with me so I just went on and rolled back over.  Then I heard some officer's calling some names, they called about five (5) or six (6) names uh Clarence Johnston um Christopher Johnston, Christopher Jones and I heard my name and I got up.  I basically thought they was having mail call but they wouldn't.  The guy asked me to uh to go to the rock.  When I went to the rock I seen blood in the hallway.  I'm like naw he, he couldn't be fixing to connect me with this cause it's obvious that I got up you know outa my sleep and uh he came down to the rock after locking all the doors, he asked uh me to put my hands behind my back.  I said I know you not fixing to try to, he was like naw they just wanna talk to you and that's all I remember.

B.C.      Okay so when Underwood comes in and tells you something's going on he didn't say what was happening?

C.J.      No sir he didn't.

B.C.      Alright you didn't get up your cell to look?

C.J.      No sir.

B.C.      Okay.  I mean and now we understand that the reason they put you in cuffs was because they was looking for a dude name C.J. and you was just the man assigned to the wrong damn dorm, on the wrong day.  Um----

C.J.      I have found out since I've been locked back here that when the stabbing did take place it was a lady by the name of Ms. Smith who had the cube.

B.C.      Yea.

C.J.      And she locked the outside first (1st) from my understanding and then they locked the other side.  So whoever did it they couldn't have went to the left, to L1 or to L2.  I really was disappointed in the prison for even locking me up.  I been here----

AD0C009014

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.     Well you know I, I'm not gonna sit over here and say that I shoulder some of that blame but the reason they have you in seg, I mean we know why you're in seg right?  I mean----

C.J.     Yea I know why but----

B.C.     Well that, that makes sense right?  Um it's just fifty (50) cases going on and they kina wait for I&I to come in and, and settle all of that and shit I mean between suicides at Limestone, homicides at Bibb and that damn institutional search we did the other day.

C.J.     Yea.

B.C.     You know it's been a mess.

C.J.     Okay, okay.

B.C.     Um----

C.J.     I do understand the investigation process and all that.

B.C.     So that, that's why they just holding you until we talk to you but that's why we're here today right?  So like I said uh you know I, I got told by a whole bunch a people that you was sleeping when it happened um that's why I'm talking to you before I'm talking to this other C.J. um gonna go talk to Robert or John Underwood.

C.J.     Okay.

B.C.     And uh holler at him real  quick before you get out.

C.J.     Okay.

B.C.     And let him go ahead and verify it and then I'm gonna talk to Warden uh Jones okay?

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.       That's fine that sound good.

B.C.       Sound like a plan?

C.J.       My mom will be happy.

B.C.       Ha, ha I bet she will be man.

C.J.       She's stressed out about this man.

B.C.       I'm sure.  Alright well uh anything else you think I need to know?

C.J.       Um no sir.

B.C.       Okay.

C.J.       Not that I know of.

B.C.       Okay that's cool.  Alright well then I'll go ahead and end this at 12:27.

BC/BA/jew

AD0C009016

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

**STATEMENT OF INMATE CLARENCE JACKSON**
**SPECIAL AGENT BRIAN CASEY**
**SPECIAL AGENT BRADLEY ARLEDGE**

B.C.        What's up man?

C.J.        Alright.

B.C.        Have a seat.  What's your name?

C.J.        Clarence Jackson.

B.C.        Clarence Jackson.  Alright we I&I.  You know why we wanna holler at you
            right?

C.J.        Ahuh.

B.C.        Alright.  Alright let me get some stuff on here.  Today's the fifteenth (15th),
            12:54.  What's your birthday man?

C.J.        ███████

B.C.        Alright.  So I wanna ask you some questions right?  Man you look familiar as
            hell to me.  Were you ever, hadn't I ever worked a case with you before?

C.J.        Uh naw.

B.C.        Um anyway I wanna ask you some questions.  I'm gonna read you something
            real quick though uh you got questions about it ask me.  Alright?  I ain't here
            to mess you over.  Alright?  You can read right?

C.J.        Yea I can.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Alright so just read along with me.  Hell scoot that chair up, get comfortable.
            Alright it says before I ask you any questions, I must explain to you that you
            have the right to remain silent. Anything you say can be used against you in
            court. You have the right to the advice and presence of a lawyer even if you
            cannot afford to hire one.  If you cannot afford to hire a lawyer and you wanna
            have one present during interrogation, the court will appoint you one before
            questioning. If you wanna answer questions you can do so, but you can stop at
            any time.  You understand that?

C.J.        Understood.

B.C.        Alright and below that there's a Waiver that says I have been advised of my
            rights, I understand what my rights are. I am willing to make a statement and
            answer questions. I understand and know what I am doing. No promises or
            threats have been made to me and no pressure or coercion of any kind has been
            used against me by anyone.  You understand that?

C.J.        Understood.

B.C.        Alright you wanna talk to me about this?  I'll get you to go ahead and throw
            your John Hancock right there where it says signature.  I'll hold it for you.  I
            know it's hard handcuffed behind your back.  I ain't met anybody with em
            behind their back yet that ain't got the skills to reach around like that and sign
            it.  Alright.  I'll just let you start man and tell me what's up?

C.J.        Um this incident that occurred, I don't, I don't really know how I got caught up
            in it.

B.C.        Alright.

C.J.        Um it happened in what, L and M?  I was in P and Q.  They came and got me
            said a dude uh said C.J. stabbed him.

B.C.        Alright.

C.J.        I don't know anything about it.

AD0C009018

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.       Do you know who dude was?

C.J.       Yea.

B.C.       I mean do you, who, do you know him?

C.J.       No not like that.

B.C.       Okay.

C.J.       Yea.

B.C.       Um what cell were you in you said?

C.J.       Um Q27.

B.C.       Q27?  Okay.  So you're in Q27 and you don't know this white boy that got stabbed right?  You wouldn't in L-dorm that day or anything?

C.J.       No.  I know him but I don't you know I don't----

B.C.       Was he your cellmate?

C.J.       He wasn't supposed to be in there.

B.C.       But he stayed with you?

C.J.       But he stayed in there.  Stayed in there for maybe like----

B.C.       For like two (2) weeks.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        Maybe two (2) weeks.

B.C.        And you didn't know his name?  And you didn't know nothing about him?

C.J.        Steve?  Yea I know him but now I didn't know him outside the cell but they called me up there.  He was assaulted and called me up there and asked did I know anything about the incident.

B.C.        Alright----

C.J.        So----

B.C.        ----who'd you talk to?

C.J.        Um maybe it was Lieutenant Price and Sergeant Wilson.  And they asked me did I know anything about it.  Asked me did uh did he owe anybody.  And I said well I don't know if he owe anybody, I don't- I was trying to

B.C.        Well I mean that's, that's a legitimate question.

C.J.        Right.

B.C.        I mean cause you know I mean I know a lotta people get stabbed over shit you know just debt.

C.J.        Right.  So I don't know, I don't know if he in debt.  I ain't seen him with no money in the cell uh I, I don't, I don't associate with him outside the cell, I really don't know.  So they got me to sign a paper saying that I didn't know anything about the situation and I signed it and I left.

B.C.        Okay.  Alright anything else that you can think of that I need to know about this?

AD0C009020

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.     Um we were on lockdown feed when the incident occurred.  I was over there getting a haircut and shaved.

B.C.     That's why you were in L-dorm?

C.J.     No I, that's why I was in Q-dorm.  I was in Willie Jenkins um cell getting a haircut and a shave when the code was called and we looked out the window and seen the police run in L and M.

B.C.     So you never went to L-dorm?

C.J.     No.

B.C.     All these people who saw you in L-dorm, they all lying?  I mean right?

C.J.     I don't, I don't know.  I ain't heard nobody said I was in L-dorm.

B.C.     Well I've heard it though.  That's why I'm asking, from a lotta people.

C.J.     Yea.

B.A.     We got you in L-dorm.  Somebody put you in L-dorm.

C.J.     Alright.

B.C.     A bunch a people.  We're gonna come back to this.  So, so was you uh I mean it ain't up to me to judge, I mean was you in some type of relationship with Steven Mullins?

C.J.     No.

B.C.     He didn't owe you a debt?

AD0C009021

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.      No.

B.C.      Why did he file a PREA complaint against you?

C.J.      I knew nothing about it.

B.C.      He says that you exposed yourself to him on more than one (1) occasion.  That, what on the twenty-fifth (25th) of February when all this stuff started that you had had woke him up by punching him in the head.  That uh you, when he woke up that the two (2) of y'all had a conversation and you told him to suck your dick and pulled a knife on you.

C.J.      That's not true.

B.C.      Come down to it you take a polygraph you gonna pass it?

C.J.      Yea.  I'll take it.

B.C.      So why out of everybody in that dorm is he just pointing this at you?

C.J.      It's more than one (1) C.J. in there.  I don't, I never got no paperwork about no PREA or anything.

B.C.      Well hell I don't think they had time to serve paperwork between the time he filed PREA and the time he got killed.  That's why you, why you ain't got no paperwork about no PREA.

C.J.      Okay.  Well I talked to Sgt. Wilson that morning, asked me did, you know if I knew anything about the incident.  He didn't say anything about me um assaulting him or PREA or anything.

B.C.      Well he was your cellmate so I mean hell it's pretty evident somebody had hit him.  I mean I looked at his damn body chart at, it ain't like he just you know.

AD0C009022

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        I wasn't even in the cell, I was at breakfast.  I told sergeant cause that's when I came in the cell and he saw me one (1) time.

B.C.        Cause see the way it started off that morning was he says he got woke up, somebody beating the hell out of him and he don't know who it was cause it was dark in there right?  Okay so we don't know who beat him up.  So they send him for a body chart.  When he goes in there you know they're doing the things they're gonna do during a body chart.

C.J.        Ahuh.

B.C.        And so they ask him who it was that stabbed you?  Or who was it that beat you up?  And that's the first (1st) time he starts to identify you.  And what's so bad is a dead man you know a dead man tell no tales but the problem is that uh I've got a whole bunch of statements from a dead man that finger you.  Um so he goes in there and stated he couldn't identify who assaulted him and then he says uh gets his body chart done and he tells the medical staff it was C.J. or he just says it was my cellmate that sta-, that, that beat me up.  So he doesn't identify C.J. he just says my cellmate.  And then he's so intent on this, he comes back and writes a letter, the day before he gets killed.  Several nights, he says on several nights my cellmate and then his, the first (1st) time he says C.J. in Cube 27 woke me up touching my foot and my feet.  I acted like I was asleep and he wouldn't expo- and he would expose himself here and there.  I'd act as if I didn't see it and I'd leave the cell.  Then this morning I was asleep and around 4:00 a.m. was woke up and he was punching me in the side of the head and twice around the right eye.  I tried to talk to him to see what the problem was, he only became more mad.  He got his knife and threatened at and he threatened me with that.  He kept asking me how I was gonna fix this.  I asked what he was talking about and he says that you exposed yourself and wanted a blow job.  He said I had to push you out the way and uh he left the block and that's when he went and reported it.  So you're telling me that didn't happen?

C.J.        It didn't happen.

B.C.        Alright so that's at least three (3) accounts of the same exact thing that you're telling me that didn't happen and then he calls the PREA prop-, hotline and says the same exact thing.  So that's four (4) accounts of the exact same thing and that didn't happen either right?  Right?

AD0C009023

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        What didn't happen?

B.C.        The assault?

C.J.        No.

B.C.        That he's reporting.  So four (4) times he says the exact same thing through the course out of the day and four (4) times none of that ever happened?  That's what you're telling me right?

C.J.        I didn't assault him.

B.C.        Right?

C.J.        I'm telling you that I didn't assault him.

B.C.        Do you know who did?

C.J.        I do not.  It says C.J.  It's multiple C.J.'s.

B.C.        There's two (2) C.J.'s in this camp.

C.J.        There's another C.J.

B.C.        There's you and there's a dude named uh Christopher Jones.  Alright Christopher Jones got fifty (50) witnesses saying he was sleeping.

C.J.        There's another C.J. in uh Cube 2.

B.C.        Who?

C.J.        C.J.  I don't know him.  I don't know his first (1st) name.

AD0C009024

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.       Huh.  Well if there's two (2) in their why did they pull only you?

C.J.       Maybe because he was in twenty-seven (27) cell.

B.C.       Maybe cause he was in twenty-seven (27) cell and he'd been reporting all this stuff that you had already started developing a motive to kill his ass.  Whether it was over debt or something sexual but I mean all I got is a whole bunch of motive on why you would be the one (1) to stab him.  I mean look it don't matter to me.

C.J.       I understand.

B.C.       But I mean you know confessions good for the soul.

B.A.       Is that you?

C.J.       Ahuh.

B.A.       You know what that is?  Somebody identified you as the one (1) who stabbed Mr. Mullins.

C.J.       Pew this is crazy.

B.C.       Yea it's crazy.  What you in here for anyway?  What's your sentence?  You in here for-----

C.J.       Statutory----

B.C.       ----yea you got twenty-eight (28) years.  Get out in 2034 huh?  What's the uh what's the damn uh specifications for capital murder?

B.A.       Uh of course you've got to have either a prior murder----

AD0C009025

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.       Got a prior murder, attempted murder, any murder.

C.J.       I don't know.

B.A.       Yea.

B.C.       So it is death sentence eligible?

B.A.       He's got a prior murder case you know?

B.C.       Well you want Holman or Atmore?

C.J.       Holman and Atmore what?

B.C.       You got, I mean you go down to Holman and Atmore or you can go to
           Donaldson.  That's where death row is.  What's up?  Which one (1) you want?

C.J.       Shi- I, Lord.

B.A.       Cause you know there's more folks in the dorm that seen all this, seen the
           stabbing in L-dorm?  You got----

B.C.       That shit happened right there in front of the cube.  I mean so you know I kina
           look at it like as this is the difference between life in prison and living or the
           difference between the electric chair or the gas chamber.

B.A.       And that's----

B.C.       I mean so----

B.A.       ----that's you and that's the signature.  That's somebody who identified you as
           the one (1) who stabbed Inmate Mullins.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    I mean this is the opportunity for leniency when the D.A. hears what the hell's going on. I just need some truth. The D.A.'s gonna wanna hear some truth and you can stick to some bullshit that I got forty (40) other people telling me what you're telling me right now is bullshit. Or we can go ahead and tell me what the hell happened and tell me why the hell it happened and then see how nice the D.A. wants to be.

C.J.    I didn't do it. I mean I don't know I don't know what's going on.

B.C.    Okay.

C.J.    You know?

B.C.    Alright. Well alright. I tell you what St. Clair County they uh love some good cases and this is a good case. How long you been here?

C.J.    Um a year.

B.C.    A year. You know we ended up popping this officer a while back thinking he gonna get off with some bullshit too. He gonna end up getting like sixty (60) fucking years because the D.A. don't play with bullshit in St. Clair County. So and he's just selling drugs to inmates. But that's fine. I'll go ahead and present capital murder. We'll do it that way. Cause I got bloody clothes right there too. So there's a little bit of uh Steven Mullins sitting in that bag I guess technically. It's like he in the room too.

B.A.    DNA.

B.C.    So alright that's what you sticking with?

C.J.    Yea.

B.C.    You got anything else?

B.A.    I'm good.

AD0C009027

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

C.J.        What's your name?

B.C.        Casey.

B.A.        I'm Arledge next (INAUDIBLE).

C.J.        Your names what?

B.A.        Arledge.

C.J.        Arledge?

B.A.        Yea.  You change your mind and wanna talk to us again.  We'll come back and talk to you.

B.C.        Yea he work up here all the time, this is his prison.  So----

B.A.        But it's all and it's but I had some made up picture and somebody had scribbled something on it.

C.J.        Ahuh.

B.A.        I just, I ain't, I ain't gonna give you no bull crap.  They picked you out and identified you as the one (1) that stabbed him.  So with your prior murder charge you already got, get you in another murder charge, it's capital.

C.J.        Um this is crazy.  It's wild.

B.A.        So it's up to you.  The balls in your court.  Regardless of how you wanna roll the dice.

C.J.        Wow.

AD0C009028

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    I mean it's just crazy damning you know like I'll write these things and I don't have two (2) pages on a homicide because I ain't usually got a whole lotta back story on this but shit right now I got four (4). Everything damn thing has you in it being identified somehow or another and shit I'm only about halfway done. So I mean this is all, everything we already know about you being involved. I just wanted to give you a chance to come clean and sleep tonight. But if you can sleep with your secret, I'll sleep with it. That changes and you wanna talk. Tell em you wanna holler at I&I.

C.J.    Okay they, I mean, they came and gave me a uh a urinalysis maybe four (4) or five (5) days ago on what last Monday, I passed that one (1). They came Wednesday and offered me another one (1). I don't get high, I don't you know like I said I don't know if he got high or what, I don't know.

B.C.    Well hell a good dealer ain't gonna use their product I mean.

B.A.    Getting high don't matter.

C.J.    Yea I'm saying but now----

B.C.    I mean actually it kina would.

C.J.    Yea.

B.C.    That's too bad because if he was high and stabbed him it'd probably be more like fucking manslaughter.

B.A.    Yea, yea you could actually have your little way out if he was messed up on dope.

B.C.    Glad he wouldn't high. Can't even go there now. That's a shame.

B.A.    But you're here, I mean you're in here for murder and attempted murder you got two mo's. Then your name pops up again. Then we get you identified out of the picture and picks you out of one of the, one of the, the guy who was seen stabbing him in L-dorm, he got stabbed. I mean there's other, we got some

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

other inmates names we gotta talk to too.  So we gets, we get a couple of people pick you out----

B.C.    I got at least six (6) more people to go talk to and there's a whole damn----

B.A.    We don't, we don't, we don't really need your----

B.C.    ----cell----

B.A.    ---- statement or not actually but the only thing that's gonna help you in the long run if want either death row or you wanted life without is cooperating.

B.C.    Or shit if you just wanna sleep and have Jesus forgive you man.  They say confessions good to the soul, good for the soul for a reason.  But I mean I got enough to build a case.  I feel pretty good on what I got to go ahead and get my warrants and bring this to trial.  So whatever you gotta say that's fine.  I'm really here, think of me as a priest right now.  I'm here to give you an opportunity to take that burden off your shoulder.  I mean you know what's coming down the pipe.  You know it.  You, I mean you know it.  Don't you?  You know it.  You know what's about to happen.  I mean you know what's about to happen with the court process and what the hell we're gonna do right?  Yea.  So what the hell does it matter now?  I mean it's just, like I said just an opportunity for us to talk.

C.J.    Alright.

B.A.    You didn't do it?

C.J.    I didn't do it.

B.C.    Okay.

C.J.    There's not gonna be nothing.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.     Okay.  Well tha t's two (2) different things too, didn't go it and not gonna admit you did it.

C.J.     Well I'm not gonna, I didn't do it and I'm not gonna need it.  I, I'm saying I didn't do it.

B.C.     Okay.  Alright.  Well I'm cool with that.  Something changes and uh man what the hell else?  You think of anything else?

B.A.     Naw all we need is to come over and talk to more folks and we'll be done.

B.C.     Yea.

C.J.     Alrighty.

B.A.     If you change your mind let us know.

B.C.     Well you know where to find us.

B.A.     (INAUDIBLE).

B.C.     We appreciate it.

C.J.     Alright take care.

B.C.     Hey where are your clothes that you had on when you come over here?

C.J.     (INAUDIBLE).

B.C.     Alright.  He walked out at 1:13.

BC/BA/jew

AD0C009031

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

### STATEMENT OF WARDEN GWENDOLYN GIVENS
### SPECIAL AGENT BRIAN CASEY
### SPECIAL AGENT BRADLEY ARLEDGE

B.C.        Alright today is Friday 3-15-18.  It's 0949 hours.  I'm Agent Casey from St. Clair I&I.  I am at St. Clair Correctional Facility on Case #19-0325.  With me is Agent Brad Arledge and Warden Gwendolyn Givens.  Just for the record warden uh just, do you know your employee #?

G.G.        No I don't.

B.C.        ■■■■■■■■■■■■■■■■■■■■■

G.G.        ■■■■■■■■■■■■■■■■■■■■■

B.C.        Okay.  Um so we'll just do this in the way that it came to my knowledge in the report here.  So um tell me about the death process of Steven Mullins.

G.G.        Honestly I don't know the death process of Steven Mullins.

B.C.        Okay.

G.G.        Um was not here when he succumbed to his injuries, he was at the hospital.  We did not receive the call, was not the on-call warden.  So I don't know about the death of Steven Mullins.

B.C.        Well the reason I asked you that was I know that you signed the um release for his family so----

G.G.        Ahuh.

B.C.        ----that's why I assumed that.  Um you don't know who received the call that he died huh?

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

G.G.      No I didn't take that on-call um if I'm not mistaken, don't want to give you false information, it probably was Warden Jones and Warden Brooks handling Steven Mullins; however when they're um out the office or they sent a call, a lotta times they send the call to the wardens uh it doesn't matter which one and the call came to me about um you know Stevens, trying to process you know his um remains----

B.C.      Ahuh.

G.G.      ----for the funeral arrangement.  So I did speak with his family, I got the paperwork sent to them.

B.C.      Yea, yea, yea----

G.G.      I faxed it to them but----

B.C.      ----well that's, that's why I was talking to you about it----

G.G.      Ahuh.

B.C.      ----because that's when I said your name came up.

G.G.      Okay.

B.C.      That's, I saw that paperwork.

G.G.      Right I----

B.C.      So I didn't know you know like if they called you cause I know it was about the time we were doing that institutional check.

G.G.      Ahuh.

AD0C009033

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.     So I didn't know if they called you and----

G.G.     Yea.

B.C.     ----all that stuff, so okay I'll ask uh Warden Brooks and Warden Jones----

G.G.     Right.

B.C.     ----about that.

G.G.     I mean they call here and they'll just send the call to a warden.  They you know they don't ask for a specific wardens um like I say they did send me the call and I handled some of the paperwork to try to go ahead and um get his remains taken care of.  So my names probably on it but----

B.C.     Yea.

G.G.     ----anything about Mr. Mullins no.

B.C.     Okay.  Let me just make sure I ain't got, cause I got crap here, I got crap in the digital file.  Naw that's the authorization for an autopsy.  I don't know whose signature that is.  That ain't you huh?

G.G.     Not me.

B.C.     I didn't think so.  When I looked at yours I was like that don't even look like a G----

G.G.     Ahuh.

B.C.     ----in any of those names.  But you know signatures is signatures.

G.G.     Doctors signatures.

AD0C009034

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    Ha, ha, that's right.  I just wanna make sure that I'm not overlooking anything.

G.G.    And I will say this for the record.  A lot of your death reports, as far as paperwork being faxed, you will probably see my name on it----

B.C.    Naw----

G.G.    ----I'm just saying because a lotta times I'll go ahead and try to get the stuff taken care of cause I----

B.C.    Yea.

G.G.    ----check the incident module and try to make sure my reports are off the dashboard.

B.C.    Yea and, and like I say, I mean that's you know those, that, that's how it came to me.

G.G.    Ahuh.

B.C.    They, when I went to the hospital that night, cause you know there was a whole bunch of I don't know, I guess stink is the right word I guess you know about the body and what they were gonna do with his organs and this, that and the other and the hospital said that all they knew was they talked to a female warden and----

G.G.    They didn't talk to me.  They talked to Warden Jones I believe.

B.C.    Okay.

G.G.    Yea she did mention it.

AD0C009035

B.C.        Okay.  Alright well then I'll get with her then.  So your only thing was that it already, we had already known that he had died and just and letting the family see the stuff and arranging for----

G.G.        Right.

B.C.        ----body transport and all that stuff?

G.G.        Ahuh.

B.C.        Okay.  Okay so then the other thing they came up when I was talking uh when I was doing this was on the 25th of February he uh called, okay here it is.  Okay so he says on the 25th of February at 0601 hours he reported to Dylan Tucker that he was a victim of a uh nope that's the wrong one (1).

G.G.        Ha.

B.C.        Yea he reported that he was the victim of an assault.  Um they did a body chart on him and he never said anything about a sexually claim.  Um then that day he called the PREA Hotline and he ended up uh saying that his roommate C.J. was rubbing his feet and his head while he slept.  Um you know pulled a knife on him and tried to get him to do oral sex.  I'm trying to make sure I'm not jumping ahead on this.  It's all the same thing.  He reported the assault, yea, so they punched him in the head, so they moved him and then he calls PREA Hotline and then he reported the incident to prison staff already, blah, blah, blah.  Oh okay, yea, okay, okay, I see it now.  That happens.  I'm right but I didn't wanna jump ahead in that.

G.G.        Okay.

B.C.        So he says while he's up there reporting it, this is what he said in the PREA Hotline recording, that you told him to go back to that cell because you were doing an institutional count.

G.G.        When I came in and I'm not sure, I can go and pull the date.  Don't know anything about Mullins reporting anything about uh sexual or assault or anything of that nature.

AD0C009036

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Right but, and, and, on that----

G.G.        Ahuh.

B.C.        ----verify you.

G.G.        Ahuh.

B.C.        He'd, he told staff that he was just assaulted.

G.G.        Okay.

B.C.        He didn't say anything about a PREA or a sexual assault.

G.G.        Okay.

B.C.        So I know you didn't know about that.

G.G.        No.  Didn't tell me, didn't you know so----

B.C.        Yea.

G.G.        ----don't know.  Um they had been counting for a while, we had to do a bed roster count.  Everybody was sent back to their area for the bed roster count. To include Mullins----

B.C.        Ahuh.

G.G.        ----and I think after the bed roster count cleared they brought Mullins back up or Mullins came back up.

B.C.        Okay.

AD0C009037

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

G.G.        And that's as far as I know.

B.C.        Okay.

G.G.        So.

B.C.        Yea cause like, like I said I mean this is, the reason I wanted to talk to you is cause your name come up----

G.G.        Ahuh.

B.C.        ----on that and you know cause what it's looking like happened was he reports, doesn't tell staff initially what happens.

G.G.        Ahuh.

B.C.        Reports it to PREA then tells Gordy or White more details about it and in the mist of this he's trying to get away from the guy who it looks like stabbed him. You know because he was in the cell with C.J.

G.G.        Okay.

B.C.        So C.J.'s the one (1) who assaulted him.  He comes up, doesn't tell anybody a name or anything----

G.G.        Okay.

B.C.        ----just says his cell #.

G.G.        Ce-, okay.

B.C.        Goes to his cell for the count.

AD0C009038

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

G.G.        Okay.

B.C.        Then comes back, then C.J. kills him, what that night or the next day?

G.G.        Okay.

B.C.        So that, that's why.

G.G.        Well I mean----

B.C.        I just you know----

G.G.        Yea.

B.C.        ----asking those.  I mean that's all that I had where your name come up in any of this.

G.G.        Ahuh.

B.C.        I wanted to clear that but have you heard anything about this that I need to know?

G.G.        No more----

B.C.        I mean like suspect or anything like that?

G.G.        ----no more than C.J.

B.C.        Okay.

G.G.        Cause I think actually had two (2) C.J.'s.

AD0C009039

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Yea.

G.G.        But one (1) of the C.J.'s wouldn't the C.J.

B.C.        Yea.

G.G.        So they just did the disciplinary on the Clarence Johnson or Clarence Jackson this morning----

B.C.        Yea whichever.

G.G.        ----which is supposed to be the correct C.J.

B.C.        Yea I gotta go through here and look at, yea cause there's Christopher Jones is not the correct C.J.

G.G.        Right it was not the correct C.J. so.

B.C.        Yea Warden Jones said that they ended up putting him in seg because one (1), his name was C.J.----

G.G.        C.J.

B.C.        ----and he was in the dorm and uh I think he had blood on him or something but probably from them trying to help him.

G.G.        Yea.  Nope don't know much about Mullins death, no more than what the talk, the C.J.'s, this, that and the other.  But yes um they did go back to their dorm for count, everybody went because it was a bed roster count.

B.C.        Yea.

AD0C009040

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

G.G.    Now as far as the details on Mullins, I didn't even know the details.

B.C.    Yea you just got an inmate up here and you gotta do a count.

G.G.    And we did uh a bed roster count.

B.C.    Okay.

G.G.    And Mullins went back but I do know or he came back up.  I don't know if they escorted him back up because he was up here or he came back up but he did.

B.C.    Yea at some point and time in that, it's like he reported it, then called PREA, all this in the same day.

G.G.    Ahuh.

B.C.    And then Gordy got a notification about the PREA so she pulls him back up.

G.G.    Okay.

B.C.    And talks to him about that so he did come back up there.

G.G.    Okay.

B.C.    So okay, well that's all I needed to know.

G.G.    Okay well----

B.C.    Since you ain't got nothing else and I'll end this at 9:57.

BC/BA/jew

AD0C009041

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

**STATEMENT OF JOHN UNDERWOOD**
**SPECIAL AGENT BRIAN CASEY**
**SPECIAL AGENT BRADLEY ARLEDGE**


B.C.        So today is 3-15-19.  It is 1357 hours.  I'm Agent Casey from St. Clair I&I.
            With me is Agent Arledge from St. Clair I&I and Inmate Robert Underwood
            right?


J.U.        John.


B.C.        John Underwood okay.  I don't know why the hell I keep saying Robert.
            What's your AI, AIS John?


J.U.        167873.


B.C.        Alright well let me start with this.  Did you see what happened that night?


J.U.        No sir.


B.C.        Okay.  How did you know something went down that night?


J.U.        Because they were fixing to lock everybody in the cell.


B.C.        Okay.  Um who is your cell partner?


J.U.        Christopher Jones.


B.C.        Okay so Chris tells me that you came running in the cell---


J.U.        I woke him up and told him----


B.C.        ----and said hey some shit going down.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

J.U.    ----I woke him up and told him hey man they fixing to lock everybody in their cell.

B.C.    But you didn't hear all the bullshit happening outside the do- ----

J.U.    I was coming out of the TV room.  They were calling chow.

B.C.    Yea.

J.U.    So they were going out to go to chow.  I wouldn't going to chow.  Chris was in there asleep.

B.C.    Ahuh.

J.U.    So when I walk in and they say man dude just got stabbed.  I said what?

B.C.    Okay.

J.U.    And the uh riot team run in and said everybody locking down.  Go to your assigned cell.  So I go in the cell and say hey man they locking everybody down in the cell.

B.C.    Okay.

J.U.    And I woke him up outa his sleep.

B.C.    Okay.  Alright, alright, alright.  You was up at the top TV room?

J.U.    Naw it ain't no top TV room in that block.  I didn't----

B.C.    Which block is this?  L-block?

AD0C009043

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

J.U.    L2.

B.C.    Uh hell some of em have em and some of em don't man.

J.U.    Yea.

B.C.    So I'm just trying to remember.

J.U.    I was in the back, all the way in the back in front of the sport TV.

B.C.    Okay I know where you're talking about.  Okay, alright, alright.  Well that's what I needed and I mean you know we don't wanna hem up the wrong C.J..  I mean you fill me?  I mean justice ain't about doing somebody wrong so.

J.U.    Yea.

B.C.    He said that you woke him up from his sleep, I just wanted to hear it from the cat's mouth.

J.U.    I did.

B.C.    Okay.

J.U.    I woke him up.

B.C.    Okay, alright, well that'll work.  Hope you enjoy two (2) weeks of sleeping in their by yourself cause it looks like you might have a cell partner-----

J.U.    I got a cell partner already.

B.C.    Why they done moved somebody else in there?

AD0C009044

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

J.U.    Yea.

B.C.    Well shit he didn't have to get familiar with somebody else I reckon.

J.U.    Yea I got a cell partner.

B.C.    Uh alright I'm gonna end it at 1:59.

BC/BA/jew

AD0C009045

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

## STATEMENT OF CAPTAIN KEVIN WHITE
## AGENT BRIAN CASEY

B.C.      Alright today is 2-20-2020.  I'm Agent Casey from St. Clair I&I.  I'm speaking with Captain Kevin White who is currently at Childersburg, formerly of St. Clair Correctional Facility and just for the record tell me your social.

K.W.      The whole social?

B.C.      I don't care.  Gimme the last four (4) of it.

K.W.      ■■■■■■■■■

B.C.      That's cool with me.  That's the way I can prove who you are when it comes.  Okay so we had talked before about the homicide of Steven Mullins and that you were one (1) of the uh first (1st) responders there um after Steven Mullins was assaulted um essentially you heard his dying statement and uh he identified Clarence Jackson as his assailant, his murderer correct?

K.W.      He did.

B.C.      Okay and how did he identify him to you?

K.W.      He told me um I saw him, I was responding to the code----

B.C.      Ahuh.

K.W.      ----and he had made it in-between the J, K and P and Q building----

B.C.      Ahuh.

K.W.      ----and I stopped him and Lieutenant Price was with me and I said who did this and he said C.J. and I said which C.J. and he looked at me and made this

AD0C009046

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

statement.  He said you know which C.J. captain.  He said y'all, the one (1) that y'all had to move me away from the other day.

B.C.        Right and that was because he had filed a PREA complaint against Clarence Jackson correct?

K.W.        Correct.

B.C.        Okay.  Alright did he say anything else?

K.W.        No.  I, he actually said um his last words were uh get me some help captain and the St. Clair ambulance as we call it, the golf cart had just arrived----

B.C.        Ahuh.

K.W.        ----and I told him to get on, get on the golf cart and he said, made the comment, he said just give me some help and I said if you don't get on the golf, I said come on let's get on this golf cart.  If you don't get on this golf cart I can't help you and he said okay and that's the uh to my knowledge he made one (1) more remark as far as his medical to a doctor but he didn't uh he didn't um he didn't speak again.

B.C.        Yea they took him to the hospital and he ended up dying the next day right?

K.W.        Um----

B.C.        Something like that cause that was the day we had the institutional shakedown up there, the day before.

K.W.        Yes.

B.C.        Yea.  Okay.  Alright.  Well I know that was short and sweet but that's what I needed.  So alright I'm gonna go ahead and end this at 11:49.

AD0C009047

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

BC/jew

AD0C009048

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

**STATEMENT OF INMATE VANDRICK THOMAS**
**SPECIAL AGENT BRIAN CASEY**
**SPECIAL AGENT BRADLEY ARLEDGE**

B.C.     Alright today is 3-15-19.  It is 1202 hours and I'm Agent Casey from St. Clair
         I&I.  With me is Agent Brad Arledge and uh Inmate Vandrick Thomas.  Just
         for record what you go by?  You go by Vandrick.

V.T.     Yea.  A lotta guys call me Bunkey though.

B.C.     Bunkey?

V.T.     Yea.  B-u-n-k-e- ----

B.C.     Alright I'll call you Bunkey.  You cool with that?

V.T.     It don't (INAUDIBLE).

B.C.     Alright Bunkey tell me your AIS man.

V.T.     148503.

B.C.     Alrighty.  Now look because I don't know what the hell role anybody is
         playing in any of this stuff.  Alright this is just to kina cover all of our uh rear
         ends on this.  What is this, what's your uh birthday?

V.T.     ███████

B.C.     ███████        Alright I'm gonna read you these Miranda.  Okay you got questions
         about this just ask me cause I ain't here to mess you over okay?  But the reason
         I'm reading these to you cause you know you read these to suspects right?  All
         I know is they got you put in seg and your name came up in this thing with this
         homicide case.  I'm not saying you done anything wrong, shit you mighta been
         a witness they hemmed up wrong.  Right?  But I gotta ask you some questions

AD0C009049

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

and just to make sure we understand each other cause of what I do and where you're at and all that stuff we cover each other okay?

V.T.        I understand.

B.C.        Alright so you can read right?

V.T.        Yes.

B.C.        Alright so just read along with me here.  Before I ask you any questions, I must explain to you that you have the right to remain silent. Anything you say can be used against you in court. You have the right to the advice and presence of a lawyer even if you cannot afford to hire one.  If you cannot afford to hire a lawyer and you wanna have one present during this interrogation, the court will appoint you one before questioning. If you wanna answer questions you can do so, but you can stop at any time.  You understand that?

V.T.        Yes sir.

B.C.        Got any questions about it?

V.T.        No sir.

B.C.        Alright.  Below there's a Waiver that says I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone.

V.T.        Yes sir I understand.

B.C.        You good with it, oh shit big table uh I'll hold that for you man.

V.T.        Sign it right here or right there, which one?

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C. Right here.  Right there.  Alright that'll work.  So tell me what you know about this homicide.  We'll just let you start and then I'll ask questions.

V.T. All I know is that, that, the cube officer, she called us for chow.  Call, call L-block for chow and we was coming out and as I was turning the door to come out I see this dude stabbing a guy you know so I, as he was stabbing, when he was stabbing the guy I ran back to the block that's how a little spot of blood got on my pants right there.

B.C. That's the spot of blood on your pants?

V.T. In, in that little spot right there and then I had a coat on and then I had a little spot, about two (2) or three (3) little spots on it.

B.C. Okay I wanna get a picture of that.

V.T. Okay.

B.C. But not now.  We'll do it before we leave.  I got the recording going.  Um we'll get that.  Okay so you saw the guy stab Mullins?

V.T. Yea I seen him.

B.C. You know who he was?

V.T. I don't know neither one (1) of em.  But I seen a guy stab him, I seen the black guy stabbing him.  I see his picture I can identify his picture but I don't know him by name, I don't know the other guy by name.

B.C. Okay.  Alright um I'll get you a picture before we leave here okay?

V.T. Yes sir.

B.C. Um did he say anything?  I mean----

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

V.T.        No I don't, I don't know what it steemed from or where it came from.  We had just got off of work.  See I work in ACI----

B.C.        Give me a couple of pictures similar to that Brad.

V.T.        ----I work in ACI and uh when the lady called chow we just went out and uh when I was going out the door, like I said when I was going out the door I just seen the dude stabbing a dude and the, and the woman in the cube she seen it too.  You know I ain't, I ain't, I don't get in no trouble, I don't get in nobody's business.  I been here twenty-three (23) years.

B.C.        Ahuh.

V.T.        And all I do is work.  I work in the kitchen.  I work in ACI and if you, you could look at my jacket, I don't, I ain't never had a stabbing case.  I ain't never wanted to do nothing to harm nobody.  But uh I don't know nothing, why it happened or why he did it or none a that.

B.C.        So they locked you up here because of why?

V.T.        They locked me up because the uh----

B.C.        The blood?

V.T.        ----little blood on my, I had a little spot of blood on my coat, on my sleeve.

B.C.        So you was just that close to where you got the blood on you?

V.T.        Yea.  See when, when the dude was stabbing him, when the dude was stabbing the dude he was right there by the cube door.  We was coming out, out of the door.

B.C.        Okay.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

V.T.    And when I came----

B.C.    So he was in the hallway?

V.T.    Yes sir.

B.C.    They popped that door, he come in and started popping?

V.T.    Yea that's how it happened.

B.C.    The white boy?

V.T.    And that's how the blood slung on my----

B.C.    So you was like standing like pretty much, hell right behind him?

V.T.    No.

B.C.    I mean the white guy?  I mean you was right there?

V.T.    Yea I was, I was standing by really by, by, by----

B.C.    By the white guy yea?

V.T.    ----the man and that's how the blood ended up getting on my pants right there, them two (2) little spots right there and about three (3) or four (4) little spots on my shin.

B.C.    What'd they do with your jacket?

V.T.    They thought, I gave it to the officer.  I don't know what they do with it.

AD0C009053

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.      Okay.  Alright, well shit I mean that's you know they, they, I read this report and you know I'm like okay I know that he supposedly said it was some dude name C.J. that stuck him.  Right?  So I see why they got two (2) C.J.'s in seg and I was like well why the hell they got----

V.T.      Because, that's how- Yes sir.

B.C.      No I know that but I mean I'm just trying to figure out cause it didn't really say in their report what the hell role you had in any of this.

V.T.      Yea that's how, that's why----

B.C.      You know?

V.T.      ----uh Captain White and them brung me over here cause I had a little, a little blood got on my arm.

B.C.      Yea better be safe than sorry though I guess you know?  I mean----

V.T.      Uh yes sir but I didn't know I was gonna be over here this long.

B.C.      Yea well you know man it, it, we did that shakedown and all that stuff----

V.T.      Yes sir.

B.C.      ----you know a couple weeks ago we did all that and they've had me running around and hell I hadn't all this information.  Today is really the first (1st) day I've had a chance to come talk to somebody.

V.T.      Yea I know y'all been pretty busy lately.

B.C.      So- I hate it you know we, that's uh the warden asked the other day but we didn't know who anybody played so I'm gonna go and talk to her when we leave here----

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

V.T. Yes sir.

B.C. ----and uh----

V.T. But then all the guys in the block will tell you that I ain't had nothing to do with it or know nothing about it.  Everybody over there in the block you know and they had and the guys in the block man uh they talked to Equal Justice about it and everything man.

B.C. Well look who, who over there in the block because I mean I ain't gonna go over there and tell anybody, I don't wanna just start pulling people because it's gonna look----

V.T. Yea you could----

B.C. ----suspicious and I know prison culture right?

V.T. Yea.

B.C. So if I were to come back another day and just randomly talk to somebody over there----

V.T. Yes sir.

B.C. ----you know who is gonna talk to me?

V.T. A guy name Shoney.

B.C. Shoney?

V.T. Yea his na-, they call him Shoney.  I can't, I can't think of his whole name.  They call him Shoney.  Then it's a guy name Willie Worm and it's a guy name Frederick Williams.

AD0C009055

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Alright they saw this?

V.T.        Yea and Jeffery Napier.

B.C.        Hold on.  You're gonna give me the whole block huh?

V.T.        Yes this is for real.

B.C.        Frederick what?

V.T.        Frederick William.

B.C.        And who was the last one (1)?

V.T.        Jeffery Nathium.

B.C.        Nathium?

V.T.        Yes.

B.C.        Okay.  Alright they'll talk?

V.T.        Yes sir.

B.C.        Alright.

V.T.        The whole block will for real you know.

B.C.        Well no that, that's what I heard when they locked up what C.J., you know C.J.?

AD0C009056

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

V.T.        Yes sir.

B.C.        Um so when they locked him up----

V.T.        Him and that guy uh him and the other guy uh practically got the same name. That's----

B.C.        Yea that's why they locked him up and it happened in L-dorm.

V.T.        Yes sir.

B.C.        You know?  So um----

V.T.        And that's where I was sleeping.  That's where both of us was sleeping at in L-dorm.  Me, me, the one (1) that got locked up----

B.C.        Was C.J. sleeping when that happened, do you know?

V.T.        I don't know----

B.C.        Okay.

V.T.        ----I couldn't say but I believe he was.  I can't just say it.

B.C.        Well that's, that's what the warden and them told me.  You know that everybody, they just couldn't tell me names but they're like all these----

V.T.        Yes sir.

B.C.        ----inmates coming up saying that C.J. was sleeping when it happened.

V.T.        Yes sir.

AD0C009057

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        And that's fine you know it's just, my whole thing is great.  So I got a suspect, I need to work through all of this and go ahead and make sure the guilty person gets charged----

V.T.        Yes sir.

B.C.        ----but at the same time you know if you innocent we gotta go ahead and prove that innocence right?

V.T.        Yes sir I'll be understanding.

B.C.        So who else was in line with you?

V.T.        Talking about going out?

B.C.        Yea.

V.T.        The whole block was coming out.  See when they----

B.C.        Naw I mean like who was, so you was behind Mullins, that's how you got the blood on you.  Who was like behind you?

V.T.        Those three (3) guys.  Tho, tho- ----

B.C.        Okay so----

V.T.        ----those three (3) guys right there.

B.C.        ----okay I'll, okay that's cool.  Okay well he's getting some pictures her----e

V.T.        Yes sir.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.     ----and as soon as he gets those pictures um cause I know what dude look like you know who I think it is.

V.T.     Yes sir.

B.C.     So uh I'll let you go ahead and point that out and hell they'll probably take you back over there for a minute till I can talk to the warden okay?

V.T.     Okay.

B.C.     I'll talk to the warden and Lt. Scott----

V.T.     Okay.

B.C.     ----and uh you know we'll go ahead and see if you can't get the hell outa there today.

V.T.     I sho appreciate that.  Then, then, then the majority----

B.C.     Hey but you was in the safest place for that shit.  They come through last night man.

V.T.     Yea.  I'm talking that stone.  Yea they said----

B.C.     I say that but hell how long you been at St. Clair?  You been here a minute?

V.T.     I been here twenty-three (23) years.

B.C.     Yea so you was here when that roof got tore off of damn seg too.

V.T.     Yes sir.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Probably freaking out about that shit huh?

V.T.        Yea I slept in the cell I'm in, the lightning was coming through there you know it kina scared me right.

B.C.        Man I tell you I was sitting out in my backyard yesterday fishing and you know them bass just wanting biting but shit I was trying.  And I ended up coming inside cause a damn mosquito flew in my eye ball.  And I walk in my bedroom and my wife and my son is in there and hell they watching something on National Geographic, something about chimpanzees or some shit cause my son is all into damn animals and uh my phone just starts going off and my wife asked me, she says is that an Amber Alert?  And I mean the birds outside singing you know and hell it look like it does today outside and I looked and I said hell there's a damn tornado warning right up the road.

V.T.        Yea see that tore a lotta power lines down.

B.C.        Well yea I know I seen it this morning coming into work.  Man I tried to get some pictures but they kina sucked.  It wouldn't uh I mean like, let's see if this damn thing will rotate.  There's some of em.  You know you kina gotta look in the background though but you see all them trees it knocked down----

V.T.        Yea I see them trees knocked down.

B.C.        ----back there in that pasture?  A whole bunch there.  It just, I think I got a really cool one (1) in here where it hit a damn barn.  See if I can't find that.  Yea man.  That's an old ass barn but I drive by this thing going to work every day and the roof was on it yesterday when I left.

V.T.        Yea.

B.C.        You know just peal that stuff off but it was, I mean hell that's the road to the prison right there.  You can see where they cleaned it up.

V.T.        Yea they had to clean it up, clean it up a little bit.

AD0C009060

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C. And I had all these people texting me.  Did you get outa there before the rain comes?  What the hell are you talking---- But it was just, I mean how close you come to stuff and don't even hell, you don't even, hell you don't even know.  I remember when I was a kid my grandfather lived like two (2) miles from our house and it was raining, pouring down rain at the house man.  It was so bad water had started coming up to the front door.  My mom and daddy moving furniture away from the door so it don't get wet when the water comes in and my momma calls my grandfather all worried and freaking out over this----

V.T. Yes sir.

B.C. ----and um my grandfather says two (2) miles away.  I said what the hell are you talking about?  The suns shining, I been out here cutting grass for the past two (2) hours is it raining?  I men just them scattered storms man they crazy.  Let me see if he's out here yet.  Uh he's trying to buy a house too.  My luck he's (INAUDIBLE).

V.T. He's trying to buy a house?

B.C. Yea.  He's probably got it strapped to his reality.

U.V. I'm sorry who's that?

B.C. Where's Arledge?

U.V. He walked, there he goes.  (INAUDIBLE).

B.C. Okay.  Good timing.

U.V. He was looking for you.

B.C. Okay.  Okay.  So I'm gonna present you with three (3) pictures okay?

V.T. Yes sir.

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.    When you see who it is that stabbed Steven Mullins I just want you to touch it. Okay?  Is it any one (1) of those three (3) guys?

V.T.    That guy.  Naw not, that's C.J. there.  That kina favor him right there.  That guy right there.

B.C.    That's the one (1)?

V.T.    Yea see kina favor.

B.A.    Favors him or looks like him?

V.T.    The picture kina black right?  But this look like him right here, this dude right here.

B.C.    Okay.

V.T.    It's either him or that one (1) right there.  This, this here, this dude he didn't have nothing to do with it.

B.C.    That ain't him?

V.T.    Naw he didn't have nothing to do with it.

B.C.    So we got it narrowed down to one (1) of these two (2) guys?  Right?  Okay.

V.T.    I would say it that though

B.C.    So which one (1), this one (1)?

V.T.    Yea that favor him, more like him right there.

AD0C009062

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

B.C.        Okay.

V.T.        That guy right there.  He have a skull cap on but when we went to the infirmary, they took all three (3) of us to the infirmary, that's him right there.

B.C.        That's him?  Okay.  Alright go ahead and throw your John Hancock down here on this one (1).  Just sign right there.

V.T.        Put my name on it?

B.C.        Yea.  Alright that'll work.  And that's what I need.  Just so I know which one (1) you identified on that one (1).  And uh just for the record uh Mr. Thomas did identify uh Clarence Jackson.  Alrighty.  Well that's what I needed man and like I said I'll talk to the warden here as soon as we get done with this okay?

V.T.        Ahuh.

B.C.        And we're gonna end this at 12:15.

BC/BA/jew

AD0C009063

# HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

| | | | | |
|---|---|---|---|---|
| DFS Case Type | 01 Death/Homicide | County of Offense | (59) St. Clair | Cross Ref Case(s) (if applicable) |
| Investigating Agency | Alabama Dept. of Corrections | | | |
| Investigating Officer | SENIOR AGENT BRIAN CASEY | Inv. Officer Agency Email | | |
| Agency Case No. | | Mailing Address City, State, Zip | | |
| Submitting Agency | Alabama Dept. of Corrections | Phone | | |
| Submitting Officer | SENIOR AGENT BRIAN CASEY | Submitting Officer Agency Email | | |

*Official agency email only. Personal email addresses cannot be accepted.*

| | | | |
|---|---|---|---|
| Charge | | Charge | Date of Offense (mm/dd/yyyy)   02/26/2019 |
| | Required for DC cases only | Required for DC cases only | |

| Type | Last Name | First | Middle | Sex | Race | |
|---|---|---|---|---|---|---|
| Suspect | JACKSON | CLARENCE | | M | B | |
| Decedent | MULLINS | STEVEN | ERIC | M | W | |
| | | | | | | |
| | | | | | | |

**BRIEF HISTORY OF CASE:**

According to staff reports, on Tuesday, February 26, 2019, at approximately 1745 hours, Inmate Stephen Mullins (AIS: W 175255) was the victim of an assault. Officer (Ofc) Brandy Smith, a correctional officer working overtime at the St. Clair Correctional Facility's (SCCF) "L" reported that as she opened the door to the dorm's "L2" side, she heard a loud bang. Ofc Smith turned and saw Inmate Mullins fall to the floor and noticed the inmate bleeding severely. She then notified SCCF staff, which responded and escorted Inmate Mullins to the prison's infirmary. Before losing consciousness, Inmate Mullins reportedly identified to Captain (Cpt) Kevin White and Lieutenant (Lt) Antoine Price, Inmate Clarence Jackson (AIS: B 249273) as his assailant. Inmate Mullins later died while at the University of Alabama Hospital in Birmingham.

**DESCRIPTION OF EVIDENCE SUBMITTED** (to include location of recovery):
(Additional items can be included on a separate attached page)

**SERVICE REQUESTED:** *

**1 X PAIR OF SUSPECT'S TAN BOOTS WITH POSSIBLE BLOOD STAINS FROM VICTIM**  ☐ DC ☐ FA/TM ☐ FB ☒ FD ☐ TX

☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX
☐ DC ☐ FA/TM ☐ FB ☐ FD ☐ TX

* DC – Drug Chemistry, FA/TM – Firearms/Tool Marks, FB – Forensic Biology , FD – Fire Debris, TX - Toxicology

**ADDITIONAL EXAMINATION REQUESTED:**

**SEAL ALL EVIDENE AND COMPLETE THIS FORM PRIOR TO SUBMISSION**

⚠ **NOTICE**

Evidence is processed in accordance with ADFS standard procedures. As a condition for submission of evidence to be worked by ADFS, the submitter accepts the agreement that deviation from test or calibration methods may occur when determined by ADFS to be technically justified, and that evidence may be processed at any ADFS facility or by a competent ADFS subcontractor.

*For ADFS Use Only*
AD0C009064

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

# EVIDENCE FORM

**INSTITUTION:** Saint Clair Correctional Facility        **CASE NUMBER:**

**DATE:** 3/1/19        **TIME:** 8 45 p

**LOCATION FOUND:** VAB Hospital Room 9508

**VICTIM(S):** Steven Mullins ʷ/175-235.x

**OFFENSE(S):**

**SUSPECT(S):**

**TYPE OF EVIDENCE:** ONE Body        ONE medical Jacket

**DESCRIPTION OF EVIDENCE:**

**CHAIN OF EVIDENCE:**        (Signature) _____

DATE: _____        TIME: _____

(Signature) _____

DATE: _____        TIME: _____

(Signature) _____

DATE: _____        TIME: _____

(Signature) _____

DATE: _____        TIME: _____

(Signature) _____

DATE: _____        TIME: _____

**INVESTIGATOR:**

## ALL EVIDENCE MUST BE PROPERLY SEALED AND SIGNED FOR.

ANNEX B TO SOP 306-1
Page 1 of 1

AD0C009065

**HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY**

Case 

**Law Enforcement Services Division**
**301 South Ripley St**
**Montgomery, AL 36104**

Friday, May 20, 2022

Page: 1/2

| 302 Case # | SCCF-19-00270 | Tracking No. | 3791 |
|---|---|---|---|
| Received From | | ████████████████ | |
| Item# | 1  Of  6 | Number of Phones | 0 |
| Suspect Name | CLARENCE JACKSON ████ | Offense | MURDER |
| Victim / Complainant | STEVEN MULLINS (175255) | Reason Seized | |
| Original Date of Recovery | 3/15/2019 | Case Agent | CASEY |
| Specfic Recovery Location | INMATE VANTRICK THOMA | Received From | CHAPMAN |
| Temporary Location | | Evidence Room Location | N. 2019 MISCELLANEOUS |
| Evidence Description | CLOTHING- (1) SEALED PAPER BAG CONT. CLOTHES OF INMATE THOMAS, WITH POSS. BLOOD OF INMATE MULLINS | | |

| In From: CHAPMAN | Received By: Brian Casey | Date In: Mar 18 2019  8:46AM |
|---|---|---|

| 302 Case # | SCCF-19-00270 | Tracking No. | 3792 |
|---|---|---|---|
| Received From | | ████████████████ | |
| Item# | 2  Of  6 | Number of Phones | 0 |
| Suspect Name | CLARENCE JACKSON ████ | Offense | MURDER |
| Victim / Complainant | STEVEN MULLINS (175255) | Reason Seized | |
| Original Date of Recovery | 3/15/2019 | Case Agent | CASEY |
| Specfic Recovery Location | C-48, BELONGING TO INMA | Received From | CHAPMAN |
| Temporary Location | | Evidence Room Location | N. 2019 MISCELLANEOUS |
| Evidence Description | CLOTHING- (2) KNIT CAPS OF JACKSON | | |

| In From: CHAPMAN | Received By: Brian Casey | Date In: Mar 18 2019  8:58AM |
|---|---|---|

| 302 Case # | SCCF-19-00270 | Tracking No. | 3793 |
|---|---|---|---|
| Received From | | ████████████████ | |
| Item# | 3  Of  6 | Number of Phones | 0 |
| Suspect Name | CLARENCE JACKSON ████ | Offense | MURDER |
| Victim / Complainant | STEVEN MULLINS (175255) | Reason Seized | |
| Original Date of Recovery | 3/15/2019 | Case Agent | CASEY |
| Specfic Recovery Location | SEGREGATION PROPERTY | Received From | CHAPMAN |
| Temporary Location | | Evidence Room Location | N. 2019 MISCELLANEOUS |
| Evidence Description | CLOTHING- (1) PR. BROWN BOOTS WORN BY JACKSON W/ POSS. BLOOD | | |

| In From: CHAPMAN | Received By: Brian Casey | Date In: Mar 18 2019  9:01AM |
|---|---|---|

| Out To: ADFS | Received By: B. CASEY | Out Date: Mar 19 2019 12:11PM | Reason Out: FORENSIC BIOLOGY |
|---|---|---|---|

| In From: ADFS | Received By: Brian Casey | Date In: May 27 2020 11:47AM |
|---|---|---|

AD0C009066

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



**Law Enforcement Services Division**
**301 South Ripley St**
**Montgomery, AL 36104**

Friday, May 20, 2022

Page: 2/2

| | | |
|---|---|---|
| **302 Case #** | SCCF-19-00270 | **Tracking No.** 4382 |
| **Received From** | | |
| **Item#** | 4    **Of**    6 | **Number of Phones** 0 |
| **Suspect Name** | CLARENCE JACKSON | **Offense** MURDER |
| **Victim / Complainant** | STEVEN MULLINS (175255) | **Reason Seized** |
| **Original Date of Recovery** | 3/15/2019 | **Case Agent** CASEY |
| **Specfic Recovery Location** | ADFS HUNTSVILLE | **Received From** ADFS HUNTSVILLE |
| **Temporary Location** | | **Evidence Room Location** N. 2019 MISCELLANEOUS |
| **Evidence Description** | MISCELLANEOUS- (1) SEALED WHITE ENVELOPE REPORTED TO CONT. FINGERPRINTS AND PALMPRINTS OF MULLINS | |

**In From: CHAPMAN**        **Received By: Renee Hill**    **Date In: Jun 24 2019 10:42AM**

| | | |
|---|---|---|
| **302 Case #** | SCCF-19-00270 | **Tracking No.** 4383 |
| **Received From** | | |
| **Item#** | 5    **Of**    6 | **Number of Phones** 0 |
| **Suspect Name** | CLARENCE JACKSON | **Offense** MURDER |
| **Victim / Complainant** | STEVEN MULLINS (175255) | **Reason Seized** |
| **Original Date of Recovery** | 3/15/2019 | **Case Agent** CASEY |
| **Specfic Recovery Location** | ADFS HUNTSVILLE | **Received From** ADFS HUNTSVILLE |
| **Temporary Location** | | **Evidence Room Location** N. 2019 MISCELLANEOUS |
| **Evidence Description** | MISCELLANEOUS- (1) SEALED WHITE ENVELOPE REPORTED TO CONT. FINGERNAIL CUTTINGS OF MULLINS | |

**In From: CHAPMAN**        **Received By: Renee Hill**    **Date In: Jun 24 2019 10:43AM**

| | | |
|---|---|---|
| **302 Case #** | SCCF-19-00270 | **Tracking No.** 5766 |
| **Received From** | | |
| **Item#** | 6    **Of**    6 | **Number of Phones** 0 |
| **Suspect Name** | CLARENCE JACKSON | **Offense** MURDER |
| **Victim / Complainant** | STEVEN MULLINS (175255) | **Reason Seized** |
| **Original Date of Recovery** | 3/15/2019 | **Case Agent** CASEY |
| **Specfic Recovery Location** | ADFS HUNTSVILLE | **Received From** ADFS HUNTSVILLE |
| **Temporary Location** | | **Evidence Room Location** N. 2019 MISCELLANEOUS |
| **Evidence Description** | BIOLOGICAL- (1) SEALED WHITE ENVELOPE REPORTED TO CONT. BLOODSTAIN CARD OF MULLINS | |

**In From: CHAPMAN**        **Received By: Brian Casey**  **Date In: May 27 2020 12:13PM**

AD0C009067

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

# EVIDENCE FORM

**INSTITUTION:** St Clair C F

**DATE:** 3-16-19    **TIME:** 1246    **CASE NUMBER:** 19-03126

**LOCATION FOUND:** On Person of Vantrick Thomas

**VICTIM:** Stephen Mullins (W 195266)

**OFFENSE:** Murder

**SUSPECT(S):** Vantrick Jackson (B 249276)

**TYPE OF EVIDENCE:** Clothing

**DESCRIPTION OF EVIDENCE:** Inmate Pants & Shirt with Victim's Blood From Assault

**CHAIN OF EVIDENCE:**
(SIGNATURE) *Inmate Vantrick Thomas    DATE: 03/16/19    TIME: 1246

(SIGNATURE) [signature]    DATE: 03/16/19    TIME: 1246

(SIGNATURE) _____    DATE: _____    TIME: _____

(SIGNATURE) _____    DATE: _____    TIME: _____

(SIGNATURE) _____    DATE: _____    TIME: _____

**INVESTIGATOR:** [signature]

**ALL EVIDENCE MUST BE PROPERLY SEALED AND SIGNED FOR.**

AD0C009068

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009069

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009070

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009071

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009072

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009073

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009074

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009075

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009076

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009077

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009078

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009079

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009080

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY



AD0C009081

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY













HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
