FILED
2025 Mar-05  PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# ST. CLAIR CORRECTIONAL FACILITY MONITOR'S REPORT ON NON-COMPLIANCE

*November 1, 2017 through March 1, 2019*

*Equal Justice Initiative*
*April 10, 2019*

CONFIDENTIAL                                          ADOC-DS019024

**ST. CLAIR CORRECTIONAL FACILITY
MONITOR'S REPORT ON NON-COMPLIANCE**

| SECTION | Page |
|---|---|
| I. OVERVIEW | 1 |
| II. CLASSIFICATION | 2 |
| 1. Population Cap | 2 |
| 2. ICB | 4 |
| 3. Intake | 6 |
| 4. SSU | 6 |
| 5. BMU | 8 |
| 6. Suspicious Injuries | 9 |
| 7. Staffing | 10 |
| 8. Elderly Inmates | 11 |
| III. CORRECTIVE ACTION SYSTEM | 11 |
| 9. IMS | 11 |
| 10. Incident Reporting | 13 |
| 11. QIT | 15 |
| 12. Institutional Investigation | 19 |
| 13. Cameras | 23 |
| IV. PHYSICAL PLANT | 23 |
| 14. Physical Plant | 23 |
| V. CONTRABAND | 25 |
| 15. Contraband | 25 |
| VI. PREA | 27 |
| 16. PREA | 27 |
| EXHIBIT INDEX | 31 |

**MONITOR'S REPORT ON NON-COMPLIANCE**

## I.    OVERVIEW

On November 1, 2017, the Alabama Department of Corrections (ADOC) and EJI entered into a Settlement Agreement (the "Agreement") to establish two new remedial systems at St. Clair Correctional Facility: internal classification and corrective action processes centered around the establishment of a Quality Improvement Team (QIT). Plaintiffs were designated as Monitors of the Agreement, and national experts in corrections management, Dr. James Austin, Richard Stalder, and Ken McGinnis, were identified by both parties to implement the remedies from the Agreement. The deadlines for implementation of these systems were staggered, with the goal of having full implementation of the Agreement by July 1, 2018.

To date, the Department has failed to implement a number of critical components for both systems. Although the Department has attempted to comply with aspects of both systems, their failure to fully and adequately implement all components of these systems has resulted in what amounts to a non-functioning internal classification system or corrective action process. Accordingly, the Department is not in compliance with the Agreement. The purpose of this Report is to detail the Department's non-compliance.

As early as February 2018, Plaintiffs, acting in their agreed-upon role as monitors to the Agreement, were concerned that the Department was not on track to implement the Agreement on schedule. At that time ADOC requested an extension of their deadlines but did not explain why this was necessary. Plaintiffs alerted ADOC that this was unacceptable and expressed concern about the risk to the Agreement and the ongoing threat to security at St. Clair. Plaintiffs first alerted the Department to their non-compliance with the Agreement in May 2018. ADOC had already missed a number of critical deadlines by that point, and Plaintiffs were concerned about the Department's ability to fully implement the Agreement by July 1, 2018. The parties have been in mediation since that point.

1

## II.    CLASSIFICATION

**1.    Failure to Consistently Adhere to the Population Cap. Agreement, ¶¶ 9-14.**

The Settlement Agreement requires that the inmate population at St. Clair not exceed "90% capacity of the beds in the blocks and dorms in the main camp that remain operational." Agreement, ¶ 11. The Agreement also provides that where the inmate population exceeds the population cap, the Department will "notify the Plaintiffs' counsel of this fact and provide an explanation for the cause in writing" within seven (7) calendar days. Agreement, ¶ 13. In the event that the population cap is exceeded, "within thirty (30) calendar days the Defendants will present to the Plaintiffs' counsel their detailed plan to return the population to at or below the agreed upon cap and will consider any recommendations made by the Plaintiffs' counsel to achieve this result." Agreement, ¶ 13.

The population cap became effective on April 30, 2018. Agreement, ¶ 14. Throughout the monitoring period, the Department has consistently identified the population cap under the Agreement at 787 inmates.[1] Since May 1, 2018, the population cap has been exceeding all but one month, and has been exceeded more often than it has been adhered to:

May 1, 2018........................844 inmates (**57 over cap**)
June 1, 2018........................845 inmates (**58 over cap**)
July 1, 2018.........................796 inmates (**9 over cap**)
August 1, 2018....................798 inmates (**11 over cap**)
September 1, 2018...............776 inmates (11 under cap)
October 1, 2018...................794 inmates (**7 over cap**)
November 1, 2018...............779 inmates (8 under cap)
December 1, 2018................792 inmates (**5 over cap**)
January 2, 2019....................782 inmates (5 under cap)
February 4, 2019..................787 inmates (at cap)
February 25, 2019................791 inmates (**4 over cap**)

---

[1]The Plaintiffs maintain that the population cap has been less than 787 inmates when portions of housing units were not being used or cells were offline for extended periods of time. For example, on July 10, 2018, when N Block and O Block remained closed and 36 cells in C Block had been closed for the foreseeable future, the rated capacity for the prison needed to be adjusted and St. Clair needed to house 754 of fewer inmates to be in compliance with the population cap. Thus, on July 10, 2018, where there were 777 inmates at St. Clair, the prison was 23 inmates over the population cap.

2

Beginning March 4, the Department began to report that it had transferred a significant number of men and was well below the cap, however there are also indications that the prison has shut down an entire general population housing unit. Plaintiffs have visited the facility, spoken with men at the prison, and received documents that indicate at least 48 beds, or one half of one housing block, is currently depopulated. The closure of an entire unit would dramatically lower the current population cap and would raise questions about the Department's reports of compliance.

Further, the Department has not consistently notified Plaintiffs' counsel when the inmate population has exceeded the population cap at St. Clair or its plans for returning the population below the cap as required by the Agreement. Where the Department has provided notice, it has not been within the agreed upon time frame of seven (7) calendar days. For example, notice was required by May 7, 2018, when the inmate population exceeded the population cap at St. Clair. On May 9, 2018, the Department gave notice via email that St. Clair's population exceeded the agreed upon cap. The Department stated that the excess was caused by the transfer of inmates away from Draper Correctional Facility after it was closed, and the closure of two general population blocks at St. Clair (N Block and O Block) for renovations. As required by the Agreement, the Department agreed to provide its plan for returning the inmate population at or below the cap by May 31, 2018.

The May 31 deadline was not met. On June 20, 2018, inmates were assigned to 95% of all beds in available housing units considered under the cap. The Department stated on June 25, 2018, that in order to comply with the population cap, St. Clair intended to open all or part of the closed N Block and O Block. However, an email from Bart Harmon to Plaintiff's counsel on June 29, 2018, stated that N Block and O Block remained closed[2] and that the prison was reducing its population by transferring inmates to Limestone and Donaldson Correctional Facilities. Even after those transfers, on July 3, 2018, the prison's population exceeded the maximum allowable under the cap by 7 inmates.

Experts James Austin and Richard Stalder agreed that a population cap was essential to implementing an operational internal classification system at St. Clair and moving away from a practice of assigning inmates to housing units based on open bed space. The Department's failure to consistently adhere to the population cap has impeded full implementation of the internal classification system and has had direct consequences that impact the safety and security of the prison. Restrictive housing continues to be run at full capacity. This undermines the prison's ability to punish inmates in population. The lack of bed space in the Special Safety Unit, described more fully below, further limits the space

---

[2]N Block and O Block remain closed today.

3

                                          ADOC-DS019028

available in restrictive housing and contributes to the prison releasing inmates to population who are in need of heightened protection. The prison frequently only has bed space available in P Block and Q Block which leads to inmates being released from restrictive housing directly into the most violent, disruptive housing units in the prison. These conditions have contributed to the ongoing crisis at St. Clair and the Department's failure to consistently adhere to the population cap has undermined the efficacy of the Agreement as a whole.

**2.    Failure to Adequately Implement the Internal Classification Board. Agreement, ¶¶ 17-22.**

The Settlement Agreement provides for the formation of an Internal Classification Board ("ICB") that includes a correctional captain or above, a classification specialist, and a psychological associate or representative designee that have the "sole authority to originate or change housing, program, and job assignments" at St. Clair. Agreement, ¶¶ 17, 19. The ICB is required to meet at least weekly and can be convened based on urgent need. Agreement, ¶ 18. Full implementation of the ICB was required by April 30, 2018. Agreement, ¶ 22.

The ICB SOP (SOP #126) was finalized and signed by Warden Jones on August 13, 2018, but failed to comply with the Agreement as follows:

1.    The SOP provides that the "shift supervisor has the authority to make emergency housing/bed changes." SOP #126(V)(3)(a). This provision is contrary to the Agreement which mandates that only the ICB "controls inmate housing assignments to, out of, and between housing units" and only the "Warden III or his designee can override an inmate's housing assignment." Agreement, ¶¶ 19, 20(e)-(f).

2.    The Agreement requires that the SOP "[d]etail[] the circumstances under which the Warden III or his designee can override an inmate's housing assignment," and provide forms or a mechanism of review for warden overrides. Agreement, ¶ 20(f)-(g). The SOP does not address these circumstances or include such forms.

3.    The SOP does not provide that a "Classification Review Board Analyst will quarterly audit the Board's housing assignments and Warden overrides to ensure that the internal classification process is operating properly and will provide that audit to the SCCF Quality Improvement Team," as required by Agreement, ¶ 20(h).

4.    The Agreement requires that the SOP include "monitoring, supervising, and auditing instruments, and transfer request forms (recording inmate requests for housing, program, and work assignment transfers)." Agreement, ¶ 20(j). No

4

such instruments or forms are included with the SOP or have been drafted.

5. The Agreement requires that the SOP provide "to the extent practicable, inmates hous[ed] in administrative segregation for their protection shall be assigned to grouped cells." Agreement, ¶ 20(I). The SOP does not include this provision.

6. The SOP does not define "the interaction between the ICB and the enemy validation committee," as required by Agreement, ¶ 20(l).

The ICB's operations are also not in compliance with the Agreement or the SOP. After site visits to St. Clair since the formation of the ICB, experts James Austin and Richard Stalder informed the Department in a meeting on February 14, 2018, that the ICB was not completing its duties and was unable to do so because of staffing deficiencies at St. Clair. See infra Section 7, Failure to Assess Staffing Problems and Develop Staffing Solutions. Specifically:

1. The ICB is not consistently meeting weekly or reviewing inmates assigned to restrictive housing every 90 days to consider release from restrictive housing as required by the Agreement and SOP. Agreement, ¶ 18; SOP # 126(V)(E)(9).

2. There have been no quarterly audit of ICB housing assignments and warden overrides provided to the Quality Improvement Team, in violation of Agreement, ¶ 20(h). Under the Agreement, there should have been at least three quarterly audits at this point and, even under the delayed implementation of the ICB, at least two audits.

3. The Agreement requires that the Department define "a practical mechanism and schedule for the [ICB] to generally monitor and evaluate program participation and idleness at SCCF using existing IMS capabilities." Agreement, ¶ 21. The ICB has done no monitoring or evaluation of program participation and inmate idleness at St. Clair.

Throughout litigation and mediation, the Department was put on notice that the lack of an internal classification system at St. Clair was directly contributing to the serious risk of violence at the prison. Prior to the Agreement, housing decisions were made at St. Clair strictly on the basis of available bed space. The prison did not evaluate an individual's classification profile in making bed assignments and failed to incorporate an individual's security needs into where they were assigned within the prison. The Department committed to developing an internal classification system that would account for these needs with the Agreement, and was put on notice that a functioning internal classification system was only possible with a functioning ICB. The ICB's operations were undermined from the beginning where the Department's SOP did not comply with the Agreement. The ICB's operations since August 2018 have demonstrated further noncompliance and an ineffectual internal

5

                                    ADOC-DS019030

classification system.

St. Clair continues to rely on a space available bed assignment system. The open bed space most commonly is found in P/Q housing units, two blocks that the prison manages as hot bay disciplinary units. This leads to the assignment of inmates with heightened safety concerns to P/Q despite clear indications that they are particularly vulnerable and at serious risk of violence in those units.

The consequences have been deadly. In the case of Steven Mullins, who was killed in a stabbing that occurred at St. Clair on February 26, 2019, it is clear that the prison did not account for the background of his risk of violence from unknown enemies, including his "problems with gang members," when they released him from restrictive housing to general population. Mr. Mullins was placed in Q-2 Block, a housing unit with rampant gang activity and that has been associated with a heightened risk of violence and extortion. Mr. Mullins reported being assaulted on February 25, 2019, while living in Q-2. SCCF-19-00259. Despite his report, Mr. Mullins remained in population and was killed the following day.

**3.      Failure to Maintain the Intake Unit. Agreement, ¶¶ 23-27.**

The Settlement Agreement provides for the establishment of a 12 bed, single-man cell intake unit at St. Clair to house inmates for up to fourteen (14) calendar days when they arrive at the prison, during which time they will be assessed and further classified for appropriate housing placement by the ICB. Agreement, ¶ 23. Full implementation of the Intake Unit was required by April 30, 2018. Agreement, ¶ 22.

The Intake Unit SOP (SOP #127) was finalized and signed by Warden Jones on August 13, 2018, and designated the 12 single-man cells in A-1 Block for the "Intake Unit." However, sometime between September 17 and October 15, 2018, the Intake Unit in A-1 Block was disbanded due to a lack of bed space and need to expand the Special Safety Unit from 12 to 24 beds. Since then, a new Intake Unit has not been established and inmates transferred to St. Clair are being placed wherever there is open bed space in segregation.

**4.      Failure to Adequately Implement the Special Safety Unit. Agreement, ¶¶ 28-34.**

The Settlement Agreement requires that the Department establish a Special Safety Unit ("SSU"): "a 48 bed unit dedicated to housing inmates at SCCF that have heightened safety needs." Agreement, ¶ 28. Full implementation of the SSU was required by April 30, 2018. Agreement, ¶ 34.

The SSU SOP (SOP #128) was finalized and signed by Warden Jones on August 13,

6

2018, and provides for "a 48-bed unit dedicated to housing inmates that have heightened safety needs." SOP #128(III)(A). However, the Department has yet to allocate a 48-bed unit at St. Clair for the SSU. The SSU was initially located in A-2 Block and only included 12 beds. Because 12 beds did not satisfy the Agreement or provide enough bed space for dozens of inmates in restrictive housing at St. Clair for their protection, Plaintiffs urged the Department to adhere to the Agreement and expand the number of beds in the SSU. In response, sometime between September 17 and October 15, 2018, A-1 Block was designated as further SSU housing and the SSU was then composed of a total of 24 beds.

Plaintiffs continued to urge the Department to adhere to the Agreement and allocate 48 beds for the SSU in the following months. On November 2, 2018, Plaintiffs' counsel sent a list of 54 inmates at St. Clair with heightened security needs to the experts and Department. Of those 54 inmates, 30 of them were not in the SSU and were being housed in restrictive housing for their protection. On November 20, 2018, Plaintiffs' counsel sent an updated list to the experts and Department that included 68 inmates at St. Clair with heightened safety needs. Of those 68 inmates, 38 of them were not in the SSU and were being housed in restrictive housing for their protection.

On November 29, 2018, the Department provided the ICB's review of Plaintiffs' counsel's lists of inmates with heightened safety needs at St. Clair. The ICB review found that the current SSU was at capacity with 24 inmates being housed there. The ICB agreed that at least 19 additional inmates identified by Plaintiffs' counsel needed placement in the SSU.[3] At least four of those inmates had been on a backlog for SSU placement since July 2018. Thus, as of November 29, it was undisputed that there was a present need at St. Clair for at least 43 SSU beds.

Steven Mullins was among the 19 men identified by Plaintiffs' counsel and the ICB as having heightened security needs and was flagged for placement in the SSU. However, he was never placed in the SSU and was instead released to general population weeks before he was murdered. Mr. Mullins was originally placed in segregation in July 2018 following a report that he feared for his life from unknown inmates. At that time, he had injuries to his face indicating that he had been assaulted. SCCF-18-00891. Mr. Mullins was held in restrictive housing for at least the next six months. Throughout that time, Mr. Mullins was consistently identified as being held for protective reasons, without any disciplinary

_____

[3]Plaintiffs' counsel had identified 16 other inmates with heightened safety needs who were not included in the ICB's review. Had the ICB evaluated those 16 inmates, it is probable that there would have been more than 19 inmates at St. Clair in need of placement in the SSU.

CONFIDENTIAL                    ADOC-DS019032

infraction documented by the prison as the basis for his placement in restrictive housing. See St. Clair Seg. Map #C42 (September 10, 2018); St. Clair Seg. Map #C42 (December 17, 2018). Plaintiffs' counsel followed up on Mr. Mullins's placement in restrictive housing with expert James Austin in early December 2018 and observed that he was still being housed in restrictive housing for his own protection as of December 17, 2018, and in late January 2019. See St. Clair Bed Roster #C42 (January 23, 2019). Mr. Mullins was again flagged by Plaintiffs' counsel for placement in the SSU in February 2019.

The Department's failure to adhere to the Agreement's requirement that the SSU include 48 beds and the lack of available bed space in the SSU directly undermined Mr. Mullins's placement in a housing unit consistent with his classification needs. Even after Mr. Mullins's death, the SSU remains at full capacity with 24 beds. As a result, inmates in need of protective housing remain in restrictive housing and at risk of being released to general population as Mr. Mullins was.

Additionally, the existing 24-bed SSU's operations have not complied with the Agreement. A core purpose of establishing the SSU was to ensure that inmates who have heightened safety needs are not placed in punitive restrictive housing conditions as had been the practice at St. Clair for years. However, inmates assigned to the SSU have repeatedly reported to Plaintiffs' counsel that the privileges of inmates in the SSU–as outlined in Agreement, ¶ 31, and SSU #128(V)(C)–are inconsistently provided and that the conditions in A Block are at times indistinguishable from the conditions in restrictive housing with respect to out-of-cell and exercise time, access to phones and visitation, and access to the library and programming. The experts and Plaintiffs' counsel have been unable to obtain reliable records from the Department to audit the functioning of the SSU, but have noted these concerns and noncompliance to the Department.

## 5.    Failure to Implement the Behavior Modification Unit. Agreement, ¶¶ 35-45.

The Settlement Agreement provides for the establishment of a Behavior Modification Unit ("BMU") "in one side of one cellblock" at St. Clair to "house inmates that the [ICB] has determined require behavior modification programming and should not be housed in general population." Agreement, ¶¶ 35-36. Inmates assigned to the BMU were "to receive a recommended case plan" and an explanation of "why he is assigned to this unit, the expectations for that inmate, and what will result in the inmate's being reassigned to a different unit." Agreement, ¶ 38. Further, a case manager or program specialist shall make rounds in the BMU and provide monthly interviews in a confidential setting "to evaluate the inmate's progress and determine if his case plan needs to be modified." Agreement, ¶ 40. Full implementation of the BMU was required by June 29, 2018. Agreement, ¶ 45.

8

The BMU was envisioned as a step up/step down housing unit that would alleviate the problems created by lack of open bed space in segregation and ensure that inmates with serious disciplinary histories were not released directly from restrictive housing to general population without behavior modification programming. Experts James Austin and Richard Stalder made clear throughout mediation that establishment of a BMU was critical to an effective internal classification system at St. Clair.

The BMU has not been implemented at St. Clair and the Department has consistently claimed that it cannot satisfy this provision of the Agreement under current staffing levels at St. Clair. See infra Section 7, Failure to Assess Staffing Problems and Develop Staffing Solutions. In an attempt to salvage this core component of the agreed-to internal classification system, experts James Austin and Richard Stalder proposed that St. Clair establish a Restrictive Housing Unit ("RHU") with provisions that aligned with the agreed-to BMU. The experts assisted the Department with drafting a "Restrictive Housing Program" SOP but a draft has yet to be finalized and signed, and implementation has not been achieved. Restrictive housing at St. Clair remains at capacity or near capacity daily. As a result, St. Clair staff continues to be limited in their ability to punish inmates with restrictive housing placement when they commit disciplinary infractions. Further, inmates with serious disciplinary histories continue to be released from restrictive housing to general population without behavior modification programming.

**6.     Failure to Implement Corrective Action Regarding Inmates with Suspicious Injuries. Agreement, ¶¶ 46-47.**

Staff at St. Clair frequently fail to investigate incidents where men have suspicious injuries to determine whether the individuals were assaulted. Plaintiffs requested that St. Clair implement protocols that would trigger mandatory referral and investigation for such incidents because of the risk that even minor incidents of violence can lead to more serious assaults. Agreement, ¶¶ 46-47. On August 24, 2018, Plaintiffs requested an update from the experts on the status of the SOP.[4] At that time, ADOC indicated that they were still working on the SOP. Plaintiffs have not received any relevant SOP's or received any information regarding updated training indicating that ADOC has implemented the mandatory referral process.

The failure to implement this process directly contributes to an ongoing serious risk of harm at the facility. For example, on December 18, 2018, ███████████████████ ███████ was observed by staff bleeding from wounds to his arm, forehead, and the back of

---

[4]Ex. 10, EJI Email and Memo to Ken McGinnis, Aug. 24, 2018.

CONFIDENTIAL                                                ADOC-DS019034

his neck. SCCF-18-01620 (On Dec. 18, 2018.) After he claimed that he fell and cut himself, staff failed to investigate further, despite his body chart documenting that his wounds were consistent with lacerations from a knife-like weapon. ███████████ was again observed with a suspicious injury on February 16, 2019, when officers saw him with blood on his ear. SCCF-1900221. Although he claimed he tripped and fell, officers failed to investigate whether this incident and the December incident were actually caused by assaults from other inmates. Less than a week after this more recent incident, ███████████ separately reported that he was first extorted, then sexually assaulted, on February 18 than on February 22. SCCF-1900230, SCCF-1900250. The facility's failure to investigate the two earlier incidents directly contributed to ███████████ subsequent assault.

7.    **Failure to Assess Staffing problems and Develop Staffing Solutions. Agreement, ¶¶ 50-51.**

During mediation Defendants committed to implement the Settlement Agreement and believed that their staffing level at the time of settlement negotiations would be sufficient. Defendants further agreed to request a staffing analysis from the National Institute of Corrections that would assess the Department's staffing problems at St. Clair and would seek to implement "solutions related to staff hiring and retention." Agreement, ¶ 51. Defendants agreed to request this analysis by January 1, 2018. Defendants have not made this request, and have taken the position that a separate staffing study they obtained satisfied the terms of the Agreement. Defendants have not provided the results from this separate staffing study to Plaintiffs.

Following Defendants failure to meet the necessary deadlines, Plaintiffs initiated the dispute resolution process as outlined in the Settlement Agreement. At that point, Defendants first took the position that their inability to adequately implement core components of the agreement, including the special safety unit, the behavior modification unit, and the corrective action process was a result of a lack of staffing.

In an attempt to salvage the remedies both parties agreed to, Plaintiffs and the experts came up with alternative solutions to the Defendants's staffing issues that would still implement the core remedies. See Ex. 1, Short-term 90 day St. Clair Security Enhancement Plan (Oct. 5, 2018). This included lowering the population cap at the facility by transferring a number of men who had behavioral profiles better suited for lower-custody facilities and focusing the Department's existing resources on the most problematic units at the facility. Defendants refused to implement the recommended alternatives and continue to maintain that they do not need to conduct an additional staffing analysis or provide Plaintiffs with the staffing study that they believe satisfies the agreement. Defendants refusal to share existing information or meaningfully consider alternative solutions is unreasonable in light of their

10

assertion that the lack of adequate staffing is the cause of their failure to implement the Agreement.

**8.    Failure to Adequately Assess Inmates 60 Years Old and Older, ¶¶ 52-54.**

The experts had specific recommendations about how to reduce the population and move people to lower security facilities in a manner that was consistent with public safety. Specifically, they recommended moving around 200 men who were 60 and over and recommended changing the security level rule that ties classification to LWOP sentence. They indicated this rule made no sense and was not required either by statute or the external classification system. Plaintiffs are in the process of assessing whether this recommendation was followed.

## III.    CORRECTIVE ACTION SYSTEM

**9.    Failure to Adequately Implement the Incident Management System. Agreement, ¶¶ 55-61.**

The Settlement Agreement provides for the implementation of an Incident Report Manager ("IRM") "in order to improve incident reporting, data processing, accountability, review, analysis, and follow-up." Agreement, ¶ 56. Although the Department has hired an incident report manager and developed a tool designed to track incident report data (the "dashboard"), the failure to adequately train and supervise the incident report manager has effectively led to non-compliance. Plaintiffs have not received a final SOP for the IRM, have not received training materials, and have not reviewed any SOP's related to the dashboard tool.

The Incident Management System ("IMS") forms the backbone of the corrective action component of the settlement agreement. The parties agreed that the safe and secure operation of St. Clair depended on the administration learning to critically evaluate the facility. That evaluation is impossible without accurate information. Before the parties began to implement the agreement, the Department had no process for the routine collection and analysis of data at St. Clair. Any data that was collected was seriously flawed, with officers failing to include critical information, misclassifying incidents, and supervisors failing to ensure the accuracy of the available information. The lack of reliable data meant St. Clair's management could not meaningfully evaluate problems at the prison and could not take affirmative steps to resolve those problems. This lack of understanding spread to the executive leadership and, ultimately, to legislators and the public.

The IMS was designed to address these flaws in incident reporting, institutional

11

                                     ADOC-DS019036

investigation, data collection and analysis. Unfortunately, existing flaws in the IMS mean that these problems persist. Throughout mediation, Plaintiffs have raised a number of concerns regarding the operation of the IMS, including that the facility is not reliably collecting and inputting incident report data in the dashboard undermining any potential investigation or data analysis.

Plaintiffs initially raised their concerns at the outset of the system's implementation and have continued to identify flaws throughout the process.[5] Plaintiffs have addressed their concerns to both ADOC, in monitoring reports and in letters addressed to the Commissioner, and to Ken McGinnis. Mr. McGinnis acknowledged the issues plaintiffs raised and sought to address them with ADOC. As a result of the issues raised by Plaintiffs and Mr. McGinnis, ADOC conducted an internal audit of the system. This audit relied on the issues identified by Plaintiffs and confirmed Plaintiff's concerns. The flaws identified in the system include:

1.  *Failure to record weapons involved in incidents*: On January 22, 2019, Mr. ███████████████ was hospitalized after being stabbed. SCCF-19-00086. The facility failed to document that a weapon was involved in the incident dashboard or incident categorization. SCCF-19-00086. This failure undermines attempts to rely on the data from the dashboard to analyze serious incidents of violence involving weapons.

2.  *Inaccurate incident categorization*: The incident involving ███████████ was categorized in the incident dashboard as an "Assault-Inmate-on-Employee with Serious Injury." Any trend analysis relying on the dashboard data regarding this incident would mis-categorize this incident as an assault on an officer, rather than an inmate.

3.  *Failure to document underlying factors contributing to incidents of violence*: In the same incident involving ███████████ the facility failed to record additional, critical information contributing to the assault. The assault was reported to have occurred in housing unit Q2. There were three assailants identified as responsible for the assault. None of these three individuals were assigned to Q2. Two of the men were assigned to P block, and one was assigned to M block. SCCF-19-00086.

4.  *Inaccurate data*: On January 24, 2019, a ███████████████ was identified to

---

[5] See Ex. 11, EJI Mon. Update for Ken McGinnis, July 8, 2018; Ex. 12, EJI Email to Ken McGinnis, July 14, 2018; Ex. 13, EJI Email to Ken McGinnis, Aug. 16, 2018; Ex. 14, EJI Email to Ken McGinnis, Aug. 21, 2018; Ex. 15, EJI Email to Ken McGinnis, Aug. 23, 2018; Ex. 16, EJI Email to Ken McGinnis, Oct. 16, 2018; Ex. 17, EJI Email to Ken McGinnis, Nov. 12, 2018; Ex. 18, EJI Email to Ken McGinnis, Dec. 11, 2018.

CONFIDENTIAL                                                      ADOC-DS019037

be in possession of two inmate made knives in G dorm. SCCF-19-00108. The dashboard identifies ████████ housing assignment as segregation cell E-10. Plaintiffs have continued to flag the facility's inaccurate recording of housing assignments in the dashboard as a problem. It appears that the dashboard often reflects an individual's assignment following an incident. This skews analysis regarding the assignment of men involved in various incidents.

The facility's internal audit reviewed three months worth of data from the facility. After noting the flaws identified by Plaintiffs, the ADOC audit concluded that the data was completely unreliable. In summarizing recommendations from the audit the ADOC found:

> In conducting the trend analysis for the months of July-September 2018, there was a significant amount of inconsistencies and discrepancies in the reporting, documenting and data entry process. In turn, this minimized the confidence of the data captured.

See QIT Analysis Report, July 2018-September 2018. The QIT report concluded that without a functioning IRM, the data collection process was effectively worthless. The QIT recommended implementing a "qualitative and quantitative corrective action plan." Id. No such plan has been implemented, and there continue to be significant flaws in the collection of data that undermine trend analysis and corrective action.

## 10.    Failure to Adequately Implement Improvements to Incident Reporting. Agreement, ¶¶ 62-66; 69-70.

Staff at St. Clair frequently fail to adequately report on incidents of violence at the prison, failing to include men's housing assignments, document the presence of weapon's contraband in an incident, and failing to include necessary statements and photographs of incidents at the prison. Accordingly, the Settlement Agreement required that Defendants revise the incident reporting requirement to ensure the accurate and timely reporting of incidents at the facility and to evaluate St. Clair personnel's training on incident report writing. Agreement, ¶ 65, 69. The parties agreed this was necessary to facilitate the accurate collection of data and indicated that "[s]pecial emphasis will be given to the need to accurately and clearly report whether the incident involved an inmate out of his assigned area, whether a weapon was used, and whether the weapon was recovered." Agreement, ¶ 69(d). Plaintiffs have not received any updated SOP's on either area, and have not reviewed any updated training materials.

The Department's failure to comply with this area of the settlement has directly contributed to ongoing inadequate documentation of incidents of violence. This further

13

undermines the corrective action process, suppressing critical information about factors that contribute to a risk to men's safety at the prison. Plaintiffs have raised concerns about the lack of consistent, accurate, and reliable reporting in communications with expert Ken McGinnis, and in reports provided to ADOC.[6] As Plaintiffs have continued to point out throughout the monitoring process, the IMS "dashboard" system depends on the reliable incident report documentation.

Despite plaintiff's continued focus on the lack of reliable reporting at the facility, the administration continues to fail to gather necessary information that directly obscures the evaluation of known risks to safety at the prison. For example, the prison consistently fails to document men's housing assignments and incident locations, undermining analysis regarding the role unauthorized movement contributed to a given incident. Additionally, the prison fails to accurately document use of force incidents which limits subsequent review of incidents. These failures have been observed both by Plaintiffs but also in the ADOC's own incident report audit:

1. ADOC audited 471 incident reports from July 2018 through September 2018. This review concluded that 126 of these incidents "were flagged for questionable information." See QIT Analysis Report, July 2018-September 2018.

2. The audit indicated that nearly 30 % of the reports from the studied period included a "failure to enter bed assignments, misclassification, [no] locations," among other faulty information.

3. EJI's own analysis demonstrates that this problem continues in recent months, with ADOC failing to accurately document over 80% of the incidents of violence in December and January.

4. Additionally, ADOC's failed to accurately document 100% of the use of force incidents from December and January. This included a failure to include officer statements, witness statements, and/or photographs in all 16 of the use of force incidents from the two months.

---

[6]See Ex. 11, EJI Mon. Update for Ken McGinnis, July 8, 2018; Ex. 12, EJI Email to Ken McGinnis, July 14, 2018; Ex. 13, EJI Email to Ken McGinnis, Aug. 16, 2018; Ex. 14, EJI Email to Ken McGinnis, Aug. 21, 2018; Ex. 15, EJI Email to Ken McGinnis, Aug. 23, 2018; Ex. 16, EJI Email to Ken McGinnis, Oct. 16, 2018; Ex. 17, EJI Email to Ken McGinnis, Nov. 12, 2018; Ex. 18, EJI Email to Ken McGinnis, Dec. 11, 2018.

14

CONFIDENTIAL                                                      ADOC-DS019039

**11.    Failure to Adequately Implement the Quality Improvement Team. Agreement, ¶¶ 62-66.**

The Quality Improvement Team ("QIT") is critical to the corrective action component of the settlement agreement. While the IRM is tasked with gathering the necessary information, the QIT is responsible for analyzing that information and relying on it to make informed decisions about prison management. Over the course of the litigation it became apparent that ADOC did not have a functioning corrective action review process, including a failure by prison administrators to investigate incidents of violence, identify underlying causes of incidents of violence, review investigative reports on incidents of violence, or engage in corrective action to address recurring factors contributing to incidents of violence. See e.g. Horn Rebuttal Report, at *7-11; DeWayne Estes Dep. 328, 331-32 (did not conduct any internal investigation into unauthorized movement contributing to Latham homicide); id. at 97-98 (warden does not receive comprehensive data regarding number of inmates found in unauthorized areas); Karen Carter Dep. 329-31 (does not review I&I documents); Culliver Dep. 196-98 (did not review results of I&I investigation regarding major incident at St. Clair); Culliver Dep. 227-29 (unable to answer why investigations into unauthorized access are not conducted); Malone Dep. 352-60 (not his responsibility to review how inmates access unauthorized areas).

The QIT was implemented in order to address this gap in management, with a primary mission of identifying factors undermining the safety at the prison and taking corrective action to address those factors. The agreement established the QIT as the entity responsible for "[c]onducting trend analysis," "[i]dentifying operations practices that impact the occurrence of incidents at SCCF both positively and negatively," "review[ing] the QIT's trend analyses for the purposes of identifying root causes of incidents and any operations practices that may need to be modified to address those root causes," and reporting on the actions recommended by the QIT. Agreement, ¶ 63. The QIT process developed by ADOC does not comply with the requirements of the settlement agreement. The QIT is not producing any verifiable or reliable trend analysis and has not taken any corrective action to address issues that are directly contributing to the lack of safety and security at the prison.

The original intent of the QIT was to develop an oversight body that would enhance the management of security at the prison. Currently the QIT is not operating in that role. Instead, the QIT has relied nearly entirely on the efforts of Plaintiffs and Mr. McGinnis to conduct trend analysis, bring patterns to their attention, flag issues for further investigation, and develop corrective action. As Monitors, Plaintiffs have thoroughly reviewed, investigated, and analyzed incidents at St. Clair. Through this analysis, Plaintiffs have repeatedly alerted ADOC and expert Ken McGinnis to issues that directly undermine institutional safety and security. Throughout the monitoring period, Plaintiffs have repeatedly

CONFIDENTIAL                                            ADOC-DS019040

raised issues regarding the presence of contraband weapons, the ongoing impact of unauthorized movement, issues related to the extortion of men at the facility, and the frequency of violence emerging from specific housing units at the facility.[7]

The failure to adequately implement the QIT process has directly contributed to the risk of lethal violence at St. Clair. There have been 4 homicides connected to the P/Q housing units in the past 8 months. Plaintiffs raised the risk associated with ADOC's management of the P/Q housing unit with ADOC, Ken McGinnis and the QIT following the first of these homicides, in September, 2018.[8] Despite this clear indication that the P/Q housing units represent a serious risk of significant harm to the men incarcerated at St. Clair and the staff assigned to work at the prison, the QIT has not developed any plan to address the units or to respond to the serious risk that the units represent.

The first of the recent homicides connected to the P/Q housing units occurred in early September 2018, with the stabbing death of ███████████ SCCF-18-01163 (Sept. 2, 2018). Following the homicide, Plaintiffs again raised their concerns with the Department, sending a letter to Commissioner Dunn outlining problems with the management of P/Q on September 6, 2018. Plaintiffs also raised concerns with the QIT through Ken McGinnis, pointing out "that residents of the P and Q housing units are frequently involved in the most serious incidents of violence at the facility, and that the prison has effectively adopted a management strategy of grouping inmates with disciplinary or behavioral issues together in those units without any increased supervision or programming."[9]

Although Plaintiffs continued to raise these concerns in mediation and through Mr. McGinnis, the QIT failed to develop any corrective action regarding P/Q. Shortly after Mr. ███████ was killed, ████████████ was stabbed to death in P Block. SCCF-18-01253 (Sept. 20, 2018). In the weeks following ████████ homicide, Plaintiffs along with experts Richard Stalder, Dr. Austin, and Ken McGinnis attempted to develop a corrective action plan that would require increased staff presence in the P/Q units. See Ex. 1, Short-term 90 day St. Clair Security Enhancement Plan (Oct. 5, 2018). Not only did the QIT not evaluate or

---

[7]See Ex. 11, EJI Mon. Update for Ken McGinnis, July 8, 2018; Ex. 19, EJI Email to Ken McGinnis, Aug. 20, 2018; Ex. 8, EJI Email and Memo to Ken McGinnis, Sept. 12, 2018; Ex. 16, EJI Email to Ken McGinnis, Oct. 16, 2018; Ex. 17, EJI Email to Ken McGinnis, Nov. 12, 2018; Ex. 9, EJI Email to Ken McGinnis, Dec. 11, 2018; Ex. 22, EJI Email to Ken McGinnis, Dec. 18, 2018; Ex. 20, EJI Email to Ken McGinnis, Feb. 18, 2019.

[8]Ex. 8, EJI Email and Memo to Ken McGinnis, Sept. 12, 2018.

[9]Ex. 8, EJI Email and Memo to Ken McGinnis, Sept. 12, 2018.

CONFIDENTIAL                                    ADOC-DS019041

consider the recommendations made in this plan, it does not appear that it was ever presented to them.

The failure to develop corrective action continued throughout the mediation process. In early December, Plaintiffs again detailed the ongoing risk to safety in P/Q based on observations from recent incidents at the facility.[10] Although minutes from the QIT's meeting on December 18 reflect that they discussed these risks, the QIT made no recommendation on any corrective action or management solutions that might address these risks. See Ex. 2, QIT Meeting Minutes (Dec. 18, 2018). Terrence Andrews was stabbed to death in P Block less than two weeks later. SCCF-18-01654 (Dec. 26, 2018). Again the Department took no corrective action and less than a month later ███████ was airlifted after being nearly stabbed to death in Q Block. SCCF-19-00086 (Jan. 22, 2019).

Shortly after this incident, Plaintiffs raised their concerns regarding the lack of corrective action with Commissioner Dunn in a mediation meeting on January 24, 2019. At that meeting, Plaintiffs and the joint experts made a number of recommendations for corrective action designed at stabilizing the P/Q housing units. See Ex. 3, Commissioner Dunn Presentation (Jan. 24, 2019). The Commissioner indicated that Plaintiffs should raise these issues with the new Deputy Commissioner of Operations, Charles Daniels, suggesting Mr. Daniels would be best suited to work on corrective action at the facility. Plaintiffs and the experts raised the same issues with Mr. Daniels at a meeting on February 14, 2019. See Ex. 4, Daniels Agenda Email (Feb. 12, 2019).[11]

Despite Plaintiffs raising specific concerns regarding a pattern of violence that had repeatedly rose to lethal levels within the preceding six months with the most senior members of ADOC's executive staff, the Department took no action. Two weeks after the Plaintiffs meeting with Comm. Daniels, Mr. Steven Mullins was stabbed and subsequently died from his injuries. In the days before the stabbing homicide, Mr. Mullins reported assaults, harassment, and sexual victimization by men in Q Block. SCCF-19-00259 (Feb. 25, 2019); SCCF-19-00262 (Feb. 25, 2019); The men who killed Mr. Mullins were assigned to Q and were allowed to move without authorization to his housing unit where he was assaulted and received the injuries that would kill him. SCCF-19-00270 (Feb. 26, 2019.)

ADOC's failure to adequately implement the QIT process is related to the failure to develop and make binding recommendations, the lack of accurate and reliable data, the

---

[10]Ex. 9, EJI Email to Ken McGinnis, Dec. 11, 2018.

[11]See also Ex. 5, PQ Management Remedies (submitted with Daniels Letter and Agenda); Ex. 6, Unauthorized Movement (same); Ex. 7 QIT and Data Issues (same).

17

absence of meaningful trend analysis, the lack of adequate institutional investigation, and the failure to ensure decisions made by the QIT are carried out. The lack of a functioning QIT is represented by:

1. *A Failure to Develop and Make Binding Recommendations*: The QIT is simply not operating as a corrective action process. While there have been repeated homicides connected to the P/Q housing unit, the *QIT has not developed any corrective action plan concerning the unit*, has included no analysis of the problem in the QIT's meetings, and has taken no action to address the repeated homicides that are taking place in connection to the units. While Plaintiffs, the experts, and executive members of the Department have all agreed that P/Q poses a risk to the safe functioning of the facility, the QIT has failed to develop any plan to address that risk. The absence of binding recommendations by the QIT effectively means the process is pointless.

2. *A Failure to Engage in Corrective Action as a Result of Inadequate Information*: the QIT process cannot engage in a corrective action process because it is not receiving sufficiently reliable information. Even if the team could make binding recommendations, the information they are relying on has been repeatedly demonstrated to be flawed. The absence of a functioning IRM process contributes to the flaws in the QIT's data. See supra Part 8, Failure to Adequately Implement the Incident Management System. Accordingly, prison administrators are left to guess at the source of problems. For example, in December Warden Jones reported to the QIT that "the educational wing (Welding) gives access for inmates to construct and introduce premium prison made weapons inside the institution." QIT Mtg. Min. at *4 (December 18, 2018). Subsequent evaluation of weapons recovered at the facility demonstrated that this report by the warden was inaccurate.

3. *The Absence of Meaningful Trend Analysis*: The QIT is simply not complying with the agreement's requirement that the team develop analytical trend reports on a monthly, quarterly, and annual basis. Agreement, ¶ 63c. The QIT has indicated that it has substituted a review of the IRM's dashboard for the trend analysis required by the agreement. This review limits the QIT's ability to evaluate the impact that decisions by the QIT have on the operation of the prison and is completely reliant on the accuracy of the dashboard and is limited to information contained within the dashboard. For example, the dashboard frequently records the bed assignment of an individual involved in a serious incident of violence only after the person has been moved to restrictive housing. Moreover, the dashboard often fails to indicate where that person used a weapon in the incident or where the incident happened in a housing location that the assailant was not authorized to access. Sole reliance on the

CONFIDENTIAL                                                    ADOC-DS019043

dashboard would therefore obscure: the housing assignment of an assailant, the presence of weapons contraband in an incident, and the role that unauthorized movement played in an incident. Meaningful trend analysis requires a more critical review of available information than simply filtering on the IRM dashboard.

4.  *The Absence of Meaningful Investigation*: The corrective action process is also dependent on an institutional investigator who can evaluate incidents and develop patterns to be reported to the QIT. While the data is useful for evaluating trends at the facility, the institutional investigator is necessary to determine where there are connections between incidents of violence, to evaluate emerging patterns that might not be clear from the data, and to follow up on specific incidents to evaluate underlying causes. This role is especially critical at St. Clair where prison administrators have long acknowledged that they do not conduct any internal investigations. Currently, the institutional investigator is not functioning in this manner and the QIT has repeatedly sought to retrain the investigator on this role. See infra, Part 11, Failure to Adequately Implement an Institutional Investigator.

5.  *The Failure to Ensure Decisions Made by the QIT are Carried Out*: Finally, the Department has failed to ensure that the limited decisions the QIT does make are carried out. The agreement requires the QIT report monthly on decisions made during the QIT meetings. Agreement, ¶ 63h.  The QIT does not report pursuant to the agreement's requirement and this has led to a lack of accountability in the QIT's decision making process. For example, Plaintiffs reported on concerns over the use of force in a recent monitoring report. See Second Monitoring Report, *13-18, *25-36 (June 2018). Subsequent QIT meetings indicated that the facility would consult with neighboring states regarding "training and implementation of the [use of force] Reduction Programs they have in place." QIT Mtg. Min. at *2 (July 17, 2018.) This action plan was not followed up on in subsequent minutes and was reportedly not completed as of February 2019. In January, 2019, a man at St. Clair was brutally beaten by two officers. The officers subsequently lied about the incident. The issues present in this incident were directly reflected in Plaintiffs's previous reports.

## 12.    Failure to Adequately Implement an Institutional Investigator at St. Clair. Agreement, ¶¶ 71-72.

The agreement called for the development of an institutional investigator at St. Clair to evaluate trends at the facility, evaluate connections between incidents of violence, identify emerging patterns that might not be immediately clear in the incident report data, and to

CONFIDENTIAL                                        ADOC-DS019044

identify the elements that contributed to specific incidents of violence. Although this is a new position for the Department, ADOC has not developed any SOP's related to the institutional investigator's role or shared the investigator's training protocols with Plaintiffs. Agreement, ¶ 72. This failure has undermined ADOC's compliance with the institutional investigator component of the agreement.

Plaintiffs have raised concerns about the lack of a functioning institutional investigator at St. Clair throughout the monitoring process. Frequently, Plaintiffs have identified patterns and specific incidents that required further investigation.[12] Despite Plaintiffs repeated efforts, conditions at the facility continue to reflect that there is no meaningful institutional investigation occurring as is required by the Agreement. The non-compliance with the institutional investigator position continues to pose a risk to the security of the prison.

For example, Plaintiffs have observed that there is a pattern of extortion at the prison and have raised this concern in reports to ADOC and communications with expert Ken McGinnis.[13] Although this concern was raised repeatedly over the summer, fall, and winter and was directly connected to serious incidents of violence at the facility, there is no indication that the corrective action process has identified the issue, investigated the problem, or recommended corrective action. In fact, the facility often fails to document the existence of the extortion or investigate the connection between incidents of violence despite objective indications that men have been assaulted and reports by the same individuals that they have been extorted:

On February 22, 2019, ███████████████ reported being sexually assaulted by an inmate named "██." SCCF-19-00250. He had been observed with questionable injuries repeatedly in the preceding months, and had reported being extorted just days before the sexual assault. See SCCF-18-01620 (On Dec. 18, 2018, ███████████ observed bleeding with lacerations to his arm, back of his neck, and his forehead. He claimed he fell and was cut by sharp objects and the facility did not investigate further); SCCF-1900221 (On Feb. 16, ████████████ was observed with blood on his ear and he claimed he tripped and fell, the facility did not investigate further); SCCF-1900230 (On Feb.

---

[12] See Ex. 11, EJI Mon. Update for Ken McGinnis, July 8, 2018; Ex. 21, EJI Email to Ken McGinnis, Aug. 17, 2018; Ex. 19, EJI Email to Ken McGinnis, Aug. 20, 2018; Ex. 8, EJI Email and Memo to Ken McGinnis, Sept. 12, 2018; Ex. 22, EJI Email to Ken McGinnis, Dec. 18, 2018; Ex. 20, EJI Email to Ken McGinnis, Feb. 18, 2019.

[13] See Ex. 11, EJI Mon. Update for Ken McGinnis, July 8, 2018; Ex. 8, EJI Email and Memo to Ken McGinnis, Sept. 12, 2018; Ex. 22, EJI Email to Ken McGinnis, Dec. 18, 2018.

20

18, Mr. Handsford reported he owed a debt in population and tried to pay but was continuing to be further extorted, the facility did not investigate further). The failure to adequately implement an institutional investigator directly contributed to the ongoing harassment and, ultimately, the reported sexual assault of ████████ His risk was compounded by the facility continuing to house him in the P/Q housing units.

On November 27, 2018, ████████████ was found with contraband marijuana during a search in the sallyport upon his return to the facility. SCCF-18-01545. He reported he had been harassed for weeks, stabbed multiple times, and was ordered to bring contraband in or face repercussions. A subsequent body chart identified multiple stab wounds on ████████ body, indicating support for his assertion that he was previously assaulted. SCCF-18-01545.

Although ███████ identified the individuals responsible, and expressed a concern that the men would also extort his cell partner, the facility failed to categorize the incident as an assault, failed to document the extortion, and appears to have not investigated Mr. ███████ report about the extortion. In documenting the incident, the underlying extortion and assault was not observed or noted in the incident report, even though the man's report was corroborated by documented knife wounds that he had previously suffered. SCCF-18-01545.

On September 29, 2018, Mr. Lee Atilano (AIS 313910) informed the administration of his concern that he was being extorted and that he was afraid he would be killed in population. He had min-out custody and appears to have been transferred to St. Clair to fill an institutional need at the prison. On September 29, he reported that he feared for his life in population and that there were men who were going to kill him "if he did not pay to live in population." See SCCF-18-01299. During the medical evaluation he told Nurse Minton he was thinking of harming himself, leading to his being placed on suicide watch. Several hours later he met with mental health personnel Jeanette Thomas due to expressing suicidal thoughts, and he told her that he had been sexually assaulted by unknown inmates. See SCCF-18-01300. ███████ also reported that he had been intoxicated for a number of days and had difficulty identifying the men responsible for the assault. ███████ was taken to the crisis center and was subsequently transferred away from the facility.

███████████ was transferred to St. Clair because of his min-out custody level, filling an institutional need for the facility. Shortly after he arrived at SCCF, two men approached ███████ after noticing that he was allowed outside the fence and asked him to help them bring drugs into the camp. ███████ refused. He indicated that he tried to alert the facility to the harassment but his report was ignored. On May 20, 2018, ████████████ reported that he had been sexually assaulted by the two men at

21

knife point. See ████████ Incident Report No. SCCF-18-00596.

Additionally, Plaintiffs have consistently raised concerned about patterns regarding the use of force at St. Clair, observing that officers frequently employ force when men are restrained, resort to force based on flimsy or suspect justifications, and that men in segregation are frequently subject to use of force by officers. See Ex. 11, EJI Mon. Update for Ken McGinnis, July 8, 2018 at *18; At the same time, the facility fails to adequately investigate or document use of force incidents, with Capt. Gary Malone often accepting false or misleading claims by officers without critical evaluation. Plaintiffs witnessed this first-hand during a monitoring legal visit, when attorneys observed CO ██████ report he sprayed an entire can of chemical spray into a prisoner's cell and then witnessed other officers restraining CO ██████ as he attempted to strike the same man with a metal baton, although the man was in handcuffs and leg irons. The subsequent incident report omitted any mention of CO ██████ attempt to strike the restrained man and did not include any use of force investigative report, body chart, or statements by the prisoner, officer or witnesses. SCCF-17-01389 (Dec. 1, 2017.)

Plaintiffs raised these concerns a number of times with Ken McGinnis in order to focus the QIT on the problem, and to raise the patterns for follow-up review by the institutional investigator. See Ex. 11, EJI Mon. Update for Ken McGinnis, July 8, 2018 at *18. Unfortunately, the QIT did not address the issue and the institutional investigator has failed to investigate these patterns. The failure to adequately document and investigate use of force incidents is ongoing and continues to raise a risk that men at the prison will be subject to unjustified use of force, as was the case in January, when Sgt. ████████ and CO ████████████ severely assaulted a man in segregation with their batons and then made false and misleading statements following the incident. Ex. 20, EJI Email to Ken McGinnis, Feb. 18, 2019. Capt. Malone initially accepted the officers statements about the incident and found the force used in the incident justified. An adequate investigation was not conducted until a video recording of the incident was published. The incident made clear that the facility is not conducting any adequate review, allowing officers to engage in unjustified force without any meaningful oversight or discipline. Ex. 20, EJI Email to Ken McGinnis, Feb. 18, 2019.

The Department's non-compliance with the institutional investigator position is directly reflected in notes by the QIT regarding his hiring, training, and indications that he did not understand the requirements of his position:

1.  Investigator Hopper hired effective July 16. QIT and Department will "develop a protocol of measurable responsibilities and results specifically for" the role. QIT Mtg. Min. at *2 (July 7, 2018).

22

2.  Investigator Arledge hired to fill role instead of Hopper. Investigator is "is briefed on his role" and the Department again indicates it will "develop a protocol of measurable responsibilities and results specifically for" the role. Investigator "will receive formalized investigative training. QIT Mtg. Min. at *2 (August 21, 2018).

3.  ADOC "encouraged Agent Arledge to conduct a more through consideration" of recent incident as possible suicide. QIT Mtg. Min. at *1 (October 16, 2018).

4.  QIT agreed to "an Investigative Spreadsheet to track" investigations handled by Arledge was necessary to "quantify and qualify the Investigator position." QIT Mtg. Min. at *2 (August 21, 2018).

5.  QIT "reiterated that the position is specific to St. Clair and it is of great importance that . . . a systematic review of all [] incidents be conducted." QIT Mtg. Min. at *2 (August 21, 2018).

6.  As of February 2019, the institutional investigator still was not tracking the investigations as was discussed in October meeting. QIT Mtg. Min. at *13 (August 21, 2018).

**13.    Failure to Implement a Video Surveillance System. Agreement, ¶¶ 67-68.**

Over the course of the litigation, ADOC installed a camera system in the housing units in order to partially supplement for the lack of consistent supervision of men in the facility. This camera system lacked critical recording capabilities, and, as a result of poor design and inadequate management, the cameras were destroyed in nearly all of the housing units. The agreement called for ADOC to get additional funding to implement a revised camera system. The Department has failed to comply with that request. The parties agreed in November 2017 that the Department would request funding for a camera system at the facility. As of March 2019, ADOC still has not requested this funding. Plaintiffs and the mediation experts sought to expedite the installation of a camera system by narrowing the initial request to the P/Q housing units. These discussions began in the fall of 2018. The camera system has not been implemented as of March 2019.

## IV.    PHYSICAL PLANT

**14.    Failure to adequately comply with physical plant requirements. Agreement, ¶¶ 73-78.**

At the outset of the lawsuit Plaintiffs stressed the dramatic safety risk posed by non-working cell door locks, pointing to homicides, sexual assaults, robberies and other incidents of violence that were directly caused by broken and tampered locks. Defendants agreed to modify their SOP's to "provide for the immediate transfer of an inmate occupying a cell with

23

a non-working locking mechanism to a cell with a working locking mechanism" and to draft or modify their SOP's to provide for systematic inspection of the cell door locks and the cameras that were previously installed. Agreement, ¶¶ 75-78. Plaintiffs have not received any relevant SOP's or received any information regarding updated training to ensure men are not assigned to live in housing units with non-working locking mechanisms.

The Defendants' failure to comply is most dramatically represented by the continued assignment of men to live in cells where there doors do not lock. Plaintiffs observed a number of non-working or obstructed cell door locks in tours in March 2018 and September 2018. In October 2018, Plaintiffs, Defendants, and experts Ken McGinnis and Richard Stalder toured the facility and observed a number of additional cells with nonfunctional locks or lock obstructions. Together the September and October tours included 17 cells with malfunctioning locking mechanisms. All but one of these cells were occupied. Additionally, between tours on both days, Plaintiffs and the experts observed that 38 cells had locks that had been tampered with. Men were living in every cell with an obstructed or tampered lock. Additionally, on March 3, 2019, there was an indication that "all the bottom cells in J and K dorms were not working." SCCF-19-00250. ADOC's did not depopulate these cells and maintenance logs from the facility do not indicate that the administration has identified or fixed the issue.

The facility's indifference to malfunctioning locking mechanisms is particularly alarming where there is evidence that men can defeat their locks and get out of their cells even when they are locked down. Although this occurs even during the most serious incidents at the facility, there is no indication that the facility has investigated the malfunctioning locks or evaluated how to ensure men are unable to defeat their locks.

Mr. Terrence Andrews was stabbed to death in P1 on December 29, 2018. SCCF-18-01654. Shortly after being instructed to lock down in their cells, the officer working the cube entered a notation that the men in P1 were exiting their cells without authorization:

> P-1 side out [of] the cells. I don't know how they did it but they are out. CCO called shift office to inform. And they are cleaning up on P1!!!

SCCF-18-01654 (P Cube Duty Post Log Dec. 29, 2018 Day Shift). The facility's documentation does not report on how the men were able to get out of their cells, when/how they were returned to their cells, whether anyone was disciplined, whether the facility investigated, and whether the locks were fixed. In fact, despite the facility's history with broken and malfunctioning locks, the incident occurring in the P housing unit, and the incident occurring immediately after the homicide of Mr. Andrews, there is no incident report associated with this incident.

24

The facility's continued placement of men in cells without working locks and failure to consistently examine the lock's functionality and other security equipment prompted experts McGinnis and Stalder to make a number of recommendations, including recommendations that are required by the agreement. Compare Security Renovation Project Inspection, St. Clair Correctional Facility, at *2 (Oct. 15, 2018), with Agreement, ¶¶ 75-77:

1. "Protocols must be put in place that prevents the occupancy of cells that have inoperable locking mechanisms." Security Renovation Project Inspection, St. Clair Correctional Facility, *2 (Oct. 15, 2018); see Agreement ¶ 75c ("provide for the immediate transfer of an inmate occupying a cell with a non-working locking mechanism");

2. "Maintenance efforts must be focused on repairing the inoperable locks on a more timely basis – it was noted that the locks noted as inoperable were recorded on the maintenance work order logs as early as October 4, 2018." Security Renovation Project Inspection, St. Clair Correctional Facility, *2 (Oct. 15, 2018); see Agreement ¶ 75d ("provide for an immediate referral to maintenance personnel to repair or replace any non-working locking mechanism").

The experts recommendations demonstrate that the facility continues to fail to comply with the physical plant requirements laid out in the settlement agreement. Although Plaintiffs have repeatedly identified the dramatic risk to safety posed by malfunctioning and tampered locks, Defendants have allowed this dangerous condition to persist.

## V.    CONTRABAND

### 15.    Failure to Adequately Comply with Contraband Requirements. Agreement, ¶¶ 79-82.

St. Clair has long been plagued by widespread presence of weapons contraband. While the presence of knives at the facility has directly contributed to the risk of harm for men and staff at the prison, the administration has failed to meet the basic contraband interdiction requirements laid out by department policy. As far back as an internal audit from 2014, ADOC recognized that the prison essentially failed to conduct any contraband searches of individuals, cells, and common areas and found that these searches "did not seem to be a very high priority." ADOC Security Team Audit Summary. The parties agreed that ADOC would receive technical and financial assistance to address these deficiencies. Agreement, ¶¶ 79-82. ADOC has effectively failed to engage in this corrective action and the facility continues to fail to comply with the department's basic contraband search requirements.

25

Plaintiffs have made clear that the presence of weapons contraband continues to plague the facility and directly contributes to the ongoing risk of lethal harm. This includes the presence of weapons contraband, the facility's failure to recover weapons that are used in serious incidents of violence, and the facility's failure to conduct necessary contraband searches. As Plaintiffs pointed out to the Commissioner in February 2019:

1. There were 817 knives/stabbing instruments documented in data from the prison from November 2017 through October 2018.
2. There were 105 knives/stabbing instruments documented in incident reports that were never recovered. This included a failure to recover weapons used in:
   i. 70% of incidents classified as homicides or inmate on inmate assaults resulting in serious injury.
   ii. A failure to recover weapons in 3 out of the 4 homicides that took place from November 2017 to October 2018.
3. The facility failed to search the entire facility in 11 out of 12 months during the first year of monitoring. See Admin. Reg. 336; SOP 110 (requiring the entire facility be searched every month).
4. The facility conducted fewer than 5% of the required contraband searches at the facility during the first year of the monitoring agreement.

Plaintiffs continued to raise the need for more consistent contraband detection and intervention with the Department. Following a homicide involving weapons contraband in September 2018, Plaintiffs called on the Department to conduct a contraband sweep of the entire facility They failed to take any action in response to Plaintiff's request and in the intervening 5 months 3 more men were stabbed to death at the prison.

Finally, in February 2019, after a third stabbing homicide since Plaintiff's September request, ADOC finally conducted a comprehensive contraband sweep of the facility. Unfortunately, any improvements from this search cannot be maintained without consistent contraband detection efforts. Because the prison has historically failed to make contraband detection and intervention a priority a one time intervention is not likely to have a meaningful impact. In fact, recent incidents at the prison following the February search suggest that contraband continues to be a problem:

1. SCCF-19-00288 (March 2, 2019). ██████████████ was found unresponsive in L Dorm. His death is listed as natural but initial reports indicate that he died after ingesting contraband narcotics.
2. SCCF-19-00288 (March 3, 2019).Inmate ████████████████ self reported at the breezeway that he was "wigging out." ████████████ ████████ later approached and reported that ████████ stabbed him in the

26

stomach. No weapon recovered. The men were cell partners in Q47.

3.  SCCF-19-00291 (March 3, 2019). The M Cubicle officer observed two men from  P  block ████████████████  and  ████████████████ ██████  assaulting another individual from P block, ████████████ ██████████  reported extortion was a contributing factor. A weapon was indicated as involved in the incident but was not recovered.

4.  SCCF-19-00302 (March 6, 2019). ████████████████████  stabbed in Q1, required hospitalization. Assailants identified as ████████████████ and ████████████████████████

## VI.    **PREA**

## 16.    **Failure to Provide Accurate and Full Information for PREA audit. Agreement, ¶¶ 83-84.**

Throughout litigation and mediation, the Department was put on notice that there were serious deficiencies with respect to its PREA compliance and promoting sexual safety at St. Clair. Certified PREA Auditor Michelle Bonner concluded that the conditions at St. Clair resulted "in repeated sexual violence and [a] continued high risk of further sexual violence" in three reports from 2016 dated February 22, August 4, and September 6. While the Department attempted to dispute Ms. Bonner's findings with a 2016 PREA audit of St. Clair completed by William Boehnemann, it was discovered during mediation that Mr. Boehnemann had been de-certified by the PREA Resource Center. Consequently, the Department agreed "to accelerate the timeline for SCCF's next PREA audit" and the Agreement provided that the audit would take place by April 30, 2018. Agreement, ¶¶ 83-84. The Agreement also provided for "a certified PREA auditor selected and compensated by Plaintiffs to conduct an independent PREA audit."[14] Agreement, ¶ 83.

The Department first retained Auditor John Barkley to conduct the accelerated PREA audit at St. Clair and posters were placed at the prison beginning in February 2018 that indicated Mr. Barkley would conduct his audit during the week of March 19, 2018. For reasons unknown to Plaintiffs' counsel, Mr. Barkley's audit was cancelled by the Department. The Department next retained Auditor David Cotten and his PREA audit of St. Clair was scheduled for May 1-3, 2018.

---

[14]Plaintiffs retained Auditor Melinda Allen to conduct an independent PREA audit at St. Clair. Ms. Allen visited the prison on April 3-6, 2018, and presented her initial findings in a report to Plaintiffs' counsel on April 23, 2018. In her report, Ms. Allen concluded that St. Clair did not meet twenty (20) PREA standards.

27

Mr. Cotten's final PREA report for St. Clair was issued September 24, 2018. In it, he noted many of the same deficiencies that Ms. Bonner had identified in her 2016 reports. For example, as Ms. Bonner had, Mr. Cotten noted "[n]umerous issues of concern":

1. *Staff did not have control of prison*: "Numerous inmates were seen violating rules, sometimes challenged by staff and sometimes not. When challenged, several of the inmates appeared to not be concerned with the challenge and continued what they were doing in violation of rules." Cotten Audit, at 4.

2. *Uncontrolled movement and failure to separate victim prone inmates from abusive prone inmates*: "The majority of inmates observed were not wearing wrist bands and staff granting access to the different sides of the unit did not check wrist bands. The access doors to the 'honor' unit are left unsecure on both sides, reportedly due to collapsing that control room's post as a result of staffing shortages, allowing inmates from both sides to walk freely between the two sides. The reasoning provided to the auditor was that because it was an 'honor' unit, the inmates were less likely to violate sexual abuse rules because they did not wish to lose the honor status." Cotten Audit, at 4.

3. *Blind spots and lack of camera coverage*: "The open bay living unit areas had sheets and blankets hanging off of numerous top bunks creating (by inmates) a large number of blind spots not visible to staff and not under camera. . . . Camera[] placement was appropriate but minimal and not in adequate numbers to provide sufficient support for the minimal staffing. Numerous cameras had been damaged by the inmates and were not usable." Cotten Audit, at 4-5.

4. *Dangerously low staffing levels*: "Of a total allotment of 315 full time security staff allotted to the facility, 127 are actually assigned. **With this type of inmate to security staff ratio, in a level five facility, the ability to protect inmates from sexual abuse and sexual harassment is highly questionable.**" Cotten Audit, at 5 (emphasis added).

As a result of these and other concerns, Mr. Cotten found that St. Clair was not in compliance with multiple PREA standards including the failure to provide adequate supervision and monitoring (Cotten Audit, at 14) and the failure to separate victims from abusers and protect against retaliation. (Cotten Audit, at 45). Mr. Cotten's final report found PREA compliance at St. Clair based on the Department's representations about being in compliance through corrective action and limited documents that he received from St. Clair. The Department's assurance that corrective action was taken in the form of new policies issued by the Warden and a single wristband audit, while knowing that the facility is unable to comply with these policies and has documented an inability to control movement out of P/Q, is deeply troubling. As detailed in QIT reports and the reports of EJI Monitors, uncontrolled movement and insufficient staffing and monitoring are ongoing patterns at the facility that have not been

<center>28</center>

                                            ADOC-DS019053

corrected and continue to create an unsafe environment for inmates and staff.

The Department has been on notice from the experts and Plaintiffs' counsel that the concerns about sexual safety raised by Ms. Bonner and Mr. Cotten, particularly those relating to the separation of potential victims and potential abusers, have not been remedied at St. Clair. The murder of Steven Mullins serves is a tragic example of the consequences of not following PREA protocol. On February 25, 2019, at 6:00 a.m., Mr. Mullins reported to Lieutenant Ragsdale, St. Clair's assistant Institutional PREA Compliance Manager ("IPCM"), that he had been assaulted. SCCF-19-00259. He was assigned to cell Q-32 at the time of his report and "stated to Lt. Ragsdale that he wanted to be in a cell by himself." SCCF-19-00259. He was instead moved to cell P-36. SCCF-19-00259. While the incident report stated that Mr. Mullins could not identify the inmate who assaulted him, his body chart stated: "laying there asleep and cell partner woke me up by beating on me."

At 3:30 p.m. that same day, Lieutenant Angelia Gordy, St. Clair's IPCM, received an email regarding a PREA hotline call made by Mr. Mullins on February 25 at 10:52 a.m. SCCF-19-00262. The duty officer report related to Mr. Mullins PREA allegation states:

> Inmate Mullins alleged that he was moved from Segregation two weeks ago, and was assigned to Cell Q32. Inmate Mullins stated that two inmates were already in Cell Q32 so he moved to an empty bed in Cell Q27. Inmate Mullins stated that his cell partner would rub on his feet and his hip while he was asleep. Inmate Mullins stated that he told his cell partner to stop. Inmate Mullins further stated that this morning, 2/25/19, he was awakening [sic] by his cell partner punching him on the side of the head and twice in the eye. Inmate Mullins stated that his cell partner pulled a knife on him and tried to force him to perform oral sex. Inmate Mullins stated that he pushed his cell partner out of the way and exited the cell. Inmate Mullins stated that he went to the shift office and reported the incident (Incident Report SCCF-19-00259). Inmate Mullins was moved to Cell P36 on day shift. Inmate Mullins claims that he is in fear for his life in population at St. Clair. Inmate Mullins identified his cell partner as inmate Clarence Jackson, B/249273.

SCCF-19-00262. Mr. Mullins was moved to cell L-28 and remained in population, as did Mr. Jackson, SCCF-19-00262, despite Administrative Regulation 454(G)(1) providing that, "Upon learning of an allegation of a PREA related incident, the first responder staff shall . . . [e]nsure that the victim(s), aggressor(s), and witnesses are physically separated."

The next day, on February 26, 2019, Mr. Mullins was seriously stabbed in L Block. SCCF-19-00270. "While en route to the health care unit, Inmate Mullins identified inmate

CONFIDENTIAL                                          ADOC-DS019054

Clarence Jackson B/249273 (Q27-2A) as the inmate that assaulted him to Correctional Captain Kevin White and Correctional Lieutenant Antoine Price." SCCF-19-00270. Mr. Mullins died from the injuries he sustained in the stabbing. The Department has long been on notice that the conditions at St. Clair violate PREA and the Eighth Amendment. If St. Clair was truly "PREA compliant," Mr. Mullins's death would have been prevented.

CONFIDENTIAL                                        ADOC-DS019055

## INDEX OF EXHIBITS

EXHIBIT 1:       Short-term 90 day St. Clair Security Enhancement Plan (Oct. 5, 2018);

EXHIBIT 2:       QIT Meeting Minutes (Dec. 18, 2018);

EXHIBIT 3:       Commissioner Dunn Presentation (Jan. 24, 2019);

EXHIBIT 4:       Daniels Agenda Email (Feb. 12, 2019);

EXHIBIT 5:       P/Q Management Remedies;

EXHIBIT 6:       Unauthorized Movement;

EXHIBIT 7:       QIT and Data Issues;

EXHIBIT 8:       EJI Email and Memo to Ken McGinnis, Sept. 12, 2018;

EXHIBIT 9:       EJI Email to Ken McGinnis, Dec. 11, 2018;

EXHIBIT 10:      EJI Email and Memo to Ken McGinnis, Aug. 24, 2018;

EXHIBIT 11:      EJI Mon. Update for Ken McGinnis, July 8, 2018;

EXHIBIT 12:      EJI Email to Ken McGinnis, July 14, 2018;

EXHIBIT 13:      EJI Email to Ken McGinnis, Aug. 16, 2018;

EXHIBIT 14:      EJI Email to Ken McGinnis, Aug. 21, 2018;

EXHIBIT 15:      EJI Email to Ken McGinnis, Aug. 23, 2018;

EXHIBIT 16:      EJI Email to Ken McGinnis, Oct. 16, 2018;

EXHIBIT 17:      EJI Email to Ken McGinnis, Nov. 12, 2018;

EXHIBIT 18:      EJI Email to Ken McGinnis, Dec. 11, 2018;

EXHIBIT 19:      EJI Email to Ken McGinnis, Aug. 20, 2018;

31

                                                          ADOC-DS019056

EXHIBIT 20:        EJI Email to Ken McGinnis,  Feb. 18, 2019;

EXHIBIT 21:        EJI Email to Ken McGinnis, Aug. 17, 2018;

EXHIBIT 22:        EJI Email to Ken McGinnis, Dec. 18, 2018.

CONFIDENTIAL                                                    ADOC-DS019057

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 1:
Short-term 90 day St. Clair Security Enhancement Plan (Oct. 5, 2018)

CONFIDENTIAL                                                                                    ADOC-DS019058

**Short-term 90 day St. Clair Security Enhancement Plan.**

Key Fact:  The St. Clair facility (as are all other ADOC facilities) are grossly understaffed. Previous studies suggest about 225 staff are needed for the main prison and less than half are currently filled. Even fewer report for duty each day. The major solution for St. Clair and the other ADOC facilities is a systemic and significant lowering of the entire prison population.

That said, the following steps could be taken by the ADOC to enhance safety at St. Clair. The major additional resource required is to fill two escort/rover positions as described below by 1/1/2019.

**Priority 1. Reduce Current Inmate Population by 96 inmates and close a full unit by 11/1/2018.**

The following actions are recommended to achieve this reduction:

      a. Cease all new admissions to St. Clair;

not      b. Transfer medium security inmates, with good conduct records, and who do hold essential jobs to other DOC medium security facilities;

troubled      c. Reassign staff now assigned to a closed unit (to be determined) to the general population P and Q units; and,

      d.  Establish new prison population cap of 701 effective 11/1/2018.

create      e. To expedite the filling of key security staff positions, the ADOC should to
security  civilian positions for the 9 cubicle positions which are easier to fill. Existing
housing unit      staff assigned to fill the 9 cubicle posts can be re-assigned to other
.      and/or escort/rover positions.

      f. The N and O units are ready for occupancy.  It may be desirable to close either Unit P and/or Q and move that population to the renovated N and/or O units.

**Priority 2. Enhance Security within General Population (now housed in P and Q units) by 12/1/2018**

      The following actions need to be implemented at these two units:

      a. Mandate that the cubicle and assigned officer post positions are always filled for both AM and PM shifts;

b. Institute the use of immediate individual cell lockdown for moderate but still serious offenses as opposed to either doing nothing and sending inmates to the disciplinary segregation units;

c.  Add cameras to the units;

d. Require the assigned classification specialist to meet within 48 hours any inmate in P or Q who receives a disciplinary incident to better determine the issue(s) surrounding the incident and make appropriate referral to the ICB for possible housing unit change; and,

e. Conduct random monthly security searchers for contraband and weapons until such searches produce minimal results.

**Priority 3. Fully Implement Restricted Housing Program by 1/1/2019.**

a. As the population is lowered and additional staff are hired, the ADOC should continue the process of opening up the RHP;

b. In order for this to occur, add two additional post escort/rover positions, 7 days per week, 6 am to 6 pm, to provide escort/rover services as required by the RHU SOP.

c. These positions should be filled by experienced existing staff as the ADOC adds additional staff (new hires or transfers) to St. Clair over the next three months.

d. In the interim, 90 day reviews by the ICB as mandated by the SOP should proceed but recognizing that inmates will not be able to receive the proposed levels of out of cell time due to staff shortages (especially on weekends).

the

e. In the interim, inmates now assigned to RHU should be housed according to three RHU phases (Red, Green and Gold) and Housing Plan as agreed to by the ADOC in the SOP.

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 2:
QIT Meeting Minutes (Dec. 18, 2018)

CONFIDENTIAL                                        ADOC-DS019061



# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883



**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

December 18, 2018

To:  Mark Fassl, Inspector General
    Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Assistant Inspector General

Re:  QIT Meeting Minutes

**Attendees:**  ADOC Legal Bart Harmon, Ken McGinnis (via phone), Institutional Coordinator Edward Ellington, Administrative Analyst Marilyn Bruton, Director of Research and Planning, Glen Casey, Deputy Inspector General Monica McCoy, I&I Agent Brad Arledge, Warden III Karla Jones, Associate Commissioner Steve Watson, Associate Commissioner Jeffery Williams

<u>**Agenda**</u>

### December 18, 2018 Meeting Agenda Items to Discuss

- Status of Camera project including projected timeline for P/Q installation;

- Issues on need for expanded search for contraband (Discussion of the East Mississippi Correctional Facility approach to search for contraband);

- Discussion on alternatives to overcome staff shortages – discussion item from EJI;

- Discussion of Issues with P/Q including amount of contraband, unauthorized movement, lock and door repair, etc. (Ryan Becker memo of 12/11/18;

- Follow-up discussion on the accuracy/Completeness of Incident reporting tracking and dashboard – includes alleged misclassification of incidents, inaccurate bed assignments, inaccurate locations and time of incidents (EJI memo dated Nov 2, 2018)

   Inconsistency with class description (drug testing/intoxicants, intentional creating security, bed assignments, etc.).  Discuss EJI previous memorandums regarding discrepancies noted in Dashboard. See email attachments.

Page | 1

**Points of Discussion/Follow-up**

In review of the recent allegation that the Department is underreporting incidents of **"serious injury"** the team reviewed the following points:

- AC Steve Watson facilitated the discussion of the Agency's definition of **Serious Physical Injury.**

The discussion of **Serious Physical Injury** in relation to capturing incidents on the Incident Dashboard, which Research and Planning has developed.    Four of the most important questions were discussed;

1. Is our definition sufficient, or should it be modified?  (our definition, the definition in the AL Criminal Code, and ASCA guidance is highlighted below)
2. When selecting a type of incident for reporting purposes, is there sufficient guidance in the definition so that our staff recognizes an injury/illness as such?
3. Is there a review of reports sufficient to ascertain that the determination is correct?
4. Is there a mechanism to modify the incident title once submitted, if review deems it should be changed?

Again, the team reviewed and compared the definition as prescribed in Administrative Regulation #302 Incident Reporting, Association of State Correctional Administrators (ASCA) and the Alabama Criminal Code.

ADOC AR 302, "Incident Reporting"

Serious Injury/Illness: Personal injury or sickness that may require emergency care at a medical provider, to include, but not limited to, prolonged unconsciousness, obvious disfigurement, protracted loss or substantial impairment of the body or mental faculty, or one which carries a substantial risk of death.

Alabama Criminal Code § 13A-1-2

(14)  SERIOUS PHYSICAL INJURY. Physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ.

**Association of State Correctional Administrators (ASCA)**

A serious injury requires urgent and immediate medical treatment and restricts the inmate's usual activity. Medical treatment should be more extensive than mere first aid such as the application of bandages to wounds. It might include stitches, setting of broken bones, treatment of concussion, loss of consciousness, etc.

In review of the existing definition:

Serious Injury/Illness: Personal injury or sickness that may require emergency care at a medical provider, to include, but not limited to, prolonged unconsciousness, obvious disfigurement, protracted loss or substantial impairment of the body or mental faculty, or one which carries a substantial risk of death.

The team reviewed the highlighted terminology, the application, renewal, quality control, and supervisory review to make it sufficient, and to minimize the number of said cases;

-Collectively it was decided that the existing definition is sufficient, with minor changes to the verbiage, "personal injury or sickness which require…"

-AC Watson will construct the revisions to the definition and disseminate to the team prior to sending to, Legal, Commissioner Dunn and Chief of Staff Hill for consideration.

Page | 2

-The noted problems with the application process of determining what is a "serious injury" at the line supervisors level will be remedied with developmental training on the applicable administrative regulations, and an incident report writing refresher, being medically informed, receiving guidance from the "On-Call" official, and ultimately the security supervisor will make an informed decision based on "the totality of circumstances" surrounding the incident.

-IC Ellington and Warden III Jones will confer with training and formulate an applicable training block.

-AC Williams and IC Ellington agreed to coordinate the remedial training for the next Wardens meeting

- A review for adding the classification, "Inmate-on-Inmate Fight w/Serious Injury," it was concluded, as a delineation between assault vs. fight will be added to the incident report module.

    -Glen will confer with Information Systems on the application and implementation of the suggested change.

- Ken and Bart led the discussion of the functionalities and responsibilities of the QIT per the Standard Operating Procedure and Settlement Agreement:

-Marilyn navigated the team through a monitoring and analysis of the Dashboard for the months of September to current.
                    -The review consisted of the current dashboard; monthly and quarterly analysis and trends (H, P & Q dormitories, Assaults/Fights, Contraband, Out of Place etc.).

    -As previously mentioned, September was one of the worst months in regards to inmate violence and deaths. The Dashboard reflects a substantial decline in violent incidents, to include deaths from October to current.  Assaults, Fighting with and without a Weapon, Weapons, Contraband Discovery, Institutional Searches/Shake Downs, Possession of Contraband, Out of Place and Unauthorized Area were all items of review.

    -There was a notable decline in violence in regards to Assaults and Homicides from November to current.

    -There was a significant decrease in the number of incidents classed "Intentional Creating a Safety, Security…".

    -Due to there are multiple options to denote the discovery of contraband, specifically weapons (i.e. Possession of Contraband, Contraband Discovery, Institutional Searches, Fighting w/Weapon, Assault w/Weapon, Major Shakedowns, etc.), the team discussed ways to hone in on contraband discovery and consistency in the reporting.

    -Warden Jones and IC Ellington advised, the security staff is currently responsible for conducting (4) random searches per officer, per shift.  Although there is an obvious need to improve the quality of the everyday searches, the searches are being conducted and documented daily per shift by security staff.

    -Bart and Glen concluded that, to have accurate record of searches, all searches; routine, random, 24 hour shakedowns, CERT missioned etc., will be forwarded to them for tracking.  Glen will confer with Ram on the details to implement this process.

- Bart discussed EJI's most recent tour of St. Clair, the effectiveness of the Internal Classification Review Board.

    -Bart discussed many noticeable improvements; institutional hygiene, infrastructure, temperament, level of security and controlled movement.

    -Bart rendered kudos to Warden Jones and her staff for their continuous efforts towards improving, and for the quality and effectiveness of the internal classification process.

Page | 3

- Staffing was discussed in regards to recruiting, hiring, post coverage, additional rovers in P & Q, C.E.R.T. rotation, institutional searches, hospital coverage, Citizens contract and coverage.

  -Due to the gravity of staff shortages, CERT rotation is twice monthly and usually comprises of 7-8 members, which are utilized for post coverage.  Which in turn limits the number of CERT team major institutional searches for contraband.

  -There has been an addition of (2) contractors to medical observation and supervision.

  -Due to the high custody of inmates housed at St. Clair, inmates admitted to Citizens and other free-world hospitals requires at least (1) ADOC security personnel in addition to the NSA security guard.

  -Warden Jones advised that (7) trainees were hired on December 1, 2018.  A few officers assigned to Limestone still volunteer to work overtime and (1) retiree returned in the last (6) months to work part-time.

  -Currently we are not conducting direct appoints of the Basic Academy graduates to St. Clair.

  -AC Watson advised that we should see an overall improvement soon in regards to competitive wages once the enhance compensation package is approved per our (3) year Strategic Plan.  This should help with the morale, recruiting, and retention of staff.

- Follow-up discussion on the accuracy/completeness of incident reporting, tracking and dashboard data– includes alleged misclassification of incidents, inaccurate bed assignments, inaccurate locations and time of incidents (EJI memo dated Nov 2, 2018)

  -DIG McCoy explained that at the completion of the collection of documentation for the said months, she will be able to give more of a fair and accurate quality report and trend analysis of the documentation and reporting procedures. The results of the quality check and trend analysis sample will be added to agenda for the next meeting.

  -The thoroughness of incident reporting, specifically classification, location, time and bed assignments were discussed in detail. The Incident Report Manager will be apprised of the specific details, and alternate solutions to induce a higher level of accuracy prior to entering the information on the Dashboard.

- Warden Jones advised per her observations, the educational wing (Welding) gives access for inmates to construct and introduce premium prison made weapons inside the institution, via throwing them over the fence. The team discussed ways to reduce the level of vulnerability (Fencing, Mobile Metal Detector etc.).  It was agreed that to fortify where the weapons are being fabricated, the staff will maintain photos of all weapons for review.  In turn, this should help us to be more concise in:

  -Tracking the type, quality and possible source

  -Demonstrate improvement

  -Target areas of contraband

- Brad discussed from his observations, there has been improvement in the PREA reports and the overall classification of reports.

  -IC Ellington and Bart will confer with Director Sides to clarify Brad's specific investigative role and responsibility to St. Clair and Operations.

Page | 4

CONFIDENTIAL                                                          ADOC-DS019065

- The camera project is at a standstill, IC Ellington with confer with Jenny Abbott on the status of the recommended designs for dorms P & Q, the repairs of the inoperable cameras (lenses, covers) and suggested ways to make the lenses less vulnerable to vandalism.

- The next meeting will be held January 23rd at 9:.00 a.m. @ ADOC Legal Conference Room

CONFIDENTIAL

ADOC-DS019066

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 3:
Commissioner Dunn Presentation (Jan. 24, 2019)

CONFIDENTIAL

ADOC-DS019067

# St. Clair Meeting

January 24, 2019

CONFIDENTIAL

ADOC-DS019068

# Agenda & Goals

- Positive Steps
- Current Status
- Remedies

CONFIDENTIAL

ADOC-DS019069

# Positive Steps

- Installation of new security doors.
- Creation of Internal Classification Board.
- Implementation of dashboard review system.
- Installation of Incident Report Manager and Institutional investigator; implementation of associated protocols.
- Ongoing development of QIT process.

CONFIDENTIAL

# Current Status

- Six critical issues at St. Clair today:
  - Staffing
  - Four homicides in the past year
  - Weapons contraband
  - Unauthorized movement
  - Lack of cameras
  - P/Q Blocks management

ADOC-DS019071

# Staffing

- The experts are in agreement that St. Clair is dangerously understaffed.
  - Review by Richard Stalder found St. Clair operating below staffing baseline required for safe operation:
    - St. Clair needs a minimum of 26 officers assigned to housing units per shift.
    - St. Clair averages only 16 to 17 officers assigned to the housing units per shift.
    - There have been as few as 11 officers assigned *to the entire facility* (9/22/2018).
  - As a result of the staffing crisis, mandatory positions vital to safety of staff and inmates remain vacant.

CONFIDENTIAL

ADOC-DS019072

# **Staffing**

- Example: 7/1/2018
  - 13 total officers on duty *for entire facility* (5 part-time and 1 overtime).
  - No rovers in J/K, L/M, or P/Q Blocks.
  - 1 rover assigned to N/O Blocks (unit closed).

# Staffing

- Example: 9/2/2018
  - No rovers in any G-Yard housing blocks.

St. Clair Correctional Facility
Night Duty Post Roster

Date: 9/2/2018 Original Day: Sunday

| POST ASSIGNMENTS | NAME | | IN | OUT | DUTY ASSIGNMENTS |
|---|---|---|---|---|---|
| **Shift Commander** | **Price, Antoine LT.** | | 5pm | 6a | - Limestone - |
| Population Sergeant | | | | | |
| Population Sergeant | **Milton, SGT** | | 6p | | T. Stephens |
| **Shift Clerk** | **Scott, J** | | 6p | 6a | |
| Central Control | | | | | |
| Central Control | Corder CCO | | 6p | 6a | |
| **Front Lobby** | **LT. Billingsley** | | 24hpm | | |
| **ICS Officer** | | | | | Emerg. Ass. Off. (IMI) for Dialysis/ H Dorm |
| Breezeway | | | | | |
| Pop Gate | Brugman | | 6p | 6a | Emergency Assistance Officer (IWI) |
| J/K Rover | | | | | |
| **J/K Hallway** | | | | | |
| **J/K Hallway** | | | | | |
| **L Cube** | ~~Lewis RVO 12~~ Corder | | 6p | 6a | |
| **M Cube** | Carnegie CCO | | 6 | 6a | |
| L/M Rover | | | | | Area of Rescue Assistance Officer |
| L/M Rover | | | | | Emergency Assistance Officer (IWI) |
| L/M Rover | | | | | Emergency Assistance Officer (IWI) |
| **N Cube** | XXXXXXXXXXXXXXXXXX | | | | Post Closed |
| **O Cube** | XXXXXXXXXXXXXXXXXX | | | | Post Closed |
| | | | | | |
| **P Cube** | ~~Harris, J.~~ Lewis | | 6pm | | |
| **Q Cube** | Russell RVO 12 | | 6p | 6a | |
| P/Q Rover | | | | | Area of Rescue Assistance Officer |
| P/Q Rover | ~~Neil RVO 12~~ | | | | Emergency Assistance Officer (IWI) |
| P/Q Rover | | | | | Emergency Assistance Officer (IWI) |
| **G Block Rover** | **Beaman** | | 6p | 6a | Area of Rescue Assistance Officer |
| Kitchen Officer | Zuspan, D | | 6p | 6a | Area of Rescue Assistance Officer |
| Kitchen Officer | | | | | Post Closed |
| **Gym Officer** | | | | | Emergency Ass. Off. (IWI) for Gym/Library/Chapel |
| Tunnel Officer | | | | | Emerg. Ass. Off. (IWI) for G Dorm/ACI/Trade School/Kitchen |
| **Sally Port Tower** | **Hitchcock v - 12** | | 6 | 6a | |
| **Sally Port** | | | | | |
| **Mobile Security Unit** | Gaines, M | | 6p | 6a | |
| **Zone 6 Tower** | | | | | |
| **Law library** | | | | | |
| Segregation Sergeant | **Mason John SGT.** | | 420p | 6a | |
| **Shift Clerk** | | | | | |
| **A-Cube** | J.T. Griffith | | 6 | 6a | |
| A Rover | **Norris, Jason, SGT** | | 500 | 6a | |
| A Rover | | | | | |
| **B-Cube** | **Puckett mand 4** | Hospital | 6p | | |
| **C-Cube** | Robinson, D | | 6p | 6a | |
| B/C Rover | White | | 8p | 6a | Shower B |
| B/C Rover | Humphrey | | 3p | 6a | Shower B |
| B/C Rover | | | | | |
| **D-Cube** | **Mostella mand 4** | Hospital | 6p | | |
| **E-Cube** | **Shorter mand 4** | | 6p | 10p | |
| D/E Rover | Hopper, T | | 6p | 6a | Shower C |
| D/E Rover | Guined, T | | 6p | 6a | Shower C |
| D/E Rover | | | | | |
| **Property Room** | | | | | |
| **Drug Lab** | Warren | | 3 | | |
| Infirmary Officer | Lowery, M | | 6p | 6a | Area of Rescue Assistance Officer (IWI) |
| Infirmary Rear Rover | | | | | Area of Rescue Assistance Officer (IWI) |
| **H-Dorm** | Crosby | | 6p | 6a | Emergency Assistance Officer (IWI) |
| **H-Dorm** | Caldwell mand 4 | | | | Area of Rescue Assistance Officer (IWI) |
| | | | | | |
| **Hospital** | **Thompkins / Broxson** | | | | Hyche BWD 261 |
| **Hospital** | **Payne** / Shaw, B | | | | Davis UAB 9326 |

| ANNUAL | Holiday | Sick | Training | MILITARY |
|---|---|---|---|---|
| Spell, C | | C. Smith RVO 12 | | |
| | | Woods, M | | |
| | | Hawkins, K | | |
| | | Howard, J | | |
| | | | | |
| **Murray, Lester SGT.** | | | | |

***By my signature below (above) I acknowledge that I understand the operational procedures and accept responsibility of the duties on my assigned post."**

# **Staffing**

- Example: 10/24/2018
  - 16 total officers on duty *for entire facility*.
  - No rovers in any G-Yard housing blocks.
  - No cube officers in M and Q Blocks.

# P/Q Blocks Patterns

- P/Q Blocks are the most dangerous housing units:
  - From August to November, 2018, 78% of serious incidents of violence at St. Clair occurred there.
  - All four homicides either occurred in P/Q Blocks or involved residents of P/Q Blocks.
  - Since September 2018, 85% of men found in unauthorized locations were assigned to P/Q Blocks.





ADOC-DS019076

# **Weapons Contraband**

- Weapons contraband continues to saturate the prison. In the first year of monitoring:
  - 712 knives/stabbing instruments recovered.
  - 105 knives/stabbing instruments were attested to in incident reports but were *not* recovered.
    - Weapons were *not* recovered in 70% (24 of 34) of incidents classified as homicides and inmate-on-inmate assaults resulting in serious injury.
    - Weapons were *not* recovered in 3 of the 4 stabbing homicides in the past year.
  - <u>Total</u>: 817 knives/stabbing instruments recovered or attested to.

CONFIDENTIAL                                                                                           ADOC-DS019077

# Contraband Searches

- AR 336 and SOP 110 require facility-wide searches monthly.
  - Such searches have happened once (in December 2017) since monitoring began.
  - All housing areas in general population were searched in only 3 of 12 months (December 2017, March 2018, October 2018).



ADOC-DS019078

# Contraband Searches

- AR 336 and SOP 110 require 8 cell searches per day in P/Q Blocks.
  - From August to November, 2018, there should have been 968 cell searches in P/Q Blocks.
  - There were 19 *total* cell searches during that 121 day period.



ADOC-DS019079

# Unauthorized Movement

- Hundreds of men have been identified in unauthorized locations during monitoring period.

- Unauthorized movement has played a direct role in over 100 incidents, including the most serious incidents of violence, sexual assault, and extortion.

- There are frequently more men counted as present in a given housing unit than are assigned to live there, including during periods overnight.

CONFIDENTIAL

# Unauthorized Movement

- Staff fail to conduct and document bed roster checks as required by SOP 340:
  - Two bed counts per week or 104 bed counts per year.
- When staff do conduct bed counts, they consistently identify men who are not in their assigned location, documenting 172 men who were not in their assigned cells in just 17 institutional bed counts in the past year.



ADOC-DS019081

# Unauthorized Movement

- Unauthorized movement undermines the safety of ADOC's residential drug treatment program in H Dorm at St. Clair.

| 1. Institution/Division: ST.CLAIR CORRECTIONAL FAC. | | 2. Date: 11/6/2018 | 3. Time: 4:11:00 PM | 4. Inc. No: SCCF-18-01467 Class Code: B |
|---|---|---|---|---|
| 5. Type of Incident - PRIMARY: Assault-Inmate-On-Inmate -- Non Serious Injury | | | 6. ASCA Incident Type - PRIMARY: | |
| 7. Type of Incident - Secondary: Weapon - Device Possession | | | 8. ASCA Incident Type - Secondary: III 12.2 Major Contraband Finds of Weapons. | |
| 9. Who Received Report: JONES, RUSSELL    A | | | 10. Time Incident Reported: 11/6/2018 4:12:00 PM | |
| 11. Location of Incident: H-Dorm | | | | |
| 12. Victim(s):    Name | | | AIS | |
| 13. Suspect(s):    Name | | | AIS | |
| 14. Witness(es):    Name N/A | | | AIS | |
| PHYSICAL EVIDENCE: | | | | |

| 15. Type of Evidence / Description: | 16. Chain of Evidence / Location & Date: |
|---|---|
| Weapon Knife Metal. On inmate ███ person, Inmate ███ stab inmate ███ / Metal fence material. Tension bar. Approximately 9 1/2 inches long. | COREY MARTIN / retrived from inmate ███ person 11/6/2018 4:12:00 PM<br><br>RUSSELL JONES / From Officer Corey Martin 11/6/2018 4:15:00 PM evidence box control / St.Clair Correction Facility 11/6/2018 5:30:00 PM |

17. Narrative Summary:

On November 6, 2018, at approximately 4:11 pm, Officer Corey Martin observed inmate ███ Q 44-2A) enter H- Building and pull an inmate made weapon and assaulted inmate ███ (H 114A). Officer Martin called via hand held radio for assistance. Lieutenant Russell Jones and several Officers responded. Inmate ███ was taken into custody and placed in handcuffs and searched. Officer Martin confiscated the inmate made knife from inmate ███ At approximately 4:15 pm, Nurse Michelle Bessette conducted a medical examination of inmate ███ for Restrictive Housing placement. See attached body chart. Lieutenant Jones and Sergeant Willie McLemore

    ADOC-DS019082

# Cameras

- Vast majority of existing cameras are non-operational; no cameras in P/Q Blocks are operational.

- Existing cameras do not have recording capabilities.

- The experts have not received plans or a date certain for installation of proposed camera project in P/Q Blocks.

ADOC-DS019083

# **Remedies**

- 30 Day Plan to Stabilize P/Q Housing Units
  - Enhance staffing in P/Q housing units.
  - Weapons contraband interdiction.
  - Install camera system in P/Q housing units.

ADOC-DS019084

# Remedies: P/Q Staffing

- Create mandatory posts of staff in P/Q Blocks.
    - **Cube Officers**;
    - **Unit Officers** are assigned to and remain within unit; and
    - **Roving Officers** provide assistance to unit officers as required/shakedown/escort/other duties associated with assigned unit(s).

CONFIDENTIAL

ADOC-DS019085

# Remedies: P/Q Staffing Needs

## Posts 5 a.m. – 11 p.m.

– 8* staff required for 18 hours per day/7 days per week:

- Unit P1 Officer
- Unit P2 Officer
- Unit Q1 Officer
- Unit Q2 Officer
- Units P1/P2 Cube Officer
- Units Q1/Q2 Cube Officer
- Units P1/P2 Rover
- Units Q1/Q2 Rover

*29 staff required for 3.3 relief factor

## Posts 11 p.m. – 5 a.m.

– 5* staff required for 6 hours per day/7 days per week:

- Unit P Officer
- Unit Q Officer
- Unit P/Q Rover
- Units P1/P2 Cube Officer
- Units Q1/Q2 Cube Officer

*6 staff required for 1.1 relief factor

CONFIDENTIAL

ADOC-DS019086

# **Remedies: Weapons Contraband**

- Focus on weapons contraband interdiction:
  - Systematic and routine searches
  - CERT team
  - K9 officers

ADOC-DS019087

# Remedies: P/Q Cameras

- Install camera system in P/Q housing units.

CONFIDENTIAL

# **Remedies**

- Full implementation of Restrictive Housing Program (RHP).

CONFIDENTIAL

# Remedies: Long-Term

- Identify which officer positions need to be APOST certified.

- Create new unit officer post position in each unit (rovers are separate).

- Conduct correctional officer training locally.

ADOC-DS019090

# Remedies: Long-Term

- Fill the vacant CCO positions.



ADOC-DS019091

# Remedies: Legal Authority

- Admin. Reg. 10 "Department of Corrections Disaster Assistance & "State of Emergency" Plan"
  - May be declared by Commissioner: "upon a determination that the orderly function and/or security of any facility is threatened by a specific occurrence o[r] circumstance."
  - Commissioner has "authority to temporarily suspend all normal activities, including but not limited to":
    - Policy and procedure directives;
    - Job and shift assignments;
    - Leave; and
    - ARs and SOPs.

CONFIDENTIAL

# Remedies: Legal Authority

- Establish new posts in similar manner to establishing the CCO Position:
  - Ala. Code § 14-1-4(a): ADOC may "appoint officers and employees as it may require for the performance of its duties and shall fix and determine their qualifications, duties, and authority").
  - In a prior opinion, the A.G.'s office found ADOC could hire security guards to fill positions formerly held by COs because there was "no prohibition against the hiring of security officers by the Department of Corrections as long as the department does not rescind a correctional officer position." Ala. Op. Att'y Gen. No. 96-00067 (Dec. 13, 1995).

CONFIDENTIAL

# Remedies: Legal Authority

- Engage Personnel Board concerning Merit System and/or A-Post certification requirements:
  - Ala. Code § 36-26-18(d):
  "Whenever there is a vacancy in a position in the classified service where peculiar and exceptional qualifications of a scientific, professional or educational character are required and upon satisfactory evidence that for specified reasons competition in such special case is impracticable and that the position can best be filled by the selection of some designated person of high and recognized attainments in such qualities, the personnel board upon recommendation of the personnel director may suspend the examination requirements in such case…"

ADOC-DS019094

# Remedies: Legal Authority

- Engage Personnel Board concerning Merit System and/or A-Post certification requirements (cont.):
  - Ala. Code § 36-26-18(e):
    "Whenever it is impossible to certify eligible persons for appointment to a vacancy in the classified service, the appointing authority may nominate a person to the director. If such nominee is found by the director to have had experience and training which appear to qualify him for the position, the director may authorize the appointment of such person to such vacancy only until an appropriate eligible register can be established and appointment made therefrom. In no event shall a provisional appointment be continued for more than 156 workdays."

ADOC-DS019095

# **Remedies: Governor**

- Gov. Declaration of State of Emergency (Ala. Code § 31-9-3); National Guard staffing via Executive Order (Ala. Code § 31-2-109):
  - Can be narrowly tailored: If a state of emergency affects less than the entire state, the Governor has the power to designate which county or counties the state of emergency applies to (Ala. Code § 31-9-8(a)).
  - Done successfully in other states:
    - South Carolina (2018)
    - West Virginia (2017)

CONFIDENTIAL                                                          ADOC-DS019096

# Remedies: Governor

- South Carolina (2018)
  - Governor declared State of Emergency via Executive Order to reduce flow of contraband in prisons.
  - Written to establish partnership between DOC and State Guard to have guardsmen patrol exterior of facilities and occupy guard towers.

- West Virginia (2017)
  - Governor declared State of Emergency via Executive Order to supplement inadequate staffing in state's prisons.
  - Written broadly to allow supplemental staffing by National guardsmen and State Fire Marshal's Office in the interior and exterior of facilities.

CONFIDENTIAL

ADOC-DS019097

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 4:
Daniels Agenda Email (Feb. 12, 2019)

                                    ADOC-DS019098

Equal Justice Initiative Mail - St. Clair Meeting Feb. 14 2019 -- Update a...        https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



Ryan Becker <rbecker@eji.org>

---

## St. Clair Meeting Feb. 14 2019 -- Update and Agenda

---

**Charlotte Morrison** <cmorrison@eji.org>                                         Tue, Feb 12, 2019 at 9:55 AM
To: charles.daniels@doc.alabama.gov
Cc: "Harmon, Bart (DOC)" <Bart.Harmon@doc.alabama.gov>, Ken McGinnis <kmcginnis@cglcompanies.com>, Richard
Stalder <rls51@yahoo.com>, James Austin <jfainstitute@gmail.com>, JUDGE OTT <John_Ott@alnd.uscourts.gov>
Bcc: rbecker@eji.org

Dear Deputy Commissioner Daniels,

We very much look forward to meeting you on February 14.  We've met with the experts and prepared an agenda for
the meeting which is attached.  In addition, we wanted to get you the presentation we circulated at our Jan. 24
meeting with Commissioner Dunn.  This presentation reviews the most critical issues at St. Clair and was developed
together with experts Richard Stalder, Ken McGinnis, and Jim Austin.  We've summarized an overview of these issues
and what was discussed at the meeting below.

These meetings stem from a settlement agreement that ADOC entered into on November 1, 2017. The Agreement is
attached to this email. ADOC retained Mr. Stalder, Mr. McGinnis and Dr. Austin as experts for the purpose of assisting
in the development of the new systems and units identified in the agreement.  By all accounts, ADOC is not in
compliance with that agreement in that it is seriously behind or not attempting to comply with several key provisions of
the agreement.  ADOC and EJI returned to mediation with Judge Ott in June 2018.  ADOC, EJI, and the experts have
been meeting on an almost weekly basis since then in an effort to avoid returning to court.  All parties want the
settlement process to work, but the urgent issues the experts have identified at St. Clair require effective and
immediate action in order to continue with this process.

**Summary of Urgent Issues at St. Clair**

A schematic of St. Clair is attached with relevant information regarding the housing units and the population cap. See
Attachment A.

**Staffing Issues**:
The Commissioner agreed that staffing remains a crucial challenge for the department. Mr. Stalder's review indicated
that the facility needs a minimum of 26 officers assigned to the housing units (general pop and lockdown units) per
shift. He found that St. Clair averages only 16 to 17 officers for the housing units per shift. At times the facility have
had as few as 11 officers working the entire prison and there have been times where there were 0 officers assigned to
work in the general population housing units. During our conversation the Commissioner discussed the following
issues that he hoped would address the staffing problem at St. Clair:  (a) local recruiting and regional training of
officers; (b) CO specific APOST training curriculum; (c) development of a new security staff position; (d) increased
hours for retiree and part-time employees; and (e) assignment of 7 or more officers from current class to St. Clair.

**Management of P/Q Housing Unit**
The P/Q housing block is the most dangerous unit in the facility. All four of the homicides from the past year have
either occurred in the unit or involved residents from the unit. The unit is connected to nearly 80% of the most serious
incidents of violence at the facility. The P/Q unit also involves nearly all of the unauthorized movement at the facility,
with nearly 90% of unauthorized movement being connected to the unit. Finally, P/Q is connected to the most frequent
number of incidents involving weapons contraband at the facility. Given the level of violence, unauthorized movement,
and weapons contraband connected to the P/Q unit, the experts have recommended that the Department take
specific remedies to address the unit. These remedies are summarized in Attachment B.

**Weapons Contraband**
Weapons contraband continues to present a dramatic problem for St. Clair's safety. Incident reports documented the
presence of 817 knives/stabbing instruments over the past year. Many of these weapons were never recovered.
Knives used in 3 of the 4 stabbing homicides from the past year were never recovered.  A review conducted by EJI
concluded that the prison is doing less than 5% of the required contraband searches at the facility.  In a three month
sample, from August 2018 to November 2018, the prison documented 19 total cell searches in the P/Q housing unit.
Department policy requires 8 cell searches per day in those units.  In response to EJI's review, ADOC reviewed the

CONFIDENTIAL                                              ADOC-DS019099

number of contraband searches at the facility itself. The number ADOC came up with was consistent with EJI's data. Warden Jones responded to this data by stating that searches are being conducted but those searches were not documented. No one in management is therefore supervising, monitoring, or tracking this security function at the facility.

**Unauthorized Movement/Bed Checks**
The prison has a continued pattern of a significant level of unauthorized movement throughout the prison. As a result, men accessing unauthorized areas have been involved in the most serious incidents of violence, sexual assault, and extortion at the facility. This problem is exacerbated by the facility's failure to conduct routine bed roster checks to ensure men are in their assigned housing location. Experts Richard Stalder and Ken McGinnis raised this as a problem with the Commissioner during the meeting, explaining that staff generally conduct a physical count and as long as the number of men in the prison can be reconciled with the facility's population then the count is cleared. Staff clear count even when men are counted as being present in the wrong location. Attachment C is just one recent example of this routine practice. The inability to react to unauthorized movement is exacerbated by the facility's failure to conduct routine bed roster checks required by the staff's security duties. Over a one year period, the prison documented only 17 bed roster checks that took place by security staff. These 17 bed roster checks documented 172 men who were in unauthorized areas.

**QIT**
Finally, we look forward to discussing the QIT process with you. The ability to identify and react to negative trends at the prison is a potentially effective management tool. While we are hopeful that the collection of data and analysis of corrective action will continue to improve, there are additional issues that we've continued to observe that undermine accurate analysis of incident trends at the facility. Please note that our observations have been verified by an internal ADOC audit. Examples of the issues that we've seen are attached as Attachment D.

**Classification Issues**
St. Clair is one of ADOC's major institutions for placing inmates with "severe management problems." Of St. Clair's 984 beds, 216 of those beds are lockdown units. During litigation and mediation, the lockdown units were regularly filled to capacity because, as acknowledged by Associate Commissioner Grantt Culliver in his deposition, "there was a large amount of inmates that were at St. Clair in the segregation unit that were taking up space because they were refusing inmate population [due to safety concerns]." As a result of the lack of bed space in segregation, the prison was unable to place inmates with disciplinary and management concerns there and employed a "Hot Bay" model for managing this population in the P/Q housing blocks. Without programming or increased monitoring for this inmate population, P/Q housing blocks became the most dangerous housing units in the prison and remain that way today. Additionally, the inmates who were ultimately placed in segregation for disciplinaries did not receive any programming and were then released from segregation without any monitoring, creating serious safety issues and incidents of violence in general population.

During mediation, experts Richard Stalder and Jim Austin recommended and ADOC agreed to implement three remedies:

(1) establishment of an Internal Classification Board (ICB) to control housing assignments at St. Clair. Implementation of the ICB has required retraining of classification officers on the close custody AR. ADOC policy in the classification manual that has been interpreted to require 6 to 12 months of close custody for an inmate based on certain disciplinary infractions. Dr. Austin and Mr. Stalder recommended that this policy is a major impediment to the RHU's functioning and that the ICB needs to have the authority to move men with close custody designations.
(2) to free up bed space occupied by men in need of increased protection, ADOC agreed to establish a 48 bed Special Safety Unit (SSU). To date, 24 beds have been allotted for the SSU, and there remains a backlog of inmates in need of increased protection who are occupying beds in the segregation units.
(3) ADOC agreed to establish a 48 bed Behavior Modification Unit (BMU)--a step up-step down unit with programming and increased supervision--in general population. To date, ADOC has not been able to implement the BMU. The experts continue to work with the Department to establish a pared down version located in the lockdown units. Even this approach has not yet reached full implementation and the segregation and lockdown units continue to consistently operate at 98 to 100 percent capacity.

Please let us know if we can get you any additional materials or if you have any questions before we meet on Thursday. We look forward to working with you on these issues.

Thank you.

Charlotte Morrison

CONFIDENTIAL

ADOC-DS019100

**5 attachments**

**St. Clair Attachment B St. Clair PQ Management Remedies.pdf**
604K

**St. Clair Attachment A Schematic Housing Blocks.pdf**
700K

**St. Clair Attachment D QIT.pdf**
625K

**St. Clair Attachment C Unauthorized Movement.pdf**
1222K

**St. Clair Agenda 21419 Meeting.pdf**
31K

CONFIDENTIAL

ADOC-DS019101

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 5:
P/Q Management Remedies

CONFIDENTIAL                                   ADOC-DS019102

## ATTACHMENT B. MANAGEMENT OF P/Q HOUSING UNITS

Given the level of violence, unauthorized movement, and weapons contraband connected to the P/Q unit, the experts have recommended that the warden take specific remedies to address the unit. These include:

1. Creation of mandatory posts of staff in the P/Q unit, including a Unit Officer position for security staff to be present in the unit at all times, and dedicated Unit Rovers;
2. A specific focus on contraband interdiction in the unit consisting of systematic and routine searches;
3. Installation of a camera system in the P/Q housing units;
4. Full implementation of the Restrictive Housing Program.

In addition to the expert's recommendations, there are a number of additional steps that the Department should take to stabilize the prison, including:

1. Relying on St. Clair cert team to supplement staffing needs at St. Clair, including both posts and contraband searches. Note that the Commissioner observed that the St. Clair CERT team officers were being used to supplement Bibb's needs. He identified this as a problem that should be addressed.
2. Adjusting staffing posts to require mandatory unit officers within each of the P and Q housing units.
3. Use of metal detectors within the unit to address the prevalence of weapons contraband.
4. Increased contraband searches relying on the St. Clair K9 unit.
5. Developing a mechanism for accountability of searches, to verify they are being done and analyze how K9 unit is being deployed.

CONFIDENTIAL                                              ADOC-DS019103

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 6:
Unauthorized Movement

CONFIDENTIAL                                    ADOC-DS019104

## ATTACHMENT C. UNAUTHORIZED MOVEMENT/BED CHECKS

The attached bed roster and count sheet from December 15, 2018 is an example of the prison's failure to enforce men's assigned housing locations. The bed roster and count sheets from the day on the following pages demonstrate that the prison documented the movement but did not take corrective action.

Throughout the course of the day, officers repeatedly counted more men present in a general population housing unit than were assigned to live there. In fact, there were more men counted throughout the day than the number of beds available in the prison. Despite the officers continued count of men who were not authorized to be there, security staff did not require the men to leave the unit, did not record any disciplinary action for men during the day, and did not document any unauthorized movement in incident reports from the day.

- Each housing unit in general population has a capacity to house 96 men;
- On Saturday, December 15, 2018, there were 93 men assigned to M Block;
- In an institutional count at 3:11 p.m. there were 99 men present in the housing unit;
- In an institutional count at 8:25 p.m. there were 99 men present in the housing unit;
- In an institutional count at 10:16 p.m. there were 99 men present in the housing unit;
- Each of these three counts documented that there were 6 more men than were assigned to the unit, and 3 more men than the unit had capacity to hold;
- The prison did not document that any bed count rosters were conducted on December 15; and
- The prison did not document any incidents involving unauthorized movement on the day.

1 of 6

Alabama Department of Corrections

**IMAS002**

**Bed Count Roster**

**Housing Unit Totals at St Clair Correctional Facility**

| Housing Unit Name | Total Beds | Total Inmates | Black | White | Other |
|---|---|---|---|---|---|
| A | 24 | 23 | 10 | 13 | 0 |
| B | 48 | 44 | 29 | 15 | 0 |
| C | 48 | 47 | 31 | 16 | 0 |
| D | 48 | 47 | 42 | 5 | 0 |
| E | 48 | 48 | 41 | 6 | 1 |
| F | 25 | 21 | 11 | 10 | 0 |
| G | 58 | 34 | 20 | 14 | 0 |
| H | 200 | 125 | 86 | 39 | 0 |
| J | 96 | 90 | 29 | 61 | 0 |
| K | 96 | 89 | 41 | 48 | 0 |
| L | 96 | 95 | 72 | 22 | 1 |
| M | 96 | 93 | 67 | 26 | 0 |
| P | 96 | 77 | 69 | 8 | 0 |
| Q | 96 | 83 | 80 | 3 | 0 |
| **Location Total** | **1075** | **916** | **628** | **286** | **2** |

CONFIDENTIAL

ADOC-DS019106

**Alabama Department of Corrections**    **IMAS002**

### Bed Count Roster

**Population for Location: St Clair Correctional Facility**

|  | Total Beds | Total Inmates | Black | White | Other |
|---|---|---|---|---|---|
| **Location Population Total** | 1075 | 916 | 628 | 286 | 2 |
| **In Holding** |  | 0 | 0 | 0 | 0 |
| **In Ingated** |  | 0 | 0 | 0 | 0 |
| **In Outgated** |  | 10 | 7 | 3 | 0 |
| **Total Population** |  | **926** | **635** | **289** | **2** |

CONFIDENTIAL    ADOC-DS019107

Date: 12/15/2018

**Start Time:** 3:11pm

| BLOCKS | | | MISCELLANEOUS | | TOTALS | |
|---|---|---|---|---|---|---|
| | | | | | SEG____ | 239 |
| A | 23 | | DIALYSIS UNIT_____ | 0 | POP____ | 651 |
| | | | MAILROOM_____ | 0 | MISC____ | 0 |
| B | 47 | | G-YARD_____ | 0 | ADMIN__ | 27 |
| | | | MISC DETAIL_____ | 0 | PHYSICAL | |
| C | 47 | | MISC DETAIL_____ | 0 | TOTAL__ | 917 |
| | | | GYM_____ | 0 | | |
| D | 47 | | CHAPEL_____ | 0 | | |
| | | | NATIVE AMERICAN | | | |
| | | | GROUND_____ | 0 | | |
| E | 48 | | TOTAL_____ | 0 | | |
| | | | | | | |
| F | 27 | | ADMINISTRATIVE | | | |
| | | | CLERKS_____ | 0 | | |
| G | 32 | | TRADE SCHOOL_____ | 12 | Outgate | |
| | | | VEHICLE_____ | 0 | B/M____ | 6 |
| H | 122 | | MFB STANDARD FURN_ | 0 | W/M____ | 3 |
| | | | FURN ASSEMB II_____ | 0 | O/M____ | 0 |
| J | 83 | | FURNITURE_____ | 0 | | |
| | | | UPHOLSTERY_____ | 0 | TOTAL__ | 9 |
| K | 75 | | CHEM PLANT_____ | 0 | | |
| | | | SALLYPORT_____ | 0 | | |
| L | 92 | | BACKGATE_____ | 0 | | |
| | | | KITCHEN_____ | 11 | B/M____ | 629 |
| M | 99 | | LAUNDRY_____ | 0 | W/M____ | 286 |
| | | | LIBRARY_____ | 0 | O/M____ | 2 |
| N | 0 | | SHIFT OFFICE_____ | 2 | PHYSICAL | |
| | | | SEG OFFICE_____ | 2 | TOTAL__ | 917 |
| O | 0 | | SOCIAL SERVICES____ | 0 | Outgate__ | 9 |
| | | | MAINTENANCE_____ | 0 | | |
| P | 75 | | TOTAL_____ | 27 | TOTAL__ | 926 |
| | | | | | | |
| Q | 73 | | **Count Cleared At:** | | 3:34pm | |
| | | | | | | |
| | | | **Shift Clerk:** | | R. McGilberry, CS | |
| BLOCK TOTALS____ | 890 | | **Shift Commander:** | | J. Weaver, CS | |
| | | | **Notes:**_____ | | | |
| | | | _____ | | | |
| | | | _____ | | | |
| | | | _____ | | | |
| | | | _____ | | | |

4 of 6

ADOC-DS019108

Date: 12/15/2018

Start Time: ___8:25 PM___

| BLOCKS | | MISCELLANEOUS | | TOTALS | |
|---|---|---|---|---|---|
| | | | | SEG_____ 238 | |
| A _____ 23 | | DIALYSIS UNIT_____ 0 | | POP_____ 679 | |
| | | MAILROOM_____ 0 | | MISC____ 0 | |
| B _____ 47 | | G-YARD_____ 0 | | ADMIN__ 0 | |
| | | MISC DETAIL_____ 0 | | PHYSICAL | |
| C _____ 47 | | MISC DETAIL_____ 0 | | TOTAL__ 917 | |
| | | GYM_____ 0 | | | |
| D _____ 47 | | CHAPEL_____ 0 | | | |
| | | NATIVE AMERICAN | | | |
| | | GROUND_____ 0 | | | |
| E _____ 48 | | TOTAL_____ 0 | | | |
| | | | | | |
| F _____ 26 | | ADMINISTRATIVE | | | |
| | | CLERKS_____ 0 | | | |
| G _____ 33 | | TRADE SCHOOL_____ 0 | | Outgate | |
| | | VEHICLE_____ 0 | | B/M_____ 6 | |
| H _____ 125 | | MFB STANDARD FURN_ 0 | | W/M_____ 3 | |
| | | FURN ASSEMB II_____ 0 | | O/M_____ 0 | |
| J _____ 90 | | FURNITURE_____ 0 | | | |
| | | UPHOLSTERY_____ 0 | | TOTAL___ 9 | |
| K _____ 87 | | CHEM PLANT_____ 0 | | | |
| | | SALLYPORT_____ 0 | | | |
| L _____ 93 | | BACKGATE_____ 0 | | | |
| | | KITCHEN_____ 0 | | B/M_____ 629 | |
| M _____ 99 | | LAUNDRY_____ 0 | | W/M_____ 286 | |
| | | LIBRARY_____ 0 | | O/M____ 2 | |
| N _____ 0 | | SHIFT OFFICE_____ 0 | | PHYSICAL | |
| | | SEG OFFICE_____ 0 | | TOTAL__ 917 | |
| O _____ 0 | | SOCIAL SERVICES_____ 0 | | Outgate__ 9 | |
| | | MAINTENANCE_____ 0 | | | |
| P _____ 78 | | TOTAL_____ 0 | | TOTAL__ 926 | |

Q _____ 74

**Count Cleared At:** ___8:55 PM___

**Shift Clerk:** ___CO N. Maul___

**Shift Commander:** ___Sgt. Santa Maria___

BLOCK TOTALS_____ 0

Notes: _____

_____

_____

_____

5 of 6

CONFIDENTIAL

ADOC-DS019109

Date: 12/15/2018

**Start Time:  10:16 PM**

| BLOCKS | | MISCELLANEOUS | | TOTALS | |
|---|---|---|---|---|---|
| | | | | SEG_____ | 237 |
| A _____ | 23 | DIALYSIS UNIT_____ | 0 | POP_____ | 680 |
| | | MAILROOM_____ | 0 | MISC____ | 0 |
| B _____ | 47 | G-YARD_____ | 0 | ADMIN___ | 0 |
| | | MISC DETAIL_____ | 0 | PHYSICAL | |
| C _____ | 47 | MISC DETAIL_____ | 0 | TOTAL__ | 917 |
| | | GYM_____ | 0 | | |
| D _____ | 47 | CHAPEL_____ | 0 | | |
| | | NATIVE AMERICAN | | | |
| | | GROUND_____ | 0 | | |
| E _____ | 48 | TOTAL_____ | 0 | | |
| F _____ | 25 | **ADMINISTRATIVE** | | | |
| | | CLERKS_____ | 0 | | |
| G _____ | 33 | TRADE SCHOOL_____ | 0 | **Outgate** | |
| | | VEHICLE_____ | 0 | B/M_____ | 6 |
| H _____ | 125 | MFB STANDARD FURN_ | 0 | W/M_____ | 3 |
| | | FURN ASSEMB II_____ | 0 | O/M_____ | 0 |
| J _____ | 90 | FURNITURE_____ | 0 | | |
| | | UPHOLSTERY_____ | 0 | TOTAL__ | 9 |
| K _____ | 87 | CHEM PLANT_____ | 0 | | |
| | | SALLYPORT_____ | 0 | | |
| L _____ | 94 | BACKGATE_____ | 0 | | |
| | | KITCHEN_____ | 0 | B/M_____ | 629 |
| M _____ | 99 | LAUNDRY_____ | 0 | W/M_____ | 286 |
| | | LIBRARY_____ | 0 | O/M_____ | 2 |
| N _____ | 0 | SHIFT OFFICE_____ | 0 | PHYSICAL | |
| | | SEG OFFICE_____ | 0 | TOTAL__ | 917 |
| O _____ | 0 | SOCIAL SERVICES____ | 0 | Outgate__ | 9 |
| | | MAINTENANCE_____ | 0 | | |
| P _____ | 78 | TOTAL_____ | 0 | TOTAL__ | 926 |

Q _____ 74

**Count Cleared At:** ____10:50 PM____

**Shift Clerk:** ____CO N. Maul____ _Natten Maul_

**Shift Commander:** ___Sgt. Santa Maria___ _Guium, cs_

BLOCK TOTALS_____ 0

Notes: _____
_____
_____
_____

6 of 6

CONFIDENTIAL

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 7:
QIT and Data Issues

CONFIDENTIAL                                    ADOC-DS019111

## ATTACHMENT D. QIT AND ACCURACY OF ST. CLAIR DATA

The QIT process is negatively impacted by the prison's management issues. This includes to require officers to perform and document the basic security duties required by the Department's administrative regulations and standard operating procedures. While weapons contraband continues to present a dramatic problem for St. Clair's safety, the managers have not taken adequate steps to respond to the crisis. This includes:

- The documented presence of 817 knives/stabbing instruments in one year of data from the prison.
- The prison's failure to recover knives used in 3 of the 4 stabbing homicides from the past year.
- A failure to record that staff are conducting the necessary contraband searches. A review conducted by EJI concluded that the prison is doing less than 5% of the required contraband searches at the facility.
- In a three month sample, from August 2018 to November 2018, the prison documented 19 total cell searches in the P/Q housing unit;
- Department policy requires 8 cell searches per day in those units;
- The facility's recent failure to react to the presence of contraband is connected to a historic pattern of the facility's failure to do the necessary searches.
- Additionally, as discussed in Attachment C, the prison fails to document that the officers are conducting the required bed roster checks to ensure men are in their assigned housing locations.

    While we are hopeful that the collection of data and analysis of corrective action will continue to improve, there are additional issues that we've continued to observe that undermine accurate analysis of incident trends at the facility. Here are some examples of the issues that we've seen:

    *Failure to record weapons involved in incidents*: On January 22, 2019, ███████████████████ was hospitalized after being stabbed. SCCF-19-00086. The facility failed to document that a weapon was involved in the incident dashboard or incident categorization. SCCF-19-00086. This failure

1 of 2

undermines attempts to rely on the data from the dashboard to analyze serious incidents of violence involving weapons.

*Inaccurate incident categorization*: The incident involving ███████████ was categorized in the incident dashboard as an "Assault-Inmate-on-Employee with Serious Injury." Any trend analysis relying on the dashboard data regarding this incident would mis-categorize this incident as an assault on an officer, rather than an inmate.

*Failure to document underlying factors contributing to incidents of violence*: In the same incident involving ███████████ the facility failed to record additional, critical information contributing to the assault. The assault was reported to have occurred in housing unit Q2. There were three assailants identified as responsible for the assault. None of these three individuals were assigned to Q2. Two of the men were assigned to P block, and one was assigned to M block. SCCF-19-00086.

*Inaccurate data*: On January 24, 2019, a ███████████ was identified to be in possession of two inmate made knives in G dorm. SCCF-19-00108. The dashboard identifies ███████ housing assignment as segregation cell E-10. EJI has continued to flag the facility's inaccurate recording of housing assignments in the dashboard as a problem. It appears that the dashboard often reflects an individual's assignment following an incident. This skews analysis regarding the assignment of men involved in various incidents.

CONFIDENTIAL

ADOC-DS019113

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 8:
EJI Email and Memo to Ken McGinnis, Sept. 12, 2018

CONFIDENTIAL

Equal Justice Initiative Mail - St. Clair Memo in Preparation for 2:30 Cal...          https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



**Ryan Becker <rbecker@eji.org>**

---

## St. Clair Memo in Preparation for 2:30 Call Today

---

**Ryan Becker** <rbecker@eji.org>                                              Wed, Sep 12, 2018 at 1:15 PM
To: Ken McGinnis <kmcginnis@cglcompanies.com>, john_ott@alnd.uscourts.gov
Cc: Charlotte Morrison <cmorrison@eji.org>

Dear Judge Ott and Mr. McGinnis,

We wanted you to get this memo in preparation for your call today. I apologize that it's coming in shortly before you scheduled time to talk but hope it's useful. As always, thanks for you continued assistance in this matter.

Sincerely,

Ryan Becker



📄  **EJI SCCF███████Homicide And Tour Observations 9.12.18.pdf**
    81K

CONFIDENTIAL                                              ADOC-DS019115

**MEMORANDUM**

**TO:**     Judge Ott, Ken McGinnis

**FROM:**   EJI

**DATE:**   September 12, 2018

**RE:**     St. Clair: Recent Homicide and Concerns Related to Monitoring Tour

The recent homicide of ▇▇▇▇▇▇ is further evidence of an ongoing indifference to inmate safety; a risk that is reflected in similar incidents that took place immediately before and immediately after ▇▇▇▇▇▇▇▇ tragic death. EJI has continued to observe this indifference throughout the monitoring period, and has seen it reflected in our monitoring tours of the facility, in the incidents documented by ADOC, and in conversations with men at the facility, staff at the facility, and the loved ones of men at St. Clair.

The following provides an overview into recent incidents of serious violence with a particular focus on incidents related in time and/or location to ▇▇▇▇▇▇▇ murder. Additionally, we are sharing observations from our tour on September 10, 2018. We were struck by: men living in cells with doors that do not secure for weeks; continued, pervasive, unauthorized movement; and the security staff's reluctance to enforce basic security rules and regulations.

## RECENT INCIDENTS OF SERIOUS VIOLENCE

While ▇▇▇▇▇▇▇ death is a dramatic example of the persistent, severe risk of harm at St. Clair, the incident shares a number of similar features with other recent incidents of severe violence at the prison. The following incidents both illustrate those shared features and expose patterns that have continued to contribute to a risk of harm at the prison over the past 6 years. While it is possible to identify many more of these recent incidents at St. Clair, these are notable because they occurred in the time leading up to, and immediately following, the homicide over Labor Day weekend.

### ▇▇▇▇▇▇▇ *Homicide on September 2, 2018*

According to information received by EJI, ▇▇▇▇▇▇ was stabbed to death following a physical altercation that escalated into lethal violence. Early reports indicate that the dispute appears to have started in the L/M housing unit, and continued to the P/Q housing unit. Reports indicate that multiple people were involved, and that while the incident began as a fight between two individuals, the situation grew increasingly more serious as armed participants joined in. Ultimately, ▇▇▇▇▇▇ was stabbed to death numerous times at the

1

ADOC-DS019116

entranceway to the P/Q housing unit. Numerous reports indicate that there were no roving officers present in either the L/M housing block or the P/Q housing block, and that because of the lack of an official response, ██████████ was given CPR by another incarcerated individual at St. Clair and was wheeled to the infirmary on a cart that is used to move garbage cans.

Based on the reports, there are a number of notable aspects to ██████████████ homicide, including: the presence of weapons contraband, the unchecked movement occurring across the general population housing areas, and the lack of officer presence or intervention.

██████████ was a resident of Q Block in the months leading up to the homicide. EJI continues to observe that residents of the P and Q housing units are frequently involved in the most serious incidents of violence at the facility, and that the prison has effectively adopted a management strategy of grouping inmates with disciplinary or behavioral issues together in those units without any increased supervision or programming. For example, every incident in August classified as involving an assault with serious were connected to the P/Q housing units. This includes five different stabbings resulting in hospitalization. Each of these assaults either occurred in P/Q buildings, or involved men assigned to P/Q who were in other locations at the time of the assault.

- On August 6, 2018, ██████████████ a Q Block resident, was hospitalized after being stabbed. He was first observed by officers bleeding "from multiple wounds" while exiting the P/Q building. No weapon was recovered, and Mr. ████████ was free to move unchecked from the site of his assault to the building's exit. Although he was reportedly assaulted based on alleged "homosexual activities," the incident was not identified as being connected to PREA. It is critical to note that ██████████ was originally identified as an assailant in this incident. While it is unclear whether there is a connection to this incident and his subsequent homicide less than a month later, it is possible that a functioning institutional investigator might have identified the risk before ██████████ was killed. See SCCF-18-00998 (Aug. 6, 2018).
- On August 8, 2018, ██████████████ a Q Block resident, was allowed to enter P2 Block without authorization around 5:55 pm. A few minutes later the cubicle officer observed an "unknown inmate" "acting strange in the day room." Shortly afterwards, other men in the block escorted ████████ to the cubicle. He had been "stabbed several times in his upper body and face." No weapon was recovered and no officers observed the assault. See SCCF-18-01017 (Aug. 8, 2018).
- On August 16, 2018, ██████████████████ a P Block resident, reported that he

was stabbed in the L/M Hallway at around 5:00 pm. Officers did not observe the assault. He was hospitalized as a result of his injuries. The inmate was not identified, and the weapon was not recovered. There is no indication why Mr. ██████ was allowed to access the L/M housing unit. See SCCF-18-01077 (Aug. 16, 2018).

- On August 19, 2018, ████████ a P Block resident, was observed with "several stab wounds to the back" walking to the breezeway. He was hospitalized as a result of his injuries. He was reportedly stabbed by █████ ██ a Q Block resident. The weapon was not recovered and the incident was not observed by officers. See SCCF-18-01077 (Aug. 19, 2018).
- On August 29, 2018, ██████, a Q Block resident, was hospitalized after he was stabbed in the tunnel that leads to the H Dorm. See incident discussed below. See SCCF-18-01146 (Aug. 29, 2018).

### ██████ *Stabbing in H Dorm on August 29, 2018*

Days before ██████ homicide, on August 29, 2018, ████████ a Q Block resident, was observed running through the tunnel that leads to the H Dorm housing area "covered in blood." ██████ an H dorm resident, was also covered in blood and was running in the opposite direction. See SCCF-18-01146 (Aug. 29, 2018). Both men had been stabbed, and ██████ injuries were severe enough that he needed to be taken to the hospital, with multiple deep lacerations to his side, chest, and forehead. The weapons used by both ██████ and ██████ in the incident were not reported as recovered.

██████ was a resident of Q when he was stabbed in the H Dorm housing area. EJI has continued to observe and report that men in general population have access to the H Dorm. This facilitates the movement of illicit drugs into the substance abuse treatment unit and has led to repeated assaults, robberies, extortion, and other violence in the unit. While the "investigation" conducted by a St. Clair lieutenant indicated only that the men "were involved in a physical altercation" and did not determine a "clear motive concerning the incident," EJI received reports that ██████ had entered the H Dorm without authorization, in order to rob men in the TC program.

Although ██████ survived the stabbing assault, his wounds were serious and reflect another near homicide at the prison in the days leading up to ██████ death on September 2, 2018. The patterns that are observed in ADOC's reporting on incident are those that continue to contribute to serious incidents of violence at the prison, including: the presence of weapons contraband, the role of uncontrolled movement, the lack of officer presence/intervention, and the prison's failure to recover weapons contraband following serious incidents of violence.

3

Finally, both ██████ and ██████ recent records at St. Clair indicate that there was a risk of serious violence for both men at the prison. In May, ██████ had been observed bleeding from a stab wound while in Q Block. See SCCF-18-00545 (May 9, 2018). The assailant was not identified, and ██████ was placed in segregation where the facility flagged the risk from his unidentified enemy and noted that he needed to be transferred. See St. Clair Seg. Map, June 20, 2018. Rather than transfer him, the facility appears to have subsequently sent him to the TC Program from seg. The facility's failure to account for this known risk directly contributed to the risk that this serious violence would occur. It is particularly notable that ██████ lived in Q Block at the time of ██████ previous assault. See St. Clair Bed Roster, May 1, 2018.

While ██████ recent record indicates that he was at potential risk of violence based on his recent victimization, ██████ had been identified as a suspect in serious stabbing incidents in January, and again in May. In January, ██████ was identified as a suspect in the stabbing of ██████, who was assaulted over a 3 day period before he was hospitalized. The incident was related to the extortion of ██████ See SCCF-18-00055 (Jan. 12, 2018). On May 7, 2018, ██████ was identified as a suspect in the stabbing of Mr. ██████ along with ██████. ██████ was stabbed in L Block and had to be hospitalized. The incident occurred in L Block, even though ██████ and Mr. ██████ lived in Q Block and ██████ lived in M Block. ██████ received a disciplinary for his role in the stabbing. See SCCF-18-00534 (May 7, 2018).

### Stabbing and Beating Involving ██████ and ██████ in H Dorm, September 3, 2018

EJI also received reports that on the day following ██████ homicide, on the morning of Monday, September 3, 2018, two inmates assigned to the Therapeutic Community in H-dorm were hospitalized following a serious incident in which one man was stabbed and the other suffered serious blunt trauma injuries. According to reports received by EJI, ██████) stabbed ██████) early in the morning of 09.03.18 while ██████ was in his bed at the back of H-dorm. ██████ was said to have previously had issues with mental health and with drug use, and after stabbing ██████ he attempted to run out of H-dorm but was pursued by a large group of other inmates, who assaulted him with blunt objects including chairs both at the front of the dorm near the restrooms and outside the dorm when he tried to run. ██████ reportedly suffered such severe head trauma that inmates assigned to H-dorm were able to see what they believed was brain matter coming out of his skull, and both he and ██████ were taken to hospitals for emergency treatment.

At the time of the incident there was only one officer assigned to H-dorm, and from

4

his position at the front of the dormitory he was unable to monitor what was occurring in the area at the back where  was stabbed or muster sufficient officer response to the assault of ██████████ until upwards of 5 minutes had elapsed and ██████████ was seriously injured. Reports to EJI indicated that illicit drugs played a role in the incident, with ██████████ reportedly being intoxicated when he initially assaulted ██████████

## EJI'S SEPTEMBER MONITORING TOUR

On September 10, 2018, EJI toured the prison and made a number of observations that reflect the continued mismanagement of the facility. They were joined on the tour by Warden Jones and Institutional Coordinator Ellington.

First, EJI observed that at least 5 doors to cells in Q Block were completely incapable of being closed or locked. These cells were occupied by men at the time of the tour. Both officers and men reported that they had been in this condition for weeks, and it was explained that there were structural problems that meant the doors were basically unable to be fixed. These reports also indicated that the doors had been in this condition for weeks, with men continuing to live in the cells. Officer reports included that they had tried to bring this problem to the attention of the Warden previously but that their concerns have gone unheeded, leaving the officer under the impression that the administration did not care about clearly identified risks to their safety.

When EJI staff pointed out the problem to Warden Jones, her initial response was to identify a piece of wood in one of the doors that prevented the door from latching. This response was problematic for a number of reasons, but most critically because: 1) the warden appeared to be unaware that the unsecured doors had been a problem for weeks; 2) the response failed to acknowledge that the problem is apparently structural and was present in other doors that were not similarly jammed; 3) it is the prison's responsibility to ensure that the men aren't jamming or destroying the security hardware. The final point is particularly salient because it has been repeatedly identified throughout the litigation, was identified by numerous experts as a problem that contributed to the defeat of the older locks, and because it reflects the warden's lack of understanding regarding the history of severe safety risks at St. Clair.

Second, EJI observed the ongoing fundamental inability of security staff to enforce basic rules at the prison. There were men who were wandering throughout the facility in unassigned areas during the tour. EJI staff talked to men who were present in multiple blocks during the tour, although they did not have had authorization to be in more than one of the various housing areas. EJI staff also observed cubicle officers opening doors to allow men into housing areas they weren't assigned to be in without anyone questioning why they were

<center>5</center>

requesting access.

At one point during the tour, Warden Jones determined that men were in a housing unit that they weren't assigned to. When she ordered the men to wait outside the unit's door for security staff to get the men's names, the men just walked off. Although multiple officers were present in the hallway and heard Warden Jones's order, noone attempted to stop the men and they exited the housing unit without further questioning.

The security staff's reluctance to enforce the facility's rules and regulations was dramatically apparent in an incident that occurred in Q Block. As EJI and the tour participants were exiting the unit, Warden Jones got in an altercation with a man on the upper tier of Q Block. She ordered the man to go to his cell and he refused. Warden Jones lack of control was obvious to everyone observing the incident, including all of the men who were assigned to the unit and were watching the altercation.

In an attempt to force the man to listen to her, Warden Jones put her hand on his chest and tried to push him away. The man continued to resist her order. Although there were multiple officers present in the unit along with the tour, noone intervened to assist Warden Jones. She turned to appeal for assistance, at which point ADOC counsel exclaimed that the cubicle officer might need to call a code to request additional officers. Finally Regional Coordinator Ellington attempted to intervene. Rather than attempt to enforce discipline on the inmate, Mr. Ellington sought to escort Warden Jones out of the housing unit, putting his hand on her shoulder. Warden Jones resisted Mr. Ellington and kept trying to engage the inmate. Mr. Ellington repeatedly sought to get her to retreat. Finally, after a continued back and forth between the Warden and Coordinator Ellington, we all exited the housing unit.

Third, EJI continued to observe that there is a lack of officer presence and functional security camera coverage. The facility appears to be putting up fencing to try to further control movement. This does not seem like it will be effective and raises additional security concerns. EJI notes that there are multiple existing barriers designed to prevent men's access to units where they aren't assigned, including exterior doors for the housing unit buildings, and doors that prevent access to the individual units. Men continue to gain access to units where they aren't assigned despite these barriers because the officers do not attempt to enforce existing regulations. The creation of an additional barrier will not prevent this issue, particularly where there is a lack of sufficient staff to ensure men are going to their assigned housing.

Simply put, officers appear afraid to enforce basic rules and regulations. This includes officers in cubicles where men have no access to harm them. Even still, the cubicle officers frequently allow men to break rules rather than risk a confrontation. This will be an even

CONFIDENTIAL                                                  ADOC-DS019121

more pronounced phenomenon where one officer is tasked with locking and unlocking gates. Faced with a crowd of men demanding access to an unassigned unit, often without backup, it's easy to imagine officers leaving the gates open and letting movement continued unchecked.

      Finally, the fences raise additional problems. Currently, the men depend on the access of carts to get severely wounded men from the housing units to the infirmary. A cart was utilized for medical assistance in the homicide of ████████ and in the serious stabbing of ██████. The fencing is being constructed in a way that will prevent those carts from getting to the housing units, forcing men to walk even further with their serious wounds before they will get medical treatment. Additionally, there are already reports that pieces of the fencing are being used to create more weapons. Given the facility's apparent disregard for identifying and eliminating weapons contraband, the men's ability to access more metal will lead to an increase in the presence of knives at the prison.

7

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 9:
EJI Email to Ken McGinnis, Dec. 11, 2018

CONFIDENTIAL                                                    ADOC-DS019123



Ryan Becker <rbecker@eji.org>

## St. Clair: Issues related to QIT, Corrective Action, Contraband Analysis and Dashboard

**Ryan Becker <rbecker@eji.org>**                                              Tue, Dec 11, 2018 at 12:04 PM
To: Ken McGinnis <kmcginnis@cglcompanies.com>, john_ott@alnd.uscourts.gov, "Harmon, Bart (DOC)"
<Bart.Harmon@doc.alabama.gov>, James Austin <jfainstitute@gmail.com>, rls51@yahoo.com, Charlotte Morrison
<cmorrison@eji.org>

Ken,

We wanted to check-in about a few issues related to the QIT, corrective action, ADOC's contraband search analysis, and the dashboard data. Much of this relates to issues that we previously raised and discussed, but we wanted to make sure we brought it to your attention in advance of your next QIT meeting. We are concerned that the facility continues to fail to correct flaws in their data collection that undermines serious efforts at trend analysis and risk identification at the prison.

**Corrective Action Issues**

A review of the most recent dashboard data indicates that there are ongoing, serious issues that the facility needs to investigate and address, including the ongoing heightened risk of violence in P/Q, ongoing unauthorized movement, and indications that men have been victimized as a result of non-functioning locking mechanisms.

Our concerns with P/Q continue to be reflected in the repeated stabbings, recovery of weapons, unauthorized movement, and reports that men are being threatened in the unit. The last two men to report that they were at risk in population resided in P/Q dorm (See SCCF-18-01577,  SCCF-18-01578), and 4 random searches of living areas and men in the units in the last week recovered 8 knives and a saw blade. (See SCCF-18-01660; SCCF-18-0166; SCCF-18-01584; SCCF-18-01585).

Additionally, men in P/Q continue to access housing areas without authorization. Just in the past few weeks:

- On Tuesday, 11/20/2018, at 10:20 p.m., 4 men from P/Q blocks were found in M Block (SCCF-18-01530);
- On Tuesday, 11/27/2018, at 8:30 p.m., 11 men from P/Q blocks were found to be in unauthorized housing areas (SCCF-18-01548);
- On Thursday, 11/29/2018, at 10:30 p.m., 25 men from P/Q blocks were found to be in unauthorized housing areas (SCCF-18-01572)

Finally, we wanted to flag an incident that potentially implicates a non-working locking mechanism and should trigger additional investigation:

- SCCF-18-01537. P-Dorm, 11/25/18 at 2:10 am. CCO Brugman and Gregory McNeff entered P1 to count, observed ▮▮▮▮▮▮ bleeding from multiple puncture wounds. ▮▮▮▮▮▮ was assigned to P18. The person who appears to be identified as stabbing him, ▮▮▮▮▮▮▮▮▮ was assigned to P22 (note: the dashboard inaccurately lists him as assigned to B block, where he was likely moved following the incident).
- The time of the incident indicates either ▮▮▮▮▮▮ was in the wrong cell, or was able to access ▮▮▮▮▮▮ cell.

**Contraband Analysis**

We also wanted to let you know that we reviewed the contraband analysis that ADOC put together. The analysis did not impact the review that EJI previously did documenting the facility's dramatic failure to identify and remove contraband weapons from the facility.

As a methodological point, EJI reviewed all contraband searches for the duration of the settlement agreement. ADOC's review began in August. Beyond that difference, ADOC's review did not identify any searches that EJI had not already accounted for. In fact, they failed to account for a number of searches that ADOC didn't identify or include

CONFIDENTIAL

ADOC-DS019124

in their analysis. This, and an apparent miscounting issue led ADOC to conclude that there were even fewer searches and knives recovered than EJI identified in our original review.

- ADOC total searches (August through October): 26 searches
- ADOC total knives (August through October): 215 knives
- EJI total searches (August through October): 39
- EJI total knives (August through October): 269 knives

The *difference of 54 knives* stems from a) ADOC not counting 49 knives found in H-dorm in a facility-wide search on 10.3.18 search (SCCF-18-01319, SCCF-18-01323); and b) ADOC failing to count 13 searches that resulted in the recover of 15 knives. Note that ADOC did double-count knives in a search on August 13, and in a search on August 24 (SCCF-18-01039; SCCF-18-01043; SCCF-18-01117). EJI did not include the miscounted knives in the above analysis.

ADOC's analysis also demonstrates that the facility continues to dramatically fall short of the contraband searches required by regulations:

- Regulations ADOC AR #336 and SCCF SOP #110 require that the entire facility be searched monthly for contraband. *The facility failed to do this at any point from August through October.* The closest they came was a complete search of all housing areas in October. Both EJI and ADOC's analysis evaluated these searches and reached the same conclusion.
- Both EJI and ADOC's analysis indicates that the facility *documented only 16 of the required 728 cell searches by rovers in P and Q* from August 1, 2018, to October 31, 2018 (note: this assumes the presence of an assigned rover in both P and Q on each shift, and that they are responsible for the two cell searches per shift mandated by AR #336 and SCCF SOP #110).

**Dashboard Issues**

As we reported in our prior review provided to you in November, the ADOC dashboard continues to suffer from systemic flaws related to incident location, incident categorization, time of incident, and bed assignments of individuals involved. Our review of the recently inputted data indicates that this is an ongoing issue.

While many of these flaws are potentially related to errors in data entry, there are also more substantive analytical errors. For example:

On Wednesday, December 5, 2018, ███████████████ reported that his life was in danger and requested to speak with a shift commander. This incident was classified as "Intentionally creating a security/safety /health hazard." SCCF-18-01577. EJI continues to maintain that it is inappropriate for the facility to rely on this designation where men are reporting threats to their safety.

On Sunday, November 25, ██████████████ was observed "bleeding from multiple puncture wounds." This incident reflects problems both with the quality of the data collection, but also with the underlying incident analysis. First, It was entered as an fight between "inmate on other" rather than "inmate on inmate." Second, it was not categorized as an assault, despite the victim's serious injuries.

We noted in the most recent QIT meeting that the discussion on reevaluating the definition of "serious injury" did not include any mention of the department's failure to classify any incident both as a "fight" and as an "assault with serious injury." In addition to the problems related to how ADOC is categorizing serious injuries, we think the department should also be addressing when incidents qualify as serious injuries. As you are aware, the ASCA definitions indicate that a "fight" should still be categorized as an "assault" where there are serious injuries.

Thanks,

Ryan C. Becker
Staff Attorney
Equal Justice Initiative

CONFIDENTIAL

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 10:
EJI Email and Memo to Ken McGinnis, Aug. 24, 2018

CONFIDENTIAL

Equal Justice Initiative Mail - St. Clair: Example of Recent Incident Invo...     https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



**Ryan Becker <rbecker@eji.org>**

---

## St. Clair: Example of Recent Incident Involving Inmate with Suspicious Injury

---

**Ken McGinnis** <kmcginnis@cglcompanies.com>                    Fri, Aug 24, 2018 at 1:06 PM
To: Ryan Becker <rbecker@eji.org>, Charlotte Morrison <cmorrison@eji.org>, Alison Mollman <amollman@eji.org>

Ryan – there was some confusion about who was specifically working on this SOP – I was not involved but Jim Austin thought I was taking the lead.  After some discussion Bart got input from all of us and was taking the lead with Jim's direct involvement.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Friday, August 24, 2018 10:36 AM
**To:** Ken McGinnis; Charlotte Morrison; Alison Mollman
**Subject:** St. Clair: Example of Recent Incident Involving Inmate with Suspicious Injury

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

---

Ken,

The settlement agreement calls for an updated SOP and training that requires mandatory reporting/investigating when medical staff treats an inmate at St. Clair for suspicious injuries. We haven't seen the SOP yet but it's our understanding that you are helping ADOC develop that. We wanted to forward you an incident that demonstrates the problem at St. Clair.

At approximately 8 am on 07.02.18 ██████████████ ) reported to the infirmary "complaining of an injury to the right side of his jaw." A medical examination by Nurse Watkins indicated that ███████ ' jaw was broken and he was transported to UAB for treatment.

The incident was classified as an "Inmate Illness," and no body chart or photographs were included in the incident documentation. The incident report is attached.

Thanks,

Ryan

**P** *: Please consider the environment before printing this e-mail*

---

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have

1/13/2019, 2:55 PM

CONFIDENTIAL

ADOC-DS019127

Equal Justice Initiative Mail - St. Clair: Example of Recent Incident Invo...          https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...

received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

CONFIDENTIAL

1/13/2019, 2:55 PM

ADOC-DS019128

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 11:
EJI Mon. Update for Ken McGinnis, July 8, 2018

CONFIDENTIAL

**MEMORANDUM**

| | |
|---|---|
| **TO:** | Ken McGinnis |
| **FROM:** | EJI Monitoring Team |
| **DATE:** | July 8, 2018 |
| **RE:** | St. Clair Monitoring Update |

The following is a memo detailing EJI's observations made pursuant to our ongoing monitoring of the St. Clair Correctional Facility. We wanted to get you this information in advance of your next trip to Alabama pursuant to your work with ADOC on the corrective action components of the settlement agreement. EJI has observed a number of continuing trends that negatively impact the safety of the facility, and the ability of the Quality Improvement Team to operate effectively. We believe that the Standard Operating Procedures and training need to directly address the facility's continued failure.

It is important to note that EJI has no clear understanding as to the current status of critical components of the corrective action provisions of the Settlement Agreement, most notably the: Incident Report Manager, Institutional Investigator, and the Quality Improvement Team. ADOC has alternatively represented both that these positions are in process, that they are up and functioning, and that they are still waiting on finalization. While many of the concerns included in the material below may be addressed upon full implementation, the continuing trends that EJI is observing is especially troubling in light of ADOC's insistence that components of the corrective action plan are currently functioning at the facility. The material that we are reviewing does not support ADOC's position, particularly in light of some of the continuing failures in the facility's incident management and investigative systems.

As always, we are also providing a link to the materials that we have referenced below, in the event that you would like to review the ADOC documents that are cited. The areas that we have the most concern about include: I. Investigations and Incident Documentation/Reporting; II. Unauthorized Movement; III. Contraband; IV. Physical Plant; V. Use of Force.

Thank you for your review. We look forward to discussing with you.

1

## I.   INVESTIGATIONS AND INCIDENT DOCUMENTATION/REPORTING

Investigations can and should play a critical role in preventing major threats to institutional security. The staff at St. Clair are not capturing important information during their investigation and documentation of incidents at the facility. Although ADOC maintains that the addition of the incident report manager has improved their internal investigations, recent major events at the prison demonstrate that they are still failing to identify critical information. This failure will continue to limit the QIT's effectiveness and increases the ongoing risks to safety and security.

The following are three incidents that demonstrate the facility: continues to fail to document critical aspects of serious incidents of violence; continues to misidentify incidents; and fails to conduct adequate investigation to evaluate institutional risks.

*Recent Serious Assault of* █████████

On May 26, 2018, █████████ approached the cubical post in housing unit Q2 and was "bleeding heavily." He then "ran out of the block" and was met by an officer while exiting the P/Q hallway. █████████ had "multiple stab wounds" that required emergency transport to the hospital. The incident report does not include the housing location of Mr. █████ or the two subsequently identified suspects. The report indicates that officers were unable to identify any suspects, weapons, or wounded inmates following the incident. It also indicates that the door to the housing unit was left open, but fails to make any connection or observation to the lack of identified suspects and unsecured weapons and the open door. The report also fails to indicate why the door to the unit was open or who was responsible for allowing the door to remain unsecured. See █████████, Incident No. SCCF-18-00619 (May 26, 2018).

The ███████ incident is also notable because it indicates that █████████ was assaulted in part because of alleged involvement in "homosexual activity." The report is unclear as to what role sexual activity played in the incident but does not indicate the incident was flagged for further PREA investigation or an evaluation as to whether █████████ was at risk of sexual victimization. See █████████, Incident No. SCCF-18-00619 (May 26, 2018). A recent PREA audit expressed concern with the quality of the sexual assault and harassment investigations at the facility. The audit found that investigators often refuse to substantiate incidents of sexual violence based on their perceptions regarding the credibility of victims, determining

2

ADOC-DS019131

that individuals are engaging in consensual sexual behavior and that "there had been 10 rapes in the past 5 years that could have prevented if the inmate didn't go into debt in the first place." <u>See</u> Melinda Allen Interim Report, *63 (Apr. 26, 2018). The failure to refer this incident to the PREA officer or to investigators reflects a culture of tolerance for sexual violence that the facility continues to fail to address.

<em>Recent Serious Assault of</em> 

On May 9, at a little after 5:00 in the morning, ███████████ was observed "staggering to the steps" of the cubicle post in housing unit Q1 with "blood on inmate jones shirt." Although ████████ had multiple injuries that were documented both as "lacerations" and "puncture" wounds, the incident report concluded that he "fell" and that the injuries were "self-inflicted." <u>See</u> ████████████ Incident No. SCCF-18-00543 (May 9, 2018).

There are obvious incident classification problems with this assault. While the injuries make it nearly certain that ████████ was stabbed, the facility concluded that his wounds were "self-inflicted." This is problematic because, in the months leading up to the incident, ████████ reported being at risk of violence because of his sexual orientation. He also indicated that he was at risk because of gang affiliation. <u>See</u> █████████████ Incident No. SCCF-18-00002 (Jan. 1, 2018). The facility perceived this to be a significant enough risk that ████████ was placed in segregation to avoid being assaulted. None of this information appears to have been evaluated or considered in the May incident report.

Additionally, the incident report indicates that ████████ stated he was "wigging out" but includes no evaluation as to whether he was actually intoxicated, whether they looked for illicit substances, or whether he was drug tested. Additionally, although the facility appears to have relied on ████████ self-reported drug use to conclude his injuries were self-inflicted, they did not include the contraband substance use in the incident categorization.

More ████████ incident is even more troubling, however, because a subsequent report indicated that he was in fact stabbed in the May 9 incident. <u>See</u> ████████████ Incident No. SCCF-18-00617 (May 23, 2018). On May 26, 2018, ████████ reported that men were threatening to kill him "for snitching" on a man in "an incident that occurred 16 days ago that resulted in inmate ████ getting stabbed." <u>Id.</u> Although this subsequent report demonstrates that ████ ████ had been stabbed in the May 9 incident, there is no indication that St. Clair officials reevaluted the earlier incident to determine if it had, in fact, been a stabbing, as the

3

objective evidence originally established. This failure to examine existing documentation and to make connections to establish patterns is evidence of the facility's ongoing failure to rely on the evidence that they have to improve the safety of the prison.

Moreover, the failure to reconsider the earlier May incident directly undermines the QIT's ability to effectively evaluate the prison. Rather than examine a serious incident of violence involving drugs in one of the most active hotspots in the facility, the May 9 incident is presented merely as one where an inmate hurt himself.

*Reported Kidnapping and Sexual Assault of* ██ ██

██████ is identified as being medium custody and is currently serving a 17 year sentence for 3 convictions of Terrorist Threats and 1 of "Obstruction of Justice-False Identity," all out of Houston County. He entered ADOC custody in November 2016 and was part of the Therapeutic Communities drug treatment program, residing in H dorm. We observed that he was there in the most recent bed roster we have preceding the incident, from March 15, 2018. See ████ Bed Roster March 15 2018.

According to ADOC documentation, on May 26, 2018, at 5:45 a.m., (the same day as the ████ and ████ incidents) ████ traveled to the breezeway and reported that he had been "kidnapped from H dorm and that he had been on the G yard since 11:30 a.m." See ████ May 26 Incident ████ reported that he was in debt for drugs and was held in Q housing unit, had been forced to perform oral sex, and had been "penetrated" by ████ See id. In his accompanying statement, Mr. ████ reports that he is "extremely scared of being put back in population" and identifies the Bloods gang as having a hit out on him. See ████ Statement from May 26 2018.

The report prepared by the I&I investigator, Hedrick, appears to be based solely on a review of the incident report and an interview conducted with ████ on June 26 2018. At that time, ████ had been held in segregation for 30 days following his report of being kidnaped from the TC unit and sexually assaulted in Q block. Hedrick's report provides no information--and indicates that no investigation was conducted--about where Mr. ████ traveled from to make his report to the breezeway officer and whether ████ was in Q block for the near 24 hour period preceding his report. Hedrick's report indicates that he did not request bed roster information which would be critical to determining the reliability of ████ account that he was in Q block.

4

ADOC-DS019133

The report also indicates that Hedrick did not request the available medical records. ███████ was seen by the United Way Crisis Center for a sexual assault examination. Hedrick does not appear to have requested, received or reviewed these records. Similarly, there is no indication that he requested, received or reviewed ███ ███ body chart information from the St. Clair infirmary.

███████ was placed into segregation following the report of the incident of sexual violence, along with ███████ Mr. ███ remained in seg until he was interviewed by I&I over a month after the reported incident. At that time, after a month of being held in solitary confinement, ███████ reported "wrote a statement admitting that he was not sexually assaulted by inmate ███ <u>See</u> ███ I&I Report (July 5, 2018).

Hedrick's conclusion relied solely on ███████ waiver of prosecution and "admission" that the incident did not occur. The report also cites a lack of physical evidence, but does not indicate that there was any review of ███████ medical records. ███ I&I Report (July 5, 2018).

There are three important aspects of the I&I report that we wanted to flag: 1) the report fits a pattern that was recently flagged as problematic by Prea auditor Melinda Allen; 2) the report neglects to evaluate critical evidence; and 3) the report is not focused on institutional patterns that contribute to ongoing risks of harm.

**First**, in her recent PREA audit, Ms. Allen noted that "[e]xtortion seems to be a huge problem withing this facility" and expressed her concern that investigations were overly focused on evaluating the "the credibility of the alleged victim, witness or suspect." Melinda Allen, Interim Report Excerpt *63-64 (April 26, 2018). Ms. Allen reported that an interview with an investigator revealed that where there were debts involved in cases alleging sexual assault "it tends to be overlooked' because "in many cases they cannot prove that [the assault] was not consensual or to pay a debt." Id. The investigation solely on ███████ own withdrawal of his complaint - made after he was held in solitary confinement for over a month - to the exclusion of other information is an example of this pattern, particularly in a case where extortion and drug debt were involved.

**Second**, the I&I report failed to evaluate critical evidence that may have corroborated the sexual assault. The report does not assess any bed roster information to evaluate whether bed roster checks were conducted in the near 24 hours leading up to ███████ report, and

<p style="text-align:center">5</p>

does not indicate whether any cubicle or roving officers were interviewed to determine Mr. ████ location. The report also fails to assess any of the following, relevant, information.

████████ appears to have been recently released from segregation. He was in segregation during EJI's March monitoring tour, and was identified in seg consistently in materials from January to March. ████████ Bed Roster March 15, 2018. In fact, Mr. ████ appears to have been continuously in segregation for approximately three years prior to the May, 2018 incident. ████ seg map Jan 2018 (indicating he was admitted into seg in May, 2015). During his time in seg, ████████ overdosed following possession of serious amounts of narcotics in his seg cell. He was also in possession of a knife at the time of his overdose. ████ Seg incident and medical record June 2015.

████████ ability to obtain significant quantities of narcotics while in the most secure area of St. Clair lends some credibility to the initial incident report that suggests the incident was related to ████████ drug debt. The recent release of ████████ to population from seg, where he had been isolated for nearly 3 years, also implicates the facility's failure to implement the behavior modification dorm. Experts Jim Austin and Richard Stalder identified this type of transitional housing as critical to phase people like ████████ back into population gradually, with increased psychological support.

Additionally, ADOC documents tend to corroborate ████████ account that he was assaulted by members of the Bloods gang in Q dorm, but no investigation appears to have been conducted into this evidence. Just seven hours after ████████ reported he had been assaulted by a member of the Bloods gang in Q dorm over a drug dispute, ████████ was stabbed in Q block (he was hospitalized that same day). Jones May 26 2018 Incident. Capt. Malone subsequently determined that ████████ was stabbed for allegedly "snitching" on Blood gang members for an incident of homosexual activity. See id. The I&I report also does not indicate whether this was considered. Despite the seriousness of these allegations and the incomplete investigation, ████████ appears to have been transferred to a lower custody facility.

**Third**, while there appears to be significant evidence of unauthorized movement, the I&I report is not focused on this risk to institutional safety. The movement is not evaluated or investigated, and there is no determination as to whether corrective action should be taken regarding specific officers who may have allowed the movement to take place, or what physical components of the plant may have contributed to the movement, including the lack



6

of cameras outside the P/Q housing unit.

## II.    UNAUTHORIZED MOVEMENT

**1.    Unauthorized movement contributes to a risk of violence at St. Clair.**

EJI staff has observed that inmates at St. Clair are able to freely move about the facility without authorization in violation of existing departmental policies. The negative impact of this uncontrolled movement is readily observable in a number of violent incidents at the prison, including frequent incidents of violence and extortion between men assigned to general population and men assigned to the H-Dorm which houses the Therapeutic Community. Because the TC program is the primary residential substance abuse treatment for all of ADOC many men who are classified to be assigned to the lowest custody facilities are transferred to St. Clair to complete the program. The facility's inability to keep this program separate from the rest of the assigned general population is a long-identified risk that continues to go unaddressed. The following are examples of the most serious incidents of violence and extortion connected to unauthorized movement during the monitoring period:

1.    SCCF-18-00616 (May 26, 2018). H-Dorm resident reports being kidnapped from H-dorm, sexually assaulted, and held against his will pursuant to extortion by Q-block residents. Incident report does not document housing assignments or unauthorized movement.

2.    SCCF-18-00533 (May 2, 2018). H-dorm resident reports being extorted by general population residents. Incident reports general population residents accessed H-dorm but does not classify the incident as including unauthorized movement.

3.    SCCF-18-00361 (Mar. 23, 2018). P-Block resident assaulted in H-dorm by H-dorm residents. Incident report does not document housing assignments or unauthorized movement.

4.    SCCF-18-00341 (March 19, 2018). Resident of Q1-block kidnapped, assaulted, and held against his will for a period of two days in Q2-block. Incident report does not document housing assignments or unauthorized movement.

5.    SCCF-18-00308 (Mar. 12, 2018). Resident of P-block involved in stabbing incident in Q2-block. Incident report does not document housing assignments or unauthorized movement.

6.    SCCF-18-00262 (Mar. 1, 2018). Resident of P-block involved in stabbing

7

                                    ADOC-DS019136

incident in L2-block. Incident report does not document housing assignments or unauthorized movement.

7.  SCCF-18-00159 (Feb. 4, 2018). Resident of N-block hospitalized following multiple hours of reported torture in Q-block. Incident report does not document housing assignments or unauthorized movement.

8.  SCCF-18-00144 (Feb. 1, 2018) Resident of Q-block assaulted in P-block with sticks by residents of P-block. Incident report does not document housing assignments or unauthorized movement.

9.  SCCF-18-00130 (Jan. 30, 2018). Individual stabbed across head, face, chest, back, arms, and legs in O-block by residents of both P-block and Q-block. Incident report does not document housing assignments or unauthorized movement.

10. SCCF-18-00104 (Jan. 25, 2018). Resident of K-block robbed at knife point at 4:19 a.m. by resident of Q-block. Incident report does not document unauthorized movement.

11. SCCF-18-00100 (Jan. 24, 2018). Resident of N-block hospitalized with fractured jaw after being beaten by resident of Q-block while both men were in L-block. Incident report does not document housing assignments or unauthorized movement.

12. SCCF-17-01496 (Dec. 27, 2017). Officer stabbed when attempting to prevent residents of H-dorm and Q-block to access G-dorm. Incident report does not document housing assignments.

13. SCCF-17-01457 (Dec. 17, 2017). Resident of O-block assaulted with weapons by residents of P-block and Q-block. Incident report does not document housing assignments or unauthorized movement.

14. SCCF-17-01393 (Dec. 2, 2017) Resident of H-dorm hospitalized after being stabbed by resident of P-Block. Incident report does not document housing assignments or unauthorized movement.

15. SCCF-17-01382 (Dec. 1, 2017). Resident of Q-block identified in possession of two knives while in P-block. Incident report does not document housing assignments or unauthorized movement.

16. SCCF-17-01374 (Nov. 29, 2017). Resident of L-block sexually assaulted by resident of Q-block. Incident report does not document housing assignments or unauthorized movement.

17. SCCF-17-01307 (Nov. 7, 2017). Resident of O-block stabbed by residents of P-block. Incident report does not document housing assignments or

CONFIDENTIAL                                    ADOC-DS019137

unauthorized movement.

Issues related to unauthorized movement are also apparent in other records from the facility. A comparison of available bed rosters and count sheets demonstrate frequent periods where the number of men present in a given housing unit exceed the number of men assigned to the unit. On December 1, 2017, there were 23 men assigned to live in L Block. See L Block Bed Roster and Count Sheets (Dec. 1, 2017). Beginning with the evening count, at 6:40 p.m., **the number of inmates counted as present in L Block exceeded the number of men assigned to live in that block in each of the 4 counts taken from 6:40 p.m. to 2:15 a.m.**, with the number of individuals in the block fluctuating from 30 to 27 to 26 over the course of the evening and in the middle of the night.

On November 15, 2017, O Block, a unit with a maximum capacity of 98 men had 103 present during the 9:55 p.m. count. See O Block Count Sheet (Nov. 15, 2017). On December 1, 2017, there were 96 men assigned to O Block and 101 present during the 9:22 p.m. count. See O Block Bed Roster and Count Sheet (Dec. 1, 2017).

Additionally, during EJI's March and June monitoring tours, staff made the following observations at the prison related to the prevalence of uncontrolled movement at St. Clair:

- A cubicle operator who informed EJI staff that the **door** allowing access to a housing area was inoperative and **could not be secured**;
- Consistent reports that the outside **entrances** to the housing buildings were **never closed**;
- Consistent reports that **men sleep in housing units where they aren't assigned**, both in unassigned cells and in housing units' common areas;
- The near complete **absence of men wearing the required colored wristband** corresponding with the housing unit they live in;
- Large numbers of **men walking freely between housing areas**, including an individual who appeared to be following the monitoring tour without any official authorization or officer intervention;
- The unavailability of cameras outside the P/Q housing unit to monitor inmate movement in and out of the facility, leading officers to leave the door open;

**2.    The root cause of unauthorized movement at the facility could be better understood through increased data collection.**

9

While it is clear that uncontrolled movement is an existing problem at St. Clair, the root of the problem is not entirely clear. One major component that seems to contribute to unauthorized movement is the ability for men to access housing areas that they aren't assigned to during general movement periods. Staff seem to regularly leave unit doors open to all housing units for long periods while the camp has open movement periods. At the same time, there are indications that men can also move freely through the facility even when the camp is locked down that suggest that staff will open doors for men even when the doors should remain closed. Unfortunately, incident reports dealing with incidents involving unauthorized movement do not include what officers were responsible for allowing men to access unauthorized areas, and why the officers allowed that access.

In order to more fully understand the problem, St. Clair staff can more consistently collect data that is readily available to them. For example, the facility's incident reports often do not identify whether uncontrolled movement contributed to a given incident. This includes incident reports that lack critical information, like the bed assignments for individuals involved in the incident and the location where the incident took place. A review of available bed rosters indicated that unauthorized movement was a factor in each of the 17 incidents discussed above. However, unauthorized movement was only identified as a contributing factor in 1 of the 17 incident reports. Similarly, the inmate's housing assignments were only included in 1 of the 17 incident reports, although they were partially recorded in another incident.

Additionally, we are told that St. Clair staff do not keep a historic record of housing assignments. This makes it difficult for a subsequent analysis regarding uncontrolled movement at the facility. In the analysis outlined above, EJI had access to only specific bed rosters that were collected for certain days of the month. While these can be compared to the day's count sheets to demonstrate unauthorized movement, they represent a small amount of the data that is available. A consistent record of housing assignments would allow the Quality Improvement Team to review the nature and extent of unauthorized movement, providing important data that would demonstrate where men are frequently moving from, where men are moving to, and what times and days are particularly bad. This type of information would provide a more accurate picture as to the problem, including whether specific shifts or supervisors are more effective at preventing uncontrolled movement.

The issues related to uncontrolled movement appear to be connected to a lack of understanding on the part of staff regarding their duties and a lack of supervision. Because

10

St. Clair staff aren't collecting the existing information, it inhibits supervisors from addressing personnel who are directly responsible for opening doors when they shouldn't and letting men into areas where they aren't allowed. It also prevents supervisors from fully understanding the risk posed by unauthorized movement. Additionally, it is also possible that personnel at the facility don't fully understand the prohibition on unauthorized movement and need additional training to ensure they understand the existing SOPs and regulations. More systematic collection of the available information will allow supervisors to determine whether additional training is necessary or whether there are specific staff members that are more frequently responsible for unauthorized movement.

The newly created incident report manager position can ensure that the necessary information is better captured by the facility's personnel, providing more immediately accessible data regarding the impact of unauthorized movement on the prison. This would include reviewing incidents to determine whether housing assignments are captured, unidentified movement is flagged, and the factors permitting the unauthorized movement are included. This information, along with a historical record of housing assignments, is critical for the quality improvement team to have a clear understanding of the problem and what the best solutions are to address the issue.

## III.    CONTRABAND

### 1.    The Presence of Weapons Contraband is not Consistently Documented at St. Clair

In our recent monitoring report to the commissioner, EJI detailed the widespread presence of weapons contraband at St. Clair, sharing our finding that there were **a total of 183 knives documented** in St. Clair incident reports in a three month period from November 1, 2017, to January 31, 2018. Since that time, EJI has had the opportunity to review incident data from February and March of this year. According to incident reports at the facility, St. Clair has documented **the presence of over 340 weapons at the facility** from November 1, 2017, to March 31, 2018. Nearly all of these documented weapons involved knives or other stabbing instruments. Put differently, in the 150 days spanning the period from the beginning of November to the end of March, the facility documented **the presence of over 2 knives per day**.

The presence of weapons contraband continues to contribute to serious incidents of

11

violence at St. Clair. In addition to the recent homicide of ████████ knives have been used in a significant number of sexual assaults, stabbing assaults of officers, and stabbing assaults requiring hospitalization at the prison. Appendix A includes an overview of incidents of violence from November 1, 2017 to March 31, 2018, including those involving the presence of weapons contraband. Please note that the number contained in the "( )" indicate situations where the administration included in the incident classification that a weapon was somehow involved in the incident. See Appendix A Assaults and Weapons Contraband Table Nov 17 to Mar 18; see also Appendix B Specific Incidents of Serious Violence, identifying incidents in that period where knives contributed directly to severe violent assaults on men and staff. The risk posed by weapons contraband is starkly apparent upon review of the data compiled by ADOC from the November 2017 to March 2018 period:

- There were **92 total incidents identifying weapons contraband** at St. Clair;
- These incidents demonstrated the presence of **over 340 weapons at the facility** in the analyzed period;
- There were **90 incidents of violence** documented by ADOC;
- **8** of these incidents included sexual assault;
- **1** of these incidents included a homicide;
- At least **43** of these incidents of violence, nearly half, involved the use of weapons contraband;
- **All of the 15** incidents that ADOC classified as involving serious injury included the use of weapons;
- In **23 out of the 43** violent incidents involving weapons contraband the weapon that was used in the assault was not recovered;
- The **failure to recover** contraband knives used in violent incidents **includes the stabbing homicide of** ████████ despite the assailant making an additional attempt to stab the victim while he was being transported to the infirmary on a gurney.

Not all incident reports include the documented presence of weapons contraband. Including this information in each incident report makes the data analysis more efficient, resulting in a more effective understanding regarding the impact of weapons contraband on the facility. In Appendix A, EJI has separately flagged where the administration included the presence of weapons contraband in the incident classification. As the table makes clear, the administration frequently does not designate when weapons are present:

CONFIDENTIAL                                        ADOC-DS019141

- EJI identified **92 incidents involving weapons** contraband at the facility.
- Only **30 of these incidents**, less than 1/3, included a designation that indicated a weapon was involved;
- There **were 15 assaults** with serious injury involving weapons at St. Clair; **only 1 of these** identified the presence of weapons contraband in the incident designation;
- There **were 11 assaults** indicating nonserious injury involving weapons at St. Clair; **only 2 of these** identified the presence of weapons contraband;
- There **were 3 assaults** on employees involving weapons that resulted in serious injury; **0 of these** incidents included a designation that a weapon was involved;
- There were **4 additional assaults** on employees; **only 2** of these included a designation that a weapon was involved;
- Finally, the ADOC failed to indicate the presence of weapons contraband even in the stabbing homicide of █████████

EJI is including an excel spreadsheet that demonstrates the evaluation of incidents involving weapons from February 2018. See Appendix C, ADOC Data February Incidents Involving Knives. This spreadsheet is generated directly from ADOC's own provided data. While it can be quickly put together by ADOC staff from the existing incident report module, what is notable when reviewing the attached chart is that by failing to document the presence of weapons contraband, the current ADOC incident reporting is creating a barrier to more thorough analysis of the facility. The attached spreadsheets demonstrate that there were **15 incidents** involving weapons in February. However, according to the prison's classification system, there were **only 4 incidents** that involved knives, even though the prison documented that it collected weapons **from 9 of these incidents**. Accordingly, the incident report data failed to identify **11 incidents where weapons** were involved, including the homicide of █████████ See SCCF-18-00179 (Feb. 9, 2018). See Appendix C. In order to put together the full picture of incidents involving weapons, EJI had to specifically identify the additional incidents involving weapons by specifically reviewing each incident from February.

## 2.    The St. Clair Staff Need to Conduct Regular Contraband Searches

Regular contraband searches are effective at identifying and removing weapons and other illicit materials from the population. EJI reviewed all searches conducted at St. Clair from November 1, 2017 to March 31, 2018. See Appendix D, Documented Searches

13

November through March. These have been broken into two categories: intentional shakedowns and reactive shakedowns. The "intentional shakedown" category includes all searches that were conducted in accordance with ADOC policy to search cells, areas, and conduct patdown searches. The "reactive shakedown" category includes all searches that appear to be triggered by circumstances at the prison including: searches done pursuant to assaults, searches following reports of suspicious activity, or searches following major breaches to security. See Appendix D.

As the attached chart demonstrates, intentional searches conducted pursuant to policy are incredibly effective at identifying and recovering weapons contraband. See Appendix E.

- There were **66 total intentional** and reactive searches combined in the studied period;
- Weapons were recovered **in 29 out of the 38** intentional shakedowns, or nearly 80 percent of the intentional searches;
- Weapons were only recovered **in 10 out of 28** reactive searches, or 35 percent of the reactive searches;
- The searches recovered only 286 of the documented 340 weapons, indicating **over 50 weapons that were documented but not recovered** at the prison;
- **275 of the knives** recovered were found during intentional searches;
- The weapons recovered in the intentional searches **represent over 95 percent** of the total weapons recovered.

Existing regulations require regularly documented contraband searches, including monthly searches of all housing areas and at least two cells per shift for each shift of a cell block rover. See ADOC AR 336 and SCCF SOP 110. Additionally, both regulations require a written record of all contraband searches that are conducted. Currently, contraband searches at the facility are very limited, despite them yielding strong results when they are conducted.

- St. Clair conducted **66 total searches** in the 5 month period counting all searches together, including both planned and reactive searches of individuals, cells, housing areas, and common areas.
- Assuming even a bare minimum of 8 rovers in a 24 hour period, a number that is less than half of the required rover coverage proposed by ADOC expert Richard Stalder, the administration should be **conducting and documenting 16 cell searches per day**.

14

ADOC-DS019143

- Over the 150 days, again assuming only 8 rovers for a 24 hour period for the entire facility, St. Clair should have **conducted and documented 2400 cell searches**.
- Even if each of the 66 searches were all cell searches, they would represent **a mere 3 percent (rounded up)** of the required searches under ADOC policy.
- The facility is also required to complete searches of every housing area on a monthly basis.
- This has **only been accomplished twice**, once in December and once in March.
- The searches from those two months, combined, represent **200 of the 286 knives** recovered at the prison, or approximately 80 percent of all knives recovered at St. Clair.

## IV.    PHYSICAL PLANT

It is critical for the St. Clair staff and the ADOC administration to understand deficiencies in the physical structure of the facility. Issues related to safety and security cannot be fully evaluated without an awareness of the deficient locking mechanisms and the proliferation of blind spots. While EJI has provided this information to ADOC leadership, it is an ongoing problem that presents a danger to staff and inmates. In order to function effectively, the Quality Improvement Team needs to pay particular attention to the facility's structural deficiencies.

## 1.    <u>Locks</u>

During the monitoring period, EJI has documented that there are problems with the existing locks at the prison. As demonstrated by the following incidents, there is little indication that the locks are being inspected or repaired:

1.    On December 7, 2017, St. Clair staff reported that a "crowd of inmates" were out of their assigned cells at 1:50 am in both Q1 and Q2 blocks. SCCF-17-01416 (Dec. 7, 2017). There was no evidence corrective action was taken including: that the cells with inoperable locks were identified; that men who were out of their cells were disciplined; that maintenance was contacted to evaluate the locks; that any officers had inspected the locks, or the last officer to inspect the locks were identified; that any measure to ensure the locks were

15

not further tampered with was taken.

2.  In that same incident, an inmate was able to run from one housing area to the other and pass off a contraband cell phone to a group of men who were out of their cells. SCCF-17-01416 (Dec. 7, 2017). There was no evidence of corrective action taken concerning the inmate's ability to get from one housing area to the other at around 2:00 am.

3.  On January 23, 2018, the cell door to cell E-1 in segregation was found to be unsecured and malfunctioning while the cell was occupied. SCCF-18-00092 (Jan. 23, 2018).

4.  On March 2, 2018, the EJI monitoring team observed that the door to cell L-47 in the 2-side of L-block was completely unsecured such that not only did the door fail to lock, but no physical effort could get the door to close and latch. This was reported to have been an issue for days, yet the cell was occupied and maintenance had not fixed the issue. A review of March 2018 incident reports indicated that nothing was filed regarding this serious failure of fundamental security hardware.

5.  On March 2, 2018, the EJI monitoring team also observed at least 40 cells with observable obstructions in cell doors' locking mechanisms, in general population and little indication that officers were regularly looking for and removing obstructions.

6.  An examination of incident reports since November 1, 2017, suggests that the facility is not regularly inspecting any of the facility's locking mechanisms, despite policy requiring weekly evaluation of all security devices, including "[l]ocks, gates, doors, bars, fences, ceilings, floors, walls, and barriers used to confine and control inmates." AR 331; SOP 170.

7.  In one of the only incident reports documenting an inspection of cell door locking mechanisms and other security equipment in general population, the ADOC documented that over 10 cell door locks were simply "not working." SCCF-18-00287 (Mar. 7, 2018). Despite this observation, the incident report did not document what corrective action was taken upon learning that men were living in cells without locking mechanisms, including a failure to note whether the locks were fixed, and whether men were removed from the cells with faulty locks.[1]

---

[1]It doesn't appear that men were removed from the cells. Most of the cells had the same occupants on bed rosters from both March 1 and March 15. See Bed Count Rosters

16

8. On EJI's most recent tour, taking place on June 20, 2018, the monitoring team again observed that there were numerous locks obstructed in general population, noting that there were nearly 30 cells locks that appeared to have been defeated in P and Q Blocks alone.

## 2. Cameras and blind spots.

St. Clair also has extensive blind spots in the housing areas and common areas. The risks associated with these areas are exacerbated by broken and ineffective cameras and mirrors. During EJI's monitoring tours in March and June, the team observed that most of the cameras installed at St. Clair were not operable. Additionally, the few cameras that were operational lacked any recording system or playback ability. Recording and playback would increase the deterrence posed by the cameras and would aid subsequent investigations into incidents at the prison.

The mirrors that were placed in the housing areas to address blind spots are also not operating effectively. The majority of these were either broken, scratched to the point of uselessness, or angled in a manner that eliminated any ability to observe the targeted blind spots. Multiple cubicle officers reported that there were large sections of the housing areas that they could not observe because of the broken cameras and mirrors.

Finally, the cameras to the doors outside the housing units were similarly not fully functioning. Because the cubicle operators rely on these cameras to maintain security within the units, the lack of functioning cameras contributes to unauthorized movement. Accordingly, because the cameras were not functioning outside P/Q Blocks, the doors were not secured and men were able to enter and exit without staff approval.

In March, ADOC received a cost estimate for an expanded camera system that would provide complete coverage of the prison. This estimate indicated that the current system was not up to the "industry standard for a state run prison," and was "creating an un-safe condition for the incarcerated and staff." Johnson Controls Letter. The cost estimate was not received in time for ADOC to submit a funding request for the current fiscal year, and ADOC has not committed to an expedited request for camera funding.

---

March 1, 2018; March 15, 2018.

17

## V.    USE OF FORCE

**Issue Overview**

On March 28, 2018, EJI provided a monitoring report to the Commissioner regarding our ongoing monitoring of the changes being implemented at St. Clair Correctional Facility pursuant to the Agreement between the ADOC and EJI. One of the issues discussed in the report were problems associated with the use of force at the prison. On December 1, 2017, staff with EJI personally witnessed an incident that highlighted the problems associated with officers' use of force at St. Clair. Attorneys were present for an incident that took place in segregation where correctional officer ███████ enthusiastically reported spraying an entire can of chemical spray into a segregation cell.[2] Shortly afterwards the attorneys witnessed the officer attempting to assault the same inmate with a metal baton, although the man was restrained. Other officers held CO ███████ back to prevent him from striking the individual. The EJI staff observed that if the ADOC officers were not aware that EJI was present to conduct monitoring visits, it was likely that the situation would have escalated and could have resulted in serious injury.[3]

From November, 2017 through May, 2018 there were a total of 101 instances where officers used force on men incarcerated at St. Clair Correctional Facility. A review of the incidents reveals a number of concerning patterns regarding the use of force. One of the central features concerning the use of force is the extent to which problematic instances are taking place in or on the way to segregation. Three major patterns emerged: 1) officers frequently resort to force when men are restrained with handcuffs and/or leg irons; 2) incident reports and investigative reports often exclude critical information concerning injuries men received during use of force incidents; 3) Officers use of force is often excessive and disproportionate to the situation.

---

[2]The official incident report conflicted with CO ███████ statement, indicating that he only released a three second burst of the spray. See SCCF-17-01389 (Dec. 1, 2017.)

[3]This incident involved ████████████████████ See SCCF-17-01389 (Dec. 1, 2017.) It is particularly notable that the incident report and use of force investigative report indicated that ███████ subsequently spat on CO ███████ but omitted any mention of CO ███████ attempt to strike ███████ with his baton. This incident is also referenced below in Part 3.

18

It is notable that Captain Malone is nearly solely responsible for conducting a review of use of force incidents. Capt. Malone is the primary supervisor over the segregation department creating a potential conflict of interest in his investigation of force incidents involving the officers he supervises.[4]

Finally, EJI is also concerned that the incidents where force is used are not always being thoroughly documented. There are frequently missing incident reports, photographs, body charts, witness statements, and even the use of force investigative reports. The lack of consistent documentation is particularly problematic in light of the apparent unreliability in at least some of the St. Clair administration's use of force investigations. It's critical to review any available documentation, particularly where the offered justifications by officers fail to explain the injuries to men, or don't stand up to more critical analysis. For example, officers appear to often rely on the claim that men are taking an "aggressive stance" or are behaving "aggressively" in situations to justify the use of chemical spray and other force, even where the men are already in physical restraints.

It appears that Capt. Malone is at least partially responsible for these lapses. He seems to consistently fail to comply with use of force investigative report standards from AR 327 and SOP 120, in several specific ways, including:

- A failure to document that a use of force investigation was conducted in 33 out of 101 incidents or over 30% of the use of force events at the facility. This includes no documented use of force investigative report in 21 out of the 61 incidents from February through May, 2018;
- A failure to include complete documentation in the incidents that were investigated, including failing to obtain complete statements in 56 out of 78 of the incidents with investigations, or over 70%;

---

[4]Captain Malone previously acknowledged this potential for bias existed during depositions that were taken pursuant to the lawsuit in this case. At that time, Captain Malone indicated he was the Captain in charge of population. He reported that he attempted to review the use of force incidents that took place in segregation, explaining that "if the incident happened in segregation, we don't let the segregation captain conduct the use of force report or what have you." When asked why this was the facility's protocol, Capt. Malone explained that it was to avoid investigative bias, stating that they wanted "to be fair" and indicating that it was more effective for someone "on the outside looking in . . . to figure out what the problem is." See Capt. Malone Dep. *93-96 (Dec. 18, 2015).

19

                                          ADOC-DS019148

- Capt. Malone investigated a number of use of force incidents that he was involved in, received initial notification of, or involved a superior officer, in violation of AR 327 and SOP 120 standards. This included a situation where the use of force investigative report omitted that Capt. Malone himself was involved in the use of force incident where it appeared that an officer was retaliating against an inmate for their misbehavior.

1. **Officers frequently resort to force when men are restrained with handcuffs and/or leg irons**.

A number of recent use of force incidents occurred when the men were already restrained with handcuffs. Nearly every one of these incidents took place in segregation or on the way to segregation and the justification for the assaults tended to fit a pattern of alleging that the inmates were becoming "aggressive." Many of the officers resorted to chemical spray in response to these allegations. In general, the presence of physical restraints tends to undermine the officer's justifications for resorting to the use of chemical spray, particularly where multiple officers were present and escorting the restrained inmate.

Additionally, a number of these incidents occurred after the men complied and allowed themselves to be placed in restraints. The apparent initial compliance further undermines the assertions that the men later became "aggressive." Finally, the most troubling aspect about a number of these incidents is that men who were restrained in handcuffs received wounds consistent with physical blows where the incident reports and investigative reports omitted any mention of physical contact. This is discussed below and in the next section.

1.   SCCF-17-01352, 53, 54. November 17, 2017.
    a.   ████████████████████ Warden Specks, Capt. Malone, Lt. Baker, Sgt. Luitz, Sgt. McLemore. ████████ was initially documented as having been restrained on the ground after another individual alleged to have passed him a weapon. He was then reported to have been restrained on the way to seg and "placed against the wall" by Capt. Malone. The administration did not provide any documentation regarding a body chart or photographs following the initial or second incidents. SCCF-17-01352, SCCF-17-01353.
    b.   Later that day, ████████ complained about headaches and had to be

20

sent to the hospital for evaluation. In a body chart from that incident report, ███████ was documented having a swollen eye and reported that he'd been assaulted in the warden's office. SCCF-17-01354. The investigative report was related only to the initial incident, and found the use of force justified.

c.    Notably, there was no documentation that explained how ███████ obtained a black eye and what caused his headaches. The incident reports indicate only that he was restrained physically on two occasions. Neither of these explain how ███████ obtained an injury to his eye that caused it to "swell shut."

2.    SCCF-17-01473. December 21, 2017.

a.    ███████ CO L. Jones, Sgt. McGilberry, Sgt. Stefaniak. In seg, ███████ was restrained in cuffs on the exercise yard. Body charts indicate he had no injuries before he went to seg. When questioned about injuries, CO L. Jones claimed that he saw Mr. ███████ having "a seizure" leading to him causing injuries to his face himself. Body charts and photographs support ███████ claim that he was assaulted while in handcuffs. Investigative report recommends I&I investigate incident.

b.    ███████ injuries prompted further inquiry from Warden Brooks. The resulting explanation for how ███████ was harmed was not satisfactory and the incident was referred to I&I for investigation.

3.    SCCF-17-01485. December 24, 2017.

a.    ███████. CO Mathis, CO Guined, Sgt. Hodge. ███████ was restrained in cuffs and escorted to breezeway. After Sgt. Hodge opened the breezeway gate, ███████ was alleged to have "pulled away" and Sgt. Hodge sprayed him with chemical spray. Then ran and he was wrestled to ground after. Investigative report finds force justified.

4.    SCCF-17-01501. December 28, 2017.

a.    ███████ CO T. Hopper, CO J. Williams, Co T. Guined, Co J. Scott. ███████ was restrained in cuffs while being escorted from the shower back to his cell in segregation. At that time, he was alleged to have become "aggressive" and "lunged" at an officer before being sprayed with chemical spray. Body charts notes abrasion to shoulder, ███████ statement indicates he was choked and

21

elbowed. Physical force not documented. Investigative report finds force justified.

5. CCF-18-00036. January 10, 2018.

   a. ██████████████████████████ Sgt. Luitze, CO D. Tucker. Mr. ████████ was alleged to have flooded his cell in segregation. He subsequently complied with cuffing order and was directed to the walk yard. He continued to be restrained in cuffs and was returned to cell. At that time he reportedly became "erratic" and "head-butted the wall" and "charged toward Sgt. Luitze." Sgt. Luitze sprayed him with chemical spray. Body chart indicates laceration to forehead. Investigative report finds force justified.

6. SCCF-18-00054. January 12, 2018.

   a. ██████████████████████ CO Fletcher. ████████ was brought to infirmary at 11:00 p.m. and was handcuffed. At that time he was alleged to "yell out loud and make demands" for medical treatment. Reported to "talk aggressive and came off of the wall." In response, ████████████ was sprayed with chemical spray.

   b. The body chart indicated numerous abrasions to head and body. Mr. ████████s statement indicates he was assaulted while handcuffed. The alleged physical force was not included in incident, despite the body chart at least partially supporting ████████████ statement. Investigative report finds force justified.

7. SCCF-18-00165. February 6, 2018.

   a. ██████████████████████████ CO McLaurin, Lt. Baker, Lt. Rooker. ████████████████ was brought to seg, handcuffed and placed on walk yard. Alleged to "jumped his handcuffs to the front on several occasions." He "also rammed his head several times against the brick wall." Lt. Rooker sprayed ████████████ with chemical spray following several orders to stop and sit down. Body chart notes red spot on forehead. Investigative report finds force justified.

8. SCCF-18-00283. March 6, 2018.

   a. ██████████████████████████. Lt. Scott, CO Chapman, CO Ambroise. In seg, ████████████ complied with an order to be handcuffed and escorted out of cell following indication of cell flooding. While being escorted to walk he was alleged to have "turned and approached Officer Ambroise in a threaten and aggressive manner." CO Ambroise then

22

sprayed him with chemical spray. Investigative report finds force justified.

9.  SCCF-18-00350. March 21, 2018.

　　a.  ██████████ ). Co McMillian, Sgt. McLemore, CO Chapman. In seg, ██████████ was in seg board room. The incident report did not explicitly note that he was restrained but this would be required by seg procedures and in ██████████ statement he indicates he was restrained. During the review, he was alleged to "become aggressive" and "belligerent." ██████████ was escorted out of seg board room. When he began "to resist" he reportedly "struck the front of his face against the wall." Body chart indicates he had a swollen lip, a bloody nose and a knot on his forehead, and ██████████ alleged assault by CO ██████████ Investigative report indicates force justified.

　　b.  While the incident report suggests ██████████ caused the injuries to himself by striking "the front of his face against the wall" the documented injuries do not appear to corroborate this account. The injuries appear to be consistent with physical blows to the face, consistent with ██████████ allegation.

10.  SCCF-18-00354. March 21, 2018.

　　a.  ██████████ ). Sgt. McLemore, Co Burns, CO Thompson. In seg, ██████████ was alleged to be swinging broken broom handle through tray hole of door, then threw unknown substance on Sgt. McLemore. He was then sprayed with chemical spray through door. He was handcuffed to be escorted to infirmary. On walk he alleged to have "turned towards Officer Burns in a threaten and aggressive manner and then kicked Officer Burns on the left leg." Officer used take down maneuver. Body chart indicates a laceration and hematoma on side of head. Investigative report indicates force justified.

11.  SCCF-18-00368. March 26, 2018.

　　a.  ██████████ ). CO McKee, CO J. Russell. In seg, Mr. ██████████ was restrained and was being escorted to the exercise yard. Investigative report notes that while on the yard, ██████████ began to make threats towards CO McKee and "approached Officer McKee in a very aggressive manner." After ██████████ refused to comply with orders to stop, Co McKee sprayed him with chemical spray. Investigative report indicates force justified.

23

2.    **Incident reports and investigative reports do not adequately explain incidents including the injuries that men received during use of force incidents.**

A number of the incidents where force was used indicate that officers are inaccurately reporting or failing to report the use of force at St. Clair. This includes situations where men were suffering from documented injuries that were completely unexplained by the incident reports and were largely ignored by the use of force investigation. The incidents below either contain no credible description for how men were injured during use of force situations or fail to evaluate the inappropriate behavior of officers at the facility.

The incident reports and use of force investigative conclusions are silent regarding the injuries, but they are supported by the body chart documentation, the photographs, and/or the men's statements. The only exception is the ████████ incident, where the reviewing officer found that the officer's explanation was not credible and referred the incident to I&I for investigation.

Additionally, as was noted above, nearly all of these incidents occurred when the men were restrained. Moreover, 4 out of the 8 incidents occurred in segregation or while the men were being escorted to segregation. The questionable circumstances further highlight a pattern of problematic force occurring while men are restrained and while men are being detained in segregation.

1. SCCF-17-01352, 53, 54. November 17, 2017.
   a. See incident description in Section 1 above.
2. SCCF-17-01473. December 21, 2017.
   a. See incident description in Section 1 above.
3. SCCF-17-01501. December 28, 2017.
   a. See incident description in Section 1 above.
4. SCCF-18-00054. January 12, 2018.
   a. See incident description in Section 1 above.
5. SCCF-18-00263. March 1, 2018.
   a. ████████████). Warden Specks. According to the incident report, Warden Specks observed an "unknown inmate" pass Mr. ██████ a knife during a security check. ██████████ refused orders to be searched, and Warden Specks sprayed him with chemical spray. The

24

incident report indicates ███████ was "combative" and was "placed on the ground" but does not indicate the warden used physical force. No knife was indicated as recovered in the incident report.

    b.    The body chart indicates ███████ had swelling and bruising to his eye, a bloody and swollen nose, and an abrasion on the side of his heads. While the body chart indicates that he suffered numerous blows to his head and face, the incident report does not indicate physical strikes were necessary and does not explain how ███████ suffered the injuries. The investigative report found the use of force justified.

6.    SCCF-18-00350. March 21, 2018.

    a.    See incident description in Section 1 above.

7.    SCCF-18-00516 (May 3, 2018).

    a.    ████████████) Sgt. R. Santa-Maria, CO Lark. On May 3, 2018, ████████ reported that Sgt. Santa-Maria punched him in the face without provocation the previous night then ordered him to his cell overnight without reporting the altercation. A medical examination found ██████ had injuries consistent with his report. The officer and Sgt Santa-Maria's statements are not included in the use of force documentation, although the incident report indicates that aspects of ██████ statement were corroborated by one of the officers, notably that Santa-Maria removed his baton and gave it to the officer before striking ██████ with his fist. The report was referred to I&I for further investigation.

8.    SCCF-18-00578, SCCF-18-00614 (May 16, 2018);

    a.    ████████████████). CO C.██████ CO. N. Brugman, CO Beamon. On May 16, 2018, Sgt. Norris observed that CO ████ ██████ had bruising around his left eye. Initially, CO ██████ claimed the bruises were a result of falling at his home that morning. Approximately two hours later, ██ ██████ recanted his statement to Sgt. Norris and admitted that the bruises came from an altercation with an inmate. CO ██████ explained that ████████████ had spit on him through the mail slot. While they were both in the P/Q barbershop, CO ██████ confronted ██████ about spitting at him. ██████ stated he wanted to fight instead of talk, which CO ██████ agreed. According to CO ██████ ██████ picked him up, slammed his face into a water faucet, and punched him repeatedly. Although ██████ identified CO Brugman and CO Beamon as being present,

<p style="text-align:center">25</p>

CONFIDENTIAL        ADOC-DS019154

both officers denied witnessing any altercation. ████ was disciplined and the incident was submitted to I&I for unjustified use of force.

3.    **Officers use of force is often excessive and disproportionate to the situation.**

A review of recent incidents at St. Clair demonstrate a pattern of officers resorting to force even in situations where the prisoners involved are not reported to pose a threat to staff or property that would justify the officers' use of force under existing regulations governing the use of force and chemical agents. See AR 312, 327; SOP 101, 120. The officers appear to have one response to situations where they perceive disobedience or inconvenience, the near immediate use of force. This is acutely problematic in situations where men are sprayed with chemical agents or struck with batons while they are in the midst of mental health crises or while they are restrained in cuffs or in a cell in a manner that demonstrates no credible threat that would justify force.

For example, while ████████ was incarcerated at St. Clair he had a reputation for problematic behavior attributed to intellectual deficiencies and mental health issues. On November 29, 2017, ████ reported that he had been sexually assaulted with a number of men reporting to EJI monitors that the assailant took advantage of ████ in part because he was known to be vulnerable. See SCCF-17-01374.

████ was housed in the infirmary following the assault. On December 1, 2017, CO Burns and CO J. Smith observed that ████ was "kicking the door with a sheet tied around [his] neck." CO Burns opened the door and attempted to remove the sheet and Mr. ████ "became disorderly." CO Smith then sprayed him with chemical spray. See SCCF-17-01385. While the apparent distress reported by officers suggests an acute mental health issue rather than any risk to the officers or ████ own safety, the officers responded by spraying him with chemical spray. This is acutely problematic in light of ████ various functional deficits, as well as his recent report of sexual victimization. Rather than respond to the issue, the officers seem to have used force because of the inconvenience that ████ posed.[5]

_____

[5]On March 29, 2018, officers responded similarly to ████████ ████ was observed banging on his window in segregation. He was ordered to stop and then to get handcuffed. He did not respond and was subsequently sprayed with

26

Additionally, there is a recent pattern of officers responding to disobedience in segregation with force despite the absence of any ongoing threat. Typically officers rely on chemical spray in these situations, although at times they have struck men with metal batons.[6] In nearly all of these incidents, officers were dealing with men who were contained in their cells but had committed relatively minor disciplinary issues.

This pattern occurred in **8 recent incidents in segregation**. In nearly all of these, the alleged misbehavior included only a refusal to close the cell's tray door, although some also included allegations the men had spat on officers, thrown liquid substances on the officers, or thrown an item out of their tray hole door.[7] None of the incidents included evidence that

_____

chemical spray. See SCCF-18-00384 (March 29, 2018). Mr. ████████ committed suicide shortly after this incident.

[6]On April 10, 2018, ████████████████████ reportedly refused to remove his arm from the tray hole in segregation and allegedly spit on Sgt. McLemore. When Sgt. McLemore attempted to wrestle ████████ arm out of the tray hole, ████████ grabbed the officer's uniform. In response the officer struck ████████ repeatedly in his arm, causing a serious injury that required hospitalization. See SCCF-18-00430 (Apr. 10, 2018). The administration did not disclose a use of force investigative report regarding the incident.

[7]See SCCF-17-01389 (On December 1, 2017, CO ████████ sprayed ████████ (████████ in his segregation cell after ████████ threw a liquid substance and broom handle out of his tray hole); SCCF-17-01433 (On December 11, 2017, Sgt. ████████ requested use of cell buster on ████████) after he reportedly threw an "unknown liquid substance" on CO McMillain from his segregation cell. Capt. Malone approved the use of spray and later conducted the use of force investigative report); SCCF-17-01436 (On December 12, 2017, ████████) reportedly refused to remove his arm from his tray hole and CO L. ████████ struck his arm with a collapsible baton); SCCF-18-00167 (On February 6, 2018, Sgt. ████████ immediately sprayed ████████) in segregation after ████████ refused to return his meal tray and became "verbally disorderly."); SCCF-18-00168 (On February 6, 2018, Sgt. ████████ again sprayed a man in segregation shortly after the incident with ████████ using chemical agent following ████████ refusal to remove his arm from the tray hole); SCCF-18-00201 (On February 16, 2018 ████████) threw his tray and food on CO Crawford out of the tray hole in his segregation cell. The officer sprayed him with chemical spray in response); SCCF-18-00392 (On March 30, 2018, ████████) refused to remove his hands out of the tray hole of his door in segregation after having his

27

would support a finding that the individual posed an ongoing risk of harm to the officer, to himself, or to any facility property. Two of these incidents occurred within a 30 minute span of each other and involved the same officer.[8]

---

handcuffs removed. CO ████████ sprayed him with chemical spray); See SCCF-18-00430 (Apr. 10, 2018) (████████████ incident on April 10, 2018).

[8]SCCF-18-00167 (Feb. 6, 2018); SCCF-18-00168 (Feb. 6, 2018).

28

**ST. CLAIR CORRECTIONAL FACILITY
MONITOR'S REPORT ON NON-COMPLIANCE**

Exhibit 12:
EJI Email to Ken McGinnis, July 14, 2018

                    ADOC-DS019158

Equal Justice Initiative Mail - St. Clair: Recent Incidents Implicating QIT...        https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



**Ryan Becker <rbecker@eji.org>**

---

## St. Clair: Recent Incidents Implicating QIT Process

---

**Ken McGinnis** <kmcginnis@cglcompanies.com>                                        Sat, Jul 14, 2018 at 8:04 AM
To: Ryan Becker <rbecker@eji.org>
Cc: Charlotte Morrison <cmorrison@eji.org>

Thank you for the information – I will use this in my discussions both with the QIT and with the Incident Manager at St Clair.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Friday, July 13, 2018 3:56 PM
**To:** Ken McGinnis
**Cc:** Charlotte Morrison
**Subject:** St. Clair: Recent Incidents Implicating QIT Process

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

---

Dear Mr. McGinnis,

During this week's meeting we discussed our concern that IRs often designates a single incident type -- for example, "Intentionally Creating a Security/Safety/Health Hazard (Employee/Inmate)" or "ICSSHH" -- even when the incident falls into multiple incident type categories like unauthorized movement or weapons assault. We expressed our concern that this type of classification would obscure the QIT's review of incidents, undercounting incidents of violence or uncontrolled movement and undermining the reliability of the dashboard and the facility's trend analysis.

The attached incident report and related documents regarding ████████████ is an example of an incident from June 23, 2018, that reflects our concern. The incident is identified solely as an ICSSHH incident, even though the man making the report states that he was extorted, kidnapped at knifepoint, held in another individual's cell, and assaulted in an incident that lasted nearly 24 hours.  The uncontrolled movement aspect of this report is particularly noteworthy because ██████ was participating in the residential substance treatment program and assigned to the H Dorm, an isolated housing unit separate from the main body of the prison. He was reportedly taken from this unit to general population, to P Block, where he was held overnight and into the next morning. He reported being assaulted and that his assailants had knives, and that they were extorting him for a significant amount of money. The unauthorized movement, kidnapping, assault, and extortion are not identified in the incident report.

The attached incident report regarding ███████████ from June 14 is another example of an incident mis-identified solely as an ICSSHH incident. ██████ stated that he was "held against his will in Q block for several hours" and was "physically beaten" by several men. The body chart documents injuries that are consistent with ████ statement, indicating lacerations to his skull, and the photographs attached to the report demonstrate that he was also hit multiple times in the face. ██████ reported that he was being extorted in an attempt to get him to smuggle contraband into the facility. In statements made to the ADOC, ██████ reported being held "all day" and "all night" throughout the assault. The assault and extortion are not identified in the incident report.

Both of these also seem to be the kind of reports the I&I investigator should investigate, but with the present coding it seems its unlikely the investigator would flag these incidents for further investigation, which is why we feel the need for some criteria the investigator should use to identify which incidents to investigate. The documents for both

---

CONFIDENTIAL

1/13/2019, 2:46 PM

ADOC-DS019159

incidents are attached.


Thanks,


Ryan Becker

Staff Attorney

Equal Justice Initiative

**P** : *Please consider the environment before printing this e-mail*

---

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

---

1/13/2019, 2:46 PM

CONFIDENTIAL    ADOC-DS019160

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 13:
EJI Email to Ken McGinnis, Aug. 16, 2018

CONFIDENTIAL

Equal Justice Initiative Mail - St. Clair: Question Regarding Incident Ca...          https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



**Ryan Becker <rbecker@eji.org>**

## St. Clair: Question Regarding Incident Categorization in Recent Assault

**Ken McGinnis** <kmcginnis@cglcompanies.com>                           Thu, Aug 16, 2018 at 5:38 PM
To: Ryan Becker <rbecker@eji.org>
Cc: Charlotte Morrison <cmorrison@eji.org>

I will review this case with the Incident Manager on Tuesday and also discuss with the I&I.  I will have to see how this was classified on the tracking spreadsheet after review by the incident manager.  I think we have to remember that the Incident report is the initial report in the process and is based on what the officer has observed – I would be more concerned about how this is reviewed and investigated by I&I after their initial review.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Thursday, August 16, 2018 10:27 AM
**To:** Ken McGinnis
**Cc:** Charlotte Morrison
**Subject:** St. Clair: Question Regarding Incident Categorization in Recent Assault

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Dear Mr. McGinnis,

We wanted to get your thoughts on the classification of the attached incident, regarding an assault that occurred in the special safety unit where a ▇▇▇▇▇▇▇▇ was sliced across the eye, face, and neck with a razor blade. He received 64 stitches in the incident and appears to have narrowly missed losing his eye or receiving a life threatening injury.

Our concern is that the facility categorized this incident as a "fight with weapon nonserious injury." We are trying to understand how it would receive that categorization. It appears to us to be an assault with serious injury. Of particular note, the initial write-up in the duty officer report identified this as an assault. When the incident report was finalized the incident was reclassified as a fight. Although the victim of the assault initially received a disciplinary for "fighting without a weapon," the disciplinary hearing officer rejected this, indicating that ▇▇▇▇▇▇ was not fighting and in fact had his throat cut "from behind" during the incident.

Additionally, the special safety unit is currently located in segregation housing. We found it notable that the weapon used in the incident was not recovered by ADOC staff despite the unit being more controlled than general population.

Finally, as is typical for St. Clair incidents, the presence of the weapon is not included in the incident categorization. This incident report appears to reflect the pattern we've noted in the past where incidents are miscategorized. We are concerned that global data analysis will fail to capture this incident as: an assault, as an incident with serious injury, or as an incident involving a weapon.

We are attaching the duty officer report, incident report, the men's body charts, and some pictures taken of ▇▇▇▇▇▇▇ injuries.

As always, thanks for you review.

Ryan Becker
Staff Attorney

CONFIDENTIAL

1/13/2019, 2:49 PM

ADOC-DS019162

Equal Justice Initiative Mail - St. Clair: Question Regarding Incident Ca...          https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...

Equal Justice Initiative

**P** *: Please consider the environment before printing this e-mail*

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

CONFIDENTIAL

1/13/2019, 2:49 PM

ADOC-DS019163

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 14:
EJI Email to Ken McGinnis, Aug. 21, 2018

ADOC-DS019164



Ryan Becker <rbecker@eji.org>

## St. Clair: Information for Monday's Call Regarding I&I

**Ken McGinnis** <kmcginnis@cglcompanies.com>                    Tue, Aug 21, 2018 at 4:15 PM
To: Ryan Becker <rbecker@eji.org>
Cc: Charlotte Morrison <cmorrison@eji.org>, Alison Mollman <amollman@eji.org>

Ryan. You must have been listening in to this morning's QIT discussion - the main point of discussion was the impact of the definitions of serious injury on the reporting and classification of incidents. This came about as a result of our discussion of the Grant case and other cases of a similar nature that had been identified.

It was agreed that the QIT members are to review the various definitions that are in use and determine how these should be modified and clarified in order to improve the classification of incidents that involve injury.   We in fact discussed at length the ASCA definitions so I think the QIT is in agreement with you on this issue and will be reviewing options prior to the next meeting.

Sent from my iPad

On Aug 21, 2018, at 4:03 PM, Ryan Becker <rbecker@eji.org> wrote:

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Mr. McGinnis,

We wanted to again follow-up briefly to flag one of the areas that we think may have also led to some confusion within ADOC that might explain their underreporting of assaults as fights.

ADOC maintains a narrower definition of "serious injury" than the ASCA definition. I'm attaching ADOC's incident reporting Administrative Regulation, AR 302 (see attached) where ADOC defines a serious injury and includes the ASCA glossary and incident categorization guidelines. It appears that it is the ADOC's intent to incorporate the ASCA definitions but they've done so in a way that is causing problems. Here are the different definitions from AR 302. We are also including the ASCA definition of a fight because it is our understanding that it would require additional classification of an assault where there is serious injury.

- **ADOC: Serious Injury/Illness:** Personal injury or sickness that may require emergency care at a medical provider, to include, but not limited to, prolonged unconsciousness, obvious disfigurement, protracted loss or substantial impairment of the body or mental faculty, or one which carries a substantial risk of death.
- **ASCA: Serious Injury:** An injury that requires urgent and immediate medical attention, severely restricts the prisoner's usual activity, and requires medical treatment. Medical attention should be more extensive than first aid such as the application of bandages to wounds. It might include stitches, setting of broken bones, treatment of concussion, being knocked unconscious, etc.
- **ASCA: Fight:** A fight may include a flare of tempers, mutual combat, or minor physical contact where there was no injury between one or more combatants. It does not include assaults that involve serious injury. . . . However, if the incident involved serious injury, for the perpetrator, it should be counted as an assault with serious injury, even if the victim was convicted of an infraction.

As you can see, there are a number of injuries that might be considered "serious" by the ASCA guidelines that would not meet ADOC's definition. This can create issues where the ADOC is relying on allegations of mutual combat to categorize an incident as a fight rather than an assault. For example, in the ███████ incident where ███████ received 64 stitches, it appears that this would unquestionably meet the ASCA definition of a serious injury. Accordingly, regardless if ADOC wanted to designate the incident as a fight (something the disciplinary hearing rejected in ███████ case) they would still be required to co-designate the incident as an assault with serious injury. It is possible that personnel at St. Clair relied on ADOC's more limited definition of a serious injury to

CONFIDENTIAL

ADOC-DS019165

resist categorizing the incident as an assault with serious injury.

We wanted to bring this to your attention because it may be something that ADOC needs to revise in their administrative regulations to reflect the divergence in approach.

Thanks,

Ryan


On Mon, Aug 20, 2018 at 8:19 PM, Ken McGinnis <kmcginnis@cglcompanies.com> wrote:
>
> Ryan – thank you – I will use these and the ▆▆▆ case for a discussion with I&I and with the QIT tomorrow
>
>
> From: Ryan Becker [mailto:rbecker@eji.org]
> Sent: Monday, August 20, 2018 6:29 PM
> To: Ken McGinnis; Charlotte Morrison; Alison Mollman
> Subject: Re: St. Clair: Information for Monday's Call Regarding I&I
>
>
>
>
> **** EXTERNAL EMAIL ****
>
> _____
>
> Dear Mr. McGinnis,
>
> I hope your travel to Alabama went smoothly today. Following up on this morning's conversation we wanted to bring a few additional incidents to your attention that underscore the concerns that we discussed earlier and the need for an audit mechanism to be developed by the Inspector General's office. We identified these incidents while reviewing ADOC's incident reports for July, which we received last week.
>
> 1) Two of these incidents reflect the under reporting of incidents at the prison.
>
> Incident No. SCCF-18-00912 involved a man who was hospitalized after being severely stabbed in the forehead, leg, and both forearms. This incident was classified as a fight and was not classified as an assault. See attached incident report and pictures.
> Incident No. SCCF-18-00886 involved a man who was hospitalized after sustaining stab wounds to his chest and abdomen. This incident was classified as an assault with "non-serious injury" even though the victim was hospitalized. See attached incident report and body chart.
>
> 2) We did not observe I&I being notified regarding any incident during the month of July, including either of the above incidents. We are concerned about this lack of investigation and believe it is connected to the under reporting of incidents.
>
> Both of the above incidents were identified as "Class B" incidents which do not trigger I&I's mandatory investigative responsibilities. If either of these incidents were categorized as Class A "assaults with serious injury" I&I would have been obligated to investigate.
>
> This is just based on our initial quick review of the incidents in July, but is consistent with what we had observed with ▆▆▆▆▆▆ We are concerned that this recent pattern reflects an intentional effort by the new St. Clair administration to minimize the violence at the facility and to limit I&I's investigations into the prison.
>
> Let us know if you have any questions or would like any additional documents.
>
> Thanks,
>
> Ryan C. Becker

CONFIDENTIAL

ADOC-DS019166

>
>
>
> On Fri, Aug 17, 2018 at 10:05 AM, Ryan Becker <rbecker@eji.org> wrote:
>
> Dear Mr. McGinnis,
>
>
> I hope you're doing well. We wanted to get you some material related to the operation of I&I that we would like to discuss on Monday. We have previously observed that the traditional I&I investigations are subject to lengthy delays and do not focus on any institutional risk factors. While we recognize that the institutional investigator will have specialized training and that you had discussed developing a manual for the position's protocols, we wanted to make sure we understood your expectations for the investigator and what his interaction with the central I&I investigations will look like.
>
>
> We have requested over 80 investigative reports for St. Clair since the start of monitoring. This includes recent homicides, sexual assaults, use of force incidents, and incidents of serious violence. Although a number of these incidents took place in October, November, and December, we have only received a handful of investigative reports, while the vast majority were either never investigated, or were closed without a report being written. Here's a quick breakdown:
>
> 86 incidents requested;
> 12 incidents are still open (including a July 2017 homicide and an October 2017 sexual assault);
> 18 incidents have been closed with an investigative report (this includes 9 different sexual assaults that were "unsubstantiated" because the victim ultimately waived prosecution);
> 27 incidents that were opened and then subsequently closed by I&I where no investigative report was ever generated (this includes 17 "assaults with serious injury");
> 29 incidents that were never investigated (this includes a reported sexual assault and 6 different assaults).
>
> As you indicated in your initial thoughts in response to the incident where ███████ had his throat cut in the special safety unit in segregation, the institutional investigator is critical to identifying risk factors. Our concern is that given the volume of incidents at St. Clair, an incident that's mis-identified as a "fight" might never be reviewed by the St. Clair investigator. As the above breakdown shows, right now I&I has been able to complete only 20% of the investigations into the incidents that we requested, even though these represent the most serious incidents at the facility. We want to be sure that the institutional investigator will have the capacity to review all of the incidents of violence at St. Clair, and that the investigator will have a clear understanding that those incidents expand well beyond I&I's traditional approach.
>
>
>
> Attached please find a chart that reviews the incidents that we requested from I&I. We have organized them by status, and where there was a report we included I&I's disposition.
>
>
>
> As always, thanks for your careful consideration,
>
>
>
> Ryan Becker
>
> Staff Attorney
>
> Equal Justice Initiative
>
>
>
> P : Please consider the environment before printing this e-mail

CONFIDENTIAL

ADOC-DS019167

Equal Justice Initiative Mail - St. Clair: Information for Monday's Call R...          https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...

> 
> _____
> 
> This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.
> 
> _____

<ADOC AR 302, Incident Reporting.pdf>

CONFIDENTIAL

1/13/2019, 2:53 PM

ADOC-DS019168

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 15:
EJI Email to Ken McGinnis, Aug. 23, 2018

CONFIDENTIAL

ADOC-DS019169

Equal Justice Initiative Mail - St. Clair: Question about Incident Report ...    https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



Ryan Becker <rbecker@eji.org>

## St. Clair: Question about Incident Report Accuracy Improvements

**Ken McGinnis** <kmcginnis@cglcompanies.com>    Fri, Aug 24, 2018 at 1:04 PM
To: Ryan Becker <rbecker@eji.org>

Ryan – The Warden is aware of the general nature of the problems as we have discussed them and reviewed examples that you have provided.  She has Deputy Warden Givens working directly with the Incident Manager not only to get the reports current but also to improve quality and accuracy.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Friday, August 24, 2018 7:46 AM
**To:** Ken McGinnis
**Subject:** Re: St. Clair: Question about Incident Report Accuracy Improvements

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Thanks Ken, it's helpful for us to have a clearer overview regarding the potential timeline. One follow-up question regarding Warden Jones. The recent incidents that we've been highlighting for you that had issues are from July. Do you think the warden is aware of the problems with those incidents and understands how their issues implicate the process?

Thanks,

Ryan

Sent from my cellular phone

On Aug 24, 2018, at 2:59 AM, Ken McGinnis <kmcginnis@cglcompanies.com> wrote:

In relation to establishing a timeframe for resolving the pending issues I think the structure is now in place that will hopefully result in significant progress in the areas of improving the accuracy and completeness of the incident reports.  As to the areas you noted in your email the following is my view of the status of things.

·    Failures in accurate categorization:  I think this will be an ongoing effort by all involved to ensure that incidents are accurately categorized.  The incident manager is becoming more proficient and is providing feedback to staff where needed.  The Institutional Investigator is just beginning his new role and spent last week in Louisiana getting some orientation in his new role.  He is also reviewing

CONFIDENTIAL

1/13/2019, 3:18 PM

ADOC-DS019170

the protocols related to identifying cases to be reviewed – initially this will include all Category a and B incidents and selected C incidents.  We will certainly have a better feel on the effectiveness of these efforts by October 1, 2018.

·    Issues regarding definitions:  I am assuming this is related to the discussion about how they present classify injuries as either serious or non-serious.  During the QIT meeting on 8/21 this was discussed at length and it was determined that each member would review the present definitions and instructions and be prepared to suggest modifications at the QIT meeting scheduled for 9/23/18.

·    IG audit of incidents:  Again this issue was discussed at the QIT meeting on 8/21.  The IG, Mr. Fassl, suggested spot audits of the incident reports – for example would pick a month at random and audit all report for accuracy.  The would be done on a periodic basis once a baseline is established.  Mr. Fassl was review these options and report back by the QIT meeting of 9/25.

We are also now at a point that the incident tracking instrument is starting to provide sufficient data to permit analysis of the incident data.  There were modifications identified at the QIT meeting on 8/21 that research staff is going to complete by next week.  The share-point site will be activated shortly so we can all view the data live and review can be ongoing.  The Warden reported that she felt incidents submitted from about July 1 2018 on are accurate and complete – I am sure there will be cases which this is not the case and hopefully between the Warden' staff and the I&I staff member these will be identified and corrected.

In summary I don't think we can assure that by the first week of September the issues you raised will be corrected and resolved. I believe this will require ongoing review by the QIT and I suggest that it is better to target October 1 if a date needs to be selected as a point when we can assess where we are with resolving these issues.  Again I think we are finally to a point where the key parts of the suggested solution is now in place and we need a period of time to determine if these steps  will in fact correct the identified problems. The QIT is in place and can take leadership in getting these issues resolved.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Thursday, August 23, 2018 4:25 PM
**To:** Ken McGinnis
**Cc:** Charlotte Morrison; Alison Mollman
**Subject:** St. Clair: Question about Incident Report Accuracy Improvements

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Ken,

CONFIDENTIAL

ADOC-DS019171

We had something else we wanted to run by you. Charlotte talked to Jim and he said he was going to reach out to you about some of the problems that we've discussed this week regarding incident report accuracy at St. Clair. Just as a quick reminder, we've discussed:

1) failures in accurate categorization;
2) issues regarding definitions the ADOC uses; and
3) need for an IG audit system to review incidents at St. Clair

We would like to check-in with you about the timeline for resolving these issues. We recognize that you are limited by the ADOC's timeliness, but the judge has asked us to try and determine when we can expect the accuracy in reporting to improve.

We were hoping that you might be able to resolve the issues regarding the definition of serious injury and the IG audit system by the first week in September. Please let us know your thoughts, and whether there is anything we can do to help facilitate your work with ADOC.

Thanks again,

Ryan

**P** **: Please consider the environment before printing this e-mail**

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

CONFIDENTIAL

ADOC-DS019172

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 16:
EJI Email to Ken McGinnis, Oct. 16, 2018

CONFIDENTIAL

ADOC-DS019173



**Ryan Becker <rbecker@eji.org>**

___

## St. Clair: Data Issue with Dashboard

___

**Ken McGinnis** <kmcginnis@cglcompanies.com>                    Tue, Oct 16, 2018 at 1:52 PM
To: Ryan Becker <rbecker@eji.org>, James Austin <jfainstitute@gmail.com>, "rls51@yahoo.com" <rls51@yahoo.com>,
"john_ott@alnd.uscourts.gov" <john_ott@alnd.uscourts.gov>, "Harmon, Bart (DOC)" <Bart.Harmon@doc.alabama.gov>
Cc: Charlotte Morrison <cmorrison@eji.org>


Ryan – I wanted to follow-up on the issue you raised in the email below – be advised this was discussed in the QIT
meeting today in Montgomery and it was reported by the research staff that they had identified a format problem
with the data base that was resulting in errors in the time of the incidents.  This has been corrected and we
reviewed the new dashboard with the corrected data.  A new version of the data was to be posted today and will
be dated 12/12/18 and will reflect the modifications.  Also note that an updated data base will be posted as usual
on this Friday.  Thank you for identifying this issue.



**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Friday, October 12, 2018 3:41 PM
**To:** Ken McGinnis; James Austin; rls51@yahoo.com; john_ott@alnd.uscourts.gov; Harmon, Bart (DOC)
**Cc:** Charlotte Morrison
**Subject:** St. Clair: Data Issue with Dashboard



**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

___

Ken, Jim, and Richard,

We wanted to alert you to a problem that we've identified related to the dashboard that appears to be significantly
skewing the trend analysis at the prison. It appears that the time for incidents is frequently being recorded as
occurring in the "AM" rather than the "PM" which makes it appear that a significant number of incidents are happening
at the wrong time. The only explanation we can see is that this is a minor data entry issue, but it is giving a very
inaccurate picture of the time when incidents are occurring.

Just to give you an idea of the problem, here are a number of Class A incidents that are entered in the dashboard as
occurring in the AM when they actually occurred in the PM:

- SCCF-18-01253 (9.20.18). Homicide of ██████████, occurred at 10:27 pm according to IR, 2:23 am
  according to dashboard.
- SCCF-18-01163 (9.2.18). Homicide of ██████████, occurred at 5:16 pm according to IR, 5:16 am according
  to dashboard.
- SCCF-18-01077 (8.16.18). Assault with serious injury of █████████, occurred at 5 pm according to IR, 5
  am according to dashboard.
- SCCF-18-01017 (8.8.18). Assault with serious injury of ████████, occurred at 5:52 pm according to IR, 5:52
  am according to dashboard.
- SCCF-18-00812 (6.29.18). Assault with serious injury of ██████████, occurred at 5 pm according to IR, 5
  am according to dashboard.
- SCCF-18-00677 (6.4.18). Assault with serious injury of █████████, occurred at 5:45 pm according to IR,
  5:45 am according to dashboard.
- SCCF-18-00596 (5.21). Sexual assault of ████████████, occurred at 1:20 pm according to IR, 1:20
  am according to dashboard.

CONFIDENTIAL                                                              ADOC-DS019174

Equal Justice Initiative Mail - St. Clair: Data Issue with Dashboard                    https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...

- SCCF-18-00459 (4.17.18). Assault with serious injury of ███████████ occurred at 5:13 pm according to IR, 5:13 am according to dashboard.
- SCCF-18-00310 (3.12.18). Assault with serious injury of ██████████, occurred at 3:50 pm according to IR, 3:50 am according to dashboard.
- SCCF-18-00055 (1.12.18). Assault with serious injury of ██████████, occurred at 2:10 pm according to IR, 2:10 am according to dashboard.

This problem is not limited to Class A incidents, and appears to be incredibly widespread. According to an initial review, we observed that:

- The dashboard identifies 184 offenses occurring between 12:00 pm and midnight from Jan. 1 to Sept. 30.
- The incident report logs indicate that 887 incidents occurred between 12:00 pm and midnight from Jan. 1 to Sept. 30.

Thanks,

Ryan Becker
Staff Attorney
Equal Justice Initiative

**P** : *Please consider the environment before printing this e-mail*

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

CONFIDENTIAL

1/13/2019, 2:56 PM

ADOC-DS019175

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 17:
EJI Email to Ken McGinnis, Nov. 12, 2018

CONFIDENTIAL                    ADOC-DS019176



**Ryan Becker <rbecker@eji.org>**

## St. Clair: Questions Regarding QIT

**Ken McGinnis** <kmcginnis@cglcompanies.com>                    Mon, Nov 12, 2018 at 8:07 PM
To: Ryan Becker <rbecker@eji.org>, Charlotte Morrison <cmorrison@eji.org>
Cc: "Harmon, Bart (DOC)" <Bart.Harmon@doc.alabama.gov>, James Austin <jfainstitute@gmail.com>, Richard Stalder <rls51@yahoo.com>, "Casey, Glen (DOC)" <Glen.Casey@doc.alabama.gov>, "Jones, Karla (DOC)" <Karla.Jones@doc.alabama.gov>

To address your questions preliminarily:

*The SOP and settlement agreement indicate that there will be monthly, quarterly, and annual trend analysis based on incident report metrics.* I am not sure the writers of the SOP envisioned the dashboard product that was produced by Research as the present spreadsheet permits ongoing trend analysis for anytime period that can be prepared for individual analysis or for analysis by groups like to QIT. I am not sure it has applicability given the capabilities of the current dashboard. I will raise this with the QIT.

*Incidents that are inaccurately classified:* I will ask the QIT and research to review this issue at tomorrow's meeting.

*Inaccurate bed assignment reporting:* I will raise this at the QIT meeting – this is a data entry issue that should be easily resolved by the Warden

*Inaccurate location provided;* I will raise this at the QIT meeting – this is a data entry issue that should be easily resolved by the Warden.

*Inaccurate time of incidents;* Like the other two I will discuss with the QIT and Warden Jones. These areas like the above should be address through the audit process also and that will be discussed tomorrow also.

*QIT Decision Making:* Glen Casey has drafted a tracking instrument to document issues discussed and the status of the remedy – I will discuss tomorrow and ensure we get that formalized.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Monday, November 12, 2018 4:34 PM
**To:** Ken McGinnis; Charlotte Morrison
**Subject:** St. Clair: Questions Regarding QIT

CONFIDENTIAL

ADOC-DS019177

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Ken,

We wanted to raise a few issues with you that we thought might be covered in a quick conversation. Our ongoing review of the QIT has raised a few concerns about meeting the requirements of the Settlement Agreement and the SOP. Part of the issue is that we are not seeing some of the required documentation that would indicate the QIT is fulfilling its obligations. The things we would like to discuss with you include:

- Documentation of regular trend analysis by the QIT;
- Ongoing data flaws in the department's dashboard;
- Reporting on the QIT's decision making

**Monthly Analysis and Potential Flaws in Dashboard**

EJI has not seen any monthly trend analysis report from the QIT. The SOP and settlement agreement indicate that there will be monthly, quarterly, and annual trend analysis based on incident report metrics. (SOP para. A3, A4, D, G, H; SA para. 63.) We have requested these analytics but have not received them. Do these exist?

Our concern is that there are components of the dashboard that continue to appear to be inaccurate in some pretty significant ways. We believe that regular production and review of the dashboard's analytics is critical to both the broader purpose of initiating corrective action, and for the more general purpose of ensuring the accuracy of the data collection. Just as a brief example of some of the problems we are seeing:

   1. Incidents that are inaccurately classified. We have seen a number of incidents that are given an incorrect designation that would skew analysis significantly. For example, these 10 incidents have been classified as inmate-on-employee assaults in the dashboard when they are actually inmate-on-inmate assaults See (SCCF-18-00145, 2.1.18; SCCF-18-00221, 2.20.18; SCCF-18-00308, 3.12.18; SCCF-18-00545, 5.9.18; SCCF-18-00599, 5.22.18; SCCF-18-00787, 6.26.18; SCCF-18-00898, 7.20.18; SCCF-18-01077, 8.16.18; SCCF-18-01167, 9.3.18; SCCF-18-01439, 11.1.18)

   2. Inaccurate bed assignment reporting. We continue to observe that the men's bed assignments are not recorded correctly, undermining any attempt to evaluate the role that unauthorized movement played in the incident. For example, the dashboard continues to record the bed assignment of men after they have been placed in segregation even where it's clear the incidents took place in general population. See (SCCF-18-00055, SCCF-18-00998, SCCF-18-01017, SCCF-18-01089, and SCCF-18-01146)

   3. Inaccurate location provided. The facility continues to identify inaccurate locations where incidents are taking place. For example, it appears that the "big yard" location is routinely given as a catch-all, even where incidents are taking place in specific housing units, at the pill call area, near the kitchen, or other areas where the dashboard provides more specific location information. This distortion prevents accurate analysis of the most troubling hotspots in the prison. See (SCCF-18-00403, SCCF-18-00424, SCCF-18-00588, SCCF-18-00723, SCCF-18-01373).

   4. Inaccurate time of incidents. While the dashboard appears to have been corrected for the systematic misreporting of the time of incidents that undermined Dr. Austin's analysis, there do continue to be problems with the time of incidents. For example, the homicide of ███████ on 9.20.18 (SCCF-18-01253) was still erroneously listed as occurring at 2:23 am rather than 2:23 pm.

**Reporting on the QIT's decision-making**

Finally, both the Settlement Agreement and the SOP indicate that the QIT will issue a monthly report on the dispositions of decisions made during QIT meetings. (SOP para. J; SA para. 63h.) We have not seen this regular reporting, and are concerned that this further undermines the ability of the QIT to recommend meaningful corrective action at St. Clair.

Thanks,

CONFIDENTIAL

ADOC-DS019178

Ryan

P **: Please consider the environment before printing this e-mail**

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

CONFIDENTIAL

1/13/2019, 3:22 PM

ADOC-DS019179

**ST. CLAIR CORRECTIONAL FACILITY
MONITOR'S REPORT ON NON-COMPLIANCE**

Exhibit 18:
EJI Email to Ken McGinnis, Dec. 11, 2018

CONFIDENTIAL



Ryan Becker <rbecker@eji.org>

## St. Clair: Issues related to QIT, Corrective Action, Contraband Analysis and Dashboard

**Ryan Becker <rbecker@eji.org>**                                                Tue, Dec 11, 2018 at 12:04 PM
To: Ken McGinnis <kmcginnis@cglcompanies.com>, john_ott@alnd.uscourts.gov, "Harmon, Bart (DOC)"
<Bart.Harmon@doc.alabama.gov>, James Austin <jfainstitute@gmail.com>, rls51@yahoo.com, Charlotte Morrison
<cmorrison@eji.org>

Ken,

We wanted to check-in about a few issues related to the QIT, corrective action, ADOC's contraband search analysis, and the dashboard data. Much of this relates to issues that we previously raised and discussed, but we wanted to make sure we brought it to your attention in advance of your next QIT meeting. We are concerned that the facility continues to fail to correct flaws in their data collection that undermines serious efforts at trend analysis and risk identification at the prison.

**Corrective Action Issues**

A review of the most recent dashboard data indicates that there are ongoing, serious issues that the facility needs to investigate and address, including the ongoing heightened risk of violence in P/Q, ongoing unauthorized movement, and indications that men have been victimized as a result of non-functioning locking mechanisms.

Our concerns with P/Q continue to be reflected in the repeated stabbings, recovery of weapons, unauthorized movement, and reports that men are being threatened in the unit. The last two men to report that they were at risk in population resided in P/Q dorm (See SCCF-18-01577,  SCCF-18-01578), and 4 random searches of living areas and men in the units in the last week recovered 8 knives and a saw blade. (See SCCF-18-01660; SCCF-18-0166; SCCF-18-01584; SCCF-18-01585).

Additionally, men in P/Q continue to access housing areas without authorization. Just in the past few weeks:

- On Tuesday, 11/20/2018, at 10:20 p.m., 4 men from P/Q blocks were found in M Block (SCCF-18-01530);
- On Tuesday, 11/27/2018, at 8:30 p.m., 11 men from P/Q blocks were found to be in unauthorized housing areas (SCCF-18-01548);
- On Thursday, 11/29/2018, at 10:30 p.m., 25 men from P/Q blocks were found to be in unauthorized housing areas (SCCF-18-01572)

Finally, we wanted to flag an incident that potentially implicates a non-working locking mechanism and should trigger additional investigation:

- SCCF-18-01537. P-Dorm, 11/25/18 at 2:10 am. CCO Brugman and Gregory McNeff entered P1 to count, observed ▆▆▆▆▆ bleeding from multiple puncture wounds. ▆▆▆▆▆ was assigned to P18. The person who appears to be identified as stabbing him, ▆▆▆▆▆▆▆▆▆ was assigned to P22 (note: the dashboard inaccurately lists him as assigned to B block, where he was likely moved following the incident).
- The time of the incident indicates either ▆▆▆▆▆ was in the wrong cell, or was able to access ▆▆▆▆▆ cell.

**Contraband Analysis**

We also wanted to let you know that we reviewed the contraband analysis that ADOC put together. The analysis did not impact the review that EJI previously did documenting the facility's dramatic failure to identify and remove contraband weapons from the facility.

As a methodological point, EJI reviewed all contraband searches for the duration of the settlement agreement. ADOC's review began in August. Beyond that difference, ADOC's review did not identify any searches that EJI had not already accounted for. In fact, they failed to account for a number of searches that ADOC didn't identify or include

CONFIDENTIAL

ADOC-DS019181

in their analysis. This, and an apparent miscounting issue led ADOC to conclude that there were even fewer searches and knives recovered than EJI identified in our original review.

- ADOC total searches (August through October): 26 searches
- ADOC total knives (August through October): 215 knives
- EJI total searches (August through October): 39
- EJI total knives (August through October): 269 knives

The *difference of 54 knives* stems from a) ADOC not counting 49 knives found in H-dorm in a facility-wide search on 10.3.18 search (SCCF-18-01319, SCCF-18-01323); and b) ADOC failing to count 13 searches that resulted in the recover of 15 knives. Note that ADOC did double-count knives in a search on August 13, and in a search on August 24 (SCCF-18-01039; SCCF-18-01043; SCCF-18-01117). EJI did not include the miscounted knives in the above analysis.

ADOC's analysis also demonstrates that the facility continues to dramatically fall short of the contraband searches required by regulations:

- Regulations ADOC AR #336 and SCCF SOP #110 require that the entire facility be searched monthly for contraband. *The facility failed to do this at any point from August through October.* The closest they came was a complete search of all housing areas in October. Both EJI and ADOC's analysis evaluated these searches and reached the same conclusion.
- Both EJI and ADOC's analysis indicates that the facility *documented only 16 of the required 728 cell searches by rovers in P and Q* from August 1, 2018, to October 31, 2018 (note: this assumes the presence of an assigned rover in both P and Q on each shift, and that they are responsible for the two cell searches per shift mandated by AR #336 and SCCF SOP #110).

**Dashboard Issues**

As we reported in our prior review provided to you in November, the ADOC dashboard continues to suffer from systemic flaws related to incident location, incident categorization, time of incident, and bed assignments of individuals involved. Our review of the recently inputted data indicates that this is an ongoing issue.

While many of these flaws are potentially related to errors in data entry, there are also more substantive analytical errors. For example:

On Wednesday, December 5, 2018, ██████████████████ ) reported that his life was in danger and requested to speak with a shift commander. This incident was classified as "Intentionally creating a security/safety /health hazard." SCCF-18-01577. EJI continues to maintain that it is inappropriate for the facility to rely on this designation where men are reporting threats to their safety.

On Sunday, November 25, ████████████ was observed "bleeding from multiple puncture wounds." This incident reflects problems both with the quality of the data collection, but also with the underlying incident analysis. First, It was entered as an fight between "inmate on other" rather than "inmate on inmate." Second, it was not categorized as an assault, despite the victim's serious injuries.

We noted in the most recent QIT meeting that the discussion on reevaluating the definition of "serious injury" did not include any mention of the department's failure to classify any incident both as a "fight" and as an "assault with serious injury." In addition to the problems related to how ADOC is categorizing serious injuries, we think the department should also be addressing when incidents qualify as serious injuries. As you are aware, the ASCA definitions indicate that a "fight" should still be categorized as an "assault" where there are serious injuries.

Thanks,

Ryan C. Becker
Staff Attorney
Equal Justice Initiative

CONFIDENTIAL
ADOC-DS019182

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 19:
EJI Email to Ken McGinnis, Aug. 20, 2018

Equal Justice Initiative Mail - St. Clair: Information for Monday's Call R...          https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



**Ryan Becker <rbecker@eji.org>**

## St. Clair: Information for Monday's Call Regarding I&I

**Ken McGinnis** <kmcginnis@cglcompanies.com>                    Mon, Aug 20, 2018 at 8:19 PM
To: Ryan Becker <rbecker@eji.org>, Charlotte Morrison <cmorrison@eji.org>, Alison Mollman <amollman@eji.org>

Ryan – thank you – I will use these and the Grant case for a discussion with I&I and with the QIT tomorrow

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Monday, August 20, 2018 6:29 PM
**To:** Ken McGinnis; Charlotte Morrison; Alison Mollman
**Subject:** Re: St. Clair: Information for Monday's Call Regarding I&I

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Dear Mr. McGinnis,

I hope your travel to Alabama went smoothly today. Following up on this morning's conversation we wanted to bring a few additional incidents to your attention that underscore the concerns that we discussed earlier and the need for an audit mechanism to be developed by the Inspector General's office. We identified these incidents while reviewing ADOC's incident reports for July, which we received last week.

1) Two of these incidents reflect the under reporting of incidents at the prison.

- Incident No. SCCF-18-00912 involved a man who was hospitalized after being severely stabbed in the forehead, leg, and both forearms. This incident was classified as a fight and was not classified as an assault. See attached incident report and pictures.
- Incident No. SCCF-18-00886 involved a man who was hospitalized after sustaining stab wounds to his chest and abdomen. This incident was classified as an assault with "non-serious injury" even though the victim was hospitalized. See attached incident report and body chart.

2) We did not observe I&I being notified regarding any incident during the month of July, including either of the above incidents. We are concerned about this lack of investigation and believe it is connected to the under reporting of incidents.

Both of the above incidents were identified as "Class B" incidents which do not trigger I&I's mandatory investigative responsibilities. If either of these incidents were categorized as Class A "assaults with serious injury" I&I would have been obligated to investigate.

This is just based on our initial quick review of the incidents in July, but is consistent with what we had observed with Mr. Grant. We are concerned that this recent pattern reflects an intentional effort by the new St. Clair administration to minimize the violence at the facility and to limit I&I's investigations into the prison.

Let us know if you have any questions or would like any additional documents.

Thanks,

Ryan C. Becker

1/13/2019, 2:52 PM

CONFIDENTIAL                                                                 ADOC-DS019184

On Fri, Aug 17, 2018 at 10:05 AM, Ryan Becker <rbecker@eji.org> wrote:

Dear Mr. McGinnis,

I hope you're doing well. We wanted to get you some material related to the operation of I&I that we would like to discuss on Monday. We have previously observed that the traditional I&I investigations are subject to lengthy delays and do not focus on any institutional risk factors. While we recognize that the institutional investigator will have specialized training and that you had discussed developing a manual for the position's protocols, we wanted to make sure we understood your expectations for the investigator and what his interaction with the central I&I investigations will look like.

We have requested over 80 investigative reports for St. Clair since the start of monitoring. This includes recent homicides, sexual assaults, use of force incidents, and incidents of serious violence. Although a number of these incidents took place in October, November, and December, we have only received a handful of investigative reports, while the vast majority were either never investigated, or were closed without a report being written. Here's a quick breakdown:

- 86 incidents requested;
- 12 incidents are still open (including a July 2017 homicide and an October 2017 sexual assault);
- 18 incidents have been closed with an investigative report (this includes 9 different sexual assaults that were "unsubstantiated" because the victim ultimately waived prosecution);
- 27 incidents that were opened and then subsequently closed by I&I where no investigative report was ever generated (this includes 17 "assaults with serious injury");
- 29 incidents that were never investigated (this includes a reported sexual assault and 6 different assaults).

As you indicated in your initial thoughts in response to the incident where ████████ had his throat cut in the special safety unit in segregation, the institutional investigator is critical to identifying risk factors. Our concern is that given the volume of incidents at St. Clair, an incident that's mis-identified as a "fight" might never be reviewed by the St. Clair investigator. As the above breakdown shows, right now I&I has been able to complete only 20% of the investigations into the incidents that we requested, even though these represent the most serious incidents at the facility. We want to be sure that the institutional investigator will have the capacity to review all of the incidents of violence at St. Clair, and that the investigator will have a clear understanding that those incidents expand well beyond I&I's traditional approach.

Attached please find a chart that reviews the incidents that we requested from I&I. We have organized them by status, and where there was a report we included I&I's disposition.

As always, thanks for your careful consideration,

Ryan Becker

Staff Attorney

Equal Justice Initiative

**P** : **Please consider the environment before printing this e-mail**

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or

CONFIDENTIAL

ADOC-DS019185

Equal Justice Initiative Mail - St. Clair: Information for Monday's Call R...        https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...

any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

CONFIDENTIAL

1/13/2019, 2:52 PM

ADOC-DS019186

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 20:
EJI Email to Ken McGinnis,  Feb. 18, 2019

ADOC-DS019187



**Ryan Becker <rbecker@eji.org>**

---

## St. Clair: QIT Related Questions/Significant Use of Force Incident

---

**Ken McGinnis** <kmcginnis@cglcompanies.com>                                Mon, Feb 18, 2019 at 8:00 AM
To: Ryan Becker <rbecker@eji.org>, "john_ott@alnd.uscourts.gov" <john_ott@alnd.uscourts.gov>, Richard Stalder
<rls51@yahoo.com>, James Austin <jfainstitute@gmail.com>
Cc: Charlotte Morrison <cmorrison@eji.org>, "Harmon, Bart (DOC)" <Bart.Harmon@doc.alabama.gov>

In follow-up to your concerns relative to the case involving ▉▉▉▉▉ this matter was discussed at the QIT on
2/13/19.  Mr. Arledge indicated that I&I had opened a formal investigation in this case on January 28, 2019 after a
review of the video. This case was assigned to Mr. Arledge and the investigation is proceeding.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Friday, February 01, 2019 6:28 PM
**To:** Ken McGinnis; john_ott@alnd.uscourts.gov; Richard Stalder; James Austin
**Cc:** Charlotte Morrison; Harmon, Bart (DOC)
**Subject:** St. Clair: QIT Related Questions/Significant Use of Force Incident

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Ken,

We had two QIT related questions/issues we wanted to raise with you.

First, in the QIT's October meeting there was a discussion about developing a spreadsheet to track institutional
investigator Arledge's investigations at St. Clair. We wanted to check-in with you to determine if this was ever
developed. I'm attaching the minutes here so you can see what I'm referring to (see the top of page 2).

Second, I'm not sure if you saw this reported but there was a recording released of two officers assaulting an inmate
in segregation with their batons last week (see https://www.al.com/news/2019/01/video-shows-alleged-beating-of-
alabama-inmate.html ). The news report and reports we've received from men at the facility confirm that this is an
incident involving ▉▉▉▉▉▉▉▉▉▉▉▉ We haven't been provided with the incident report but the dashboard
contains some information on the likely incident from Jan. 21, 2019. See SCCF 19-00082. The incident is categorized
as an arson, failure to obey a direct order, and a use of force from C Block in the segregation unit.

Here is the available excerpt from the incident report narrative that we've reviewed:

> "Sgt. Dent opened the tray door of cell C16 and gave inmate ▉▉▉ a direct order to place inmate ▉▉▉ hands
> out to be cuffed. Inmate ▉▉▉ charged out the cell, with handcuffs to the front and hands appeared to be
> clinched in a threatening manner towards Sgt. Dent. Saber Red chemical agent was . . . [note: excerpt finishes
> at this point]"

We are trying to further investigate the incident and have not yet reached any conclusions, but we did observe some
items from the dashboard that raised a red flag with us and we wanted to run them by you:

- While the incident report narrative indicates Sgt. Dent handcuffed ▉▉▉▉▉ the video demonstrates very
  clearly that he was not handcuffed. Handcuffing men when they are taken out of their cells in seg. is ADOC

CONFIDENTIAL                                                          ADOC-DS019188

policy.
- We've previously raised a concern regarding the use of force in segregation, something we've discussed with you and included in our monitoring reports to the commissioner. I'm reattaching that memo so you can review again (see Second Monitoring Report at page 13-18).
- In addition to the pattern related to the use of force in segregation, we also raised a concern regarding the questionable reporting of use of force incidents at the facility. Given the conflict between the incident report excerpt and the video we are concerned about the incident involving ███████ We are including the appendix to the second monitoring report reviewing use of force incidents that involved questionable reporting in case you'd like to review those as well.
- Concerns over the accuracy of officer's accounts is particularly concerning considering the officer's report that ███████ "hands appeared to be clinched in a threatening manner." On its face, this statement doesn't make sense, particularly if ███████ were actually handcuffed as the incident report narrative alleges. We've seen this pattern of alleged hostile/aggressive movements by men in the past in similar use of force incidents containing questionable reports by the officers.

We are trying to determine whether Mr. Arledge will investigate this incident but we have broader investigative concerns as well. Notably, this is the first Class A incident that was identified as not referred to I&I since September. Under ADOC's regulations, Class A incidents are required to be referred to I&I for investigation. The media reports indicate that the incident is being investigated, and we noted that ███████ has been moved to Limestone, but it is concerning to us that the dashboard appears to reflect an initial non-referral given the severity of the force at issue.

Thanks for your review, please let us know if you have any follow-up questions or concerns,

Ryan

**P** : *Please consider the environment before printing this e-mail*

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

CONFIDENTIAL

ADOC-DS019189

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 21:
EJI Email to Ken McGinnis, Aug. 17, 2018

CONFIDENTIAL

Equal Justice Initiative Mail - St. Clair: Information for Monday's Call R...    https://mail.google.com/mail/u/0?ik=6585085225&view=pt&search=all...



**Ryan Becker <rbecker@eji.org>**

## St. Clair: Information for Monday's Call Regarding I&I

**Ryan Becker** <rbecker@eji.org>                                                        Fri, Aug 17, 2018 at 10:05 AM
To: Ken McGinnis <kmcginnis@cglcompanies.com>, Charlotte Morrison <cmorrison@eji.org>, Alison Mollman
<amollman@eji.org>

Dear Mr. McGinnis,

I hope you're doing well. We wanted to get you some material related to the operation of I&I that we would like to
discuss on Monday. We have previously observed that the traditional I&I investigations are subject to lengthy delays
and do not focus on any institutional risk factors. While we recognize that the institutional investigator will have
specialized training and that you had discussed developing a manual for the position's protocols, we wanted to make
sure we understood your expectations for the investigator and what his interaction with the central I&I investigations
will look like.

We have requested over 80 investigative reports for St. Clair since the start of monitoring. This includes recent
homicides, sexual assaults, use of force incidents, and incidents of serious violence. Although a number of these
incidents took place in October, November, and December, we have only received a handful of investigative reports,
while the vast majority were either never investigated, or were closed without a report being written. Here's a quick
breakdown:

- 86 incidents requested;
- 12 incidents are still open (including a July 2017 homicide and an October 2017 sexual assault);
- 18 incidents have been closed with an investigative report (this includes 9 different sexual assaults that were
  "unsubstantiated" because the victim ultimately waived prosecution);
- 27 incidents that were opened and then subsequently closed by I&I where no investigative report was ever
  generated (this includes 17 "assaults with serious injury");
- 29 incidents that were never investigated (this includes a reported sexual assault and 6 different assaults).

As you indicated in your initial thoughts in response to the incident where ███████ had his throat cut in the special
safety unit in segregation, the institutional investigator is critical to identifying risk factors. Our concern is that given the
volume of incidents at St. Clair, an incident that's mis-identified as a "fight" might never be reviewed by the St. Clair
investigator. As the above breakdown shows, right now I&I has been able to complete only 20% of the investigations
into the incidents that we requested, even though these represent the most serious incidents at the facility. We want to
be sure that the institutional investigator will have the capacity to review all of the incidents of violence at St. Clair, and
that the investigator will have a clear understanding that those incidents expand well beyond I&I's traditional approach.

Attached please find a chart that reviews the incidents that we requested from I&I. We have organized them by status,
and where there was a report we included I&I's disposition.

As always, thanks for your careful consideration,

Ryan Becker
Staff Attorney
Equal Justice Initiative

 **St. Clair I&I Investigations Chart Organized by Status.docx**
26K

CONFIDENTIAL

ADOC-DS019191

# ST. CLAIR CORRECTIONAL FACILITY
# MONITOR'S REPORT ON NON-COMPLIANCE

Exhibit 22:
EJI Email to Ken McGinnis, Dec. 18, 2018

CONFIDENTIAL                                     ADOC-DS019192



**Ryan Becker <rbecker@eji.org>**

---

## St. Clair: Pattern Related to Extortion/Violence of Men with Reduced Custody

---

**Ken McGinnis** <kmcginnis@cglcompanies.com>                                    Wed, Dec 19, 2018 at 7:03 AM
To: Ryan Becker <rbecker@eji.org>, "Harmon, Bart (DOC)" <Bart.Harmon@doc.alabama.gov>, James Austin
<jfainstitute@gmail.com>, "john_ott@alnd.uscourts.gov" <john_ott@alnd.uscourts.gov>, "rls51@yahoo.com"
<rls51@yahoo.com>
Cc: Charlotte Morrison <cmorrison@eji.org>, Alison Mollman <amollman@eji.org>

Thank you  - I will review with the Warden and Mr. Ellington.  I think this is a matter also for review by the assigned
institutional investigator, Mr. Arledge.

**From:** Ryan Becker [mailto:rbecker@eji.org]
**Sent:** Tuesday, December 18, 2018 1:00 PM
**To:** Ken McGinnis; Harmon, Bart (DOC); James Austin; john_ott@alnd.uscourts.gov; rls51@yahoo.com
**Cc:** Charlotte Morrison; Alison Mollman
**Subject:** St. Clair: Pattern Related to Extortion/Violence of Men with Reduced Custody

**\*\*\*\* EXTERNAL EMAIL \*\*\*\***

Ken,

We wanted to report a pattern that we have observed that appears to be jeopardizing the safety and security of men
at St. Clair. Over the past several months we have identified incidents where men with reduced custody levels have
been transferred to St. Clair and are subsequently extorted and/or assaulted by other men at the facility. In at least
two of these situations it has been reported that the men were specifically targeted because their reduced custody
allowed them access to go outside the fence. In these situations the men were threatened with serious violence if they
did not cooperate to bring contraband in the facility.

We are particularly concerned that the facility appears to be ignoring this pattern. In fact, in the most recent incident,
the underlying extortion and assault was not observed or noted in the incident report, even though the man's report
was corroborated by documented knife wounds that he had previously suffered. See ▮▮▮▮ Incident Report, ▮▮▮▮
Statement, and ▮▮▮▮ Body Chart, No. SCCF-18-01545.

▮▮▮▮▮▮▮▮ had min-out custody and worked on the K9 squad and, because of his custody and work
assignment he appears to have been a target for the harassment and coerced introduction of contraband. On
November 27, 2018 ▮▮▮▮ was found with contraband marijuana during a search in the sallyport upon his return
to the facility. ▮▮▮▮ reported he had been harassed for weeks, stabbed multiple times, and was ordered to bring
contraband in or face repercussions.

A subsequent body chart identified multiple stab wounds on ▮▮▮▮ body, indicating support for his assertion
that he was previously assaulted. See ▮▮▮▮ Incident Report, ▮▮▮▮ Statement, and ▮▮▮▮ Body Chart, No.
SCCF-18-01545. Although ▮▮▮▮ identified the individuals responsible, and expressed a concern that the men
would also extort his cell partner, the facility failed to categorize the incident as an assault, failed to document the
extortion, and appears to have not investigated ▮▮▮▮ report about the extortion.

Two other recent incidents also indicate that there is a pattern of men with reduced custody being targeted for
extortion:

CONFIDENTIAL

ADOC-DS019193

██████████████ ) had min-out custody and appears to have been transferred to St. Clair to fill an institutional need at the prison. On September 29, 2018, ██████████ reported that he feared for his life in population and that there were men who were going to kill him "if he did not pay to live in population." See ██ Incident Report, No. SCCF-18-01299. During the medical evaluation he told Nurse Minton he was thinking of harming himself, leading to his being placed on suicide watch. Several hours later he met with mental health personnel Jeanette Thomas due to expressing suicidal thoughts, and he told her that he had been sexually assaulted by unknown inmates. See ██████ Incident Report, No. SCCF-18-01300 ██████████ also reported that he had been intoxicated for a number of days and had difficulty identifying the men responsible for the assault. ██████████ was taken to the crisis center and was subsequently transferred away from the facility.

██████████████ ) was transferred to St. Clair because of his min-out custody level, filling an institutional need for the facility. Shortly after he arrived at SCCF, two men approached ██████████████ after noticing that he was allowed outside the fence and asked him to help them bring drugs into the camp. ████ refused. He indicated that he tried to alert the facility to the harassment but his report was ignored. On May 20, 2018, ██████████ reported that he had been sexually assaulted by the two men at knife point. See ██████████ Incident Report No. SCCF-18-00596 (note: I&I found his report "unsubstantiated" because of minor inconsistencies between ██████████ statement to investigators and his report to the rape crisis center. The report also indicated that it was pending the results of DFS testing).

Thanks,

Ryan

**P** *: Please consider the environment before printing this e-mail*

---

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

---

CONFIDENTIAL

3/27/2019, 2:12 PM

ADOC-DS019194