FILED
2025 Mar-05  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA



# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883



**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

July 17, 2018

To:  Mark Fassl, Inspector General
     Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Assistant Inspector General

Re:  QIT Meeting Minutes

Attendees:  ADOC Legal Bart Harmon, Ken McGinnis, Institutional Coordinator Edward Ellington, Classification Analyst Latriece Green, Marilyn Bruton, Glen Casey, Assistant Inspector General Monica McCoy

Points of Discussion:

## Policy

- ADOC Inspector General Mark Fassl will chair the Quality Improvement Team (QIT).
  QIT Team members include IG Mark Fassl, IC Edward Ellington, Analyst Latriece Green, Glen Casey, AIG Monica McCoy

- The QIT collectively decided to meet monthly for the next 6 months.  Once confidence has been established in the monitoring systems and processes, the team will propose to move to quarterly sessions.

  The meeting will pertain to issues raised, current trend analysis, results of decisions and/or follow-up that derived from meetings and events.

- The EJI will receive a QIT Report which will consist of QIT meeting notes, ADOC Interim Incident Report, ADOC Dashboard (electronic incident report tracking tool) to be used as comparative data to quality check the information captured by the Dashboard.

- The Dashboard has been standardized and uniformed to capture; space (details), class code, location, inmate, offenses etc.

Page | 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005928

- Marilyn and Glen will refine the Dashboard to provide definitions of drop downs, space for I&I Investigation status, and date chart capture trends.

- Although we will be able to drill down data by inmate, dates, offenses, etc., all involved should be aware that the data captured on the dashboard may be somewhat inflated due to the information is inmate based and incident based.  In order to get a fully accurate account, one must utilize the comparative data from the Dashboard, Ad Hoc Report which allow for Information Systems and Research to extract itemized incident report data for a specific institution.

  Incident reporting should include the inmate(s) current bed assignment in the narrative.  This will help to hone in on the number of incidents occurring because of the lack of controlled movement, unauthorized area, out of place etc.  It was suggested that a revised training on the Incident Report Writing and data input be offered to security and support.

- Institutional Investigative Agent Mr. Clark Hopper II has been hired for St. Clair effective July 16, 2018.

  Agent Hopper will receive formalized investigative training.  Ken will put the team in contact with Stadler of Louisana DOC who is willing to provide investigative training and resources.  In addition, Agent Hopper's training will be enhanced by coupling in-house ADOC formalized with the out-sourced investigative training.

  The QIT and IC Ellington will collaborate with Director of Investigations & Intelligence, Arnaldo Mercado to develop a protocol of measurable responsibilities and results specifically for Agent Hopper.

  **Points of Discussion**

- Cameras have been installed and since then disabled and/or destroyed by the offender population.  IC Ellington will request through the channels of Operations and Engineers to get quotes and/or bids to repair or replace the cameras prioritizing the entries of the dormitories.  The dayrooms are a challenge due to the low hang.
- Per IC Ellington the locks and doors are being inspected daily per shift and documented on the inspection form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005929



# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883



**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

August 21, 2018

To:  Mark Fassl, Inspector General
      Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Assistant Inspector General

Re:  QIT Meeting Minutes

Attendees:  ADOC Legal Bart Harmon, Ken McGinnis, Institutional Coordinator Edward Ellington, Marilyn Bruton, Director of Research and Planning, Glen Casey, Assistant Inspector General Monica McCoy, William Seals, Warden III Karla Jones, I&I Investigators Brad Arledge and Scott Sides

Inspector General Mark Fassl chaired the Quality Improvement Team (QIT) meeting.

**Points of Discussion/Follow-up**

    The meeting will pertain to issues raised, current trend analysis, results of decisions and/or follow-up that derived from meetings and events.

- As previously discussed, the EJI will receive a QIT Report which will consist of QIT meeting notes, ADOC Interim Incident Report, ADOC Dashboard (electronic incident report tracking tool) to be used as comparative data to quality check the information captured by the Dashboard.  The document will go live tentatively, Friday, September 7, 2018.  Judge Ott and Investigator Arledge will be added to the distribution list.

- Marilyn and Glen completed the revisions of the Dashboard to provide definitions of drop downs, space for I&I Investigation status, and date charts to capture trends by month and quarter. The Dashboard has been standardized and uniformed to capture; space (details), class code, location, inmate, offenses etc.   In addition, the Dashboard has been updated to reflect the suspects bed assignment.  As of 8/13/18, 970 incidents have been entered on the Dashboard.  The (970) incident reports represents the y-t-d accurate count of major incidents.

- Marilyn demonstrated through a test run, the updates, revisions and capabilities of the Dashboard.

Page | 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

-Once the Dashboard has been published, Marilyn will conduct a tutorial on the data and how navigate through the module.

-It was emphasized that this is a living and breathing SharePoint document.  The information will be entered

-To hone in on the number of incidents occurring because of the lack of controlled movement, unauthorized area, out of place, Warden Jones and Captain McCoy both confirmed that the security personnel are now including the inmate(s) current bed assignments in the narrative of all incident reports.

-Although the Dashboard reflects all raw base data for the period specified, Warden Jones and the QIT agrees that the confidence of the data entered ranges from July 1, 2018 to current.

-It was agreed that it is unrealistic expectation for the data to be entered onto the Dashboard in "real time".  There will be approximately two weeks of lay time for Dashboard updates.

- Institutional Investigative Agent Brad Arledge has assumed the Investigative position at St. Clair effective July 16, 2018.  Ken met with and briefed Agent Arledge on his role, the ins and outs of the settlement agreement prior to the QIT meeting beginning.

- Now that Agent Arledge is in position, the QIT and IC Ellington will collaborate with Director Mercado and Agent Sides to develop a protocol of measurable responsibilities and results specifically for Agent Arledge.

    -Currently Warden Jones is reviewing all Class A and Class B, and some applicable Class C reports.

    -It was emphasized that going forward, Investigator Arledge will need to review all Class A, B Duty Officer (302-C), applicable C and Incident (302-A) reports.

    -Investigator Arledge's appointment is specific to St. Clair to aide St. Clair/ADOC in meeting the investigative requirements as it pertains the settle agreement. Arledge was encouraged to work collaboratively with Ms. Montgomery, Incident Report Manager.

- Agent Arledge will receive formalized investigative training.  Agent Arledge shadowed Louisiana DOC to gain correctional investigative training and resources.  In addition, collaborative efforts will be made with IC Ellington, Warden Jones and her team to enhance Investigator Arledge's knowledge of ADOC incident report policies, the reviewing of incident reports, St. Clair's SOPs, etc. Scott will assure that Agent Arledge is credentialed via IS to access SharePoint, St. Clair's incident report module and be added to St. Clair's Class A and B email notification distribution list.

- Ken and Agent Arledge introduced concerns of misclassified Class C incident reports. Currently "serious injury" reports capture statistics but only as a baseline measure. It was suggested that the Department

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005931

reviews AR 302 definition of serious injury in comparison to ASCA and conform our definition with the ASCA to align with nationwide standards and statistics.

- It was also recommended that the applicable SOP governing incident reporting be revised to coincide as well.

- The IG team will provide oversight and monitoring. October 2018, the team will conduct its first quarterly internal audit of the Incident Report Management System and Dashboard for quality review of the accuracy rate of the data by the sampling of (30) days of incident reports

- IC Ellington advised that we are looking for another vendor to re-install, and/or install cameras that have been installed, and since then disabled and/or destroyed by the offender population.  There are two vendors that have agreed to provide us with free assessments and quotes for the purchase and installation of internal, external cameras a DVR system etc.  We will follow-up at the Sept. 25th QIT next meeting.

- Bart and Warden Jones discussed tentative dates for EJI quarterly tour.

- Warden Jones advised the staff at St. Clair have been participating in mandatory meetings which consists of remediating their knowledge of standards and requirements.  It's a slow process but they are all being informed of the changes and the implementation thereof.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005932





# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883

**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

October 16, 2018

To:  Mark Fassl, Inspector General
       Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Assistant Inspector General

Re:  QIT Meeting Minutes

Attendees:  ADOC Legal Bart Harmon, Ken McGinnis, Institutional Coordinator Edward Ellington, Administrative Analyst Marilyn Bruton, Director of Research and Planning, Glen Casey, Deputy Inspector General Monica McCoy, I&I Agent Brad Arledge

Bart Harmon/DIG McCoy chaired the Quality Improvement Team (QIT) meeting.

**Points of Discussion/Follow-up**

- Marilyn advised of a formatting issue that occurred with the Dashboard.  The issue affected the a.m. and p.m. column of the spreadsheet.  Corrections have been made and the 10/12/18 spreadsheet updates will be uploaded by COB.

- Bart opened with a discussion of St. Clair recent homicide and suicide and methodical ways to hone in on the heighten level of violence in dorms P and Q.

  The team discussed the EJI 10-15-18 visit and progress assessment at St. Clair.  Doors, call buttons, locks, fencing, and cameras were focal points.  Some areas of concern included approximately (5) cell doors inoperable, several light panels in need of repair by the vendor, and a major panel in dorm Q needing repair or replacement along with several individual lights in dorm P.

- Investigator Arledge updated the team on the status of the investigation surrounding the death of inmate Brandon Harris, SCCF-18-01317.  DIG McCoy and IC Ellington expressed concerns of the incident and encouraged Agent Arledge to conduct a more thorough consideration into looking at this as a possible suicide based on the evidence (letter left behind) and the circumstances surrounding the incident.

Page | 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005918

- To quantify and qualify the Investigator position, the team agreed to implement an Investigative Spreadsheet to track the number of reports and investigations reviewed and handled by Agent Arledge.

- It was also reiterated that the position is specific to St. Clair and it is of great importance that in addition to referred investigations, a systematic review of all (A, B and applicable C) incidents be conducted by Agent Arledge.

- Agent Arledge advised the recent CERT shake down at St. Clair was a success and yielded an excessive amount of major contraband finds to include; handmade weapons, drugs and currency.

- The team discussed how ASCA vs ADOC defines "serious" and "non-serious" injury.  Based on a previous meeting with Commissioner Dunn, Associate Commissioner Steve Watson has been tasked to explore this issue. Updates are forthcoming.

- Marilyn raised concerns of how to remove "blank" incident reports from the module.  This raised concern and DIG McCoy will follow-up to see what constitutes a "blank" report and the methods to complete and/or remove as applicable.   Reports 1182, 1204, 1214, and 1215 were given as examples.

- DIG McCoy will conduct a quality audit of a sample of incident reports.  This will be a comparative analysis of incident reports prior to the settlement agreement and current.

- It was suggested that an interim plan be implemented for video and camera equipment in the dormitories. Will refer with Engineers to see if it is feasible to place cameras high enough above the emergency lighting and fans to shoot back to the corners where there are blind spots near the shower areas.

- Looking to place a monitor of dorms P and Q inside the control area with DVR capabilities.  This will allow for the executive team and I&I the accessibility review approximately (45) days of footage.

- Ken and Bart addressed the concerns raised of the occupancy of the cells with inoperable door locks.  The team discussed mechanisms to be used to restrict the access to the cells while they are offline for repair.

- The IG team will provide oversight and monitoring. October 2018, the team will conduct its first quarterly internal audit of the Incident Report Management System and Dashboard for quality review of the accuracy rate of the data by the sampling of (30) days of incident reports and report results at the November 13th QIT Meeting.

- Bart and Ken advised that moving forward, a representative of St. Clair's executive attends the QIT meetings.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005919

The next meeting will be held November 13th at 9:.00 a.m. @ ADOC Legal Conference Room.  Ken will conference in.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005920




# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883

**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

November 13, 2018

To:  Mark Fassl, Inspector General
     Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Assistant Inspector General

Re:  QIT Meeting Minutes

**Attendees:**  ADOC Legal Bart Harmon, Ken McGinnis (via phone), Institutional Coordinator Edward Ellington, Administrative Analyst Marilyn Bruton, Director of Research and Planning, Glen Casey, Deputy Inspector General Monica McCoy, I&I Agent Brad Arledge (via phone), Warden III Karla Jones, Associate Commissioner Steve Watson

Bart Harmon chaired the Quality Improvement Team (QIT) meeting.

**Points of Discussion/Follow-up**

- At the request of Commissioner Dunn, Associate Commissioner Steve Watson facilitated an examination and discussion of the Agency's definition of **Serious Physical Injury.**

The discussion of **Serious Physical Injury** in relation to capturing incidents on the Incident Dashboard which Research and Planning has developed.   Four of the most important questions raised by AC Watson included:

1. Is our definition sufficient, or should it be modified?  (our definition, the definition in the AL Criminal Code, and ASCA guidance is highlighted below)
2. When selecting a type of incident for reporting purposes, is there sufficient guidance in the definition so that our staff recognizes an injury/illness as such?
3. Is there a review of reports sufficient to ascertain that the determination is correct?
4. Is there a mechanism to modify the incident title once submitted, if review deems it should be changed?

In addition, a comparison of the definition as prescribed in Administrative Regulation #302 Incident Reporting, Association of State Correctional Administrators (ASCA) and the Alabama Criminal Code were discussed (see below).

ADOC AR 302, "Incident Reporting"

Serious Injury/Illness: Personal injury or sickness that may require emergency care at a medical provider, to include, but not limited to, prolonged unconsciousness, obvious disfigurement, protracted loss or substantial impairment of the body or mental faculty, or one which carries a substantial risk of death.

Page | 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005921

Alabama Criminal Code § 13A-1-2

(14)  <u>SERIOUS PHYSICAL INJURY</u>. Physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ.


**Association of State Correctional Administrators (ASCA)**

A <u>serious injury</u> requires urgent and immediate medical treatment and restricts the inmate's usual activity. Medical treatment should be more extensive than mere first aid such as the application of bandages to wounds. It might include stitches, setting of broken bones, treatment of concussion, loss of consciousness, etc.

There were suggested changes discussed including but not limited to the following:

It was agreed that there have been problems with the application process of determining what is a "serious injury" at the line supervisors level.

In review of the existing definition:

<u>Serious Injury/Illness</u>: Personal injury or sickness that may require emergency care at a medical provider, to include, but not limited to, prolonged unconsciousness, obvious disfigurement, protracted loss or substantial impairment of the body or mental faculty, or one which carries a substantial risk of death.

The team will review the highlighted terminology, the application, renewal, quality control, and supervisory review to make it sufficient.

Marilyn suggested a revision of the definition to be all-inclusive of ADOC, Alabama Criminal Code, and ASCA definition.

IC Ellington and Warden Jones both suggested the existing definition is sufficient, suggesting minor changes in the verbiage and staff training on the application process.

It was agreed that the team will formulate and circulate recommendations to revise the definition as per our discussion. Final recommendations will be discussed at the next meeting.

AC Watson reminded the team to take into consideration the vortex of making the change to include; legal accommodations, training accommodations, and a possible spike in the number of incidents because of the changes.

- Ken and Bart led the discussion of the functionalities and responsibilities of the QIT per the Standard Operating Procedure and Settlement Agreement.

- Discussion points included compliance in the areas of; EJI tours, review of the Dashboard, trend analysis, comparative analysis, monthly, quarterly and annual reporting is required.  The Internal Classification Review Board, and effectiveness of the Incident Report Manager system were also discussed.

- Staffing was discussed in regards to recruiting, hiring, post coverage, additional rovers in P & Q, C.E.R.T. rotation, institutional searches, hospital coverage, Citizens contract and coverage.

- DIG McCoy will report the results of the quality check and trend analysis  sample at the next scheduled meeting.

- The next meeting will be held December 18th at 9:.00 a.m. @ ADOC Legal Conference Room


Page | 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005922





# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883

**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

December 18, 2018

To:  Mark Fassl, Inspector General
       Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Assistant Inspector General

Re:  QIT Meeting Minutes

**Attendees:**  ADOC Legal Bart Harmon, Ken McGinnis (via phone), Institutional Coordinator Edward Ellington, Administrative Analyst Marilyn Bruton, Director of Research and Planning, Glen Casey, Deputy Inspector General Monica McCoy, I&I Agent Brad Arledge, Warden III Karla Jones, Associate Commissioner Steve Watson, Associate Commissioner Jeffery Williams

<u>**Agenda**</u>

## December 18, 2018 Meeting Agenda Items to Discuss

- Status of Camera project including projected timeline for P/Q installation;

- Issues on need for expanded search for contraband (Discussion of the East Mississippi Correctional Facility approach to search for contraband);

- Discussion on alternatives to overcome staff shortages – discussion item from EJI;

- Discussion of Issues with P/Q including amount of contraband, unauthorized movement, lock and door repair, etc. (Ryan Becker memo of 12/11/18;

- Follow-up discussion on the accuracy/Completeness of Incident reporting tracking and dashboard – includes alleged misclassification of incidents, inaccurate bed assignments, inaccurate locations and time of incidents (EJI memo dated Nov 2, 2018)

   Inconsistency with class description (drug testing/intoxicants, intentional creating security, bed assignments, etc.).  Discuss EJI previous memorandums regarding discrepancies noted in Dashboard. See email attachments.

Page | 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005923

**Points of Discussion/Follow-up**

In review of the recent allegation that the Department is underreporting incidents of **"serious injury"** the team reviewed the following points:

- AC Steve Watson facilitated the discussion of the Agency's definition of **Serious Physical Injury.**

The discussion of **Serious Physical Injury** in relation to capturing incidents on the Incident Dashboard, which Research and Planning has developed.    Four of the most important questions were discussed;

1. Is our definition sufficient, or should it be modified?  (our definition, the definition in the AL Criminal Code, and ASCA guidance is highlighted below)
2. When selecting a type of incident for reporting purposes, is there sufficient guidance in the definition so that our staff recognizes an injury/illness as such?
3. Is there a review of reports sufficient to ascertain that the determination is correct?
4. Is there a mechanism to modify the incident title once submitted, if review deems it should be changed?

Again, the team reviewed and compared the definition as prescribed in Administrative Regulation #302 Incident Reporting, Association of State Correctional Administrators (ASCA) and the Alabama Criminal Code.

ADOC AR 302, "Incident Reporting"

<u>Serious Injury/Illness</u>: Personal injury or sickness that may require emergency care at a medical provider, to include, but not limited to, prolonged unconsciousness, obvious disfigurement, protracted loss or substantial impairment of the body or mental faculty, or one which carries a substantial risk of death.

Alabama Criminal Code § 13A-1-2

(14)  <u>SERIOUS PHYSICAL INJURY</u>. Physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ.

**Association of State Correctional Administrators (ASCA)**

A <u>serious injury</u> requires urgent and immediate medical treatment and restricts the inmate's usual activity. Medical treatment should be more extensive than mere first aid such as the application of bandages to wounds. It might include stitches, setting of broken bones, treatment of concussion, loss of consciousness, etc.

In review of the existing definition:

<u>Serious Injury/Illness</u>: Personal injury or sickness that may require emergency care at a medical provider, to include, but not limited to, prolonged unconsciousness, obvious disfigurement, protracted loss or substantial impairment of the body or mental faculty, or one which carries a substantial risk of death.

The team reviewed the highlighted terminology, the application, renewal, quality control, and supervisory review to make it sufficient, and to minimize the number of said cases;

     -Collectively it was decided that the existing definition is sufficient, with minor changes to the verbiage, "personal injury or sickness which require…"

     -AC Watson will construct the revisions to the definition and disseminate to the team prior to sending to, Legal, Commissioner Dunn and Chief of Staff Hill for consideration.

Page | 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005924

-The noted problems with the application process of determining what is a "serious injury" at the line supervisors level will be remedied with developmental training on the applicable administrative regulations, and an incident report writing refresher, being medically informed, receiving guidance from the "On-Call" official, and ultimately the security supervisor will make an informed decision based on "the totality of circumstances" surrounding the incident.

-IC Ellington and Warden III Jones will confer with training and formulate an applicable training block.

-AC Williams and IC Ellington agreed to coordinate the remedial training for the next Wardens meeting

- A review for adding the classification, "Inmate-on-Inmate Fight w/Serious Injury," it was concluded, as a delineation between assault vs. fight will be added to the incident report module.

    -Glen will confer with Information Systems on the application and implementation of the suggested change.

- Ken and Bart led the discussion of the functionalities and responsibilities of the QIT per the Standard Operating Procedure and Settlement Agreement:

    -Marilyn navigated the team through a monitoring and analysis of the Dashboard for the months of September to current.
                        -The review consisted of the current dashboard; monthly and quarterly analysis and trends (H, P & Q dormitories, Assaults/Fights, Contraband, Out of Place etc.).

    -As previously mentioned, September was one of the worst months in regards to inmate violence and deaths. The Dashboard reflects a substantial decline in violent incidents, to include deaths from October to current.  Assaults, Fighting with and without a Weapon, Weapons, Contraband Discovery, Institutional Searches/Shake Downs, Possession of Contraband, Out of Place and Unauthorized Area were all items of review.

    -There was a notable decline in violence in regards to Assaults and Homicides from November to current.

    -There was a significant decrease in the number of incidents classed "Intentional Creating a Safety, Security…".

    -Due to there are multiple options to denote the discovery of contraband, specifically weapons (i.e. Possession of Contraband, Contraband Discovery, Institutional Searches, Fighting w/Weapon, Assault w/Weapon, Major Shakedowns, etc.), the team discussed ways to hone in on contraband discovery and consistency in the reporting.

    -Warden Jones and IC Ellington advised, the security staff is currently responsible for conducting (4) random searches per officer, per shift.  Although there is an obvious need to improve the quality of the everyday searches, the searches are being conducted and documented daily per shift by security staff.

    -Bart and Glen concluded that, to have accurate record of searches, all searches; routine, random, 24 hour shakedowns, CERT missioned etc., will be forwarded to them for tracking.  Glen will confer with Ram on the details to implement this process.

- Bart discussed EJI's most recent tour of St. Clair, the effectiveness of the Internal Classification Review Board.

    -Bart discussed many noticeable improvements; institutional hygiene, infrastructure, temperament, level of security and controlled movement.

    -Bart rendered kudos to Warden Jones and her staff for their continuous efforts towards improving, and for the quality and effectiveness of the internal classification process.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005925

- Staffing was discussed in regards to recruiting, hiring, post coverage, additional rovers in P & Q, C.E.R.T. rotation, institutional searches, hospital coverage, Citizens contract and coverage.

  -Due to the gravity of staff shortages, CERT rotation is twice monthly and usually comprises of 7-8 members, which are utilized for post coverage.  Which in turn limits the number of CERT team major institutional searches for contraband.

  -There has been an addition of (2) contractors to medical observation and supervision.

  -Due to the high custody of inmates housed at St. Clair, inmates admitted to Citizens and other free-world hospitals requires at least (1) ADOC security personnel in addition to the NSA security guard.

  -Warden Jones advised that (7) trainees were hired on December 1, 2018.  A few officers assigned to Limestone still volunteer to work overtime and (1) retiree returned in the last (6) months to work part-time.

  -Currently we are not conducting direct appoints of the Basic Academy graduates to St. Clair.

  -AC Watson advised that we should see an overall improvement soon in regards to competitive wages once the enhance compensation package is approved per our (3) year Strategic Plan.  This should help with the morale, recruiting, and retention of staff.

- Follow-up discussion on the accuracy/completeness of incident reporting, tracking and dashboard data– includes alleged misclassification of incidents, inaccurate bed assignments, inaccurate locations and time of incidents (EJI memo dated Nov 2, 2018)

  -DIG McCoy explained that at the completion of the collection of documentation for the said months, she will be able to give more of a fair and accurate quality report and trend analysis of the documentation and reporting procedures. The results of the quality check and trend analysis sample will be added to agenda for the next meeting.

  -The thoroughness of incident reporting, specifically classification, location, time and bed assignments were discussed in detail. The Incident Report Manager will be apprised of the specific details, and alternate solutions to induce a higher level of accuracy prior to entering the information on the Dashboard.

- Warden Jones advised per her observations, the educational wing (Welding) gives access for inmates to construct and introduce premium prison made weapons inside the institution, via throwing them over the fence. The team discussed ways to reduce the level of vulnerability (Fencing, Mobile Metal Detector etc.).  It was agreed that to fortify where the weapons are being fabricated, the staff will maintain photos of all weapons for review.  In turn, this should help us to be more concise in:

  -Tracking the type, quality and possible source

  -Demonstrate improvement

  -Target areas of contraband

- Brad discussed from his observations, there has been improvement in the PREA reports and the overall classification of reports.

  -IC Ellington and Bart will confer with Director Sides to clarify Brad's specific investigative role and responsibility to St. Clair and Operations.

Page | 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005926

- The camera project is at a standstill, IC Ellington with confer with Jenny Abbott on the status of the recommended designs for dorms P & Q, the repairs of the inoperable cameras (lenses, covers) and suggested ways to make the lenses less vulnerable to vandalism.

- The next meeting will be held January 23rd at 9:.00 a.m. @ ADOC Legal Conference Room

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC-DS005927

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY




# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883

**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

April 3, 2019

To:  Mark Fassl, Inspector General
     Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Deputy Inspector General

Re:  QIT Meeting Minutes

**Attendees:**  ADOC Legal Bart Harmon, Institutional Coordinator Edward Ellington, Director of Research and Planning, Glen Casey, Deputy Inspector General Monica McCoy, I&I Agent Brad Arledge, Associate Commissioner Steve Watson, Scott Sides, Assistant Director Scott Sides, Classification Analyst, Latrice Green

**Points of Discussion/Follow-up**

- Director Casey facilitated a review a 2019 1st quarter review of the Dashboard to include Class A & B incidents, Searches, Contraband Discovery, and a comparative analysis of 2018 4th Quarter vs. 2019 1st Quarter.

- Key points discussed included; violent incidents, fights and assaults w/weapon, deaths by homicide and suicide, searches (i.e. CERT, institutional daily, monthly, routine and random). The analysis denoted an increase in major incidents for that quarter.

- The team discussed a need to effectively and consistently capture and measure all searches, all contraband discoveries and disposals in IMS and the Dashboard.  It was noted that although there are great efforts being made to increase and improve the number and quality of searches, IMS and the Dashboard data input on the surface, tends to underreport the actual number of searches that are being conducted. Because IMS allows for multiple primary/secondary codes to report the confiscation and/or discovery of contraband and searches, one must diligently analyze all

ADOC 042877

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

applicable codes, and review the narratives for the details of such incident reports for accurate reporting.

- Glen noted that all should be aware that when reviewing the Dashboard, one should remember that the data reflects the number of offenses that occurred, not a representative number of violence.

- It was suggested that Operations implement a "catch all" measure or way to annotate on all reports involving searches and contraband discoveries of any kind. For example; routine use of canines, institutional searches, possession of contraband, contraband discovery, institutional inspections, CERT searches, possession of a communication device, fighting w/weapon, assault w/weapon, monthly institution inspections are just a few of the incident report classes where contraband will exist but may not be accurately reported.

- The QIT had preliminary discussions on how to manage this item of the settlement agreement:

- Central Review Board Analyst Latrice Greene reviewed the process of conducting audits of St. Clair Internal Classification process. She and AC Watson discussed a need for clarity on the expectations of the audit and the review of the SOP for clarification. It was noted that the SOP conflicts with the settlement agreement and should be reviewed by Operations. Follow on will be conducted.

- Based on last month's meeting, AC Watson and Director Casey reviewed and pushed forth the proposed changes. The proposal is currently at the level of Associate Commissioner Daniels, Operations pending review and discussion of how the proposed changes would induce subjective classification of serious vs non-serious. A collaboration of the QIT and Operations will be scheduled to discuss the specifics.

  AC Watson raised questions regarding the legalities of the proposed changes. How will the proposed changes affect current litigation, the impact on the Research data reporting, etc. Bart, confirmed that the only legal requirement, is to accurately report. There is no law in place that says the agency must conform to ASCA. However, we must be diligent in making a concerted effort on doing the right thing in our reporting process to assure we are not underreporting.

ADOC 042878

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

- Bart and Asst. Director Sides will look towards and Analyst to conduct the upcoming quarterly audit of the Dashboard.

- As a follow-up to EJI request for methods to track Investigator Arledge involvement of incidents, investigations etc., the QIT agreed that Arledge would compose and track the said information monthly for review by the QIT, beginning with the month of January. Arledge advised that there is now a spreadsheet to track the activity and will forward an electronic copy to the QIT for review.

- As a follow-up to the previous inquiry regarding use of force training, DIG McCoy explained that all security personnel received use of force training during annual in-service throughout the 2018 calendar year.  The previous 2-year training schedule, to include use of force was presented (see attached).

- The next QIT meeting is scheduled for June 19th @ 9:00 a.m. in Legal Conference Room.

ADOC 042879

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY





# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL 36130-1501
(334) 353-3883

**KAY IVEY**
GOVERNOR

**JEFFERSON S. DUNN**
COMMISSIONER

February 13, 2019

To:  Mark Fassl, Inspector General
      Edward Ellington, Institutional Coordinator

From: Monica P. McCoy, Assistant Inspector General

Re:  QIT Meeting Minutes

**Attendees:**  ADOC Legal Bart Harmon, Ken McGinnis, Institutional Coordinator Edward Ellington, Administrative Analyst Marilyn Bruton, Director of Research and Planning, Glen Casey, Deputy Inspector General Monica McCoy, I&I Agent Brad Arledge, Warden III Karla Jones, Associate Commissioner Steve Watson, Scott Sides, Assistant Director of I&I

**Points of Discussion/Follow-up**

- Section C, paragraph 20 of the Settlement Agreement states that "the Classification Review Board Analyst will quarterly audit the Board's housing assignments and Warden overrides to ensure that the internal classification process is operating properly and will provide that audit to the SCCF Quality Improvement Team".  The audit process is being developed by the ICB and the QIT needs to establish a process to review and comment on these findings.

  The QIT had preliminary discussions on how to manage this item of the settlement agreement:

    Central Review Board Analyst Latrice Greene has been conducting audits of St. Clair Internal Classification process.

    A report of the audit findings will be requested. Audit forms will be reviewed, amended and forwarded to be created by Jim Austin.

     Audit process needs to be developed and defined and will be discussed with Ms. Greene.

ADOC 042871

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

Warden Jones proposed that we utilize Ms. Greene's documentation to satisfy the requirements.

AC Steve Watson will be included on the email correspondence as it relates to the "serious injury" and "internal classification" issues.

- Based on last month's meeting, there was embracement by the QIT team to modify the AR as described previously, add the incident type, have Information Systems add the functionality into the Incident Module.

AC Watson and Glen Casey reviewed the amendments and brought forth other elements that a potential regulation change would drive.

AC Watson emphasized the gravity of said changes to the regulation.

The prescribed changes should enable the agency to chronicle different offenses properly and aid the staff creating the reports to discern what is serious injury or not.  The staff must be trained and be aware of what's at stake when determining whether an incident rise to the definition of "serious injury" or not.

The proposed regulatory changes are aligned with Title 13 and Alabama Code of Law.

AC Watson reiterated that the proposed change should be considered a formal ADOC regulation change is not specific to St. Clair, but it effects the agency.

Now that the QIT have unanimously agreed on the proposed changes, Glen will move the proposal forward to the executive level for review and approval.

Once reviewed and if approved, Commissioner Dunn will sign off and then we will move forward to implement the approved changes.

Ken raised concerns over EJI previous issue raised to the Judge regarding the difference between ADOC "serious injury" definition vs ASCA definition and we seem to be deleting the definition on "Inmate on Inmate Assaults with Serious Injury" or any serious injury incidents.  Glen and AC Watson advised that ASCA definition and the Performance Based Measurement Systems (PMBS) are no longer viable and does not align with Alabama Code of Law. For this reason, the agency moved away from ASCA and PBMS. We recognize that previous referenced cases such as the Grant, was deemed more of a misapplication than an underreporting of serious injuries.

AC Watson noted the proposed changed to the regulation is predicated upon a minor change to the regulation, which gives us the ability to chronicle a different offense properly. The most important element to the change is the training component, which must be congruent with the release of the regulation changes.  Because the change will place a burden on the employee to decide of whether the incident is deemed a "serious injury," AC Watson noted that it is imperative that we

ADOC 042872

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

consider the training element, and if the agency is not prepared to develop and train the staff across the state on the prescribed changes immediately upon release of the regulation. Operations must be on board with the implementation of the training element. If not, we should **halt** the change process until we are prepared to do so.

Glen noted that the proposed changes of the verbiage to the regulation will drive other necessary changes:

> *"may require emergency care" to "which requires emergency care"*
>
> *"at a medical provider" to "by a medical provider"*

Adding new offense type:

Class A Incident Code:  Fighting inmate-on-inmate w/serious injury, which correlates with ASCA indicator a. Inmate-on-Inmate fights.

By adding the code, it will have ripple effect through the regulation.

Fighting with or w/out a weapon…additional ASCA indicator assigned.

Consideration should be made to remove all reference to ASCA due to the inconsistencies, standards and counting, because rules for incidents are no longer viable.

Proposed that we remove the ASCA indicators, in doing so the Primary and Secondary must be specific.

**Scott Sides and Brad Arledge**

- Bart facilitated a discussion regarding Brad's investigative role and assignment to St. Clair as it relates to the settlement agreement.

- Assigned to St. Clair and only handles St. Clair but, as reiterated by Director Sides, Investigator Arledge is not the only investigator assigned to conduct investigations at St. Clair.

- Bart, stressed that Arledge's role was not just investigations after the fact, but a more proactive collaboration of staff, STG, intelligence gathering and sharing to compare the security processes, trends of violence, etc. with Operations.  Per Mr. Harmon, the SOP prescribes Investigator Arledge as being one of the primary factor or sources of help to combat violence at St. Clair.

- So, the question raised, "In Arledge's current role, are we actually meeting the settlement agreement requirements?"

ADOC 042873

**HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY**

- Because his sole focus on St. Clair he should be able to develop relationships, and a proactive approach to combatting the violence.

Brad explained that it has been a slow process, but the last escape he has been talking to others gaining intel, etc.

DIG McCoy shared concerns of a recent review of major incidents requiring investigation, very few of the incidents were investigated by Investigator Arledge. Per the review of the incident report module of Class A and Class B, along with Investigation summaries, Investigator Arledge does not share in the on-call, reporting to the institution for major incidents, nor the tracking, documentation or accountability of incidents, which in her opinion does not satisfy the requirements of the settlement agreement. It was recommended that Investigator Arledge's role is defined as per the SOP and settlement agreement.

Bart suggested that it's possible that more is going on the investigative end than what is revealed in the documentation. Arledge's role as explained by Mr. Harmon is to be the liaison to St. Clair investigation, not the primary investigator on all Class A & B incidents.

Ken raised the discussion regarding EJI's inquiry on the investigative procedures of the Hyde incident. Per their review of the incident reports, Agent Arledge was not showing as the person investigating the incident.  Director Sides, Agent Arledge and Ops executives explained that the original duty officer and incident reports were submitted as an arson and use of force, which did not warrant an investigation. Warden Jones, IC Ellington and Director Sides explained that the investigations team became involved at the discovery of the video, which warranted a full investigation. Per, Agent Arledge, he is now involved in the investigation of the Hyde incident.

Ken noted as a reminder, Incident Reports entered at the security supervisor level, are NOT the same as Investigation Reports at the I&I level.  The information that EJI is reviewing through the Dashboard, spreadsheets, IMS etc. should not be viewed the same as I&I investigation reports.

Ken requested that Agent Arledge send him a timeframe of the date I&I became involved.

Director Sides presented the need to collect data on the operations of Arledge in his role at St. Clair. Currently there is no data collection or means of tracking.

EJI wanted documentation that in fact, the investigator is involved in the investigations. This is not a requirement of the settlement, but for tracking purpose.  Going forward, Arledge will compose and track the said information monthly for review by the QIT, beginning with the month of January. Arledge will provide the QIT with his monthly synopsis of activities, going back to the month of January at the next scheduled QIT meeting.

Ken inquired on the tracking sheet of the decisions made during QIT meetings, as previously discussed. The monthly minutes satisfies this decision. Glen will also send a sample tracking sheet, but at this point, we will use the minutes for this purpose.

Page | 4

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

Per Ken, Charlotte raised a question from the July 7th meeting regarding use of force training. DIG McCoy explained that all security personnel received use of force training during annual in-service throughout the 2018 calendar year. Director Sides, suggested a remediation to reporting and report writing procedures.

The requirement to prepare incident reports in a chronological sequence was discussed. It was explained that the onset of incident may begin with a minor infraction and escalate to a major incident such as; failure to obey vs use of force. Bart suggested changing the incident report writing procedures from writing in sequential chronological order to prioritizing by offense type. It was decided collectively that a change of this nature would be of no benefit. Marilyn will look at ways to capture the information on the Dashboard. This item will be placed on the next meeting's agenda for discussion.

Bart led the discussion regarding EJI concerns on searches for weapons. DIG McCoy raised the point that the lack of continuity at the line staff level in the way they capture searches, contraband finds, etc. is the reason it appears we are not assertive in our efforts to reduce the contraband. Contraband Find, Institutional Searches, daily shakedowns, CERT shakedowns, Security Inspections (bar/window checks), Trade School check in/out pat & strip searches, fighting with a weapon, Possession of a Communication Device, Participating in Social Networking, Possession of Contraband, Drug/paraphernalia Possession, Possession of a Weapon are examples of how contraband is being documented in the Incident Report Module and on the Dashboard. DIG McCoy recommended that Operations come up with a consistent way to capture this information via the Incident Report Module and the Dashboard.

Ken suggested a way to formerly report all searches on one document. Marilyn demonstrated on the Dashboard that improvements have been made to induce consistency when capturing the searches being conducted. It was also explained that one must read the narrative of the reports in to get a realistic figure of the number of cell searches being conducted during any given search.

Ken reviewed the documents presented by EJI regarding AR 336 and SOP 110 based on an ideal manning level. These are unreasonable expectations in the current crisis manning levels. IC Ellington, discussed that we are fulfilling the requirements within the prescribed policy as manning permits. In addition, the security staff (supervisors & rovers) will be re-educated on the requirements to conduct cell searches. Staff safety in such low manning levels is of great concern.

Per Bart, proposed that we construct and execute an additional plan to enhance the number and quality of searches in addition to CERT searches, daily searches, etc.

Addendum:

Capt. McCoy: after you left here is what we did/talked about

- A follow-up audit of incident report accuracy this Spring (to compare with the last audit)

- Weapons—search of Q 1 yesterday (2.12.19) and what was found, tactics, reports

ADOC 042875

HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY

- Weapons—how to accurately document actual searches being done (Glen Casey volunteered to create a compilation of data based on info sent to him from Warden Jones or her staff)

- Snapshots of Dashboard to be sent to Jim Austin at his request

- Next meeting of QIT is April 3, 2019 at 9 am (Legal Conf. Room)

Page | 6

ADOC 042876