FILED
2025 Mar-07 PM 06:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# In The Matter Of:

# Lakeisha Ezell v. Jefferson Dunn, et al.

---

William Ragsdale

*August 1, 2024*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **William Ragsdale**
**8/1/2024**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
 2                   MIDDLE DIVISION

 3

 4  LAKEISHA EZELL, as        )
    representative of the     )
 5  ESTATE OF TERRENCE        )   Honorable Judge
    ANDREWS                   )   Annemarie Carney Axon
 6                            )
    PLAINTIFF,                )
 7                            )
                             )   CASE NO.
 8  VS.                       )
                             )   4:20-CV-02058-ACA
 9                            )
    JEFFERSON DUNN, et al.,   )
10                            )   JURY TRIAL DEMANDED
    DEFENDANTS,               )
11                            )

12                            )
    LORI GUY, as             )
13  representative of the    )
    ESTATE OF STEVEN          )
14  MULLINS,                  )
                             )   CASE NO.
15  PLAINTIFF,                )
                             )   4:21-CV-00264-SGC
16                            )
                             )
17  VS.                       )
                             )   JURY TRIAL DEMANDED
18                            )
    JEFFERSON DUNN, et al.,   )
19                            )
    DEFENDANTS,               )   DEPOSITION OF:
20                            )   WILLIAM RAGSDALE

21

22        S T I P U L A T I O N S

23        IT IS STIPULATED AND AGREED, by and

24  between the parties through their respective

25  counsel, that the deposition of:
                                            Page 1
```

```
 1                 APPEARANCES

 2

 3  FOR THE PLAINTIFF:

 4     Megan Pierce (VIA ZOOM)
       Attorney at Law
 5     Loevy & Loevy
       311 North Aberdeen, Suite 3
 6     Chicago, Illinois 60697
       megan@loevy.com
 7     312-243-5900

 8

 9  FOR THE DEFENDANTS:

10     Richard Hill
       Attorney at Law
11     Cappell & Howard
       150 South Perry Street
12     Montgomery, Alabama 36104
       Rick.Hill@chlaw.com
13     334-241-8043

14  FOR THE DEFENDANTS:

15     William Cranford (VIA ZOOM)
       Attorney at Law
16     Butler Snow
       200 West Side Square, Suite 100
17     Huntsville, Alabama 35801
       will.cranford@butlersnow.com
18     256-936-5650

19

20              EXAMINATION INDEX

21
    Examination by Ms. Pierce            5
22  Examination by Mr. Cranford         146
    Further Examination by Ms. Pierce   177
23

24

25
                                            Page 3
```

```
 1             WILLIAM RAGSDALE

 2  may be taken before Lauryn Bellerose, Commissioner

 3  and Notary Public, State at Large, at the offices

 4  of Cappell & Howard, PC, 3120 Frederick Road, Suite

 5  B, Opelika, Alabama 36801, on the 1st day of August

 6  2024, commencing at 9:07 a.m.

 7

 8          IT IS FURTHER STIPULATED AND AGREED that

 9  the signature to and reading of the deposition by

10  the witness is waived, the deposition to have the

11  same force and effect as if full compliance had

12  been had with all laws and rules of Court relating

13  to the taking of depositions.

14

15          IT IS FURTHER STIPULATED AND AGREED that

16  it shall not be necessary for any objections to be

17  made by counsel to any questions, except as to form

18  or leading questions, and that counsel for the

19  parties may make objections and assign grounds at

20  the time of the trial, or at the time said

21  deposition is offered in evidence, or prior

22  thereto.

23

24

25
                                            Page 2
```

```
 1                EXHIBIT INDEX

 2  PLAINTIFF'S

 3  PX-1    Internal Security Audit Team Email   39

 4  PX-2    Secure Facility Vulnerability        41
            Assessment
 5
    PX-3    Institutional Security Inspection    44
 6          Form B Email

 7  PX-4    Institution Security Inspection      49
            Email
 8
    PX-5    Copy of Maintenance Work Order       52
 9          Email

10  PX-6    Duty Officer and Incident Reports    55

11  PX-7    Inmate Mullins' Movement History     85

12  PX-8    Investigative Report                 86

13  PX-9    PREA Audit Report (Melinda Allen)   114

14  PX-10   PREA Audit Report (Dave Cotten)     139

15  PX-11   Alabama Department of Corrections   139
            Written Reprimand
16
17  DEFENDANTS'

18  DX-1    February 26th, 2019                 150
            Incident Report
19
    DX-2    February 25th, 2019                 154
20          Incident Report

21  DX-3    Memorandum from Karla Jones         161

22  DX-4    Memorandum from Christopher Gordy   167

23  DX-5    Corrective Action Plan             169
24
25
                                            Page 4
```

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

| | |
|---|---|
| 1   I, Lauryn Bellerose, a Court Reporter | 1   you are in a court of law.  Okay? |
| 2   of Rainbow City, Alabama, and a Notary Public for | 2   A.     Uh-huh.  Yeah. |
| 3   the State of Alabama at Large, acting as | 3   Q.     If you don't understand a question, please |
| 4   Commissioner, certify that on this date, pursuant | 4   ask for clarification.  If you don't ask for |
| 5   to Rule 30 of the Alabama Rules of Civil Procedure | 5   clarification, I'll assume that you understood the |
| 6   and the foregoing stipulation of counsel, there | 6   question.  Is that fair? |
| 7   came before me on the 1st day of August 2024, at | 7   A.     Yes. |
| 8   the offices of Cappell & Howard, PC, 3120 Frederick | 8   Q.     I know we're on Zoom.  So if you're having |
| 9   Road, Suite B, Opelika, Alabama 36801, commencing | 9   any difficulty hearing me or seeing any of the |
| 10  at 9:07 a.m., WILLIAM RAGSDALE, witness in the | 10  exhibits that I share, please let me know so that I |
| 11  above cause, for oral examination, whereupon the | 11  can make sure that you can hear and see everything |
| 12  following proceedings were had: | 12  all right.  Okay? |
| 13            WILLIAM RAGSDALE, | 13  A.     Okay. |
| 14     having been duly sworn, was examined and | 14  Q.     Because the court reporter is taking down |
| 15         testified as follows: | 15  everything we say, it's really important that we |
| 16            EXAMINATION | 16  don't talk over each other.  So I'll do my very |
| 17  BY MS. PIERCE: | 17  best to make sure you are done answering before I |
| 18  Q.     Good morning, Mr. Ragsdale.  My name is | 18  ask a new question.  And please also wait until I'm |
| 19  Megan Pierce, and I'm an attorney for the | 19  done asking a question before you begin answering. |
| 20  plaintiffs, Lakeisha Ezell and Lori Guy in this | 20  Okay? |
| 21  matter. | 21  A.     Okay. |
| 22         Have you ever been deposed before, | 22  Q.     And then, again, for the same reason, |
| 23  Mr. Ragsdale? | 23  please make sure to give verbal answers.  So try to |
| 24  A.     Where? | 24  avoid shaking or nodding your head or making |
| 25  Q.     Have you ever been deposed before, | 25  inaudible noises, you know, to agree or disagree so |
| Page 5 | Page 7 |

| | |
|---|---|
| 1   Mr. Ragsdale? | 1   that the court reporter can get a clear record. |
| 2   A.     Yes.  Uh-huh. | 2   A.     Okay. |
| 3   Q.     Okay.  About how many times? | 3   Q.     And if your lawyer objects, you still must |
| 4   A.     One. | 4   answer the question, unless they instruct you |
| 5   Q.     One? | 5   otherwise. |
| 6   A.     This will be my second one. | 6         Do you understand that? |
| 7   Q.     Okay.  And what was the other case in | 7   A.     Yes. |
| 8   which you were deposed -- strike that.  Let me ask | 8   Q.     And then we'll move through this hopefully |
| 9   it differently. | 9   pretty quickly today, but if you need to take a |
| 10        Was the other occasion in which you were | 10  break at any point, please let me know.  We can |
| 11  deposed related to your -- your work with ADOC? | 11  take a break.  I just ask, if a question is |
| 12  A.     Yeah.  Uh-huh. | 12  pending, you answer that question, and then we will |
| 13  Q.     Okay.  And what case was that in which you | 13  take a break after you answer that question.  Okay? |
| 14  were deposed? | 14  A.     Okay. |
| 15  A.     I don't remember.  It's been a while.  I | 15  Q.     Do you have any medical conditions or are |
| 16  don't even remember what case it was. | 16  you taking any medication that would affect your |
| 17  Q.     About how long ago was it? | 17  ability to testify here today? |
| 18  A.     Probably about three, four years. | 18  A.     No. |
| 19  Q.     Well, I'm going to go over the ground | 19  Q.     Do you have any medical conditions or are |
| 20  rules of the -- the deposition just to make sure | 20  you taking any medication that would affect your |
| 21  we're on the same page before we get started. | 21  memory? |
| 22  Okay? | 22  A.     No. |
| 23  A.     All right. | 23  Q.     All right.  Did you do anything to prepare |
| 24  Q.     So I'm going to ask questions, and then | 24  for your deposition today? |
| 25  you're going to give answers under oath, just like | 25  A.     No. |
| Page 6 | Page 8 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (5 - 8)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

| | |
|---|---|
| 1       MR. HILL:  Other than talk to your | 1   Q.      What area did you work prior to Russell |
| 2   lawyers. | 2   A.      **I was a technician at Russell Corporation.** |
| 3       THE WITNESS:  Yeah, other than talk to the | 3   Q.      Okay.  And what made you want to join |
| 4   lawyers. | 4   ADOC? |
| 5   Q.      Did you review any documents? | 5   A.      **I -- well, I had some friends that worked** |
| 6   A.      **No.** | 6   **there when Russell Mills, they closed, and they** |
| 7   Q.      And how many -- without going into any of | 7   **talked me into getting on with the ADOC.** |
| 8   the conversations that you had with your lawyers, | 8   Q.      When you joined in 2020, what was your |
| 9   how many times did you speak with them? | 9   position? |
| 10  A.      **Two other times.** | 10  A.      **That's -- it wasn't 2020.  It was 2000 --** |
| 11  Q.      Have you ever at any point read the | 11  **2000.** |
| 12  complaints in this matter? | 12  Q.      Oh, okay. |
| 13  A.      **No.** | 13  A.      **2000.** |
| 14  Q.      Do you understand the allegations against | 14  Q.      All right.  And -- |
| 15  you in this case? | 15  A.      **2020 is when I retired.** |
| 16  A.      **I'm here, I think, because of an incident** | 16  Q.      Okay.  Sorry.  So you joined in 2000? |
| 17  **report.** | 17  A.      **2000.** |
| 18  Q.      And as you sit here today, do you have any | 18  Q.      What was your position when you joined? |
| 19  independent recollection of Steven Mullins? | 19  A.      **Correctional officer.** |
| 20  A.      **No.** | 20  Q.      Correctional officer.  And what -- what |
| 21  Q.      Okay.  And let me make sure we're on the | 21  institution did you work at? |
| 22  same page about independent recollection. | 22  A.      **Alex City Work Release.** |
| 23       By independent recollection, I mean | 23  Q.      Okay.  And how long were you there? |
| 24  without relying on any documents, do you have any | 24  A.      **About -- I was there about ten and a half** |
| 25  memory of him as you sit here today? | 25  **years.** |
| Page 9 | Page 11 |

| | |
|---|---|
| 1   A.      **No.** | 1   Q.      And were you a correctional officer the |
| 2   Q.      And as you -- | 2   whole time? |
| 3   A.      **I couldn't tell you what he looks like.** | 3   A.      **Yes.** |
| 4   Q.      And as you sit here today, do you have any | 4   Q.      Okay.  And then what was your next |
| 5   independent recollection of Terrance Andrews? | 5   position after that? |
| 6   A.      **No.** | 6   A.      **I made sergeant at Childersburg Work** |
| 7   Q.      Are you aware that Steven Mullins was | 7   **Release.** |
| 8   killed by another inmate at St. Clair while you | 8   Q.      And how long were you there? |
| 9   were working there? | 9   A.      **About -- I think it was about six and a** |
| 10  A.      **Yes, I knew that.** | 10  **half years, and then I made lieutenant at St.** |
| 11  Q.      Okay.  Do you understand the circumstances | 11  **Clair.** |
| 12  of how he died? | 12  Q.      Okay.  So you transferred to St. Clair as |
| 13  A.      **I'm not even sure how he died.  I just** | 13  a lieutenant? |
| 14  **know he got killed.** | 14  A.      **Yeah.** |
| 15  Q.      And do you know that Terrance Andrews was | 15  Q.      Okay.  And at some point, you also became |
| 16  killed by another -- another inmate at St. Clair? | 16  the backup PREA coordinator; is that correct? |
| 17  A.      **Who was that now?** | 17  A.      **Well, I was supposed to be backup, but** |
| 18  Q.      Terrance Andrews. | 18  **when I got there, they put me over a shift, and I** |
| 19  A.      **I don't remember it.** | 19  **run a shift the whole time I was there.** |
| 20  Q.      Okay.  Mr. Ragsdale, when did you join | 20  Q.      Okay.  So I want to make sure I |
| 21  ADOC? | 21  understand. |
| 22  A.      **In 2000 -- let's see -- 2020.** | 22       So from the moment you started at |
| 23  Q.      Okay.  Did you have any experience in | 23  St. Clair, you were supposed to be the backup PREA |
| 24  corrections prior to joining ADOC? | 24  coordinator; is that correct? |
| 25  A.      **No.** | 25  A.      **Uh-huh.  Yes.** |
| Page 10 | Page 12 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (9 - 12)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  Q.        Okay.  And I want to make sure I'm using
2  the correct terminology.
3          Would you title yourself backup PREA
4  coordinator or backup PREA compliance manager?
5  A.        I don't -- I guess just backup manager.
6  But --
7  Q.        Okay.
8  A.        -- like I said, I never worked at -- I run
9  a shift.  They put me on the shift when I got
10 there, and I run a shift the whole time.
11 Q.        And how did you get that position of
12 backup PREA compliance manager?
13 A.        Well, I was -- I was PREA manager at Alex
14 City -- I mean, Childersburg.
15 Q.        Okay.  Did you ever -- did anyone, when
16 you arrived at St. Clair, ever tell you what your
17 responsibilities were as backup PREA compliance
18 manager?
19 A.        No.  Like I said, I was -- I run a shift
20 the whole time I was there.  Two weeks, I helped
21 Angelia Gordy when we had the federal PREA audit.
22 I just had to get up some stuff, and that's all.
23 That's the only time I ever did anything with it.
24 Q.        Okay.  I want to make sure I understand
25 your testimony correctly.
                                              Page 13

1  So the only time you did anything related
2  to PREA was a two-week period when you were
3  assisting with a PREA audit?
4  A.        Uh-huh.  Working with -- working with the
5  audit.
6  Q.        And when about was that?
7  A.        I'm not really sure when it was.  Let's
8  see.  Probably about 2016, 2017, I think.  It --
9  Q.        I want to back up just one second.
10         When did you start at St. Clair?
11 A.        About -- I think it was about the end of
12 2015.
13 Q.        And -- okay.  So as backup PREA compliance
14 manager, did you ever fill in for Angelia Gordy to
15 receive PREA complaints?
16 A.        I did have to take some up there to the
17 place in Birmingham -- well, you know, if we had
18 one that got raped.  You know, if I was on the
19 shift and she wasn't available, I would have to --
20 I would have to take them, but she usually -- I
21 think I took -- I had to take maybe three while I
22 was there.
23 Q.        Okay.  I want to make sure I understood
24 your testimony.
25         So you're saying that you took individuals
                                              Page 14

1  who were raped to the SAFE clinic; is that fair?
2  A.        Yeah.  Uh-huh.
3  Q.        To receive medical treatment?
4  A.        Yeah.
5  Q.        Did you at any point ever respond to --
6  strike that.
7          While you were at St. Clair, did you at
8  any point respond to PREA allegations as backup
9  PREA compliance manager to make sure that the
10 requirements of PREA were being followed in
11 response?
12 A.        Not that I can remember, because we just
13 reported it to her.  You know, if we had an
14 incident, we called her.
15 Q.        Okay.  And that was not as backup PREA
16 compliance manager.  That was just in your normal
17 position as lieutenant --
18 A.        Yeah.  Uh-huh.
19 Q.        -- if there was a PREA incident, you would
20 call her?
21 A.        Yeah, we had to call her.
22 Q.        And -- and, Mr. Ragsdale, I want to remind
23 you to just please make sure to wait until I finish
24 my question.
25 A.        Okay.
                                              Page 15

1  Q.        Even though it's normal speaking cadence
2  to kind of overlap, but we want to make sure the
3  court reporter can make a good record.
4  A.        All right.
5  Q.        Okay.  So you don't recall responding to
6  an allegation of a PREA complaint other than to
7  alert Ms. Gordy of those allegations, correct?
8  A.        Correct.
9  Q.        Okay.  And besides taking individuals who
10 had been raped at St. Clair to the SAFE clinic for
11 medical care, do you require -- do you recall
12 taking any steps to carry out the requirements of
13 PREA while you were at St. Clair?
14 A.        No.  We had a dorm we put them in.  All --
15 all I did was, if I got back, I'd assign them to a
16 dorm.
17 Q.        And where was that?
18 A.        I think it was over in Seg A.  A was a
19 dorm for that.
20 Q.        And would you be responsible for assigning
21 all individuals who had made PREA allegations to
22 specific housing units?  Or would you only do it if
23 you brought individuals back from the SAFE clinic?
24 A.        Only when we would bring them back is when
25 I would assign them, if she had -- if Lieutenant
                                              Page 16

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4 (13 - 16)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  Gordy hadn't already assigned them.  A lot -- a lot
2  of times, she had already tell us where to put
3  them.
4  Q.      Okay.  So as a general matter, you were
5  not responsible for identifying the proper place to
6  house somebody who had made a PREA allegation; is
7  that correct?
8  A.      That's correct.
9  Q.      Beyond meetings that you had related to
10 the audit that we -- the PREA audit that we spoke
11 about earlier, did you ever have any regular
12 meetings with Angelia Gordy or anyone else about
13 the implementations of PREA at St. Clair?
14 A.      No.  Other than, you know -- just I think
15 I had to go to another training one time, but other
16 than that, that was it.
17 Q.      Did you ever alert anyone to the fact that
18 you didn't have time to participate in the
19 implementation of PREA as backup PREA compliance
20 manager?
21 A.      No.
22 Q.      Did Ms. Gordy ever speak with you about
23 carrying out any responsibilities as backup PREA
24 compliance manager?
25 A.      No, not that I recall.  Because she knew I

Page 17

1  was on the shift.
2  Q.      Did Warden Jones also know that you were
3  on a shift on -- and not working as a backup PREA
4  compliance manager?
5  A.      Warden Jones, yes, she would have -- she
6  would have knew.
7  Q.      Are you still working at St. Clair?
8  A.      No.  I've been retired four years, almost
9  four years.
10 Q.      And why did you leave ADOC?
11 A.      I had -- I had my time end.
12 Q.      Okay.  Was it because you wanted to retire
13 or because you no longer wanted to work at ADOC?
14 A.      I wanted to retire.
15 Q.      Were you the backup PREA compliance
16 manager the entire period that you were at
17 St. Clair?
18 A.      Yes.
19 Q.      And were you a lieutenant the entire
20 period that you were at St. Clair?
21 A.      Yes.
22 Q.      Did you ever apply to be a captain?
23 A.      No.
24 Q.      Did you at any point at St. Clair have
25 responsibilities for training other employees in --

Page 18

1  in how to carry out PREA?
2  A.      Not at St. Clair.
3  Q.      And while you were at St. Clair, did you
4  have any responsibilities related to creating or
5  implementing policies related to PREA at the
6  facility?
7  A.      No.
8  Q.      I wanted to turn to your -- your position
9  as lieutenant.
10        So I understand from your testimony that
11 you are responsible for running a shift as
12 lieutenant; is that correct?
13 A.      Correct.
14 Q.      And what were your responsibilities as a
15 shift commander?
16 A.      Handling reports, you know, just pretty
17 much making sure officers was where they were
18 supposed to be and we know the things that come up.
19 You know, I had to assign officers to it and all.
20 Q.      Okay.  So you were responsible for
21 supervising the officers on the shift?
22 A.      Yeah.  Uh-huh.
23 Q.      And would you -- how would you do that?
24 Would you do that by patrolling the facility,
25 monitoring the cameras?  How would you go about

Page 19

1  supervising officers?
2  A.      Well, just depending on what I had going
3  on at the time.  Usually, just by patrolling, but,
4  like, we was so short.  Every day, me and my
5  sergeant, we had to feed chow, you know, so that
6  took up about two hours of time.
7  Q.      Sorry.  So you said every day you and your
8  sergeant had to feed chow?
9  A.      Yes.
10 Q.      Okay.  So does that mean you and your
11 sergeant had to carry out the -- the logistics of
12 -- of making sure everybody was fed during meal
13 time?
14 A.      Yes.
15 Q.      Okay.  Is that something that should have
16 been your responsibility?
17 A.      No.
18 Q.      Okay.  Who -- as staffing permits, who is
19 supposed to carry out chow?
20 A.      Used -- officers used to do it when they
21 had the -- enough officers to do it.
22 Q.      Does that create any problems if the
23 sergeant and lieutenant are the ones carrying out
24 chow?
25        MR. CRANFORD:  Object to the form.

Page 20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (17 - 20)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  A.      Well, if -- if we had an incident of
2  something that happened, you know, we'd just -- one
3  of us would have to leave chow.
4  Q.      Were you the only two people present in
5  the dining area?
6        MR. CRANFORD: Object to the form.
7  A.      Sometimes -- you know, if we had some
8  other officers, sometimes they would come in and
9  help feed.
10 Q.      And you said that you dealt with incident
11 reports and things like that; is that correct?
12 A.      Yes.
13 Q.      As lieutenant and shift commander, what
14 were your responsibilities in regard to incident
15 reports and duty reports?
16 A.      Pretty much just write them and, you know,
17 whatever happens after -- you know, with -- like,
18 if the incident we had, you know, we would talk to
19 the inmates or whatever and find out what caused it
20 all, and then we had to call the on-call. And then
21 they would tell us, you know, how to -- what we was
22 -- where to put them or what to do with them. And
23 then we just typed up the report of what all
24 happened.
25 Q.      When you say "the on-call," what do you

Page 21

1  mean by that?
2  A.      The -- we had an on-call. If we had to
3  have an incident, you had to call the on-call,
4  which was the captains or either the wardens,
5  whichever one was on call. They take a -- each one
6  of them took a week at a time. And any incident we
7  had on a shift, we had to call and report it to
8  them.
9  Q.      How quickly after an incident occurred
10 were you supposed to contact the on-call?
11 A.      Usually right after we found out what was
12 going on or what had happened, we called them right
13 then.
14 Q.      Were you responsible for writing your own
15 incident report for every incident that happened on
16 your shift?
17        MR. HILL: Object to the form.
18 A.      Well, now, the sergeants could write them
19 too.
20 Q.      Okay. But either the sergeant or the
21 lieutenant had to write an independent incident
22 report for every incident, whether or not an
23 officer already had?
24 A.      The officers didn't write them --
25 Q.      Okay.

Page 22

1  A.      -- the officers just -- if the inmate went
2  to the officer, the officer was the one that
3  escorted them to us, and then we found out what was
4  going on. You know, they told us what was going
5  on, and then we wrote the report.
6  Q.      If you -- if an -- if an officer witnessed
7  a fight, for example, would they need to write an
8  incident report or a duty report about that?
9        MR. CRANFORD: Object to the form.
10 A.      The officer wouldn't. The supervisor
11 would.
12 Q.      And that goes for both incident and duty
13 reports?
14 A.      Yeah.
15 Q.      If a sergeant wrote an incident or duty
16 report on your shift, were you responsible for
17 reviewing that?
18        MR. CRANFORD: Object to the form.
19        MR. HILL: Same objection.
20 Q.      And so you would re -- strike that.
21        Would you be alerted to every incident
22 that happened during your shift?
23        MR. HILL: Object to the form.
24        MR. CRANFORD: Same objection.
25 A.      Yes.

Page 23

1  Q.      And how would you be notified of that?
2        MR. HILL: I'm sorry to stop. How would
3  he be notified to be -- of every incident that
4  occurred on his shift?
5        MS. PIERCE: Yes.
6        MR. HILL: Incident, meaning anything that
7  --
8        MS. PIERCE: If he understands the
9  question -- if he needs clarification, he can ask.
10        THE WITNESS: I would know about it. If
11 the incident happened, I was informed --
12 Q.      (By Ms. Pierce) Okay.
13 A.      -- you know, even if it was reported to my
14 sergeant, I was informed of it.
15 Q.      Okay. And this is every incident that
16 would require the writing of a duty or incident
17 report, correct?
18 A.      Yes.
19        MR. CRANFORD: Object to the form.
20 Q.      And that would include all -- all
21 altercations between inmates or inmates and staff?
22        MR. CRANFORD: Object to the form.
23 A.      Yes.
24 Q.      Would that include all incidents in which
25 a weapon was seen or found?

Page 24

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6 (21 - 24)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

---

| | |
|---|---|
| 1        MR. CRANFORD: Object to the form. | 1   had to get out there and work too. |
| 2   **A.**      **Yes.** | 2   Q.      And I want to focus on contraband |
| 3   Q.      And, again, Mr. Ragsdale, please wait. If | 3   searches. |
| 4   Will or your attorney might have some objections, | 4        Is it your testimony that you would |
| 5   just try to let them get it on the record so we can | 5   participate in one way or another in contraband |
| 6   make sure the court reporter can get everything | 6   searches every day? |
| 7   down. Okay? | 7   **A.**      **Pretty much if -- you know it, some days,** |
| 8   **A.**      **Okay.** | 8   **I couldn't, but, you know, we had -- everybody** |
| 9   Q.      Thank you. I know it's difficult -- | 9   **tried to get out there and help.** |
| 10   **A.**      **Yeah.** | 10   Q.      And besides assisting in contraband |
| 11   Q.      -- to wait that long. | 11   searches, what else did you do to make sure that |
| 12        As a lieutenant and shift commander, what | 12   searches and shakedowns were being done at |
| 13   were you -- was your responsibility with regard to | 13   St. Clair on your shifts in compliance with policy? |
| 14   contraband searches? | 14   **A.**      **Well, each -- each officer had so many he** |
| 15   **A.**      **We just had to make sure the officers was** | 15   **had to do, and then they had to turn it in and tell** |
| 16   **doing the shakedowns.** | 16   **whether -- what contraband they had and if they** |
| 17   Q.      Okay. Were you responsible for carrying | 17   **found any or if they didn't find any.** |
| 18   out any searches or shakedowns yourself? | 18   Q.      And what did you do to make sure that |
| 19   **A.**      **I helped them. But lieutenant really** | 19   officers were -- were carrying out their |
| 20   **didn't have to, but, you know, I'd go out there and** | 20   responsibilities with regard to contraband |
| 21   **help them.** | 21   searches? |
| 22   Q.      Okay. So is it fair to say you did not | 22   **A.**      **Just checking their -- the sheet that we** |
| 23   have responsibility to carry out any searches or | 23   **had that they had to turn in.** |
| 24   shakedowns, but you decided, based on your own | 24   Q.      And did you do that everyday? |
| 25   discretion, to go assist officers in carrying out | 25   **A.**      **Pretty much every day.** |
| Page 25 | Page 27 |

| | |
|---|---|
| 1   their own searches and shakedowns; is that correct? | 1   Q.      As lieutenant, what was your |
| 2   **A.**      **Yeah. Yes.** | 2   responsibility with regard to inspections? |
| 3   Q.      And how often would you assist with | 3   **A.**      **You talking about cell inspections or --** |
| 4   searches and shakedowns? | 4   Q.      Cell inspections, dorm inspections, any |
| 5   **A.**      **We'd -- you know, I tried to help them if** | 5   inspections that had to happen on your shift. |
| 6   **I didn't have anything going on. And, you know, I** | 6   **A.**      **Well, we was pretty much in all the dorms** |
| 7   **-- I don't know how often it was. You know, I'd** | 7   **every day, walking around, checking.** |
| 8   **usually get to help them a little bit every day,** | 8   Q.      Okay. Were there inspections that were |
| 9   **you know...** | 9   required by policy to make sure that locks and |
| 10   Q.      When you say "you would help them every | 10   lights and cameras and things like that were |
| 11   day," do you mean you would help them every day | 11   working in each dorm room? |
| 12   with searches? Or you would just help them every | 12   **A.**      **Yes.** |
| 13   day with general matters of some sort? | 13   Q.      Okay. And how often were those supposed |
| 14   **A.**      **Well, we had -- you know, we had to pretty** | 14   to happen? |
| 15   **well just get out there and help too, you know,** | 15   **A.**      **We'd -- I think they was about every day.** |
| 16   **because we was shorthanded. So, you know, we** | 16   **We had a sheet with all the cameras listed and** |
| 17   **didn't -- you know, a lot of institutions, the** | 17   **everything, and we had to go down through there and** |
| 18   **lieutenants got to sit in the office. We didn't** | 18   **check it off if it was working or if it wasn't.** |
| 19   **get that, you know. We had -- you know, we was** | 19   Q.      And who was responsible for carrying that |
| 20   **short. We had to get out there and work. We** | 20   out? |
| 21   **worked sort of like the officers did.** | 21   **A.**      **That could have just been any officer and** |
| 22   Q.      And that was unique to St. Clair? | 22   **-- unless it's sergeants and lieutenants doing it** |
| 23   **A.**      **Do what now?** | 23   **some too.** |
| 24   Q.      That was unique to St. Clair? | 24   Q.      And who is responsible for making sure |
| 25   **A.**      **Yeah, pretty much, yeah. The lieutenant** | 25   those inspections were carried out? |
| Page 26 | Page 28 |

---

1-888-326-0594   depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (25 - 28)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  **A.      I -- that would have been me on the shift,**
2  **the lieutenant.**
3  Q.      And what steps did you take to make sure
4  those inspections were carried out?
5  **A.      I just went over the paperwork and then**
6  **just walk around, you know, and observing.**
7  Q.      Anything else that you did to make sure
8  the inspections were carried out?
9      MR. HILL:  Object to the form.
10  **A.      All I said, just check it and checking on**
11  **them is all.**
12  Q.      Did you take any steps to make sure
13  that -- strike that.
14      Did you take any steps to make sure that
15  officers were accurately filling out inspection
16  forms?
17  **A.      Did you -- you're saying that they were**
18  **accurately?**
19  Q.      Yes.
20  **A.      Well, we would -- we would go back**
21  **sometimes and check behind them just to see, every**
22  **once in a while, if they was -- everything is what**
23  **they was saying it was --**
24  Q.      So you --
25  **A.      -- but we didn't do it every day, you**

Page 29

1  know, but...
2  Q.      Sorry.  So to be clear, you'd go with them
3  on their inspection to make sure they were doing it
4  correctly?
5  **A.      No, not every day.**
6  Q.      But occasionally?  That's what you're
7  saying?  You'd go with --
8  **A.      I'd go -- yeah.**
9  Q.      Sorry.  Let me get my question in then.
10      So you'd go with them every --
11  occasionally to make sure that they were doing
12  their inspection accurately; is that correct?
13  **A.      Correct.**
14  Q.      Anything else you did to make sure they
15  were filling out their inspection forms accurately?
16  **A.      Not that I know.**
17  Q.      And what was your responsibilities as
18  lieutenant and shift commander for disciplining
19  inmates who violated policies or rules?
20  **A.      We could -- well, we could take good time**
21  **from them.  We could take a store drop from them.**
22  **But that had -- when we did that, that had to be**
23  **approved by somebody up higher than us.  You know,**
24  **all we could do is recommend it.**
25  Q.      Okay.  And so what -- what actions would

Page 30

1  you actually take if you became aware that a --
2  strike that.
3      If an officer saw a -- on your shift saw
4  an inmate break a policy or rule, would you be
5  alerted of that?
6      MR. HILL:  Object to the form.
7  **A.      Ask that question again.**
8  Q.      Yeah.  If -- if an officer on your shift
9  saw an inmate violate a policy or rule, were they
10  supposed to alert you of that rule violation?
11  **A.      Yes.**
12  Q.      And what did you do when you learned that
13  an inmate had violated a policy or rule on your
14  shift?
15  **A.      Well, it really depended on what they did**
16  **whether, you know -- you know, if we wrote them a**
17  **disciplinary or...**
18  Q.      Okay.  Would you be responsible for
19  writing the disciplinary?  Or would someone else be
20  responsible for writing the disciplinary?
21  **A.      The sergeant would have been responsible.**
22  Q.      And were you involved in the decision
23  about whether a disciplinary should be written?
24  **A.      Not necessarily.  If a sergeant wrote it,**
25  **you know, he would tell me about it, but, you**

Page 31

1  know -- you know, he was able to write it, and, you
2  know -- you know, he could take good time and all
3  or just, you know, whatever --
4  Q.      And it --
5  **A.      -- he thought it deemed.**
6  Q.      Go ahead.  I'm sorry.
7  **A.      You know, just whatever he thought it was**
8  **deemed to do.  It was his -- it was his decision if**
9  **he wrote the report --**
10  Q.      And --
11  **A.      -- but he just notified me of it.**
12  Q.      Understood.  And if -- if you witnessed an
13  inmate violating a rule, would you yourself fill
14  out a disciplinary?
15  **A.      Yes.**
16  Q.      How often did you issue disciplinaries on
17  a given shift?
18      MR. HILL:  Object to the form.
19  **A.      Some days, we might not -- we go and not**
20  **even have anything, and, you know, some days, you**
21  **might write two or three.**
22  Q.      Were you aware or did you ever have
23  concerns that staff were not issuing disciplinaries
24  when they saw inmates breaking rules at the prison?
25      MR. HILL:  Object to the form.  You can

Page 32

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8 (29 - 32)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

```
 1  answer.
 2  A.        Not that I'm aware of.
 3  Q.        Did you ever take any steps to make sure
 4  that staff were holding inmates accountable when
 5  they broke rules?
 6  A.        Well, if it was reported to me.  You know,
 7  because, you know, if they didn't report it, there
 8  wouldn't be nothing I could do.  So, you know, I
 9  can't -- you can't have it if they don't tell you
10  about it.  So you know, I'm probably sure some of
11  them that broke rules that wasn't reported.  I
12  don't know, but...
13  Q.        Did you provide officers on your shift
14  with any additional instruction to make sure that
15  they knew their responsibilities for notifying you
16  of rule violations and disciplining inmates
17  involved in them?
18  A.        Yes, they knew they were supposed to let
19  me know if anything happened --
20  Q.        Did you --
21  A.        -- me or even a sergeant.
22  Q.        Did you specifically provide instruction
23  to officers on your shift about that?
24  A.        Yes.
25  Q.        What was your responsibility for
                                            Page 33
```

```
 1  disciplining the staff on your shift who violated
 2  rules or policies?
 3  A.        I would pretty much report it to like a
 4  captain or the warden.  They -- you know, they
 5  pretty much handled the staff discipline.
 6  Q.        Okay.  So you didn't have any direct
 7  responsibility in disciplining staff; is that
 8  correct?
 9       MR. HILL:  Object to the form.
10  A.        It -- you know, I could if they told me
11  to, but, you know, they usually handled it.
12  Q.        And by "they," you mean the captains and
13  warden and stuff?
14  A.        Yeah.  Uh-huh.
15  Q.        On your shifts, did you have any
16  responsibility for post assignments?
17  A.        Yes.
18  Q.        And what was your responsibility for post
19  assignments?
20  A.        I had to come in early every day and get
21  my list of the officers that was working, and then
22  I assigned their post, where they would be working
23  at.
24  Q.        Was there generally a shortage of staff to
25  assign them to the posts?
                                            Page 34
```

```
 1       MR. HILL:  Object to the form.
 2  A.        Yes.
 3  Q.        Were there any areas of the prison that
 4  were generally short of staff on your posts -- on
 5  your shifts?
 6       MR. HILL:  Object to the form.
 7       THE WITNESS:  Still answer?
 8       MR. HILL:  You could -- unless I tell you
 9  not to --
10       THE WITNESS:  Yes.
11       MR. HILL:  -- answer.
12       THE WITNESS:  Yes.
13  Q.        (By Ms. Pierce) And what areas were those?
14  A.        Most all of them was short.  You know, we
15  was just short-staffed.
16  Q.        Was it common on your shifts to have a
17  dorm supervised by a single cube officer?
18       MR. CRANFORD:  Object to the form.
19       MR. HILL:  Same objection.
20  A.        Yes.
21  Q.        Was it common on your shifts to have the
22  P, Q-blocks staffed by just a cube officer in -- in
23  each block?
24  A.        Yes.
25       MR. CRANFORD:  Object to the form.
                                            Page 35
```

```
 1       MR. HILL:  Same objection.
 2  Q.        I'm sorry.  Can you repeat your answer,
 3  Mr. Ragsdale?
 4  A.        Yes.
 5  Q.        Did you have concerns about this level of
 6  staffing?
 7  A.        Everybody did, yeah.
 8  Q.        Did you ever discuss those concerns with
 9  anyone?
10  A.        Well, we -- you know, we talked about it
11  in our staff meetings.
12  Q.        And when you say "staff meetings," who are
13  involved in those staff meetings?
14  A.        That was pretty much all the staff that,
15  you know, supervises anyway, from sarge itself was
16  there, and then medical staff, they was involved in
17  it.
18  Q.        So all supervisors and the sergeant and
19  the wardens; is that correct?
20  A.        Yeah.  Uh-huh.
21  Q.        How often were those staff meetings held?
22  A.        About once a month.
23  Q.        And given the levels of staffing, were any
24  -- was there any discussion of actions that would
25  be taken to try to ensure that the dorms were
                                            Page 36
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9 (33 - 36)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  properly supervised despite the level of staffing?
2       MR. CRANFORD:  Object to the form.
3  **A.     Yes.**
4  Q.     What types of solutions did you talk
5  about?
6  **A.     I went -- we pretty much just had to try**
7  **to get officers to come in on other shifts and**
8  **help.**
9  Q.     Anything else was discussed?
10  **A.     No.  That was all you could do was just --**
11  **just try to get somebody else to come in on another**
12  **shift, which everybody was pretty good about it.**
13  **We had -- you know, we had some that would come in.**
14  **That's like I went in at 11:00, and I -- I was on**
15  **second at 2:00, but I went at 11:00 every day and**
16  **helped the first shift feed on my days I was**
17  **assigned to work.**
18       MR. HILL:  I'm going to object to the
19  previous question to the form.
20  Q.     While you were shift commander at
21  St. Clair, did you ever alert a supervisor about --
22  or discipline a subordinate because you found a
23  subordinate sleeping on the job?
24  **A.     No.  Uh-huh.**
25  Q.     While you were shift supervisor at
Page 37

1  St. Clair, did you ever alert a supervisor about or
2  discipline a subordinate because you found a
3  subordinate failing to control an inmate movement?
4  **A.     I don't remember.**
5  Q.     I'm sorry?
6  **A.     I don't remember having to discipline one**
7  **for it.**
8  Q.     While you were shift commander at
9  St. Clair, did you ever alert a supervisor or
10  discipline -- discipline a subordinate because you
11  found that a subordinate was failing to carry out
12  their required contraband searches?
13  **A.     No.**
14  Q.     While you were lieutenant at St. Clair,
15  did you ever alert a supervisor or discipline a
16  subordinate because you found out that a
17  subordinate was failing to discipline inmates for
18  rule violations that the subordinate observed?
19  **A.     No, I don't think so.**
20  Q.     While you were lieutenant, did you ever
21  alert a supervisor about or discipline a
22  subordinate because you found out that the
23  subordinate was leaving cell block doors open?
24       MR. CRANFORD:  Object to the form.
25  **A.     No, I don't...**
Page 38

1  Q.     And while you were lieutenant, did you
2  ever alert a supervisor about or discipline a
3  subordinate because you found the subordinate
4  failed to respond or intervene in an altercation
5  between inmates?
6       MR. HILL:  Object to the form.
7  **A.     No.**
8  Q.     Besides the staff meetings, the monthly
9  staff meetings that we just discussed, did you
10  participate in any regular meetings as a lieutenant
11  at St. Clair?
12  **A.     No.  It -- our meetings was just a staff**
13  **meeting just every month.  No.  We didn't have any**
14  **other really meetings other than that.**
15  Q.     All right.  I'm going to share with you
16  what I will mark as Exhibit 1.  Bear with me for a
17  moment.
18       (Plaintiff's Exhibit Number 1 was marked
19       for identification.)
20  Q.     Okay.  For the record, this is ADOC020163
21  to ADOC020164, and this is marked as highly
22  confidential.  Give me a moment.  I'll just have it
23  up on your screen.
24       MR. HILL:  Can you see this?
25  Q.     I'm sorry.  Hold on one second.  I shared
Page 39

1  the wrong exhibit.  Oh, one second.  Sorry.  Okay.
2       This is an email from Warden Brooks to
3  Warden Estes from May 8, 2018.
4       Do you see that?
5  **A.     I can't hardly read it.**
6       MR. HILL:  You can bring this closer to
7  you if you need to.
8  Q.     Let me zoom in to see if that helps.
9       Do you see that okay now?
10       MR. HILL:  Give us one second to try to
11  get a bigger picture here.
12       How's that?
13       THE WITNESS:  Yeah.  That's way better.
14       I see it, but I don't remember that.
15  Q.     (By Ms. Pierce) Okay.  So I just want to
16  -- so this -- this looks to be a email from Warden
17  Brooks --
18  **A.     Warden, uh-huh.**
19  Q.     -- identifying you and three others as --
20  as part of an internal security audit team; is that
21  correct?
22  **A.     Correct.**
23  Q.     Do you know what the internal security
24  audit team was?
25  **A.     I don't have no idea.**
Page 40

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (37 - 40)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  Q.      Do you recall carrying out any internal
2  security audit?
3  A.      Nope.
4  Q.      And to be clear, you don't know what an
5  internal security audit is?
6  A.      No.  I don't even remember this.  I don't
7  have no idea about it.
8  Q.      Okay.  I'll stop sharing that.  And for
9  the record, that was Exhibit 1.
10         All right.  I'm going to share with you
11 what I will mark as Exhibit 2.  Again, I believe
12 this is marked as highly confidential -- actually,
13 it -- yep, it's marked as highly confidential.  I'm
14 sorry.  And the Bates number for the record is
15 ADOC-DS010625 to ADOC-DS01629.  Let me make this as
16 big as possible.  That way, you can see it.
17             (Plaintiff's Exhibit Number 2 was marked
18              for identification.)
19             Okay.  Can you see that, Mr. Ragsdale?
20 A.      Yeah, I can see it a little bit.  I can
21 tell a little bit about it.
22 Q.      And you don't need to read through the
23 whole thing.
24         But you can see the document okay on your
25 screen?
                                              Page 41

1  A.      Yes.
2  Q.      Okay.  Have you ever -- this document is
3  titled Secure Facility Vulnerability Assessment,
4  and it's dated September 6, 2017; is that correct?
5  A.      Correct.
6  Q.      Have you ever seen this document or a
7  document like it before?
8  A.      Yeah.  I think that was for the cameras,
9  checking the cameras.
10 Q.      You think this was for the cameras?
11         Who was responsible for completing --
12         MR. HILL:  Megan, I think he was about to
13 answer your question.
14         MS. PIERCE:  Oh, sorry.  I couldn't hear
15 you.  Thank you.
16         THE WITNESS:  I'm thinking that would have
17 been Lieutenant Gordy, the PREA compliance
18 manager --
19 Q.      (By Ms. Pierce) Did you --
20 A.      -- look.  Because it says "IPCM
21 responsible."
22 Q.      Okay.  You believe that Lieutenant Gordy
23 was responsible for completing this vulnerability
24 assessment?
25 A.      Yeah.  I don't remember the form.  I think
                                              Page 42

1  it would -- she would...
2  Q.      So I want to make sure I understand your
3  testimony.
4          You don't recognize this form, correct?
5  A.      No, I don't recognize it.
6  Q.      Do you recognize the term, "secure
7  facility vulnerability assessment"?
8  A.      Now, where is that at?
9  Q.      That's the top.
10 A.      Oh, oh, the top of it, yeah.  I'm not --
11 because I was trying to -- I think I had to fill
12 one of these out when I was the manager at Alex
13 City -- I mean, Childersburg --
14 Q.      Okay.  So you didn't --
15 A.      -- but I didn't at St. Clair.
16 Q.      Sorry.  Sorry.  I interrupted you.
17         Could you repeat that?
18 A.      I didn't at St. Clair, but I think I had
19 to fill one of these out at -- when I was at
20 Childersburg.
21 Q.      Okay.  And that was in your role as PREA
22 compliance manager, right?
23 A.      Yeah.  Uh-huh.
24 Q.      Okay.  Did you have any involvement in
25 filling out this form at St. Clair?
                                              Page 43

1  A.      No.  I don't remember filling out a form
2  at St. Clair.
3  Q.      And did you have any involvement or
4  responsibility in carrying out the assessment
5  that's reflected in this form?
6  A.      No.
7  Q.      So best of your knowledge, this would have
8  been the responsibility of Ms. Gordy, correct?
9  A.      Yes.
10 Q.      All right.  I will stop sharing that.  I
11 will share the next one.  I'll mark it as
12 Exhibit 3.
13             (Plaintiff's Exhibit Number 3 was marked
14              for identification.)
15 Q.      (By Ms. Pierce) And this is ADOC027812 to
16 ADOC027813, and, again, this is marked as highly
17 confidential.  All right.  Blowing it up large.
18         Can you see this now, Mr. Ragsdale?
19 A.      Yes.
20 Q.      Okay.  And so this looks to be an email
21 from Bruce Hodge to you and Angelia Gordy, and then
22 Gary Malone, Carla Graham and Gwendolyn Givens; is
23 that correct?
24 A.      Correct.
25 Q.      The date is August 17, 2018?
                                              Page 44

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  A.      Correct.

2  Q.      And it's titled -- the caption is titled

3  Institutional Security Inspection Form B dated

4  August 16th; is that correct?

5  A.      Correct.

6  Q.      I'm going to scroll down to the attachment

7  and show you this document here, which is titled

8  Alabama Department of Corrections Institutional

9  Security Inspection; is that correct?

10  A.      That's correct.

11  Q.      Okay.  Do you recognize this form or --

12  strike that.

13        Have you seen this particular form or this

14  form generally in your job at St. Clair?

15  A.      Yes.  This is a form that we had -- the

16  supervisors had to fill out.

17  Q.      Okay.  So was this something you were

18  responsible for filling out?

19  A.      Yes, I had to do it too.  I was over the

20  shift, so I had to fill it out sometimes too.

21  Q.      Were you responsible for filling it out on

22  every shift that you worked?

23  A.      A supervisor would -- pretty much would --

24  every shift, it was a supervisor had to check it.

25  Q.      And that would be a sergeant or

Page 45

1  lieutenant?

2  A.      Usually, a sergeant, lieutenant.

3  Q.      And would this be filled out for each cell

4  block?

5  A.      That would have -- yes.  You had to --

6  pretty much had to walk the whole institution to

7  fill it out.

8  Q.      Okay.  I'm going to scroll down to the

9  bottom.

10        Do you know?  Is that your signature at

11  the bottom?

12  A.      That?  No, that's not my signature.

13  Q.      Do you know whose signature it is?

14  A.      I don't have any idea.

15  Q.      And these areas that are listed in

16  handwriting down at the bottom -- perimeter,

17  population, restrictive housing, kitchen, each dorm

18  -- do you know what that list means?

19  A.      That's -- that's all the dorms that they

20  checked.

21  Q.      Okay.  And then up here, everything is

22  marked "yes."

23        So does that -- except for two things,

24  does that mean all of those things are in -- in

25  good working order?

Page 46

1  A.      Yes, all of them that was marked "yes."

2  Because of where it's got "no," you have -- that's

3  what they did.  You have to put outside what's the

4  matter.

5  Q.      Okay.  So based on this form, it looks

6  like the cameras were not working in the P/Q and

7  L/M-blocks?

8  A.      Yes.  When they checked it, they wasn't,

9  because they had them -- it looks like they had

10  them blocked, the cameras blocked.  Because the

11  inmates was always putting something over the

12  cameras to block them, the ones they could reach.

13  They couldn't reach all of them.  But the ones they

14  would reach, they would put something over them.

15  Q.      And then the other issue with inspection

16  was that the lock in -- or the door in P-10 cell

17  wasn't working?

18  A.      Yes.

19  Q.      And so this form had to be carried out on

20  every shift; is that correct?

21  A.      Yes.

22  Q.      And what was done with this form after it

23  was completed?

24  A.      I -- we had a file we put them in and

25  turned them in, and I'm not sure what they did with

Page 47

1  them then.

2  Q.      And if something wasn't working -- like

3  here, P-10 cell -- would you specifically alert

4  someone to that if this -- if you had done this

5  inspection?

6  A.      I -- we would point it to our maintenance

7  guy, the one that does maintenance, over in

8  maintenance.

9  Q.      So you would do that in addition to

10  completing this form?

11  A.      Yes.

12  Q.      Would you alert anyone else besides

13  maintenance?

14  A.      Usually, we just made -- notified

15  maintenance.  So...

16  Q.      Would you ever alert a captain or a warden

17  if you found something during your inspection that

18  you thought posed a risk to safety at the -- at the

19  institution?

20  A.      Yes, we had to report to them.

21  Q.      And what types of things would those be?

22  A.      Well, like, if there was something -- you

23  know, if we found something that had been thrown

24  over the fence or something, you know, we would

25  have to report them.  Or, you know, they're doing

Page 48

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (45 - 48)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

---

Page 49

1  the -- the fence walk and, you know, like, down
2  there, where it says "the razor wire intact," you
3  know, we would report that to them.  And, you know,
4  all of it, we didn't report to them, but some of
5  the real serious stuff on here, you know, we would
6  have to report to them.
7  Q.      If cell block doors -- or excuse me --
8  strike that.
9          If cell door locks were broken or not
10  working, would you take steps to move the inmates
11  out of that cell?
12  A.      Yeah, if they wasn't working, as soon as
13  we found out they wasn't working, we put the inmate
14  in a different cell until -- we didn't use that
15  cell until they got fixed.
16  Q.      All right.  I'm going to stop sharing this
17  exhibit.  I'm going to share what I'll mark as
18  Exhibit 4.
19          (Plaintiff's Exhibit Number 4 was marked
20          for identification.)
21  Q.      And this is ADOC031244 to ADOC031245.
22  Again, it's marked as highly confidential.  And
23  we'll share it with you now.
24          MR. HILL:  Megan, just so you know, from
25  time to time over the last minute or two, you've

Page 50

1  been freezing up a little bit.  So if there's a
2  communication problem, just be aware of that.
3          MS. PIERCE:  Okay.  Thank you for letting
4  me know.  If that causes any difficulty in hearing
5  me, please let me know, and I'll repeat what I'm
6  saying.  Thanks for that.
7  Q.      (By Ms. Pierce) Okay.  Can you see this
8  now, Mr. Ragsdale?
9  A.      Yes.
10  Q.      Great.  So this is an email on
11  September 24, 2018, from Bruce Hodge to you, Ms.
12  Gordy and Ms. Graham, and Mr. Malone; is that
13  correct?
14  A.      That's correct.
15  Q.      And this, again, is an institution
16  security inspection, like we just looked at,
17  correct?
18  A.      Correct.
19  Q.      Okay.  So this one has been filled out not
20  by hand but on a computer; is that correct?
21  A.      Correct.
22  Q.      Okay.  Let's move down to the bottom.  So
23  there are several places where there are Xs marked
24  in each column -- yes, no, and not applicable.
25          So for example, security screens intact,

Page 51

1  do you see that?
2  A.      Security -- let me see -- yes.  Uh-huh.  I
3  see it.
4  Q.      So what do those -- what do those Xs mean?
5  A.      I don't have no idea what they did there.
6  Q.      Okay.  Have you ever filled out a report
7  using Xs like that?
8  A.      Nope, I hadn't.
9  Q.      I'm going to go down.
10          Do you see -- the signature here is David
11  Bivins.
12          Do you recognize that name?
13  A.      Yes.
14  Q.      And what position did David Bivins have at
15  St. Clair?
16  A.      David, he was an officer.
17  Q.      Okay.  So if an officer filled out --
18  strike that.
19          Was it permissible to have an officer fill
20  out one of those inspection reports?
21  A.      They could fill out one of these.
22  Q.      Would somebody -- a supervisor need to
23  review it?
24  A.      Yes.  Which he would -- he would have had
25  to tell the supervisor, you know, what all this

Page 52

1  was, but I still don't understand all the Xs.
2  Q.      Okay.  I'm going to stop sharing
3  Exhibit 4.  I'm going to share what I will mark as
4  Exhibit 6 -- I'm sorry -- exhibit -- this is 33626
5  -- ADOC33626 to 33634.
6          (Plaintiff's Exhibit Number 5 was marked
7          for identification.)
8  Q.      And this, again, is marked as highly
9  confidential.  And this is an email from Anthony
10  Brooks to mate11@bellsouth.net?
11          You are not on this email, but the
12  attachment says "a copy of maintenance work
13  orders"; is that correct?
14  A.      Yes.
15  Q.      All right.  And I'm going to scroll down
16  to the attachment, and it says, "maintenance work
17  orders."
18          Have you seen this document before or one
19  like it?
20  A.      No, I have never seen one of them.
21  Q.      Okay.  Was it your understanding that
22  during the time period of -- of 2018 and early
23  2019, that there were problems with having the
24  cameras functioning in the dorm rooms at St. Clair?
25          MR. CRANFORD:  Object to the form.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13 (49 - 52)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

| | |
|---|---|
| 1  A.      I know what we -- we always had, you know,<br>2  some problems with the cameras working because the<br>3  inmates would cover them.<br>4  Q.      I'm going to stop sharing Exhibit 5.<br>5        If cameras were not working on a shift<br>6  where you were shift commander, would you report<br>7  that to anyone?<br>8  A.      Yes.  We had -- we would have to put a<br>9  work order in, and we would have to report it up to<br>10  somebody up higher than us, a captain or a warden.<br>11  Q.      Were there periods in 2018 and early 2019<br>12  when there were no working cameras in P/Q-blocks?<br>13  A.      I'm not sure about that.  I know we --<br>14  we've got -- we had cameras -- we got cameras<br>15  brought for a little while later that, you know,<br>16  you could see in there because the inmates couldn't<br>17  get to them.<br>18  Q.      And when was that?<br>19  A.      I'm not sure exactly when they was put<br>20  in --<br>21  Q.      So it sounds like you --<br>22  A.      -- but we -- we had new cameras put in all<br>23  the way through.<br>24  Q.      Sorry.  You said you had new cameras put<br>25  all the way through the facility?<br>Page 53 | 1  A.      Yeah.  Everybody was.<br>2        MS. PIERCE:  Is it all right with everyone<br>3  if we take a ten-minute break?<br>4        MR. HILL:  Sure.<br>5        MS. PIERCE:  Let's come back at 10:30<br>6  Central.<br>7        (A recess was taken.)<br>8  Q.      (By Ms. Pierce) Mr. Ragsdale, I'm going to<br>9  share -- let me make sure I'm on the right exhibit<br>10  -- I'll mark as Exhibit 6 -- with you.  This is,<br>11  again, marked -- not marked as confidential --<br>12  sorry.  And it is ADOC000472 to ADOC000473.<br>13        (Plaintiff's Exhibit Number 6 was marked<br>14        for identification.)<br>15  Q.      And the first page of this exhibit, can<br>16  you see that okay, Mr. Ragsdale?<br>17  A.      Yes.<br>18  Q.      Great.  So this is a duty officer report<br>19  written by you relating to an attack on Steven<br>20  Mullins; is that correct?<br>21  A.      Correct.<br>22  Q.      Okay.  When is the last time you saw this<br>23  document?<br>24  A.      The last time I saw it?<br>25  Q.      Yes.<br>Page 55 |
| 1        Yeah.  Uh-huh.<br>2  Q.      And prior to that, were there concerns<br>3  about having cameras that did not work at the<br>4  facility?<br>5  A.      Yes.  Uh-huh.<br>6  Q.      And what were those concerns?<br>7  A.      Well, you -- which we had the cube<br>8  officers, but, you know, the cube officers had to<br>9  watch from two sides.  You know, they had two --<br>10  you had two cubes on each side of you, and, you<br>11  know, their cameras weren't working in there, you<br>12  know, you can't see what all's really going on.<br>13  Q.      Okay.  So there were concerns that because<br>14  cube officers had to watch both sides of the cell<br>15  block, if the cameras weren't working, they<br>16  couldn't see everything that was going on in the<br>17  cell block?<br>18  A.      Yes.<br>19  Q.      Did you ever discuss that concern with<br>20  anyone?<br>21  A.      We talked about it, but it just -- you<br>22  know, I said they eventually got the new ones, but<br>23  it, you know...<br>24  Q.      Was warden -- were the wardens aware of<br>25  this concern?<br>Page 54 | 1  A.      I -- I'm not -- I don't even know if I've<br>2  seen it after the -- after I wrote it.<br>3  Q.      Okay.  So take a quick look at what's<br>4  written in the brief narrative section, and let me<br>5  know when you're done.<br>6  A.      I'm done.<br>7  Q.      Okay.  You completed this form, correct?<br>8  A.      Correct.<br>9  Q.      And these date and time stamps here, is<br>10  that the -- the date and time stamp that you<br>11  completed it?<br>12  A.      Yes.  Uh-huh.<br>13  Q.      And by date and time stamp, I'm referring<br>14  to those -- that last line of the brief narrative<br>15  section at 2/25?<br>16  A.      Yes.<br>17  Q.      Okay.  Yeah.  It says, "2/25/2019, 9:43<br>18  a.m. by William Ragsdale."<br>19        That means you completed this at 9:43 a.m.<br>20  on February 25, 2019, correct?<br>21  A.      Yes.<br>22  Q.      Do you -- as you sit here today, do you<br>23  have any independent recollection of -- of filling<br>24  out this form?<br>25  A.      Not really.<br>Page 56 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14 (53 - 56)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1 Q.    When you say "not really," what -- what do
2 you recall about completing this?
3 **A.    I don't really remember just this one**
4 **because, like I said, we had so many of them.**
5 Q.    Okay.  So fair to say you recall filling
6 out duty officer reports generally, but you don't
7 recall filling out this specific one about what
8 happened to Mr. Mullins, correct?
9 **A.    No.**
10         MR. HILL:  No, you don't remember --
11         THE WITNESS:  No.
12         MR. HILL:  -- filling out this form?  Or,
13 no, you don't remember filling them out generally?
14         THE WITNESS:  No, I don't remember filling
15 out this form on him.  I don't remember the
16 incident, but I filled it out.  But I don't -- I
17 just don't remember it because, you know, like I
18 said, we filled out so many of them.
19         MS. PIERCE:  Okay.  Thanks for the
20 clarification.
21         MR. HILL:  Yeah.  Sorry to jump in on
22 that.  It was just --
23         MS. PIERCE:  Well, that's -- that's fine.
24 I was going to ask the same thing.  So no -- no
25 problem.  Thank you.
Page 57

1 Q.    (By Ms. Pierce) Let's scroll down to the
2 second page, which is, I believe, the incident
3 report relating to the same incident; is that
4 correct?
5 **A.    That's correct.**
6 Q.    Okay.  And do you recall filling out this
7 form related to this specific incident?
8 **A.    No, I really -- I don't even remember the**
9 **incident.**
10 Q.    Okay.  And here, again, at the bottom of
11 the narrative summary, there are dates and times --
12 3/6/2019 at 5:45 a.m., 3/6/2019 at 6:05 a.m., and
13 3/8/2019 at 10:07 a.m.
14         Do you see that?
15 **A.    Yes.**
16 Q.    And what are -- those times and dates
17 reflect?
18 **A.    I'm not really sure --**
19 Q.    Do those --
20 **A.    -- because --**
21 Q.    Go ahead.
22 **A.    That was -- that was in March.**
23 Q.    So is it possible that you completed this
24 form sometime in March, March 6th?
25 **A.    No.  I -- it would have been completed the**
Page 58

1 **-- February the 25th, when I wrote it.**
2 Q.    How do you know that you wrote it
3 February 25th?
4 **A.    Up here, on the narrative's summary.  I**
5 **don't even have any idea what these dates and times**
6 **would be on the bottom there in the -- in the blue.**
7 Q.    Is it possible -- is it possible that you
8 filled out the duty officer report on February 25th
9 and didn't fill out the incident report until
10 March 6th?
11 **A.    No.**
12 Q.    How do you know that?
13 **A.    They would have been -- they would have**
14 **been both done at the same time, pretty much the**
15 **same time.**
16 Q.    So as you sit here today --
17 **A.    They took --**
18 Q.    -- you have no idea what these -- oh, go
19 ahead.
20 **A.    Because we did all of it at one time.  We**
21 **had all of it at one time.**
22 Q.    When you say "all of it," do you mean the
23 duty officer report --
24 **A.    The duty officer report, yeah, and the**
25 **incident report.**
Page 59

1 Q.    And, again, Mr. Ragsdale, please just try
2 to wait until I'm done and -- I know we're talking
3 over each other, I think.
4 **A.    Uh-huh.  Okay.**
5 Q.    Okay.  So what's the difference of what
6 information you put in your duty officer report
7 versus your incident report?
8 **A.    Well, usually, the duty officer is just a**
9 **-- a shorter report.  You know, it don't -- won't**
10 **have everything in it because it -- it -- we have**
11 **to send it -- like, the commissioner and everybody**
12 **gets it.  So it's different than -- an incident**
13 **report, you know, they can go in -- I'm -- I'm sure**
14 **they got access to go into it and look at it, but**
15 **they -- or we will have to send the duty officer**
16 **report out.  It goes, like I said, to the**
17 **commissioners and associate commissioners and all**
18 **of them.**
19 Q.    Okay.  So you -- you don't send the
20 incident report to everybody?
21 **A.    The incident -- the incident, it stays in**
22 **the account.**
23 Q.    And am I understanding your testimony
24 correctly that the incident report should include a
25 more full explanation of everything that happened?
Page 60

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15 (57 - 60)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1   A.      Yes.
2   Q.      Okay.  So let's focus on your -- your
3   incident report, then.
4           So based on what you've written here, on
5   February 25, 2019, at about 6:01 a.m., Officer
6   Dylan Tucker escorted inmate Steven Mullins from
7   Q-block to the breezeway; is that correct?
8   A.      Correct.
9   Q.      And Officer Tucker told you, Lieutenant
10  William Ragsdale, that Inmate Mullins alleged he
11  had been assaulted; is that correct?
12  A.      That's correct.
13  Q.      Inmate Mullins was escorted to the
14  infirmary for a body chart?
15  A.      Correct.
16  Q.      The nurse completed an examination of
17  Mr. Mullins, and he was found to have an abrasion
18  on the left side of his head; is that correct?
19  A.      Correct.
20  Q.      Okay.  And it says that you, Lieutenant
21  Ragsdale, questioned Inmate Mullins about the
22  incident; is that correct?
23  A.      Correct.
24  Q.      As you sit here today, do you recall
25  questioning him about the incident?

Page 61

1   A.      Not really.  Because they -- they -- you
2   know, they're not going to tell you nothing, you
3   know, and I'm sure he -- he probably knew who did
4   it, but he wasn't going to say.  So, you know,
5   you're not really going to get nothing out of them.
6   Q.      Okay.  So am I understanding you correctly
7   that it wasn't your practice to really question the
8   inmates because they wouldn't tell you much
9   information?
10  A.      Yeah, we questioned them.  You know, we
11  had to question them to try to find out.
12  Q.      What information would you try to find
13  out?
14  A.      Well, first off, we tried to find out
15  where it happened, what -- you know, who was
16  involved in it, what it was over.  And like I said,
17  most of them is not going to tell you anything.
18  You know, they go back out there, and, you know,
19  then they're going to be afraid.
20  Q.      I'm sorry.  They're going to be afraid?
21  Is that what you said?
22  A.      Yeah, they're -- yeah, they're not going
23  to tell on each other.  You know, you're just about
24  always going to get an "I don't know who it was."
25  Q.      Okay.  So it's your understanding, based

Page 62

1   on your experience at St. Clair, that inmates were
2   afraid to tell when somebody had attacked them
3   because they were afraid of retaliation; is that
4   right?
5   A.      Yes.
6           MR. HILL:  Object to the form.
7   Q.      Did you take any steps while you were at
8   St. Clair to make sure that inmates were protected
9   from retaliation after they reported an incident
10  of violence?
11  A.      Well, we just kept a check on them for a
12  while.  And we always usually put them in another
13  dorm away, you know, other than the dorm they was
14  in.
15  Q.      And what would you do to check on them?
16  How would you make sure that they were checked on?
17  A.      I was -- might go by.  And some of the
18  officers, we'd go by and just talk to them.
19  Q.      And how would you know who needed to be
20  checked on?
21  A.      Well, the one did -- like, Mullins there,
22  we would have checked him.  You know, we couldn't
23  have checked on the other one.  We didn't know who
24  he was.
25  Q.      You wouldn't have checked on who?

Page 63

1   A.      The other one that hit him, that he
2   wouldn't tell who it was.
3   Q.      When you questioned an inmate, would you
4   try to find out exactly what happened during the
5   physical altercation?
6   A.      Yes.
7   Q.      Would you ask questions to determine
8   whether or not it was a PREA incident?
9   A.      If -- you know, if we thought it might be,
10  we might ask questions, but...
11  Q.      The only thing you have written here about
12  what happened during the inmate -- or during the
13  incident is that Inmate Mullins stated that he
14  could not identify who assaulted him because it was
15  too dark in the cell.
16          Did I read that correctly?
17  A.      Let me see --
18          MR. HILL:  You want to move this closer to
19  you?
20          THE WITNESS:  I was trying to find where
21  it was.  Okay.  Yeah, I see where.
22          Yeah.  Yeah, that's what it says, but it
23  wouldn't have been too dark in that cell to tell.
24  Q.      (By Ms. Pierce) Based on what you have
25  written here, you understand that Inmate Mullins

Page 64

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (61 - 64)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  was attacked in his cell, correct?
2  A.      Yes.
3  Q.      Okay.  If you -- if you had obtained any
4  additional information about what happened during
5  the attack, who committed it, would you have
6  included it here in the incident report?
7  A.      **Yes, if we -- yeah, if anything else, we**
8  **would -- well, I -- you know, it -- it would have**
9  **been with this report, but we would have probably**
10 **just done a different incident too.**
11 Q.      What do you mean by that?
12 A.      **If -- you know, if we found out something**
13 **later, we would, you know, just added it on to**
14 **this, but...**
15 Q.      And if you had found out more either from
16 Officer Tucker or Inmate Mullins himself during
17 this period of questioning referenced here, would
18 you have included that in the incident report?
19 A.      **Yes, it would have been in this incident**
20 **report.**
21 Q.      Here, you have Steven Mullins -- strike
22 that.
23         The next line says that Inmate Mullins
24 stated to Lieutenant Ragsdale that he wanted to be
25 in a cell by himself.
                                              Page 65

1         Did I read that correctly?
2  A.      Yes.
3  Q.      And Inmate Mullins was moved to P-dorm,
4  bed P36-1A.  No further action taken at this time.
5         Did I read that correctly?
6  A.      Yes.
7  Q.      Why didn't you take any steps to
8  investigate who Mr. Mullins's attacker was?
9  A.      **Well, if -- if anybody was going to tell**
10 **us, it would have been him.  There wasn't nobody**
11 **else going to say nothing.**
12 Q.      Well, you said he was --
13 A.      **They don't tell on each other, you know,**
14 **if -- if --**
15 Q.      I'm sorry.
16 A.      Go ahead.  Go ahead.
17 Q.      No.  Go ahead, please.
18 A.      **No.  Because they're not going to tell on**
19 **each other.  If the one who gets assaulted is not**
20 **going to tell you anything, you're not going to**
21 **find out nothing about it.**
22 Q.      Mr. Mullins said that he was attacked in
23 his cell, correct?
24 A.      **Correct.**
25 Q.      You could have taken steps to figure out
                                              Page 66

1  who else was assigned to his cell or who his
2  cellmate was, correct?
3  A.      **Yeah.  But, you know, that's not his cell.**
4  **See, they're not locked up in their cells.  You**
5  **know, he -- he could have been in there by himself.**
6  Q.      Well, he was attacked in his cell.
7         So he wasn't in there by himself, correct?
8  A.      **No.  Whoever attacked him probably went in**
9  **there.**
10 Q.      Okay.  Did you take any steps to determine
11 whether he was in a cell by himself or whether
12 anyone else was assigned to or living in that cell?
13         MR. HILL:  Object to the form.
14 A.      **No.  I don't know if he was in -- we would**
15 **have knew if he was in there -- in the cell, if he**
16 **had a cell partner or whatever, but, you know, we**
17 **don't put it in there.**
18 Q.      You don't put it in there?
19 A.      **But 6:01 a.m., you know, that's when --**
20 **that's usually during breakfast, when we're serving**
21 **breakfast.  So...**
22 Q.      Did you look at any classification or bed
23 assignment documents to determine who else was
24 assigned to Mr. Mullins's cell?
25 A.      **No, I don't recall it.**
                                              Page 67

1         Did you speak with Officer Tucker or
2  anyone else who was assigned to Q-block during that
3  shift to determine who else may have been in
4  Mr. Mullins's cell?
5  A.      **Officer Tucker, I think.  He was probably**
6  **the rover.  So the Q-dorm -- I -- but I know the**
7  **one that was in the cube, I don't -- they didn't**
8  **see nothing.  So he just come up there to the**
9  **window and, you know, let them know.  And then**
10 **Officer Tucker -- they would have called Officer**
11 **Tucker because he would have been the yard rover,**
12 **and he escorted him up to the shift office.**
13 Q.      How do you know the cube officer didn't
14 see anything?
15 A.      **Because he would have -- if he had seen**
16 **who done it, he would have told Officer Tucker.**
17 Q.      Is there any occasion that Officer Tucker
18 spoke to the cube officer?
19 A.      **Well, I'm sure he did because, you know,**
20 **cube officers is the one that had called him.  And,**
21 **you know, he would have told him whatever -- which**
22 **Mullins didn't say.  He wouldn't tell so I don't**
23 **know.  There's a good possibility he couldn't have**
24 **talked to him, he just escorted him up there.**
25 Q.      Okay.  Fair to say you don't know one way
                                              Page 68

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (65 - 68)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  or the other --
2  A.     No, I don't.
3  Q.     Hold on.  Let me get my question out so we
4  have a clean record.
5        So fair to say you don't know one way or
6  the other whether Officer Tucker or anyone else
7  spoke to the cube officer to see if they could
8  identify who attacked Mr. Mullins or who was in
9  Mr. Mullins's cell?
10 A.     No.  Because like I said, if the cube
11 officer were to have told Officer Tucker, Officer
12 Tucker would have -- he would have told me if they
13 seen somebody else, and the cube officer would have
14 told it.
15 Q.     But you don't know one way or the other
16 whether or not the cube officer and Officer Tucker
17 discussed that, correct?
18 A.     No, I don't.
19 Q.     Okay.  And based on this incident report,
20 you did not take any steps to figure out, based on
21 records or speaking with anyone, who was in
22 Mr. Mullins's cell, correct?
23 A.     Correct.
24 Q.     And you had -- as the lieutenant shift
25 manager, you had access to records that would have
                                              Page 69

1  identified bed assignments, correct?
2  A.     Yes, we had a bed count roster.
3  Q.     Why did you decide to place Mr. Mullins in
4  the P-dorm?
5  A.     I think, at the time, P -- I can't
6  remember if it was then or not, but P-dorm was a
7  dorm where we had -- where we just kept one inmate
8  in a cell.
9  Q.     Okay.  At this time in early 2019, was
10 there a lot of movement of inmates between the P
11 and Q-blocks?
12 A.     Well, there was probably some movement
13 because -- pretty good movement because, you know,
14 P and Q was -- well, at one time, they was our two
15 worst dorms.
16 Q.     What do you mean they were your two worst
17 dorms?
18 A.     Yeah, it just -- there was once -- before
19 they singled it out in, like, P and Q, they was
20 where all the -- pretty much most of the incidents
21 happened, and then they changed it.  And N/O was
22 the worst one after we -- we had a lot of incidents
23 in N/O.  But about that -- around that time, P was
24 -- it was pretty quiet.
25 Q.     And what did they change to make the P and
                                              Page 70

1  Q-blocks better?
2  A.     Well, I think it was P, they -- we put all
3  of the older inmates in there.
4  Q.     And at what time did that start that you
5  put all of the older inmates in P?
6  A.     I'm not sure what time it was.
7  Q.     So you're not sure whether that was in
8  place at this time in -- in February 2019; is that
9  correct?
10 A.     No, I'm not sure about that.
11 Q.     Okay.  So it's possible that the P and
12 Q-blocks were still some of your worst dorms at
13 this time in February of 2019; is that correct?
14 A.     It could have -- could have been.  I --
15 I'm not sure.
16 Q.     And did you know what was causing the P
17 and Q-blocks to be some of the worst dorms?
18 A.     Well, that used to be where all the
19 younger inmates was at.
20 Q.     Any other thing that you were aware of
21 that was causing the P and Q-blocks to be
22 problematic?
23 A.     No.  It just -- like I said, it's most of
24 your young ones, and that's the ones you had a lot
25 of problems out of.
                                              Page 71

1  Q.     Did all of the supervisory staff,
2  including the captains and the wardens, understand
3  that the P and Q-blocks had -- were problematic and
4  had the most incidents?
5  A.     Yes, they would have knew too.
6  Q.     And besides eventually switching the
7  P-block to be mostly -- mostly older inmates, was
8  any -- were any other steps taken while you were at
9  St. Clair to address the number of incidents that
10 were happening in the P/Q-blocks?
11 A.     Well, that was one reason they tried to
12 move inmates around.  Like I said, we put the older
13 ones in there and...
14 Q.     Anything else that was done that you can
15 recall?
16 A.     No.
17 Q.     Did you have any concern sending
18 Mr. Mullins to P-block that he would not be safely
19 separated from the person who had attacked him in
20 Q-block?
21 A.     Well, with -- let's see -- no.  Because,
22 you know, we have -- they're split off from each
23 other.
24 Q.     What do you mean when you say they're
25 split off from each other?
                                              Page 72

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  A.       Well, we have our cube, and you have a
2  hallway, and P's on one side, and Q's on the other
3  side.
4  Q.       Is there a closed door between P and Q?
5  A.       There's a -- there's a door on both sides
6  right there in front of the cube.  You have a door.
7  There's a locked door that goes into P and then a
8  locked door on the other side that goes into Q.
9  Q.       And do you know whether, at this time in
10 2019 those doors were kept locked at all times?
11 A.       They pretty much was kept all the time
12 locked.
13 Q.       Were you aware of any issue of
14 uncontrolled movement between the P and Q-blocks?
15 A.       No.
16 Q.       Was there a reason that you didn't move
17 Mr. Mullins at this time into restrictive housing
18 or some other type of protective housing?
19 A.       Well, the -- all we -- we could have done
20 was put him in C, and then, you know, you --
21 because we just pretty much put them where we're
22 told to put them because we have to -- we don't
23 make -- really make the decisions.  We have to call
24 and report it to the on-call, and they make the
25 decisions of what we do with them.

Page 73

1  Q.       Okay.  So this would not have been your
2  decision to move Mr. Mullins to the P-dorm?
3  A.       No.
4  Q.       Whose decision would it have been?
5  A.       It would have been whoever the on-call was
6  that week.  They pretty much tell us, you know,
7  whether to put them in Seg or put them back in,
8  send them back to population or...
9  Q.       If an inmate had been violently attacked
10 in his cell and couldn't identify his attacker,
11 would it have been appropriate to put him in
12 segregation until his attacker could be identified?
13 A.       Yeah, he could have been put in Seg, but,
14 you know, because Seg -- we never did that.  That's
15 why we didn't put a lot of them in Seg, because,
16 you know, when -- I tell you, when you turn one of
17 them out, you knew something was going to happen to
18 them within a couple of days because all the other
19 inmates was thinking he done told something, the
20 way he got out.  So we -- you know, we tried not to
21 put them in Seg if we didn't have to.  We just put
22 them in a different dorm.
23 Q.       What do you mean when they got released
24 out of Seg, something would happen?  Can you
25 explain that a little bit more?

Page 74

1  A.       Well, while I was there, they'd turn them
2  out, and in two and three days, they done got
3  stabbed again or beat up, and you just have to put
4  them right back in there.
5  Q.       And when you say "they," you mean people
6  who had reported that they were victims of
7  violence; is that correct?
8       MR. CRANFORD:  Object to the form.
9  A.       Ask that question again.
10 Q.       Yeah.  So you were saying that when you
11 turned them out, you know, they would be stabbed
12 within a few days.  I want to understand who "they"
13 is referring to?
14 A.       The inmate we turned out.
15 A.       And --
16 A.       Because the other inmate is -- you know,
17 they would think he had done told something to get
18 out.  And I don't know.  We've had several of them
19 we'd turn out, and that's what happened.  So
20 they...
21 Q.       And are you referring to anyone who was
22 released from segregation or specifically people
23 that had been --
24 A.       Not a lot of them, but a big majority of
25 them.  It depends on -- because most of them that

Page 75

1  went to Seg, had done run up a debt and couldn't
2  pay it, and that's -- they went over there for
3  protection.
4  Q.       Okay.  I want to make sure that I
5  understand your testimony correctly.
6       So when you say that you try not to put
7  people in segregation because, when you turn them
8  out, they were often stabbed within a few days of
9  being turned out, are you referring to anyone who
10 was placed in segregation or people who were placed
11 in segregation for their protection?
12 A.       Well, it -- you know, it depends on what
13 they went to Seg for.  A lot of it depended on
14 that.  Like I said, if they had run up a bill out
15 there and couldn't pay it or something, that's --
16 you know, that's -- because the one -- when you
17 turned them out, you know, the other inmates was
18 going to get them.
19 Q.       And why was that?
20 A.       Why was it?  Because they'd done beat them
21 out of their money.
22 Q.       And if someone reported to you that they
23 were a victim of violence, unlike Mr. Mullins did
24 here, did you have concerns about placing them in
25 segregation?

Page 76

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19 (73 - 76)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1 A.    Not if -- you know, if we was told to put
2 them in there, we would have put them in there --
3 Q.    Did you have different --
4 A.    -- but he'd --
5 Q.    Okay. Go ahead.
6 A.    But normally, we just put them in a
7 different dorm.
8 Q.    And why didn't you put someone like
9 Mr. Mullins in segregation for their protection?
10        MR. HILL: Object to the form.
11        You can answer.
12 A.    I don't know. A lot -- a lot of times,
13 they just ask -- they could ask. You know, they
14 just put in another dorm.
15 Q.    Did you take any steps after this to make
16 sure that Mr. Ragsdale [sic] felt safe later in the
17 day? I mean, excuse me -- strike that.
18        Did you take any steps after -- after this
19 bed assignment to make sure that Mr. Mullins felt
20 safe later in the day?
21 A.    Yes. We talked to him.
22 Q.    And how do you talk to them?
23 A.    We would have talked to him, and we would
24 -- then we would, you know, inform the cube officer
25 to keep an eye on him too.
Page 77

1 Q.    And would you have reported that? If you
2 had done that, would you have reported that in a
3 duty or incident report or somewhere else?
4 A.    No. We didn't record that.
5 Q.    How do you know that you did that in this
6 case?
7 A.    Well, we would inform -- I know we would
8 inform the cube officer. The cube officer would
9 have been informed to check him.
10 Q.    Okay. And how do you know that?
11 A.    Well, he would have -- he would have put
12 it in his -- should have put it in his log --
13 Q.    Okay. So the cube officer --
14 A.    -- because, yeah, the cube officer has to
15 keep a log.
16 Q.    Okay. So if you told the cube officer or
17 someone else told the cube officer to keep an eye
18 out for Mr. Mullins, that should have been put in
19 the log, correct?
20 A.    Correct.
21 Q.    And if you went to check on Mr. Mullins in
22 the P-block, that also would have been put in the
23 cube officer's log, correct?
24 A.    That would have been put in too.
25 Q.    Did you ask Mr. Mullins whether or not he
Page 78

1 wanted to be placed in segregation?
2 A.    I'm not sure because -- you know, I don't
3 remember if I asked him or not because I really
4 don't even remember a whole lot about the event
5 report and all of the incident but -- because most
6 of them don't want to go to Seg.
7 Q.    Why is that?
8 A.    Well, in Seg, you're locked up in a cell,
9 a little old cell all the time, and they don't want
10 that.
11 Q.    I'll represent to you that Mr. Mullins
12 later alleged that his cellmate had a knife during
13 this incident.
14        Did you ask Mr. Mullins any questions to
15 determine whether or not his cellmate had a weapon?
16 A.    I don't even remember -- I'm not sure
17 about that. I didn't know a -- I don't even
18 remember nothing about a weapon --
19 Q.    What would be --
20 A.    -- with a cellmate --
21 Q.    I'm sorry. Go ahead.
22 A.    I don't even remember nothing about his --
23 his cellmate -- saying anything about a cellmate
24 had a weapon.
25 Q.    Did you take any steps to determine
Page 79

1 whether a weapon was involved in this incident?
2 A.    Well, just what Inmate Mullins would tell
3 us.
4 Q.    Here, you don't really go into any details
5 about what happened to Mr. Mullins, correct?
6 A.    Not really. He pretty much just said he
7 -- he was assaulted, you know --
8 Q.    But you don't remember --
9 A.    -- but I don't remember him saying nothing
10 about no weapon.
11 Q.    To be clear, you don't remember speaking
12 to Mr. Mullins, correct?
13 A.    Not really, not a...
14 Q.    As you sit here today, do you remember
15 anything about Mr. Mullins or this conversation
16 with Mr. Mullins?
17 A.    I can't remember whether, you know, he
18 asked to go to Seg, you know, the question you
19 asked about. But I don't -- like I said, he
20 wouldn't have wanted to go to Seg anyway.
21 Q.    So I want to make sure that I understand
22 your -- your memory of this event.
23        As you sit here today, do you have any
24 memory of Mr. Mullins or your conversation with
25 Mr. Mullins?
Page 80

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20 (77 - 80)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  A.      No, not really.  Not a lot, you know, I...
2  Q.      When you say "not a lot" --
3  A.      Because like I said, we had so many -- we
4  wrote so many of these incident reports, it's hard
5  to remember all of this stuff.
6  Q.      And I want to make sure that the record is
7  very clear on what you do remember about this
8  incident and what you don't.
9         So please tell me everything that you do
10  remember, as you sit here today, about Mr. Mullins
11  and speaking with Mr. Mullins.
12         MR. CRANFORD:  Object to the form.
13         MR. HILL:  Same objection.
14  A.      I don't know.  Like I said, I just don't
15  really know a whole lot.  I don't remember a whole
16  lot about it.  I just...
17  Q.      When you say you don't remember a whole
18  lot, do you remember anything about this
19  conversation or this incident with Mr. Mullins
20  outside of what's written in the report?
21  A.      Just -- it would be just what was written
22  in the report, but --
23  Q.      And do you have --
24  A.      -- and a lot of it -- a lot of it, I don't
25  even remember because...
Page 81

1  any details about his attack other than that it
2  occurred in his cell, correct?
3  A.      Ask that question again.  I didn't catch
4  the first part of it.
5  Q.      You did not get any details about the
6  attack Mr. Mullins suffered other than that he was
7  attacked in his cell, correct?
8  A.      Yeah, just what he told us.
9  Q.      It would have been important to get as
10  much detail as possible about the attack, correct?
11  A.      Yes --
12  Q.      And it would have --
13  A.      -- and we probably asked him.  You know, I
14  probably asked him, but like I said, he wouldn't
15  tell nothing.
16  Q.      Okay.  You say you probably asked him, but
17  as you sit here today, you don't have a
18  recollection of what you actually asked him,
19  correct?
20  A.      No, I don't remember everything I asked
21  him.
22  Q.      Okay.  Do you remember anything that you
23  asked him?
24  A.      Well, I would have asked him who attacked
25  him and, you know, but...
Page 83

1  Q.      Without relying on the report as you sit
2  here today, do you have any independent
3  recollection of Mr. Mullins or this incident?
4  A.      I -- I just don't remember -- really
5  remember the report either.  I don't remember the
6  incident or the report but...
7  Q.      Okay.  I just want to make sure to
8  understand your testimony.
9         So you do not have any independent
10  recollection of any conversation that you had with
11  Mr. Mullins on February 25, 2019, correct?
12  A.      Correct.
13  Q.      Okay.  So it's possible that Mr. Mullins
14  told you more about the attack that he suffered and
15  what happened and you did not include it in this
16  report, correct?
17  A.      No.  What he -- what he would have told
18  me, I would have put it in the report.
19  Q.      Okay.  And you do not recall, as you sit
20  here today, exactly what Mr. Mullins told you,
21  correct?
22  A.      No, I don't recall exactly what he told
23  me, but what he told me, I would have put in the
24  report.
25  Q.      And so you did not secure from Mr. Mullins
Page 82

1  Q.      So I want to be clear about my question.
2  I'm not asking you what you believe you would have
3  done.  I want to know exactly what you do recall
4  asking him, as you sit here today, without relying
5  on this report.
6         MR. CRANFORD:  Object to the form.
7  A.      Oh, I don't know -- I don't know what all
8  I asked him.  You know, I'd have just tried to find
9  out what happened, you know, what all happened, you
10  know --
11  Q.      And your testimony about what you --
12  sorry.  Go ahead.
13  A.      We try to get everything we can from them,
14  you know, but -- you know, whether they cooperate
15  with you or not.
16         MR. HILL:  Just tell her what you know.
17  Don't speculate.
18         THE WITNESS:  Yeah.
19         MR. HILL:  If you know, you know.
20         THE WITNESS:  I don't -- I don't know
21  really.
22  Q.      (By Ms. Pierce) Okay.  So your testimony
23  is based on what your normal practice was, but you
24  do not recall what you did in this conversation
25  with Mr. Mullins, correct?
Page 84

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21 (81 - 84)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

| | |
|---|---|
| 1  A.      Correct. | 1  document or one like it before? |
| 2  Q.      I'm going to stop sharing this report. | 2  A.      No, I hadn't seen one of these. |
| 3  I'll share what is marked as Exhibit 7.  One | 3  Q.      Okay.  So I will represent to you that on |
| 4  moment.  This is ADOC000615 to ADOC000620. | 4  February 26th, the record shows that Mr. Mullins |
| 5              (Plaintiff's Exhibit Number 7 was marked | 5  was stabbed in the L-block as the block was being |
| 6              for identification.) | 6  released for chow.  Okay? |
| 7  Q.      This is not marked as confidential. | 7  A.      Yes. |
| 8      All right.  Can you see that, | 8  Q.      Do you recall anything about that incident |
| 9  Mr. Ragsdale? | 9  or learning about that incident? |
| 10  A.      I can see it. | 10  A.      I just heard about it.  You know, I |
| 11  Q.      Okay.  Do you recognize this document or | 11  don't -- |
| 12  documents like it? | 12  Q.      When did you hear about it? |
| 13  A.      Okay.  That's the inmate movement history. | 13  A.      Well, I'd have been informed of it when I |
| 14  Q.      For Mr. Mullins, correct? | 14  come on duty for my shift. |
| 15  A.      Yes. | 15  Q.      Okay.  Were you notified that Mr. Mullins |
| 16  Q.      And I want to direct your attention to the | 16  died as a result of his injuries? |
| 17  sixth entry on this form for February 25th, 2019. | 17  A.      Was I notified? |
| 18      It says, "Moved to bed -- bed P36-1A at | 18  Q.      Yes. |
| 19  8:53 until 2/25/2019, SL:  5, Custody:  Medium, and | 19  A.      Yes.  I -- when I come in on my shift -- I |
| 20  user name is William Ragsdale; is that correct? | 20  think I worked the day after he got killed, and |
| 21  A.      Yes.  Yes. | 21  they told me about it. |
| 22  Q.      Did you fill out this entry? | 22  Q.      Okay.  Okay.  I want to turn your |
| 23  A.      No.  I'm not sure who fills this report | 23  attention down to the second-to-last paragraph on |
| 24  out. | 24  this page.  The last sentence of that paragraph. |
| 25  Q.      Okay.  Do you know why your name is | 25  SA Casey also noticed -- noted that prison staff |
| Page 85 | Page 87 |
| 1  reflected as the user name? | 1  did not locate or recover the weapon used in the |
| 2  A.      Oh, because I was the one that made the | 2  assault. |
| 3  bed move. | 3      Did I read that correctly? |
| 4  Q.      Okay.  So you were responsible for making | 4  A.      Yes.  Uh-huh. |
| 5  the bed move to P-36? | 5  Q.      While you were at St. Clair, was that |
| 6  A.      Yes. | 6  common that after a violent incident involving a |
| 7  Q.      If anyone signed off on that move, where | 7  weapon, that the weapon would not be located or |
| 8  would it be reflected? | 8  found? |
| 9  A.      I'm not even sure who would sign off on it | 9      MR. CRANFORD:  Object to the form. |
| 10  because this is -- just all the bed movements | 10      MR. HILL:  Object to the form. |
| 11  that's made, you know, they just put on a sheet | 11  A.      Yes, it was common. |
| 12  like this. | 12  Q.      And was anything done to locate a weapon |
| 13  Q.      I'm going to stop sharing Exhibit 7. | 13  that was used in a violent assault like this one? |
| 14      And I'm going to now share what I'll mark | 14      MR. HILL:  Object to the form. |
| 15  as Exhibit 8. | 15  A.      Well, they would have searched the dorm. |
| 16              (Plaintiff's Exhibit Number 8 was marked | 16  After it happened, they would have searched the |
| 17              for identification.) | 17  dorm to try to find it. |
| 18  Q.      This record is marked highly confidential. | 18  Q.      Would they have searched all of the dorms |
| 19  It is ADOC008963 to ADOC009201, and I'll represent | 19  to try to find it? |
| 20  to you -- I'm sharing it now -- but this is the I&I | 20  A.      They -- |
| 21  investigation report related to the death of | 21      MR. HILL:  Object to the form.  If you |
| 22  Mr. Mullins. | 22  know, you know. |
| 23      Can you see that okay? | 23  A.      Yeah, they usually locked us -- lock it |
| 24  A.      Yes. | 24  down and search it, but they -- you don't always |
| 25  Q.      Okay.  Have you seen a document -- this | 25  find it because... |
| Page 86 | Page 88 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22 (85 - 88)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  Q.      Because why?
2  A.      Well, we've had them flush them down the
3  toilets, and just depends on, you know, what they
4  use.
5  Q.      I'm going to -- this is page 1 of the
6  report that we're on.  I'm going to scroll to the
7  third page.  Okay.  So I'm going to scroll down to
8  the third paragraph.  I'll represent to you, in
9  this part of the report, the report writer is
10 discussing a -- a PREA call that Mr. Mullins made
11 to the PREA hotline.  Okay?
12 A.      Okay.
13 Q.      All right.  It says, "Inmate Mullins then
14 said that he reported the incident to prison staff,
15 a statement consistent with the incident documented
16 by Incident Number SCCF-19-00259."
17         Did I read that correctly?
18 A.      Yes.
19 Q.      Okay.  If that is the incident number on
20 the incident report that you wrote, then this
21 statement is referring to him speaking to you,
22 correct?
23 A.      No.  I don't know nothing about this
24 report right here.
25         MR. HILL:  Yeah.
                                              Page 89

1  upon himself to relocate to Q-27.  Inmate Mullins
2  then told his cell partner in Q-27, a man he
3  identified as "CJ", rubbed him on his feet and his
4  head while he slept.  Inmate Mullins told "CJ" to
5  stop, but the cellmate evidently persisted."
6         Did I read that correctly?
7  A.      Yes.
8  Q.      "Inmate Mullins continued and said that on
9  the morning of that recording, the same morning on
10 which he reported his assault to St. Clair
11 Correctional Facility staff, "CJ" woke up Inmate
12 Mullins by punching him in the head, a narrative
13 consistent with that told by the inmate to prison
14 staff and documented by the inmate's visit -- visit
15 to the prison's infirmary.
16         "After punching Inmate Mullins, "CJ" then
17 pulled a knife on him and demanded that Inmate
18 Mullins perform oral sex on "CJ".  Inmate Mullins
19 refused and pushed "CJ" aside, allowing Inmate
20 Mullins to escape.
21         "Inmate Mullins then said that he reported
22 the incident to prison staff, a statement
23 consistent with the incident documented by Incident
24 Number SCCF-19-00259."
25         Did I read that correctly?
                                              Page 91

1  Q.      Okay.  I'm -- I'm going to represent to
2  you that this incident number right here --
3  A.      Uh-huh.
4  Q.      -- is the same one as the incident number
5  on the report that we just spoke about.  Okay?
6         MR. HILL:  The one we looked at before
7  this.
8         THE WITNESS:  Before?
9  Q.      Yes.
10 A.      Where the other incident happened, they
11 could be re -- I don't know -- I don't know why
12 they would have put that incident number in there
13 and...
14 Q.      Okay.  Let me -- let me go back up to the
15 top of this.  We'll read it all together so we're
16 on the same page.
17         So the first full paragraph on this page,
18 later that day, at 1052 hours, "Inmate Mullins,
19 using the prison's PREA hotline, reported a sexual
20 assault, apparently perpetrated by the same
21 cellmate identified by the prison's infirmary.
22         "According to that report, upon his
23 release from St. Clair Correctional Facility
24 segregation unit and his assignment to Q-32, Inmate
25 Mullins found both beds occupied.  He then took it
                                              Page 90

1  A.      Yes.
2  Q.      Okay.  And am I reading this correctly
3  that the incident where Mr. Mullins was attacked in
4  the morning by his cellmate CJ is the incident
5  reflected in your incident report, correct?
6  A.      This -- I don't -- I don't know nothing
7  about this now.
8         MR. HILL:  Megan, do you want me to take a
9  swipe at it or just leave it -- leave it be?
10         MS. PIERCE:  Sure.
11         MR. HILL:  Right here, he's referring to
12 the incident report that you discussed earlier --
13 we all discussed earlier.  Okay?  There was --
14 there was --
15         THE WITNESS:  The one where he reported of
16 it -- where Tucker reported --
17         MR. HILL:  Correct.
18         THE WITNESS:  Okay.  Well, he ain't said
19 --
20         MR. HILL:  And then this I&I report, on
21 this sentence, he -- he -- he reports X, Y, and Z,
22 and then he refers to the same report that you did.
23 And I think she's trying to agree -- get -- see if
24 you agree that she's just -- that this -- this guy
25 is just reporting that he got this information from
                                              Page 92

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23 (89 - 92)

Lakeisha Ezell v. Jefferson Dunn, et al.                                William Ragsdale
8/1/2024

```
 1  your report.  Is that fair to say?  I mean, whether
 2  or not -- I mean, would you -- would you agree?
 3         THE WITNESS:  Well, if he would -- because
 4  if he would have -- maybe I'm not understanding.
 5  If he would have said anything about anything
 6  sexual, we would had to have a whole different --
 7  so I'm just --
 8         MR. HILL:  That's fine.
 9         I wasn't trying to put words in your
10  mouth, Megan.  I was seeing if I could...
11         MS. PIERCE:  I appreciate it.
12  Q.     (By Ms. Pierce) I'll ask it a little
13  differently.
14         So here, on paragraph 3, the I&I agent
15  states that Inmate Mullins reported an incident
16  where he was attacked in his cell to staff, and it
17  was reflected in the incident report that you
18  wrote.  Okay?
19         MR. CRANFORD:  Object to the form.
20  A.     Yeah.  I don't know.  I know this right
21  here, that he -- you know, it wouldn't have -- he
22  might have -- I don't know how it got that incident
23  report on it --
24  Q.     Okay.
25  A.     -- because there -- this -- my incident
                                                    Page 93
```

```
 1  report was just an assault --
 2  Q.     Okay.  Well --
 3  A.     -- it didn't have nothing to do with PREA.
 4  Q.     Sure.  Your incident report does not
 5  include any details about what actually happened
 6  during the assault on Mr. Mullins, correct?
 7         MR. CRANFORD:  Object to the form.
 8  A.     No.  He just said he was assaulted.
 9  Q.     Okay.  So it's possible that the details
10  provided here to the PREA hotline reflect what
11  actually happened in the assault that Mr. Mullins
12  reported to you, correct?
13         MR. CRANFORD:  Object to the form.
14  A.     Yeah.  Well, he could -- well, if he were
15  on the -- he could have went and called the PREA
16  hotline, but he didn't let us know that there was
17  any sexual things going on.
18  Q.     Okay.  So your testimony is if Mr. Mullins
19  had told you that there was a sexual assault as
20  part of the assault that he reported to you, you
21  would have put that in your incident report,
22  correct?
23  A.     Correct --
24  Q.     Okay.
25  A.     -- and it would have had to been a whole
                                                    Page 94
```

```
 1  lot more done then with the report too.
 2  Q.     Okay.  I want to look to the next sentence
 3  of paragraph -- the third full paragraph.  After
 4  your incident report number is listed, it says,
 5  "However, at the order of Warden Gwendolyn Givens,
 6  Inmate Mullins returned to his cell and his
 7  assailant for the prison's performance of an
 8  institutional count.  After that count, Inmate
 9  Mullins said that he no longer felt safe in his
10  dorm or at the prison and relocated himself to the
11  prison's gym for his own safety.  Before ending
12  that call, Inmate Mullins begged for help and
13  expressed his fear for his own safety."
14         Did I read that correctly?
15  A.     Correct.
16  Q.     Okay.  Were you present when Warden Givens
17  instructed Inmate Mullins to return to his cell?
18  A.     No.
19  Q.     Okay.  Based on what is written here, if
20  Warden Givens instructed Inmate Mullins to return
21  to his cell after he reported the assault to you
22  and to Mr. Tucker, would Warden Givens have been
23  the on-call who was responsible for determining
24  where Mr. Mullins would be housed?
25  A.     I don't know if she would have been on
                                                    Page 95
```

```
 1  call then or not.  I don't know who was on call,
 2  because there was, like, six of them it was -- that
 3  done the on-call, all three wardens and all three
 4  captains.
 5  Q.     Based on your understanding of policy, was
 6  it appropriate for Warden Givens to send
 7  Mr. Mullins back to his cell after he reported
 8  being attacked by his cellmate?
 9         MR. CRANFORD:  Object to the form.
10  A.     I can't -- I don't know about that now.
11  You know, I don't know what he told her, but -- so,
12  you know, I can't say what -- why she made the
13  decision or not.
14  Q.     And it's your testimony that after
15  Mr. Mullins reported his assault to you, you would
16  have contacted a captain or warden, whoever was on
17  call; is that correct?
18  A.     Correct.
19  Q.     And how quickly after he reported his
20  assault would you have done that?
21  A.     Usually, I would -- you know, just a few
22  minutes.  You know, once we -- we tried to get as
23  much detail from him as we can, if he'll tell us
24  anything, because, you know, that's the first thing
25  the warden is going to want to know is he wants to
                                                    Page 96
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24 (93 - 96)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

Page 97

1  know all the details.  But, you know, he never
2  would really tell us nothing other than he was just
3  assaulted.
4  Q.    Okay.  And as soon as you spoke with
5  Mr. Mullins, you would have then contacted the
6  warden or whoever was on call as quickly as
7  possible, correct?
8  A.    Correct.
9  Q.    And that person would have been
10  responsible for determining if --
11  A.    Where he was -- yeah, where he was going
12  to be placed.
13  Q.    Okay.  Let me just make sure to get the
14  question out for the record so we have a clean
15  record.
16  A.    All right.
17  Q.    I appreciate you -- you trying to answer
18  my question.
19        So the person who was on call, whether the
20  warden or the captain, that you contacted would
21  have been the one responsible for determining if
22  and where Mr. Mullins would have been placed,
23  correct?
24  A.    Correct.
25  Q.    I'm going to move to page 17, the I&I

Page 98

1  report, and I will represent to you that this is a
2  transcript, a verbatim transcript of Mr. Mullins's
3  call to the PREA hotline on the same day he
4  reported his assault to you.  Okay?
5  A.    Okay.
6  Q.    And this occurred at 10:52 a.m., according
7  to the second line.
8        Am I reading that correctly?
9  A.    Where are you --
10  Q.    The second line up at the top.
11  A.    Oh, yeah.  All right.  That's correct.
12  Q.    Okay.  And I'm going to read his call to
13  the hotline for the record.
14        "My name is Steven Mullins.  I'm at
15  St. Clair Correctional Facility.  I was released
16  from the Seg two weeks ago tomorrow.  I was told to
17  go sleep in cube 32.  There were to be (inaudible)
18  that cell.  So I found an empty bed in cube 27.
19        "Okay.  I've had issues with my cell
20  partner rubbing on my feet while I was asleep,
21  rubbing me on my hip while I was asleep.  I asked
22  him to stop.  Okay.  And then this morning, I was
23  waking up by him punching me in the side of the
24  head, and he hit me in the eye twice.  He pulled a
25  knife on me and actually wanted me to perform oral

Page 99

1  sex on him.  And what I did was I shoved him out of
2  my way, and I left out of that cell.
3        "Someone went and got my property for me,
4  and then I got dressed in the hallway and went to
5  the shift office.  From the shift office,
6  eventually talked to Warden Givens, and I was
7  supposed to go back to the block so they could do a
8  recount this morning.
9        "And I'm the only white individual in that
10  block came to 2-side.  My life is in danger.  I
11  feel very unsafe, and I have nowhere to sleep.  My
12  property is in the breezeway by the shift office
13  now, my mattress and all my other stuff.  And
14  that's why I'm calling from the gym because that's
15  where I feel the safest and that's the only place I
16  can go that's out of the way.
17        "I need some help.  I've asked to be
18  placed in Seg for my own safety, PC, if possible,
19  but I cannot live in St. Clair population.  I need
20  some help badly, and I don't know what to do.
21        "Your message has been saved.  Please hang
22  up now."
23        Did I read that correctly?
24  A.    Correct.
25  Q.    Okay.  Based on what you've seen here,

Page 100

1  what should have been done when staff received this
2  call from Mr. Mullins?
3        MR. CRANFORD:  Object to the form.
4        MR. HILL:  Object to the form.
5  A.    Well, the -- he should have probably been
6  put back in Seg.
7  Q.    And why is that?
8  A.    Well, if he had reported to them that --
9  you know, what had happened, you know, that's
10  probably where he should have been put, was back in
11  Seg, but I don't know why he wouldn't.
12  Q.    Reading this, this is a report of a sexual
13  assault under PREA, correct?
14  A.    Correct.
15  Q.    Okay.  And what should be done when an
16  individual reports that he's been sexually
17  assaulted by somebody in general population?
18        MR. CRANFORD:  Object to the form.
19        MR. HILL:  Object to the form.
20  A.    Yeah.  He should have been put in
21  protective custody.
22  Q.    Okay.  And is that according to ADOC or
23  St. Clair policy?
24        MR. CRANFORD:  Object to the form.
25  A.    That would be ADOC.  That's all

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25 (97 - 100)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

Page 101

```
1   institutions.
2   Q.        And was it consistent with ADOC policy to
3   leave Mr. Mullins in general population with his
4   attacker after he reported this incident?
5            MR. CRANFORD:  Object to the form.
6            MR. HILL:  Object to the form.
7   A.        Well, I don't -- I don't -- I'm not sure
8   about that because, like I said, I don't know what
9   he -- because he says he talked to the warden, and
10  I don't know how much he told her, because she
11  would have -- I -- I don't believe -- I really
12  don't believe he told the warden and she didn't
13  move him if he was having them problems.
14  Q.        You don't know the warden, correct?
15           MR. CRANFORD:  Object to the form.
16  A.        No.
17  Q.        And I want to focus just on this report
18  here.
19           If this report from Mr. Mullins was
20  provided to staff, would it be consistent with ADOC
21  policy to leave Mr. Mullins in general population
22  with his attacker?
23  A.        No.
24           MR. CRANFORD:  Object to the form.
25  Q.        Sorry.  Can you repeat your answer?
```

Page 102

```
1   A.        No.
2   Q.        Based on this report, when staff was
3   notified of these allegations by Mr. Mullins, what
4   steps, if any, should be taken to identify and
5   locate the knife referenced?
6   A.        You talking about locate the knife?
7   Q.        Yes.
8   A.        They would have probably -- I don't know
9   if they did.  I wasn't there, but they should have
10  locked the dorm down and tried to find it.  But
11  then by the time, you know, it got reported and
12  all, you know, whoever done it would have most
13  likely already done took the knife out.
14  Q.        But pursuant to policy, when these
15  allegations were received by staff, the Q-block
16  should have been locked down and the knife searched
17  for, correct?
18  A.        Correct.
19           MR. CRANFORD:  Object to the form.
20           MR. HILL:  Object to the form.
21  Q.        Can you repeat your answer?
22  A.        Correct.
23  Q.        Okay.  Where would that have been
24  documented if the Q-block was locked down and the
25  knife was searched for?
```

Page 103

```
1   A.        It should have been in the cube officer's
2   log.
3   Q.        Anywhere else?
4   A.        Well, it could -- it could have been in
5   the, you know, shift log, the shift office log.
6   Q.        Anywhere else that you can think of?
7   A.        No.  Just being in either the cube or the
8   shift office log was the only two it's been logged
9   at.
10  Q.        What else should have been done when staff
11  was alerted to this PREA call by Mr. Mullins?
12  A.        That would have went to the PREA
13  compliance manager, Lieutenant Gordy, and she
14  handles it from there.
15  Q.        And who would have ultimately been
16  responsible for making sure that Mr. Mullins was
17  separated from his attacker?
18           MR. CRANFORD:  Object to the form.
19           MR. HILL:  Same objection.
20  A.        Well, she would have probably -- she would
21  have called them up and talked to him, and then,
22  you know, find out what went on and all.  And then
23  like I said, after she talked to him, she would
24  have put him in protective custody.
25  Q.        Okay.  So am I -- is it a fair
```

Page 104

```
1   characterization of your testimony that the PREA
2   compliance manager, Ms. Gordy, would have been
3   responsible for making sure that Mr. Mullins was
4   safely housed after this incident?
5            MR. CRANFORD:  Object to the form.
6            MR. HILL:  Object to the form.
7   A.        If it -- yeah, if -- because she would
8   have -- she would have got the report -- well,
9   Christy Benson over it would have got it, and then
10  she would have got in touch with Lieutenant Gordy
11  on it.
12  Q.        Okay.  And then fair to say Ms. Gordy
13  would have been responsible for making sure that
14  all PREA steps were carried out in relation to this
15  and that Mr. Mullins was safely housed, correct?
16           MR. HILL:  Object to the form.
17           MR. CRANFORD:  Object to the form.
18  A.        Yes.
19           MS. PIERCE:  And, Rick and Will, you're
20  both welcome to object, but I'm happy to stipulate
21  that if one of you objects, that can apply for all
22  defendants.
23           MR. CRANFORD:  Okay.
24           MR. HILL:  That's fine.  I mean, I don't
25  know his basis, but I mean, the last question was a
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26 (101 - 104)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  supposition based off of two presuppositions, but
2  that's fine.
3          MS. PIERCE:  Sure.
4  Q.      (By Ms. Pierce) Okay.  All right.  I'm
5  going to move over to the next page, page 18 of
6  this I&I report.  And the title here is Statement
7  of Inmate Clarence Jackson by Agent Brian Casey.
8          Did I read that correctly?
9  A.      Yes.
10 Q.      Have you ever seen a document like this?
11 A.      No.
12 Q.      So I will represent to you that Clarence
13 Jackson was the person ultimately identified for --
14 as responsible for murdering Mr. Mullins.  Okay?
15 A.      Okay.
16 Q.      So I am going to turn to page 28 of the
17 I&I report, which is page 10, ADOC -- ADOC008990 of
18 Mr. Casey's interview of Clarence Jackson.  And I
19 will just start reading at the top of the page.
20         And I will represent to you that the "he"
21 referenced here in this question is Mr. Mullins.
22 Okay?
23 A.      Okay.
24 Q.      "So why he's all pissed off at you that --
25 over that?  Why -- why is he going to make all of
                                              Page 105

1  those PREA complaints on you then?"
2          "Answer:  By C.J., he got jumped on in his
3  cell.  I don't -- you know, I don't know if he
4  thought I had something to do with it or, you know,
5  some of the people I hang with jumped on him, but I
6  wasn't in a cell.  I was at breakfast.  I didn't
7  know anything about it.  I think it was Lieutenant
8  Ragsdale that called me up there and asked me about
9  it, did I know anything about it.  And so I told
10 him I had no knowledge of it, signed the paper, put
11 my statement down."
12         Did I read that correctly?
13 A.      Correct.
14 Q.      Okay.
15 A.      But I don't remember talking to him, C.J.
16 Q.      Okay.  So you don't have any recollection
17 of talking to C.J., Clarence Jackson, about the
18 attack on -- that Mr. Mullins reported to you on
19 the morning of February 25, 2019, in his cell?
20 A.      No.
21 Q.      If you had spoken to Clarence Jackson
22 about the attack that Mr. Mullins reported to you
23 in his cell on February 25, 2019, would you have
24 been required to record or document that
25 conversation somewhere?
                                              Page 106

1  A.      Yes.
2          MR. CRANFORD:  Object to the form.
3  Q.      Where should that have been documented?
4          MR. CRANFORD:  Object to the form.
5  A.      We would have -- we'd have had to done
6  another report on it, but it would have had to have
7  been another report wrote up on it.  That would
8  have been -- you know, would have been put -- I
9  think you call it an addendum, and it would have
10 had to been put with the main report.
11 Q.      If you were able to identify Clarence
12 Jackson as a suspect in the February 25, 2019,
13 attack on Mr. Mullins in his cell, should
14 Mr. Jackson have been placed on restrictive housing
15 while the investigation was ongoing?
16         MR. CRANFORD:  Object to the form.
17         MR. HILL:  Object to the form.
18 A.      Yeah, he probably would have been, but
19 like I said, I don't even -- I don't even know if
20 this is the same because -- because I don't even --
21 I don't even remember talking to him, but I don't
22 think this has got anything to do with that other
23 report, the assault.
24 Q.      Why do you say that?
25 A.      Well, this is something -- it had to come
                                              Page 107

1  up earlier because, if he would have told us it was
2  C.J., then, you know -- yeah, we would have to have
3  locked C.J. up, but he -- you know, he wouldn't
4  tell us who it was.  So I guess this is something,
5  you know, he told I&I or I -- the inmates come up
6  with it, because I don't even know nothing about
7  this.
8  Q.      So as you sit here, do you dispute that
9  Clarence Jackson's statement that you questioned
10 him about the attack that Mr. Mullins suffered in
11 his cell on February 25, 2019?
12         MR. CRANFORD:  Object to the form.
13         MR. HILL:  Object to the form.
14 A.      I don't even remember talking to him about
15 it.
16 Q.      I understand that you don't remember
17 talking to him about it.
18         Do you dispute that you could have spoken
19 to him?
20         MR. HILL:  Object to the form.
21         MR. CRANFORD:  Object to the form.
22 A.      Yeah.
23 Q.      You dispute that?
24 A.      Uh-huh.
25 Q.      And why do you dispute that?
                                              Page 108

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27 (105 - 108)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

| | |
|---|---|
| 1 **A.** **Because I'm pretty sure I didn't.** | 1 steps you took as backup PREA compliance manager at |
| 2 Q. And what is that based on? | 2 St. Clair was a two-week -- was during a two-week |
| 3 **A.** **I don't know. I just don't remember** | 3 period when you were involved in a PREA audit; is |
| 4 **talking -- I don't remember talking to no C.J.** | 4 that correct? |
| 5 **about that.** | 5 **A.** **Correct.** |
| 6 Q. And to be clear, you don't recall anything | 6 Q. Okay. What steps or what involvement did |
| 7 about this -- | 7 you have in the PREA audits that were conducted at |
| 8 **A.** **No.** | 8 St. Clair while you were backup PREA compliance |
| 9 Q. -- Mr. Mullins or the attack on | 9 manager? |
| 10 Mr. Mullins, correct? | 10 **A.** **During the audit, I don't -- I just helped** |
| 11 **A.** **Not that right there, uh-uh.** | 11 **her get up some paperwork and stuff and put it** |
| 12 Q. So is it possible that you spoke to | 12 **together.** |
| 13 Clarence Jackson about the attack on Mr. Mullins in | 13 Q. Anything else you did besides compiling |
| 14 his cell on February 25, 2019, but you just don't | 14 some paperwork? |
| 15 recall? | 15 **A.** **Nothing that I remember --** |
| 16 MR. CRANFORD: Object to the form. | 16 Q. What other paperwork -- |
| 17 **A.** **It could -- it could be -- well, I didn't** | 17 **A.** **-- because she -- she had a -- she had** |
| 18 **speak to -- I --** | 18 **paperwork just -- you know, just had to get it** |
| 19 Q. It's possible? | 19 **in -- filed in certain ways so I helped her with** |
| 20 **A.** **-- I just -- I don't even remember talking** | 20 **that.** |
| 21 **to him. So...** | 21 Q. Who did you help? |
| 22 Q. I understand you that you don't recall | 22 **A.** **Lieutenant Gordy. She was PREA.** |
| 23 talking to him. | 23 Q. Okay. So you -- the extent of your |
| 24 Is it possible that you spoke to | 24 involvement was helping Lieutenant Gordy compile |
| 25 Mr. Jackson about the attack on Mr. Price -- strike | 25 and file some paperwork related to the audit; is |
| Page 109 | Page 111 |

| | |
|---|---|
| 1 that. | 1 that correct? |
| 2 Is it possible that you spoke to Clarence | 2 **A.** **Correct.** |
| 3 Jackson about the attack that Mr. Mullins suffered | 3 Q. Did you participate in any tours or |
| 4 in his cell on February 25, 2019, but you just | 4 meetings when the PREA auditors came to St. Clair? |
| 5 don't remember? | 5 **A.** **I had to -- I sit in the -- the last one,** |
| 6 MR. HILL: Object to form. | 6 **the one, you know, after she had completed all that** |
| 7 MR. CRANFORD: Object to the form. | 7 **and all and when she told them how -- how we done** |
| 8 **A.** **I guess it could be possible, but I sure** | 8 **and all.** |
| 9 **don't remember talking to him.** | 9 Q. Okay. You sat in on, is it fair to say, a |
| 10 Q. And, again, you don't recall speaking to | 10 debrief after the PREA auditor conducted their |
| 11 Mr. Mullins either, correct? | 11 tour? |
| 12 **A.** **No, not really. Like I said, we do so** | 12 **A.** **Yes, a debrief.** |
| 13 **many of them, I just don't -- I don't really** | 13 Q. Okay. Anything else you participated in |
| 14 **remember it.** | 14 while the PREA auditors were at St. Clair? |
| 15 Q. I'm going to stop sharing that exhibit, | 15 MR. HILL: Object to the form. |
| 16 and that was, I believe, Exhibit 8. | 16 **A.** **No.** |
| 17 Mr. Ragsdale, I just want to make sure the | 17 Q. Who else was at the debrief with you? |
| 18 record is very clear. | 18 **A.** **I think it was me and Lieutenant Gordy and** |
| 19 Had reviewing any of these documents | 19 **the lady and the warden.** |
| 20 relating to the attack on Mr. Mullins, had those | 20 Q. Okay. Which warden? |
| 21 documents refreshed your recollection in any way | 21 **A.** **I think it was -- when we did that, it was** |
| 22 about any discussions or any involvement you had in | 22 **Karla Jones.** |
| 23 responding to the assault suffered by Mr. Mullins? | 23 Q. And would the warden -- Karla Jones is the |
| 24 **A.** **No.** | 24 Warden III, correct? |
| 25 Q. Okay. You mentioned earlier that the only | 25 **A.** **Uh-huh. I think -- I think she was warden** |
| Page 110 | Page 112 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28 (109 - 112)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  then.
2  Q.      Were any of the warden -- other wardens,
3  the Warden II or the Warden I present?
4  **A.      I don't remember them being in there.**
5  Q.      And was anyone from outside of the
6  institution -- so just the institutional
7  coordinator, the deputy commissioner, or the
8  commissioner, were any of them present?
9  **A.      No.  None of them was present.**
10 Q.      After the PREA audit, did you receive any
11 of the PREA audit reports?
12         MR. CRANFORD:  Object to the form.
13 **A.      No.**
14 Q.      Did you -- besides the debrief with the
15 PREA auditor, did you participate in any
16 discussions about the findings of the PREA audit?
17         MR. CRANFORD:  Object to the form.
18 **A.      You mean after we -- after we met with**
19 **her?  Is that what you're asking?  Or why we was**
20 **meeting with her?**
21 Q.      By "her," do you mean the PREA auditor?
22         Well, let me ask -- re-ask my question.
23 **A.      Well, I --**
24 Q.      Let me re-ask my question.
25         So I understand that your testimony is
                                                Page 113

1  that after the PREA auditor toured the facility,
2  you sat in a meeting where there was a debrief of
3  the PREA audit with the PREA auditor, PREA
4  compliance manager, and Warden Jones; is that
5  correct?
6  **A.      Correct.**
7  Q.      Okay.  Besides that debrief meeting, did
8  you participate in any other meetings or
9  conversations about the findings of the PREA
10 audits?
11 **A.      No.**
12 Q.      Were you involved in any discussions about
13 creating or implementing corrective action plans to
14 address deficiencies identified in the PREA audits?
15         MR. CRANFORD:  Object to the form.
16 **A.      No.**
17 Q.      Were you involved in any efforts to
18 address deficiencies identified in the PREA audits?
19         MR. CRANFORD:  Object to the form.
20 **A.      No.**
21 Q.      I'm going to share with you what I will
22 mark as ADOC025764 to ADOC025847.  This is marked
23 as highly confidential.
24         (Plaintiff's Exhibit Number 9 was marked
25          for identification.)
                                                Page 114

1  Q.      I'll share it with you.
2         Can you see this document?
3  **A.      Yes.**
4  Q.      Let me see if I can make it a little bit
5  bigger so it's easier just...
6         Are you familiar -- do you recognize this
7  document?
8         MR. HILL:  This specific document?  Megan,
9  is that your question?
10        MS. PIERCE:  Yep.
11 **A.      No.**
12 Q.      Have you ever seen this type of document
13 before?
14 **A.      I don't remember seeing one before.**
15 Q.      Okay.  And the title of this document is
16 the Prison Rape Elimination Act Audit Report; is
17 that correct?
18 **A.      Correct.**
19 Q.      Okay.  And based on this report, it looks
20 like the PREA auditor was named Melinda Allen; is
21 that correct?
22 **A.      Correct.**
23 Q.      And Ms. Allen visited the facility on
24 April 3 through 6, 2018; is that correct?
25 **A.      Correct.**
                                                Page 115

1  Q.      I'm going to scroll down to the fourth
2  page titled Audit Findings, subtitle Audit
3  Narrative.
4         Do you see that?
5  **A.      Yes.**
6  Q.      I'm going to look at the second paragraph
7  on this page.
8         "An in-brief meeting was held April 3,
9  2018, with Deputy Warden Anthony Brooks,
10 institutional PREA compliance manager Lieutenant
11 Angelia Gordy, and institutional assistant PREA
12 compliance manager Lieutenant Ragsdale and Captain
13 Carla Graham.  Immediately following the in-brief,
14 the tour of the facility began."
15        Do you recall, as you sit here today,
16 being part of this meeting on April 3, 2018?
17 **A.      No.**
18 Q.      Do you dispute that you were part of it?
19 **A.      I don't remember it.  I just remember**
20 **meeting with -- I was with the warden and Jones and**
21 **a PREA lady and Lieutenant Gordy.  I don't remember**
22 **this.**
23 Q.      I'm going to scroll down to page 5 of this
24 report, looking at the second full paragraph on
25 that page.  I'll read it.
                                                Page 116

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29 (113 - 116)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1   "During the facility tour, I observed
2   several deficiencies in security that were of grave
3   concern to include:  Unsecured gates, unsecured
4   cell doors, unsecured storage doors,
5   cameras/electronic monitoring devices that were
6   damaged or not viewable, broken windows, makeshift
7   curtains used to block officers' view into the
8   cells, cell doors jammed with paper to prevent the
9   proper securing of the doors, inmates that --
10  openly violating the facility rules, including
11  being in the wrong housing unit, smoking and not
12  wearing an armband which designated the inmate's
13  housing assignment."
14          Did I read that correctly?
15  **A.      Yes.**
16  Q.      Do you remember learning about these
17  findings from Ms. Allen?
18  **A.      I think in the -- in the meeting we had,**
19  **you know, on the -- at the last meeting we had with**
20  **her, yeah, she talked about this.**
21  Q.      You recall that discussion?
22  **A.      Yes, in that -- that debriefing, in it,**
23  **she talked about this.**
24  Q.      Did you agree with those conclusions?
25          MR. CRANFORD:  Object to the form.
Page 117

1   **A.      Yes.  Some of -- some of it probably.**
2   **Because, like I said, we kept bands on the inmates,**
3   **but they stretched them where they could take them**
4   **off.**
5   Q.      Do you recall, during this time period,
6   there being problems with unsecured gates and
7   unsecured cell doors?
8           MR. CRANFORD:  Object to the form.
9   **A.      They could have been, but...**
10  Q.      During this time period, was there a
11  problem with inmates moving into other housing
12  units where they were not assigned without
13  authorization?
14  **A.      Yep.  They -- well, we would -- like, when**
15  **we feed chows, you could -- you know, some of them**
16  **go in the wrong dorms, and that's when they would**
17  **pull that armband off.**
18  Q.      So that was an issue during this time
19  period of inmates moving into other dorms during
20  chow?
21  **A.      Yes.**
22  Q.      Was that an issue that you reported to
23  your supervisors?
24  **A.      Well, everybody was aware of it.**
25  Q.      When you say that --
Page 118

1   **A.      Because we -- you know, because when we**
2   **caught them without an arm -- without an armband,**
3   **we had to come up there and put another one on**
4   **them, but they did the same thing.  They just**
5   **stretched it out enough they could slide it over**
6   **their hand.**
7   Q.      Was it common to see inmates without their
8   armbands on?
9           MR. CRANFORD:  Object to the form.
10  **A.      Yes, because we eventually got to where we**
11  **wouldn't feed them if they didn't have an armband.**
12  **We would make them go to the office to get a new**
13  **one, but, like I said, you couldn't keep them on**
14  **them.**
15  Q.      As far as you're aware, was anything done
16  to change the type of armbands that were used so
17  they couldn't be stretched or taken off?
18  **A.      Not that I know of.**
19  Q.      During this -- this time period in 2018
20  and into early 2019, was it common for inmates to
21  sleep in cells other than their assigned cell?
22  **A.      It could have happened, I guess.**
23          MR. HILL:  Do you know, or don't you know?
24          THE WITNESS:  I don't know for sure.
25  Q.      (By Ms. Pierce) I'm going to scroll down
Page 119

1   to page 12, and I will go down to the fourth
2   paragraph.
3           "Unannounced rounds are documented on the
4   admin logbooks.  Facility has an electronic
5   monitoring system that is monitored by cubical
6   correctional officers.  However, when checked, most
7   of the cameras were inoperable or not visible
8   because inmates had manipulated the system or
9   scratched the lenses, rendering them not visible.
10  There were numerous blind spots identified to which
11  inmates have access.  Facility currently has a plan
12  to place -- in place to address these blind spots
13  and to add additional cameras.  They are aware of
14  where many of the problems are located."
15          Did I read that correctly?
16  **A.      Yes.**
17  Q.      Do you dispute Ms. Allen's -- strike that.
18          Do you dispute Ms. Allen's conclusions
19  here?
20  **A.      No.**
21  Q.      So you and staff were aware that there
22  were blind spots that were not being monitored at
23  all times in the -- in the housing blocks; is that
24  correct?
25  **A.      Yes.  Because they -- the inmates covering**
Page 120

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30 (117 - 120)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1 the cameras up.
2 Q.      I'm going to go down to the next
3 paragraph.
4          "The facility uses a screening system to
5 identify vulnerable inmates during the initial
6 screening process before placement in a housing
7 unit.  However, with the pervasive open gates, unit
8 doors, and cell doors, inmates move throughout the
9 facility when and where they desire.
10          "I interviewed numerous inmates that
11 claimed they did not sleep in the housing unit they
12 were assigned by staff.  Inmates acknowledged that
13 they return to their assigned unit for mandated
14 counts when names or identities are verified.
15          "It was particularly disturbing to learn
16 that any inmates identified as being at risk for
17 victimization are often moved to the adjacent
18 housing unit, where potential predators are housed.
19 The facility typically houses the vulnerable
20 inmates -- vulnerable inmates on one side of the
21 unit and the predators on the other.
22          "Many inmates stated that they simply
23 place their bedrolls in the floors of the day room
24 areas or other common areas to sleep."
25          Did I read that correctly?

Page 121

1 A.      Yes.
2 Q.      Do you recall learning about this finding
3 from Ms. Allen?
4 A.      No, I don't remember that.
5 Q.      Do you dispute her conclusions here?
6 A.      I don't dispute it.  I just don't recall
7 it.
8 Q.      And then I'm going to go to the next
9 paragraph.
10          "To determine if intermediate or
11 higher-level supervisors conduct unannounced
12 rounds, I reviewed logbook entries to see who was
13 conducting the rounds and when.  In interviews with
14 staff, I discovered that key lieutenants often
15 delegate this function to the sergeants to
16 complete.  Sergeants do not qualify as intermediate
17 or higher-level supervisors at this facility, as
18 they are front-line supervisors.
19          "I was unable to review any video footage,
20 as the facility does not record the cameras in the
21 facility.  This is problematic, especially coupled
22 with a large number of inoperable cameras.
23          "Unannounced rounds were verified for day
24 and night shifts.  It should be noted that there
25 are times when higher-level staff do walk through

Page 122

1 the facility to conduct rounds.  The facility SOP
2 Number 229 mandates that shift commanders and
3 segregation commanders personally conduct a minimum
4 of three unannounced rounds each week in an effort
5 to deter staff sexual abuse and harassment."
6          Did I read that correctly?
7 A.      Yes.
8 Q.      Do you recall learning about this finding
9 from Ms. Allen?
10 A.      You're talking about learn about finding
11 it?  Because we are -- we did that.
12 Q.      What do you mean you did that?
13 A.      We -- we conducted a -- so I'm not really
14 sure what she's saying, if she's saying we didn't
15 do it, because we had to put it in our shift log.
16 Q.      Do you know whether other lieutenants were
17 sometimes delegating their rounds to sergeants or
18 officers?
19 A.      That would have been on another shift.  I
20 don't -- I don't know about that.
21 Q.      Okay.  So your testimony is that you would
22 conduct -- strike that.
23          At any time while you were working as
24 lieutenant at St. Clair, did you delegate your
25 required rounds to a sergeant?

Page 123

1 A.      I think we had sergeants that we let do
2 it --
3          MR. HILL:  But did you?
4          THE WITNESS:  -- but they --
5 Q.      I'm sorry.  Could you repeat that last
6 part?
7 A.      Because I think --
8          MR. HILL:  I think her question was did
9 you.
10          THE WITNESS:  Oh, no.
11 Q.      (By Ms. Pierce) You never delegated your
12 assigned rounds or your required rounds to
13 sergeants?
14 A.      No.
15 Q.      I'm going to take us to page 43 in this
16 report.  Looking at this first paragraph, Agency
17 Regulation 454, page 9, section 86 states that,
18 "The warden is responsible for ensuring that
19 inmates at high risk for sexual victimization are
20 not placed in involuntary segregation, such as
21 administrative segregation or protective custody,
22 unless an assessment of all available needs have
23 been made and there are no other available
24 alternatives.
25          "Interviews with inmates indicate that

Page 124

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31 (121 - 124)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  they are placed in segregation for extended periods
2  of time.  Inmates interviewed indicated that they'd
3  been in segregation for six and seven months and
4  continuing.  Inmates placed in segregation that are
5  at risk of sexual victimization had not had access
6  to programming, education, work or other
7  privileges."
8        Did I read that correctly?
9  **A.    Yes.**
10  Q.    Do you recall learning about this
11  conclusion from Ms. Allen?
12  **A.    No.**
13  Q.    Do you dispute her finding here?
14  **A.    Well, I don't dispute it, but I don't -- I**
15  **hadn't heard anything about it.  Because I know we**
16  **got a -- in Seg and -- well, it's A dorm, that's**
17  **where they're put, but, you know, how long they**
18  **stay there and all, I don't know.**
19  Q.    Did you take any steps while you were
20  lieutenant and backup PREA compliance manager to
21  make sure that inmates who are identified as high
22  risk for sexual victimization were not held in
23  segregation for long periods of time?
24        MR. CRANFORD:  Object to the form.
25  **A.    No.  Because I never did even -- I really**

Page 125

1  **didn't even -- like I said, I didn't deal with**
2  **PREA.  So, you know, I run the shifts.  So if one**
3  **was in there, I couldn't even tell you how long he**
4  **had been in there really because I didn't deal with**
5  **it.**
6  Q.    And who was responsible for monitoring the
7  length of time that an individual was held in
8  segregation for their protection?
9  **A.    The PREA compliance manager.**
10  Q.    Anyone else?
11  **A.    I'm pretty sure it would have just been**
12  **her.**
13  Q.    I'm going to take us to page 62.  In the
14  last paragraph here, Ms. Allen wrote, "Interviews
15  reveal that investigators evaluate the credibility
16  of the alleged victim, witness or suspect.  It was
17  concerning that the investigator claimed that in
18  many cases, they cannot prove it was not consensual
19  or to pay a debt.  He stated that if there was a
20  debt involved in the case, it tends to be
21  overlooked."
22        Did I read that correctly?
23  **A.    Yes.**
24  Q.    Do you recall learning about this finding
25  from Ms. Allen?

Page 126

1  **A.    No, I don't -- I don't...**
2  Q.    Do you dispute this finding?
3  **A.    I don't dispute it, you know, but I don't**
4  **remember seeing nothing about it.**
5  Q.    Were you aware of a problem that sometimes
6  sexual assaults were overlooked because a debt was
7  involved in the sexual assault?
8        MR. HILL:  Object to the form.
9        MR. CRANFORD:  Object to the form.
10  **A.    No.**
11  Q.    All right.  I will stop sharing this
12  document.
13        Mr. Ragsdale, am I correct that you do not
14  recall being involved in any efforts to address the
15  deficiencies identified in this PREA audit report
16  that we discussed today?
17        MR. CRANFORD:  Object to the form.
18  **A.    No.**
19  Q.    No, you don't recall?
20  **A.    No.**
21  Q.    And who would have been responsible for
22  making sure that the deficiencies identified in
23  this PREA audit report were addressed?
24        MR. CRANFORD:  Object to the form.
25  **A.    PREA compliance manager and -- well,**

Page 127

1  **actually, the warden too.**
2  Q.    When you say "the warden too," do you mean
3  the warden number two or warden --
4  **A.    The warden -- yeah, the warden too.  The**
5  **warden --**
6        MR. HILL:  The warden also?
7        THE WITNESS:  The main warden.  The main
8  warden, Warden III.
9  Q.    (By Ms. Pierce)  Okay.  So it's your
10  testimony, correct, that the Warden III and the
11  PREA compliance manager would have been responsible
12  for making sure that these deficiencies were
13  corrected?
14  **A.    Uh-huh.  And they -- they probably got**
15  **that report there.  Uh-huh.**
16  Q.    And you nodded your head.  I just want to
17  make sure that the record is clear.
18        Again, your testimony is that the PREA
19  compliance manager and the Warden III would have
20  been responsible for making sure that the
21  deficiencies identified in this report were
22  addressed, correct?
23  **A.    Yes.**
24  Q.    Thank you.  I think that we just talked
25  about Exhibit 9.

Page 128

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32 (125 - 128)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

| | |
|---|---|
| 1 MR. CRANFORD: That's right. | 1 Q. Okay. I'm going to direct you to the |
| 2 MS. PIERCE: Thanks, Will. | 2 third paragraph. |
| 3 Q. All right. Let me identify what I'll mark | 3 It says, "Auditors arrived at the facility |
| 4 as Exhibit 10. | 4 on 5/1/18 at approximately 8:00 o'clock a.m. and |
| 5 (Plaintiff's Exhibit Number 10 was | 5 met with Warden Brooks, IPCF Gordy and Lieutenant |
| 6 marked for identification.) | 6 Ragsdale, backup to the IPCM. Tour of the facility |
| 7 Q. (By Ms. Pierce) For the record, this is | 7 was then conducted with Lieutenant Gordy, |
| 8 ADOC-DS027451 to ADOC-DS027542. This is marked as | 8 Lieutenant Ragsdale, and Auditor Cotten." |
| 9 highly confidential. | 9 Did I read that correctly? |
| 10 Can you see that, Mr. Ragsdale? | 10 **A. Yes.** |
| 11 **A. Yes.** | 11 Q. Do you recall being part of this -- strike |
| 12 Q. Great. This is the same type of form that | 12 that. |
| 13 we just looked at in Exhibit 9, correct? | 13 Does this -- reading this paragraph |
| 14 **A. Correct.** | 14 refresh your recollection at all about |
| 15 Q. Okay. It's a PREA audit report of | 15 participating in this audit? |
| 16 St. Clair; is that correct? | 16 **A. Now, I might have did this first** |
| 17 Let me scroll down so you can see the | 17 **walk-around with them, just showing them around,** |
| 18 institution. | 18 **but as far as participating in the audit, I didn't** |
| 19 **A. Yes.** | 19 **do that.** |
| 20 Q. Okay. And the PREA audit was conducted by | 20 Q. Okay. Do you recall participating in any |
| 21 Dave Cotten; is that correct? | 21 debrief with regard to this audit? |
| 22 **A. Yes.** | 22 **A. I don't think -- I don't believe I was** |
| 23 Q. And the facility visit was May 1st through | 23 **even on the debrief on this one.** |
| 24 3rd, 2018? | 24 Q. Do you recall anything about the |
| 25 **A. Yes.** | 25 observations that were made during the walk-around |
| Page 129 | Page 131 |

| | |
|---|---|
| 1 Q. Did you ever receive this report? | 1 that's identified here? |
| 2 **A. No.** | 2 And you don't need to read this. I'm just |
| 3 Q. Do you recall this PREA audit? | 3 asking based on, as the report states, do you |
| 4 **A. Yes --** | 4 recall anything about walking around? |
| 5 Q. Okay. | 5 **A. No. No, I don't recall any.** |
| 6 **A. -- I remember that --** | 6 Q. Do you recall, following this PREA audit, |
| 7 MR. HILL: Yes is fine. | 7 any conversations -- strike that. |
| 8 **A. Yes.** | 8 Do you recall being involved after this |
| 9 Q. What do you recall about this PREA audit? | 9 PREA audit in any conversations to address the |
| 10 **A. I just know we had it.** | 10 deficiencies that were identified by the PREA |
| 11 Q. Do you recall what your involvement was in | 11 auditor? |
| 12 this PREA audit? | 12 **A. I don't remember any.** |
| 13 **A. I didn't have any involvement on that one.** | 13 Q. And do you recall taking any steps after |
| 14 **I was on the federal. This wasn't the federal** | 14 this PREA audit to address any of the deficiencies |
| 15 **here. This was -- I guess, on this -- I don't** | 15 identified by the PREA auditor? |
| 16 **think this one was federal here because we had two** | 16 MR. CRANFORD: Object to the form. |
| 17 **of them.** | 17 **A. No, I don't remember that either.** |
| 18 Q. And what was -- | 18 Q. I'm done with that exhibit. I'll close |
| 19 **A. -- the one the lady conducted was the one** | 19 it. |
| 20 **that I had helped that two weeks with. Yeah, I** | 20 During the time period of 2018 to 2019, |
| 21 **didn't do anything on this one.** | 21 did you have concerns about the levels of |
| 22 Q. I'm going to scroll down to page 4, which | 22 inmate-on-inmate violence at St. Clair? |
| 23 is titled Audit Findings and subtitled Audit | 23 MR. HILL: Object to the form. |
| 24 Narrative; is that correct? | 24 **A. Well, we -- we had several.** |
| 25 **A. Correct.** | 25 Q. What do you mean by you've had several? |
| Page 130 | Page 132 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33 (129 - 132)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  A.        Well, we had several incidents, but you
2  know...
3  Q.        How common were incidents of
4  inmate-on-inmate violence during your time at
5  St. Clair in 2018 and early 2019?
6        MR. HILL:  Object to the form.
7  A.        I really don't know.  You know, it's just
8  different.  We might go a while and not have one,
9  and then you could have three or four a day.  It's
10  hard to say.
11  Q.        While you were working at St. Clair, how
12  many times was an inmate murdered by another
13  inmate?
14        MR. HILL:  Object to the form.
15  A.        I'm not sure.  I know when Warden Jones
16  come, we had six the first six months she was
17  there.
18  Q.        Why do you --
19  A.        Well, because everybody -- she was talking
20  about it all the time --
21  Q.        What was the --
22  A.        -- I think --
23  Q.        I'm sorry.
24  A.        -- she was sort of hating the job.  I
25  think she was sort of hating she took it.
                                        Page 133

1  Q.        She was -- I'm sorry.  Can you repeat
2  that?
3  A.        She was sort of hating she had took the
4  job because she wasn't used to that, but...
5  Q.        And what was she saying about the -- the
6  levels of violence after she took the job?
7        MR. CRANFORD:  Object to the form.
8  A.        She just couldn't believe we had that
9  many.
10  Q.        And that six inmates' deaths in the six
11  months after she arrived, was that an unusually
12  high number?
13        MR. CRANFORD:  Object to the form.
14  A.        Oh, yes, uh-huh.
15  Q.        Were any steps taken to understand why
16  there had been so many inmate deaths at that
17  time -- strike that.
18        Were any steps taken to identify why so
19  many inmate deaths had occurred during that
20  six-month period?
21        MR. HILL:  Object to the form.
22        MR. CRANFORD:  Same objection.
23  A.        Not that I know of.  I...
24  Q.        Were you involved in any conversations
25  about steps that could be taken to try to lower the
                                        Page 134

1  risk of violence to inmates at St. Clair during
2  that six-month period?
3  A.        No.
4  Q.        During the period of 2019 -- or excuse me
5  -- during the period of 2018 or early 2019, did you
6  have concerns about the levels of sexual violence
7  at St. Clair?
8  A.        No.  Because, you know, we really didn't
9  -- we really didn't have that many.
10  Q.        When you say you didn't have that many,
11  what was your understanding about how often sexual
12  assaults were occurring at St. Clair during the
13  2018 and early 2019 period?
14  A.        I don't know.  Because, like I said, we'd
15  go -- we'd go a couple -- several months without
16  even having one.  So I -- you know, I can't really
17  say how many.
18  Q.        Did you ever have any discussions with
19  Christy Vincent about your role and
20  responsibilities as backup PREA compliance manager?
21  A.        No.
22  Q.        Did you ever have any discussion with
23  Warden Jones about your role and responsibilities
24  as backup PREA compliance manager?
25  A.        No.
                                        Page 135

1  Q.        Did you ever have any discussions with
2  Institutional Coordinator Ellington about your role
3  and responsibilities as backup PREA compliance
4  manager?
5  A.        Nope.  Like I said, when I got there, I
6  went on shift.
7  Q.        Okay.  Did you have any discussions with
8  anyone about your roles and responsibilities as
9  backup PREA compliance manager?
10  A.        No.
11  Q.        Did you ever raise to any of your
12  supervisors concern that you had about issues of
13  unsafe conditions at St. Clair?
14        MR. CRANFORD:  Object to the form.
15  A.        I don't remember, no.
16  Q.        Did you ever raise concerns with any of
17  your supervisors about the levels of violence in
18  the P/Q-blocks?
19  A.        We talked -- we talked about it, but...
20  Q.        When you say you talked about it, what do
21  you mean by that?
22  A.        Well, you know, we had had discussions
23  of -- you know, about it, but, you know, the big --
24  I guess the biggest --
25        MR. HILL:  Just answer her question.  It
                                        Page 136

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34 (133 - 136)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1  was a yes or no question.
2          THE WITNESS:  Yeah.  Yeah.  Yes.
3          MS. PIERCE:  I'm going to ask you not to
4  instruct him like that.  My question was not a yes
5  or no question.  I asked him what he meant by that.
6  Q.        Could you please just continue your
7  explanation of -- of what you meant by your
8  testimony that you talked about issues in the
9  P/Q-blocks with your supervisors?
10 **A.        Yeah.  You know, we just talked about**
11 **things we could try to do, you know, different**
12 **things, but...**
13 Q.        Who did you have those discussions with?
14 **A.        Usually, you know, between the officers**
15 **and maybe other shifts --**
16 Q.        Did you have any discussions --
17 **A.        -- but --**
18 Q.        I'm sorry.  Go ahead.
19 **A.        -- but, you know, the biggest thing was**
20 **just the shortage.**
21 Q.        The shortage, what do you mean by that?
22 **A.        Shortage of officers.**
23 Q.        And did you have discussions with the
24 captains and the wardens about the shortages of
25 officers and the risks that posed to safety?
Page 137

1          MR. CRANFORD:  Object to the form.
2  **A.        Well, you know, they -- they knew it, but,**
3  **you know...**
4  Q.        Did you have discussions about it?
5  **A.        Yes.  And, you know, they tried -- they**
6  **tried to hire, but, you know, nobody wants to do**
7  **it.**
8  Q.        And besides increased hiring, did you
9  discuss any other actions that could be taken to
10 reduce the risk of violence posed to inmates at
11 St. Clair during the 2018 and early 2019 period?
12         MR. CRANFORD:  Object to the form.
13 **A.        No.**
14 Q.        During the 2018 and early 2019 period, did
15 you ever raise concerns with your supervisors about
16 the levels of weapon contraband that was present at
17 St. Clair?
18 **A.        No.**
19 Q.        During the 2018 to early 2019 period, did
20 you ever raise any concerns with your supervisors
21 about staff not carrying out their required
22 contraband searches and shakedowns?
23         MR. CRANFORD:  Object to the form.
24 **A.        No.**
25 Q.        I'm going to share what I'll mark as
Page 138

1  Exhibit 11.  Okay.  For the record, this is
2  DS-FD-009542.
3                  (Plaintiff's Exhibit Number 11 was
4                  marked for identification.)
5          MR. CRANFORD:  Sorry.  Megan, can you
6  repeat that for me?
7          MS. PIERCE:  Yeah.  Sorry.  My computer is
8  lagging.  I've got -- I'm on the last page right
9  now.  Let me read the last number of the -- of the
10 exhibit is DS-FD-009710.  Let me scroll back up to
11 the first page.  It's DS-FD-009542.
12         MR. CRANFORD:  Thank you.
13 Q.        (By Ms. Pierce) And, Mr. Ragsdale, I will
14 represent to you that this was produced to us as
15 your personnel file.  I'm going to share this with
16 you now.
17         This is -- can you see this page?
18 **A.        Yes.**
19 Q.        Title says, "Alabama Department of
20 Corrections written reprimand, William Ragsdale,
21 April 29, 2017."
22         Did I read that correctly?
23 **A.        Yes.**
24 Q.        I am going to look at paragraph number 3,
25 facts related to offense.
Page 139

1          "It has been reported to me by your
2  supervisor, Carla Graham, correctional captain,
3  that on April 29, 2017, you, William Ragsdale,
4  correctional lieutenant, failed to report an
5  incident that took place between the gangs "Bloods,
6  Crips and GDs."  You, Lieutenant Ragsdale, were the
7  shift commander on duty and did not report the
8  incident to the on-call official, Captain Graham.
9  You were questioned about the incident and
10 instructed to write a report.
11         "Captain Graham discovered that several
12 inmates had knives on the G yard and discovered
13 there was a standoff between gang members.  You did
14 not mention the incident in your statement or
15 notify the on-call supervisor when the incident
16 took place.  If the incident had been reported, it
17 may have been prevented -- excuse me -- it may have
18 prevented the stabbing of two inmates on Sunday,
19 April 30, 2017."
20         Did I read that correctly?
21 **A.        That's correct.**
22 Q.        Do you recall this incident?
23 **A.        Yes.  And it did -- it wasn't between no**
24 **gangs.  It was the same gang.  And what happened,**
25 **the younger gang -- the younger guys in the gang**
Page 140

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35 (137 - 140)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  didn't like the way the older guys in the gang was
2  running it so they was going to try to take over it
3  and -- which we had a CERT team -- CERT team come
4  there, and they send -- because I sent the two --
5  the guy that was -- the two that was in it, they
6  took -- got them and took them up, and I stayed
7  back and talked to the others, but there wasn't
8  nothing to it.  But she wrote it up, you know, like
9  it was a -- it was a cause of this other incident
10 they had which didn't have nothing to do with all
11 the gangs getting together.  That was a whole
12 different thing.
13 Q.     Why didn't you write an incident report
14 about what happened?
15 A.     Because it -- it really wasn't -- didn't
16 nothing happen.  It was just two -- the young guy
17 and one of the older guys that -- and CERT said
18 they, you know -- because I went back up there
19 because I actually -- I met both of them when I was
20 going back up there, and CERT, you know, they're
21 all lieutenants too and captains.
22        Well, one of them -- the couple of
23 captains, they'd done talked to both of them and
24 said there wasn't nothing to it.  It was just a
25 disagreement.  You know, it wasn't no licks or
Page 141

1  nothing passed.
2  Q.        It is important to report an incident
3  where weapons are involved, correct?
4  A.        If weapons are involved, but there wasn't
5  no weapons involved.
6  Q.     So you dispute Ms. Graham's statement
7  about what occurred?
8  A.     Yes.
9  Q.     Did you do anything to challenge the
10 disciplinary that you received here?
11 A.     No, I -- I didn't do nothing --
12 Q.     Was there --
13 A.     -- I just told her, you know, really
14 what happened, but it didn't matter.  She wrote me
15 up anyway.
16 Q.     Was there a mechanism by which you could
17 challenge a disciplinary or a written reprimand
18 like this?
19 A.     I could have.  Yeah, I -- yeah --
20 Q.     You chose not to, correct?
21 A.     -- I chose to let it go.  It was the only
22 time I had ever been wroten up -- written up,
23 but...
24 Q.     I'm sorry.  You said it was the first time
25 you had been written up?
Page 142

1  A.      Yeah, so I didn't worry about it.
2  Q.     I'm going to turn to page 53.  Sorry.  Is
3  that right?  Let's see -- 52.
4        Have you seen this form before?
5  A.     Yeah, the PREA appraisal.
6  Q.     What is your understanding of what this
7  form is?
8  A.     I think it's just about the -- for your
9  responsibilities and all.
10 Q.     Does this include an evaluation of your
11 work performance?
12 A.     Yes.
13 Q.     And this is your employee performance PREA
14 appraisal for the period of March 1, 2018, to
15 March 1, 2019; is that correct?
16 A.     Yes.
17 Q.     I'm going to scroll to the next page.  I'm
18 going to read what's written here.  I'll blow it up
19 a little bit so we can all see it.
20        "Describe an employee's strengths in
21 performing responsibilities and/or conducting work
22 habits as observed during the first half of the
23 appraisal period.
24        "Lieutenant William Ragsdale exchanges
25 information so that okay communication" -- oh, I'm
Page 143

1  sorry.  Let me reread that.  Strike that.
2        "Lieutenant William Ragsdale exchanges
3  information so that all communication is clear,
4  concise, and accurate without valid complaint."
5        Did I read that correctly?
6  A.     Yes.
7  Q.     And then I'm going to go to the next
8  paragraph.
9        "Describe any areas that the employee
10 needs to improve in performance of responsibilities
11 and/or work habits as observed during the first
12 half of the appraisal period.  Document any actions
13 taken or the corrective action plan that was
14 developed to improve the areas of improvement.  If
15 a plan has not been developed, it is appropriate
16 for the rater to consider developing a plan at this
17 time."
18        I'm going to read the handwritten lines
19 here.
20        "Lieutenant Ragsdale needs improvement
21 inspecting and monitoring appearance of personnel,
22 facility, inmates, and equipment so that employees
23 and facilities are in accordance with
24 administrative and standard operational procedures
25 with no more than two failures per quarter."
Page 144

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36 (141 - 144)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

| | |
|---|---|
| 1 | Did I read that correctly? |
| 2 | **A.**    **Yes.** |
| 3 | Q.    Do you recall receiving this feedback? |
| 4 | **A.**    **Yes.** |
| 5 | Q.    Did you receive that feedback from Ms. |
| 6 | Graham? |
| 7 | **A.**    **Yeah, Captain Graham.** |
| 8 | Q.    Did you agree with Ms. Graham that you |
| 9 | could improve the quality of your inspection and |
| 10 | monitoring of personnel, the facility and inmates? |
| 11 | **A.**    **Not really, but...** |
| 12 | Q.    When you say "not really," is there |
| 13 | anything that you did? |
| 14 | **A.**    **Well, I felt like I did the same as** |
| 15 | **everybody else did.** |
| 16 | Q.    Did Ms. Graham come up with a corrective |
| 17 | action plan with you as part of this appraisal? |
| 18 | **A.**    **No.** |
| 19 | Q.    Did anyone else come up with a corrective |
| 20 | action plan as part of this appraisal? |
| 21 | **A.**    **No.  They just fill this out.** |
| 22 | Q.    All right.  I will stop sharing.  That was |
| 23 | Exhibit 11. |
| 24 | All right.  I have no other questions at |
| 25 | this time.  I appreciate your time, Mr. Ragsdale. |

Page 145

| | |
|---|---|
| 1 | **A.**    **All right.  Thank you.** |
| 2 | MR. HILL:  Will, do you have any |
| 3 | questions? |
| 4 | MR. CRANFORD:  Yeah.  If you have some, |
| 5 | though... |
| 6 | MR. HILL:  I have no questions.  But |
| 7 | before you start, this 1:00 o'clock deposition, is |
| 8 | it -- will someone let somebody know that we're up |
| 9 | against that time?  Or should I -- is it on this |
| 10 | link?  Or I mean, what -- |
| 11 | MS. PIERCE:  Yep, I think it's on this |
| 12 | link.  I have already -- I can message -- |
| 13 | MR. HILL:  Okay. |
| 14 | MS. PIERCE:  -- right now and let them |
| 15 | know that we'll be -- |
| 16 | MR. HILL:  Okay.  That's fine. |
| 17 | Go ahead.  Go ahead, Will.  I'm sorry to |
| 18 | interrupt. |
| 19 | MR. CRANFORD:  Yeah.  No.  You're fine. |
| 20 | No problem. |
| 21 | EXAMINATION |
| 22 | BY MR. CRANFORD: |
| 23 | Q.    Mr. Ragsdale, my name is William Cranford. |
| 24 | I'm an attorney with the law firm Butler Snow, and |
| 25 | I represent Mr. Dunn and a number of the other |

Page 146

| | |
|---|---|
| 1 | executive-level ADOC officials from back in |
| 2 | 2018-2019, when these incidents occurred, and I |
| 3 | just have a few questions I wanted to ask you. |
| 4 | Ms. Pierce showed you some incident |
| 5 | reports.  Do you remember that? |
| 6 | **A.**    **Yes.** |
| 7 | Q.    And I want to take you back -- I believe |
| 8 | it was -- let me see if I can figure out which |
| 9 | exhibit it was.  Oh, Exhibit 6, it looks like, and |
| 10 | I'll show you this document real quick if I can |
| 11 | figure out how to share my screen with everybody. |
| 12 | So this -- this document that I'm going to |
| 13 | show you is Bates labeled ADOC000473. |
| 14 | And do you see that this is an Alabama |
| 15 | Department of Corrections incident report? |
| 16 | **A.**    **Yes.** |
| 17 | Q.    And do you see that it's dated |
| 18 | February 25th of 2019? |
| 19 | **A.**    **Yes.** |
| 20 | Q.    And on the time, it's 6:00 o'clock a.m. on |
| 21 | this report; is that right? |
| 22 | **A.**    **Yes.** |
| 23 | Q.    Okay.  And if you look in box number 9, it |
| 24 | says who received the report, and it says Ragsdale, |
| 25 | William J. |

Page 147

| | |
|---|---|
| 1 | Would that be you? |
| 2 | **A.**    **Yes.** |
| 3 | Q.    And in the boxes 12 and 13, it says, |
| 4 | "Victim:  Steven Mullins.  Suspects:  Steven |
| 5 | Mullins." |
| 6 | Do you see that? |
| 7 | **A.**    **Yes.** |
| 8 | Q.    Okay.  And I want to turn your attention |
| 9 | to the narrative summary here, and it indicates |
| 10 | that on February 25th of 2019, at approximately |
| 11 | 6:01 a.m., Officer Dylan Tucker escorted Steven |
| 12 | Mullins to the breezeway. |
| 13 | Do you see that? |
| 14 | **A.**    **Yes.** |
| 15 | Q.    And it says that Officer Tucker reported |
| 16 | to Lieutenant William Ragsdale that Inmate Mullins |
| 17 | alleged he had been assaulted. |
| 18 | Do you see that? |
| 19 | **A.**    **Yes.** |
| 20 | Q.    And then it says that Inmate Mullins was |
| 21 | escorted to the infirmary for a body chart. |
| 22 | Do you see that? |
| 23 | **A.**    **Yes.** |
| 24 | Q.    And that he had -- says a couple lines |
| 25 | later, Inmate Mullins had an abrasion on the left |

Page 148

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37 (145 - 148)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

1 side of his head, which did not appear to be a
2 fresh wound.
3          Do you see that?
4 **A.       Yes.**
5 Q.       It goes on to say, "Lieutenant Ragsdale
6 questioned Inmate Mullins about the incident.
7 Inmate Mullins stated that he could not identify
8 who assaulted him because it was too dark in the
9 cell."
10          Do you see that?
11 **A.       Yes.**
12 Q.       The -- it also indicates that, "Inmate
13 Mullins stated to Lieutenant Ragsdale that he
14 wanted to be in a cell by himself.  Inmate Mullins
15 was moved to P-dorm at P36-1A."
16          Do you see that?
17 **A.       Yes.**
18 Q.       And do you see up here at the top where it
19 lists Steven Mullins, it says WM?  Does that stand
20 for white male?
21 **A.       Yes.**
22 Q.       And then his AIS number, I'm assuming.
23 **A.       AIS number.**
24 Q.       Okay.  And then this part in parentheses
25 here, Q32-2A, what is that?
Page 149

1 **A.       That's the -- he was in Q-dorm, cell 32,**
2 **bed 2A.  There's two beds to a cell, 1A and 2A.**
3 Q.       Got you.  So according to this incident
4 report, following Mr. Mullins's allegations that he
5 had been assaulted, you moved him to a -- another
6 dorm; is that right?
7 **A.       P-dorm.**
8          MS. PIERCE:  Object to the form.
9 Q.       I'm sorry?
10 **A.       P-dorm.**
11 Q.       Okay.  So you did actually move him --
12 move his bed assignment after this initial incident
13 report was --
14 **A.       Yes.**
15 Q.       I want to take you now to what's Bates
16 labeled as ADOC000470.
17          And do you see that this is -- and I will
18 --
19          MS. PIERCE:  I'm going to -- sorry.  Will,
20 do you want to mark this as an exhibit?  This
21 wasn't something that I used.
22          MR. CRANFORD:  Sure.  We can mark it as an
23 exhibit.  That's fine.  So Defense Exhibit 2 -- or
24 1, I mean.
25          (Defendants' Exhibit Number 1 was marked
Page 150

1          for identification.)
2 Q.       (By Mr. Cranford) Do you see this Alabama
3 Department of Corrections incident report?
4 **A.       Yes.**
5 Q.       And it's dated February 26, 2019?
6 **A.       Yes.**
7 Q.       Okay.  So that would be the day after that
8 initial report that we just looked at; is that
9 right?
10 **A.       Yes.**
11          MR. CRANFORD:  And I want to stop real
12 quick because I think we got Mr. Price on the Zoom
13 now.  I want to make sure he's not present for any
14 more of my questions to Mr. Ragsdale.
15          MR. HILL:  Mr. Price, this is Rick Hill.
16 I'm going to be representing you in the next
17 deposition, but do you mind -- how long do you
18 think it'll be, Will?  About ten minutes maybe or
19 five minutes?
20          MR. CRANFORD:  Probably about five to ten
21 minutes, yeah.
22          MR. HILL:  In five to ten minutes, you
23 want to check back in?  Can you hear me, Mr. Price?
24          MR. PRICE:  Can you hear me?
25          MR. HILL:  Yeah.  Why don't you log off
Page 151

1 and then just try back in about ten minutes.  Okay?
2          MR. PRICE:  All right.
3          MR. HILL:  Okay.
4 Q.       (By Mr. Cranford) So, again, this incident
5 would have occurred the following day after the
6 incident that we just looked at; is that right?
7 **A.       Yes.**
8 Q.       Okay.  And this says the time of the
9 incident was 5:45 p.m.; is that correct?
10 **A.       Yes.**
11 Q.       And it shows that the victim was Steven
12 Mullins, correct?
13 **A.       Yes.**
14 Q.       And the suspects, it lists three different
15 suspects, correct?  Clarence Jackson, Christopher
16 Jones, and Vandrick Thomas; is that right?
17 **A.       Right.**
18          MS. PIERCE:  Object to the -- object to
19 the form.
20          MR. CRANFORD:  What's the objection?
21          MS. PIERCE:  Sorry.  I meant object to
22 foundation.
23          MR. CRANFORD:  What's the -- this is not a
24 form of objection.
25          So what's your objection?
Page 152

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38 (149 - 152)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1    MS. PIERCE:  Object to foundation.  He
2    didn't -- there's no indication that he was
3    involved in completing this form.
4    MR. CRANFORD:  Okay.  I mean, he's
5    reviewing the report so he can see what it says.
6    Q.    (By Mr. Cranford) Do you see here that it
7    says there is three suspects listed, correct?
8    A.    **Correct.**
9    Q.    The first is Clarence Jackson, correct?
10   A.    **Correct.**
11   Q.    The second is Christopher Jones, correct?
12   A.    **Correct.**
13   Q.    And the last is a Vandrick Thomas; is that
14   right?
15   A.    **Correct.**
16   Q.    So, again, this would have been 5:45 p.m.
17   on February 26, 2019.  And if you look down about
18   the second full sentence, I believe it -- or sorry
19   -- third full sentence of the narrative, it says,
20   "While en route to the healthcare unit, Inmate
21   Mullins identified Inmate Clarence Jackson as the
22   inmate that assaulted him to Correctional Captain
23   Kevin White and Correctional Lieutenant Antoine
24   Price."; is that right?
25   A.    **That is right.**
Page 153

1    Q.    And that -- so this -- according to this
2    incident report, the first time security staff knew
3    Clarence Jackson identified as the individual who
4    assaulted Mr. Mullins was on 5:45 p.m. on the 26th,
5    right?
6    A.    **Right.**
7    MS. PIERCE:  Object to -- object to form.
8    Q.    (By Mr. Cranford) I want to take you
9    to another incident report.  And this is Bates
10   labeled ADOC000468.  And we can make this Defense
11   Exhibit 2.
12   (Defendants' Exhibit Number 2 was marked
13   for identification.)
14   Q.    Do you see that this is an incident report
15   for February 25th of 2019 again?
16   A.    **Yes.**
17   Q.    And this one is listed at 4:00 p.m.; is
18   that right?
19   A.    **That's right.**
20   Q.    And it indicates that Karla Jones received
21   this report?
22   A.    **Right.**
23   Q.    And it indicates that there -- Steven
24   Mullins is the victim and a Clarence Jackson is the
25   suspect.
Page 154

1    Q.    Do you see that?
2    A.    **Yes.**
3    Q.    I want to take you to the narrative here.
4    And it says that on February 25th of 2019 at
5    approximately 4:00 p.m., Correctional Lieutenant
6    Angelia Gordy, PREA compliance manager, received an
7    email from Correctional Lieutenant Tavorez--
8    Tavorez Surles concerning a PREA hotline call made
9    by Steven Mullins -- Inmate Steven Mullins.
10   Do you see that?
11   A.    **Yeah.**
12   Q.    And do you see where it indicates "Inmate
13   Mullins stated that he was released from
14   segregation a couple of weeks ago and moved to cell
15   Q-32."  Do you see that?
16   A.    **Yes.**
17   Q.    Do you know why Mr. Mullins was in
18   segregation?
19   A.    **No, I don't have no idea.**
20   Q.    Okay.  And I want to take you down --
21   let's see a little bit further.  It says, at
22   approximately 4:30 p.m., the incident was reported
23   to Warden Karla Jones.
24   Do you see that?
25   Sorry.  It's a --
Page 155

1    A.    **Oh, yeah, I found it.**
2    Q.    And do you see that it goes on to say, at
3    6:45 p.m., Lieutenant Gordy escorted Inmate Mullins
4    to the infirmary for a body chart.
5    Do you see that?
6    A.    **Yes.**
7    Q.    And that Inmate Mullins was moved to cell
8    L-28.
9    Do you see that?
10   A.    **Yes.**
11   Q.    And so after Ms. Gordy received this
12   report or allegations from Mr. Mullins about a
13   sexual assault from his cellmate, he was
14   transferred to a different dorm, correct?
15   MS. PIERCE:  Object to foundation.
16   A.    **Yes.**
17   Q.    Well, this -- this incident report says
18   that he was assigned to another dorm, right?
19   A.    **Yes.**
20   Q.    I want to go to -- I think this was
21   Exhibit 8, Plaintiff's Exhibit 8, the investigative
22   report for this incident, and I want to take you to
23   -- I think it's page 2 right here.
24   Do you see the paragraph that starts "as
25   SA Casey"?
Page 156

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39 (153 - 156)

Lakeisha Ezell v. Jefferson Dunn, et al.

William Ragsdale
8/1/2024

---

```
 1  A.      Yes.
 2  Q.         Do you see that it says, "As Special Agent
 3  Casey continues the investigation into Inmate
 4  Mullins's homicide, he discovered that on Saturday,
 5  July 7, 2018, at approximately 1730 hours, Inmate
 6  Mullins approached SCCF staff and told officers
 7  that he was unable to live in the prison's general
 8  population."  And it says, "See Incident Number
 9  SCCF-18-00891."  Do you see that?
10  A.      Yeah.
11  Q.         And so is that, to your knowledge,
12  referencing a prior incident report number?
13          MS. PIERCE:  Object to foundation.
14  A.      I'm not sure.
15  Q.         The next line is -- indicates that Inmate
16  Mullins cited a previous assault by unknown inmates
17  in an alleged debt as his reasons for the request
18  of a removal from the general population.
19          Do you see that?
20          Here, I can direct you to it.  It's
21  starting right here, this line.
22  A.      Okay.
23  Q.         Did I read that correctly?
24  A.      Yes.
25  Q.         And the next line, starting, "As a result,
                                                    Page 157
```

```
 1  February 12th of 2019, after an Institutional
 2  Classification Board review of Inmate Mullins's
 3  time in segregation and considering his own request
 4  to leave that protective custody, the prison's ICB
 5  released Inmate Mullins from the prison's
 6  protective custody."
 7          Do you see that?
 8  A.      Yes.
 9  Q.         Did I read that correctly?
10  A.      Yes.
11  Q.         And do you see the next line, "Prior to
12  his return to the prison population, the inmate
13  signed a voluntary statement, which, in part, read,
14  I, Steven Mullins, do hereby state that I can live
15  in the St. Clair population without any problems,
16  and I have no known enemies at this institution.  I
17  hereby relieve any and all ADOC officials of any
18  liability and damages.  Upon his release, prison
19  staff assigned Inmate Mullins to SCCF's Q-dorm,
20  cell 32."  Do you see that?
21  A.      Yes.  Uh-huh.
22  Q.         Did I read that correctly?
23  A.      Yes.
24  Q.         And the next paragraph, that's the
25  paragraph we read earlier, where it indicated that
                                                    Page 159
```

```
 1  SCCF placed Inmate Mullins in the prison's
 2  segregation special security unit, an area referred
 3  to as protective custody pending disciplinary
 4  hearing -- hearings and actions for inability to
 5  adjust to population/programs."
 6          Did I read that correctly?
 7  A.      Yes.
 8  Q.         So after this incident where Mr. Mullins
 9  alleged to owe a debt and have been assaulted by
10  some unknown inmates, this report at least
11  indicates that he was placed in the special
12  security unit?
13          MS. PIERCE:  Object to foundation.
14  A.      Yes.
15  Q.         Do you see that it continues that the same
16  day Inmate Mullins provided a urine sample for a
17  prison drug screen?  The return results of that
18  test show that Inmate Mullins had sometime recently
19  ingested amphetamine.  Do you see that?
20  A.      Yes.
21  Q.         And I want to go down just a little bit
22  further.  It indicates in the paragraph starting
23  "ultimately," do you see that paragraph?
24  A.      Yeah.
25  Q.         It says, "Ultimately, on Tuesday,
                                                    Page 158
```

```
 1  on Monday, February 25, 2019, at 0601 hours, Inmate
 2  Mullins reported to Officer Dylan Tucker that he
 3  was the victim of an assault by an unknown
 4  assailant.
 5          Do you see that?
 6  A.      Yes.
 7  Q.         And that's consistent with what's in your
 8  incident report; isn't that right?
 9  A.      Yes.
10  Q.         I wanted to ask you -- I think this is --
11  I believe this was Exhibit 10, Plaintiff's
12  Exhibit 10, and this is the PREA audit report from
13  June 4th of 2018 that was completed by Dave Cotten.
14          Do you see that?
15  A.      Yes.
16  Q.         And do you see, at the top, it has a box
17  for interim and a box for final, correct?
18  A.      Yes.
19  Q.         And this -- the box that is checked is
20  actually the box for interim, correct?
21  A.      Yes.
22  Q.         Does that indicate to you that this was
23  not Mr. Cotten's final report?
24          MS. PIERCE:  Object to foundation.
25  A.      I'm not sure about that.  I would say it
                                                    Page 160
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40 (157 - 160)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **William Ragsdale**
                                                                        **8/1/2024**

| | |
|---|---|
| 1  wasn't his final. | 1  enforce the wristband policy. Staff will check |
| 2  Q.      Do you recall how many times Mr. Cotten | 2  inmates' wristbands before allowing them to enter a |
| 3  actually came and toured St. Clair to perform a | 3  dormitory. Inmates will not be allowed to enter an |
| 4  security -- I mean, a PREA audit? | 4  unauthorized area. If the inmate becomes |
| 5  A.      I think it was that he was there about | 5  disruptive, call for assistance. Disciplinary |
| 6  three days. | 6  action will be initiated against the inmate. |
| 7  Q.      Do you remember on how many occasions he | 7          "Also, all staff will ensure the security |
| 8  visited St. Clair? | 8  doors are secured always. Failure to comply with |
| 9          MS. PIERCE: Object to the form. | 9  this memorandum will result in corrective action." |
| 10         MR. HILL: If you know. | 10         Do you see that? |
| 11 A.      I don't know. | 11 A.      Yes. |
| 12 Q.      Okay. That's fine. I got you. | 12 Q.      And did I read that correctly? |
| 13         Earlier, Ms. Pierce asked you some | 13 A.      Yes. |
| 14 questions about the PREA audit and then whether | 14 Q.      Do you see the next paragraph? It |
| 15 anything was done in the aftermath to address it. | 15 indicates in compliance with PREA standard, section |
| 16         Do you remember those questions? | 16 115.13, subsection D, each agency operating |
| 17 A.      Yes. | 17 facility shall implement a policy and practice of |
| 18 Q.      I'm going to -- I'm showing you what will | 18 having intermediate-level or high-level supervisors |
| 19 be Defense Exhibit 3. | 19 conduct and document unannounced rounds to identify |
| 20         (Defendants' Exhibit Number 3 was marked | 20 and deter staff sexual abuse and sexual harassment |
| 21          for identification.) | 21 complaints." |
| 22 Q.      And it's basically ADOC-DS027639 through | 22 A.      Yes. |
| 23 ADOC-DS027642. | 23 Q.      Do you see that? |
| 24         And if you look at this, it's dated | 24         And the next line, it reads, "Effective |
| 25 May 22nd of 2018, correct? | 25 immediately, only lieutenants and above are to |
| Page 161 | Page 163 |
| 1  A.      Correct. | 1  conduct PREA unannounced rounds." |
| 2  Q.      And this is a memo from Karla Jones, who | 2          Do you see that? |
| 3  is the warden at the time; is that right? | 3  A.      Yes. |
| 4  A.      Correct. | 4  Q.      And then it asks -- she asked, "Please |
| 5  Q.      And it's to all staff at St. Clair. Is | 5  acknowledge by signature and return to me by May |
| 6  that -- is that accurate? | 6  30, 2018." |
| 7  A.      Correct. | 7          Do you see that? |
| 8  Q.      And do you see that the reference line is | 8  A.      Yes. |
| 9  PREA standards use of screening information, | 9  Q.      And on the next page, it's -- it's dated |
| 10 protection from retaliation and then PREA standard | 10 May 22, 2018, and it indicates, "By my signature |
| 11 unannounced rounds? | 11 below, I have read and understand the memorandum |
| 12 A.      Yes. | 12 dated May 22, 2018, unannounced rounds, use of |
| 13 Q.      And in this memo, do you see, it reads, | 13 screening information, protection from |
| 14 "During the recent audit, it was determined by the | 14 retaliation." |
| 15 auditor -- auditor that the facility was not | 15         Do you see that? |
| 16 enforcing a wristband policy and allowing inmates | 16 A.      Yes. |
| 17 to enter living areas where they were not assigned. | 17 Q.      And then below that, the -- it's signed by |
| 18 It was also noted during the PREA audit that in the | 18 different members of the St. Clair staff; is that |
| 19 Honor dorm, doors to both sides are left open any | 19 correct? |
| 20 time staff are not in the cube, reportedly due to | 20 A.      Correct. |
| 21 shortage of staff, thereby granting all facility | 21 Q.      Specifically, do you see here that on |
| 22 inmates access to the entire dorm. This subverts | 22 June 6th of 2018, Larry Baker signed this document? |
| 23 the facility's policy on the separation of victims | 23         MS. PIERCE: Object to foundation. |
| 24 and abusers in protection from retaliation. | 24 A.      Yes. |
| 25         "Effective immediately, all staff will | 25 Q.      And underneath Mr. Baker's name, do you |
| Page 162 | Page 164 |

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  see the name Eric Garrett?
2  **A.      Yeah.**
3  Q.      Do you see a signature beside his name?
4  **A.      Yeah.**
5  Q.      And that was June the 6th of 2018
6  according to this sheet?
7  **A.      Yes.**
8  Q.      Do you see, at the very bottom of this
9  second sheet -- that's ADOC-DS027641 -- at the very
10 bottom, there's A. Gordy.  Do you see that?
11 **A.      Yes.**
12 Q.      And it's got a signature next to that
13 name, correct?
14 **A.      Yes.**
15 Q.      And dated June the 6th of 2018; is that
16 correct?
17 **A.      Correct.**
18 Q.      Do you also see, on this third -- third
19 page of the signature pages, the name LaTonya Scott
20 about a third of the way down the page?
21 **A.      Yes.**
22 Q.      And do you see that is -- there's a
23 signature next to her name as well?
24 **A.      Yes.**
25 Q.      And it's dated June 6th of 2018?
                                              Page 165

1  **A.      Yes.**
2  Q.      And lastly, at the bottom of this page, do
3  you see the name Cynthia Caver?
4        MS. PIERCE:  We have the witness on again.
5        MR. CRANFORD:  Oh.
6        THE WITNESS:  Okay.  Oh.
7        MR. CRANFORD:  Give us a few more minutes,
8  Mr. Price.  I'm almost done.
9        THE WITNESS:  All right.  Yes, I see it.
10 Q.      (By Mr. Cranford) And do you see her
11 signature next to that?
12 **A.      Yes.**
13 Q.      Next to her name?
14 **A.      Uh-huh.**
15 Q.      And it's also dated June 6th, correct?
16 **A.      Yes.**
17 Q.      I'm almost -- almost through here.  I just
18 want to ask you a few -- or a couple more
19 questions.  Let me get to -- there we go.  Okay.
20 So this is a document that's Bates labeled
21 ADOC-DS027665 through 7666.
22        And do you see that --
23        MS. PIERCE:  Are you going to mark that as
24 an exhibit?
25        MR. CRANFORD:  Yeah.
                                              Page 166

1        MS. PIERCE:  I think that we --
2        MR. CRANFORD:  We will mark it as
3  Exhibit 4, Defense Exhibit 4.
4              (Defendants' Exhibit Number 4 was marked
5              for identification.)
6  Q.      (By Mr. Cranford) You see that it says, on
7  July 22, 2018, Mr. Dave Cotten with PREA Auditors
8  of America conducted a follow-up PREA audit at
9  St. Clair Correctional Facility.  Do you see that?
10 **A.      Yes.**
11 Q.      And that on May 1st through the 3rd, 2018,
12 the facility did not meet standards?  Do you see
13 that?
14 **A.      Yes.**
15 Q.      And it lists three standards -- use of
16 screening information -- I'm sorry -- two standards
17 -- use of screening information and agency
18 protection duties; is that right?
19 **A.      Yes.**
20 Q.      Do you know how many total standards there
21 are under PREA?
22 **A.      No, I don't remember now.  It's...**
23 Q.      Is it more than ten?
24 **A.      I am pretty sure it is.  It's a...**
25 Q.      And do you see that if we go down, there's
                                              Page 167

1  a section entitled corrective action plan?
2  **A.      Yes.**
3  Q.      And do you see that it lists that
4  wristbands will be placed on inmates at receiving.
5  Wristbands will be put on tight enough to minimize
6  the inmates' ability to slip the wristbands on and
7  off?  Do you see that?  Did I read that correctly?
8  **A.      Yes.**
9  Q.      Do you see that during unannounced rounds,
10 the supervisor will check for wristband compliance,
11 and inmates who do not have on wristbands will
12 receive disciplinary action; is that right?
13 **A.      Yes.  Uh-huh.**
14 Q.      It also indicates that during the black
15 and white count -- and let me -- let me ask real
16 quick:  What's a black and white count?
17 **A.      It's the black inmates and the white**
18 **inmates.**
19 Q.      Is that the same thing as a bed roster
20 count?
21 **A.      Yes.**
22        MS. PIERCE:  Hold on.  Object to form.
23 Q.      Okay.  And you said yes?
24 **A.      Yes, same as a bed count.**
25 Q.      "The officers will check for wristband
                                              Page 168

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  compliance.  The officers will document how many
2  inmates had on wristbands and how many inmates did
3  not have on wristbands."
4          Do you see that?
5  A.      Yes.
6  Q.      It indicates that inmates who did not have
7  on wristbands will receive disciplinary action; is
8  that right?
9  A.      That's right.
10 Q.      And this is just the last -- last thing I
11 wanted to ask you about.  This is a document that
12 is identified or Bates labeled ADOC-DS027659
13 through 027661.  And I'll mark this as Defense
14 Exhibit 5.
15          (Defendants' Exhibit Number 5 was marked
16           for identification.)
17 Q.      Do you see that this is a memorandum dated
18 September 13, 2018?
19 A.      Yes.
20 Q.      Do you see that it's from Jeffery Williams
21 to Edward Ellington, Christopher Gordy -- I'm sorry
22 -- Christopher Gordy?
23 A.      Yes.
24 Q.      And it's titled Wristband Audit at
25 St. Clair; is that right?
                                        Page 169

1  A.      Yes.
2  Q.      Do you see that it says that on September
3  the 13th of 2018, at approximately 10:30 a.m., the
4  following ADOC employees conducted a wristband
5  audit at St. Clair Correctional Facility?
6  A.      Yes.
7  Q.      And it lists Karen Carter, Warden II from
8  Childersburg Work Release; Michael Wood, the
9  institutional PREA compliance manager at
10 Childersburg Work Release; Christopher L. Gordy,
11 the Warden III from Donaldson Correctional
12 Facility; and Deaundra Johnson, institutional PREA
13 compliance manager from Donaldson Correctional
14 Facility.
15 A.      Yes.
16 Q.      And it indicated the purpose of the audit
17 is to check inmate compliance with wearing the
18 wristbands and the staff's ability to prevent
19 inmates from entering living areas where they are
20 not assigned.
21          Do you see that?
22          MS. PIERCE:  Object to the form.
23 A.      Yes.
24 Q.      And it indicates that Warden Gordy and
25 Lieutenant Johnson were escorted by Gwendolyn
                                        Page 170

1  Givens, who is the Warden II, to check wristband
2  compliance in the following housing units:  P1, P2,
3  Q1, Q2, and H?
4          Does that -- did I read that right?
5  A.      Yes.
6  Q.      If we go down, it indicates that the
7  results of the audit were as follows:  That in P1,
8  there were five inmates without a wristband; is
9  that right?
10 A.      Correct.
11 Q.      How many inmates are on each side of a
12 dorm?
13          MS. PIERCE:  Object to foundation.
14 A.      48.
15 Q.      So in total, a dorm can house up to 96
16 inmates?
17 A.      Well, one dorm -- one dorm, you have 12
18 cells around the bottom with two inmates to a cell,
19 and then you have a top tier with 12 cells, two
20 inmates to -- a dorm -- one dorm, like our P-dorm,
21 it would hold 48 inmates.
22 Q.      So -- but you've got two sides, correct?
23 A.      Yeah, you've got -- well, like, your P and
24 Q side, it'd be -- you'd have one -- yeah, it
25 would -- doing it that way, it would be 96.
                                        Page 171

1          MS. PIERCE:  Object to -- object to form.
2  Q.      So if you have -- let's take P for
3  example.  You've got -- in P-dorm, you've got P on
4  one side, which can hold up to 48 inmates, correct?
5  A.      Yeah.
6  Q.      And P2 side, which can also hold up to --
7  A.      Hold up to 40, yeah.
8  Q.      So altogether, you would have --
9  A.      96.
10 Q.      At full capacity, you would have 96
11 inmates?
12 A.      Yeah.
13 Q.      And it indicates, in P2, eight inmates did
14 not have their wristband, and six of the eight
15 inmates were assigned to dorm P2; is that right?
16 A.      Right.
17 Q.      Okay.  And in Q, there are four inmates
18 who did not have their wristband, correct?
19          MS. PIERCE:  Object to foundation.
20 A.      Correct.
21 Q.      And this report indicated that there were
22 four inmates in Q2 that didn't have their
23 wristbands, correct?
24 A.      Correct.
25 Q.      And it indicates that all of the inmates
                                        Page 172

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43 (169 - 172)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**William Ragsdale**
**8/1/2024**

1  in H dorm had their wristbands; is that right?
2  **A.**    **Yes.  Correct.**
3  **Q.**    It also indicates that Warden Carter and
4  Lieutenant Wood were escorted by Angelia Gordy,
5  who's the institutional PREA compliance manager, to
6  the following housing units: J1, J2, K1, K2, L1,
7  L2, M1, M2, and G.
8      Did I read that correctly?
9  **A.**    **Yes.**
10  **Q.**    And the result of the audit indicates that
11  in J1, all inmates had their wristbands on,
12  correct?
13  **A.**    **Correct.**
14  **Q.**    And it reports that all the inmates were
15  assigned to J1, correct?
16      MS. PIERCE:  Sorry.  Object to foundation
17  on those questions.
18  **Q.**    Well, the report indicates that all
19  inmates were assigned to J1 that were there,
20  correct?
21  **A.**    **Correct.**
22  **Q.**    And the same for J2.  It reports that all
23  J2 inmates had on wristbands and were assigned to
24  that housing unit, correct?
25      MS. PIERCE:  Object to form and
Page 173

1  foundation.
2  **A.**    **Correct.**
3  **Q.**    And it goes on.  In K1, all inmates in K1
4  had on wristbands.  Did I read correctly?
5  **A.**    **Yes.**
6  **Q.**    And all inmates were assigned to K1.
7      Did I read that correctly?
8  **A.**    **Yes.**
9  **Q.**    And K2, it -- this report indicates that
10  all inmates in K2 had on wristbands, correct?
11  **A.**    **Correct.**
12  **Q.**    And all inmates were assigned to K2,
13  correct?
14  **A.**    **Correct.**
15      MS. PIERCE:  Object to foundation and
16  form.
17  **Q.**    And in L1, it -- this report indicates
18  that all inmates in L1 had on their wristbands?
19      Did I read that correctly?
20  **A.**    **Yes.**
21  **Q.**    And that all inmates were assigned to L1.
22      Did I read that correctly?
23  **A.**    **Yes.**
24  **Q.**    And in L2, all inmates in L2 had on their
25  wristbands.
Page 174

1      Did I read that right?
2  **A.**    **Yes.**
3  **Q.**    And all inmates were assigned to L2; is
4  that correct?
5  **A.**    **Yes.**
6  **Q.**    And the same for --
7      MS. PIERCE:  Object to the form -- hold
8  on.  Hold on.  Object to form and foundation.
9  **Q.**    (By Mr. Cranford) Okay.  And we could go
10  through -- there's M1, M2, and G left.  And am I
11  act -- am I representing this report accurately
12  when I say that for all three of these dorms, it's
13  reported that all of the inmates had on their
14  wristbands and were in the appropriate dorm for
15  their assignment?
16  **A.**    **Yes.**
17  **Q.**    And then the conclusion for this report
18  indicates that out of a total population of 888
19  inmates, there was a total of two inmates who were
20  out of place.
21      Did I read that correctly?
22  **A.**    **Yes.**
23  **Q.**    And these two inmates had on their
24  assigned dorm's wristband.
25      Did I read that correctly?
Page 175

1  **A.**    **Yes.**
2  **Q.**    And 19 inmates who did not have on their
3  wristbands but were in their assigned dorm.
4      Do you see -- did I read that correctly?
5  **A.**    **Yes.**
6  **Q.**    Then it reads, "All inmates who did not
7  have on a wristband or were out of place received
8  disciplinary action."
9      Does that -- did I read that correctly?
10  **A.**    **Yes.**
11  **Q.**    "All the doors were secured and controlled
12  by security within -- with only 21 inmates,
13  2.3 percent of population inmates, not compliant
14  with the wristband policy.  St. Clair is doing an
15  excellent job enforcing the wristband policy."
16      Did I read that correctly?
17  **A.**    **Yes.**
18  **Q.**    I'll stop sharing my screen if I can
19  figure out how to do that.
20      MR. CRANFORD:  Those are all the questions
21  I have, Mr. Ragsdale.
22      THE WITNESS:  All right.
23      MS. PIERCE:  I have just one follow-up
24  question.
25      MR. HILL:  I have no questions, by the
Page 176

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44 (173 - 176)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **William Ragsdale**
                                                                  **8/1/2024**

---

| | |
|---|---|
| 1  way. | 1                C E R T I F I C A T E |
| 2          MS. PIERCE:  Sorry. | 2 |
| 3          MR. HILL:  It's okay. | 3  STATE OF ALABAMA) |
| 4          MS. PIERCE:  Just a few follow-up | 4  ETOWAH COUNTY   ) |
| 5  questions, Mr. Ragsdale. | 5 |
| 6                FURTHER EXAMINATION | 6          I hereby certify that the above and |
| 7  BY MS. PIERCE: | 7  foregoing proceedings were taken down by me in |
| 8  Q.      That wristband audit that was reflected in | 8  stenotype, and the questions and answers thereto |
| 9  the report that you just discussed with Mr. | 9  were reduced to computer print under my |
| 10  Cranford, do you have any personal knowledge of | 10  supervision, and that the foregoing represents a |
| 11  that wristband audit or the result that came out of | 11  true and correct transcript of the proceedings |
| 12  it? | 12  given by said witness upon said hearing. |
| 13  A.      No -- | 13          I further certify that I am neither of |
| 14  Q.      I have no additional -- | 14  counsel nor of kin to the parties to the action, |
| 15  A.      -- I don't -- I don't know when -- I could | 15  nor am I in anywise interested in the result of |
| 16  have been off when they done it.  The way we | 16  said cause. |
| 17  worked -- | 17          Signed the 14th day of August 2024. |
| 18  Q.      I'm sorry? | 18 |
| 19  A.      I could have been off of work, the way we | 19 |
| 20  done it. | 20 |
| 21  Q.      Okay.  So to be clear, you don't have any | 21  /s/ Lauryn Bellerose |
| 22  personal knowledge or -- |      Lauryn Bellerose |
| 23  A.      No. | 22  ACCR #720 - Expires September 30th, 2025 |
| 24  Q.      -- memory of it, correct? |      My Commission Expires April 12th, 2027 |
| 25  A.      No. | 23 |
|                              Page 177 | 24 |
| | 25 |
| |                              Page 179 |

---

| |
|---|
| 1  Q.      Is that correct? |
| 2  A.      Yeah. |
| 3          MS. PIERCE:  I have no other additional |
| 4  questions. |
| 5          THE COURT REPORTER:  Okay.  Are we going |
| 6  to order a copy of the transcript? |
| 7          MS. PIERCE:  We won't be ordering at this |
| 8  time. |
| 9          MR. CRANFORD:  We will need one. |
| 10          (The deposition of WILLIAM RAGSDALE was |
| 11          concluded at 1:32 p.m.) |
| 12          --oOo-- |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
|                              Page 178 |