FILED
2025 Mar-10 PM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| LORI GUY, as representative of the ESTATE OF STEVEN MULLINS | ) | Honorable Judge Annemarie Carney Axon |
| Plaintiff, | ) | |
| | ) | Case No.: 4:21-cv-00264-ACA |
| v. | ) | |
| JEFFERSON DUNN, et al., | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFF LORI GUY'S RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

RESPONSE TO FACILITY DEFENDANTS' FACTS .......... 2

RESPONSE TO ADOC DEFENDANTS' FACTS .......... 14

ADDITIONAL UNDISPUTED FACTS .......... 26

ADDITIONAL DISPUTED FACTS .......... 32

A. Defendants knew Mullins was a vulnerable prisoner who required housing in the Special Safety Unit ("SSU") but did not place him there. .......... 32

B. Defendants placed Mullins in the Q-2 block with known predators including Clarence Jackson, rather than the SSU, after he became suicidal in restrictive housing. .......... 35

C. Defendants responded unreasonably to Mullins's pleas for help after he reported violence at knifepoint by Jackson on February 25, 2019. .......... 40

D. Defendants failed to protect Mullins on February 26, 2019, from the danger posed to him by Jackson .......... 50

E. Defendants allowed Jackson to move without authorization to the L Block to fatally stab Mullins .......... 51

F. In 2018 and early 2019, violence at St. Clair was the norm, particularly in the dangerous P/Q blocks. .......... 52

G. In 2018 and early 2019, weapons contraband was pervasive and St. Clair had a widespread practice of failing to conduct reasonable contraband searches. .......... 58

H. In 2018 and early 2019, St. Clair had a widespread practice of largely uncontrolled prisoner movement in its general population units. .......... 65

I. In 2018 and early 2019, St. Clair had a widespread practice of failing to safely segregate and monitor violent prisoners with histories of institutional violence from vulnerable prisoners such as Mullins ....70

J. In 2018 and early 2019, St. Clair had a widespread practice of noncompliance and lack of enforcement with its written security policies. ....74

K. In 2018 and early 2019, physical plant issues at St. Clair exacerbated the substantial risk of serious harm from violence to prisoners ....79

L. Defendants were well aware of the risk to prisoners such as Mullins, but failed to act....82

M. Defendants failed to act even after multiple 2018 murders at St. Clair ....97

LEGAL STANDARDS ....99

I. Summary Judgment ....99

II. Eighth Amendment Failure to Protect Liability .... 100

III. Affirmative Defense of Qualified Immunity....103

IV. Wrongful Death Liability....105

V. Eighth Amendment Unlawful Retaliation Liability....107

ARGUMENTS AND AUTHORITIES ....109

I. Jones is not entitled to summary judgment on Count I.... 109

II. Jones is not entitled to qualified immunity as to Count I ....117

III. Jones is not entitled to summary judgment on Count IX ....124

IV. Ellington is not entitled to summary judgment on Count I ....126

V. Ellington is not entitled to qualified immunity as to Count I ....132

VI. Ellington is not entitled to summary judgment on Count IX.....................134

VII. Dunn is not entitled to summary judgment on Count I..............................136

VIII. Dunn is not entitled to qualified immunity as to Count I............................141

IX. Dunn is not entitled to summary judgment on Count IX. ..........................144

X. Givens is not entitled to summary judgment on Counts IX and X...........147

XI. Givens is not entitled to summary judgment on Count VI. ........................155

XII. Brooks is not entitled to summary judgment on Counts IX and X.........................................................................................................160

XIII. Ragsdale is not entitled to summary judgment on Count IX and X. .........164

XIV. Ragsdale is not entitled to summary judgment on Count VI......................169

XV. Culliver is not entitled to summary judgment on Count IX.......................173

XVI. Gordy is not entitled to summary judgment on Counts XI and X............176

XVII. Malone is not entitled to summary judgment on Count IX........................183

XVIII. Price is not entitled to summary judgment on Counts XI and X...............189

XIX. Price is not entitled to summary judgment on Count VI............................195

**TABLE OF AUTHORITIES**

CASES

*Adickes v. Kress & Co.*, 398 U.S. 144 (1970) ....................99

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir.1985)....................141

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................99

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) ....................143

*Auriemma v. Rice*, 910 F.2d 1449 (7th Cir. 1990) ....................143

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................101

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005)....................107

*Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc)....................109

*Boykins v. Dunn*, 696 F. Supp. 3d 1061 (N.D. Ala. 2023)....................*passim*

*Bridges v. Poe*, 487 F. Supp. 3d 1250 (N.D. Ala. 2020) ....................112

*Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015) ....................123

*Brown v. Dunn*, 2024 WL 5168637 (M.D. Ala. Dec. 19, 2024) ....................145

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014).................... 100, 122, 123

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................... 99, 109

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ....................103

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ....................104

*Dickinson v. Cochran*, 833 F. App'x 268 (11th Cir. 2020) .................... *Passim*

*Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121 (5th Cir. 1991) .................... 14, 187

*Duke v. Dunn* Case No. 4:14-cv-01952-RDP (N.D. Ala. Jan. 14, 2022).................... *Passim*

*Epps v. Watson*, 492 F.3d 1240 (11th Cir. 2007) ....................104

*Est. of Cummings v. Davenport*, 906 F.3d 934 (11th Cir. 2018).................... *Passim*

*Ex parte Ala. Dept. of Corr.*, 201 So.3d (Ala. 2016) ....................126

*Ex parte Cranman*, 792 So. 2d 392 (Ala. 2006) ....................107, 126, 135, 146

*Ex parte Est. of Reynolds*, 946 So. 2d 450 (Ala. 2006)....................107, 126, 135, 146

*Ex parte Hayles*, 852 So. 2d 117 (Ala. 2002) ....................107

*Ezell v. Dunn, et al,* Case No. 4:20-cv-02058-ACA (N.D. Ala. Mar. 31, 2023)....................99, 102, 106, 140

*Farmer v. Brennan*, 511 U.S. 825 (1994).................... *Passim*

*Fikes v. Abernathy,* 2018 WL 2207134 (N.D. Ala. May 14, 2018) ....................106

*Fleming v. Dowdell*, 434 F. Supp. 2d 1138 (M.D. Ala. 2005) ....................181, 187

*Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974)....................120

*George v. Wexford Health Sources*, 2024 WL 1120110 (M.D. Ala. Mar. 10, 2024) ....................141

*Gomez v. Toledo*, 446 U.S. 635 (1980)....................104

*Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003)....................104

*Guy v. Dunn*, 2023 WL 6378967 (N. D. Ala. Sept. 29, 2023) ....................145

*Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995).................... *Passim*

*Handley v. United States*, 5:17-CV-01278-HNJ, 2021 WL 2023057 (N.D. Ala. Mar. 18, 2021)....................105

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)....................104, 143

*Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227 (11th Cir. 2010)....................103

*Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991)....................................................141

*Hicks v. Ferrero*, 241 F. App'x 595 (11th Cir. 2007)....................................107, 159

*Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004)................................................104

*Hope v. Pelzer*, 536 U.S. 730 (2002) ..............................................................................105

*Huffman v. Dunn*, 2021 WL 2533024 (N.D. Ala. June 21, 2021).......................... *Passim*

*Int'l Woodworkers v. Champion Int'l*, 790 F.2d 1174 (5th Cir. 1986) ................................121

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)............................................143

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir. Jan. 29, 1981) (en banc)............... 120, 133, 142

*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010) ...............................................107

*Kingsley v. Hendrickson*, 801 F.3d 828 (7th Cir. 2015)..................................................143

*Kumar v. Panera Bread Co.*, 2024 WL 4281018 (S.D. Tex. Sept. 24, 2024)................ *Passim*

*LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) .......................................... *Passim*

*Lane v. Philbin*, 835 F.3d 1302 (11th Cir. 2016) ................................... 120, 133, 142

*Ledbetter v. Goodyear Tire*, 421 F.3d 1169 (11th Cir. 2005), aff'd, 550 U.S. 618 (2007)........................................................................ 100, 121, 133

*Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019) ....................... 100, 101, 102, 110, 111

*Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (en banc) ............................ *Passim*

*Moton v. Cowart*, 631 F.3d 1337 (11th Cir. 2011) ........................................................108

*Patel v. Lanier Cnty.*, 969 F.3d 1173 (11th Cir. 2020).....................................................122

*Pearson v. Callahan*, 555 U.S. 223 (2009)......................................................................143

*Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016) .....................................105, 118

*Perryman v. Butler Cnty. Comm'n*, 2024 WL 2221476 (M.D. Ala. May 16, 2024) ............145

*Powell v. Dunn*, 2022 WL 610172 (N.D. Ala. March 1, 2022) .........................................145

*Purcell ex rel. Est. of Morgan* 400 F.3d 1313 (11th Cir. 2005) .......................... 120, 133, 142

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ..................................... *Passim*

*Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611 (11th Cir. 2007) .............................. *Passim*

*Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678 (11th Cir. 2014) ......109, 110, 118, 127

*Smith v. Mosley*, 532 F.3d 1270 (11th Cir. 2008) ..............................................................159

*Smith v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980) ..............................................................141

*Taylor v. Hughes*, 920 F.3d 729 (11th Cir. 2019) ...............................................................107

*Thompson v. Alabama*, 65 F.4th 1288 (11th Cir. 2023) ................................................ *Passim*

*Valdes v. Crosby*, 450 F.3d 1231 (11th Cir. 2006) .................................................... 112, 140

*Vinson v. Clarke Cnty., Ala.*, 10 F. Supp. 2d 1282, 1303 (S.D. Ala. 1998) ......................105

*Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc) ................101, 102, 136, 143

*Waldron v. Spicher*, 954 F.3d 1297 (11th Cir. 2020) .........................................................105

*Wildberger v. Bracknell*, 869 F.2d 1467 (11th Cir. 1989) .......................................... 159, 160

*Williams v. Edwards,* 547 F.2d 1206, 1211 (5th Cir. 1977) ...................................... 120, 141

*Wilson v. Stewart*, 2021 WL 3439398 (S.D. Ala. Aug. 5, 2021) ........................................145

RULES

Fed. R. Civ. P. 56(c) .....99

STATUTES

Alabama Code 1975 § 14-1-1.3 .....28

Alabama Code § 6-5-410 .....105

## INTRODUCTION

Plaintiff Lori Guy Willis brings this action to redress the tragic and preventable death of her brother, Steven Mullins, while in Defendants' custody at the horrifically violent St. Clair Correctional Facility ("St. Clair"). Defendants allowed Mr. Mullins to be sexually assaulted, threatened, and ultimately, murdered, by a serial assailant, Clarence Jackson, despite Mullins's repeated pleas to be removed from general population at St. Clair and protected from Jackson, a known and armed PREA predator with a well-known and documented history of assault and retaliation.

Sadly, Mr. Mullins's death was but one in a string of violent stabbings at St. Clair, where violence and terror reigned. Plaintiff's evidence shows that, rather than acting urgently to respond to the crisis of violence, Defendants ignored the dangerous conditions and continued the practices that fueled the violence; they permitted contraband weapons to proliferate at St. Clair and failed to take steps to control the use of contraband weapons by prisoners; they enabled a culture of rampant unauthorized movement and widespread non-compliance with written policies, failing to discipline misconduct; and they failed to segregate prisoners with known histories of institutional violence from vulnerable prisoners, housing dangerous predators in the poorly monitored "hot bay" P/Q blocks, where they were able to travel throughout general population without intervention from staff. This conduct continued in the timeframe leading to Mr. Mullins's death, as Defendants responsible for rules compliance, housing assignments, contraband searches, and response to

reports of sexual assault at St. Clair acted callously and unreasonably in response to a series of desperate pleas for help from Mr. Mullins to protect him from the dangerous, knife-wielding Jackson.

Seeking to escape liability for their abdication of duty, the Moving Defendants seek dismissal of all claims against them prior to trial, disclaiming any responsibility for Mr. Mullins's preventable death. However, Defendants fail to satisfy their burden to establish an absence of genuine issue of material fact on Plaintiff's Eighth Amendment and wrongful death claims, nor an entitlement to either qualified or state law immunity. All Defendants received all of the extra pages they asked from the Court in their briefing, without any opposition from Plaintiff (ECF 149, 150), and thus Defendants have no excuse to have failed to meet their burden on either account. Their motion must be denied in full.[1]

**RESPONSE TO FACILITY DEFENDANTS' FACTS** (ECF 248)

1. Disputed that Mullins was a "known drug user." Doc. 165-54, pg. 5, says only that "Lt Price told the investigators that Inmate Mullins was a known drug user," but at his deposition, Price denied having any knowledge of Mullins being a drug user (ECF 352 at 115:3-116:224) and Mullins had not a single disciplinary sustained relating to drugs in the five years leading up to his death (ECF 184-1 at 88). Further disputed

[1] To continue to streamline her claims for trial, Plaintiff does not pursue her claims against Defendants Graham and Vincent, or her retaliation claim against Defendant Brooks, and thus does not oppose dismissal of those claims.

that Mullins was a member of the Aryan Brotherhood: Mullins's classification records consistently reflect *no* indication of a gang or Security Threat Group (STG) membership (ECF 184-1 at 86, 237, 71, 33; ECF 185-1 at 54) and Defendants cite only an email following his death.

2. Disputed that there is no evidence of a final decision on Mullins's need for the SSU. First, as discussed at PSOF 43-46, Malone and others involved admit otherwise. E.g., ECF 322 at pg. 40, No. 107; ECF 328 at pg. 7, No. 106; ECF 329 at pg. 7, No. 106; ECF 330 at pg. 7, No. 106; ECF 360 at 116:15-117:6; ECF 354 at 59:18-60:8 ; ECF 165-44 at 1, 4. Second, ECF 165-14 at 172:19-173:5 discusses only the general process; it does not state that Mullins was not approved. Finally, ECF 160-5 at 116:21-25 does not contain any information pertinent to this statement of fact. Further dispute footnote 2 that the SSU had 48 beds; it had 24 at the time of Mullins's death. PSOF 204. Further objection to footnote 3 because it does not contain the material cited. ECF 165-14 at 51

3. Disputed Mullins left "protected custody' on February 12; he was in the restricted housing unit under severe restrictions (PSOF 40-41, 50-54), and he was never offered a housing assignment in the SSU, which was protective custody (PSOF 46-49, 51, 54, 100-101); ECF 282. Further disputed to the extent that Defendants imply that the release Defendants forced Mullins to sign to leave restrictive housing somehow relieved Defendants of responsibility to respond to Mullins' February 25 and 26 reports about the threat from Clarence Jackson. ECF 361 at 98:13-101:24.

4. Admitted that Mullins moved himself to Q27. Disputed that Defendants cite any evidence indicating that Mullins did not raise his cell assignment with staff between February 13 and February 24, or that staff would have responded appropriately had he done so. When Mullins raised the issue on February 25, no staff took any action to address the matter (PSOF 57-58), consistent with a practice of declining to discipline unauthorized movement (PSOF 171-176, 183-84).

5. Disputed. Contemporaneous reports from Mullins in his own words, show that Mullins repeatedly indicated that his assailant was his cellmate, C.J., in cell Q27, whom Defendants could easily identify. PSOF 68-74; E.g., ECF 266; ECF 286 at 2, 4; ECF 327 at 1. Further deny that Mullins merely told Tucker that he "was assaulted"; Mullins's reports in his own words from the same time period reflect detailed descriptions of escalating abuse culminating in sexual assault. PSOF 70-71, 74, 78; ECF 266; ECF 286 at 2, 4. Ragsdale also spoke to Mullins directly about the abuse. ECF 220-2 at 2. Further deny that Mullins merely requested placement in a one-man cell; Mullins's contemporaneous reports in his own words state: "I need some help. I've asked to be placed in seg for my own safety, PC if possible but I cannot live in St. Clair population." ECF 266; *see also* ECF 171-2 at 1 ("Mullins claims that he is in fear for his life in population at St. Clair"). Footnote 4 is further disputed because the exhibit does not contain the material cited. ECF 182-1.

6. The first sentence is disputed only to the extent that Ragsdale's purpose was "to separate Mullins from his assailant" because Ragsdale knew about the widespread

unauthorized movement in the P/Q blocks and thus he knew there would be no meaningful separation (PSOF 103-104). The second sentence is denied because ECF. 219-1 does not contain the information cited.

7. The first sentence is disputed only to the extent that Givens told Mullins to return for a "bed roster count." That is not in ECF. 165-63 at p.9, or in ECF. 210-1 at 121:15-21, and Plaintiff's evidence indicates that bed roster counts were infrequent and, when done, staff either did not actually confirm if prisoners were in their assigned cell or did not discipline individuals who were living in unauthorized areas. PSOF 172; ECF 299 at 14; ECF 292 at 58, 77, 82-87. For example, no one detected for two weeks that another inmate was sleeping in Mullins's assigned bed (PSOF 56-57). Moreover, Mullins was not living in his assigned cell, and he was not disciplined for failing to live in his assigned cell following any alleged count on February 25 (nor were prisoners disciplined for living in Mullins's assigned cell). ECF 275 (3.15.19 spreadsheet filed under seal and conventionally in native format) Further disputed that Mullins "did not tell Givens about his safety concerns"; that is what Givens claimed when she was interviewed by investigators after Mullins's murder, but Mullins's PREA phone call implies otherwise, and his reports in his own words from the morning of February 25 indicate that Mullins was desperately seeking assistance and reaching out to whatever staff he could speak with, and that he reached out to help from Givens. PSOF 68-76; ECF 266; ECF 286 at 2, 4; ECF 327 at 1; ECF 220-2 at 1-2. The final sentence is also disputed because the testimony is not in the cited

document.

9. Disputed that Mullins was "unharmed"; the cited sources do not so state, and furthermore, Mullins had been punched multiple times in the head and eye, had been assaulted at knifepoint, and had injuries to his head documented by medical staff. ECF 327 at 1; ECF 266; ECF 286 at 2, 4. Further disputed that an officer brought Mullins to the shift office; none of the cited sources so state, and Doc. 201-1 at 121:15-21 does not contain the cited information.

10. Disputed that Gordy was not notified of his sexual assault until she received the email at 3:30pm; Gordy was received notice of PREA incidents not only by email but she would also usually receive a phone call or personal visit to her office as well. ECF 346 at 18:21-19:1. Further disputed that Jones "instructed Defendant Graham to move Mullins from cell P36 to cell L28." See PSOF 105; ECF 160-12 at 276:18-277:10; ECF 277 at 4; ECF 199-1 at 148:15-149:6.

11. Disputed; none of these cites contain the information described except for Doc. 160-12 at 277, which states only that Jones told Gordy, "let's move him somewhere in population and Angelina Gordy found a bed in L."

12. Disputed as to the investigation: Gordy assigned White to complete a "Sexual Harassment Investigation," but Mullins had reported a sexual assault, not mere sexual harassment. ECF 361 at 98:13-101:24; ECF 160-5 at 300:6-22; ECF 199-1 at 139:7-24 & 140:25-141:7; ECF 356 at 169:15-22; ECF 345 at 129:13-20. White was not supposed to conduct sexual assault investigations. ECF 356 at 84:15-25.

13. Undisputed that those checks were documented; disputed that all of them occurred, as fabrication was common. ECF 349 at 147:1-157:5. Disputed as to footnote 7. Staffing was sufficient to conduct searches, and supervisors had the authority to hold over staff or request additional staff for searches. PSOF 158, 167.

14. Disputed that the call was "about his safety in general population"; rather, it specifically indicated that Mullins "fears for his life and does not need to be in population." ECF 165-67 at 3. Further disputed that there is evidence Mullins directed his mother to make this specific call, as Doc. 160-20 at 104:15-105:2 does not so state.

16. The third sentence is disputed, as Doc. 182-1 does not contain the cited information; moreover, Price confirms that Mullins specifically told Defendants Price and White that the "CJ" who stabbed him was the same inmate that "y'all had to move me away from the other day," reflecting their knowledge of the prior incident between Mullins and Jackson (ECF 352 at 76:13-24; ECF 165-54 at 7), and Price told investigators "they had an [prior] altercation or something like that dealing with some kina homosexual type a stuff.'" (ECF 186-3 at 2).

19. Disputed that St. Clair staff followed PREA protocol. Mullins should have been placed in restricted housing or the SSU after his report (PSOF 82, 99, 100-104); Gordy should have initiated a sexual assault investigation, not merely one for sexual harassment (PSOF 75); Jackson should have been placed in restrictive housing pending investigation (PSOF 80-81); Mullins and Jackson should not have remained in general population together, particularly given the widespread unauthorized

movement there (PSOF 100-104); and staff should have searched Jackson for the knife Mullins reported in his possession (PSOF 110, 118).

20. Partially disputed. Housing alleged victims and predators in separate dormitories does not satisfy the separation requirement because uncontrolled movement at St. Clair allowed prisoners unimpeded access to housing blocks and areas of the prison where they were not authorized to be. PSOF 103-104, 171-173, 200; ECF 361 at 98:19-99:22, 100:12-101:1, 101:19-23.

21. Disputed. Jones had the authority to place an inmate into the SSU regardless of the decision of the ICB. PSOF 19-20. Further, Jones, as Warden III, oversaw the ICB and had approval of all ICB decisions. PSOF 18-19; ECF 160-12 107:25-108:21; ECF 360 at, 56:13-20; ECF 165-14 171:1-11; ECF 333at 151:23-152:10. Malone could also place a prisoner in the SSU if the prisoner expressed safety concerns. ECF 165-14 at 171:15-172:12; PSOF 66. Once a prisoner was approved for housing in the SSU, Malone, or the shift commander, was responsible for making sure they were housed there. ECF 160-12 at 124:9-125:25.

22. Disputed that SCCF lacked sufficient capacity to house all SSU candidates. Jones herself signed an SOP instructing that there be 48-beds in the SSU, in line with settlement agreement in *Duke v. Dunn*. ECF 160-12 at 117:4-19, 118:14-119:14; ECF 160-13 at 2, 5; ECF 348-7 at 1, 9. The SSU was increased at some point after Mullins was killed to 48 beds, and Malone, who was chair of the ICB, testified that the SSU never reached its capacity. ECF 165-14 at 176:20-177:12 Jones also testified that she

did not recall the SSU regularly being at capacity; moreover; if the SSU was ever full, the SSU candidate should be placed in restrictive housing until room in the SSU opened up. ECF 160-12 at 126:1-24.

23. Disputed to the extent Defendants incorrectly imply that a person who could not or would not name their enemies could not be properly housed and segregated from threats. Malone testified that a prisoner who expressed safety concerns from unknown enemies should be placed in restrictive housing. ECF 165-14 at 181:3-21. Moreover, this was not the case with Mullins, who was identified as a proper candidate for, and requiring housing in, the SSU. PSOF 44.

25. Disputed to the extent Defendants incorrectly imply that searches were being done at St. Clair as required by policy, but were simply not documented. The exhibits cited by Defendants note that efforts were being made to increase and improve the number and quality of searches in *April* 2019 (after Mullins was killed). ECF 165-52 (April 3, 2019 meeting minutes). And Exhibit 165-51 does not state that searches were not documented, it just suggests that they were not documented *accurately*. Regardless, the overwhelming evidence shows that searches were sporadic and infrequent, and that the number of searches were well below policy requirements. PSOF 142-149, 248, 266. Moreover, there should be thousands of searches in a year period, PSOF 147; even if the searches were coded incorrectly, the incident report unequivocally shows that insufficient searches were carried out. ECF 275 (3.15.19 spreadsheet) (submitted conventionally and in native format under seal). Finally,

Dunn's statement that searches might not be documented due to staffing shortages
was clear speculation, as he acknowledged; Dunn stated he received reports from EJI
concluding that searches were not happening, but that these reports needed further
investigation in order for him to accept the conclusion, that he could have directed
investigation into the conclusions, and that he did not request any investigation be
carried out. ECF 160-11 at 203:22-205:13.

     26. Disputed. The document cited does not indicate when cameras were
installed. ECF 165-50 at 3. Moreover, the exhibit states that Ellington would request
quotes or bids for replacement cameras, but there is no indication this was done or
that cameras were installed on an ongoing basis. *Id.* Moreover, "daily security checks
of cell doors and locks", were required to be documented, but were not happening.
ECF 181-10 at 1-3 (experts agree there is a "culture of indifference" toward facility
conditions and locks/sensors); ECF 333 at 105:3-106:25; ECF 349-7 at 1
(reprimanding staff for not doing inspections); ECF 296 at 5 ("security inspections are
not being performed")]; ECF 292 at 121-123 (providing explanation of incidents
showing inspections not being carried out); ECF 275 (3.15.19 spreadsheet) (submitted
conventionally and in native format under seal) (showing far fewer than daily
inspections occurring); PSOF 225, 232. Inoperable cell locks and sensors were a
serious problem at St. Clair. PSOF 224-226.

     28. Disputed. It was not sufficient to leave Mullins and his assailant in general
population together, even if they were in different housing units because this did not

actually provide any meaningful separation. PSOF 81, 99, 102, 104, 171-173, 200; ECF 361 at 98:19-99:22, 100:12-101:1, 101:19-23.

29. Disputed. ECF 165-16 does not contain the page and lines cited and does not support this fact. Further disputed to the extent Defendants incorrectly imply that searches and other basic security functions were being carried out as required. PSOF 142-148. CERT was mainly used to staff posts. PSOF 158. Moreover, Dunn does not state when he believed contraband searches occurred, and indeed discusses contraband searches that occurred *after* Mullins was killed. ECF 160-11 at 166:17-167:9; PSOF 168-170 (discussing when Operation Restore Order happened).

30. Disputed. ECF 165-16 does not contain the page and lines cited and does not support this fact. Searches were not being conducted as required, and substantial contraband was being brought in by people entering the facility. PSOF 142-149.

31. Disputed. ECF 165-16 does not contain the page and lines cited and does not support this fact. Further, Dunn says that cameras were installed in "subsequent years" but does not state that they were installed before Mullins was killed and indeed he did not know when they were installed. ECF 160-11 at 32:19-33:2. Similarly he does not state when locks or fencing were installed, or whether it occurred before Mullins was killed. ECF 160-11 at 66:2-17. Moreover, Defendants knew that these efforts (to the extent they occurred at all or before Mullins's death) were largely ineffective, that the wristband policy was not enforced and was openly violated, and that uncontrolled movement was the norm. PSOF 224-227 (cameras and locks

broken); PSOF 171-175 (uncontrolled movement norm); ECF 300 (stabbing in yard in September 2018). ECF 334-12 at 6 ("Officers do not enforce basic facility policies such as challenging inmates moving without authorization on the yard, enforcing the requirement for inmates to wear their issued identification wristband").

32. Disputed to the extent that Defendants incorrectly imply that staffing was insufficient to perform basic and critical security functions at St. Clair. PSOF 167; ECF 160-11 at 248:12-16; ECF 345 at 151:2-14.

33. Disputed to the extent that Givens suggests she did not have any responsibility to make sure PREA was being complied with. Everyone who worked at the facility was responsible for making sure PREA was complied with. ECF 333 at 16:10-14. Givens was also responsible for approving housing changes when she was on call if a safety issue arose. ECF 333 at 52:5-22, 37:23-38:14, 73:20-74:2

34. Disputed. The exhibit does not contain the material cited. Moreover, anyone who received a record of contact from a prisoner's family expressing safety concerns had a responsibility to make sure follow up action was taken. And when Jones, Givens and Brooks received the email alerting them that Mullins's mother had called expressing concerns for his safety, the wardens would have needed to speak to one another and decide who would respond; it was not appropriate for them to just assume that Jones (or anyone else) would handle it. ECF 345 at 141:1-144:6.

35. Partially disputed. The exhibit does not contain all of the material cited. ECF 180-1 at 21. Additionally disputed because Brooks, as Warden I, had

responsibility for supervising and taking corrective action related to subordinate security staff. PSOF 14-15.

36. Partially disputed. ECF 165-2 does not contain the cited material and therefore does not support the fact that White oversaw general population security operations.

37. Disputed to the extent Defendants imply Malone did not have additional responsibilities as chair of the ICB. As chair of the ICB, he was responsible for meeting weekly with the ICB and reviewing inmates' files and other information (as well as interviewing the inmates) to see if they had high safety concerns, and making decisions about what housing and other conditions and programming the inmates required. ECF 165-14 at 165:6-170:23.

38. Disputed. Graham is also responsible for gathering information to maintain discipline and control at the facility; assigning personnel to shifts, inspecting the institution for safety and security concerns, and supervising and directing contraband searches, among other things. ECF 358 at 3-4.

39. Partially disputed. ECF 182-1 does not contain the material cited and does not support the fact that Price did not make housing placement or that he was responsible for overseeing the shift he commanded. ECF 182-1. Similarly 165-16 does not contain the material cited and does not support that subordinate staff would report to Price. ECF 165-16. Further disputed because when safety issues arose, Price was responsible for identifying and requesting approval for specific housing changes.

ECF 333 at 73:20-74:2, 37:23-38:14, 40:3-20.

40. Disputed. ECF 219-1 and 210-1 do not contain the material cited, and therefore do not support these facts. ECF 160-75 supports that Ragsdale assisted with PREA audits, but not that his involvement as backup PREA Coordinator was limited to that function. ECF 160-75 at 5.

41. Disputed. Defendants do not provide a proper cite to the record for all parts of this fact, per the Court's instructions. *See, e.g.*, "(Guy 1998-2043)". Further disputed to the extent Defendants incorrectly imply that St. Clair achieved meaningful compliance with PREA, including requirements to separate abusers and victims. PSOF 104, 119, 171-175, 200.

**RESPONSE TO ADOC DEFENDANTS' FACTS** (ECF 166)

4. Disputed. Defendants do not provide competent evidence to support this fact. *See Kumar v. Panera Bread Co.*, 2024 WL 4281018, at *5 (S.D. Tex. Sept. 24, 2024 ("Unsworn pleadings are not . . . competent summary judgment evidence") (citing *Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121, 124 (5th Cir. 1991)).

9. Disputed. Defendants do not provide competent evidence to support this fact. *See Kumar*, 2024 WL 4281018, at *5

10. Disputed as to the fact that Jones exercised general oversight over certain day-to-day operations at St. Clair. Defendants do not provide competent evidence to support this fact. *See Kumar*, 2024 WL 4281018, at *5

11. Disputed. The cited material does not state that Level V housing has the

"most violent" prisoners. Moreover, the document notes that life without parole prisoners and Medium custody inmates that require more security will be housed in Level V facilities, and that "[s]mall numbers of Minimum custody inmates may also be housed" in Level V facilities.

16. First sentence disputed: ECF 160-31 does not contain the cited fact.

18. Disputed. These records reflect that Mullins was assaulted by three inmates, who received a disciplinary for assaulting Mullins (ECF 183-1 at 131); in addition, a fourth inmate, K.G., assaulted Mullins after K.G. attempted a sexual advance on Mullins (ECF 183-1 at 151, 130). There is no evidence that Mullins did anything other than attempt to protect himself from an unwanted sexual advance and he was not disciplined for any assault (ECF 183-1 at 130, 151; ECF 184-1 at 35); rather, inmate K.G. was charged with assault. ECF 183-1 at 130 & 151.

19. Disputed. Defendants do not support these facts with competent evidence. Defendants cite solely to one of their expert's reports (ECF 160-32),[2] not Mullins's institutional records which were available to them, and the expert does not provide a fair characterization of the incident: the underlying records describe Mullins being present for an altercation primarily between two other inmates, in which all three were charged with fighting without a weapon. ECF 183-1 at 116. Further, neither Myers's

[2] Plaintiff will file a motion to strike Defendants' expert opinions relied on by Defendants in their summary judgment motions by March 24, consistent with the Parties' agreement and notification to the Court via email on February 17.

report nor the underlying incident report indicate that Mullins assaulted another inmate "for stealing sandwiches from kitchen."

20. Disputed. Defendants do not support these facts with competent evidencel they cite solely to one of their retained expert's reports (ECF 160-32), not Mullins's institutional records which were available to them, and the expert does not provide a fair characterization: the hearing officer found that both prisoners suffered stab wounds and that the "principal aggressor could not be determined." ECF 183-1 at 75.

21. Disputed. Defendants do not support these facts with competent evidence. Defendants cite solely to one of their retained expert's reports (ECF 160-32), not Mullins's institutional records which were available to them. Further disputed that Mullins was a member of the Aryan Brotherhood; Mullins's classification records consistently reflect *no* indication of a gang or Security Threat Group (STG) membership (ECF 184-1 at 86, 237, 71, 33; ECF 185-1 at 54), and there is no evidence of any similar incidents between 2008 and Mullins's death in February 2019.

23. Undisputed that they so found, but disputed that the determination was reasonable or proper; they so found without reference to Mullins's documented history of being assaulted in custody in his classification file and without discussion of his approval for the SSU. ECF 160-36 at 42.

24. Disputed to the extent that this statement implies that Mullins "failed to identify" his assailant, as opposed to being *unable* to identify the assailant; Mullins presented with bruises to his face and reported that he was beaten up twice and told

he owed a debt to an inmate he did not know. ECF 200-1 at 17; ECF 181-2 at 1-2.

25. Disputed. The hearing officer found Mullins "not guilty" of a disciplinary charge relating to the urine test. ECF 184-1 at 132-33.

26. Disputed. None of these sources indicate that Mullins believed he could live "problem free" in population; moreover, other evidence indicates that Mullins wanted to leave restrictive housing because he began to get suicidal and his mental health deteriorated under the conditions there. PSOF 50-53.

27. Undisputed, except to the extent that Defendants imply that the release Defendants forced Mullins to sign to leave restrictive housing after he had become suicidal (PSOF 53) somehow relieved Defendants of responsibility to respond to Mullins' February 25 and 26 reports about the threat from Clarence Jackson. ECF 361 at 98:12-101:23.

28. Admitted that Mullins moved himself to Q27, but Defendants cite no evidence indicating that Mullins did not raise his cell assignment with staff between February 13 and February 24, or that staff would have responded appropriately had he done so. When Mullins raised the issue on February 25, no staff took any action to address the matter (PSOF 57-58), consistent with a widespread practice of declining to discipline those types of violations (PSOF 171-176).

31. Disputed to the extent that "several" means not very many. Jackson had an extensive disciplinary history. PSOF 60, 62-63; ECF 186-4 at 8 & 1-14.

34. Disputed. Defendants do not support these facts with competent evidence.

Defendants cite solely to one of their retained expert's reports (ECF 160-32), not Mullins's institutional records which were available to them. Jackson was assessed as a "PREA predator," not merely a "potential predator," by Malone and Jones at St. Clair in 2018. ECF 321 at 41; PSOF 66.

35. Undisputed, but disputed that the "medium custody" designation was appropriate or complied with with ADOC's classification manual. PSOF 60-65.

36. Disputed. Contemporaneous reports from Mullins in his own words, show that Mullins repeatedly indicated that his assailant was his cellmate, C.J., in cell Q27, whom Defendants could easily identify. PSOF 68-74, 78-79; E.g., ECF 266; ECF 286 at 2, 4; ECF 327 at 1; ECF 220-2 at 1-2. Further deny that Mullins merely told Tucker that he "was assaulted"; Mullins's reports in his own words from the same time period reflect detailed descriptions of escalating abuse culminating in sexual assault. PSOF 68-79; ECF 266; ECF 286 at 2, 4.

38. Disputed; the nurse's underlying medical assessment records note a 4cm knot to the top of the head and bruising to the right temple, and do not indicate that the wounds were not fresh. ECF 327 at 1-2.

39. Disputed. While Ragsdale so indicated in his incident report finalized *after* Mullins's death (ECF 220-2 at 2, modified on 3/6/2019), his initial duty officer report did not include this purported statement from Mullins (ECF 220-2 at 1). Contemporaneous reports from Mullins in his own words, show that Mullins indicated repeatedly on February 25 that his assailant was his cellmate, C.J., in cell

Q27, whom Defendants could easily identify. PSOF 68-74, 78-79; E.g., ECF 266; ECF 286 at 2, 4; ECF 327 at 1; ECF 220-2 at 1-2.

40. Disputed that Gordy was not notified of the call until 4:00. Gordy received notice of PREA incidents not only by email but she would also usually receive a phone call or personal visit to her office as well. ECF 346 at 18:21-19:1. As for email, Gordy stated she received it at approximately 3:30pm. ECF 165-65 at 2.

42. The second clause is disputed on the grounds that the cited source (ECF 160-18 at 4) does not indicate that staff completed mental health referrals for Mullins and Jackson.

43. Disputed as to a "full investigation": Gordy assigned White to complete a "Sexual Harassment Investigation" (ECF 171-2 at 2) but Mullins had reported a sexual assault, not mere sexual harassment. ECF 361 at 98:12-100:14; ECF 160-5 at 300:6-22; ECF 199-1 at 139:7-24 & 140:25-141:7; ECF 356 at 169:15-22; ECF 345 at 129:13-20. White was not supposed to conduct sexual assault investigations, which were more serious and required different staff. ECF 356 at 84:15-25.

44. Disputed that Smith "immediately called for assistance": Doc. 160-129 at 2 indicates a 20 minute delay between Smith's reported first awareness of the incident (5:45pm) and Mullins receiving medical care (6:05pm).

45. Disputed. Mullins specifically told Defendants Price and White that the "CJ" who stabbed him was the same inmate that "y'all had to move me away from the other day" and Price documented that Mullins told them that "Clarence

Jackson" was his assailant. ECF 352 at 76:13-77:3, 79:12-18, 68:5-69:21; ECF 184-1

at 225 ("Inmate Mullins identified inmate Clarence Jackson B/249273 (Q27-2A) as

the inmate that assaulted him to . . .White and . . . Price."); ECF 160-29 at 2.

47. Disputed. Doc. 160-129 does not mention paramedics, or paramedics

administering "life-saving measures," and indicates a 20 minute delay between an

officer's first awareness of the incident and Mullins receiving medical care.

51. Disputed; at his deposition, Price denied having any knowledge of Mullins

being a drug user (ECF 352 at 115:3-116:24) and Mullins had not had a single

disciplinary sustained relating to drugs in the five years leading up to his death (ECF

184-1 at 88).

52. Disputed. At his deposition, Price denied having any information about

this topic. ECF 352 at 115:3-116:24.

53. Disputed. The information cited is not at ECF Doc. 160-18 at 2.

59. Disputed only to the extent that Defendants imply that these policies

were followed. *See* PSOF 210-223.

60. Disputed only to the extent that Defendants imply that these policies

were followed. *See* PSOF 210-223.

64. Disputed to the extent Defendants' incorrectly imply that potential PREA

victims and potential PREA predators cannot be housed in restrictive housing (or

the SSU, for potential victims). ECF 350 at 172:9-12, 181:3-182:22. Further disputed

to the extent that Defendants suggest placing prisoners in opposite sides of a

housing block is sufficient to separate them, as required by policy; Defendants knew that, given the levels of uncontrolled movement, placing prisoners on opposite sides of the housing blocks was not sufficient to separate them. PSOF 104, 171-176, 200.

66. Undisputed that the ICB was required to meet weekly to review housing assignments among other things, but disputed that the ICB was meeting as required in 2018 and early 2019 and carrying out its obligations to house prisoners at St. Clair based on their safety needs. ECF 292 at 6-8. Further disputed because the quoted language is not found in the exhibit cited.

70. Disputed because the language from the exhibit is not quoted accurately ("custodial sexual *misconduct*"). ECF 160-64 at 8.

71. Undisputed that this is what policy requires. ECF 160-64 at 8.

72. Undisputed that this is what policy requires. ECF 160-64 at 8. Disputed to the extent Defendants imply that shift supervisors and above were carrying out unannounced rounds as required. ECF 160-2 at 13-14.

74. Disputed. The exhibit states that I&I must be notified of all PREA allegations, not just substantiated allegations; indeed, I&I is the entity that investigates allegations and determines whether they are substantiated. ECF 160-64 at 2, 14, 16, 18.

78. Disputed. The cited exhibits do not indicate who introduced the CCO position. Disputed to the extent "direct contact" means something less than direct physical contact. CCOs interacted with and spoke to prisoners at St. Clair. ECF 335

at 49:9-12, 71:3-10.

83. Disputed in part. The cited exhibit appears to be from 2017 and does not show that ADOC and Savage completed any analysis in May 2018.

87. Disputed. In 2018 and early 2019, ADOC staff regularly failed to conduct required contraband searches and to seize contraband they saw. PSOF 142-149

88. Disputed to the extent that Defendants imply the contraband levels at St. Clair were typical of those across the country; they were not. ECF 160-36 at 45-47

89. Disputed. The cited testimony does not discuss any searches of vehicles, searches of individuals entering the front gate, or of monitoring the perimeter fences. Similarly, cited testimony does not discuss any searches conducted by I&I or LESD. Undisputed that at times the K-9 team conducted searches.

90. Disputed. The evidence shows searches were not happening as required, and a jury could disbelieve Ellington's self-serving testimony, which is the only evidence provided to support this fact. PSOF 142-149. Moreover CERT was used primarily for post coverage. PSOF 158.

91. Disputed. In 2018, CERT members were used primarily for post coverage, not contraband searches. PSOF 158

92. Undisputed that this fact is a mostly accurate summary of her testimony, although she testified that facility-wide searches happened "monthly, sometimes twice a month." ECF 160-12 at 186:1-4. Disputed that her testimony is accurate. Contraband searches were not being carried out as required by policy, and ADOC's

own records show that individual searches, shakedowns, and facility-wide searches were sporadic and infrequent. PSOF 142-149, 266; ECF 292 at 28, 55-56 [EJI Noncompliance ADOC-DS019051, ADOC-DS019078-79].

94. Disputed only to the extent that this fact incorrectly suggests that the plan was implemented, which the cited evidence does not reflect.

95. Disputed only to the extent that this fact incorrectly suggests that the plan was implemented, which the cited evidence does not reflect.

97. Disputed. The cited exhibits do not discuss replacing cell doors at St. Clair.

98. Disputed to the extent that Defendants imply SOP 137 was implemented and enforced at St. Clair. PSOF 171-176, 210-214.

99. Disputed that "interior fences" assisted with inmate movement control, given that unauthorized movement across housing blocks continued unabated throughout 2018 and early 2019 (PSOF 119, 171-176, 183-184). Defendants also knew that fencing would not address the issues of uncontrolled movement because the problem stemmed from officers not enforcing policies to control movement; indeed additional fencing exacerbated safety issues at the facility. ECF 292 at 98-99.

100.  Disputed. St. Clair has a wristband policy on paper, but it was rarely enforced. PSOF 171-176, 184 187, 216

101. Disputed. 21 prisoners were not wearing their wristbands, and all were assigned to the P/Q blocks. ECF 244-5. Disputed to the extent Defendants suggest

this shows sustained compliance with the wristband policy, which it does not. *See* PSOF 171-173, 184; ECF 272 at 1, 5, 7 (12/18 statement: "This whole facility in unauthorized area sir. . . . Don't nobody sleep in the . . . same assigned cell.")

102. Disputed that officers actually received corrective action for failing to secure doors. Exhibit 160-14 does not support this, and the deposition testimony relied on by Defendants' expert to say corrective action was taken does not support that opinion as Caver did not recall any discipline that anyone received for failing to secure doors. *See* ECF 335 at 99:8-100:24. Policies relating to controlling prisoner movement were largely unenforced. PSOF 171-176.

103. Disputed. Neither ECF 160-61 (P-21) nor Exhibit P-23 (ECF 160-63) support this fact.

104. Disputed. Housing assignments at St. Clair were made largely based on where there was available bed space. PSOF196-197.

106. Disputed. The classification system Defendants allege was in place was not actually being used. See PSOF 45-49, 62-65, 196-197. Defendants cite only to their own expert Myers's report to allege that ADOC and St. Clair's classification system complies with nationally accepted standards. But Myers did not review St. Clair's complete classification manual or any classification records other than Andrews and Davis's records; he also did not conduct any analysis to see if St. Clair staff were following the classification manual. ECF 351 at 87:13-14, 89:7-12, 89:22-90:5, 201:21-202:12.

108. Undisputed that AR 454 requires this training. Partially disputed that training was provided. This exhibit does not support that training was actually provided to employees at St. Clair in 2018 and early 2019. ECF 160-57 at 12.

110. Disputed. This exhibit does not support that IPCMs were on call twenty-four hours a day, seven days a week. ECF 160-57 at 11-12.

111. Undisputed that this is what policy required.

112. Partially disputed. Defendants' fact does not accurately quote Vincent's testimony. ECF 160-1 at 60:8-11.

113. Partially disputed. Defendants' fact does not accurately quote the AR. ECF 160-57 at 18 ("[u]pon learning of an *allegation* of a PREA related incident").

114. Undisputed that this is what the auditor wrote in their report, but disputed that Defendants made meaningful and lasting improvements to the areas of non-compliance relevant to this case. ECF 160-75 at 8-9 (discussing failure to separate high risk victims and high risk predators. 115.42 & 115.67); PSOF 171-176, 180-190, 213, 215-216.

115. Undisputed that this is what the auditor wrote in their report, but disputed that Defendants made meaningful and lasting improvements to the areas of non-compliance relevant to this case. ECF 160-75 at 8-9 (discussing failure to separate high risk victims and high risk predators, standards 115.42 & 115.67); PSOF 171-176, 180-190, 211-213, 215-216.

116. Disputed. The declaration from Mr. Sanders was not produced to

Plaintiff in this litigation, and Mr. Sanders is not listed on Defendants' disclosures. As such, Defendants do not support this fact with competent or admissible evidence. *See* ECF 293 & 312. Moreover, the timeframe discussed in this paragraph is 2024, five years after Mullins was killed.

117. Disputed. The declaration from Mr. Sanders was not produced to Plaintiff in this litigation, and Mr. Sanders is not listed on Defendants' disclosures. As such, Defendants do not support this fact with competent or admissible evidence. *See* ECF 293 & 312. Moreover, the timeframe discussed in this paragraph is 2024, well after Mullins was killed. *See* ECF 160-70 & ¶ 9-11 (declaration signed in 2024 and speaking in present tense).

118. Disputed. The declaration from Mr. Sanders was not produced to Plaintiff in this litigation, and Mr. Sanders is not listed on Defendants' disclosures. As such, Defendants do not support this fact with competent or admissible evidence.*See* ECF 293 & 312.. Moreover, the cited document does not support that 40 hours of annual training was required, and the discussion of annual in-service training requirements concerns the period of 2024. ECF 160-70 & ¶16 (declaration signed in 2024 and speaking in present tense)

## ADDITIONAL UNDISPUTED FACTS

1.     Defendant Karla Jones served as St. Clair's warden III from May 2018 through July 2019. ECF 349 at 34:15-20, 337:16-22, 339:14-17; ECF 345 at 17:19-25, 19:15-20.

2. Jones's responsibilities included enforcing St. Clair's Standard Operating Procedures ("SOPs"), including by instituting corrective action when they were not being followed. ECF 343at 134:21-135:9.

3. Jones's responsibilities included ensuring that necessary corrective action was taken in response to incidents of violence, including any necessary staff discipline. ECF 160-5 at 169:14-170:5.

4. Defendant Edward Ellington began working as an ADOC Institutional Coordinator in June 2017 (ECF 160-5 at 21:14-20) and oversaw St. Clair from 2017 through 2022. ECF 160-5 at 33:16-24, 34:4-7.

5. Ellington was Jones's direct supervisor for her entire tenure as St. Clair's warden. ECF 160-12 at 17:25-18:3; ECF 160-5 at 34:8-21.

6. Ellington and Jones were the direct supervisors of Defendant Warden II Gwendolyn Givens. ECF 345 at 31:23-32:3.

7. Ellington's responsibilities included ensuring that the wardens and captains at St. Clair were following all policies and procedures, including PREA policies. ECF 160-1 at 18:21-19:4; ECF 336 at 40:1-18. If St. Clair's Warden III was not enforcing policies, Ellington was responsible for bringing corrective action against her. ECF 343 at 135:10-19, 136:4-15.

8. Defendant Grantt Culliver began working as ADOC Associate Commissioner of Operations in 2014. ECF 336 at 28:8-21; ECF 337 at 130:6-9.

9. Culliver was Ellington's immediate supervisor, and his responsibilities

included overseeing all day-to-day activities at St. Clair and all leadership at St. Clair. ECF 160-5 at 51:2-3; ECF 341 at 40:4-15; ECF 336 at 55:14-23, 57:12-24. Culliver was also responsible for ensuring that staff at St. Clair complied with policies related to security operations. ECF 341 at 44:14-22.

10.     Defendant Jefferson Dunn served as ADOC's Commissioner from 2015 through 2021. ECF 160-11 at 14:8-10, 273:22-23.

11.     As Commissioner, Dunn had a broad statutory duty to oversee and lead the ADOC, including independently directing, supervising and controlling the ADOC. Ala. Code. 1975 § 14-1-1.3. Dunn was the highest ranking official in ADOC. ECF 340 at 18:23-19:3. He was Culliver's direct supervisor. ECF 337 at 39:17-23.

12.     Givens was transferred to St. Clair as a Warden II in May 2018. ECF 345 at 17:19-25, 19:15-20.

13.     Givens, as Warden II, was in charge of security, and her responsibilities included supervising the captains (ECF 180-1 at 13:16-25), and ensuring that subordinates complied with policies and administrative regulations, including conducting searches per policy. ECF 345 at 59:19-60:10, 136:23-137:13.

14.     Defendant Anthony Brooks began working as a Warden I at St. Clair in August 2016. ECF 180-1 at 11:4-13, 11:14-16.

15.     As Warden I, Brooks's responsibilities included supervising subordinates, ensuring that staff carried out essential security functions and followed SOPs, inspecting the facility, and developing or making recommendations about

facility policy. ECF 334-2 at 1.

16.    Defendant Gary Malone became a captain at St. Clair in 2010. In 2018 and early 2019, Malone was the captain over restrictive housing at St. Clair. ECF 165-14 at 12:18-13:5, 40:22-23; 42:22-43:9; 44:9-14.

17.    Malone reported to all three wardens, including Jones. ECF 165-14 at 44:15-44:23; 54:13-18.

18.    The Institutional Classification Board ("ICB") at St. Clair consisted of its chairman Captain Malone, a classification specialist, and a mental health representative, and was overseen by Warden Jones. ECF 160-12 at 107:25-8:6-21; ECF 360 at 56:13-20; ECF 350 at 163:20-164:4.

19.    Jones had final approval on all ICB decisions, either on her own, or through her designee. ECF 165-14 at 171:1-11.  Jones sat in on classification reviews and was responsible for signing off on the classification decision for each prisoner. ECF 333 at 48:9-22, 151:23-152:10.  When making classification-related decisions, members of the ICB such as Jones had electronic access to, and would have reviewed, an inmate's classification records, disciplinary records, and incident reports. ECF 160-12 at 46:2-47:8, 48:2-8, 43:2-44:6.

20.    Jones had the authority to place an inmate in the SSU regardless of ICB's decision. ECF 160-12 at 120:11-121:17; ECF 160-13 at 5.

21.    Defendant Carla Graham became a captain at St. Clair around 2015; she was captain over administration (ECF 199-1 at 16:15-17, 23:2-9).

22.    Graham's responsibilities included assisting with searching inmates for contraband in the general population (ECF 199-1 at 33:17-22), and searching staff for contraband before they entered the prison (ECF 199-1 at 34:12-19).

23.    Graham reported to Givens and Jones. ECF 199-1 at 27:22-28:13, 28:14-16.

24.    Defendant Christy Vincent began working with ADOC as the Prison Rape Elimination Act Director in 2015, and continued in that role through 2024. ECF 160-1 at 9:14-10:2.

25.    Vincent's responsibilities included ensuring that the Institutional PREA Compliance Manager ("IPCM") and all other staff followed and implemented policies related to PREA and prevention of sexual violence at St. Clair, and for revising those policies where necessary. ECF 160-1 at 14:12-15:2, 20:2-5.

26.    When a PREA audit was done, Vincent was responsible for initiating a plan for and overseeing the implementation of corrective action, and ensuring that PREA requirements were effectively implemented and prisoners protected from sexual violence. ECF 160-1 at 17:4-18, 29:6-30:8, 117:14-118:7, 174:19-25.  Gordy and Jones were responsible for carrying out the corrective action. ECF 160-1 at 17:4-18, 29:6-30:8, 128:22-129:1, 137:1-12.

27.    In 2015, Gordy became a Lieutenant and the Institutional PREA Compliance Manager (IPCM) at St. Clair and she remained in that role until she retired in 2020. ECF 346 at 12:7-10; 13:4-14; 17:4-6, 97:7-8.

28.     Gordy and Jones's responsibilities included monitoring compliance with PREA at St. Clair on a day-to-day basis and ensuring that PREA was being properly implemented at the facility. ECF 160-1 at 37:19-25, 43:22-45:5. Gordy's responsibilities also included ensuring that prisoners involved in a PREA incident at St. Clair were separated in compliance with facility policy. ECF 160-1 at 38:16-40:10.

29.     Defendant Anthony Price was a shift commander at St. Clair, and he was on duty from 6:00am through the late evening of February 26, 2019; he was responsible for the entire general population. ECF 270; ECF 267 at 1 ; ECF 352 at 13:20-25; 23:23-24; 26:21-25 .

30.     Defendant William Ragsdale was a lieutenant shift commander at St. Clair from 2015 through2020. ECF 361 at 11:16-12:14; 14:10-12; 19:10-22. Ragsdale was on duty on February 25, 2019. ECF 361 at 55:8-56:21, 148:8-19.

31.     As shift commanders, Ragsdale and Price's responsibilities each included supervising officers on the shift; setting the shift roster and assigning officers to their posts, including requesting more staff up the chain of command as needed; ensuring that officers were completing shakedowns, cell inspections, and contraband searches daily; conducting inmate interviews following altercations to learn what happened; and completing and reviewing duty and incident reports for their shifts. ECF 361 at 19:20-22, 21:13-24; 24:15-23, 25:12-27:9, 28:24-29:6, 34:15-22; ECF 345 at 49:16-51:5;  ECF 352 at 17:15-18; 18:3-11, 26:21-25; ECF 332 at 22:4-23, 26:4-8; ECF 361 at 34:15-23.

32.     Shift commanders had the authority to station a supervisor in the P/Q

blocks to monitor inmates and deter assault. ECF 332 at 93:6-12.

33.     Ragsdale was also the backup PREA compliance manager for Angelia

Gordy in 2018 and early 2019. ECF 361 at 12:22-25, 14:13-22, 14:25-15:4. As Gordy's

backup, Ragsdale's responsibilities included ensuring those inmates who made PREA

allegations were properly assigned to a secure housing unit, specifically to the SSU in

A block. ECF 361 at 16:14-17:1; ECF 288.

## ADDITIONAL DISPUTED FACTS

### A.    Defendants knew Mullins was a vulnerable prisoner who required housing in the Special Safety Unit ("SSU") but did not place him there.

34.     Steven Mullins was transferred to St. Clair prison on March 22, 2018.

ECF 165-56 at 2-3; ECF 184-1 at 107.  At the time, Mullins had had a clean

disciplinary record for nearly six years, with only one sustained disciplinary over the

previous twelve years (in 2012). ECF 184-1 at 81 & 84.

35.     Mullins was housed primarily in St. Clair's general population in the P

and O blocks from March 2018 through July 2018. ECF 165-56 at 2; ECF 160-12 at

102:5-102:16.

36.     On July 17, 2018, Mullins reported that he was jumped at knife point

and beaten up twice; was told he owed a debt to an inmate he did not know and did

not owe anything to; feared for his life; was beat up twice on Sunday; was tired of

feeling unsafe; and could not live in general population. ECF 200-1 at 17; ECF 181-2

at 1-2. Mullins presented with bruises on his face reflecting that he had been in a

physical altercation. ECF 181-2 at 1-2. An incident report was created. ECF 181-2 at 1-2. Defendants Brooks and Graham were among those notified. ECF 181-2 at 1-2; ECF 180-1 at 61:12-14. See also PSOF 126(a, d, h).

37.    The incident report regarding Mullins's July 17, 2018 report reflects no investigation into Mullins's allegations of assault and extortion in the P block. ECF 200-1 at 17; ECF 181-2 at 1-2.

38.    When an inmate made allegations about his safety, St. Clair supervisors were supposed to investigate and ensure an investigation of those allegations, followed by consideration of whether the inmate required placement in St. Clair's Special Safety Unit ("SSU"). ECF 160-12 at 122:10-24; ECF 165-14 at 179:13-181:2, 185:17-186:16.

39.    There is no evidence that Brooks or any other correctional employee made any attempt to have Mullins considered for SSU placement following Mullins's July 17, 2018 report. ECF 181-2 at 1-2. Brooks had the authority and ability to have someone placed in the SSU if he was notified of a threat to their safety. ECF 333 at 74:22-75:10.

40.    Instead, after Mullins's July 17, 2018 report, Mullins was placed in the RHU because of his "inability to adapt to population." ECF 181-2 at 1-2; ECF 360 at 107:6-9; ECF 165-56 at 2; ECF 160-12 at 102:5-16. Brooks was involved in the decision to keep Mullins in the RHU due to "unknown enemies." ECF 200-1 at 16.

41.    In late 2018 and again in early 2019, the Equal Justice Initiative ("EJI")

flagged Mullins twice as an inmate with heightened safety needs who required placement in the SSU. ECF 292 at 9-10; *see also id.* at 8, 31-32.

42.     It was the responsibility of the St. Clair ICB to ensure that an appropriate housing placement was made for inmates that had heightened safety needs such that they couldn't reside safely in general population. ECF 160-12 at 107:25-108:16. Jones had the authority to place inmates in administrative restricted housing pending determination of whether they required an SSU placement. ECF 160-12 at 109:2-110:19.

43.     As Defendant Malone admits, the ICB on which he served determined in November or December 2018 that Mullins required housing in the SSU. ECF 322 at pg. 40, No. 107; ECF 328 at pg. 7, No. 106; ECF 329 at pg. 7, No. 106; ECF 330 at pg. 7, No. 106; ECF 360 at 116:15-117:6; ECF 354 at 59:18-60:8; ECF 165-44 at 1, 4.

44.     An email from Defendant Malone to Defendants Jones, Brooks, Ellington, Givens, and Estelle, confirmed that Mullins was identified as an approved candidate for the SSU because of his "problems with gang members." ECF 165-44 at 1, 4; ECF 160-12 at 130:14-24. Jones received and reviewed the email listing Mullins as an approved candidate for the SSU due to problems with gang members. ECF 160-12 at 128:22-130:18. Jones was the final decision-maker on approval. ECF 360 at 60:21-61:18.

45.     Jones testified that, once an inmate (or list of inmates) was approved for housing in the SSU because of heightened safety needs, it was the responsibility of the

segregation (RHU) captain and/or on-call security supervisor to ensure that the inmate was actually placed in the SSU. ECF 160-12 at 124:9-125:25.

46. If an inmate required an SSU placement, the inmate was supposed to be placed in the SSU, at the RHU, or at another facility, but not in St. Clair's general population. ECF 165-14 at 172:15-173:5; ECF 160-5 at 247:14-248:1, 249:3-18 & 250:4-25; ECF 160-12 at 126:1-24; ECF 360 at 64:4-18 & 63:18-21.

47. Rather than being placed in the SSU, Mullins was kept in the RHU in late 2018 and early 2019. ECF 165-56 at 2; ECF 184-1 at 234.

48. Jones did not take any action to ensure that inmates approved for the SSU such as Mullins were placed in the SSU. ECF 160-12 at 132:24-133:7.

49. St. Clair supervisors including Malone, Jones, Brooks, and Givens did not take any action to place Mullins in the SSU. ECF 165-56 at 2; ECF 160-12 at 102:5-102:16; ECF 184-1 at 234.

**B. Defendants placed Mullins in the Q-2 block with known predators including Clarence Jackson, rather than the SSU, after he became suicidal in restrictive housing.**

50. The conditions in St. Clair's restrictive housing unit were far more restrictive than in general population. ECF 352 at 32:7-34:5.

51. Men housed in the SSU were supposed to receive privileges not allowed in administrative restricted housing, to include daily out-of-cell time, recreation, commissary, and access to work assignments and programming. ECF 160-36 at 40; ECF 160-13 at 3-4; ECF 352 at 32:7-34:5.

52.     During the period of December 3, 2018 through February 10, 2019, Mullins went weeks with minimal, if any, exercise and infrequent showers in the RHU. ECF 185-1 at 86-94.

53.     In December 2018, Mullins, growing desperate in the deprivation of the RHU, expressed thoughts of suicide, telling medical staff that he has "gotta get out of that cell." ECF 327 at 7. A mental health assessment on December 10, 2018, noted that Mullins was having thoughts of suicide. ECF 327 at 7. Mullins requested mental health services again on December 27, 2018, citing depression, anxiety, nightmares, and difficulty sleeping.  ECF 327 at 12.

54.     On February 12, 2019, Mullins finally left the RHU, but instead of being sent to the SSU, Mullins was placed by Malone in the Q block in general population. ECF 165-56 at 2; ECF 354 at  51:11-52:13. Mullins was sent to general population "per [direction of the] ICB." ECF 193-1 at 1; ECF 354 at 51:23-52:7. Malone assigned Mullins to the general population Q block, with the approval of the ICB, which Jones oversaw. ECF 193-1 at 1; ECF 354 at 51:11-14, 52:8-13; ECF 160-12 at 107:25-108:21; ECF 360 at 56:13-20; ECF 165-14 at 171:1-11.

55.     Malone chose to assign Mullins to bed Q32, on the "2 side" of Q block, even though that side was specifically reserved for prisoners designated as predators, with victims housed elsewhere. ECF 351 at 170:20-171:7 ; ECF 160-61 at 8-9.

56.     When Mullins attempted to go to bed Q32-2A, two inmates were already living in that cell and Mullins was told by an inmate to go to Q27 and reside with

"CJ." ECF 160-21 at 2 ("I'm assigned to 32 cell, But, there are already 2 in there. So, I sat at this same table STRESSING!! Then, the . . . guy . . . . directed me to towards 27 cell. Said the guys name is "CJ" and he's laid back. . . . he's okay with me moving in."); ECF 171-2 at 1; ECF 346 at 37:4-15.

57. At no time between February 12, 2019 and February 26, 2019, did any ADOC staff detect that an inmate was sleeping in bed Q32-2A without authorization and discipline the rule violation. ECF 275 (3.15.19 spreadsheet filed conventionally and under seal in native format). This was the case even though bed roster checks were supposed to occur frequently to identify inmates sleeping in unauthorized beds. ECF 345 at 171:19-172:4; ECF 160-12 at 166:20-167:8.

58. Mullins disclosed the unauthorized movement to staff no later than February 25, 2019. ECF 171-2 at 1. Again, no ADOC staff investigated whether an inmate was sleeping in bed Q32-2A without authorization or disciplined the rule violation. ECF 171-2 at 2; ECF 275 (3.15.19 spreadsheet filed conventionally and under seal in native format).

59. The "CJ" assigned to cell Q-27 was Clarence Jackson, which was reflected in ADOC's own records at the time. ECF 186-5 at 2.

60. Prior to February 26, 2019, Jackson was known for in-custody "violent activities" to St. Clair staff including Defendant Price. ECF 267 at 2; ECF 352 at 77:20-78:18, 80:2-7 & 80:19-23.

a. Jackson's April 2018 classification summary noted that "Jackson has a

history of institutional assaultive behavior. Close is justified" and described a long history of in-custody assaults. ECF 186-4 at 8 & 1-14.

b.    For example, the April 2018 classification summary reflected that Jackson had sexually assaulted an inmate on February 28, 2018, and stated that Jackson was going to get back at him for telling on his cousin. ECF 186-4 at 7.

c.    Jackson's April 2018 classification summary indicated that Jackson had assaulted another inmate with two locks attached to a piece of cloth in March 2018. ECF 186-4 at 13. The victim had reported that the assault was retaliation for refusing to "participate in sexual activities" when Jackson "had been asking him for sexual favors since his [] arrival." ECF 321 at 40. The sexual assault infraction was deemed unsubstantiated because the victim had a history of drug use and Jackson had claimed the victim owed him a debt. ECF 321 at 40.

d.    Other sexual assault allegations documented against Jackson included a September 18, 2015 sexual assault (ECF 321 at 36-37), and a June 13, 2016 sexual assault (ECF 321 at 38).

e.    Jackson also had major disciplinary infractions sustained on August 18, 2016 for assault on an inmate; on November 19, 2015 for assault on an inmate; and on September 10, 2015 for contraband possession. ECF 186-4 at 4.

f.    On November 20, 2015, Jackson had a major disciplinary sustained for unauthorized possession of a weapon (an inmate-made knife). ECF 186-4 at 4; ECF 321 at 26.

61. Close custody is required for inmates with extensive histories of institutional violence. ECF 160-12 at 232:23-233:3.

62. ADOC's classification manual indicates closed custody pursuant to a risk assessment tool for inmates with **either**: (a) a total of 12 points or more for the entire set of 8 questions, or (b) 10 points or more in total on the first 4 questions. ECF 160-17 at 75-76; ECF 360 at 51:2-12.

63. Jackson's April 2018 classification summary indicated (a) 22 points in total; and (b) 11 points in total for the first 4 questions. ECF 186-4 at 12. Both metrics independently qualified him for close custody according to the risk assessment tool. ECF 160-17 at 75-76; ECF 360 at 51:2-12.

64. Mullins's classification score on ADOC's risk assessment tool was a total of only 2 points. ECF 184-1 at 83; ECF 160-17 at 75-76.

65. Despite Jackson's history of institutional violence, on September 18, 2018, St. Clair staff including Malone recommended that Jackson be reduced from close custody in the RHU to medium custody in general population. ECF 321 at 25. The justification for the custody level reduction was that Jackson had "done his time" in restricted housing and been infraction-free for three months *while secured in the RHU*. ECF 321 at 25. On the custody reduction form, which was signed by Defendant Malone, only a single April 1, 2018 assault was listed as the "infraction(s) leading to current placement," despite the many other assaults identified in Jackson's April 2018 classification summary. ECF 321 at 25; ECF 186-4 at 8 & 1-14.

66. On September 19, 2018, the ICB, chaired by Malone, assessed Jackson as a PREA predator, noting prior assaults. ECF 321 at 41. The ICB kept Jackson in the RHU pending approval of a requested reduction in custody to medium custody. ECF 321 at 41. Jones signed off on the ICB's plan for Jackson. ECF 321 at 41.

67. On October 23, 2018, Defendant Malone released Jackson to general population in the Q block, to cell Q-27, where Jackson remained through his fatal stabbing of Mullins. ECF 186-5 at 2.

**C. Defendants responded unreasonably to Mullins's pleas for help after he reported violence at knifepoint by Jackson on February 25, 2019.**

68. Beginning early in the morning of February 25, 2019, Mullins made a series of reports to St. Clair staff regarding his cell partner, Clarence Jackson, to whom Mullins referred as: "CJ" in cell Q-27. ECF 266; ECF 286 at 2, 4; ECF 327 at 1; ECF 220-2 at 1-2. Mullins reported conduct from Jackson that began with rubbing on Mullins's feet and hip while Mullins was asleep and exposing himself to Mullins, and escalated to Jackson waking Mullins up by punching Mullins multiple times in the head and eye, exposing himself, pulling a knife on Mullins, and trying to obtain oral sex. ECF 266; ECF 286 at 2, 4; ECF 327 at 1.

69. Two documents reflect Mullins's report in his own words: a call that Mullins made to the PREA hotline at approximately 10:52am on February 25 and Mullins's handwritten statement provided to ADOC staff. ECF 266; ECF 286 at 2, 4.

70. The handwritten statement was provided on the morning of February

25. ECF 286 at 2, 4 (dated 2/25/19 and indicating he completed the statement right after he came up to the breezeway after the assault); ECF 327 at 3 (declining to provide a second written statement because "I did that this morning").

71. In both his written statement and hotline call, Mullins identified his assailant as his cellmate in cell Q-27 named "CJ." ECF 286 at 2, 4; ECF 266; ECF 278 at 1.

72. ADOC's records reflected that Clarence Jackson was assigned to cell Q27 in February 2019. ECF 186-5 at 2.

73. In Mullins's PREA hotline call (ECF 266), he stated:

> My name is Steve Mullins. I'm at St. Clair Correctional Facility. Um I was released from the seg two (2) weeks ago tomorrow, I was told to go sleep in uh Cube [Q] thirty-two (32). They were to be (INAUDIBLE) that cell so I found an empty bed in Cube [Q] twenty-seven (27). Okay um I've had issues with my cell partner uh rubbing on my feet while I was asleep, rubbing me on my hip while I was asleep, I asked him to stop. Okay and then this morning uh I was waking up by him punching me in the side of my head and he hit me in the eye twice. He pulled a knife on me and um actually wanted me to perform uh oral sex on him and what I did was I shoved him outa my way and I left out of that cell. Someone went and got my property for me and then I got dressed in the hallway and went to the shift office. Um the shift office uh eventually talked to Warden Givens and I was supposed to go back to the block so they could do a recount this morning and um I'm the only white individual in that block came to 2-side. Um my life is in danger, I feel very unsafe and I have nowhere to sleep. . . . I'm calling from the gym because that's where I feel the safest and that's the only place I can go that's outa the way. I need some help. I've asked to be placed in seg for my own safety, PC if possible but I cannot live in St. Clair population. Um I need some help badly. Um and I don't know what to do.

74. Mullins's written statement dated February 25 (ECF 286 at 2, 4), states:

> On several nights my cellmate (CJ) in Q-27 woke me up touching my foot/feet.

> I acted like I was asleep. He would also expose himself here and there. I would act as if I didn't see it and leave the cell. Then this morning I was asleep around 4am and woke up as I was punched in the side of my head and twice more around my right eye. I tried to talk to him . . . and he only became more mad. He got his knife and threatened me with that. He kept asking me how I was going to fix it. I asked what he was talking about and then he exposed himself wanting me to give him a blowjob. I then sat up and shoved him so that I could leave the cell. . . . And came to the breezeway.

75. The conduct of Jackson's reported by Mullins was a sexual assault, not mere sexual harassment. ECF 345 at 129:13-20; ECF 356 at 169:15-22; ECF 361 at 98:12-100:14; ECF 160-5 at 300:6-22; ECF 199-1 at 139:7-24 & 140:25-141:7.

76. Mullins's earliest report of CJ's [Clarence Jackson's] conduct to staff was on February 25 at approximately 6:01am, to a correctional officer in the breezeway who, in turn, alerted Defendant Lt. Ragsdale. ECF 220-2 at 1.

77. At 9:43am that morning, Ragsdale summarized in a brief report that "Officer Tucker reported to [] Ragsdale that inmate Mullins alleged he had been assaulted"; that "Inmate Mullins had a [sic] abrasion on the left side of his head," and that "Inmate Mullins could not identify who assaulted him." ECF 361 at 55:18-57:18, 61:4-12; ECF 220-2 at 1.

78. Mullins was taken to the infirmary, where medical staff at 6:30 a.m. documented Mullins's bruises and explanation that he was "laying there asleep and cell partner woke me up by beating on me." ECF 327 at 1. Mullins also provided his written statement that morning. ECF 286 at 2, 4; ECF 327 at 3.

79. At his deposition, Ragsdale claimed to not recall his communications

with Mullins. ECF 361 at 55:8-58:9, 61:24-62:5.  However, Ragsdale confirmed that

Mullins had disclosed that he had been assaulted in his cell (ECF 361 at 83:5-8) and

requested to be in a cell by himself (ECF 361 at 65:23-66:2; ECF 220-2 at 1-2).

80.     As the shift commander, Ragsdale should have investigated the reported

assault, including investigating the reported assailant and/or cell partner and searching

for contraband weapons. ECF 356 at 79:15-81:21, 85:16-86:5 & 86:25-87:3 ; ECF 332

at 80:10-17; ECF 361 at 102:14-22.

81.     St. Clair's written policy required that, when a sexual assault was

reported, the alleged abuser was to be secured in restrictive housing pending

investigation. ECF 160-65 at 5. Nevertheless, Jackson was left in Q block in general

population after Mullins reported the assault on February 25. ECF 278 at 1.

82.     As the shift commander, Ragsdale should have requested a temporary

SSU placement for Mullins, or sent Mullins to the restricted housing unit. ECF 360 at

124:4-125:4; ECF 361 at 16:9-19 (take sexual assault victims to A block); ECF 288

(identifying SSU in A block); ECF 350 at 179:13-181:15, 185:17-186:16.

83.     Nonetheless, Ragsdale did not put Mullins in the SSU or restricted

housing. ECF 220-2 at 2. Nor did he conduct any further investigation. *Id.* at 2.

84.     At 8:53am, Ragsdale moved Mullins to cell P36-1A, a double-cell

assignment in general population (ECF 220-2 at 2; ECF 165-56 at 2; ECF 288), in the

same housing block where Terrence Andrews had been stabbed to death two months

earlier (ECF 160-8 at 2).

85. After Mullins reported the assault to Ragsdale, Ragsdale notified Warden Givens, who responded by simply making Mullins return to Q block for count. ECF 266 ("[S]hift office uh eventually talked to Warden Givens and I was supposed to go back to the block . . ."); ECF 165-56 at 2.

86. Givens was on call at the time that Mullins reported his assault to Ragsdale, so that incident (and all other incidents that day) were reported to her. *See* ECF 333 at 51:25-53:14 (the three wardens and three captains rotated being on call for a week at a time, so each would be on call every six weeks; when on call, they were contemporaneously notified of each incident that occurred); ECF 266 at 1 (identifying Givens as the warden or captain that the shift office reached out to regarding Mullins's report of an assault). Ragsdale testified that the on-call supervisor would make the decision about where to house someone following an incident raising a safety concern. ECF 361 at 73:16-74:8. However, Brooks testified that the lieutenant reporting the incident would decide where to house someone, and the on-call supervisor would just approve it without providing any additional direction. ECF 333 at 37:23-38:14, 40:6-20, 73:20-74:2

87. Jones also would have been notified about Mullins's report to Givens. ECF 333 at 53:6-53:14.

88. Givens did not take any action with respect to Mullins's assailant, Jackson, such as ensuring a contraband search. ECF 266 ("[E]ventually talked to Warden Givens and I was supposed to go back to the block . . ."); ECF 171-2 (no

mention of any search for knife); ECF 345 at 30:12-31:18 (any search or action in response to incident should be documented in incident report).

89. Givens knew that it was inappropriate that she sent Mullins back to his cell after he reported having been assaulted. ECF 345 at 97:19-25 & 102:1-103:23 & 104:3-20. Givens should have requested a temporary SSU placement for Mullins, or returned Mullins to the RHU. *See* PSOF 82.

90. Mullins made his PREA hotline call at 10:52am on February 25, and Defendant Gordy received it by email at approximately 3:30pm that afternoon. ECF 266; ECF 171-2 at 1. Gordy received notice of PREA incidents not only by email but she would also usually receive a phone call or personal visit to her office as well when the incident was reported. ECF 346 at 18:21-19:1.

91. After receiving the PREA hotline call, Gordy spoke with Mullins, who orally relayed the same information provided in his PREA call. ECF 277 at 2.

92. Gordy showed Mullins a photo of Jackson, and Mullins confirmed that Jackson was the cell partner who had assaulted him. ECF 171-2 at 1; ECF 277 at 2-3. Gordy knew to show Mullins Jackon's photo because Mullins had said the assailant was his cellmate "CJ" in cell Q-27. ECF 277 at 2-3; ECF 266; ECF 171-2 at 1.

93. As documented in Gordy's February 25 duty officer report, Gordy knew of the details of Mullins's report, including that "Mullins claims that he is in fear for his life in population at St. Clair" and asked "to be placed in seg for my own safety, PC if possible but I cannot live in St. Clair population….I need some help badly…I

don't know what to do." ECF 171-2 at 1; ECF 266.

94.    Gordy also received Mullins's handwritten statement on February 25. ECF 184-1 at 224 (describing his report and adding: "See attached statement").

95.    At 4:30pm on February 25, Jones was apprised by Gordy of the details of how Mullins reported that his cell partner, Clarence Jackson in cell Q-27, had rubbed on his feet and hip, had woken him up by punching him in the head and eye, and had pulled a knife on Mullins and tried to make him perform oral sex. ECF 160-12 at 262:22-266:2; ECF 171-2 at 2 ("At approximately 4:30 pm, the incident was reported to Warden Karla Jones."); ECF 346 at 46:13-16 ; ECF 277 at 3.

96.    Jones also received an incident report with the same information, which she reviewed, either in the early evening on February 25 or the morning of February 26. ECF 160-12 at 266:21-267:6 & 262:22-264:13; ECF 171-2 at 2.

97.    Jones also received Mullins's February 25 handwritten statement. ECF 184-1 (incident report stating: "See attached statement"). Prisoners' handwritten statements regarding incidents were available in the "incident module" for supervisors to review. ECF 160-12 at 269:16-270:12. See PSOF 126.

98.    Jones also received and reviewed on February 25 the duty officer report by Ragsdale indicating that Mullins alleged that he had been assaulted and had an abrasion on his head. ECF 160-12 at 268:9-269:1; ECF 184-1 at 228, 224.

99.    As an inmate reporting sexual assault, Mullins should have not have been left in general population with his alleged assailant; he should have been taken to

protective custody in the SSU, or at a minimum, to administrative restrictive housing. ECF 361 at 98:12-101:23.

100. A central purpose of the SSU was to house inmates at risk of sexual victimization and sexual abuse who could not adjust to general population and those at risk or vulnerable to assaults in general population. ECF 160-12 at 107:5-107:16.

101. As Defendants, including Jones, knew, inmates that had heightened security needs such that they could not reside safely in general population were supposed to be placed either in the SSU or in administrative segregation until it could be determined whether they needed to go into the SSU. ECF 160-12 at 107:5-107:24; ECF 360 at 124:4-125:4; ECF 361 at 98:12-101:23.

102. If an inmate required placement in the SSU and it was at capacity, the inmate was supposed to be placed in administrative restrictive housing, pending further bed assignment in the SSU as space allowed. ECF 160-12 at 126:12-24 & 128:9-17.

103. Defendants, including Jones, knew potential PREA victims were supposed to be separated from potential PREA abusers and protected from retaliation when they made a report. ECF 160-12 at 158:17-159:1.

104. Defendants, including Jones, knew that uncontrolled movement in general population impaired St. Clair's ability to separate potential PREA victims from potential aggressors. ECF 244-4 at 1; ECF 160-12 at 155:23-156:9. Even Defendants' own retained expert, Mark Inch, testified that, in St. Clair's general population (unlike

in restrictive housing), an inmate such as Jackson who wanted to assault another inmate would have been able to find an opportunity to do so during the scheduled calls and group movement that occurred in general population. ECF 347 at 207:4-211:5; ECF 160-30 at 48 ("Jackson likely planned the movement around general movement periods to hide from detection. If Jackson failed to assault Mullins outside L-block, he could have found other opportunities during scheduled calls and group movement."); ECF 292 at 30-32, 113-115 (prior notice of issue); ECF 160-3 at 5, 8-9, 46-47 (prior notice of issue).

105. Mullins came to see Gordy and Jones, but instead of ensuring that Mullins was placed in the SSU or RHU, Jones said words to the effect of, "let's move [Mullins] somewhere in population" and Gordy simply found a bed for Mullins on the L block in general population. ECF 160-12 at 276:18-277:10; ECF 277 at 4; ECF 199-1 at 148:15-149:6.

106. Defendants Graham and Price also participated in the movement of Mullins to general population in the L Block on the afternoon of February 25. ECF 193-1 at 1; ECF 354 at 53:12-54:15; ECF 352 at 103:4-21 & 107:15-19; ECF 199-1 at 142:7-16; ECF 285 at 1-2.

107. Graham notified Jones, Givens, Brooks, Malone, White, Price, and Estelle that Mullins was being kept in general population and of the housing change to L Block. ECF 285 at 1.

108. No action was taken toward Jackson on February 25 other than

completion of a mental health referral form regarding him. ECF 171-2 at 2.

109.    Jackson was neither investigated nor placed in investigative status in the RHU on February 25 (ECF 165-58 at 3; ECF 171-2 at 2), as was required, despite being positively identified as the alleged perpetrator of a sexual assault at knifepoint and the subject of an investigation. ECF 160-65 at 5; ECF 332 at 80:10-17; ECF 359 at 198:16-24 & 199:1-15; ECF 360 at 66:20-25; 67:12-18, 124:4-125:4.

110.    No one searched Jackson on February 25 for the knife Mullins had reported him to have (ECF 171-2 at 2; ECF 160-12 at 277:11-277:16; ECF 352 at 110:15-25) even though a search was protocol (ECF 361 at 102:2-103:5; ECF 160-5 at 299:8-300:5 & 198:16-199:15); ECF 352 at 41:25-43:1; ECF 160-65 at 5.

111.    Security staff investigating an inmate's report of having been threatened at knifepoint by a specific inmate were supposed to conduct a search for weapons of the alleged perpetrator as quickly as possible so that there was no opportunity to hide the weapon. ECF 160-12 at 69:15-69:21 & 250:3-252:4.

112.    Security staff that received information that an inmate had a weapon was supposed to notify a supervisor so the supervisor could ensure a search. ECF 160-12 at 182:8-182:21 & 250:3-252:4 & 252:5-252:15. Responsibility would fall on the shift supervisor; the PREA coordinator, if involved; and the on-call supervisor to ensure that a weapons search was conducted. ECF 160-12 at 252:5-254:13.

**D.    Defendants failed to protect Mullins on February 26, 2019, from the danger posed to him by Jackson.**

113.    Early the next day, February 26, Gordy received a series of emails regarding Mullins, providing her with electronic copies of Mullins's body chart and handwritten statement completed the previous day. ECF 286 at 1-6.

114.    On the afternoon of February 26, at approximately 4:24pm, Jones, Givens, Brooks, Graham, White, and Malone all received an email stating that Mullins's mother called and alerted them that Mullins was in "fear for his life" and should not be in general population. ECF 286 at 7-8; ECF 345 at 140:7-142:22.

115.    The 4:24pm email was supposed to have been treated with urgency given the fear expressed for Mullins's life. ECF 333 at 82:11-14 at 82:11-14 ; ECF 286 at 7-8. A warden or captain (i.e. Jones, Givens, Brooks, Graham, White, or Malone) should have taken action, including bringing Mullins to the shift office, talking to him about his safety, and placing him in either the RHU or the SSU.  ECF 333 at 80:1-24 & 81:5-82:10; ECF 345 at 143:2-144:6, 144:21-145:8. Each of the wardens and captains had a responsibility to make sure action was taken; it was not appropriate to assume someone else would handle the threat to Mullins's safety. ECF 345 at 141:1-144:6.

116.    Nonetheless, not a single Defendant on the 4:24pm email (ECF 286 at 7-8) took any action to remove Mullins from general population and place him in the SSU or RHU, as required. ECF 165-56 at 2; ECF 333 at 80:1-24, 82:7-14.

117.    There is no evidence of any action taken on February 26 to place

Jackson in restrictive housing on investigative status, or to search for the knife that Mullins had reported being in Jackson's possession, at any time prior to Jackon's assault of Mullins. ECF 165-54 at 3-4; ECF 345 at 30:12-31:18. Indeed, there were no contraband searches of any kind conducted at any time on February 26 before Mullins's death. ECF 270 at 1); ECF 275 (3.15.19 spreadsheet filed conventionally and under seal in native format)

118.    All Defendants from the shift commander up through the Warden III (Jones), and including the Institutional PREA Compliance Manager (IPCM Gordy), were responsible for ensuring that Jackson was searched for a knife. ECF 356 at 165:25-166:6; ECF 361 at 98:12-102:18; ECF 359 at 299:8-300:5 & 198:16-199:15.

**E.    Defendants allowed Jackson to move without authorization to the L Block to fatally stab Mullins.**

119.    At approximately 5:45pm on February 26, 2019, Mullins was stabbed by the door to the L-2 block, by Jackson. ECF 165-54 at 2, 6. Jackson was assigned to the Q block, but was able to move to the L block without authorization. ECF 165-54 at 2, 6; ECF 165-1 at 39:9-19, 40:2-5; ECF 292 at 19; ECF 299 at 11-12.

120.    When staff responded, Mullins identified "CJ" to Price and White as his attacker and indicated that it was the "CJ" that "y'all had to move me away from the other day." ECF 352 at 76:13-77:3, 79:12-18 & 68:5-69:21; ECF 184-1 at 225. Price knew Mullins was referring to Clarence Jackson when he used the name "CJ" because Jackson was known for violent activities. ECF 352 at 77:15-79:18; ECF 184-1 at 225.

121. Mullins was stabbed repeatedly by Jackson. ECF 327 at 4, 13. At 6:55pm, Mullins was airlifted to the hospital, where he survived surgery, but was subsequently declared dead on March 1. ECF 184-1 at 231.

122. Jackson was not placed in the RHU until February 27. ECF 165-58 at 3. The weapon used to stab Mullins was never recovered. ECF 184-1 at 225.

**F. In 2018 and early 2019, violence at St. Clair was the norm, particularly in the dangerous P/Q blocks.**

123. The mortality rate for prisoners in ADOC–especially for deaths caused by homicide–were some of the highest in the nation, in the years leading up to December 2018. The rate was significantly higher than the national average based on ADOC's data, which undercounted the actual number of homicides by classifying some homicides as natural deaths. ECF 323 at 8, 19; ECF 307 at 11-12 [D.S. 19042-43 DOJ April 2019]; ECF 181-14 at 1 (Sept. 2018 email from Jones to Ellington).

124. In 2018, St. Clair's homicide rate at St. Clair was higher than that of any other Alabama prison. ECF 274, https://doc.alabama.gov/docs/MonthlyRpts/2018-09.pdf at p.1, 12 (provided a chart comparing inmate on inmate homicides at the various ADOC facilities for *fiscal* year 2018); ECF 276 https://doc.alabama.gov/docs/MonthlyRpts/2018-12.pdf at 1, 5 (providing a chart comparing inmate on inmate homicides at the various ADOC facilities through December of *fiscal* year 2019, which is part of calendar year 2018); ECF 340 at 110:4-7 (explaining the ADOC's legislative fiscal year).

125.    Between February 2018 and February 2019, five prisoners were stabbed to death at St. Clair. ECF 339-4 at 1, SCCF-18-00179 (Feb. 2018 fatal stabbing of Travis Wilson); ECF 349-12 at 2-3, SCCF-18-01163 (Sept. 2018 fatal stabbing of Terry Pettiway); ECF 295 at 1-2, SCCF-18-01253 (Sept. 2018 fatal stabbing of Rogarius Bray); ECF 165-32 (Dec. 2018 fatal stabbing of Mr. Andrews); ECF 160-29 (Feb. 2019 fatal stabbing of Steven Mullins). There were numerous other serious prisoner-on-prisoner assaults in 2018. ECF 181-11 at 7-8; ECF 275 (3.15.19 spreadsheet filed conventionally and under seal in native format) (also reflecting entries about the 5 murders and other assaults, which can be found using the incident report numbers above).

126.    ADOC supervisors received notice of these incidents. For example:

a.    Jones testified that she received and reviewed St. Clair's incident reports for Class A, B and C incidents, and had notice of trends through incident reports sent to her, the electronic "incident module" that she checked regularly, phone calls from staff, and a spreadsheet of incidents emailed to her regularly. ECF 363 at 49:22-53:10; ECF 160-12 at 43:2-23, 65:1-21, 284:5-21; ECF 160-5 at 227:1-229:20.

b.    Ellington also had access to the incident module and was notified of incidents at St. Clair orally or in writing; he also regularly received a spreadsheet of incidents at the facility, and reviewed all Class A and B incident reports ECF 160-5 at 56:2-13, 56:24-57:22, 60:9-20, 302:11-16, 227:1-229:20; ECF 343 at 47:10-21; 62:13-19; ECF 349 at 99:1-100:1; 70:12-71:10; ECF 345 at 38:22-39:16.

c. Culliver received duty and incident reports; he would also be involved in creating or receiving briefing related to individual assaults at St. Clair, as well as trends in violence, which would be shared with Dunn. ECF 341 at 30:17-31:14. ECF 336 at 156:12-15, 162:19-163:15.

d. Givens and Brooks also had access to all of the incident reports (including the incident module/dashboard) and were responsible for reviewing them regularly. They also were notified of incidents from staff and Warden Jones, including by phone. ECF 345 at 59:19-60:10; 91:7-16, 92:8-93:5, 42:15-23; ECF 334 at 64:2-6, 64:21-66:4

e. As PREA Director, Vincent would be notified of every PREA incident that occurred at St. Clair; she would also be provided with quarterly reports from the IPCM that show PREA data for St. Clair. ECF 160-1 at 38:1-4, 40:18-41:19.

f. Gordy was also notified every time a PREA incident was reported at St. Clair. ECF 346 at 18:21. She would receive a phone call or personal visit to her office. ECF 346 at 18:24-19:1.

g. Gordy was further responsible for reviewing quarterly PREA data from each facility and identifying trends or repeat problems relating to PREA at the facility. ECF 160-1 at 43:13-44:5.

h. Like the wardens, Malone would receive all duty officer reports. ECF 165-14 at 55:5-9. He also reviewed all incident reports on the incident report module - a database where all supervisors review the report. ECF 165-14 at 55:10-15; 56:9-15.

127.    For years, and especially in late 2018 and early 2019, the level of violence at St. Clair was well above what would be expected in a controlled and reasonably safe facility, with near-daily violent incidents. ECF 180-1 at 35:14-18, 71:25-72:18; ECF 160-36 at 45; ECF 292 at 11-12.

128.    Violent incidents, including serious assaults and murders, were unsurprising to staff and occurred with regularity. ECF 299 at 10 (noting that there were 152 incidents of violence at St. Clair between 11/2017 and 6/2018, including 22 resulting in serious injury); ECF 180-1 at 72:14-23; ECF 160-36 at 33, 45, 53; ECF 334 at 90:11-20, 146:12-22; ECF 337 at 135:7-12; 234:17-19; ECF 275 (3.15.19 spreadsheet filed conventionally and under seal in native format); ECF 337-4 at 7-8; ECF 297 at 7-9; ECF 181-11 at 7-8; ECF 160-3 at 2-93; ECF 345 at 64:1-65:5, 84:10-85:7, 194:10-21 (Givens testifying that she has no recollection of the sexual assault and murder of Stephen Mullins, and that she was not surprised when she learned that a prisoner was killed at St. Clair, but that she would have been notified of all murders that occurred at the facility)

129.    Warden Jones understood while warden that St. Clair had high levels of violence. ECF 160-12 at 32:13-32:18.

130.    In May 2018, St. Clair's own internal Vulnerability Analysis found extremely high levels of contraband and violence at the facility, as well as other disciplinary issues, that increased the dangerousness of St. Clair. ECF 181-11 at 6-9. There were 550 major disciplinary incidents *reported*, including 80 for possession of

weapons. ECF 181-11 at 6. There were also 170 documented prisoner-on-staff assaults and 269 documented prisoner-on-prisoner assaults. ECF 181-11 at 7-8.

131.    Given that many incidents of violence or contraband, among other rule violations, were not addressed or reported (or were improperly classified), the reported statistics significantly underestimated the true levels of violence, contraband, and rule violations in 2017 and 2018. ECF 292 at 11, 41-43 (failure to properly document incidents and investigate suspicious injuries); ECF 296 at 5, 16 ("Officers do not enforce basic facility policies[.]"); ECF 160-36 at 55; ECF 178-4 at 5; ECF 160-2 at 6 (openly violating rules); *see* ECF 345 at 79:16-83:9 (failing to properly classify an assault).

132.    As one example of the undercounting, the incident report regarding Mullins's July 17, 2018 report described at PSOF 36 did not include a designation of fighting, assault with a weapon, or extortion, and was instead merely designated as "inability to adjust to population."  ECF 181-2 at 1-2.

133.    The levels of violence and lack of facility control reached such high levels that, in March 2019, the New York Times received from an anonymous source over 2,000 photos depicting mostly seriously injured and dead prisoners within St. Clair. ECF 269, New York Times. Inside America's Black Box: A Rare Look at the Violence of Incarceration. March 30, 2019; ECF 331 at 1-2.

134.    Violence was so common at St. Clair that many of the Defendants and St. Clair security employees have no memory of Terrence Andrew or Steven Mullins,

or their murders. ECF 333 at 71:25-72:23, 85:25-86:18; ECF 345 at 64:1-65:5, 84:10-85:7; ECF 346 at 32:3-20; ECF 361 at 9:14-10:19; ECF 160-12 at 144:12-145:3, 256:23-257:3.

135.    Throughout 2018 and early 2019, the levels of violence, contraband, and unauthorized movement in the general population P/Q blocks were especially high in comparison to other housing units and staff were on notice through letters and reports that serious action needed to be taken to address the resulting risks. ECF 306 at 6, 11; ECF 165-19 at 3; ECF 313 at 3, 15-17; ECF 292 at 8, 18-20, 53 94-95, 113-14; ECF 306 at 11-15.

136.    Jones knew the majority of incidents at St. Clair in late 2018 and early 2019 involved the P/Q blocks. ECF 160-12 at 147:25-148:24, 135:22-136:3; ECF 349 at 300:7-301:10; ECF 336 at 265:18-266:3.

137.    Defendant Dunn was put on notice of elevated levels of violence in the P/Q blocks. ECF 291.

138.    From August to November 2018, 78% of serious incidents of violence at St. Clair occurred in the P/Q blocks. ECF 292 at 53. In August 2018, five stabbings resulting in hospitalizations occurred in the P/Q blocks or involved prisoners assigned to those blocks. ECF 292 at 94-95. From November 2017 and June 2018, at least 22 incidents of serious violence occurred in P/Q blocks or involved prisoners assigned to the P/Q blocks. ECF 299 at 29-30; ECF 290 at 2 & n.3.

139.    The September 2018 Terry Pettiway and Rogarius Bray murders

occurred in and/or in front of the P/Q blocks. ECF 340-10; ECF 292 at 53; ECF 295. Just three months later, Terrence Andrews was also stabbed to death in P block. ECF 160-8 at 1-2. In January 2019, inmate Danny Weaver had to be airlifted out of St. Clair after having been nearly stabbed to death in Q block. ECF 326

140. As Warden III, Jones was responsible for identifying St. Clair housing units that were at high risk for violence and taking action to reduce that violence. ECF 160-12 at 133:19-134:7.

141. St. Clair had sufficient staff to ensure constitutional conditions for the prisoners at St. Clair and to conduct fundamental security functions like properly supervising prisoners, conducting contraband searches and facility inspections, and controlling prisoner movement. ECF 160-11 at 248:12-16; ECF 210-1 at 150:10-151:14.

### G. In 2018 and early 2019, weapons contraband was pervasive and St. Clair had a widespread practice of failing to conduct reasonable contraband searches.

142. It was well-understood that contraband was pervasive and commonplace at St. Clair in the months and years leading up to February 2019. ECF 160-36 at 35,47-49; ECF 337 at 133:9-19; ECF 340 at 44:17-22; ECF 334 at 270:18-21; ECF 160-12 at 25:16-27:14; ECF 296 at 5; ECF 349 at 82:21-84:1. Indeed, the ASCA audit of St. Clair in January 2018 concluded that the Facility "ha[d] a major contraband problem." ECF 296 at 19, 24 ("All correctional staff that were interviewed readily acknowledged that SCCF Level 5 offenders possessed weapons, drugs, and cell

phones in abundance."); *see also* ECF 292 at 27 (ADOC-DS019050 (EJI Non-Compliance report) ("St. Clair has long been plagued by widespread presence of weapons contraband.")); ECF 160-12 at 180:2-6.

143. Contraband was frequently brought into St. Clair by staff and visitors. ECF 296 at 13; ECF 334-4 at 1. Two prisoners who escaped from St. Clair in December 2017 were able to escape in possession of a gun provided to them by staff. ECF 360 at 33:3-34:10; ECF 336 at 108:18-21

144. SOP 110 had been in effect for years by the time of Mullins's death and set out requirements for conducting searches within St. Clair. ECF 349-3 at 3.

145. SOP 110 required shift commanders to make sure that all cell block rovers conducted a minimum of two cell searches each shift, as well as random pat searches. ECF 349-3 at 3; ECF 210-1 at 59:7-13. Additionally, captains were required to ensure that each area of St. Clair (including every housing unit) was searched on a monthly basis. ECF 349-3 at 3; ECF 180-1 at 15:19-16:3. SOP #56 also required all rovers to "conduct sufficient random personal and area searches to eliminate the flow of contraband," but no less than four cell searches and personal searches each shift by each officer. ECF 296 at 16; ECF 306 at 13.

146. All searches were required to be documented in an incident report (form 302), whether or not contraband was found. If contraband was not found, that was required to be documented in the incident report. ECF 349-3 at 3; ECF 210-1 at 59:14-22, 60:4-61:3; ECF 160-12 at 183:9-184:4.

147.    St. Clair's own records show that contraband searches were not happening as required by policy. ECF 296 at 16-17; ECF 292 at 120. Based on SOP 110, there should have been thousands of searches and shakedowns completed and documented at St. Clair every year. ECF 292 at 120 (at bare minimum, there should have been 16 cell searches documented per day). Yet ADOC's own dashboard shows only 116 institutional searches[3] in 2018. ECF 275 (3.15.19 spreadsheet filed conventionally and under seal in native format);[4] ECF 343-13 at 1 (only 61 searches were reported over 12 months); ECF 348-10 at 6. St. Clair staff knew that searches were not happening as required by policy in 2018 and early 2019. ECF 296 at 1; ECF 343-13; ECF 292 at 56.

148.    Indeed, staff members regularly failed to seize contraband when they saw it, or to discipline prisoners for contraband including weapons. ECF 296 at 5; ECF 292 at 118; ECF 219-2 (prisoner who assaulted another prisoner allowed to continue roaming around with knife). It was common for weapons used in assaults to not be recovered. ECF 345 at 190:10-13; ECF 299 at 26-27.

149.    As a result, when searches were done, unreasonably large amounts of contraband were discovered. ECF 160-36 at 47-49. For example:

---

[3] The designation "institutional search" does not mean that a search was done of the entire facility. Instead, it encompasses any search done in the facility, including individual cell or individual prisoner searches or shakedowns. *See, e.g.*, (line 279 2/19/28 "Institutional search" of cell L-33, incident number SCCF-18-00215) (line 1334 7/28/18 "Institutional search" discussing "routine inmate shakedowns"); *see also* ECF 160-5 at 123:21-124:16.

[4] The actual number of searches done appears to be lower, as searches were often counted multiple times. *See* lines 1060-1062 (counting 6/12/2018 search three separate times).

a. A December 27, 2017 institutional search yielded, among other things, 98 inmate-made knives and a hacksaw blade. ECF 317 at 1-3.

b. In August 2018, a search of one side of the P block (P-2) turned up 16 weapons. Up to 48 prisoners could live in P-2, meaning approximately one in three prisoners had a weapon. ECF 288. Sixteen weapons was a common number of weapons found in a search of one half of a cell block. ECF 345 at 207:11-14; ECF 219-3.

c. One random search of a prisoner on November 29, 2018 revealed that he was carrying five knives. ECF 275 (3.15.19 spreadsheet filed conventionally, under seal in native format).

150. Controlling contraband is a critical and fundamental correctional duty. ECF 160-36 at 47, 49; ECF 160-12 at 29:24-30:18. Contraband—particularly weapons, cellphones and drugs—seriously undermine safety of prisoners and staff and contribute to violence. ECF 160-36 at 47, 15-16; ECF 296 at 19, 24; ECF 178-4 at 63; ECF 160-2 at 63; ECF 160-12 at 34:18-35:4; ECF 363 at 122:23-123:22, 124:15-124:22, 86:11-87:18.

151. Defendants were aware of the importance of conducting contraband searches to reduce the risk of violence. ECF 160-12 at 63:19-64:8; ECF 160-11 at 242:21-243:8; ECF 343 at 271:7-19. SOP 110 explicitly acknowledged that "[s]earches and shakedowns are simply a necessary portion of correctional work," should be commonplace, and that, for many positions at St. Clair, should make up a majority of

staff responsibilities and are indeed "the most important single function of the job."
ECF 349-3 at 3.

152.    Dunn knew well before Mr. Andrews was killed that additional
contraband searches were needed to reduce the levels of contraband weapons at St.
Clair. ECF 160-11 at 242:21-243:8.

153.    Dunn was alerted to the issue that staff were not conducting required
routine contraband searches at St. Clair, and he did not take any meaningful steps to
investigate this information, nor did he take any steps to specifically enforce, or direct
the enforcement, of policy requiring daily and monthly contraband searches. ECF
160-11 at 164:8-175:19, 201:9 -204:24. Dunn could have done so. ECF 160-11 at
204:25-205:24.

154.    Culliver, Ellington and Jones were responsible for making sure that
contraband searches were done at St. Clair in compliance with the SOPs. ECF 160-5
at 142:25-143:15; ECF 160-12 at 64:9-64:17; ECF 160-11 at 176:5-21; ECF 336 at
72:14-19, 74:7-13.

155.    Culliver knew contraband was a serious problem at  St. Clair that was
leading to violence, but he did not know what Ellington or the Warden at St. Clair
were doing to control contraband at the facility. He also did not take any action to
make sure that Warden was having sufficient contraband searches carried out at St.
Clair. ECF 336 at 97:9- 25, 102:6-103:1, 114:12-115:1, 215:21-24.

156.    Although Ellington was advised that contraband searches were not

happening as required, he never took any meaningful steps to ensure that Jones was actually enforcing search policies at St. Clair, despite having responsibility to do so; he knew staff were not being disciplined for failing to conduct searches. ECF 160-5 at 143:16-21, 162:24-163:15, 183:8-19, 185:17-186:4, 185:22-4; ECF 160-11 at 176:5-21.

157.    After a monitoring report brought to Jones's attention a decrease in the frequency of institutional contraband searches at St. Clair, Jones did not implement any action plan directed at locating and removing contraband from the facility. ECF 349 at 317:17-318:14. Nor did Jones discipline any staff (or ensure that staff were disciplined) for failing to conduct contraband searches. ECF 160-5 at 162:17-163:21.

158.    Supervisors such as Jones had the authority to have CERT teams at St. Clair conduct additional searches and to request additional CERT teams to conduct searches, or to hold a shift over or call in supervisors or canine teams to do a search. ECF 160-5 at 126:24-128:15, 129:21-130:9. Despite this, CERT teams at St. Clair were primarily used for post coverage, not contraband searches, prior to Mr. Mullins's death. ECF 160-12 at 196:2-197:11; ECF 306 at 14.

159.    Reports documenting searches were sent directly to Givens, so she knew that searches were not happening as required. She also shared responsibility for making sure searches were done in compliance with policy. ECF 180-1 at 16:4-9; ECF 210-1 at 59:19-60:10.

160.    Givens never disciplined staff for failing to carry out contraband searches. ECF 210-1 at 61:12-16. Indeed, Givens signed off on the report relating to

Mullins's murder, and did not discipline anyone for failing to search for the knife used to kill Mullins. ECF 210-5 at 2; ECF 210-1 at 96:15-97:3.

161.    Givens knew that it was common for staff to be unable to locate weapons used in an altercation at the facility. Despite this, she was not concerned that these weapons were out in the prison population. ECF 345 at 190:14:18.

162.    Givens never took any steps to make sure staff were acting quickly after an assault to locate the weapon used in the assault or identify suspects. ECF 345 at 193:6-10.

163.    Similarly, when a weapon was used in a violent incident in a housing unit, Givens did not require the housing unit to be locked down to conduct a search for the weapon, despite policy requiring a lock down and search. ECF 345 at 190:19-24; ECF 361 at 102:2-18.

164.    Brooks similarly did not discipline or reprimand any staff for failing to conduct required contraband searches. ECF 180-1 at 143:8-144:8.

165.    Givens and Graham were responsible for making sure that searches were done of staff and other individuals entering St. Clair. ECF 199-1 at 34:12-19; ECF 210-1 at 56:22-57:4, 58:1-5.

166.    Ragsdale and Price were responsible for ensuring that officers were completing shakedowns, cell inspections, and contraband searches daily on his shift. ECF 361 at 25:12-27:5, 28:24-29:6.

167.    Staffing levels were sufficient to conduct the contraband searches

required by St. Clair policy. ECF 210-1 at 151:2-5; ECF 160-5 at 131:10-13; ECF 160-12 at 185:5-185:25, 186:23-187:7.

168. Charles Daniels joined the ADOC as Deputy Commissioner in January 2019, and immediately recognized the need for, and planned, a thorough, institution-wide search of St. Clair called "Operation Restore Order" intended to ascertain the level of contraband at St. Clair and remove it, so that a clean facility could then be maintained through consistent searches. ECF 338 at 43:18-44:6, 144:18-146:3, 174:6-22, 176:20-177:7, 178:6-20. The operation took Daniels only a few weeks to plan and implement at St. Clair. ECF 338 at 175:3-7.

169. The Operation Restore Order search at St. Clair could have been proposed and carried out before Mr. Daniels started by other supervisors and administrators, but was not. ECF 160-11 at 236:5-237:10, 238:18-21.

170. The Operation Restore Order search at St. Clair occurred on February 28, 2019, too late to help Mr. Mullins; it turned up 130 inmate made knives, 20 razor blades, and 17 manufactured knives, in addition to many drugs and cell phones. ECF 339-14 at 1-8.

### H. In 2018 and early 2019, St. Clair had a widespread practice of largely uncontrolled prisoner movement in its general population units.

171. In 2018 and early 2019, uncontrolled prisoner movement was the norm at St. Clair in general population, as it had been for years. ECF 160-36 at 50; ECF 296 at 5 ("Officers do not enforce basic facility policies such as challenging inmates

moving without authorization on the yard, enforcing the requirement for inmates to wear their issued identification wristband"); ECF 316 at 1-2; ECF 349 at 299:16-300:6, 320:10-321:3; ECF 160-12 at 159:12-160:15, 161:4-162:1, 164:14-165:1; ECF 349 at 40:19-41:4, 41:13-20.

172.    Prisoners regularly lived or slept in areas other than their assigned cells. ECF 218-6; ECF 160-12 at 24:3-25:15, 169:14-170:15; ECF 272 at 1, 5, 7 ("This whole facility in unauthorized area sir. . . . Don't nobody sleep in the . . . same assigned cell."); ECF 349 at 192:4-194:14; ECF 165-1 at 39:9-19.

173.    Indeed, the Internal Investigation report related to Mullins's murder explicitly acknowledged the "fluid nature of the prison population's residences and the frequency by which inmates locate to various cells without authorization." ECF 171-4 at 2-3.

174.    St. Clair's SOPs required that all prisoner movement be coordinated through the shift commander's office. ECF 160-28 at 3. The Shift Supervisors were responsible for making sure that staff were controlling prisoner movement during their shifts. ECF 160-28 at 2. St. Clair policy also required that all cellblock entrances remain closed except to permit authorized movement, and that prisoners not be allowed to enter cellblocks to which they are assigned without authorization. ECF 335 at 28:12-29:3; ECF 160-28 at 2-6; ECF 316 at 1. It also required that all inmate movement be documented in the duty post log. ECF 160-28 at 3.

175.    In 2018 and early 2019, staff did not enforce policies controlling

prisoner movement, resulting in prisoners moving about without interference. ECF 160-36 at 49-53; ECF 296 at 23; ECF 160-2 at 6, 13; ECF 160-14 at 2; ECF 181-10 at 2; ECF 165-19 at 2-3; ECF 299 at 13-15; ECF 292 at 30-31; ECF 160-12 at 161:4-161:19, 164:14-165:1.

176. In 2018, St. Clair had a wristband policy to control movement; however, the wristband policy was rarely enforced, and prisoners were allowed to move freely throughout the general population despite the policy. ECF 160-36 at 27-29; ECF 296 at 5; ECF 160-2 at 6,13; ECF 160-14 at 2; ECF 160-75 at 5; ECF 160-12 at 159:12-161:19, 164:14-165:1; ECF 349 at 140:17-141:15; ECF 160-5 at 166:3-17, 168:1-19.

177. Controlling prisoner movement is a critical and fundamental correctional duty. ECF 160-36 at 50. It was well understood by correctional staff that failure to control prisoner movement puts staff and prisoners at risk of violence. ECF 160-36 at 52-53; ECF 160-12 at 35:11-16; ECF 160-2 at 6, 13; ECF 316 at 1; ECF 160-14 at 2; ECF 349 at 320:10-321:3. It is also important to control movement to hold prisoners accountable and manage unlawful activity. ECF 160-36 at 52; ECF 355-1 at 31:20-32:2; ECF 315, 318, 322 at ¶2; ECF 292 at 113-114; ECF 299 at 14-15, 28-29.

178. The failure to control prisoner movement falls well below accepted correctional standards. ECF 160-36 at 49-50.

179. Given staffing challenges at St. Clair, controlling prisoner movement was especially important. ECF 160-36 at 59.

180.    Jones received reports that officers were leaving the doors to the P/Q housing block open when the camera was not functioning, and herself observed the door left open, but did not recall any discipline of staff who had left the doors open and did not create any written plan for P/Q movement. ECF 349 at 327:11-328:21; ECF 160-12 at 162:2-162:15, 164:21-165:1, 174:12-17.

181.    Jones knew that St. Clair had an issue with prisoners living outside of their assigned housing units. ECF 160-12 at 24:3-25:15.

182.    Bed roster checks were an important mechanism to ensure that prisoners were sleeping in their assigned cells. Jones did not know if these were happening as required, and did not take steps to keep track of when bed roster checks were happening. ECF 210-1 at 116:9-14 ; ECF 349 at 141:16-142:16.

183.    Jones's response to unauthorized movement at St. Clair was merely to reemphasize existing procedures. ECF 349 at 321:4-324:15. Indeed, she provided a performative memo in May 2018 telling staff to enforce the wristband policy, which was wholly ineffective, and which she did not enforce. ECF 160-14 at 2; ECF 310 at 7-8 (explaining that after Jones's directive, Cotten returned and staff were still not complying with the policy); ECF 160-36 at 28-29, 61-62, 52-53 (a minimally competent correctional supervisor would have recognized the need for meaningful action and urgency, not empty performative gestures shown to be ineffective).

184.    A single wristband audit was conducted that continued to show serious noncompliance in the P/Q blocks. ECF 289 at 1-2 (13 prisoners in P block were not

wearing wristbands, and another 8 prisoners in Q block). And any improvement in enforcement was short-lived at best, and uncontrolled movement remained the norm throughout 2018. ECF 292 at 30 ("The Department's assurance that corrective action was taken in the form of new policies issued by the Warden and a single wristband audit, while knowing that the facility is unable to comply with these policies and has documented an inability to control movement out of P/Q, is deeply troubling."); ECF 292 at 82-87, 101; ECF 275 and 320 (two spreadsheets filed conventionally, under seal in native format) (providing additional information about the incidents identified in the EJI report, SCCF-18-01548, SCCF-18-01572, SCCF-18-01530 and showing that more than 27 men were found in unauthorized housing areas during a single count on November 29, 2018 - SCCF-18-01572 incident number); ECF 179-4 at 4; ECF 160-18 at 3-4; ECF 352 at 47:12-24; 48:9-12.

185.   Neither Jones, nor any other St. Clair or ADOC staff, made any changes before Mullins was stabbed to ensure that prisoner movement was controlled. ECF 165-1 at 41:16-42:12; ECF 345 at 112:23-113:7, 135:9-14, 156:14-22, 171:7-15, 179:24-180:3; ECF 333 at 143:8-144:8, 144:19-145:12; ECF 165-1 at 41:21-42:12 (Smith was not aware of any steps that Jones or any St. Clair or ADOC staff took prior to February 2019 to address uncontrolled movement).

186.   Culliver knew that unauthorized movement, especially in the P/Q blocks was a problem, but the only steps he took to address it were having conversations with the warden, who he knew was not taking steps to control prisoner movement.

ECF 336 at 265:18-266:21, 267:4-9.

187. Givens testified that as Warden II, she did had no concerns about staff controlling prisoner movement; the only thing she did to enforce the wristband policy was to send prisoners to the command office or breezeway for a replacement if she saw a prisoner without a wristband. ECF 345 at 135:10-14, 156:14-22,171:7-15.

188. Givens knew that prisoners were being forced by other prisoners out of their assigned cells. ECF 218-6. Givens never took any action as Warden II at St. Clair to make sure prisoners were sleeping and living in their assigned cells, nor does she recall anyone else taking action to do so. ECF 345 at 112:23-113:7, 179:24-180:3. Givens testified that it was each prisoner's responsibility to make sure they were living and sleeping in their assigned cell, not anyone else's responsibility, and she would not say whether prisoners sleeping outside their assigned cell posed a risk to safety. ECF 210-1 at 114:13-115:10.

189. Brooks also did not discipline or reprimand staff for failing to control prisoner movement. ECF 352 at 143:8-144:8, 113:20-24.

190. Vincent testified that she believed she had no obligation to address uncontrolled prisoner movement even where it undermined the ability to keep PREA victims separated from their abusers. ECF 160-1 at 167:21-171:15.

**I. In 2018 and early 2019, St. Clair had a widespread practice of failing to safely segregate and monitor violent prisoners with histories of institutional violence from vulnerable prisoners such as Mullins.**

191. It is well known that prisoners with an established history of institutional

violence need to be housed in a single cell or otherwise separated from other prisoners, or that they need to be closely monitored and have their movements controlled, to avoid a significant risk of violence to other prisoners. ECF 160-36 at 43; ECF 360 at 91:7-12, 90:18-21; ECF 160-12 at 232:23-233:3; ECF 290 at 2.

192.    When a prisoner makes a PREA complaint against another prisoner, there is a risk of retaliation against the victim. As a result, it is important to separate alleged victims and alleged abusers, and everyone in ADOC knows this separation requirement is important to protect victims and vulnerable prisoners. ECF 160-1 at 63:10-65:7. Failure to separate reporting victims and alleged abusers creates a risk of violence the victim.  ECF 160-1 at 67:8-68:8.

193.    It was well known that prisoners at St. Clair were often retaliated against for reporting sexual abuse. ECF 309 at 32, 41-42.

194.    Indeed, prisoners at St. Clair were often afraid to tell correctional staff when somebody had attacked them because they were afraid of retaliation. ECF 361 at 62:25-63:5.

195.    SOPs 229 and 230 explicitly required that, immediately upon receiving a PREA complaint, staff must separate the alleged victim and abuser(s). ECF 160-65 at 4; ECF 160-64 at 13. When a sexual assault was reported, the alleged abuser was to be secured in restrictive housing pending investigation. ECF 160-65 at 5.

196.    In 2018 and early 2019, St. Clair prisoners were assigned to cells based on empty bed space, and often, the only open beds were in the P/Q blocks. ECF 292

at 5-8; ECF 160-2 at 42.

197.    Prisoners were often moved out of the restrictive housing unit simply because bed space was needed there, not because it was determined that the removed prisoners could be properly and safely housed in general population. ECF 296 at 28; ECF 160-5 at 244:6-16; ECF 160-12 at 201:15-202:14, 203:12-18.

198.    Throughout 2018 and early 2019, prisoners were frequently released from the restrictive housing unit directly into the inadequately supervised P/Q blocks. ECF 292 at 6, 8; ECF 290 at 2; ECF 165-74 at 3 (released into to P/Q on 2/1/18 and 11/13/18); ECF 165-73 at 1 (instances on 6/20/18, 7/11/18 and 11/13/18); ECF 193-1 at 1 (3/30/18 and 1/12/19); ECF 186-5 at 2 (10/23/18); ECF 288 at 1 (identifying A, B, C, D and E blocks as part of the restrictive housing unit).

199.    In 2018 and early 2019, prisoners in general population (including P/Q) were left largely unmonitored, and cell houses were regularly staffed with just a single cube officer. ECF 361 at 35:16-24; ECF 296 at 9; ECF 160-11, 26:14-24, 28:4-22, 29:2-6; ECF 181-10 at 2; ECF 361 at 54:2-55:1; ECF 337-4; ECF 297; ECF 181-11 at 13; ECF 160-12 at 104:16-105:1.

200.    Due to uncontrolled movement, prisoners in general population, even if in separate housing units, were not meaningfully separated from one another; as a result, placing PREA victims and abusers in different housing units in general population did not comply with St. Clair and PREA policies requiring separation of such individuals, and all staff at St. Clair were informed that leaving prisoners in

general population did not satisfy separation requirements. ECF 160-14 at 2-3; *see also* ECF 347 at 207:4-211:5; ECF 160-30 at 48; ECF 292 at 30-32, 113-115; 160-3 at 5, 8-9, 46-47.

201.    The settlement agreement in *Duke v. Dunn* required the creation of a Behavior Modification Unit at St. Clair to safely house prisoners identified as in-need of behavior modification programming and who should not be housed in general population because they pose a risk to the safety of others. ECF 160-76 at 7-9; ECF 160-12 at 107:5-10.

202.    The Behavior Modification Unit was not implemented as required by the *Duke* settlement agreement, nor was any behavioral modification programming implemented at St. Clair in 2018 or early 2019. ECF 160-11 at 214:5-21, 215:22-216:3; ECF 160-12 at 203:19-25.

203.    The *Duke* settlement agreement also required the creation of a Special Safety Unit ("Special Safety Unit") to house prisoners with heightened safety needs. ECF 160-12 at 115:23-119:20; ECF 160-13; ECF 348-7 at Pg. 9 & 1; ECF 160-12 at 105:2-106:9, 102:17-103:23.

204.    At the time of Mullins's death, the SSU had 24-bed capacity. ECF 292 at 9-10; ECF 288. Malone and Jones do not recall the SSU ever being at capacity. ECF 165-14 at 176:20-177:12;  ECF 160-12 at 126:1-24.

205.    Jones was responsible for implementing the SSU and ensuring that it was functioning as required. ECF 210-1 at 152:13-25.

206. Neither Givens nor Brooks took any steps to implement the SSU. ECF 333 at 73:10-12; ECF 345 at 152:13-153:5.

207. Despite being the ADOC PREA Director for nine years, Vincent testified that she did not know whether it was common within ADOC for a prisoner to suffer violence after making a PREA allegation against another prisoner or to otherwise be retaliated against for making a PREA complaint, and that she did not have data to answer that question. Vincent did not conduct any investigation or instruct the IPCM to conduct any investigation to determine whether it was common for PREA complainants to be retaliated against during the 2018 and 2019 period. ECF 160-1 at 9:14-23, 152:13-153:1, 155:20-156:12, 159:1-8.

208. Givens was not concerned that prisoners at St. Clair who reported threats or attacks would be retaliated against by the prisoners they reported on. ECF 210-1 at 201:1-5.

209. Brooks does not recall taking any steps as Warden I at St. Clair to make sure that prisoners who reported violence or threats were not retaliated against by the prisoners they reported on. ECF 180-1 at 141:18-22.

### J. In 2018 and early 2019, St. Clair had a widespread practice of noncompliance and lack of enforcement with its written security policies.

210. It was well understood that a failure to enforce security policies and procedures at an institution like St. Clair risks increased violence. ECF 160-12 at 35:23-36:3; ECF 341 at 74:23-75:22

211. In 2018 and early 2019, officers did not enforce basic security policies at St. Clair. ECF 296 at 11, 5 ("Officers do not enforce basic facility policies such as challenging inmates moving without authorization on the yard, enforcing the requirement for inmates to wear their issued identification wristband, and prohibiting smoking within housing units. This has resulted in the inmate population being very undisciplined and empowered by the lack of any real structure."); ECF 160-36 at 55-56; ECF 343 at 270:11-14; ECF 160-2 at 6.

212. Supervisors also failed to hold subordinate staff accountable for failing to carry out their basic security functions, including for failing to conduct required searches; seize contraband weapons; conduct required searches; control prisoner movement; and maintain security by locking down housing block doors. ECF 160-36 at 55-56; ECF 296 at 5, 10, 13; ECF 320 (ADOC045014 spreadsheet filed conventionally and under seal in native format) (of the 25 incidents of employee discipline in October through December 2018, 13 were related to work attendance/overtime policies, and there was no staff discipline for failure to conduct contraband searches, failure to conduct inspections or work-throughs, failure to control prisoner movement, or failure to secure cell block dorms)[5]; ECF 345 at 61:12-16, 175:15-21; ECF 315, 318, 322 at ¶¶9, 10, 13-16, 18-19 (RFAs of Givens, Brooks

[5] To view only employee discipline on this spreadsheet, in column F, select the arrow in the right corner and check the box for "staff discipline." Then use column G to look at incidents only in October -December 2018. Explanations of each incident are in column Y.

and Malone); ECF 210-1 at 61:12-16; ECF 180-1 at 143:8-144:8; ECF 275 (3.15.19 spreadsheet filed conventionally and under seal in native format).

213. The number of major disciplinary reports for prisoner misconduct fell from 1,511 in 2016 to just 550 in 2018. *Compare* ECF 297 at 6, *with* ECF 181-11 at 6.

214. The failure to enforce ADOC and St. Clair policies led to dangerous and chaotic conditions at St. Clair, where prisoners were emboldened to violate rules and intimidate staff, leading to increased violence. ECF 160-36 at 53-54; ECF 296 at 16; ECF 160-75 at 5.

215. In 2018 and 2019, Ellington was provided with reports for all prisoner and staff discipline at St. Clair. ECF 160-5 at 85:19-86:7, 162:17-163:10.

216. Ellington is not aware of any instances in 2018 in which officers were disciplined at St. Clair for failing to conduct required contraband searches, failing to properly respond to a prisoner's expression of fear for their safety, failing to supervise their subordinates, failing to enforce the wristband policy, or failing to control prisoner movement. ECF 160-5 at 163:11-21, 164:9-166:17.[6]

217. Jones knew that staff were not enforcing policies, but she merely made "vague recommendations and admonitions" at staff meetings "without any enforcement." ECF 160-36 at 29-30.

[6] Ellington remembers one time that a staff member was disciplined for having too many prisoners on the yard, but he does not know if that occurred in the 2018-19 timeframe or not. He otherwise does not recall any staff discipline for failing to control prisoner movement. ECF 160-5 at 164:14-165:22.

218. Jones does not recall taking any corrective action against any wardens, captains or shift supervisors for failing to supervise subordinates. ECF 160-12 at 199:24-200:3 Jones, along with Ellington, supervised Warden Givens. ECF 210-1 at 31:23-32:3. Givens never disciplined any staff for failing to carry out daily searches or failing to enforce SOPs related to searches, or for failing to properly complete incident reports. ECF 345 at 61:12-16, 161:12-163:11, 175:15-21. Prior to 2020, Givens was never disciplined for failing to ensure contraband searches and inspections were carried out, or for failing to make sure that incidents were properly documented, ECF 345 at 231:17-.233:1.

219. Givens had a practice of accepting subordinates' conduct as appropriate, without making an independent decision about whether it complied with policy, despite being a supervisor. ECF 345 at 136:12-22, 132:3-4, 196:24-199:15 ("The supervisor took the appropriate action, whatever they did."); *id* at 196:24-199:15 (assuming a lieutenant had a valid reason for disciplining a prisoner who stated he had been threatened by another prisoner, and failing to investigate to determine if the action was appropriate); *id.* at 199:17-200:4 (whether discipline of a prisoner was appropriate depends on "who the incident was reported to and what he or she felt that they needed to do"); *id.* at 138:2-19 (the way Givens enforced policy was making sure subordinates signed off on reading the SOPs)

220. Givens did not take any corrective action to make sure that incident reports were properly filled out with all required information, despite knowing that St.

Clair had a problem of staff not properly filling out incident reports with all required information. Givens never disciplined staff for failing to properly complete incident reports. ECF 345 at 161:12-163:11, 175:15-21; ECF 324 at 7.

221. Givens signed off on incidents she knew were not handled properly, and did not institute corrective action or discipline. As examples:

a. A prisoner named C.N. told Givens and Lieutenant Russell Jones that he was assaulted by prisoners Cedric Davis and L.W., and Givens took no steps to make sure that the incident was investigated or that Davis and L.W. were disciplined. ECF 345 at 68:20-69:1; ECF 210-2. Givens also knew that no one else took any steps to investigate the incident or discipline Davis or L.W. ECF 305 at 3 (Section 9 indicating report was given to Givens); *supra* 126d; ECF 345 at 73:21-74:16, 76:6-17. Givens also knew an investigation should have been taken into the alleged assault that C.N. reported, and that if an investigation showed that L.W. and Davis had assaulted C.N, L.W. and Davis should have been placed in segregation. ECF 345 at 73:7-20, 76:25-77:5 78:14-79:9. Based on the report, only C.N. was disciplined for "creating a security, safety and or health hazard."[7]

b. Givens signed off on the report relating to Mullins's murder, and did not discipline anyone for failing to search for the knife used to threaten and kill Mullins.

[7] Givens testified that references in the incident report to a "statement" might be a statement from the alleged attackers. But subsequent production showed that the statement was from Mr. Nero himself. *See* ECF 305 at 2.

ECF 210-4; ECF 210-1 at 96:15-97:3.

222. Brooks does not recall, as Warden I at St. Clair, disciplining or reprimanding staff for failing to control prisoner movement, failing to secure cell block doors, failing to conduct required contraband searches, failing to document an incident of violence or an incident involving a contraband weapon. If he had done so, it would have been documented. ECF 180-1 at 143:8-144:8. Brooks also does not recall taking any action to address the problem of prisoners being left unmonitored for long periods of time. ECF 333 at 123:24-124:25.

223. Warden Brooks does not recall ever being disciplined at St. Clair for failing to ensure contraband searches were carried out, conduct necessary rounds and inspections, control prisoner movement, or document violent incidents or weapons. ECF 180-1 at 11:6-7, 18:5-9, 144:19-145:17.

**K. In 2018 and early 2019, physical plant issues at St. Clair exacerbated the substantial risk of serious harm from violence to prisoners.**

224. The physical condition of the St. Clair facility presented a number of obvious security risks. ECF 296 at 5,13, 20; ECF 160-2 at 6. Dunn was aware of many of these risks as early as his first tour at St. Clair in 2015. ECF 160-11 at 26:14-24, 28:4-22, 29:2-6.

225. Cell locks were frequently jammed or inoperable, and the lights that would indicate whether cell locks were secured frequently did not work. ECF 345 at 209:9-23. In October 2018, about half the lock-indicator lights in the P/Q blocks

were inoperable and had been that way for months, and men continued to be housed in cells with locks that were known to be broken. ECF 181-10 at 2-3; ECF 333 at 106:15-25, 107:11-16 (discussing findings in Exhibit 15); ECF 178-4 at 5; ECF 160-2 at 6; ECF 160-36 at 35, 52; ECF 296 at 23; ECF 340 at 241:6-21; ECF 349 at 147:1-157:5 (institutional logs from May and Sept. 2018 show many cell locks, many call buttons, and all cameras not working in P/Q, and some staff are fabricating the required checks); ECF 306 at 6-8.

226.    In 2018, there was "an overall culture of indifference to the security of cell doors/locks and a tolerance of obstructions in locks." ECF 181-10 at 2; ECF 333 at 106:15-25, 107:11-108:1.

227.    Camera systems were largely inoperable in the years leading up to Mullins's murder. ECF 333 at 106:15-25, 107:11-108:1; ECF 181-10. For instance, in October 2018, there were no working cameras in P/Q or monitoring the entrance to those blocks; ECF 178-4 at 5-6; ECF 181-10 at 2; ECF 299 at 13, 24; ECF 160-75 at 25. Dunn knew from his first tour of St. Clair in 2015 that there were serious problems with the cameras and their placement, but he did not submit a request to the legislature for a new camera system until at least three years later. ECF 160-11 at 29:7-12, 254:5-11; ECF 340 at 243:21-244:12, 246:16-21.

228.    In 2018, cell and cube windows were commonly so dirty or damaged that one could not see through them, and sometimes went months without cleaning or repair. ECF 160-36 at 6; ECF 181-10 at 2-3; ECF 178-4 at 5; ECF 160-2 at 6.

229.    Because of the layout in the cell houses, cube officers were not able to see many cells in the housing units they were charged with monitoring. In general, the layout and conditions in the cell houses made it difficult to properly monitor all areas of the cell house, and there were numerous blind spots. ECF 160-11 at 26:14-24, 28:4-22, 29:2-6; ECF 181-10 at 2; ECF 361 at 54:3-55:2.

230.    Given the physical plant problems, ADOC and St. Clair staff were well aware for years that steps needed to be taken to ensure that prisoners were properly monitored and that movement was controlled, among other things. ECF 160-11 at 26:14-24, 28:4-22, 29:2-6.

231.    Jones was responsible for ensuring the housing units were properly supervised despite staff shortages and camera deficiencies. ECF 160-11 at 33:3-15, 34:7-19.

232.    Moreover, Jones discovered that institutional inspection reports to identify issues with security cameras and cell locks were being fabricated by staff and not being done according to policy. ECF 160-12 at 204:20-23, 205:12-22, but there is no evidence that any staff members were disciplined for lack of compliance. ECF 320 (ADOC045014 spreadsheet filed conventionally and under seal in native format) (of the 25 incidents of employee discipline in October through December 2018, none

were for failure to conduct inspections or work-throughs).[8]

**L. Defendants were well aware of the risk to prisoners such as Mullins, but failed to act.**

233. The risks discussed above were so serious, long-established, readily apparent, and well-known that every Defendant would have been aware of them. ECF 160-36 at 57-58; ECF 349 at 310:22-311:13.

234. Dunn visited St. Clair within the first six months of being appointed ADOC Commissioner in 2015. ECF 340 at 26:12-16, 27:1-17, 28:13-30:15.

235. Dunn was advised about significant challenges or problems within ADOC facilities like St. Clair by the deputy commissioners and institutional coordinators. ECF 160-11 at 52:21-53:4. Dunn would also receive daily summaries of all major incidents at St. Clair, including assaults. ECF 160-11 at 103:25-104:25, 106:10-17. Dunn received monthly and annual statistical reports about violence at St. Clair, as well quarterly analyses of this data. ECF 160-11 at 114:19-115:19.

236. Dunn knew that steps needed to be taken to address deficiencies at St. Clair and to adjust correctional practices. ECF 160-11 at 32:8-12. Dunn was also aware of a lack of leadership at St. Clair, and a lack of support and supervision of staff. ECF 340 at 134:18-135:7; ECF 296 at 5.

237. Despite this, Dunn did not address problems at St. Clair as to the day-to-

[8] To view only employee discipline on this spreadsheet, in column F, select the arrow in the right corner and check the box for "staff discipline." Then use column G to look at incidents only in October-December 2018. Explanations of each incident are in column Y.

day facility operation, he left that to the Deputy Commissioner and Warden III. He did not take meaningful steps to make sure that recommendations or corrective action were actually implemented by the Warden and other staff at St. Clair. Dunn focused on obtaining resources for St. Clair and other facilities. ECF 340 at 157:18-158:21, 159:19-160:14, 161:20-162:12, 164:19-165:8, 165:15-167:14, 206:20-207:21, 228:21-229:18, 230:22-232:3, 320:15-321:12; ECF 160-36 at 58 ("Commissioner Dunn were responsible for taking urgent and meaningful action to stem the dangerous conditions and violence at St. Clair, and remove the risk of harm faced by inmates such as Mullins, and did not do so prior to his death."); ECF 160-36 at 52-53 ("Any minimally competent warden and administrator would understand the extreme levels of risk posed by these conditions and take urgent action to address them. In my opinion, Defendant Jones (as well as Ellington and Dunn) failed to do so here.").

238.    Dunn failed to carry out, or instruct anyone else to carry out, any evaluation of corrective action taken against staff at St. Clair. ECF 340 at 309:18-310:5.

239.    In 2018 and early 2019, Ellington visited St. Clair at least once a month, and during these visits he would speak with staff and the wardens. ECF 160-5 at 44:11-19; ECF 210-1 at 38:13-17.

240.    Ellington was responsible for corrective action regarding the wardens' conduct. Ellington never gave the St. Clair wardens any written reprimands or corrective action in 2018, nor did he create in 2018 any written improvement plans for

Jones for St. Clair. ECF 160-5 at 210:5-19, 211:1-15.

241. Annual internal "vulnerability analyses" at St. Clair alerted Defendants and other St. Clair staff to serious risks of violence and other unsafe conditions for years. ECF 337-4; ECF 297; ECF 181-11 at 7-8. Among other things, they alerted ADOC and St. Clair staff that prisoners were being left unmonitored for long periods of time, ECF 337-4 at 13; ECF 297 at 14; ECF 181-11 at 13; drugs and other contraband are readily available, ECF 297 at 6 , ECF 181-11 at 13; and a significant number of serious and dangerous incidents were causing stress and low morale, ECF 297 at 9; ECF 181-11 at 9. Warden Jones received the 2018 Institutional Vulnerability Analysis, and Warden Brooks was part of the team that completed the analysis. ECF 349 at 249:18-250:17, 251:8-251:23; ECF 181-11 at 14 .

242. In 2014, the Equal Justice Initiative ("EJI") brought a class action on behalf of prisoners at St. Clair alleging that prisoners at St. Clair faced a substantial risk of serious violence due to inadequate supervision and monitoring at the facility, widespread contraband (especially weapons) at the facility, and a failure by staff to respond appropriately to instances of violence at the facility, among other things. ECF 1-1. Dunn was aware of this lawsuit early in his tenure as Commissioner. ECF 340 at 78:16-79:11. In March 2016, a motion for class certification detailed dangerous conditions at St. Clair: prolific violence, including sexual violence, pervasive contraband weapons, failures to monitor the housing units and control prisoner movement, widespread broken cell door locks and control panels, and severe

understaffing, providing evidence from St. Clair's own documents. *See* ECF 309.

243. The parties in the *Duke* class action entered into a settlement in November 2017. As part of the settlement, the parties jointly retained mutually agreed experts to assist with and monitor implementation of the agreement. ECF 160-76 at 2-21; ECF 160-36 at 16; ECF 160-11 at 84:13-85:13. The settlement agreement was entered into on behalf of ADOC employees including Dunn and Ellington. ECF 160-76 at 2-3.

244. When Jones took over as warden (ECF 349 at 34:15-20), she understood that she had been transferred to St. Clair to implement many provisions in the *Duke* settlement agreement. ECF 160-12 at 23:15-19, 32:19-33:8; ECF 210-1 and 345 at 166:1-168:25; ECF 349 at 58:19-60:6.

245. Jones was kept informed about significant communications in *Duke*. ECF 160-12 at 73:21-73:25, 74:1-78:24.

246. At the start of Jones's tenure as warden, she was advised about problems at St. Clair, including inmates not being housed in correct housing units, unauthorized inmate movement, the overall security of the facility, the amount of contraband in the facility, gang activity, and the need to ensure adequate contraband searches. ECF 160-12 at 23:20-31:3. Jones was aware that St. Clair had a lot of contraband and received incident reports on contraband. ECF 349 at 82:21-84:1.

247. Among other things, the *Duke* settlement required ADOC to: implement a 48-bed special safety unit; establish a Behavior Modification Unit; establish "an

incident management, corrective action, and quality improvement process" and

"Quality Improvement Team"; audit and improve St. Clair's video surveillance

system, including "submit[ting] the cost estimate to the legislature in the 2018

legislative session and to apply for known, available federal funding to support

additional camera upgrades at SCCF"; completing a Security Renovation Project;

addressing policies on contraband; and accelerating the timeframe to conduct a PREA

Audit. ECF 160-76 at 2-21.

248.    In January 2018, the Association of State Correctional Administrators

("ASCA") conducted an audit at St. Clair after two prisoners escaped with a handgun;

the audit found numerous alarming conditions, including: staff were not enforcing

basic policies, sanitation at the facility was very poor, there was excess contraband,

inmate vandalism was visible throughout the facility, leadership was lacking; staff

morale was low; security inspections were not being completed; the wardens and

supervisors did not seem to tour the facility as frequently as required; staff were not

adequately supervised; operations needed to be changed in light of staffing shortages;

staff largely did not follow facility policies (SOPs); cellblock and dormitory

inspections were not conducted as required, and there were major issues with

contraband and searches were not being conducted as required, among other things.

ECF 296 at 3, 5, 12-13, 16.

249.    Defendant Dunn also received a copy of the ASCA report, and he was

generally aware of the problems described in it well before he received it. Despite this,

he left implementation of recommendations and corrective action from the ASCA assessment to his Deputy Commissioner of Operation and the Warden III, and he did not take any steps to make sure they were implemented. ECF 340 at 121:2-122:7, 125:17-21, 126:6-21, 150:16-152:12, 159:19-160:14, 165:15-168:17. 171:12-172:15, 194:7-196:5, 205:6-12, 260:14-20, 261:8-12, 263:18-264:9, 117:6-12.

250. Ellington received and reviewed the ASCA report. ECF 160-5 at 182:15-183:7.

251. The ASCA report was also made available to Jones, but she could not remember any steps she took to implement its recommendations or any communications she had to implement its recommendations. ECF 349 at 277:12-278:21, 279:22-281:19.

252. In March 2018, two months after the ASCA audit was completed, EJI submitted its First Monitoring Report regarding implementation of the settlement agreement, which was meant to reflect the period of November 1, 2017 through March 1, 2018. ECF 165-19 at 1.

253. Jones, Ellington, security staff, and executive team members at St. Clair received and discussed the *Duke* monitoring reports, including this First Monitoring Report. ECF 349 at 307:10-309:5, 292:7-292:21; ECF 160-5 at 264:4-265:4.

254. The First Monitoring Report identified numerous significant deficiencies in the implementation of the settlement agreement and serious concerns about the conditions at St. Clair, citing to specific incident reports and other evidence. ECF 165-

19 at 1-4. Among other things, the report concluded that "[i]nmate movement within general population appears to be occurring nearly unchecked", "inmates are frequently documented sleeping in unauthorized housing areas" and "violent incidents are frequently associated with unauthorized movement"; 183 knives were *documented* in incident reports in a three-month period; "ADOC did not meet the deadline for drafting new SOPS for the internal classification board, intake unit, special safety unit, and behavioral modification unit", as well as the "incident report manager, the quality improvement team, incident reporting, and the I&I position"; and "single officers are being tasked with ensuring the safety of large areas of the prison". ECF 165-19 at 1-4.

255.    In April 2018, Melinda Allen conducted a PREA audit and expressed "grave concerns" about conditions that posed serious risks to prisoners of sexual violence, including: inadequate staffing to ensure safety of prisoners; unsecured gates, cell doors, and storage doors; broken cameras and electronic monitoring devices and windows; jammed cell door locks; and inmates "openly violating facility rules." ECF 160-2 at 6.

256.    Vincent received a copy of the interim PREA audit from Melinda Allen and took the findings about deficiencies at the facility seriously. ECF 355-1 at 13:20-14:22, 16:19-17:2. Despite this, Vincent did not take any steps to address any deficiencies identified by Ms. Allen in response to the Allen interim PREA audit report. ECF 355-1 at 22:12-16, 32:7-23.

257.    In May 2018, Dave Cotten conducted a second PREA audit of St. Clair.

He found, among other things, that "[n]umerous inmates were seen violating rules, sometimes challenged by staff and sometimes not"; policies separating victim prone inmates from abusive prone inmates were not in place; "[t]he majority of inmates observed were not wearing wrist bands and staff granting access to the different sides of the unit did not check wrist bands"; dormitory doors were left unsecured; numerous blankets and sheets created blind spots; "camera placement was . . . not in adequate numbers to provide sufficient support for the minimal staffing"; and numerous cameras were damaged. ECF 160-75 at 4-5.

258.    Vincent, along with Jones and Gordy, received copies of Dave Cotten's interim PREA audit report. ECF 160-1 at 111:16-112:7.

259.    Jones, along with the Institutional PREA Compliance Manager "(IPCM"), was responsible for carrying out corrective action related to the PREA audit's findings. ECF 160-1 at 17:4-18, 29:6-30:8, 128:22-129:1, 137:1-12. Gordy was further responsible for providing additional training to staff at St. Clair in response to the PREA audit findings ECF 160-1 at 119:11-19, 121:23-122:2.

260.    Jones, along with the IPCM, was responsible for monitoring compliance with PREA at St. Clair on a day-to-day basis and ensuring that PREA is being properly implemented at the facility, including requirements to separate victims and abusers. ECF 346 at 12:7-10; 13:4-14; 17:4-6; ECF 160-1 at 34:20-36:4, 37:19-25, 38:16-40:10 43:19-44:5; ECF 210-1 at 54:11-55:18.

261.    Givens did not take any action to address the Audit findings that

numerous prisoners were violating facility rules, sometimes without challenge, and that the majority of prisoners were not wearing their required wristbands and were allowed to move freely from dorm to dorm. ECF 345 at 213:12-214:13, 215:4-6, 215:13-216:3, 217:4-7, 218:14-219:19, 221:11-15.

262.    In July 2018, EJI issued a Second Monitoring Report again ringing alarm bells about serious deficiencies in implementation of the settlement agreement and dangerous risks to prisoners. Again, relying on cited evidence, the Report concluded, among other things, that: ADOC had taken no steps to comply with requirements to establish a behavioral modification unit; "the presence of weapons contraband continues to contribute to serious incidents of violence at St. Clair"; "St. Clair has maintained a steadily high rate of violence throughout the monitoring period"; "[i]nmates at St. Clair are able to freely move about the facility without authorization"; and "there is a routine failure to identify, investigate, review or record . . . [t]he presence of weapons in incident reports. ECF 299 at 8-19.

263.    Jones received the first and second monitoring reports and discussed them with executive team members and Ellington. ECF 363 at 307:10-309:5. Dunn received the second monitoring report and reviewed it within a month of receiving it, including the appendices. ECF 340 at 276:19-278:8.

264.    In April 2019, EJI issued a Monitor's Report on Non-Compliance, covering the period of November 2018 through February 2019. ECF 292 at 1. The Report cited attached evidence and incident numbers and concluded, among other

things, that: the Internal Classification Board was not reviewing segregation placements as required and "St. Clair continues to rely on a space available bed assignments system" and that "open bed space most commonly is found in P/Q housing units"; the behavioral modification unit had not been put in place; the Quality Improvement Team was not actually monitoring as an oversight body; ADOC failed to take corrective action to address serious risks in the P/Q blocks; and that "the presence of weapons contraband . . . directly contributes to the ongoing risk of lethal harm." ECF 292 at 6, 7, 9, 15-18.

265. Following the *Duke* Monitoring Reports, the Settlement Agreement eventually fell apart, and the litigation resumed. ECF 160-36 at 16-17; *Duke v. Dunn, et al.*, Case No. 4:14-cv-1952-RDP-JHE (N.D. Ala.) at ECF 198, 202.

266. On September 6, 2018, Dunn received a letter from EJI informing ADOC administrators of a "concerning increase in serious incidents of violence" at St. Clair; warning—specifically—about the "dangers of St. Clair's "'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack . . . any regular security staff presence" and that "the last two homicides [in the P/Q block] are a manifestation of the safety problems this kind of management technique creates." EJI also warned that "weapons contraband continues to saturate the prison and . . . contribute to serious incidents of violence at St. Clair", that "contraband searches continue to be sporadic and ineffectual," recommending feasible steps to regain control. The letter provided a

number of expert recommendations to address these problems. ECF 348-5.

267.    In October 2016, the U.S. Department of Justice opened a Civil Rights of Institutionalized Persons investigation into the conditions within ADOC's male prison facilities, including St. Clair, such as whether there were systematic Eighth Amendment violations, whether ADOC adequately protects prisoners from physical harm and sexual abuse, and whether ADOC provides prisoners with secure and safe living environments. ECF 292 at 5. Jones was aware of the DOJ investigation. ECF 349 at 292:1-292:6.

268.    Dunn understood that when serious problems at St. Clair were identified to him by any source, including advocacy groups, he needed to investigate those problems and, if substantiated, implement a plan to address them. ECF 160-11 at 80:6-81:12. Nonetheless, Dunn did not do any investigation into EJI's conclusions or review the data they relied on to see if their conclusions were correct. ECF 340 at 275:21-276:2.

269.    Numerous recommendations to improve St. Clair safety and security were made as part of, or following, facility assessments. *See, e.g.*, ECF 296 at 1-35; ECF 298; ECF 165-5 at 1-26; ECF 348-5; ECF 160-75 at 1-92 (setting forth various "corrective action")); ECF 160-2. Despite this, Defendants failed to take meaningful steps to timely implement any of the detailed and specific recommendations, or to take other actions to increase safety and security that were available to them before Mr. Mullins's death. *See, e.g.* ECF 160-36 at 50-51 ("Any minimally competent warden

and administrator would understand the extreme levels of risk posed by these conditions and take urgent action to address them. In my opinion, Defendant Jones (as well as Ellington and Dunn) failed to do so here."); ECF 292 at 3-32 (discussing numerous failures). For example:

a. In January and March 2018, it was recommended that tier rotation be implemented in the housing units to better facilitate inmate movement and supervision. ECF 298 at 2; ECF 296 at 17. However, Defendants still had not initiated a plan for staggered or tier rotation movement in the P/Q blocks as of February 26, 2019. ECF 165-6 at 7.

b. After Daniels took over as ADOC Deputy Commissioner of Operations in January 2019, he ordered staff to implement a new tier rotation for the P/Q blocks starting in April 2019. Daniels started discussions about the new policy in late February 2019. ECF 338 at 50:19-22, 201:8-205:21, 268:21-269:10, 273:3-274:4; ECF 165-6 at 7; ECF 160-5 at 90:18-92:13, 94:18-23. This policy could have been instituted much earlier. ECF 160-11 at 236:5-237:10, 238:18-21, 278:21-280:5, 281:16-23. Still, Jones, who was the primary person responsible for implementing the policy, did not implement it. ECF 160-5 at 102:2-8, 104:1-20.

c. Daniels later discovered that Jones (and Warden II Gwendolyn Givens) were not implementing his 2019 controlled movement directive for the P/Q blocks when a staff member informed Daniels in August 2019 before someone "gets hurt." ECF 338 at 279:11-281:13; ECF 319 at 2.

d. Jones retired from her position under threat of discipline initiated by Daniels due to allegations that she had not ensured compliance by her staff with the March 2019 controlled movement directive issued by Charles Daniels for the P/Q blocks. ECF 349 at 339:18-341:4; ECF 160-12 at 176:1-177:4; ECF 340 at 294:3-21; ECF 165-5 at 7; ECF 338 at 201:5-202:8; ECF 319 at 2, 4.

e. Givens was eventually disciplined and demoted in 2019 for her role in failing to implement the March 2019 controlled movement directive from Daniels. ECF 345 at 221:25-222:12; ECF 319 at 2, 4 .

f. In October 2018, the *Duke* experts provided a short-term 90-day plan to address acute risks and suggested, among other things, that St. Clair initiate the use of immediate individual cell lockdowns for moderate but still serious offenses; shift staffing to P/Q blocks; and more frequently assess the housing of individuals assigned to P/Q. ECF 292 at 36-37, 61-63. Dunn did not take any action to implement this plan or provide any counter proposals. ECF 160-11 at 229:25-235:9. Jones also received this plan. ECF 160-12 at 286:2-287:8; ECF 292.

g. In January 2018, the ASCA audit team recommended using the CERT team to conduct regular shakedowns of locked down housing units. ECF 296 at 18; But quarterly CERT team searches were not instituted until February 28, 2019. ECF 165-6 at 5-6.

h. On February 28, 2019, a comprehensive, institution-wide search was carried out at St. Clair. ECF 165-6 at 5; ECF 165-3; ECF 160-5 at 93:9-12, 131:14-25.

This search–called Operation "Restore Order"–could have been proposed and carried out at ADOC before Mr. Daniels started, but was not. ECF 160-11 at 236:5-237:10, 238:18-21. Daniels expected that, if staff conducted regular searches after Operation Restore Order as directed, contraband levels, uncontrolled movement and violence at St. Clair would decrease. ECF 338 at 182:22-183:6.

     i.     It was not until April 2019 that Daniels implemented a policy to have senior staff stationed in the P/Q blocks to reduce the violence there. ECF 160-12 at 138:16-139:22; ECF 160-11 at 243:21-5, 245:8-24; ECF 160-5 at 113:1-20, 114:17-23. This initiative was effective in reducing violence. ECF 160-5 at 116:18-117:4.

     j.     It was not until April 2019 that schedules for the captains and wardens were staggered so that a warden or captain would be present outside the 8-5 shift previously assigned to all captains and wardens, to improve supervision and policy enforcement. ECF 160-5 at 186:9-187:12.

     270.    Assessments of the conditions at St. Clair were done regularly, but Dunn generally refused to accept the conclusions from those assessments or dismissed them as only temporary problems. ECF 340 at 103:1-104:10, 142:4-23, 177:9-179:15, 185:5-186:11, 194:7-22, 212:7-213:2, 213:21-214:12, 227:20-228:13, 232:18-23, 246:22-247:22, 249:23-251:22. Indeed, rather than acknowledge problems at St. Clair, Dunn had a practice of quibbling with how the problems were defined. ECF 340 at 80:2-81:15, 82:6-83:3,163:13-164:18, 186:12-187:6, 238:20-239:10, 260:9-261:2.

     271.    In 2018, Ellington had access to quarterly and monthly reports

identifying trends at major ADOC institutions, but he did not review them because he felt they fell outside of his job responsibilities. ECF 160-5 at 67:8-68:23.

272.    To reach a settlement in *Duke* and at the suggestion of experts, Dunn and the other *Duke* defendants agreed in 2017 to create a St. Clair Quality Improvement Team that would assist with the implementation of corrective action. ECF 160-76 at 12; ECF 160-11 at 82:9-23, 83:16-84:12.

273.    Dunn received very general updates on the QIT, but he did not ask for any details or meaningfully supervise implementation.  ECF 160-11 at 92:18-93:5, 98:15-99:3, 100:6-101:23.

274.    Ellington participated in QIT meetings in 2018 and early 2019. ECF 160-5 at 86:8-14, 206:18-21. Jones did as well. ECF 306 at 3, 9, 11, 19.

275.    The QIT's first meeting did not occur until July 17, 2018, and the QIT decided to meet monthly for six months and then quarterly after that. ECF 306 at 1.

276.    The QIT did not initiate or implement any corrective action or create any corrective action plan at St. Clair prior to March 2019, other than changing the definition of "serious injury" as it related to incidents at St. Clair. ECF 292 at 17-21 (discussing failure to implement the QIT, including that it "has not taken any corrective action to address issues that are directly contributing to the lack of safety and security at the prison"); ECF 160-12 at 141:18-143:7; ECF 306; ECF 348-10 at 6-8 (acknowledging issues with P/Q blocks involving contraband, unauthorized movement, and lock and door repair issues, but failing to make any plan to address

those risks); ECF 160-36 at 58-59.

277.    Ellington could not recall any changes the QIT team implemented at St. Clair prior to February 2019. ECF 160-5 at 207:15-21; ECF 160-11 at 102:12-19.

**M.    Defendants failed to act even after multiple 2018 murders at St. Clair.**

278.    Dunn testified that, when there was an incident of serious violence at St. Clair, Ellington was responsible for learning what had occurred so that he could identify and direct the implementation of appropriate corrective action. ECF 160-11 at 127:23-128:18, 130:11-20, 131:14-22.

279.    Ellington testified that it was Jones's responsibility to assess major incidents. ECF 160-5 at 273:4-14, 305:22-306:6; ECF 345 at 127:3-18.

280.    Jones did not recall the names of, or the circumstances of the deaths of, men killed at St. Clair while she was warden. ECF 349 at 330:23-331:18; ECF 160-12 at 256:24-257:16. Jones did not recall Andrew's name, even while appearing for her deposition in a case relating to his death. ECF 160-12 at 144:12-145:9, 149:8-149:12.

281.    After the stabbing deaths of Pettiway and Bray in September 2018, and the near-fatal stabbing of Weaver in January 2019, Jones did not conduct any inquiry into whether her staff could have done anything differently to prevent those assaults. ECF 160-12 at 151:15-153:20.

282.    Ellington did not have any conversations with Jones about what could have been done differently with regard to Terrence Andrews's December 2018 murder at St. Clair, and he has no opinions about what staff could or should have

done differently. ECF 160-5 at 274:24-276:21.

283.    After the deaths of Mr. Andrews and Mr. Mullins, Jones did not examine whether issues such as unauthorized movement, inoperable security cameras, inadequate supervision, or P/Q blocks violence played any role in those deaths, nor did she impose any staff discipline, nor identify where staff had missed an opportunity to prevent those deaths. ECF 160-12 at 244:12-244:21, 245:12-245:21, 246:2-246:9, 293:17-294:20, 295:16-295:21.

284.    Following Mr. Mullins's death, neither Ellington, Givens nor Vincent took any steps to investigate and review his murder to determine whether staff violated policy, whether anything could be done differently to prevent similar violence in the future, or whether corrective action was needed. ECF 160-5 at 292:1-293:6, 306:7-14; ECF 160-1 at 172:3-173:9, 173:17-21; ECF 345 at 126:14-128:2.

285.    Jones did not address Terrence Andrews's December 2018 murder at any staff meetings (ECF 160-12 at 243:9-243:12) or institute any policy or training change in response. ECF 335 at 82:11-18; ECF 160-12 at 244:2-244:8. Indeed, no wardens spoke to the sole cube officer on duty in P block when Andrews was killed in that block, and no policy or training changes were instituted in response to Andrews's murder. ECF 335 at 82:11-18. Jones similarly failed to act to make changes after Mullins's death. ECF 160-12 at 293:17-295:25

286.    Culliver did not advise Ellington at any point after Ellington began working as Institutional Coordinator in 2017 about problems with violence,

contraband weapons, and uncontrolled movement at St. Clair that should be addressed. ECF 160-5 at 53:8-54:17. Neither Culliver nor Dunn ever provided Ellington with any guidance in 2017 about what actions he should prioritize with regard to St. Clair. ECF 160-5 at 54:24-55:5.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment must be denied unless the moving party demonstrates both that there "is no genuine issue as to any material fact" and that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) ("Rule 56(c)"). As Defendants concede in a parallel case (*Ezell* ECF 269, Case No. 4:20-cv-2058-ACA, at 9), the moving party carries the burden of demonstrating that the evidence "is so one-sided that [the moving] party [should] prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Adickes v. Kress & Co.*, 398 U.S. 144, 157 (1970). A defendant cannot meet this burden unless it identifies "the basis for its motion, and identif[ies] those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). In adjudicating the motion, the Court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all justifiable inferences in that party's favor." *Thompson v. Alabama*, 65 F.4th 1288, 1297 (11th Cir. 2023). A court considers the entire record, but "disregard[s] all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000) (court gives credence only to "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."); *Ledbetter v. Goodyear Tire*, 421 F.3d 1169, 1177 (11th Cir. 2005), aff'd, 550 U.S. 618 (2007) (same).

## II.        Eighth Amendment Failure to Protect Liability

The Constitution requires correctional institutions to "provide humane conditions of confinement" and "take reasonable measures to guarantee the safety of . . . inmates." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). "[U]nder the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014); *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007). "'It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment . . . if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury.'" *Dickinson v. Cochran*, 833 F. App'x 268, 271-72 (11th Cir. 2020) (unpublished) (quoting *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019)); *see also Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). "Having stripped prisoners of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Rodriguez*, 508 F.3d at 616-17. To survive summary judgment, Plaintiff must "produce sufficient evidence of (1) a

substantial risk of serious harm that was objectively, sufficiently serious"; and conduct by the defendant that amounts to "subjective recklessness as used in the criminal law." *Wade v. McDade*, 106 F.4th 1251, 1252 (11th Cir. 2024) (en banc) (quoting *Farmer*, 511 U.S. at 834, 844-45)); *see also Hale*, 50 F.3d at 1582.

To show "a deprivation that was, objectively, sufficiently serious" (*Wade*, 106 F.4th at 1252), a prisoner need not show that he "was especially likely to be assaulted by the specific prisoner who eventually committed the assault" (*Rodriguez*, 508 F.3d at 617). Rather, the prisoner can "face[] an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. A showing of a generalized risk of violence, without any more, suffices if the plaintiff provides evidence "that serious inmate-on-inmate violence was the norm or something close to it." *Marbury*, 936 F.3d at 1234-1235; *Dickinson*, 833 F. App'x at 275. When "inmate-on-inmate violence occur[s] regularly" and "the violence [is] severe enough to require medical attention and even hospitalization on occasion," there is a question of fact as to this element. *Hale*, 50 F.3d at 1583. Alternatively, a plaintiff may demonstrate a claim by showing dangerous *conditions* of a correctional institution that "render it particularly violent," such as a failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates. *Dickinson*, 833 F. App'x at 275, 271-72; *see also Marsh v. Butler County*, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc), abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (conditions including a

failure to segregate nonviolent prisoners from violent ones, to control prisoner movement, and to discipline prisoners who assaulted others; the availability of contraband weapons; and the inadequacy of supervision and monitoring posed an objectively substantial risk of serious harm). "[S]pecific features of a facility or its population rendering it particularly violent" may also include unique risks posed by individual prisoners or logistical issues that render prison staff unable to stem near-constant violence. *Marbury*, 936 F.3d at 1235.

To show that a defendant acted with "subjective recklessness as used in the criminal law," the plaintiff must show that "the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm," and yet disregarded the risk.[9] *Wade*, 106 F.4th at 1255, 1262. In addition, liability does not attach if the Defendant responded reasonably to the risk. *Id.* at 1255, 1262. "A prison official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly ... or recklessly declined to act." *Rodriguez*, 508 F.3d at 620. This showing may be made by evidence that a supervisor "(1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence,' and (3) had 'other means [ ] available to him which he nevertheless

[9] Plaintiff agrees with the defense represented by the same counsel in a parallel case, *Ezell* ECF 269, Case No. 4:20-cv-2058-ACA, at 29, that the former causation element of the claim is "subsumed" by the *Wade* standard of subjective recklessness. Should the Court analyze this element separately, the same evidence presented by Plaintiff in support of subjective recklessness likewise establishes causation.

disregarded.'" *Rodriguez*, 508 F.3d at 622 (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993)). A plaintiff may also show that: (1) a "history of widespread abuse" put the supervisor on notice of the need to correct the deprivation, and he or she failed to do so; (2) a supervisor's custom or policy resulted in deliberate indifference to constitutional rights; or (3) the supervisor . . . knew that subordinates would act unlawfully and failed to stop them from doing so. *Dickinson*, 833 Fed. App'x at 272; *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1236 (11th Cir. 2010); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), overruled on other grounds by *Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). "[W]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Hale*, 50 F.3d at 1583 (quoting *Farmer,* 511 U.S. at 842). A Defendant's state of mind presents a question of fact for the jury. *Chanel, Inc. v. Italian Activewear of Fla.*, Inc., 931 F.2d 1472, 1476 (11th Cir. 1991).

## III. Affirmative Defense of Qualified Immunity[10]

Qualified immunity does not protect correctional officials from suit if their

[10] This brief accepts the current state of the law in which the defendants can assert a qualified immunity defense. Qualified immunity, however, is a judge-made doctrine not tied to the statutory language or to the common law as it existed at the time § 1983 was enacted. Plaintiff contends qualified immunity has no place in analysis of this case and reserves the right to seek relief should there be a change in the law. In addition, this brief accepts the current state of the law in the Eleventh Circuit regarding the manner by which a plaintiff may show clearly established law and the prohibition on pointing to circuit cases outside of the Eleventh Circuit. Again, Plaintiff reserves the right to seek relief should there be a change in the law on that issue.

conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003). Qualified immunity is an affirmative defense that defendants themselves must invoke. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Crawford-El v. Britton*, 523 U.S. 574, 587 (1998); *Harlow v. Fitzgerald*, 457 U.S. 800, 815 & n.24 (1982). A defendant asserting qualified immunity as a defense must first show that he was "engaged in a discretionary function when he performed the acts of which the plaintiff complains." *Epps v. Watson*, 492 F.3d 1240, 1243 (11th Cir. 2007). "To even be potentially eligible for summary judgment due to qualified immunity, the official must have been engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263–64 (11th Cir. 2004). The discretionary function inquiry turns on whether the Defendant is "engaged in a legitimate job-related function," and if so, whether he was "executing that job-related function . . . in an authorized manner." *Id.* at 1266.

"It is the burden of the governmental official to make" the discretionary function showing. *Id.* at 1266. "A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds." *Id.* at 1263-64; *Est. of Cummings v. Davenport*, 906 F.3d 934, 939 (11th Cir. 2018). A defendant's single sentence argument, that does not demonstrate with authority and based on the evidentiary record "what his job-related function was or how his actions were within the scope of his authority," is insufficient to satisfy the defendant's burden. *Boykins v.*

*Dunn*, 696 F. Supp. 3d 1061, 1079-1080 (N.D. Ala. 2023).

"For a right to be clearly established, "[t]he 'salient question' is 'whether the state of the law' at the time of the official's conduct gave the official 'fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Dickinson*, 833 F. App'x at 273 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Plaintiff may show such fair warning in three independent ways: first, she can show that a "materially similar case" with "binding precedent tied to particularized facts" has already been decided; second, she can show that "a broader, clearly established principle should control the novel facts of a particular case"; and third, she can show that the case "fits within the exception of conduct which so obviously violates the Constitution that prior case law is unnecessary." *Waldron v. Spicher*, 954 F.3d 1297, 1304-05 (11th Cir. 2020) (cleaned up). At summary judgment, the Court draws all reasonable inferences in favor of the plaintiff when deciding if qualified immunity is applicable as a matter of law. *Perez v. Suszczynski*, 809 F.3d 1213, 1221 (11th Cir. 2016).

## IV.        Wrongful Death Liability

The elements of a wrongful death claim pursuant to Alabama Code § 6-5-410 are duty, breach, causation, and damages. *Vinson v. Clarke Cnty., Ala.*, 10 F. Supp. 2d 1282, 1303 (S.D. Ala. 1998); *Huffman v. Dunn*, 4:20-CV-01293-CLM, 2021 WL 2533024, at *6 (N.D. Ala. June 21, 2021); *Handley v. United States*, 2021 WL 2023057, at *25 (N.D. Ala. Mar. 18, 2021). With regard to the duty element, correctional officials that manage a prison have a duty of care towards its prisoners to ensure reasonable

safety. *Farmer*, 511 U.S. at 828. This element is satisfied by a showing that prison supervisors had a duty to protect Mr. Andrews from known and unreasonable risks of serious harm from prisoner-on-prisoner violence. *Huffman*, 2021 WL 2533024, at *6-*7. To establish breach of duty, negligence suffices. *Fikes v. Abernathy,* 2018 WL 2207134, at *6 (N.D. Ala. May 14, 2018). The plaintiff need only show that Defendants disregarded and failed to reduce the known risk of harm to a prisoner from violence. *Id.*; *Huffman*, 2021 WL 2533024, at *6-*7. Finally, the causation and injury elements require a showing that the defendant caused the decedent prisoner's death by failing to take corrective action to address the known risks to prisoners from violence, when that failure led to the death. *Ezell v. Dunn*, 2023 WL 11987541, at *26 (N.D. Ala. Mar. 31, 2023); *Huffman*, 2021 WL 2533024, at *6-*7.

Plaintiff asserted wrongful death claims against certain Defendants in Counts IX and X: one turning on supervisory liability (Count IX) and one turning on the Defendant's direct participation in the events involving Mullins and Jackson (Count X). However, as the Court observed at the motion to dismiss stage: "The court can locate no basis in Alabama law for distinguishing wrongful death claims based on supervisory liability or direct participation. Therefore, the court will address Counts Nine and Ten together." ECF 84 at 59-60 n.8. For this reason, Plaintiff does the same here, and addresses the conduct supporting wrongful death liability together, as it is the totality of Defendants' misconduct that supports wrongful death liability.

Under Alabama law, "[s]tate-agent immunity protects state employees . . in the

exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). The Alabama Supreme Court has established a burden-shifting framework. *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006). First, the state agent must demonstrate that the "plaintiff's claims arise from a function that would entitle the State agent to immunity." *Id.* If that burden is satisfied, the burden shifts to the Plaintiff to show either: (1) that "the Constitution or laws of the United States . . . require[s] otherwise," or (2) that the defendants acted "willfully, maliciously, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2006). "[S]tate-agent immunity do[es] not immunize" defendants "from liability under state law if they violated [a plaintiff's] constitutional rights." *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019).

## V.     Eighth Amendment Unlawful Retaliation Liability

To present a triable claim of retaliation, a plaintiff must provide evidence that: the prisoner's speech or act was constitutionally protected; that defendants' retaliatory conduct adversely affected the protected speech, meaning that it would likely deter a person of ordinary firmness from the exercise of First Amendment rights; and that there exists a causal connection between the retaliatory actions and the adverse effect on speech. *Bennett v. Hendrix*, 423 F.3d 1247, 1250-51 (11th Cir. 2005). The causal connection may be achieved by direct participation or supervisory liability. *Keating v. City of Miami*, 598 F.3d 753, 767 (11th Cir. 2010); *Hicks v. Ferrero,* 241 F. App'x 595,

598. Thus, as the Court found at the motion to dismiss stage, here, Plaintiff must provide evidence upon which a jury could find that: (1) Mr. Mullins's speech was constitutionally protected, (2) the defendant's retaliatory conduct adversely affected that speech, and (3) a causal connection existed "between the retaliatory actions and the adverse effect on speech." ECF 84 at 56 (quoting *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011)). For example, a factual showing that Defendants "knew that prisoners who reported sexual abuse were often violently attacked by other prisoners" and yet left "Mr. Mullins in the general population despite knowing that prisoners who reported sexual abuse were often violently attacked by other prisoners [and that this] was these defendants' retaliation against him for reporting Mr. Jackson's misconduct" would provide a "plausible claim for retaliation." ECF 84 at 56.

Evidence of states of mind is subject to inference from circumstantial evidence. *Hale*, 50 F.3d at 1583 (quoting *Farmer,* 511 U.S. at 842). Moreover, whether a Defendant had the requisite subjective state of mind presents a question of fact for the jury. *Chanel, Inc. v. Italian Activewear of Fla.*, Inc., 931 F.2d 1472, 1476 (11th Cir. 1991).

## ARGUMENTS AND AUTHORITIES[11]

### I. Jones is not entitled to summary judgment on Count I.

Defendant Jones does not carry her initial burden to demonstrate an absence of genuine issue of material fact as to any elements of Plaintiff's Eighth Amendment failure-to-protect claim in Count I, and thus this Court need go no further. *See supra* at 99-100 (citing *Celotex*, 477 U.S. at 323). Jones's discussion consists of a single paragraph. ECF 166 at 48-49. That paragraph is unclear as to the specific claim elements challenged, cites only two "example" facts, and is cursory at best. *Id.* It does not comply with the requirement of this Court and the Eleventh Circuit that arguments be "'plainly and prominently" raised," and thus amounts to forfeiture. ECF 96 at 2 (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)). On top of that, Jones's statement of undisputed facts is rife with misstatements and citations to evidence that do not track the fact proposed. *See* Resp. to Facts, *supra* at 14. These errors violate the Court's orders. ECF 85 at 16; ECF 96 at 2. Thus, even if Jones had cited sufficient facts to carry her initial burden in her claim discussion (which she has not), even her statement of facts (not discussed in her claims analysis) fails to make out a sufficient basis for the motion. *See Celotex*, 477 U.S. at 323. All Defendants received all of the extra pages they asked from the Court in their briefing,

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

without any opposition from Plaintiff (ECF 149, 150), and thus Jones (and the remaining defendants below), have no excuse to have failed to meet their initial burden on any matter below. To the extent that Jones attempts to resuscitate this deficiency with new arguments in reply, it will come too late, as doing so would unfairly deprive Plaintiff of any opportunity to respond. *See Boykins*, 696 F. Supp. 3d at 1079 (citing *Sapuppo*, 739 F.3d at 683).

Substantial risk of serious harm. Jones does not appear to challenge the first element of the claim, waiving the challenge. Regardless, Plaintiff provides sufficient evidence of an objectively serious deprivation in several ways. *See supra* at 101-102.

First, Plaintiff presents evidence that Mr. Mullins faced a serious risk of substantial harm from violence at St. Clair (PSOF 123-39), where violence "was the norm or something close to it." *Marbury*, 936 F.3d at 1234; *Dickinson*, 833 F. App'x at 275. The risk was particularly acute emanating from the P/Q blocks (PSOF 135-39), from where Mr. Mullins's assailant escaped to stab Mr. Mullins to death (PSOF 119). Plaintiff also shows dangerous *conditions* of a correctional institution, that, both in isolation and collectively, "render it particularly violent," such as dangerous levels of contraband (PSOF 142-70); widespread unauthorized movement in general population (PSOF 171-90); a failure to safely house and monitor violent prisoners with histories of institutional violence, particularly in the P/Q blocks, and to segregate them from vulnerable prisoners (PSOF 191-209); and a widespread practice at St. Clair of lack of enforcement of written security policies (PSOF 210-223), all

exacerbated by physical plant deficiencies, including in the P/Q blocks, such as broken locks, nonfunctional security cameras, and blind spots (PSOF 224-32). *See Dickinson*, 833 F. App'x at 275, 271-72; *Marsh*, 268 F.3d at 1029. In summary, vulnerable prisoners such as Mr. Mullins in general population lived at constant threat of assault because of the extreme violence and contraband weapons, the threat emanating from the P/Q blocks of dangerous prisoners with histories of institutional violence going without sufficient monitoring and supervision, exacerbated by the physical plant issues, amidst a culture of violence, widespread noncompliance with policy, unauthorized movement, and inadequate discipline.

Further supporting this element, although unnecessary to the result, are the "unique risks posed by" Mr. Mullins's assailant (*Marbury*, 936 F.3d at 1235), who had a long history of stabbings, a PREA predator designation, and an obvious propensity for further violence and retaliation (PSOF 60-67, 108-112, 117-118) and yet was housed in general population, with Defendant Jones's knowing approval (PSOF 60-67, 18-19, 108-112, 117-18), in the poorly monitored "hot bay" general population Q blocks (PSOF 60-67, 191-202, 264, 266, 135-39). Jackson's housing assignment was but one manifestation of the dangerous practice of failing to segregate, monitor, and provide behavioral modification to St. Clair prisoners who engaged in in-custody violence (PSOF 60-67, 108-112, 117-18, 191-202, 264, 135-39). Also adding to the risk to Mullins was his status as vulnerable inmate that had been previously victimized and required housing in the Special Safety Unit (PSOF 34-49), particularly after he

reported sexual assault by Jackson and thus faced an acute risk of retaliation (PSOF 68-75, 103, 192-94, 60).

Such evidence easily suffices to satisfy this element. *See Dickinson*, 833 F. App'x at 271-72; *LaMarca*, 995 F.2d at 1535; *Marsh*, 268 F.3d at 1029 (conditions including a failure to segregate nonviolent prisoners from violent ones, to control prisoner movement, and to discipline prisoners who assaulted others; the availability of contraband weapons; and the inadequacy of supervision and monitoring); *Hale*, 50 F.3d at 1583; *Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006); *Bridges v. Poe*, 487 F. Supp. 3d 1250, 1258 (N.D. Ala. 2020).

Subjective recklessness: Likewise, a genuine fact dispute exists regarding whether Jones was subjectively aware that her conduct put prisoners such as Mr. Mullins at substantial risk of serious harm, and responded unreasonably to that risk, pursuant to the standards described *supra* at 102-103.

Plaintiff provides evidence that Jones was St. Clair's head warden, with responsibilities to enforce St. Clair's written policy SOPs, including by instituting corrective action for noncompliance, and to ensure corrective action in response to incidents of violence at St. Clair, including any necessary staff discipline. PSOF 1-3, 6, 17-20, 23, 26, 28, 42, 118, 140, 154, 158, 205, 230-232, 244, 259-60, 279. Jones had the authority and responsibility as warden to ensure policy compliance. PSOF 2-3. Jones was responsible for ensuring that contraband searches were done in compliance with the SOPs and had authority to bring in additional staff for searches as needed. PSOF

154, 158, 118. Jones was also responsible for ensuring that the housing units were properly monitored according to policy (PSOF 231, 157), and sufficient staff to carry out the required contraband searches and to staff the housing units (PSOF 141, 167). Jones was the final decisionmaker on classification decisions and recommendations (PSOF 17-20), pursuant to the requirements of the classification manual (PSOF 62), including the recommendation to place and keep Mr. Jackson in general population despite his extensive violence (PSOF 60, 65-67). Jones was responsible for ensuring compliance with requirements to separate victims and abusers. PSOF 260, 28, 103-104, 192-200. Jones was responsible for identifying housing units such as the P/Q blocks that were at high risk for violence and taking action to reduce that violence. PSOF 140. Finally, Jones was charged with implementing the settlement agreement in the *Duke v. Dunn* class action (PSOF 243-265, 201-202) and served on the Quality Improvement Team (PSOF 247, 254, 264, 272-77).

Jones was aware of, and repeatedly warned about, the dangerous conditions identified above (e.g., PSOF 233-77, 129, 150-52, 154), and knew they would lead to continued violence (e.g., PSOF 150-52, 177-78, 191-93, 210-11, 241-47, 123-39). *See also, e.g.*, *Farmer*, 511 U.S. at 842-43 (where "inmate attacks are longstanding, pervasive, well-documented, or expressly noted by officials in the past" a fact finder can infer knowledge of the risk). Yet Plaintiff's evidence is that she failed to respond meaningfully to that risk and acted unreasonably, failing to enforce policies she knew were required for safety, declining to take the urgent and meaningful action such as

employee discipline that was needed to stem the time of violence as dangerous conditions persisted, and declining to take feasible actions that were presented to her. E.g., PSOF 233-77, 157-58, 180-85, 196-202, 211-18, 226, 230-32, 279-85. Jones failed to take even the bare minimum of competent action to protect prisoners in the P/Q blocks, such as by enforcing regular and consistent contraband searches as required by policy through St. Clair's staff or by using available augmenting resources, remedying the culture of widespread noncompliance with security policies, and either segregating the inmates most likely to inflict violence in restrictive housing, controlling their movement, or ensuring sufficient monitoring and staffing in the particularly dangerous P/Q blocks. *See id.* The violence and dangerous conditions continued through February 2019, further reflecting Jones's inaction. PSOF 123-39.

Moreover, Jones's inaction is further apparent in her callous response of inaction following each murder at St. Clair in 2018 and early 2019 (PSOF 279-85), including Mullins's murder, which was peppered with obvious rule violations that went undisciplined (e.g., PSOF 109-112, 80-81, 88, 108-112, 117-118, 60-67, 82-85, 89, 99-105, 108-110, 115-116, 122, 56-57, 119, 44-47, 221(b), 37, 283). Plaintiff thus presents evidence that Jones's role put her in a position of responsibility for addressing the extreme prisoner-on-prisoner violence and dangerous conditions at St. Clair, and she had the means and authority to act, but turned a blind eye.

These failures were a cause of, and facilitated, Mr. Jackson's attack on Mr. Mullins. It was foreseeable and known to Jones that, without action on her part to

stem the violence and ameliorate the dangerous conditions described above, those conditions would continue and prisoners such as Mr. Mullins would continue to be stabbed to death. Thus, as reflected at the time of Mr. Mullins's death: contraband searches were inadequate and noncompliant (PSOF 109-112, 80-81, 88, 108-112, 117-18, 221(b)); unauthorized movement went unchecked (PSOF 56-57, 119); the P/Q blocks held known violent perpetrators of institutional violence due to Jones's recommendations to house prisoners like Jackson in general population, in the dangerous and poorly monitored Q blocks, notwithstanding the classification manual risk assessment tool (PSOF 44-47); vulnerable inmates were not safeguarded from retaliation from predatory prisoners with known histories of institutional violence (PSOF 44-47, 55, 56, 60-67, 80-81, 82-84, 85, 89, 99-105, 108-110, 115-116, 122); contraband knives were prevalent (PSOF 119, 121, 170), in a general environment of lawlessness and noncompliance (PSOF 210-23). Given the dangerous conditions and lack of urgent action by Jones to ameliorate them, it was entirely foreseeable that the conditions persisted on the date of Mr. Mullins's death, contributing to his death. A jury could thus find, or infer from circumstantial evidence, that Jones knew the manner in which she ran St. Clair was endangering prisoners such as Mr. Mullins, but turned a blind eye and acted unreasonably.

A jury could likewise find that Jones acted unreasonably in responding with inaction to the culture of violence emanating from the P/Q blocks, contraband weapons, uncontrolled movement, failures to safely house and monitor prisoners with

histories of institutional violence, and widespread lack of compliance with security policies, of which she was repeatedly put on notice, by ignoring readily available fixes and persisting without any meaningful, urgent action. PSOF 233-77, 278-85; ECF 160-36 at 28-30 & 58-62 (a minimally competent correctional supervisor would have recognized the need for meaningful action and urgency, not inaction and, at best, empty performative gestures the administrator knew to be ineffective, followed by continued inaction). "A prison official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly ... or recklessly declined to act." *Rodriguez*, 508 F.3d at 620 (quoting *Hale*, 50 F.3d at 1583).

Jones argues otherwise based on evidence that she issued a single memo to enforce the wristband policy and ensure door closing, and a citation to her own unpersuasive testimony claiming that she implemented additional bed roster checks. ECF 166 at 48. These facts are disputed: Plaintiff's evidence reflects that the May 2018 memo gesture was empty and performative and Jones knew that the noncompliance continued after that date, as well as that Jones knowingly failed to take any meaningful action to increase bed roster checks. E.g., PSOF 183; ECF 160-36 at 28-30 & 58-62. Plaintiff's evidence is fulsome that Jones did not enforce her wristband memo, bed roster checks, or other aspects of controlled movement, even though Jones knew of the widespread noncompliance with her movement policies, as part of a broader culture of widespread noncompliance with security policies. PSOF 171-85, 57-58, 210-33. Instead, she responded with inaction and continued the

previous practices (e.g., PSOF 233-77, 278-85), even while inmates continued to suffer horrific assaults and die (PSOF 123-39; ECF 160-36 at 28-30 & 58-62).

## II.        Jones is not entitled to qualified immunity on Count I.

Qualified immunity is an affirmative defense that Jones bears the burden to invoke through an initial showing that she acted in a discretionary capacity. *Supra* at 103-104. Jones does not make this showing, even though this Court instructed her in advance that the Court will "consider only those arguments 'plainly and prominently' raised," supported by specific evidence. ECF 96 at 2. Jones forfeits the defense by offering a mere fragment of a sentence, unsupported (that "Jones took reasonable actions within her authority," ECF 166 at 49), which fails to demonstrate with authority and record evidence "what [her] job-related function was or how [her] actions were within the scope of [her] authority." *Boykins*, 696 F. Supp. 3d at 1079-80; *see also Est. of Cummings*, 906 F.3d at 939. Jones does not show that the body of conduct as alleged by Plaintiff fell within her discretion. Moreover, even if Jones had made this showing (which she has not), Plaintiff's evidence reflects that Jones's conduct fell outside her authority because her job required her to ensure compliance with SOPs (e.g., PSOF 2-3) and she did the opposite, and indeed was recommended for termination in late 2019 by administrator Charles Daniels for failing to enforce controlled movement at St. Clair. PSOF 269(d).

Should Defendants attempt to resuscitate this argument for the first time in reply, it will come too late, as doing so would deprive Plaintiff of any opportunity to

respond. *See Boykins*, 696 F. Supp. 3d at 1079 (citing *Sapuppo*, 739 F.3d at 683). Should Defendants attempt to argue in reply that Plaintiff waived this argument at the motion to dismiss stage, such an argument would fail because Plaintiff defeated the qualified immunity defense then and was not obliged to raise (and waste the Court's time with) alternative arguments in support of denial. The defense's invocation of an immunity defense at summary judgment presents a different inquiry: whether the evidentiary record establishes the defense as a matter of law. This Court's prior order in no way held that Plaintiff conceded the issue at the summary judgment stage, and its ruling does not excuse Jones's forfeiture here.

On the merits, Plaintiff establishes the elements of an Eighth Amendment violation above to satisfy the first prong of qualified immunity. Pursuant to the second prong, Jones had fair warning of the unconstitutionality of her conduct in all three permissible ways (*supra* at 105), when as required, all reasonable inferences are taken in Plaintiff's favor. *Perez*, 809 F.3d at 1221.

The Court previously explained at the motion to dismiss stage (ECF 84 at 33-37), that broader, clearly established principles provided Jones with fair notice of the unconstitutionality of her conduct. As the Eleventh Circuit recognized recently in *Dickinson*, it was clearly established as of January 2018 (before Mr. Mullins's February 2019 murder) that high-ranking officials violate the Eighth Amendment where, as here, they fail to respond reasonably to deficiencies in management of contraband weapons, supervision and monitoring of prisoners, and classification/housing of

prisoners, through inaction or unconstitutional practices, and those deficiencies resulted in a known, "ongoing problem with inmate-on-inmate abuse." 833 F. App'x at 272-73 (discussing *Hale*, 50 F.3d at 1584-85; *Marsh*, 268 F.3d at 1034). *Dickinson* post-dates the misconduct here, but its holding regarding the clarity of the law in January 2018 and discussion of *Hale* and *Marsh* compels denial of qualified immunity here.

*Dickinson* relies on *Marsh*, in which the Eleventh Circuit held, sitting *en banc*, that, "it was clearly established in this Circuit [in 1996] that it is an unreasonable response for an official to do nothing when confronted with prison conditions that pose a risk of serious physical harm to inmates." 268 F.3d at 1034. The particular conditions in *Marsh* included—as alleged here—a proliferation of contraband weapons, improper classification and segregation of dangerous prisoners, a failure to discipline and segregate prisoners who assaulted other prisoners, inadequate supervision and monitoring of prisoners, and other similar policies and customs promoting and facilitating violence. *Id.* at 1029. Indeed, even though the plaintiffs in *Marsh* did not allege "a history of inmate assaults with serious injuries" (as Plaintiff here has alleged in detail) the Court explained that "that factual variance cannot make a difference." *Id.* at 1034.

Subsequently, the Eleventh Circuit's decision in *Hale* provided notice that—as alleged here—prison supervisors violate the Eighth Amendment when they act unreasonably in the face of a substantial risk of serious harm arising from the failure

to segregate dangerous prisoners, inadequate supervision and monitoring of prisoners,

and regularly occurring fights between prisoners that occasionally necessitated medical

attention. *See Hale*, 50 F.3d at 1581-84; *Marsh*, 268 F.3d at 1033 n.12. By February

2019, other cases, too, had held—consistent with *Hale* and *Marsh*—that deliberate

indifference to an "excessive risk of inmate-on-inmate violence" violates the Eighth

Amendment. *E.g.*, *Lane v. Philbin*, 835 F.3d 1302, 1307-1308 (11th Cir. 2016)

(inadequate supervision of prisoners, failures to segregate particularly dangerous

prisoners, ready access to contraband weapons, and widespread prisoner-on-prisoner

violence gives rise to a substantial risk of serious harm to which prison officials

cannot constitutionally respond with deliberate indifference); *LaMarca,* 995 F.2d at

1536-38 (prison officials' deliberate indifference in the face of inadequate supervision

and monitoring of prisoners with known histories of prisoner-on-prisoner violence

violates the Eighth Amendment); *Purcell ex rel. Est. of Morgan v. Tooms Cty*,  400 F.3d

1313, 1320 (11th Cir. 2005) (recognizing that "excessive risk of inmate-on-inmate

violence . . . creates a substantial risk of serious harm" based on *Hale* and *Marsh* and

dismissing claims at summary judgment based only on a lack of evidence of such risk);

*Williams v. Edwards,* 547 F.2d 1206, 1211 (5th Cir. 1977) (citing *Gates v. Collier,* 501

F.2d 1291 (5th Cir. 1974)); *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir. Jan. 29,

1981) (en banc) ("When prison officials have failed to control or separate prisoners

who endanger the physical safety of other prisoners and the level of violence has

become so high . . . it constitutes cruel and unusual punishment . . . . "), overruled on

other grounds, *Int'l Woodworkers v. Champion Int'l*, 790 F.2d 1174 (5th Cir. 1986).

Pursuant to this line of cases, Jones had fair notice of the unconstitutionality of her conduct (inaction, dangerous customs, and continued failure to take reasonable steps to provide a safer environment while knowing her subordinates would act unlawfully), in light of the materially similar dangerous conditions here – endemic violence emanating from the unsupervised P/Q blocks, widespread contraband weapons, uncontrolled movement, failures to safely house and monitor prisoners with histories of institutional violence and separate them from vulnerable prisoners, and widespread lack of compliance with security policies, all exacerbated by physical plant deficiencies, such as broken cameras, broken locks, and blind spots. Any minimally competent correctional administrator would have recognized the need for urgent, meaningful action to address those issues. ECF 160-36 at 28-30 & 58-62.

Jones cannot secure an immunity defense merely by citing without explanation to more than 30 statements of fact (ECF 166 at 54); many of which are disputed or incorrect, and most of which do not concern Jones's conduct. *See supra* at 14. In addition, the "jury is not required to believe" much of this evidence, such as Jones's own statements about her conduct that are flatly disproved by Plaintiff's evidence, and thus it must be disregarded. *See Reeves*, 530 U.S. at 150; *Ledbetter*, 421 F.3d at 1177. Given Plaintiff's robust evidence of Jones's lack of action and unreasonable response (e.g., PSOF 233-77, 157-58, 180-85, 196-202, 211-18, 226, 230-32, 279-85; ECF 160-36 at 28-30 & 58-62), Jones cannot avoid a jury trial by citing to disputed facts

regarding a handful of empty performative gestures early in her tenure that Jones knew did not change her subordinates' behavior. This includes her own testimony that she instituted bed roster checks or issued a single wristband memo, which Jones knew accomplished nothing and did not enforce (*supra* at 116-17; PSOF 171-85, 57-58, 210-33, 233-77, 278-85). Likewise, Jones cannot prevail merely by pointing to written policies that, as Plaintiff's evidence establishes, existed only on paper, as Jones knew of widespread lack of compliance (PSOF 210-23). The lack of compliance was reflected in the events leading to Mr. Mullins's death (PSOF 109-112, 80-81, 88, 108-112, 117-118, 60-67, 82-85, 89, 99-105, 108-110, 115-116, 122, 56-57, 119, 44-47, 221(b),  37, 283), and Jones tellingly took no action to discipline the rule violations (PSOF 283-84, 210-23), further supporting the claim.

In addition, the law is clear that prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates," and "have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832-33 (quotation omitted). Based on this tenet, "[a] prison official violates the Eighth Amendment when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Caldwell*, 748 F.3d at 1099. "This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1190 (11th Cir. 2020). Likewise, as discussed in *Caldwell*,

the Court has found that a "total failure to investigate–or to take any other action to mitigate" a condition that poses a substantial risk of harm constitutes a clearly established constitutional violation. 748 F.3d at 1103. Pursuant to this law, as well, Plaintiff's evidence that Jones did not take any meaningful, urgent action in response to repeated notice of a host of dangerous conditions and resulting stabbings and deaths defeats a qualified immunity defense at the summary judgment stage. No reasonable correctional official would have thought that it was constitutionally permissible to do so little in the face of the dangerous conditions leading up to Mr. Mullins's murder. E.g., ECF 160-36 at 28-30 & 58-62.

In addition to providing broad, clearly established principles, Plaintiff also contends that *Hale* and *Marsh* constitute materially similar cases, for the reasons discussed immediately above, that likewise provided fair notice of the unconstitutionality of Jones's conduct. Finally, any reasonable correctional official would have known that inaction in the face of the dangerous conditions at St. Clair was obviously "at war with the command of the Eighth Amendment." *Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015). No case on point was required for Defendants to know that prisoners should not have been subjected to the horrific and obviously cruel violence at St. Clair without meaningful intervention by supervisors with the authority and means to respond.

Jones cites *Boykins v. Dunn*, 696 F. Supp. 3d 1061, 1085 (N.D. Ala. 2023), in support of immunity, but omits the critical difference that the *Boykins* plaintiff

proceeded based only on a theory of materially similar cases and obviousness, and did not pursue the theory here of broader, clearly established principles. *Compare id.*; with ECF 84 at 33-36. This case does not present the same instance of waiver.

### III.    Jones is not entitled to summary judgment on Count IX.

With regard to Plaintiff's wrongful death claim against Jones, Plaintiff sets forth the requirements for liability *supra* at 105-107. Jones offers a one-sentence argument, devoid of argument or citation to facts or authority, that Plaintiff's "failure to provide evidence that Jones caused Mullins's death." ECF 166 at 49. This argument is so conclusory as to have been forfeited (ECF 96 at 2) and does not meet an initial summary judgment burden (*supra* at 99-100).

Any challenge to duty is waived, but regardless, Plaintiff shows that Jones had a duty of care as a prison warden to prisoners in her custody, by virtue of her position of authority and responsibilities for addressing violence. E.g., PSOF 1-3, 6, 17-20, 23, 26, 28, 42, 118, 140, 154, 158, 205, 230-232, 244, 259-60, 279. Likewise, Jones does not challenge breach; regardless, Plaintiff's evidence establishes that Jones was negligent by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Mullins at St. Clair (*supra* at 113-15) and in her knowing, negligent response to the risk posed by Jackson, including to vulnerable prisoners such as Mr. Mullins (*infra* at 125-26), and particularly after Mr. Mullins reported Jackson's sexual assault and thus was foreseeably at risk of retaliation (PSOF 192-94, 200, 60). *Huffman*, 2021 WL 2533024, at *6-*7. This same evidence could lead a jury to

find causation: a foreseeable result of Jones's failure to address known risks to prisoners such as Mr. Mullins was the stabbing of prisoners such as Mr. Mullins.

On top of that, a jury could find that Jones was negligent in failing to safely segregate and house Jackson, and failing to safely protect and house Mullins, both before and after Mullins's many reports seeking safety from Jackson (ECF 160-36 at 63; PSOF 44-47, 60-67, 80-81, 82-84, 85, 89, 99-105, 108-110, 115-116, 122); failing to ensure contraband searches to eliminate the knife used by Jackson to kill Mullins (ECF 160-36 at 63; PSOF 109-112, 80-81, 88, 108-112, 117-18, 221(b)); and failing to address the widespread unauthorized movement within general population and unchecked rules violations that resulted in Jackson being able to travel without authorization from the Q block to the L block to kill Mullins (PSOF 56-57, 119, 37, 278-85), foreseeably leading to Mr. Mullins's death. After learning of Mr. Mullins's detailed report of sexual assault at knifepoint, as well as his documented injuries, policy required Jones to ensure an investigation of the incident, a search for the knife, and separation of Mullins from his assailant, including by placing Mullins in the SSU and placing his assailant in restrictive housing. ECF 160-36 at 63; PSOF 38, 75, 80-83, 99, 103, 109-112, 192, 195. Yet Jones did not ensure any of these things; she merely moved Mullins within general population, even though she knew that leaving Mullins in general population, while his violent assailant (PSOF 60) remained in general population without having been searched for the knife reported to be in his presence, was insufficient to separate Mullins and protect him from harm and likely retaliation.

PSOF 192-94, 200. Indeed, Jones ignored Mullins's own desperate request to be moved out of general population to a single cell in protective custody. PSOF 73, 79. In short, Jones had the means to improve safety and prevent the risk posed to Mullins, and by Jackson; knew her actions were insufficient; and had means available to her which she disregarded.

As for state agent immunity, Jones's one-sentence argument (ECF 166 at 49) fails to satisfy her initial burden to demonstrate based on factual evidence that the "plaintiff's claims arise from a function that would entitle [her] to immunity." *See supra* at 106-107; *Ex parte Est. of Reynolds*, 946 So. 2d at 452; ECF 96 at 2. Moreover, Plaintiff's evidence that Jones violated the Eighth Amendment (*supra* at 109-17) defeats state agent immunity. *Ex parte Cranman*, 792 So. 2d at 405. Finally, Plaintiff presents evidence that raises an inference (*Thompson*, 65 F.4th at 1297) of callous, willful, bad faith conduct (e.g., PSOF 233-77, 278-85), further defeating the defense. *See also Reeves*, 530 U.S. at 150 (court "disregard[s] all evidence favorable to the moving party that the jury is not required to believe"). Contrary to Jones's undeveloped argument, the factual record in *Ex parte Ala. Dept. of Corr.*, 201 So.3d at 1181 (Ala. 2016) is materially different, and so that case does not support dismissal.

## IV. Ellington is not entitled to summary judgment on Count I.

Defendant Ellington, too, does not carry his initial burden to demonstrate an absence of genuine issue of material fact on the Eighth Amendment claim in Count I. *See supra* at 99-100. Ellington's discussion consists of a single paragraph. ECF 166 at

44-45. That paragraph is unclear as to the specific claim elements challenged and does not comply with the requirement that arguments be "'plainly and prominently' raised," resulting in forfeiture. ECF 96 at 2 (citing *Sapuppo*, 739 F.3d at 681). On top of that, Ellington's statement of undisputed facts is rife with errors and disputed facts. *Supra* at 14. These errors violate the Court's orders regarding record evidence. ECF 85 at 16; ECF 96 at 2. Thus, even if Ellington had cited sufficient facts to carry his initial burden (which he does not), once the few facts cited in his substantive discussion are assessed for their improperly disputed nature, inaccuracies, and lack of factual support, what remains is further deficient. Ellington is not permitted to resuscitate this deficiency by raising new arguments in reply. *Boykins*, 696 F. Supp. 3d at 1079.

Regardless, Plaintiff provides sufficient evidence of each element of Count I. First, Plaintiff shows a substantial risk of serious harm (supra at 101-102), for the same reasons and upon the same evidence discussed *supra* at 110-112. Ellington does not appear to challenge this element. ECF 166 at 44-45.

As for subjective recklessness, a jury must decide whether Ellington was subjectively aware that his conduct and inaction put prisoners such as Mr. Mullins at substantial risk of serious harm, and responded unreasonably to that risk, pursuant to the standards *supra* at 102-103. Ellington was Warden Jones's direct supervisor and had the authority and responsibility to address the violence and dangerous conditions at St. Clair as Institutional Coordinator, overseeing St. Clair from 2017 through 2022. PSOF 4-7. Ellington's responsibilities included supervising St. Clair's wardens,

ensuring that its wardens and captains followed all policies and procedures, and

bringing corrective action if they were not. PSOF 4-7, 154, 240, 243, 278. Ellington

bore responsibility for ensuring contraband searches that were compliant with policy.

PSOF 154. He served on St. Clair's Quality Improvement Team, created pursuant to

the *Duke* settlement.  PSOF 247, 254, 264, 272-77. When serious incidents of violence

occurred, Ellington was responsible for learning what had occurred so that he could

identify and implement corrective action. PSOF 278. Ellington received audits and

other documents identifying systemic deficiencies at St. Clair. PSOF 126(b), 215, 248,

250, 253, 262-64, 271, 274, 278.

Ellington was repeatedly warned about the dangerous conditions in P/Q (e.g.,

PSOF 233, 123-141, 196-202, 224-230), which he knew had, and would, result in

violence (e.g., PSOF 224-230,150-152, 177-178, 191-193, 210-211, 239-40). The

dangerous conditions continued through February 2019, reflecting Ellington's

inaction. PSOF 233, 240, 123-139, 140-285. Yet Ellington failed to take action (e.g.,

PSOF 269, 240, 250-51, 274-77, 278-85), such as by enforcing contraband search

policy prior to Mr. Mullins's death (including through additional available staffing

resources) (PSOF 154-58, 167, 240, 269); taking action against unauthorized

movement (e.g., PSOF 185, 240, 269); addressing the culture of widespread policy

noncompliance (PSOF 210-218, 240, 269);  implementing change in the P/Q blocks

through St. Clair's Quality Improvement Team, such as by posting a supervisor there

(PSOF 240, 247, 254, 264, 272-277, 269); and/or ensuring that Jones segregated the

inmates most likely to inflict violence in restrictive housing, controlled their movement, and/or provided sufficient monitoring and staffing in the particularly dangerous P/Q blocks, such as through the placement of a supervisor in those blocks (PSOF 196-202, 269, 185, 240, 269).

A jury could that Ellington acted negligently in his response to the stream of deaths and culture of violence in the P/Q blocks (PSOF 123-139), contraband weapons (PSOF 142-70), uncontrolled movement (PSOF 171-90), failures to safely house and monitor prisoners with histories of institutional violence and to segregate them from vulnerable prisoners (PSOF 191-209), and widespread lack of compliance with security policies by subordinates (PSOF 224-232), of which he was repeatedly put on notice (e.g., PSOF 233, 123-141, 126(b), 196-202, 215, 224-230, 248, 250, 253, 262-64, 271, 274, 278), by taking no meaningful, urgent action and by ignoring feasible measures to stem the violence that were repeatedly made known to him, until it was too late (PSOF 269, 240, 250-51, 274-77, 278-85). Ellington's inaction is apparent in his non-response to the spate of deaths and other serious violence in P/Q (PSOF 278-285), including his failure to implement any corrective action or discipline following Mr. Mullins's death (*id.*), despite the many obvious rule violations (e.g., PSOF 68-75, 76-83, 85-89, 90-112, 114-18).

Plaintiff presents evidence that Ellington's role put him in a position of authority and responsibility for addressing the extreme prisoner-on-prisoner violence and dangerous conditions at St. Clair, but that he turned a blind eye. E.g., PSOF 269,

240, 250-51, 274-77, 278-85, 233-73. Given the dangerous conditions and lack of urgent action by Ellington to ameliorate them, it was entirely foreseeable that these same conditions persisted on at the time of Mr. Mullins's reports about Jackson, contributing to Mr. Mullins's death: inadequate contraband searches and proliferation of weapons (PSOF 119-21, 109-112, 80-81, 88, 108-112, 117-18); unauthorized movement (PSOF 56-57, 119); dangerous housing of known violent perpetrators of institutional violence in the P/Q blocks (PSOF  44-47, 60-67, 80-81, 82-84, 85, 89, 99-105, 108-110, 115-116, 122), in a general environment of lawlessness and widespread policy noncompliance (e.g., PSOF 37, 278-85). It was thus foreseeable and known to Ellington that prisoners such as Mr. Mullins would continue to be stabbed to death without action on his part to address the risks emanating from the P/Q blocks; Ellington had the means to improve safety, knew his actions were insufficient, and had means available which he disregarded. *Rodriguez*, 508 F.3d at 622; *LaMarca*, 995 F.2d at 1539.

Ellington argues otherwise, citing disputed evidence that does not, as a whole, create an entitlement to dismissal. For example, Ellington cites his own deposition testimony that he held meetings that "presented '*an opportunity*'" for "discussions." ECF 166 at 49 (emphasis added). This fact appears nowhere in Ellington's list of "undisputed" facts (ECF 166 at 2-20) and thus is improper, as even Ellington does not claim it is undisputed, as required. *Supra* at 99-100. Regardless, these once-per-month meetings discussed all Level IV and V facilities and took as little as an hour.

ECF 160-5 at 64:5-23. Ellington does not present evidence that any action resulted, let alone undisputed evidence the jury is required to believe. ECF 166 at 44-45; *Reeves*, 530 U.S. at 150. Plaintiff's evidence reflects that *no* meaningful action came out of the Duke-mandated QIT meetings (PSOF 247, 254, 264, 272-277).

Ellington next discusses cameras and cell door locks as evidence of a response to the different dangerous conditions identified by Plaintiff *supra* at 129, but his sole fact on this matter (No. 97), is unsupported by the underlying record cite and thus should be stricken. *Supra* at 23. Regardless, Plaintiff's evidence is to the contrary. PSOF 224-232. A jury need not believe Ellington's vague testimony, particularly given his lack of certainty about the timeframe of these efforts, and Plaintiff's evidence that the cameras and locks were largely broken throughout 2018 and early 2019, and that staff routinely fabricated the inspections to identify broken hardware with impunity. PSOF 224-232. Ellington also points to the use of CERT team staff for contraband searches, but Plaintiff's evidence shows CERT teams were not regularly used for contraband searches at St. Clair until after Mr. Mullins's death, even though recommended by the ASCA audit team back in January 2018. PSOF 269(g)-(h), 158, 168-70. Without an accompanying "undisputed" fact, Ellington also cites testimony about a gang member transfer, but he omits that this transfer was both initiated by a different administrator, and implemented, *after* Mr. Mullins's death (ECF 160-5 at 94:18-95:9 & 97:17-98:13), even though gangs were a known problem as early as May 2018 (PSOF 246, 244). A jury could find liability here.

**V. Ellington is not entitled to qualified immunity as to Count I.**

Ellington does not meet his initial burden to raise the affirmative defense of qualified immunity (*supra* at 103-104), despite the Court's order. ECF 96 at 2. Ellington offers a mere fragment of an argument that he took unspecified "reasonable actions within his [unspecified] authority" (ECF 166 at 51), which fails to demonstrate with sufficient specificity, authority, and pin cites to the evidentiary record, "what his job-related function was or how his actions were within the scope of his authority." *Boykins*, 696 F. Supp. 3d at 1079-80; *Est. of Cummings*, 906 F.3d at 939. This half-sentence is insufficient. Should this Court hold that Ellington met his burden, Plaintiff's evidence reflects that Ellington's conduct fell outside his authority because, for example, his job required him to identify corrective action following incidents of violence, ensure compliance with SOPs, discipline subordinates (PSOF 4-7 & 154, 240, 243, 278), and he did the opposite (*e.g.*, PSOF 269, 240, 250-51, 274-77, 278-85). To the extent that Defendants attempt to resuscitate this argument in reply, it has been forfeited. 696 F. Supp. 3d at 1079. To the extent that Ellington attempts to argue that Plaintiff previously waived this argument, such a claim fails for the reasons discussed *supra* at 118.

As to clearly established law, Plaintiff's analysis above regarding Jones applies with equal force to Ellington, and thus, given space limitations, she incorporates that discussion by reference here. *Supra* at 117-24. As with Jones, Ellington was a correctional administrator with direct responsibility for overseeing and remedying St.

Clair's violent conditions, and for ensuring adherence to policy there (*supra* at 127-28; PSOF 4-7 & 154, 240, 243, 278), and yet, a jury could find that, in the many months leading to Mr. Mullins's 2018 death, Ellington took no meaningful action to address the dangerous conditions (*supra* at 127-31; PSOF 269, 240, 250-51, 274-77, 278-85), failing to act, continuing problematic practices, and taking no action despite knowledge that his subordinates would act unlawfully. Pursuant to the *Hale*, *Marsh*, *Dickinson*, *Lane*, *LaMarca*, *Purcell*, and *Jones* line of cases (*supra* at 117-124), Ellington had fair notice of the unconstitutionality of inaction and continued failure to take reasonable steps to provide a safer environment, in light of the broadly established principles reflected in those decisions in response to materially similar dangerous conditions. Likewise, *Hale* and *Marsh* present materially similar decisions, and, in any case, the constitutional violation was obvious. *Supra* at 123.

Ellington cannot secure an immunity defense merely by citing to the snippets of conduct described on page 44, which are disputed, inaccurate, misleading, or unsupported. *Supra* at 103-104. The "jury is not required to believe" Ellington's characterizations, such as his own statements about his violence indicator meetings and conduct that are flatly disproved by Plaintiff's evidence (*supra* at 130-31). *Reeves*, 530 U.S. at 150; *Ledbetter*, 421 F.3d at 1177. Ellington cannot avoid a jury trial by citing to disputed facts regarding conduct that took place either long before or after 2018; conduct addressing different issues; written policies that Plaintiff's evidence establishes existed on paper only given widespread noncompliance in the open (PSOF

210-223); or conduct that, as a whole, failed at all to respond to the dangerous
conditions and violence identified by Plaintiff, despite repeated warnings to Ellington
and his knowledge of available remediation (PSOF 269, 240, 250-51, 274-77, 278-85,
233-273).

**VI.     Ellington is not entitled to summary judgment on Count IX.**

Plaintiff set forth the requirements for wrongful death liability *supra* at 105-107.
Ellington does not challenge the duty element; even if he had, Plaintiff's evidence
demonstrates that Ellington had a duty of care to prisoners at St. Clair by virtue of his
position of authority and responsibility with direct oversight responsibility over St.
Clair and its wardens. *See* PSOF 3-5. Likewise, Ellington does not challenge
negligence/breach; regardless, Plaintiff's evidence establishes that Ellington breached
a duty by disregarding and turning a blind eye to the known risk of harm to prisoners
such as Mr. Mullins at St. Clair from violence and dangerous conditions. *See supra* at
127-31; *Huffman*, 2021 WL 2533024, at *6-*7.

As to causation, Ellington offers a one-sentence argument, so devoid of
argument or citation to facts or authority as to have been forfeited. ECF 166 at 48.
Yet Plaintiff's evidence shows that Ellington was a cause of Mr. Mullins's death by
failing to take corrective action to address the known risks to prisoners such as Mr.
Mullins from prisoner-on-prisoner violence, when that failure led to Mr. Mullins being
stabbed. *Supra* at 127-31. A jury could find that Ellington acted negligently, and that,
given the dangerous conditions and lack of urgent response by Ellington, it was

entirely foreseeable that prisoners such as Mr. Mullins would continue to be stabbed to death by unmonitored, unsegregated, dangerous prisoners from the Q block that were permitted to roam throughout general population with contraband weapons.

As for state agent immunity, Ellington fails to satisfy his initial burden (ECF 166 at 48) to demonstrate that the "plaintiff's claims arise from a function that would entitle him to immunity." *See supra* at 106-107; *Ex parte Est. of Reynolds*, 946 So. 2d at 452. Ellington's reference to unspecified "reasonable actions within his authority" does not satisfy this burden, and thus forfeits this argument. ECF 96 at 2. Should the Court find that the burden is satisfied, Plaintiff's evidence reflects that Ellington's conduct fell outside his authority because, for example, his job required him to identify corrective action following incidents of violence, ensure compliance with SOPs, discipline subordinates (PSOF 4-7 & 154, 240, 243, 278), and he did the opposite. *E.g.*, 269, 240, 250-51, 274-77, 278-85.

Plaintiff's evidence that Ellington violated the Eighth Amendment (*supra* at 127-31) likewise suffices to defeat state agent immunity. *Ex parte Cranman*, 792 So. 2d at 405. Finally, Plaintiff presents evidence that gives rise to a jury inference that Ellington engaged in callous, willful, bad faith conduct (e.g., PSOF 278-85), knowing that prisoners were being stabbed and dying at incredibly high rates (e.g., PSOF 123-139, 233-77), further defeating the defense at the summary judgment stage. *Thompson*, 65 F.4th at 1297; *Reeves*, 530 U.S. at 150.

## VII. Dunn is not entitled to summary judgment on Count I.

Defendant Dunn, too, does not carry his initial burden to demonstrate an absence of genuine issue of material fact as to any elements of Plaintiff's Eighth Amendment claim. *See supra* at 99-100. Dunn's challenge appears limited to the criminal recklessness element, as discussed in *Wade*, 106 F.4th 1251. ECF 166 at 39-44. Dunn does not appear to challenge whether Mullins faced an objectively serious deprivation, which, in any case, is satisfied by Plaintiff's showing *supra* at 110-12.

Fatal to his argument, Dunn does not satisfy his initial burden to demonstrate an absence of genuine issue of material fact as to criminal recklessness. His discussion at pages 39-44 of his brief cites no evidence that he responded reasonably in 2018 and early 2019 to stem the violence in P/Q or St. Clair (PSOF 123-39), or the dangerous conditions that fueled it, such as extraordinary levels of contraband (PSOF 142-70), widespread unauthorized movement (PSOF 171-190), a failure to safely house and monitor violent prisoners with histories of institutional violence, and to segregate them from vulnerable prisoners such as Mr. Mullins (PSOF 191-209), and a widespread practice of noncompliance with security policies (PSOF 210-223). As shown in the response to facts, *supra* at 14-26, Dunn's statement of undisputed facts is rife with errors that violate the Court's orders (ECF 85 at 16; ECF 96 at 2), and regardless, Dunn does not rely on any such facts in his discussion of the claim. ECF 166 at 39-44.

Dunn primarily rests on a citation to six lines of text from his own deposition

in which he lists a few items, without any explanation, timeframe, or context. ECF 166 at 42 (citing ECF 160-11 at 161:17-23). This sentence fragment falls far short of establishing an absence of genuine dispute of fact, and thus he has not met his burden. Dunn does not even claim that it is undisputed as required (*supra* at 99-100), nor could he. Plaintiff's evidence shows that Dunn failed to take meaningful action in 2018, prior to Mr. Mullins's death, despite repeated notice of dangerous conditions that fueled violence (PSOF 233-277, 278-285, 151-153, 171, 177, 184-85, 191-193, 197-99, 201-202, 210-14). Dunn cites actions that he purportedly took, but many did not occur in 2018 and all are hotly disputed. Dunn's testimony snippet references Operation Restore Order, but that was a weapons search that post-dated Mr. Mullins's death, initiated by a different administrator who joined ADOC in 2019, even though it could have been done far earlier by Dunn and Ellington. PSOF 167-170 & 269(h).

Dunn ambiguously references the CERT team and staffing issues, but Plaintiff's evidence shows that CERT teams were not used for contraband searches at St. Clair until after Mr. Mullins's death, even though recommended by the ASCA audit team back in January 2018. PSOF 158, 269(g), 167, 141. Tellingly, Dunn does not produce any underlying records to show frequent CERT team searches at St. Clair in 2018. Likewise, Plaintiff's evidence establishes that the Quality Improvement Team referenced did absolutely nothing and that Dunn did not even meaningfully oversee it. PSOF 247, 254, 264, 272-277.

Dunn cites his own testimony (which the jury need not credit), attempting to excuse his lack of urgent, immediate action in 2018 by falling back on a "long-term" years-out approach of building new prisons. ECF 166 at 42. Yet the jury is not required to credit this argument. *See, also,* E.g., ECF 160-36 at 59-62 (expert testimony that "A crisis requires an immediate response. There is nothing wrong with having a strategic plan or a staffing analysis, but inaction when the safety and security of your staff and the people in your custody is at immediate risk, as it clearly was at St. Clair, while you wait for another report that you may or may not chose to do anything with is a dereliction of duty."). Even Dunn (ECF 160-11 at 186:23-187:1) acknowledges that he had a duty to act in the short term to address the violence. A jury could find that allowing prisoners to continue to suffer violent assaults and die in the P/Q blocks, week after week, constituted deliberate indifference, regardless of whether or not Dunn intended to build a new prison many years later.

If the Court finds that Dunn satisfied his initial burden, Plaintiff's evidence easily raises an inference and creates a fact issue for trial as to whether Dunn was subjectively aware that his conduct and inaction put prisoners such as Mr. Mullins at substantial risk of serious harm, and responded unreasonably to that risk, pursuant to the standards described *supra* at 101-103. Plaintiff's proof tracks that for Defendant Ellington, which she further incorporates by reference here. *Supra* at 127-31.

Plaintiff provides evidence that Dunn was ADOC Commissioner from 2015 through 2021, with the broad statutory authority to oversee facilities including St.

Clair and with the authority to direct, supervise, and control the ADOC. PSOF 10-11. Dunn had notice of the same violence and conditions identified *supra* at 128-29 for Ellington, pursuant to the same evidence. *See also* PSOF 137, 152-153, 177-178, 191-93, 210-211, 233-36, 123-277. Despite this, Dunn failed to take any meaningful action in response to those conditions, which required an urgent response, while knowing that his subordinates would continue the unlawful conduct. E.g., PSOF 233-77. 150-170, 191-209, 210-23; ECF 160-36 at 28-30 & 58-62. The many forms of notice to Dunn included a September 2018 letter warning him of a "concerning increase in serious incidents of violence" at St. Clair; about the "dangers of St. Clair's "'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack . . . any regular security staff presence"; and that "the last two homicides [in the P/Q block] are a manifestation of the safety problems this kind of management technique creates." PSOF 266. EJI also warned that "weapons contraband continues to saturate the prison and . . . contribute to serious incidents of violence at St. Clair" and that "contraband searches continue to be sporadic and ineffectual," recommending feasible steps to regain control. *Id.* The letter also provided a number of expert recommendations to address these problems. *Id.* Yet again Dunn did not respond with any corrective action, even though any minimally competent administrator would have done so (ECF 160-36 at 58-62). Taking inferences in Plaintiff's favor, including from circumstantial evidence of the persistence of the conditions despite notice (*Hale*,

50 F.3d. at 1583), and Dunn's continued inaction in response to the spate of prisoner deaths at St. Clair (PSOF 278-85), a reasonable jury could find that Dunn knew the manner in which he oversaw St. Clair in 2018 and early 2019 was endangering prisoners such as Mr. Mullins, but turned a blind eye.

This Court need not even reach Dunn's challenge to Plaintiff's evidence from the *Duke* litigation because Plaintiff presents abundant evidence independent of that litigation. E.g., PSOF 248-49, 269 (ASCA audit). Moreover, while Dunn takes issue with EJI's monitoring reports, Defendant Jones herself agreed with many of their characterizations, providing independent evidence of the same. ECF 349 at 292:11-18, 299:16-301:10, 307:10-307:15, 311:2-311:13, 313:16-314:5. Regardless, Dunn's arguments about the *Duke* settlement are a red herring: Plaintiff does not argue that non-compliance with individual *Duke* settlement terms is equivalent to a constitutional violation. He argues that the *Duke* litigation, including the class certification motion and monitoring reports with supporting evidence, put Dunn (and Jones and Ellington) on notice of the dangerous conditions at St. Clair and of the urgent need to fix them (PSOF 242-277). Dunn provides no authority permitting the Court to disregard Plaintiff's evidence of notice from lawsuits merely because the complaints did not take the form of facts adjudicated in court. This Court has already rejected Dunn's argument in the *Ezell* case. *See Ezell* ECF 105, Case No.4:20-cv-02058-ACA, at 31-32 (citing *Marsh*, 268 F.3d at 1029); *see also Dickinson*, 833 F. App'x at 273 (letter from advocates); *Valdes*, 450 F.3d at 1244 (prisoner complaints); *LaMarca*, 995 F.2d at

1536) (reports).

Moreover, certain substantive terms in the settlement agreement, adopted by Dunn and other Defendants, reflect commitments to make changes to address dangerous conditions at St. Clair that Defendants then chose not to implement (e.g., PSOF 242-277). *See* Order on Mtn. to Dismiss, ECF 84 at 13-14 (allegations that "no meaningful action to comply with the terms of the settlement had taken place" supported the claim). Plaintiff does not dispute that she needs to show criminal recklessness on the part of each Defendant as *Williams* requires. 689 F.2d at 1386. However, Defendants' conduct in *Duke* bears on that inquiry: it reflects admissions about the availability of feasible actions and subjective knowledge of the consequences of non-implementation of previously agreed changes. Nor is *George v. Wexford Health Sources*, 2024 WL 1120110 (M.D. Ala. Mar. 10, 2024), relevant as Plaintiff does not rely on the *Duke* settlement to overcome qualified immunity. As a final matter, to the extent that Dunn implies that budgetary or logistical concerns provide some kind of a defense, they are not. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir.1985); *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991); *Smith v. Sullivan*, 611 F.2d 1039, 1043-44 (5th Cir. 1980).

## VIII.    Dunn is not entitled to qualified immunity on Count I.

Defendant forfeits his affirmative defense of qualified immunity by failing to make an initial showing that he acted within his discretionary authority to meet his initial burden to establish an entitlement to qualified immunity. ECF 166 at 44-47;

*supra* at 103-104; ECF 96 at 2. Dunn's analysis fails to specify "what his job-related function was or how his actions were within the scope of his authority." *Boykins*, 696 F. Supp. 3d at 1079-80. Any attempt to improperly construct this argument in reply fails. *Id.* at 1079. Any argument that Plaintiff waived this argument at the motion to dismiss stage fails for the reasons discussed *supra* at 118.

On the merits, Plaintiff's analysis of qualified immunity above regarding Jones and Ellington applies with equal force to Dunn, and thus, given space limitations, she incorporates that discussion by reference here. *Supra* at 117-24. Dunn, too, was a correctional administrator with core responsibility for overseeing and remedying St. Clair's violent conditions, and for ensuring adherence to policy there (*supra* at 138-39), and yet, a jury could find that, in the many months leading to Mr. Mullins's death, Dunn took no meaningful action to address the dangerous conditions and responded with unconstitutional inaction (*supra* at 139; ECF 160-36 at 28-29, 61-62, 52-53). Pursuant to the *Hale*, *Marsh*, *Dickinson*, *Lane*, *LaMarca*, *Purcell*, and *Jones* line of cases (*supra* at 117-24), Dunn had fair notice of the unconstitutionality of inaction and continued failure to take reasonable steps to provide a safer environment, in light of the broadly established principles reflected in those decisions in response to materially similar conditions. Likewise, those same cases present materially similar decisions, and, in any case, the constitutional violation was obvious. *Supra* at 123 (explanation).

Contrary to Dunn's argument, he does not establish material differences between the facts here and *Hale* or *Marsh*. The nature of Dunn's conduct in 2018 and

early 2019 is disputed and requires a jury; his factual statements regarding actions taken (for example, regarding cameras, classification, bed roster checks, training and classification procedures) are hotly disputed, as reflected in Plaintiff's facts and response to facts. Dunn is also incorrect that any change to the subjective element of the claim due to *Wade* impacts the qualified immunity analysis (nor could it abrogate *Marsh*, which, too, was *en banc*). Whether a right is clearly established hinges on the "'objective legal reasonableness of the action . . . at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (emphasis added)). A defendant's state of mind is irrelevant to the objective qualified immunity inquiry, *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015) (citing *Harlow*, 457 U.S. at 819), including when a particular state of mind is an element of the constitutional violation itself. *Kingsley v. Hendrickson*, 801 F.3d 828, 832-33 (7th Cir. 2015); *Auriemma v. Rice*, 910 F.2d 1449, 1452 (7th Cir. 1990); *Jackson v. City of Cleveland*, 925 F.3d 793, 826 (6th Cir. 2019). In other words, the pertinent question under the Supreme Court's analysis of qualified immunity is whether, as an objective matter, *Marsh* and *Hale* put Dunn on notice of the unconstitutionality of the *conduct* of taking no meaningful action in the face of materially similar conditions in those case.

Nor can Dunn secure an immunity defense merely by citing without explanation to dozens of statements of fact (ECF 166 at 46); many of which are disputed, inaccurate or misleading, lack appropriate timeframes, and lack supporting record cites. Fatal to Dunn's argument, not a single purportedly undisputed fact that

mentions Dunn by name reference any actions taken by Dunn in the year leading up to Mr. Mullins's February 2019 death, to address any of the dangerous conditions identified by Plaintiff above, such as horrific levels of violence, particularly in the P/Q blocks, dangerous levels of contraband weapons, widespread unauthorized movement, failure to segregate violent inmates from vulnerable ones, and widespread security policy noncompliance.[12] Also, the "jury is not required to believe" Dunn's own pronouncements, such as those about CERT team and Operation Restore searches that post-dated Mr. Mullins's death, as Plaintiff's evidence establishes. *See supra* at 137. Given Plaintiff's robust evidence of Dunn's inaction and unreasonable response (*supra* at 138-40), Dunn cannot avoid a jury trial by citing to disputed facts regarding conduct that took place either long before or long 2018; written policies that existed on paper only given known, widespread noncompliance (PSOF 210-223); or conduct that, as a whole, failed to respond to the dangerous conditions identified above and violence at St. Clair despite repeated notice.

## IX.    Dunn is not entitled to summary judgment on Count IX.

Defendant Dunn offers a one-sentence argument that the wrongful death claim in Count IX against him is redundant of Plaintiff's Eighth Amendment claim against

---

[12] Fact Nos. 3-4 merely set out Dunn's position; No. 77 references a "reversed [] decline in hiring" in 2019, after Mr. Mullins's death, and simply indicates that 2018 and early 2019 were the low point in staffing at St. Clair; No. 78 discusses the introduction of a cubicle officer position by an unknown person in 2016, three years prior to Mr. Mullins's death; No. 82 discusses budget increases as of 2021, two years after Mr. Mullins's death; Nos. 94-95 reference a long-term facility replacement plan and no evidence indicates they in any way addressed the dangerous conditions identified above at St. Clair in 2018 and early 2019; and Nos. 93 and 96 reference problems at St. Clair.

Dunn, citing *Brown v. Dunn*, 2024 WL 5168637, at *10 (M.D. Ala. Dec. 19, 2024). ECF 166 at 47. Yet in that case, the plaintiff pleaded a wrongful death claim that was directly tied to, and dependent upon, the section 1983 claim, alleging that the wrongful action causing the decedent's' deaths was the Eighth Amendment violation. *Id.* at *10. Where, as here, a plaintiff makes specific claims about how a state law duty was owed to the decedent and the defendants' conduct violates that statute, then courts have permitted both claims to proceed. *Perryman v. Butler Cnty. Comm'n*, 2024 WL 2221476, at *6 (M.D. Ala. May 16, 2024); *Wilson v. Stewart*, 2021 WL 3439398, at *20-21 (S.D. Ala. Aug. 5, 2021); *Huffman*, 2021 WL 2533024, at *7; *Powell v. Dunn*, 2022 WL 610172 (N.D. Ala. March 1, 2022). Moreover, should the Court find any of the Defendants are entitled to qualified immunity on Count I, the wrongful death claim should survive for that reason as well, as the state law claim would not be redundant for yet another reason, as it operates pursuant to a separate and distinct immunity standard. *Guy v. Dunn*, 2023 WL 6378967, at *23 (N. D. Ala. Sept. 29, 2023).

Likewise, in an argument devoid of explanation, facts, or authority, Dunn appears to challenge the negligence/breach element of the claim. Yet Plaintiff's evidence establishes that Dunn had a duty of care as the ADOC commissioner with oversight responsibility and authority over St. Clair to its prisoners, by virtue of his position of authority and responsibility for addressing violence and safety at St. Clair, but breached that duty by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Mullins at St. Clair from prisoner-on-prisoner violence

and dangerous conditions. *See supra* at 138-40; *Huffman*, 2021 WL 2533024, at *6-*7. A jury could find this to constitute negligence. Given the dangerous conditions and lack of urgent action by Dunn to ameliorate them, it was entirely foreseeable that prisoners such as Mr. Mullins would continue to be stabbed to death by unmonitored and uncontrolled violent prisoners emanating from the P/Q blocks at St. Clair as a result.

As for the affirmative defense of state agent immunity, Dunn fails to satisfy his initial burden to demonstrate that the "plaintiff's claims arise from a function that would entitle him to immunity." *See supra* at 106-107; *Ex parte Est. of Reynolds*, 946 So. 2d at 452. Dunn contends that Plaintiff waived this argument at the motion to dismiss stage, citing only to the Court's order observing that the issue was not challenged at that stage. ECF 84 at 60. Yet Dunn is incorrect; Plaintiff defeated Dunn's state agent immunity defense at the pleading stage, and was not obliged to raise (and waste the Court's time with) alternative arguments in support of denial. The defense's invocation of an immunity defense at summary judgment presents a different inquiry: whether the evidentiary record establishes the defense as a matter of law. This Court's prior order in no way held that Plaintiff conceded the issue at the summary judgment stage, and its ruling does not excuse Dunn's forfeiture here.

Moreover, Plaintiff's evidence that Dunn violated the Eighth Amendment (*supra* at 138-40) likewise suffices to defeat state agent immunity, which does not protect unconstitutional conduct, regardless of the applicability of qualified immunity. *Ex parte Cranman*, 792 So. 2d at 405. Plaintiff also presents evidence that gives rise to

an inference of callous, willful, bad faith inaction by Dunn despite continued notice of

that violence, as prisoners died at horrific deaths and high rates at St. Clair (e.g., PSOF

278-85, 233-77), further defeating the defense. *Thompson*, 65 F.4th at 1297; *Reeves*, 530

U.S. at 150.

## X.        Givens is not entitled to summary judgment on Counts IX and X.

Defendant Givens does not carry her initial burden to demonstrate an absence

of genuine issue of material fact as to Plaintiff's wrongful death claim against her in

Counts IX and X, *supra* at 99-100, and thus a jury must decide this claim. Plaintiff

stated two bases for wrongful death claims against Givens: one turns on Givens's

policies, practices and customs as a supervisor (Count IX), and the other on Givens's

direct participation in the events involving Mullins and Jackson that gave rise to

Mullins's death (Count X), but the claim is singular, with all evidence supporting

liability considered together, as this Court previously recognized. *See supra* at 106.

Givens provides a cursory, one paragraph argument for summary judgment on

each of these claims that fails to cite to any of Defendants' factual statements or

identify any undisputed facts that support her position. Indeed, Givens argues that she

took steps that are wholly unsupported by the evidence she cites and that are directly

disputed by Plaintiff's evidence. ECF 248 at 38-39. Plaintiff has presented ample

evidence to require a jury to decide whether Givens is liable for Mr. Mullins's

wrongful death.

Givens does not challenge that she had a duty to safely house Mr. Mullins

under Alabama law. ECF 248 at 38. Regardless, Plaintiff shows that Givens, who
began working as Warden II at St. Clair in May 2018 and held that position at the time
of Mullins's death, had a duty of care as a prison warden to prisoners in her custody,
by virtue of her position of authority and responsibilities for addressing violence and
safety risks at St. Clair. PSOF 12-13, 85, 259e.

With regard to breach, Plaintiff's evidence creates (at minimum) a dispute of
fact as to whether Givens acted negligently (and thereby breached her duty) by
disregarding and turning a blind eye to the known risk of harm to prisoners such as
Mr. Mullins at St. Clair (*supra* at 105-107). As Warden II, Givens was responsible for
overseeing security operations at St. Clair, for supervising the captains, and for making
sure that staff carried out essential security functions and followed facility and ADOC
policies. PSOF 13. Givens knew that in 2018 and early 2019, there were high levels of
violence at St. Clair, and that pervasive contraband weapons and uncontrolled
movement contributed significantly to this violence and posed serious risks to
prisoners at the facility. PSOF 123-125, 126d, 128, 130, 134, 142, 146-147, 151, 159,
175-177, 192. Givens also knew that these problems were particularly acute in the
P/Q blocks, where prisoners were left largely unmonitored. PSOF 135, 138-39, 199,
241, 126.

Givens had particular responsibility for making sure that contraband searches
were carried out. PSOF 160. Reports relating to searches that were carried out were
sent directly to Givens, so she knew that required searches were not being conducted

and that this left substantial amounts of contraband weapons circulating in the prison population. PSOF 143, 146, 148-152 160. Despite this, Givens never held staff accountable for failing to conduct contraband searches. PSOF 160. Indeed, Givens' sanctioned subordinate behavior in failing to conduct contraband searches by reviewing and signing off on incident reports where staff failed to conduct searches for weapons used in assaults, including the failure of staff to search for and confiscate the weapon used to kill Mullins. PSOF 160. Givens knew that staff routinely failed to search for and locate weapons used in physical altercations between prisoners, and she took no steps to address this problem and stated that she had no concern that these weapons were being left to circulate in the prison population and be used for subsequent assaults. PSOF 161-163.

Similarly, it was well known that prisoners were moving freely throughout the prison, especially to and from the P/Q blocks. PSOF 171, 172. Indeed, one prisoner told an investigator following the December 2018 murder of Terrence Andrews: "This whole facility is unauthorized area . . . Don't nobody sleep in the . . . same assigned cell." *Id.* Despite Givens's knowledge of the problem and the risks it posed to vulnerable prisoners (e.g., PSOF 183, 200, 177-78), Givens failed to take any meaningful steps to enforce the wristband policy, to make sure prisoners slept in their assigned cell, or to control prisoner movement at St. Clair. PSOF 187, 188. Givens's indifference was explicit—she stated that she had no concerns about staff not controlling prisoner movement or about prisoners being retaliated against for

reporting assaults, and that it was each prisoner's responsibility to make sure they were living and sleeping in their assigned cell, despite that she had been put on notice of specific examples when prisoners were forced out of their own assigned cells by other prisoners. PSOF 187, 188, 208.

Givens also knew that, in 2018 and early 2019, staff were failing to enforce basic security policies at St. Clair, and that this led to chaotic and dangerous conditions at the facility. PSOF 210-214. Despite this, Givens regularly failed to assess whether her subordinates' conduct complied with policy, and she took no steps to hold staff accountable for widespread policy violations. PSOF 160, 212-213, 218-220, 284. Indeed, Givens herself engaged in and sanctioned policy violations related to prisoner discipline, responding to and investigating assaults, and contraband searches. PSOF 221, 269e.

Moreover, Givens further acted negligently by disregarding the known risk of harm posed to Mr. Mullins by Clarence Jackson. Givens was notified on February 25, 2019 that Mullins had been attacked and sexually assaulted by his cellmate "C.J.", and that he was afraid and wanted to be placed in a cell by himself. PSOF 68-73, 75-77, 86. Rather than immediately separate him from his attacker and place Mullins in protective housing (including the Special Safety Unit, or SSU), she returned him to his cell for what was, at best, a perfunctory count (which did not detect, for example, that different prisoners were living in Mullins's assigned cell without authorization). PSOF 56-58, 88. Givens knew it was unacceptable to return Mullins to Q block and his

assailant following his assault. PSOF 89; ECF 160-36 at 63-64.

Indeed, St. Clair policy required that staff (1) place Mullins in protective housing; (2) immediately investigate the incident; (3) place the assailant in restrictive custody, and (4) conduct a search for the knife; however, none of these things were done. PSOF 79-84, 38, 110-112. Givens, as Warden II, was responsible for overseeing subordinates like Ragsdale and making sure they complied with policy. PSOF 13. She was also responsible as a supervisor and on-call warden for making sure the response to Mullins's assault was proper, and that a search for the knife was conducted and that Mullins was safely housed. PSOF 89, 112. She did not take any steps to do this; instead, she authorized Mullins's transfer to P dorm, where she knew he would not be separated from his attacker. PSOF 49, 86, 88; ECF 160-36 at 63-64.

Tellingly, this was not the first time that Givens failed to take action to protect a prisoner whose assault was reported to her–just a few months earlier, Givens had been notified of a separate but similar assault; she took no steps to ensure the assailant was investigated and disciplined, or that a search was done for the weapon used, and instead only the reporting victim faced any discipline. PSOF 221.

Givens was informed later on February 25 that Mullins had been moved to L block but remained in general population. PSOF 107. Givens knew that prisoner movement at St. Clair was virtually unchecked and that Mullins's attacker remained in general population with access to Mullins and she understood the importance of physically separating Mullins from his attacker (PSOF 88, 126d, 171-173, 187-188,

191-195), as was policy for reporting sexual assault victims (PSOF 75, 80-83, 38, 102-103, 111-12, 192, 195). Around 4:24pm on February 26, Givens was informed that Mullins's mother had called to report that Mullins was afraid for his life and should not be in general population. PSOF 114. She had a responsibility to speak with the other wardens and captains, and to make sure this was investigated and action was taken to keep Mullins safe as soon as possible. PSOF 115. Despite this, no steps were taken in response to this call to protect Mr. Mullins. PSOF 116-117. As a result, later that evening, Mullins was brutally stabbed by Jackson, resulting in his death. PSOF 119-121.

Givens argues that she did not breach her duty because she allegedly engaged in a variety of tasks to address risks at St. Clair, which she fails to support with reference to any statements of facts. Regardless, this list of alleged actions is rife with errors and disputed facts, and also includes alleged conduct in which there is no evidence to show Givens took part (even had it occurred). For example, Givens cites no evidence that she had any involvement in installing and/or repairing cameras, nor that repairs or replacements of cameras were done, and Plaintiff provides ample evidence that cameras were largely inoperable for an extended period leading to Mullins's death. *See* ECF 160-50 at 3 (discusses that *Ellington* would request quotes/bids to repair/replace cameras, but not supporting that camera were repaired/replaced or that Givens had any involvement); *see also* PSOF 227 (camera systems were largely inoperable leading up to the death of Mullins). There is substantial evidence disputing that security

checks of cell doors and locks were carried out, and showing that the cell doors and locks were frequently inoperable. *See* Response to DSOF 26 (*supra* at 10); PSOF 224-226.

There is no evidence Givens had any involvement in bringing in CERT personnel, which largely covered posts rather than conducting contraband searches. *See* ECF 165-16 at 101:5-18; ECF 160-11 at 166:17-22; PSOF 58 (CERT were used largely for post coverage, not searches). Givens does not support with any evidence her assertion that staff entering the facility were searched. *See* ECF 165-16 (exhibit does not include cited material and does not support that staff entering the facility were searched); *see* PSOF 143 (contraband regularly brought in by staff). Plaintiff also identifies substantial evidence to dispute that Givens ensured that shakedowns and searches were carried out, ensured bed roster checks were performed, and that the wristband policy was actually enforced; and Givens fails to provide supporting evidence. PSOF 57, 142, 146-147, 172-173, 176, 182, 188; *see* ECF 165-16 (does not contain material cited and does not); ECF 182-1 (does not contain cited material or support that the wristband policy was enforced. Finally, Givens does not show that she had any involvement in the installation of fences, nor does she provide evidence to show what fencing was installed (if any) prior to Mullins's death. See ECF 165-16 at 2 (does not contain material cited and does not support that fences were installed); ECF 160-11 at 32:22-24 (does not discuss fencing or locks); ECF 160-11 at 66:2-17 (discussing that *Dunn* led the installation of fencing and locks, but failing to identify

when this was done and whether it occurred prior to February 2019, as well as any role Givens played). In short, Givens's conclusory claim that she fulfilled her responsibilities as Warden II despite staffing shortages is wholly unsupported by the evidence and one that a jury could choose not to credit. Givens had the authority and responsibility to act to implement and enforce policies around, among other things, prisoner supervision, movement control, and contraband searches. *Supra* 148-49. Instead, she turned a blind eye to these problems, leading to the entirely foreseeable and preventable murder of Mr. Mullins. *Supra* at 149-52.

Givens also argues for summary judgment by relying on disputed facts and failing to take the evidence in Plaintiff's favor. For example, Givens, argues that she did not know that Mullins's assault had been sexual in nature. This is hotly disputed, as Mullins reports in his own words describe sexual assault. *See* PSOF 68-75. Regardless, Givens had a responsibility to ensure that Mullins was not exposed to a risk by someone who had just assaulted him, whether or not the assault was sexual in nature. E.g., PSOF 38; ECF 160-36 at 63-64. Givens also argues that her inaction could not have caused Mullins's death because staff satisfied PREA by separating him from Mullins. Again, these facts are directly disputed (e.g., PSOF 75, 80-83, 38, 102-103, 111-12, 192, 195), and there is ample evidence for a jury to conclude that, had Givens made sure that the required investigation into Mullins's assault was taken, that the weapon was searched for, that Jackson be placed in restrictive housing, and that Mullins was placed in protective housing (either when he reported his assault on the

25th, or when his mother called on the 26th), then Jackson would not have been able to move freely through general population and fatally stab Mullins with a knife. PSOF 68-118.

Givens invokes state agent immunity. ECF 248 at 36-37. Yet she makes only a conclusory argument that "she exercised her discretionary judgment and authority in operating as SCCF's warden and supervising its inmates and his staff" and fails to meet her burden given her citation only to a single allegation from Plaintiff's complaint, rather than competent evidence. *See supra* 106-107; *Kumar* , 2024 WL 4281018, at *5. Moreover, the cited allegation does not speak to whether Givens exercised discretion or, rather, as Plaintiff shows, carried out functions that were subject to "hard and fast rule" (ECF 248 at 31): Plaintiff has shown that Givens repeatedly flouted specific responsibilities and violated policy as Warden II at St. Clair (e.g., PSOF 85-89, 68-75, 108-112, 117-18).

Regardless, Plaintiff presents evidence that raises an inference (*Thompson*, 65 F.4th at 1297) of callous, willful, bad faith conduct (*supra* at 151; e.g., PSOF 187, 188, 208), defeating the defense on the merits, as well as conduct that amounts to a constitutional deprivation. *See also Reeves*, 530 U.S. at 150 (court "disregard[s] all evidence favorable to the moving party that the jury is not required to believe").

## XI. Givens is not entitled to summary judgment on Count VI.

Plaintiff also presents a triable retaliation claim against Givens in Count VI pursuant to the standards above, *supra* at 107-108, when evidence and inferences are

taken in her favor, as required, *supra* at 99. A jury will need to assess this claim.

Plaintiff's evidence supports allegations that this Court already clarified suffice, if supported, and Givens's challenge therefore fails. ECF 84 at 56. Plaintiff alleges that St. Clair (and in particular, the P/Q blocks) had horrific levels of violence, including sexual violence, of which Givens was aware. PSOF 123-39. Givens was also aware of the substantial risk of retaliation facing victims who reported violence at St. Clair (PSOF 191-94); that the failure to separate likely victims from predators leads to foreseeable violence (PSOF *id.*); and that St. Clair was unsafe and unsecured, with excessive contraband weapons (142-170), unauthorized movement (PSOF 171-91), and widespread policy noncompliance (210-23), despite physical plant deficiencies that exacerbated the resulting risk to prisoners (e.g., PSOF 224-32).

Nonetheless, it was the practice at St. Clair, perpetuated by supervisors including Warden Givens, to discourage victims from reporting assaults and sexual abuse and to retaliate against victims who reported assaults by failing to house them safely and exposing them to retaliation from their assailants, despite a knowledge of the consequence of failing to separate them. PSOF 191-210, 221. Consistent with this practice, and despite knowing of Jackon's violent history (which included retaliation) (PSOF 60), Givens responded to Mullins's report of sexual assault and request to be removed from general population by failing to confiscate Jackson's knife, failing to segregate Jackson, and simultaneously continuing to house Mullins in general population, where he was accessible to Jackson and subject to foreseeable abuse due

to the lack of supervision, uncontrolled movement, and other dangerous conditions; Givens even forced Mullins to return to Q block and his attacker for a perfunctory count. *See supra* at 150-52. Givens did so even though she knew of Mullin's vulnerability and Jackson's dangerousness and history of in-custody violence (PSOF 36, 44-45, 60). Givens took no action to confiscate Jackson's knife, discipline him for the misconduct, or segregate him from Mr. Mullins, or to recommend that Mullins be placed in restrictive housing or the SSU as required. *See supra* at 151. Even after Mr. Mullins reported the abuse to the PREA hotline, he was kept in general population, where he remained easily accessible to Jackson because of St. Clair's uncontrolled movement in general population (PSOF 171-91, 119) and widespread lack of compliance with security policies (PSOF 210-23). Givens left Jackson in general population where he had access to Mr. Mullins, even though Mullins had reported that Jackson had a knife, and even though Givens could have instead confiscated his weapons and placed Jackson in segregation to keep him from assaulting Mr. Mullins. *See supra* at 151; ECF 160-36 at 63-64. This evidence gives rise to an inference that Givens purposefully left Jackson in general population alongside Mullins, where Givens knew the armed and dangerous Jackson continued to pose a substantial risk of serious harm to the vulnerable Mullins, thereby subjecting Mr. Mullins to exposure to his enemies to retaliate against him for reporting his assault. A jury could find his conduct to have been retaliatory.

Givens is unable to show that she is entitled to summary judgment on this

claim. Givens's argument that Plaintiff has not shown unconstitutional retaliation is based on fundamental disputes of fact and a failure to take the evidence in Plaintiff's favor. ECF 248 at 34-35. Givens relies on her own self-serving testimony to argue that she did not have any knowledge of the assault Mullins had suffered or the concerns raised by his mother, and that her only motivation in sending Mullins back to Q block was to maintain order and disciplined. ECF 248 at 35-36. But the records and Mullins's other contemporaneous reports provide ample evidence for a jury to conclude that Givens, as the on-call supervisor, was well-aware of the sexual assault Mullins suffered. PSOF 68-86. Further, Givens's argument that Mullins returned to the shift office after count is unavailing because Givens had an obligation to separate Mullins and Jackson and instead approved Mullins's move to P block, a housing unit plagued by violence and uncontrolled movement, while Jackson remained close by in Q block; indeed, she knew her behavior was inappropriate. PSOF 81-82, 88-89, 112. The evidence further would allow a jury to conclude that, the next day, Givens received a message from Mullins's mother that Mullins was afraid for his life in general population; Givens had an obligation to make sure this was investigated and addressed urgently; and Givens left Mullins in general population. PSOF 114-116. Givens has failed to demonstrate an absence of material disputes of fact.

Nor does Givens meet her initial burden to raise the affirmative defense of qualified immunity (*supra* at 103-104), despite the Court's order. ECF 96 at 2. Givens offers an undeveloped argument primarily relying on Plaintiff's allegations, which do

not suffice at the summary judgment stage, and which do not even address the conduct Plaintiff alleged Givens to have engaged in: keeping Mr. Mullins in general population where he was subject to retaliation from the sexual assault perpetrator Mullins had reported and failing to segregate or search Jackson. *See supra* 151; ECF 248 at 33-34, 37; *Kumar*, 2024 WL 4281018, at *5. Givens's argument fails to demonstrate with sufficient specificity, authority, and pin cites to the evidentiary record, "what his job-related function was or how his actions were within the scope of his authority." *Boykins*, 696 F. Supp. 3d at 1079-80; *Est. of Cummings*, 906 F.3d at 939. To the extent that Givens attempts to resuscitate this argument in reply, it has been forfeited. *Boykins*, 696 F. Supp. 3d at 1079.

On the merits, it has also long been clearly established that prison staff cannot retaliate against prisoners for raising grievances regarding their conditions of confinement. *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989); *Hicks v. Ferrero*, 241 F. App'x 595, 598-99 (11th Cir. 2007) (clearly established by 1989 based on *Wildberger* that a prisoner's First Amendment free speech rights are violated when officials retaliate against the prisoner for raising a grievance); *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

Thus, as the Court has already explained, "the fact that retaliation violates Mr. Mullins's constitutional rights is clearly established." ECF 84 at 56-57 (quoting *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989)). This is so based on the broad, constitutional principle set forth in *Wildberger* that, "that Mr. Mullins has a

constitutional right not to be subjected to a prison official's deliberate indifference of a substantial risk of serious harm in retaliation for his complaints about Mr. Jackson's abuse." ECF 84 at 57. No reasonable correctional officer would believe it permissible to leave a reporting sexual assault victim within access of a knife-wielding assailant in order to discourage reports of sexual abuse, and thus Givens is not entitled to qualified immunity. Indeed, this Court has already rejected Givens's contention that the "broad statement of principle" in *Wildberger* was insufficient to place Defendants on notice of the unconstitutionality of their conduct: Plaintiff "relies on the principle that Mr. Mullins has a constitutional right not to be subjected to a prison official's deliberate indifference of a substantial risk of serious harm in retaliation for his complaints about Mr. Jackson's abuse," which suffices. ECF 84 at 57. The same reasoning forecloses a qualified immunity defense at the summary judgment stage, at which time all inferences are made in Plaintiff's favor (*supra* at 99-100), on the retaliation claim.

## XII.    Brooks is not entitled to summary judgment on Counts IX and X.

Defendant Brooks does not carry his initial burden to demonstrate an absence of genuine issue of material fact as to Plaintiff's wrongful death claim against him in Counts IX and X, *supra* at 99-100, and thus a jury must decide this claim. Plaintiff stated two bases for wrongful death claims against Brooks: one turns on Brooks's policies, practices and customs as a supervisor (Count IX), and the other on Brooks's direct participation in the events involving Mullins and Jackson that gave rise to

Mullins's death (Count X), but the claim is a single claim and all of the evidence supporting liability considered together, as this Court previously recognized. *See supra* at 106.

Plaintiff has provided sufficient evidence for a jury to determine whether Brooks is liable for Mr. Mullins's wrongful death. As an initial matter, Brooks does not challenge the duty element, thus waiving any challenge. ECF 248 at 53. Regardless, Plaintiff shows that Brooks, who began working as Warden I at St. Clair in 2016 and held that position at the time of Mullins's death, had a duty of care as a prison warden to prisoners in his custody, by virtue of his position of authority and responsibilities for addressing violence and safety risks at St. Clair. PSOF 14-15, 114.

Plaintiff's evidence also creates a dispute of fact as to whether Brooks acted negligently (and thereby breached his duty) by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Mullins at St. Clair. As Warden I, Brooks was responsible for supervising subordinates, ensuring that staff carried out their essential security functions and followed SOPs, inspecting the facility, and developing or making recommendations about facility policy. PSOF 15. Brooks knew that in 2018 and early 2019, there were high levels of violence at St. Clair, and that pervasive contraband weapons, a lack of contraband searches, and uncontrolled movement contributed significantly to this violence and posed serious risks to prisoners at the facility. PSOF 123-125, 126d, 128, 130, 134, 142, 146-147, 151, 175-177, 183, 192, 200, 241. Brooks also knew that these problems were particularly acute

in the P/Q blocks, where prisoners were left largely unmonitored. PSOF 135, 138-39, 199, 241.

Despite this, Brooks took no meaningful steps to address the serious risk of violence and ensure that policies and basic security functions were being implemented at St. Clair in 2018 and early 2019. *See* PSOF 164, 189, 209 (never disciplined staff for failing to conduct required contraband searches, control prisoner movement, or ensure prisoners who reported violence did not suffer retaliation); PSOF 222 (failing to reprimand staff for failing to comply with security policies). Indeed, as Warden I, Brooks contributed directly to a culture of indifference at St. Clair pursuant to which policies were not enforced and staff were not held accountable for failing to enforce policies, leading to chaotic and unsafe conditions. PSOF 210-214. Plaintiff has identified sufficient evidence for a jury to conclude that Brooks turned a blind eye to the serious risks of violence experienced by Mullins and breached his duty of care.

In addition, in July 2018, Brooks was notified that Mullins was vulnerable, that he was assaulted several times including at knifepoint, and that he feared for his life. PSOF 36-37. Brooks had the authority and ability to place Mullins in the SSU at that time, but he did not. PSOF 39-40. Later, Brooks was informed that Mullins required, and had been approved for, placement in the SSU due to security risks. PSOF 44. Again, on the afternoon of February 26, Brooks received information from a phone call from Mullins's mother, that Mullins feared for his life and could not live in general population. PSOF 114. Given this information, coupled with Malone's

knowledge of the underlying dangerous conditions at St. Clair, Malone had a responsibility to ensure an investigation and that action was taken to keep Mullins safe, pursuant to policy. PSOF 115. Yet no steps were taken in response to this call to protect Mr. Mullins (PSOF 116-117), and Jackson stabbed Mullins (PSOF 119-21). A jury could easily conclude based on this course of conduct that Brooks acted negligently by failing to take steps to protect Mullins from the known serious risks to his safety. *See* ECF 160-36 at 63-64.

Brooks argues that Plaintiff cannot establish breach based on the same arguments and citations made by Givens, in an argument that does not cite to any undisputed facts identified by Defendants in their statement. *Compare* ECF 248 at 38-39 with ECF 248 at 53. The argument fails for the same reasons discussed *supra* at 152-54. Brooks relies on disputed facts, fails to show that he actually participated in the alleged actions taken, and cites to evidence that frequently does not support the assertion made. *See supra id.;* PSOF 15 (Brooks was responsible for supervising subordinates and ensuring that security functions were carried out).

Brooks also argues that he is entitled to summary because there is no evidence that he was aware of Mullins's February 25 assault or that Mullins was moved to L block. ECF 248. But Brooks was put on notice that Mullins was living in general population and afraid for his life when Mullins's mother called on February 26. PSOF 114. Mullins had a responsibility to act to make sure these safety concerns were immediately addressed and that Mullins was safely housed. A jury could conclude that

Brooks was aware of the acute risk to Mullins's safety and failed to act, despite his obligation to do so, and that his conduct was a cause of the preventable and foreseeable death of prisoners such as Mullins.

Brooks invokes state agent immunity. ECF 248 at 52. Yet he makes only a conclusory argument that "he exercised his discretionary judgment and authority in operating as SCCF's warden and supervising its inmates and his staff" and fails to cite to competent evidence, pointing only to a single allegation from Plaintiff's complaint (ECF 40 ¶25). *See supra* 99-100, 106-07; 2024 WL 4281018, at *5. That allegation does not speak to whether Brooks exercised discretion or, rather, as Plaintiff shows, carried out functions that were subject to "hard and fast rule."  ECF 248 at 31. Regardless, Plaintiff presents evidence that raises an inference (*Thompson*, 65 F.4th at 1297) of callous, willful, bad faith conduct, as Brooks acted with deliberate indifference as prisoners continued to suffer horrific injuries and die at St. Clair (PSOF 123-39), defeating the defense. The jury need not credit Brooks's argument, and thus a jury must resolve this claim. *See also Reeves*, 530 U.S. at 150.

## XIII.     Ragsdale is not entitled to summary judgment on Counts IX and X

Defendant Ragsdale does not carry his initial burden to demonstrate an absence of genuine issue of material fact as to Plaintiff's wrongful death claim against him in Counts IX and X, which Plaintiff discusses as a single claim, with all of the

evidence supporting liability considered together, pursuant to this Court's prior analysis. *See supra* at 106.

Ragsdale does not challenge that he had a duty to safely house Mr. Mullins under Alabama law. ECF 248 at 43-44. Regardless, Plaintiff shows that Ragsdale, who was a lieutenant and shift commander at St. Clair from 2015 through 2020, had a duty of care to prisoners in his custody, by virtue of his position of authority and responsibilities for addressing violence and safety risks at St. Clair. PSOF 30-31.

With regard to breach, Plaintiff's evidence creates (at minimum) a dispute of fact as to whether Ragsdale acted negligently (and thereby breached his duty) by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Mullins at St. Clair. Ragsdale was a lieutenant and shift commander at St. Clair from 2015 through 2020. PSOF 30. Ragsdale was responsible for supervising officers on the shift and making sure they were complying with policy and carrying out their security functions, including completing searches, shakedowns and cell inspections. PSOF 31. As Lieutenant and shift commander, Ragsdale was responsible for supervising officers on his shift; setting the shift roster and assigning officers to posts; requesting more staff as needed; ensuring that searches, shakedowns, and cell inspections were happening daily as required by policy, conducting inmate interviews following altercations to investigate what happened; ensuring that staff controlled inmate movement; and completing and reviewing incident and duty reports. PSOF 31, 174. Ragsdale was also the backup PREA compliance manager in 2018 and early 2019,

and he was responsible for ensuring that prisoners who made PREA allegations were properly assigned to housing units. PSOF 33.

Ragsdale knew, as lieutenant and shift commander, that contraband was ubiquitous at St. Clair and that staff were not carrying out shakedowns and searches as required by policy; he also knew that searches were critical to reducing serious violence and injury at the facility. PSOF 142-151. Despite this, Ragsdale did not take steps to ensure contraband searches were carried out as required. PSOF 142-59, 146-47, 108-112, 166, 170. Similarly, Ragsdale knew that prisoners were moving freely throughout the facility in 2018 and early 2019, and that the wristband policy was not being enforced. PSOF 171-176. Ragsdale understood the importance of controlling inmate movement to reduce violence and protect vulnerable prisoners like Mullins. PSOF 177. But he did not enforce controlled movement policies on his shift. PSOF 175-176. Additionally, Ragsdale was aware that there was a general failure to enforce basic security policies and procedures at St. Clair, yet he took no steps to change this. PSOF 210-213. This led to a dangerous and chaotic environment, PSOF 214, that facilitated Jackson's murder of Mullins.

On the morning of February 25, following Mullins's sexual assault at knife point inside the cell he shared with Clarence Jackson, Q-27, Mullins reported the assault to Ragsdale and provided a detailed written statement. PSOF 68-79. Mullins identified his assailant as C.J. in cell Q27, and stated that his assailant had a knife. *Id.* Policy required Ragsdale to investigate the incident, conduct a search for the knife,

and make sure that Mullins was actually separated from his attacker, including by placing Mullins in the SSU and placing his attacker in restrictive housing. PSOF 38, 75, 80-83, 99, 103, 109-112, 192, 195.

Ragsdale did none of these things; he did not conduct or direct a search for the knife, he did not conduct any further investigation into the sexual assault, and he did not place Mullins in protective housing or place Jackson in restrictive housing. PSOF 83, 108-110. Instead, the only action he took was to move Mullins to P block, another housing unit in general population that had a well known problem with uncontrolled movement and heightened levels of contraband and violence. PSOF 84, 135. Ragsdale knew that moving Mullins to P block, while his assailant remained in general population, was not sufficient to separate Mullins and protect him from harm and likely retaliation. PSOF 192-194, 200. Indeed, he ignored Mullins's own desperate request to be moved out of general population to a single cell in protective custody or restrictive housing. PSOF 73, 79. A jury could find liability. ECF 160-36 at 63-64.

Ragsdale's argument for summary judgment on the breach element does not cite to any statement of facts, and relies solely on disputed evidence. First, Ragsdale argues that he did not know about the sexual nature of the attack on Mullins. ECF 249 at 44-45. This fact is hotly disputed, as Mr. Mullins's reports in his own words are clear as to the sexual assault. PSOF 68-79. Regardless, Ragsdale had a responsibility to ensure that Mullins was not exposed to a risk by someone who had just assaulted him, whether or not the assault was sexual in nature (PSOF 38, 80, 99), as well as to search

for the knife, investigate Jackson, and place Jackson into restrictive housing. E.g., PSOF 81, 83, 108-112. Ragsdale also argues that he would not have been the ultimate decisionmaker about where to house Mullins following the assault, and that he complied with PREA by placing Mullins in P block. ECF 248 at 45. But, again, both facts are disputed (PSOF 81, 82, 86, 200), as is Ragsdale's overall negligence. Plaintiff has shown that a jury must decide this claim.

Ragsdale further argues that he did not breach his duty to Mullins because, he contends based on disputed evidence, he discharged his duties as backup PREA Coordinator by helping Gordy to bring SCCF in compliance with the issues identified by PREA auditors. ECF 248 at 44. But the evidence cited by Defendant Ragsdale does not support that he took any action to bring the facility into compliance. ECF 160-76 at 5-6. Moreover, Ragsdale himself testified that he never took any actions as backup PREA coordinator besides helping Gordy set up the audit over a two-week period and to occasionally take prisoners to an outside clinic if they had been sexually assaulted and Gordy was not available to take them. ECF 361 at 12:15-19, 13:15-15:18. He never took any steps to assist Gordy with the implementation of PREA at St. Clair. ECF 361 at 17:9-18:1. Moreover, Plaintiff disputes that any compliance achieved with PREA requirements was temporary and short-lived, as uncontrolled movement and failure to separate vulnerable and predatory prisoners remained the norm at St. Clair through Mullins's death.  PSOF 171-177, 183-185, 196-200. Ragsdale fails to make any argument that he carried out his responsibilities as lieutenant and

shift commander to enforce security policies at St. Clair, and therefore any argument
has been waived. *See supra.*

A jury could conclude that, had Ragsdale investigated Mullins's February 25
assault and conducted a search for the knife, and placed Jackson in restrictive housing,
as required, Mullins would not have been murdered by Jackson the following day.
PSOF 100, 119. A jury could similarly conclude that, had Ragsdale enforced basic
security policies, including those related to contraband and uncontrolled movement,
Jackson would not have assaulted and murdered Mullins. Indeed, had Ragsdale
enforced controlled movement, Mullins would not have been pushed out of his
assigned cell and never would have been living with Jackson. PSOF 56-58.

Ragsdale invokes state agent immunity. ECF 248 at 32. Yet he makes only a
conclusory argument that "he exercised his discretionary judgment and authority in
operating as SCCF's lieutenant and supervising its inmates and his staff" and fails to
cite to competent evidence, citing only to a single allegation from Plaintiff's complaint
(ECF 40 ¶31). *See supra* 99-100, 106-07; 2024 WL 4281018, at *5. Moreover, that
allegation does not speak to whether Ragsdale exercised discretion or, rather, as
Plaintiff shows, carried out functions that were subject to "hard and fast rule." ECF
248 at 31. Indeed, Plaintiff has shown that Ragsdale repeatedly flouted his
responsibilities and violated policy as shift supervisor at St. Clair. Regardless, Plaintiff
presents evidence of knowing misconduct with respect to Mr. Mullins that raises an
inference (*Thompson*, 65 F.4th at 1297) of callous, willful, bad faith conduct, defeating

the defense. *See also Reeves*, 530 U.S. at 150.

## XIV. Ragsdale is not entitled to summary judgment on Count VI.

Plaintiff also presents a triable retaliation claim against Defendant Ragsdale in Count VI pursuant to the standards above, *supra* at 99-100, when evidence and inferences are taken in his favor, as required, *supra* at *id.* A jury will need to assess this claim.

Plaintiff's evidence supports allegations that this Court already clarified suffice, if supported, and Ragsdale's challenge therefore fails. ECF 84 at 56. Plaintiff alleges that St. Clair (and in particular, the P/Q blocks) had horrific levels of violence, including sexual violence, of which Givens was aware. PSOF 123-39. Ragsdale was also aware of the substantial risk of retaliation facing victims who reported violence at St. Clair (PSOF 191-94 & ECF 361 at 62:25-63:5); that the failure to separate likely victims from predators leads to foreseeable violence (PSOF *id.*); and that St. Clair was unsafe and unsecured, with excessive contraband weapons (142-170), unauthorized movement (PSOF 171-91), and widespread policy noncompliance (210-23), despite physical plant deficiencies that exacerbated the resulting risk to prisoners (e.g., PSOF 224-32).

Nonetheless, it was the practice at St. Clair, perpetuated by supervisors including Ragsdale (lieutenant, shift commander and back-up PREA compliance manager), to discourage victims from reporting assaults and sexual abuse and to retaliate against victims who reported assaults by failing to house them safely and

exposing them to retaliation from their assailants, despite a knowledge of the consequence of failing to separate them. PSOF 191-210. Consistent with this practice, and despite knowing of Jackon's violent history (which included retaliation) (PSOF 60), Ragsdale responded to Mullins's report of sexual assault and request to be removed from general population by failing to confiscate Jackson's knife, failing to segregate Jackson, and simultaneously continuing to house Mullins in general population, where he was accessible to Jackson and subject to foreseeable abuse due to the lack of supervision, uncontrolled movement, and other dangerous conditions. *See supra* at 165-67. Ragsdale did so even though she knew of Mullin's vulnerability and Jackson's dangerousness and history of in-custody violence (PSOF 60). Ragsdale took no action to confiscate Jackson's knife, discipline him for the misconduct, or segregate him from Mr. Mullins, or to recommend that Mullins be placed in restrictive housing or the SSU as required. *See supra* at 166-67. Even after Mr. Mullins reported the abuse to the PREA hotline, he was kept in general population, where he remained easily accessible to Jackson because of St. Clair's uncontrolled movement in general population (PSOF 171-91, 119) and widespread lack of compliance with security policies (PSOF 210-23). Ragsdale left Jackson in general population where he had access to Mr. Mullins, even though Mullins had reported that Jackson had a knife, and even though Ragsdale could have instead confiscated his weapons and placed Jackson in segregation to keep him from assaulting Mr. Mullins. *See supra* at 166-67. This evidence gives rise to an inference that Ragsdale purposefully left Jackson in general

population alongside Mullins, where Ragsdale knew the armed and dangerous Jackson continued to pose a substantial risk of serious harm to the vulnerable Mullins, thereby subjecting Mr. Mullins to exposure to his enemies to retaliate against him for reporting his assault. A jury could find his conduct to have been retaliatory.

Ragsdale's argument that Plaintiff has not shown unconstitutional retaliation is based on fundamental disputes of fact and a failure to take the evidence in Plaintiff's favor. ECF 248 at 34-35. Ragsdale relies on his own self-serving testimony and reports to argue that Mullins did not identify his attacker when reporting his assault to Ragsdale. *Id.*at 41. But the records and Mullins's other contemporaneous reports provide ample evidence that Mullins identified his attacker repeatedly as his cellmate C.J., that ADOC's own records identified C.J.as Jackson, and that Mullins was begging for help. PSOF 68-86. Regardless, Ragsdale had an obligation to safely house Mullins after the reported assault, but he instead left Mullins in general population where Ragsdale knew he was exposed to his armed attacker. *See supra* 166-67. This claim must be heard by a jury.

Similarly, Ragsdale fails to meet his initial burden to raise the affirmative defense of qualified immunity (*supra* at 103-05), despite the Court's order. ECF 96 at 2. Ragsdale offers an undeveloped argument primarily relying on Plaintiff's allegations, which do not suffice at the summary judgment stage, and which do not even address the conduct Plaintiff alleged Ragsdale to have engaged in: keeping Mr. Mullins in general population where he was subject to retaliation from the sexual assault

perpetrator Mullins had reported and failing to segregate or search Jackson. *See supra*
166-67, 170-71; ECF 248 at 40, 42; *Kumar*, 2024 WL 4281018, at *5. Ragsdale's
argument fails to demonstrate with sufficient specificity, authority, and pin cites to the
evidentiary record, "what his job-related function was or how his actions were within
the scope of his authority." *Boykins*, 696 F. Supp. 3d at 1079-80; *Est. of Cummings*, 906
F.3d at 939. To the extent that Givens attempts to resuscitate this argument in reply, it
has been forfeited. *Boykins*, 696 F. Supp. 3d at 1079.

On the merits, it has also long been clearly established that prison staff cannot
retaliate against prisoners for raising grievances regarding their conditions of
confinement, and any argument for qualified immunity fails here. *See supra* 159-60.

## XV.     Culliver is not entitled to summary judgment on Count IX.

A jury must also decide Mr. Mullins's wrongful death claim in Count IX against
Defendant Culliver. Culliver challenges this claim on only a single element–causation.
ECF 166 at 55. Culliver does not challenge duty, breach, or damages, nor does he
make any argument for immunity. As such, these arguments have been waived and
cannot be raised in reply. *See supra* 109, 117-18. Moreover, Culliver's argument as to
causation is conclusory and does not cite to or discuss any evidence in the record nor
does Culliver provide any authority for his position that Plaintiff cannot prove
causation. This, too, is insufficient to satisfy Culliver's initial burden at summary
judgment on the issue, and it has therefore been waived. *See supra* 99-100, 109, 117-18.

Regardless, Plaintiff has shown that, on the merits, this claim must go to a jury.

Plaintiff shows that Culliver, who was the Associate Commissioner for Operations from 2014 until he retired on November 20, 2018, under threat of discipline for misconduct. PSOF 8, ADOC DSOF 5. Culliver reported directly to Dunn, and Culliver had responsibility for overseeing day-to-day operations at St. Clair and supervising St. Clair leadership, including Jones. PSOF 8-9. Culliver was also responsible for ensuring that staff at St. Clair were complying with policy related to security operations including, specifically, policy related to contraband searches. PSOF 9, 154. He also was responsible for directly supervising Ellington as Institutional Coordinator over St. Clair. PSOF 9. As Associate Commissioner, Culliver had a duty of care to prisoners at St. Clair, by virtue of his position of authority and responsibilities for addressing violence and safety risks at St. Clair. PSOF 8.

Due to his position, Culliver was well aware of the significant security issues that pervaded St. Clair, including the high levels of serious violence (PSOF 123-41), the pervasive contraband (142-55), and the uncontrolled movement (171-78, 186), particularly involving in the P/Q blocks (135-59). Despite this, when Ellington began work as Institutional Coordinator in charge of St. Clair in 2017, Culliver did not provide Ellington with any guidance or instruction about addressing violence, contraband weapons, or uncontrolled movement at St. Clair. PSOF 286. Culliver took no meaningful steps to ensure that St. Clair was complying with policy relating to movement control and contraband weapons. Culliver did not know what steps Jones and Ellington were taking to address the problems (if any), and he did not take any

steps to hold them accountable for the widespread policy noncompliance at St. Clair. PSOF 115, 186, 211-213. Indeed, Jones was never disciplined until Charles Daniels took over as Associate Commissioner for Operations and, after Mullins's death, issued a directive to control movement at St. Clair that Jones did not implement. PSOF 168-170, 269(b)-(e). Daniels initiated a number of directives to control contraband, movement and violence at St. Clair that Culliver could have—but did not-–implement at any time during his tenure. PSOF 269.

Given Culliver's knowledge of the conditions at St. Clair, his own inaction, and the clear inaction of his subordinates, there can be no doubt that Culliver knew he was failing to carry out his duty to protect prisoners like Mullins in ADOC custody and care, and that he was exposing them to a substantial risk of serious harm.

There is also sufficient evidence to establish causation. Culliver spent four years as Associate Commissioner for Operations, allowing a culture of indifference and violence to become deeply embedded in the institution. PSOF 210-214, 233-286, 123-39. Moreover, when Daniels took over the position in early 2019, he immediately began taking action to address contraband and movement and to reduce violence at St. Clair, something that could have been done earlier under Culliver but was not. ECF 259b. Had Culliver taken action earlier, these policies could have been implemented before Mullins was killed. *Id.* The fact that Culliver retired three months before Mullins was killed does not, as a matter of law, show that Culliver's total inaction in the face of widespread violence and noncompliance with policy did not

foreseeably result in Mullins's death. Culliver's failure to provide any authority or discussion of the record to support a position to the contrary must be rejected. *Supra* 99-100, 109, 117-18

## XVI. Gordy is not entitled to summary judgment on Counts IX and X.

Defendant Gordy does not carry her initial burden to demonstrate an absence of genuine issue of material fact as to Plaintiff's wrongful death claim against her in Counts IX and X, which Plaintiff discusses as a single claim, with all of the evidence supporting liability considered together, pursuant to this Court's prior analysis. *See supra* at 106.

Gordy does not challenge any element apart from breach, conceding the other elements. ECF 248 at 58. Plaintiff's evidence further establishes a jury question as to whether Gordy breached her duty of care to prisoners such as Mr. Mullins in a way that was a cause of Mr. Mullins's death.

As Institutional PREA Compliance Manager, Gordy was responsible for ensuring that prisoners involved in a PREA incident at St. Clair were separated in compliance with facility policy, monitoring compliance with PREA at St. Clair on a day-to-day basis, and ensuring that PREA was being properly implemented at the facility. PSOF 26-28, 258-60.

A jury could find that Gordy knew of the horrific violence (PSOF 123-39), particularly that emanating from prisoners in the poorly supervised P/Q blocks (PSOF 135-39), and underlying conditions at St. Clair: dangerous levels of contraband

(PSOF 142-70); widespread unauthorized movement in general population (PSOF 171-90); and a widespread practice at St. Clair of lack of enforcement of written security policies (PSOF 210-223), all exacerbated by physical plant deficiencies, including for dangerous predators housed in the P/Q blocks, such as broken locks, nonfunctional security cameras, and blind spots (PSOF 224-32). Gordy further knew of the importance of segregating predatory prisoners from vulnerable ones, particularly reporting victims at risk of retaliation (PSOF 191-95, 99-104, 200); that St. Clair's written policies required meaningful separation between reporting victims of sexual assault and their alleged assailants, including contraband weapons searches of the alleged assailants and placement of them in restrictive housing pending investigation (PSOF 191-95); and that, in practice, PREA predators and other known dangerous prisoners were often kept in general population, in the unsupervised P/Q blocks, without regard to the risk they posed to vulnerable inmates (PSOF 197-99); and due to uncontrolled movement, prisoners in general population, even if in separate housing units, were not meaningfully separated from one another (PSOF 198, 99-104, 200). A jury could find that Gordy also knew these dangerous conditions would lead to further violence (e.g., PSOF 150-52, 177-78, 191-93, 210-11, 233, 241-47, 123-39), and yet took no action in the face of a widespread practice at St. Clair of failing to safely house and monitor violent prisoners with histories of institutional violence, particularly in the P/Q blocks, and to segregate them from vulnerable prisoners (PSOF 191-209), over which Gordy had direct responsibility as the

Institutional PREA Compliance Manager. Plaintiff's evidence shows that Gordy disregarded and turned a blind eye to the known risk of harm to vulnerable prisoners at St. Clair such as Mr. Mullins who were in need of PREA protections, failing to take action to ameliorate the resulting risk. PSOF 233, 191-209, 258-60.

On top of that, a jury could find that Gordy was negligent in failing to safely segregate and house Jackson, and failing to safely protect and house Mullins. After learning of Mr. Mullins's detailed report of sexual assault at knifepoint, as well as his documented injuries (PSOF 68-98), and determining that his assailant was Clarence Jackson (PSOF 91-92), policy required Gordy to ensure an investigation of the incident, a search for the knife, and separation of Mullins from Jackson, including by placing Mullins in the SSU and placing Jackson in restrictive housing (PSOF 38, 71, 75, 80-83, 99-105, 108-112, 117-18, 192, 195). This was all the more because Gordy had notice of Jackson's identity, and he was known to staff (and documented) as a violent PREA predator with a history of in-custody assaults, sexual assault, and retaliation (PSOF 60, 66). Yet Gordy did not ensure any of these things; she merely moved Mullins within general population (*id.*), even though she knew that leaving Mullins in general population with his assailant (who was known to be violent and retaliatory (PSOF 60) and had not been searched for the knife reported to be in his possession), was insufficient to separate Mullins and protect him from harm and likely retaliation. PSOF 192-194, 200. Indeed, Gordy ignored Mullins's own desperate request to be moved out of general population to a single cell in protective custody.

PSOF 73, 79. In short, Gordy had the means *and responsibility* to improve safety and prevent the risk posed to Mullins, and by Jackson; knew her actions were insufficient; and still failed to take further or different action available to her to protect Mullins and others at St. Clair, PSOF 26-28, 191, 209. This was the case even though Gordy knew of the dangerousness of St. Clair and the likelihood that her inaction would lead to violence and serious injury. *See supra* 176-77. A jury could easily find that her failure to segregate prisoners such as Mullins from Jackson was negligent and breached her duty to prisoners such as Mr. Mullins, causing Mr. Mullins's death as a foreseeable result.

Contrary to the suggestion in Gordy's motion, she had full notice and knowledge of the severity of the conduct—sexual assault—reported by Mr. Mullins (PSOF 73-75, 90-95) and also notice of the dangerousness and PREA predator status of Jackson (PSOF 66). A jury could easily find that Defendant Gordy was in a position to influence Jones's decision to keep Mr. Mullins in general population even though the policy required restrictive housing or the SSU (the evidence reflects that she did not try, PSOF 85, 105); and/or to seek to move Mr. Jackson and ensure a search for the knife reported on his person by Mullins, as required by policy (PSOF 109, 110).

Gordy cannot escape a trial on her negligent, injurious conduct by pointing to acts she carried out that not only violated St. Clair policy, but also were obviously negligent. For example, a jury could find breach notwithstanding that Gordy moved

Mr. Mullins to a different cell within general population, given that he pleaded for removal from general population, the written policy required the same, and she knew that unauthorized movement would render ineffective any effort to separate Mullins and Jackson simply by moving him to a different cell within general population, and she knew of the risk of retaliation posed to Mr. Mullins, both generally and specifically as it related to Mr. Jackson, who had a history of violence and retaliation (PSOF 66, 81, 99, 171-173, 200 ). Gordy's conduct in characterizing the report as one of mere sexual harassment rather than sexual assault, prevented an immediate investigation from commencing and deprived Mr. Mullins of the benefit of a more urgent, serious investigation by I&I as opposed to Defendant White, who Gordy assigned to the investigation even though he was not qualified to conduct sexual assault investigations. PSOF 75; ECF 356 at 84:15-25.

A jury could find that Gordy knew the full extent of Mr. Mullins's reports regarding sexual assault by the armed Jackson, based on his oral reports, his PREA call, and his written statement (PSOF 73-75, 90-95); that she knew of Jackson's well-known disciplinary history and PREA predator designation (PSOF 66); that she knew that Mullins pleaded that he was "in fear for [my] life in population at St. Clair" and asked "to be placed in seg for my own safety, PC if possible but I cannot live in St. Clair population….I need some help badly…I don't know what to do" (PSOF 73); that she knew of the dangerous underlying conditions at St. Clair such as sky-high violence (particularly that emanating from inmates such as Jackson that were housed

in the P/Q blocks); unchecked contraband weapons; widespread unauthorized movement; and noncompliance with security rules. *See supra* at 176-77.

Gordy argues that there is no evidence that she failed to reasonably carry out her duties as IPCM; but to do so, she ignores the evidence discussed above and the complete failure to implement the critical separation requirements at St. Clair. PSOF 200. The only evidence she cites in support is that she made some effort to help rectify PREA deficiencies at St. Clair. But any efforts to rectify PREA deficiencies were performative and short-lived. Uncontrolled movement and widespread failure to enforce policy at St. Clair remained the norm, and put prisoners like Mullins at high risk of sexual violence and retaliation. PSOF 255-257 (issues identified during PREA audits); PSOF 171-177, 191-194, 200, 210-214.

Gordy invokes state agent immunity. ECF 248 at 57-58. Yet again, she fails to make the initial showing through competent evidence. *Supra* at 99-100, 106-07; *see also* ECF 96 at 2. Gordy points only to a single allegation from Plaintiff's complaint (ECF 40 ¶30), but that allegation does not speak to whether Gordy exercised discretion, or rather, as Plaintiff shows, carried out functions that were subject to "hard and fast rule." ECF 248 at 31 (citing *Fleming v. Dowdell*, 434 F. Supp. 2d 1138, 1164 (M.D. Ala. 2005)). Moreover, reliance on an allegation is impermissible at the summary judgment stage on an issue for which Gordy carries the initial burden of proof. *See supra* at 106-07; *Kumar*, 2024 WL 4281018, at *5. Indeed, Plaintiff presents evidence that Gordy's core conduct here was subject to hard and fast rule that she violated, not discretionary

conduct. E.g. PSOF 75, 81, 109, 195 (Gordy misclassified and misrepresented Mullins's report as sexual harassment rather than sexual assault; Gordy declined to place Jackson in restrictive housing as required by hard-and-fast policy).

Immunity exceptions apply as well. Plaintiff presents evidence from which a jury could infer bad faith, willful, malicious misconduct, given Gordy's failure to protect Mullins and those similarly situated while he pleaded to be removed from general population and protected (PSOF 68-74), and she knew that prisoners were dying at high rates at St. Clair (PSOF 123-39). In addition, although this Court dismissed Plaintiff's Eighth Amendment claim against Gordy at the pleading stage based on the allegations that were available to Plaintiff to make without access to evidence as well as based on a qualified immunity defense, those rulings do not foreclose a state law immunity exception if, based on the evidence available at summary judgment, a jury could find that Gordy acted unconstitutionally. That is the case here: Plaintiff's evidence above amounts to criminally reckless apathy and inaction in the face of an objectively serious deprivation. Plaintiff thus presents evidence that Gordy's role put her in a position of authority and responsibility for addressing the critical need to safely house vulnerable prisoners and to address the risk posed by known PREA predators with histories of institutional violence that were nonetheless permitted to roam without authorization in the general population housing blocks at St. Clair. Gordy turned a blind eye even though she had the means, authority, and responsibility as IPCM to take action, and thus a jury must decide this

claim.

## XVII. Malone is not entitled to summary judgment on Count IX.

A jury must decide Plaintiff's wrongful death claim in Count IX against Malone. *See supra* at 105-06 (setting forth the law on this claim). Malone challenges only breach, conceding the other elements of the claim. ECF 248 at 46-47. Yet Plaintiff's evidence establishes a jury question as to whether Malone breached his duty of care to prisoners such as Mr. Mullins in a way that was a cause of Mr. Mullins's death and is thus liable for wrongful death.

Specifically, Defendant Malone was the captain over restrictive housing at St. Clair, who chaired the Institutional Classification Board ("ICB") at St. Clair. PSOF 16-18. Malone was in charge of making determinations about SSU placements and also made housing decisions and assignments for prisoners. PSOF 16, 18. When making classification-related decisions, members of the ICB had electronic access to, and reviewed, an inmate's classification records, disciplinary records, and incident reports. PSOF 19, 126(h). Yet, despite Malone's responsibilities as a supervisor, including over restrictive housing and inmate classification and housing decisions, Malone perpetuated policies and practices of failing to separate predators from vulnerable inmates (PSOF 191-209); failing to discipline inmates and subordinates to address the widespread culture of noncompliance with security policy at St. Clair (PSOF 210-14); and failing to take action to root out unauthorized movement and contraband at St. Clair by disciplining inmates (PSOF 171-76, 183-85, 142-51).

Malone's conduct with regard to Mullins and his assailant, Clarence Jackson, further constituted (and reflected his overall) negligence and breach of duty. ECF 160-36 at 63-64. Defendant Malone knowingly housing Mullins in the "2 side" of the dangerous Q block, which was reserved for prisoners designated as predators, and declined to put Mr. Mullins in the Special Safety Unit, when Malone knew that Mullins required an SSU placement due to heightened security needs, vulnerability, and an inability to safely reside in general population at St. Clair. PSOF 43-49 & 53-55, 19. Defendant Malone failed to put Mr. Mullins in the SSU even after Mullins had been flagged twice by Equal Justice Works as being a vulnerable inmate who required placement there. PSOF 43-44. In doing so, Malone reviewed and had access to Mullins's classification and disciplinary records, and was aware of his prior victimization and vulnerability. PSOF 19, 126(h).

Malone now claims that Mullins was not approved for placement in the SSU, but he has directly admitted otherwise, as have other Defendants (PSOF 43-44), and at the minimum, a fact dispute exists regarding this issue for trial. The jury need not believe Malone's own self-serving deposition testimony–which he does not even claim as undisputed, contrary to the standard at summary judgment (*supra* at 99-100)—that Mullins failed to qualify for an SSU placement because his enemies at the time were unknown. PSOF 43-44. Malone's own email and admissions are directly to the contrary. PSOF 43-44. Rather, despite having responsibility to put Mullins in the SSU, and knowledge of Mullins's acute need for the SSU due to heightened security

interests, vulnerability, and inability to live in general population (PSOF 34-49, 62, 64), Malone did not place Mullins in the SSU or in an alternative safe placement (PSOF 45-49, 100-104, 200): rather, he shockingly chose to house Mullins in the dangerous Q block (PSOF 123-39), on the "2 side" of Q block reserved specifically for predators (PSOF 54-55).

At the time Malone put Mullins in the "2 side" of the Q block, Malone was aware that he had chosen to house extraordinarily dangerous PREA predators in that same block. PSOF 54-55, 191-209. For example, Malone had chosen to house Mr. Mullins's assailant, Clarence Jackson, in general population in the Q blocks, even though Malone had assessed Jackson as a PREA predator and was aware of Jackson's prior history of in-custody violence, use of weapons, and retaliation against other reporting victims. PSOF 60-67, 19, 126(h).

A jury could also find that Malone then received incident reports about Mr. Mullins's reports about Jackson on February 25 and 26 (PSOF 77, 95-97, 19, 126(h)); he was notified that Mullins was being kept in general population following Mullins's reports of escalating abuse and sexual assault and knifepoint by Jackson (PSOF 107); and he received notice of an urgent request by Mullins's mom that Mullins feared for his life and should not be in general population, but Malone took no action whatsoever to protect Mullins (PSOF 114-16). Malone engaged in this conduct despite his knowledge of the dangerous conditions at St. Clair (PSOF 233), at which contraband weapons were widespread (PSOF 142-70); there was widespread,

unchecked practice of unauthorized movement throughout general population (PSOF 171-90); violent prisoners with histories of institutional violence were housed alongside vulnerable prisoners in general population without meaningful separation (PSOF 191-209); and there was a culture of noncompliance with, and nonenforcement of, St. Clair's written security policies (PSOF 210-223); all exacerbated by physical plant deficiencies, including in the P/Q blocks, such as broken locks, nonfunctional security cameras, and blind spots (PSOF 224-32). Malone knew that prisoners were dying and suffering serious assaults at St. Clair, particularly emanating from the dangerous and unsupervised conditions in the Q block (PSOF 123-39), and he took no action to protect Mr. Mullins.

Contrary to Malone's argument, the release Defendants forced Mullins to sign to leave restrictive housing in early February 2019 after he had become suicidal under the extreme restrictive conditions there (having been deprived of an SSU placement by Mullins) (PSOF 50-53), did not relieve Malone of any responsibility to house Mullins in the SSU, house Jackson in a safe and monitored space, and respond to the incident reports and Mullins's mother's plea for help about the threat Malone faced, including of retaliation, from Jackson. At a minimum, this presents a fact dispute for resolution by the jury.  A jury could find that Malone disregarded and turned a blind eye to the known risk of harm to vulnerable prisoners such as Mr. Mullins at St. Clair who were in need of protection from PREA predators such as Jackson, failing to take action to ameliorate the resulting risk, and that his actions facilitated Mr. Jackson's

attack on Mr. Mullins. It was foreseeable and known to Malone that, without action on his part to meaningfully separate Mullins and Jackson and ameliorate the dangerous conditions described above, those conditions would continue and prisoners such as Mr. Mullins would continue to be stabbed to death.

Malone also invokes state agent immunity. ECF 248 at 54-55. Yet again, he fails to make the initial required showing through competent evidence. *Supra* at 106-07; *see also* ECF 96 at 2. Malone points only to a single allegation from Plaintiff's complaint (ECF 40 ¶26), but that allegation does not speak to whether Malone exercised discretion, or rather, as Plaintiff shows, carried out functions that were subject to "hard and fast rule." ECF 248 at 31 (citing *Fleming*, 434 F. Supp. 2d at 1164). Moreover, reliance on an allegation is impermissible at the summary judgment stage on an issue for which Malone carries the initial burden of proof. *See Kumar*, 2024 WL 4281018, at *5 ("Unsworn pleadings are not . . . competent summary judgment evidence") (citing *Dorsett*, 940 F.2d at 124). Indeed, Plaintiff presents evidence that Malone's core conduct here was subject to hard and fast rule that he violated, not discretionary conduct. For example, Malone failed to place Mullins in the SSU after approval, as required, PSOF 43-49 & 53-55, 19, and he makes no showing that this decision involved any discretion on his part.

Immunity exceptions apply as well. Plaintiff presents evidence from which a jury could infer bad faith, willful, malicious misconduct, given Malone's refusal to protect Mullins after notice of the reports of Mullins and his mother about Jackson

and Mullins's lack of safety in general population, while simultaneously knowing about Jackson's history and placement in the poorly-monitored Q blocks, which offered no meaningful separation of predators from reporting victims, given the uncontrolled movement and lack of supervision there, as Malones knew that prisoners were suffering serious assaults and even dying at astronomical rates at St. Clair. In addition, although this Court dismissed Plaintiff's Eighth Amendment claim against Malone at the pleading stage based on the allegations that were available to Plaintiff to make without access to evidence as well as based on a qualified immunity defense, those rulings do not foreclose a state law immunity exception if, based on the evidence available at summary judgment, a jury could find that Malone acted unconstitutionally. That is the case here: Plaintiff's evidence above amounts to criminally reckless apathy and inaction in the face of an objectively serious deprivation.  Plaintiff thus presents evidence that Malone's role over segregation and housing/classification decisions, and as a captain, put him in a position of authority and responsibility for addressing the extremely dangerous conditions at St. Clair for reporting victims; and for addressing the risk posed by known PREA predators with histories of institutional violence that were nonetheless permitted to roam without authorization in the general population housing blocks at St. Clair; but Malone turned a blind eye even though she had the means, authority, and responsibility to take action. A jury must decide this claim.

## XVIII. Price is not entitled to summary judgment on Counts XI and X.

Defendant Price does not carry his initial burden to demonstrate an absence of genuine issue of material fact as to Plaintiff's wrongful death claim. *See supra* at 99-100. Rather, a jury must decide Plaintiff's wrongful death claim against Price. Plaintiff stated two bases for wrongful death claims against Price: one turns on Price's policies, practices and customs as a supervisor (Count IX), and the other on Price's direct participation in the events involving Mullins and Jackson that gave rise to Mullins's death (Count X), but the claim is a single claim and all of the evidence supporting liability considered together. *See supra* at 106.

As an initial matter, Price does not challenge that he had a duty to safely house Mr. Mullins under Alabama law, waiving the argument. *Supra* at 109, 177-18. Regardless, Plaintiff shows that Price, who was a lieutenant and shift commander at St. Clair (PSOF 29-32), had a duty of care to prisoners in his custody, by virtue of his position of authority and responsibilities over Mr. Mullins and Jackson, and for further addressing violence and safety risks at St. Clair in the general population housing blocks. PSOF 29-32.

As to negligence/breach, Plaintiff's evidence creates (at minimum) a dispute of fact as to whether Price acted negligently (and thereby breached his duty) by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Mullins at St. Clair (*supra* at 105-06).

As lieutenant and shift commander, Price was responsible for supervising

officers on his shift; setting the shift roster and assigning officers to posts; requesting more staff as needed; ensuring that searches, shakedowns, and cell inspections were happening as required by policy, conducting inmate interviews following altercations to investigate what happened; ensuring that staff controlled inmate movement; and completing and reviewing incident and duty reports. PSOF 29-32, 174.

Price knew, as lieutenant and shift commander, that contraband was ubiquitous at St. Clair and that staff were not carrying out shakedowns and searches as required by policy; he also knew that searches were critical to reducing serious violence and injury at the facility. PSOF 142-151, 166-67. Despite this, Price did not take steps to ensure contraband searches were carried out as required. PSOF 146-147, 166-67. Similarly, Price knew that prisoners were moving freely throughout the facility in 2018 and early 2019, and that the wristband policy was not being enforced. PSOF 171-176. Price understood the importance of controlling inmate movement to reduce violence and protect vulnerable prisoners like Mullins. PSOF 177. But he did not enforce controlled movement policies on his shift. PSOF 175-176. Additionally, Price was aware that there was a general failure to enforce basic security policies and procedures at St. Clair, yet he took no steps to change this. PSOF 210-213. This led to a dangerous and chaotic environment. PSOF 214.

On February 25, Price was on duty and had knowledge of the substance of Mullins's many reports that day about Jackson, as well as his visible injuries from Jackson, and participated in keeping Mullins in general population on that day and

was kept up to date on the movement (PSOF 68-98, 106-107, 31). Because Price

participated in moving Mullins within general population on February 25, a jury can

infer from that fact alone that Mullins reported the conduct to him, as he pleaded for

help and to be removed from general population, as reflected in Mullins's reports in

his own words on that date. PSOF 106, 68-98. Price confirms that Mullins specifically

told him after the stabbing on February 26th that his assailant was the same inmate

that "y'all had to move me away from the other day," reflecting Price's knowledge of

the February 25th incident between Mullins and Jackson. PSOF 120; ECF 352 at

76:13-24; ECF 165-54 184-1 at 7225. Price also recalled when he spoke to

investigators that Mullins and Jackson "had an [prior] altercation or something like

that dealing with some kina homosexual type a stuff.'" ECF 186-3 at 2.

      At the time, Price also knew that Jackson was particularly violent, and of

Jackson's history of in-custody violence (PSOF 60), and either reviewed or had access

to the underlying incident reports regarding Mullins's reports about Jackson (PSOF

31, 97, 68-98, 106-107), further putting him on notice of Mullins's need for protection

as a sexual assault victim suffering escalating abuse from Jackson, and as a reporting

victim at risk of retaliation. PSOF 60, 31.

      On February 26, Price was the shift commander on duty during the day shift,

and was at St. Clair from the morning through the time Mr. Mullins was stabbed there

in the early evening. ECF 248 at 16 n.7; ECF 165-68 at 2; PSOF 29. Due to Price's

role as shift commander, a jury could find that Price was kept up to date on

occurrences during the shift (PSOF 31). However, despite knowing that Mullins had been sexually assaulted by Jackson at knifepoint, he did not move or search Jackson. PSOF 109, 117.

As a shift commander, Price knew that, as an inmate reporting sexual assault, Mullins should have not been left in general population with his alleged assailant; he should have been taken to protective custody in the SSU, or at a minimum, to administrative restrictive housing. PSOF 99-104, 200. Price also knew of the risk of retaliation to reporting victims (PSOF 192-94), such as Mr. Mullins and that uncontrolled movement in general population impaired St. Clair's ability to separate potential PREA victims from potential aggressors (PSOF 103-104, 200). However, Price took no action to move Mullins out of general population to the SSU or other safe housing placement. PSOF 106-107. Price knew that keeping Mullins in general population, while his assailant remained in general population with him, was insufficient to separate Mullins and protect him from harm and likely retaliation. PSOF 192-194, 200. Indeed, he ignored Mullins's own desperate request to be moved out of general population to a single cell in protective custody. PSOF 73, 79.

Price also knew of the requirement that Jackson be searched by a supervisor for the knife Mullins had reported on his person, and also be placed in restrictive housing pending investigation, to alleviate a risk of violence. PSOF 111-112, 81; ECF 160-36 at 63-64. However, Price took no action on either date to search or move Jackson on either February 25 or February 26, prior to Jackson's fatal assault of Mr. Mullins.

PSOF 108-110, 117-18. Indeed, even though Price was shift commander with a responsibility to set schedules, request extra staff as needed, and had sufficient staffing resources to comply with St. Clair's contraband search policies (PSOF 31, 141), Price admits that no contraband searches were done of any prisoners on February 26. PSOF 117; Facility DSOF 16 n.7.

Price does not challenge causation as to either Count IX or X. Any causation argument has therefore been waived. *See supra* 109, 177-18. Regardless, a jury could easily conclude that, had Price followed policy to search for Jackson's knife and ensured that contraband searches were carried out on shifts he supervised, he would have recovered the knife used to assault Mullins. And had he placed Jackson in restrictive housing on February 25 and/or placed Mullins in the SSU or administrative restrictive housing, Mullins would not have been murdered by Jackson. A jury could similarly conclude that, had Price enforced basic security policies as a shift supervisor with responsibility over general population, including those related to contraband and uncontrolled movement, Jackson would not have assaulted and murdered Mullins with a knife after having entered the L block without authorization (PSOF 119-122). Indeed, had Price enforced controlled movement on his shifts, as well as bed assignments, Mullins would not have been pushed out of his assigned cell and never would have been living with Jackson in the first place (PSOF 56-58). Finally, Price does not challenge damages. There can be no dispute that Mullins suffered significant damages including loss of life. PSOF 121.

Price cannot escape trial based on disputed evidence, such as that he had insufficient staff to carry out contraband searches on February 26th, as Plaintiff's evidence is the contrary, indicating that shift supervisors were able to secure staff as needed to comply with St. Clair's contraband search policies. PSOF 158, 167.  Nor can Price escape liability merely because he says that Jones approved the decision to keep Mullins in general population on February 25th. Yet a jury could find negligence, as Price had knowledge of Jackson's dangerousness, and could have requested a different placement for Mullins; moreover, he could have (and should have) searched Jackson for a knife and moved Jackson into restrictive housing as required, as well as requiring contraband searches and prohibiting unauthorized movement on shifts he supervised.  ECF 160-36 at 63-64. A jury will have to assess whether the totality of his conduct was negligent.

Price invokes state agent immunity. ECF 248 at 48. Yet he makes only a conclusory argument that "he exercised his discretionary judgment and authority in operating as SCCF's lieutenant and supervising its inmates and his staff" and fails to cite to competent evidence, impermissibly citing only to Plaintiff's complaint allegations prior to discovery. *See supra* 106-07; *Kumar*, 2024 WL 4281018, at *5. Moreover, Plaintiff's allegations do not speak to whether Price exercised discretion or, rather, as Plaintiff shows, carried out functions that were subject to "hard and fast rule."  ECF 248 at 31. Indeed, Plaintiff has shown that Price repeatedly flouted his responsibilities and violated policy as a lieutenant and shift supervisor at St. Clair.

Regardless, Plaintiff presents evidence that raises an inference (*Thompson*, 65 F.4th at 1297) of callous, willful, bad faith conduct, defeating the defense, particularly when Price's conduct toward Mullins is assessed in light of his knowledge of the string of violent assaults and deaths taking place at St. Clair (PSOF 123-39). *See also Reeves*, 530 U.S. at 150 (court "disregard[s] all evidence favorable to the moving party that the jury is not required to believe"). Plaintiff's evidence also supports a finding that his conduct was unconstitutional, as discussed below, and thus that defense remains available to Plaintiff at trial as well to defeat immunity.

## XIX. Price is not entitled to summary judgment on Count VI.

Plaintiff also presents a triable retaliation claim against Defendant Price in Count VI pursuant to the standards above, *supra* at 107-08, when evidence and inferences are taken in his favor, as required, *supra* at 99-100. A jury will need to assess this claim.

Plaintiff's evidence supports allegations that this Court already clarified suffice, if supported, and Price's challenge thus fails. ECF 84 at 56. Plaintiff alleges that St. Clair had horrific levels of violence, including sexual violence, of which Price was aware. PSOF 123-39. Price was also aware of the substantial risk of retaliation facing victims who reported violence at St. Clair (PSOF 191-94); that the failure to separate likely victims from predators leads to foreseeable violence (PSOF *id.*); and that St. Clair was unsafe and unsecured, with excessive contraband weapons (142-170), unauthorized movement (PSOF 171-91), and widespread policy noncompliance (210-

23), despite physical plant deficiencies that exacerbated the resulting risk to prisoners (e.g., PSOF 224-32).

Nonetheless, it was the practice at St. Clair, perpetuated by supervisors including Lieutenant and Shift Commander Price, to discourage victims from reporting assaults and sexual abuse and to retaliate against victims who reported assaults by failing to house them safely and exposing them to retaliation from their assailants, despite a knowledge of the consequence of failing to separate them. PSOF 191-210. Consistent with this practice, and despite knowing of Jackon's violent history (which included retaliation) (PSOF 60), Price responded to Mullins's report of sexual assault and request to be removed from general population by failing to confiscate Jackson's knife, failing to segregate Jackson, and simultaneously continuing to house Mullins in general population, where he was accessible to Jackson and subject to foreseeable abuse due to the lack of supervision, uncontrolled movement, and other dangerous conditions. *See supra* at 190-92. Price did so even though he knew of Mullin's vulnerability and Jackson's dangerousness and history of in-custody violence (PSOF 60). Price took no action to confiscate Jackson's knife, discipline him for the misconduct, or segregate him from Mr. Mullins, or to recommend that Mullins be placed in restrictive housing or the SSU as required. *See supra* at 191-92. Even after Mr. Mullins reported the abuse to the PREA hotline, he was kept in general population, where he remained easily accessible to Jackson because of St. Clair's uncontrolled movement in general population (PSOF 171-91, 119) and widespread

lack of compliance with security policies (PSOF 210-23). Price left Jackson in general

population where he had access to Mr. Mullins, even though Mullins had reported

that Jackson had a knife, and even though Price could have instead confiscated his

weapons and placed Jackson in segregation to keep him from assaulting Mr. Mullins.

*See supra* at 190-93. This evidence gives rise to an inference that Price purposefully left

Jackson in general population alongside Mullins, where Price knew the armed and

dangerous Jackson continued to pose a substantial risk of serious harm to the

vulnerable Mullins, thereby subjecting Mr. Mullins to exposure to his enemies to

retaliate against him for reporting his assault. A jury could find his conduct to have

been retaliatory.

Nor does Price meet his initial burden to raise the affirmative defense of

qualified immunity (*supra* at 103-05), despite the Court's order. ECF 96 at 2. Price

offers an undeveloped argument primarily relying on Plaintiff's allegations, which do

not suffice at the summary judgment stage, and which do not even address the

conduct Plaintiff alleged Price to have engaged in: keeping Mr. Mullins in general

population where he was subject to retaliation from the sexual assault perpetrator

Mullins had reported and failing to segregate or search Jackson. *See supra* 106-07;

*Kumar*, 2024 WL 4281018, at *5. Price's argument fails to demonstrate with sufficient

specificity, authority, and pin cites to the evidentiary record, "what his job-related

function was or how his actions were within the scope of his authority." *Boykins*, 696

F. Supp. 3d at 1079-80; *Est. of Cummings*, 906 F.3d at 939. To the extent that Price

attempts to resuscitate this argument in reply, it has been forfeited. *Boykins*, 696 F. Supp. 3d at 1079.

On the merits, it has also long been clearly established that prison staff cannot retaliate against prisoners for raising grievances regarding their conditions of confinement, and any argument for qualified immunity fails here. *See supra* 159-60.

WHEREFORE, for the reasons set forth above, Plaintiff respectfully asks this Court to deny Defendants' motions for summary judgment so that he may proceed to trial.

Respectfully submitted,

BY: /s/ Megan Pierce
*One of Plaintiff's Attorneys*

BY: /s/ Anil Mujumdar
*Local Counsel*

*Ruth Z. Brown (pro hac vice)
Megan Pierce (pro hac vice)
Quinn Rallins (pro hac vice)
Attorneys for Plaintiff
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
Telephone: 312-243-5900
Fax: 312-243-5902
Email: ruth@loevy.com,
megan@loevy.com
rallins@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-L65M)
Dagney Johnson Law Group
2170 Highland Avenue, Suite 250

Birmingham, AL 35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com

**CERTIFICATE OF SERVICE**

I, Megan Pierce, an attorney, hereby certify that on March 10, 2025, I caused the foregoing to be filed using the Court's CM/ECF system, thereby effecting service on all counsel of record.

/s/ Megan Pierce
*One of Plaintiff's Attorneys*