FILED
2025 Jul-18  PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **LORI GUY WILLS, as administrator of the estate of Steven Mullins,[1]** | ] ] ] ] | |
| **Plaintiff,** | ] | **Case No.: 4:21-cv-264-ACA** |
| | ] | |
| **v.** | ] | |
| | ] | |
| **JEFFERSON DUNN, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

### MEMORANDUM OPINION

Steven Mullins reported sexual abuse by his cellmate, Clarence Jackson, while incarcerated at St. Clair Correctional Facility. The next day, Mr. Jackson stabbed Mr. Mullins to death. Plaintiff Lori Guy Wills, as administrator of the Estate of Mr. Mullins, brought various claims against individuals who served either as Alabama Department of Corrections ("ADOC") officials or St. Clair Correctional Facility supervisors and officers. (Doc. 40).

All defendants who remain move for summary judgment. (Docs. 158–59). At a hearing on the motions, the court denied the motions as to several of Ms. Wills's

---

[1] After Carol Guy, the mother of Steven Mullins, the administrator of his estate, and the named plaintiff in this case, passed away (doc. 103 at 1), the court substituted Plaintiff Lori Guy Wills, Mr. Mullins's sister and new administrator of Mr. Mullins's estate, as the named plaintiff in Ms. Guy's place (doc. 104).

claims but deferred ruling on Ms. Wills's retaliation claims against Defendants Gwendolyn Givens, William Ragsdale, and Antoine Price ("Count Six"). Thus, before the court is Warden Givens, Lt. Ragsdale, and Lt. Price's motion for summary judgment on Ms. Wills's retaliation claims. (Doc. 159).

## I.    BACKGROUND

In deciding a motion for summary judgment, the court is "required to view the evidence and all factual inferences therefrom in the light most favorable to [Ms. Wills], and to resolve all reasonable doubts about the facts in her favor." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1341 (11th Cir. 2022) (quotation marks omitted; alterations accepted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the non-movant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not even be what a jury at trial would, or will, determine to be the facts.").

Leading up to Mr. Mullins's death, St. Clair had the highest homicide rate out of all prisons in Alabama, and in the year before Mr. Mullins's death, four other prisoners were stabbed to death at St. Clair. (Doc. 274 at 1, 12 (ADOC's September 2018 Monthly Statistical Report showing that St. Clair had three homicides in 2018, whereas all other facilities had one or fewer); doc. 276 at 1, 5 (ADOC's December

2018 Monthly Statistical Report showing that St. Clair had a fourth homicide between September and December 2018); doc. 339-4 at 1 (February 2018 fatal stabbing of Travis Wilson); doc. 349-12 at 2–3 (September 2018 fatal stabbing of Terry Pettiway); doc. 295 at 1–2 (September 2018 fatal stabbing of Rogarius Bray); doc. 165-32 (December 2018 fatal stabbing of Terrence Andrews)). Throughout 2018 and early 2019, the levels of violence, contraband, and unauthorized movement in St. Clair's P and Q blocks were especially high (*see, e.g.*, doc. 306 at 6, 11), and St. Clair staff knew that serious action was necessary to address the resulting risks (*see id.*; *see also* doc. 165-19; doc. 292 at 18–20; *id.* at 44–45, 53–66).

Not only were inmates at St. Clair subjected to a high risk of violence, but they were also concerned about retaliation by prisoners that could result from reporting incidents of violence to staff. (Doc. 361 at 17). To address the risk of retaliation, policy required that when inmates reported violence, including sexual assault, staff had to separate the alleged victim and abuser. (Doc. 160-65 at 2, 4–5). But in 2018 and early 2019, St. Clair did not implement that policy; its practice was to assign inmates to cells based on bed space. (Doc. 292 at 5–8; doc. 160-2 at 42). Frequently, the only open beds were in the P and Q blocks (doc. 292 at 8), the most dangerous dorms in St. Clair.

Mr. Jackson was an inmate at St. Clair, and his history of violence toward other inmates required that he be placed in restrictive housing. (Doc. 186-4 at 1, 13;

doc. 160-17 at 29). But in September 2018, St. Clair staff moved Mr. Jackson from restrictive housing to general population because he had "done his time in [restrictive housing]" for three months with a clear disciplinary record. (Doc. 321 at 25). St. Clair placed Mr. Jackson in cell Q-27. (Doc. 165-58 at 1, 3).

In contradistinction to Mr. Jackson, who often perpetuated violence while incarcerated, Mr. Mullins was placed in restrictive housing after being assaulted by other inmates and deemed "[unable] to adapt to population." (Doc. 200-1 at 16–17; doc. 181-2 at 2). In restrictive housing, Mr. Mullins's mental health deteriorated (doc. 327 at 9, 12), so in February 2019, St. Clair staff released him to the Q block (doc. 165-56 at 2). Mr. Mullins went to his assigned cell, but because it was already occupied by two other inmates, he found an open bed in cell Q-27. (Doc. 266).

On the morning of February 25, 2019, Mr. Mullins told a corrections officer that an inmate assaulted him (doc. 220-2 at 1), and that officer alerted Lt. Ragsdale, the shift commander on duty (doc. 361 at 6, 15). The officer escorted Mr. Mullins to the infirmary (doc. 220-2 at 1), where Mr. Mullins told the nurse that his "cell partner" was the assailant (doc. 327 at 1–2). As shift commander, it was Lt. Ragsdale's responsibility to investigate the assault and separate Mr. Mullins from the assailant by placing him in protective custody or restrictive housing. (Doc. 356 at 21, 23–24; doc. 332 at 81).

But Lt. Ragsdale did not investigate the assault or remove Mr. Mullins from general population. (Doc. 220-2 at 2). Instead, he apparently reassigned Mr. Mullins to a cell in the P block (*id.*; doc. 165-56 at 2), and informed Warden Givens of the assault (doc. 266). Despite Mr. Mullins's reassignment to the P block, Warden Givens told Mr. Mullins to return to the *Q block* for a bed count. (Doc. 266). Warden Givens knew that it was inappropriate to send Mr. Mullins back to his cell after he reported the assault, and she should have protected Mr. Mullins from his assailant by placing him in protective custody or restrictive housing. (Doc. 363 at 54 ¶ 89; doc. 378 at 4–5 (not disputing ¶ 89)).

Less than an hour later, at 10:52 a.m., Mr. Mullins called the Prison Rape Elimination Act ("PREA") hotline, where he detailed that his "cell partner" in cell Q-27 sexually assaulted him in the early morning hours. (Doc. 160-18 at 4; doc. 266). He explained that he had nowhere to go, all of his property was in the shift office, and his life was in danger. (Doc. 266). He stated that he had asked St. Clair staff to remove him from general population and place him in segregation. (*Id.*).

At 3:30 p.m., a St. Clair official received an email with information about Mr. Mullins's hotline call, and after speaking with Mr. Mullins, she identified his assailant as Mr. Jackson in cell Q-27. (Doc. 171-2 at 1; doc. 277 at 1–3). Although Mr. Jackson was identified by the afternoon of February 25, 2019, St. Clair staff did

not remove Mr. Mullins or Mr. Jackson from general population. (Doc. 165-58 at 1, 3; doc. 165-56 at 2).

On February 26, 2019 at 5:45 p.m., Mr. Jackson stabbed Mr. Mullins to death. (Doc. 160-18 at 2, 6). As Mr. Mullins lay dying, he identified his assailant as Clarence Jackson (doc. 184-1 at 225; doc. 352 at 20–21), and the "C.J." who "y'all had to move [Mr. Mullins] away from the other day" (doc. 160-18 at 7). Lt. Price knew Mr. Mullins was referring to Mr. Jackson because Mr. Jackson had a propensity for violence, and Lt. Price was aware that Mr. Mullins had recently reported sexual assault. (Doc. 186-3 at 1–2).

Warden Givens and other St. Clair officials testified that they had no recollection of Mr. Jackson's stabbing of Mr. Mullins. (Doc. 345 at 17; *see also* doc. 363 at 65–66 ¶ 134; doc. 378 at 4–5 (not disputing ¶ 134)).

## II.    DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

In Count Six, Ms. Wills alleges that Warden Givens, Lt. Ragsdale, and Lt. Price retaliated against Mr. Mullins in violation of his First, Eighth, and Fourteenth Amendment rights for reporting the sexual assault by Mr. Jackson by purposefully leaving him in general population. (Doc. 40 ¶¶ 322–29). To prevail on her retaliation claim, Ms. Wills "must prove that: (1) [Mr. Mullins's] speech or act was constitutionally protected"; (2) the defendant[s'] retaliatory conduct adversely affected the protected speech; and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (quotation marks omitted).

Ms. Wills can establish a causal connection sufficient to withstand summary judgment by "show[ing] that the defendant[s] w[ere] subjectively motivated to discipline [Mr. Mullins] for exercising his First Amendment rights," *id.*, which requires evidence that the protected speech was a "motivating factor" for the adverse action, *Williams v. Radford*, 64 F.4th 1185, 1193 (11th Cir. 2023). After establishing the three elements of the retaliation claim, "the burden of production shifts to the defendant[s] . . . [to] show that [they] would have taken the same action in the absence of the protected activity." *Id.* at 1340–41.

Warden Givens, Lt. Ragsdale, and Lt. Price first argue that they are entitled to qualified immunity (doc. 248 at 33–37 (Givens); *id.* at 40–42 (Ragsdale); *id.* at 45–48 (Price)), but for the reasons given at the hearing, the court declines to find

that they have established that defense. Next, Warden Givens, Lt. Ragsdale, and Lt. Price argue that Ms. Wills's evidence is insufficient to sustain her prima facie burden. (Doc. 248 at 34–36 (Givens); *id.* at 41–42 (Ragsdale); *id.* at 46–47 (Price)). Here, the court agrees.

For purposes of their motion, Warden Givens, Lt. Ragsdale, and Lt. Price concede that Mr. Mullins's speech was constitutionally protected and do not address whether their allegedly retaliatory conduct would deter an ordinarily firm person from engaging in speech. (Doc. 248 at 26; *see generally id.*). They contend only that they are entitled to summary judgment because Ms. Wills failed to produce sufficient evidence from which a reasonable jury could find that Mr. Mullins's complaint was a motivating factor in their decision not to remove Mr. Mullins from the general population. (Doc. 248 at 34–36 (Givens); *id.* at 41–42 (Ragsdale); *id.* at 46–47 (Price)).

Viewed in the light most favorable to Ms. Wills, a reasonable jury could find that Warden Givens, Lt. Ragsdale, and Lt. Price failed to remove Mr. Mullins from general population knowing that Mr. Mullins faced possible retaliation from other prisoners for complaining to prison officials about the sexual abuse by Mr. Jackson. A reasonable jury could also find that despite Warden Givens's obligation to separate Mr. Mullins from his assailant, Warden Givens sent Mr. Mullins back to his cell for a bed count (doc. 363 at 165–66); that Lt. Ragsdale failed to investigate

the assault and merely moved Mr. Mullins to the P dorm instead of separating Mr. Mullins from his assailant (*id.* at 179–81); and that Lt. Price knew that Mr. Jackson was a predator yet "took no action to confiscate [his] knife, discipline him for the misconduct, . . . segregate him from Mr. Mullins, or . . . recommend that [Mr.] Mullins be placed in" protective custody or segregation. (Doc. 363 at 205).

But a reasonable factfinder could not infer from these circumstances that Mr. Mullins's complaint was a motivating factor in their decisions or actions. Ms. Wills notes that evidence of Warden Givens's, Lt. Ragsdale's, or Lt. Price's state of mind can be inferred from circumstantial evidence. (Doc. 363 at 117) (citations omitted); *see also Smith v. Mosely*, 532 F.3d 1270, 1278–89 (11th Cir. 2008) ("We assume without deciding that a reasonable fact finder could infer from the circumstances, taken as a whole, that the [protected speech] was a motivating factor in [the defendants'] decision to go forward with the charges."). But she does not provide circumstantial evidence upon which to draw that inference. Instead, Ms. Wills points out that the allegations of her complaint were sufficient to withstand a motion to dismiss. (Doc. 363 at 117).

Ms. Wills does not provide evidence to support the allegations in her complaint. There, she supported her allegations that these defendants "purposely left Mr. Mullins in the general population with his assailant, thereby subjecting him to exposure to his enemies to retaliate against him" with allegations of other ways in

9

which St. Clair officials retaliated against other prisoners for filing complaints. (Doc. 40 ¶ 325; *see, e.g.*, *id.* ¶ 321 (incorporating ¶ 255 (alleging that prisoners were placed in isolation cells for reporting sexual abuse) and ¶¶ 256–57 (alleging that St. Clair officials did not properly investigate complaints, emboldening perpetrators))). At summary judgment, there is no evidence of other attempts to retaliate or motivation for retaliation in general or against Mr. Mullins, specifically. Indeed, Ms. Wills's evidence establishes only that prisoners were afraid to report sexual assaults out of fear of retaliation *by other prisoners* (*see* doc. 363 at 80 ¶¶ 193–94; doc. 378 at 4–5 (not disputing ¶¶ 193–94)); that cell assignments were based entirely on available bed space (doc. 363 at 80–81 ¶ 196; doc. 378 at 4–5 (not disputing ¶ 196)); that restrictive housing did not have adequate housing available (doc. 363 at 81 ¶ 197; doc. 378 at 4–5 (not disputing ¶ 197)); and that because there was so much violence occurring at St. Clair, many officials, including Warden Given, did not remember the stabbing of Mr. Mullins (doc. 345 at 17; *see also* doc. 363 at 65–66 ¶ 134; doc. 378 at 4–5 (not disputing ¶ 134)).

Because Ms. Wills has failed to provide any evidence of a causal connection between Mr. Mullins's protected speech and the subsequent adverse action, the court's analysis ends before the burden shifts to Warden Givens, Lt. Ragsdale, and Lt. Price to "show that [they] would have taken the same action in the absence of the protected activity." *Moton*, 631 F.3d at 1341. Accordingly, the court **WILL**

**GRANT** Warden Givens, Lt. Ragsdale, and Lt. Price's motion as to Count Six and **WILL ENTER SUMMARY JUDGMENT** in their favor on the retaliation claims. (Doc. 159).

### III.    CONCLUSION

For the reasons set out above, the court **WILL GRANT** Warden Givens, Lt. Ragsdale, and Lt. Price's motion for summary judgment as to Count Six and **WILL ENTER SUMMARY JUDGMENT** in their favor on the retaliation claims. (Doc. 159).

**DONE** and **ORDERED** this July 18, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE